**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

JEFFREY WINICK

　　　　　　　　　Debtor.

Chapter 7
No. 20-11976 (PB)

UNITED STATES OF AMERICA,

　　　　　　　　　Plaintiff,

　　- against –

JEFFREY WINICK

　　　　　　　　　Defendant.

Adv. Proc. No. 20-1138 (PB)


### MEMORANDUM OF LAW IN SUPPORT OF
### THE UNITED STATES OF AMERICA'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2728
Fax: (212) 637-2717
E-mail: zachary.bannon@usdoj.gov


ZACHARY BANNON
Assistant United States Attorney
– Of Counsel –

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 2

    I.    Procedural Background.................................................................................................. 2

    II.    Tax Payment History ................................................................................................... 2

        A.  Mr. Winick's 2000-2005 Tax Liabilities............................................................ 2

        B.  Mr. Winick's 2012-2016 Tax Liabilities............................................................ 3

        C.  IRS Procedures for Collecting Tax Liabilities ................................................... 4

        D.  Mr. Winick's Payment History ......................................................................... 5

    III.    Mr. Winick's Lifestyle and Expenses ....................................................................... 7

    IV.    Mr. Winick's Divestment of Assets and Consolidation of Liabilities ........................ 10

    V.    Mr. Winick's Remaining Assets ................................................................................ 12

STANDARD OF REVIEW ......................................................................................................... 13

ARGUMENT .............................................................................................................................. 14

    I.    Mr. Winick Willfully Evaded His Taxes for Tax Years 2012 to 2016............................. 14

        A.  Mr. Winick Satisfies the Conduct Element for Willful Evasion.................................... 15

        B.  Mr. Winick Satisfies the Mens Rea Element for Willful Evasion ................................ 18

    II.    Mr. Winick Concealed the Value of His Assets on His Bankruptcy Schedules................ 21

CONCLUSION............................................................................................................................ 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................... 14

*D'Amico v. City of New York*,
132 F.3d 145 (2d Cir. 1998) ............................................................................... 14

*Diorio v. Kreisler-Borg Const. Co.*,
407 F.2d 1330 (2d Cir. 1969) ............................................................................. 22

*Haesloop v. United States*,
No. 197-17172-575, 2000 WL 1607316 (Bankr. E.D.N.Y. Aug. 30, 2000) ........... 15

*In re Carmel*,
134 B.R. 890 (Bankr. N.D. Ill. 1991) ................................................................. 20

*In re Colish*,
289 B.R. 523 (Bankr. E.D.N.Y. 2002) ............................................................... 18

*In re Epstein*,
303 B.R. 280 (Bankr. E.D.N.Y. 2004) ............................................................... 15

*In re Fretz*,
244 F.3d 1323 (11th Cir. 2001) .......................................................................... 21

*In re Griffith*,
206 F.3d 1389 (11th Cir. 2000) .......................................................................... 17

*In re Hamer*,
328 B.R. 825 (Bankr. D. Ala. 2005) ................................................................... 15

*In re Jacobs*,
490 F.3d 913 (11th Cir. 2007) ............................................................................ 15

*In re Jalajel*,
No. 09-11453, 2010 WL 3946420 (Bankr. E.D. Va. Oct. 8, 2010) ........................ 23

*In re Ligon*,
55 B.R. 250 (Bankr. M.D. Tenn. 1985) ............................................................... 23

*In re Lynch*,
299 B.R. 62 (Bankr. S.D.N.Y. 2003) .................................................................. 16

*In re May,*
    No. 10-0431, 2010 WL 5014716 (S.D. Ala. Nov. 30, 2010) ............................................ 17, 18

*In re Mitchell,*
    633 F.3d 1319 (11th Cir. 2011) ........................................................................................... 18

*In re Moreo,*
    437 B.R. 40 (Bankr. E.D.N.Y. 2010) .......................................................................... 21, 22, 24

*In re Murray,*
    249 B.R. 223 (E.D.N.Y. 2000) ........................................................................................... 22

*In re Silver,*
    367 B.R. 795 (Bankr. D.N.M. 2007) .................................................................................. 23

*In re Tudisco,*
    183 F.3d 133 (2d Cir. 1999) ................................................................................... 15, 18, 19

*In re Wright,*
    191 B.R. 291 (S.D.N.Y. 1995) ........................................................................................... 17

*Kerger v. United States,*
    609 F. Supp. 3d 562 (N.D. Ohio 2022) .............................................................................. 16

*Price-Davis v. United States,*
    549 B.R. 537 (S.D. Fla. 2015) ........................................................................................... 16

*Taylor v. Freeland & Kronz,*
    503 U.S. 638 (1992) ........................................................................................................... 22

*Thunberg v. Wallick,*
    No. 09-419, 2010 WL 1838003 (D.R.I. May 5, 2010) ....................................................... 23

*United States v. Carmel,*
    801 F.2d 997 (7th Cir. 1986) ............................................................................................. 20

*United States v. Gorokhovsky,*
    575 F. Supp. 3d 1050 (E.D. Wis. 2021) ....................................................................... 15, 19

*United States v. Helton,*
    843 F. App'x 779 (6th Cir. 2021) ...................................................................................... 19

*United States v. Timon,*
    No. 20 Civ. 1101 (MAD), 2022 WL 17249463 (N.D.N.Y. Sept. 6, 2022) .......................... 19

**Statutes**

11 U.S.C. § 522 ................................................................................................................ 16, 26

11 U.S.C. § 523 ....................................................................................................... 6, 18, 22, 24

11 U.S.C. § 727(a)(4)(A) ..................................................................................... 6, 18, 25

26 U.S.C. § 6159 ................................................................................................................. 8

26 U.S.C. § 6321 ................................................................................................................. 8

26 U.S.C. § 6331 ....................................................................................................... 8, 9, 21

26 U.S.C. § 6654 ........................................................................................................... 7, 19

26 U.S.C. § 7122 ................................................................................................................. 8

Plaintiff the United States of America (the "United States" or the "Government"), by its attorney Damian Williams, United States Attorney for the Southern District of New York, respectfully files this memorandum of law in support of its motion for partial summary judgment on Claims II, III, and IV of its adversary complaint, Dkt. No. 1 ("Compl.") ¶¶ 72-74,[1] which seek a judgment that Mr. Winick's tax debts from tax years 2012 to 2016 and 2019 are non-dischargeable and that Mr. Winick should be denied a bankruptcy discharge. For the reasons stated herein, the Court should grant summary judgment to the Government on these claims.

## PRELIMINARY STATEMENT

Chapter 7 Debtor Jeffrey Winick earned millions of dollars as a commercial real-estate broker between 2012 and 2016, but failed to make required tax payments with respect to these earnings and thus incurred millions of dollars in tax liabilities. At the same time, he lived a life of luxury, renting as many as three high-end apartments in New York City at a time, while maintaining an address in Southampton, spending thousands on outings at fancy restaurants and retail stores, driving luxury cars and speedboats, and gambling at high-stakes casinos. Mr. Winick also sought to prevent the Internal Revenue Service ("IRS") from collecting on his tax obligations. He transferred property worth millions of dollars to family and friends, entered and breached several payment plans with the IRS to prevent collection activities, and avoided accumulating valuable assets by renting and leasing real estate and vehicles and by conducting his personal affairs through his real-estate company Winick Realty Group, LLC ("WRG").

Mr. Winick's bankruptcy filing in August 2020 was yet another effort to stymie the IRS from collecting the tax debts he owed. Mr. Winick narrowed his creditors down to almost none before filing (90% of what he owes is to the IRS), so that his favored creditors would not be

---

[1] This memorandum cites docket entries from this adversary proceeding as "Dkt. No." and docket entries from the main bankruptcy as "Bankr. Dkt. No."

impacted by his bankruptcy. And he concealed the value of the assets he had not yet transferred in the hope that the Chapter 7 Trustee would not notice them.

Because of Mr. Winick's conduct over the past decade, his debts to the IRS should not be discharged. He willfully evaded his tax obligations from 2012 through 2016, rendering them non-dischargeable pursuant to 11 U.S.C. § 523(a)(1)(C). And when he filed for bankruptcy, he concealed the value of his remaining assets to further frustrate collection, requiring denial of discharge pursuant to 11 U.S.C. § 727(a)(4). This Court thus should enter summary judgment in favor of the Government on Counts II, III, and IV of its complaint.[2]

## STATEMENT OF FACTS

### I.   Procedural Background

On August 27, 2020, Mr. Winick filed a voluntary Chapter 7 bankruptcy petition. *See* Bankr. Dkt. No. 1 ("Petition"). On November 6, 2020, the IRS filed a proof of claim for Mr. Winick's income tax liabilities for tax years 2012 to 2016 and 2019, totaling $8,896,271.59. *See* Claim No. 2-1. On May 17, 2021, the United States filed an adversary complaint arguing, among other things, that Mr. Winick's tax liabilities were non-dischargeable under 11 U.S.C. § 523(a) and that discharge should be denied pursuant to 11 U.S.C. § 727(a)(4)(A).

### II.   Tax Payment History

#### A.   Mr. Winick's 2000-2005 Tax Liabilities

Although not at issue in this case, Mr. Winick previously incurred millions of dollars in tax liabilities resulting from tax underpayments in tax years 2000 to 2005. Declaration of John T.

---

[2] Mr. Winick does not dispute that his liability for tax year 2019 is not dischargeable under 11 U.S.C. §§ 523(a)(1)(A) and 507(a)(8)(A)(i), as his tax return was due less than three years before the bankruptcy filing date, *see* Dkt. No. 21, and so judgment should be entered in the Government's favor on Count III of the complaint, which seeks such a determination. This memorandum thus discusses only Counts II and IV of the complaint.

Harrison dated April 14, 2023 ("Harrison Decl.") ¶ 3, Ex. 1. During this time, Mr. Winick repeatedly failed to make quarterly estimated tax payments required by 26 U.S.C. § 6654, despite earning most of his income through commissions from which his employer did not make withholdings. Statement of the United States Pursuant to Local Bankruptcy Rule 7056-1(b) ("56.1 Stat.") ¶¶ 1-2; Harrison Decl ¶ 3, Ex. 1; *id.* ¶ 5, Ex. 3 at USA03071, 03102; Declaration of Zachary Bannon dated April 14, 2023 ("Bannon Decl.") ¶ 3, Ex. 1 ("Winick Dep.") 26:8-13. In addition, Mr. Winick purchased a multi-million-dollar summer home in Southampton in the early 2000s, which he immediately transferred to a trust for the benefit of his daughter while continuing to make $150,000 per year rental payments to live in that property. 56.1 Stat. ¶¶ 3-5; Winick Dep. 81:18-82:9; Bannon Decl. ¶¶ 4-6, Exs. 2-4.

Mr. Winick ultimately entered into an installment agreement ("IA") with the IRS in 2008 regarding his outstanding tax liabilities. Harrison Decl. ¶ 5, Ex. 3 at USA03183-03187. He fully paid off the liabilities by 2012. Harrison Decl. ¶ 5, Ex. 3 at USA03247-03248.

*B. Mr. Winick's 2012-2016 Tax Liabilities*

Immediately after paying off his previous set of tax liabilities, Mr. Winick incurred new ones. Mr. Winick's income, taxes owed, tax withholdings, and incurred tax liabilities for tax years 2012 through 2016 are summarized in the following table:

| Tax Year | Taxable Income | Taxes Owed | Tax Withholdings | Tax Liability |
|---|---|---|---|---|
| 2012 | $7,922,503 | $2,958,768 | $676,747 | $2,282,021 |
| 2013 | $4,675,510 | $1,944,528 | $558,099 | $1,386,429 |
| 2014 | $4,911,103 | $2,100,533 | $276,518 | $1,824,015 |
| 2015 | $3,891,521 | $1,578,350 | $876,635 | $701,715 |
| 2016 | $2,412,311 | $995,865 | $251,377 | $744,488 |
| Totals | $23,812,948 | $9,578,044 | $2,639,376 | $6,938,668 |

56.1 Stat. ¶ 6; Harrison Decl. ¶ 4, Ex. 2. From 2012 through 2016, Mr. Winick made no required quarterly estimated tax payments, despite having previously made estimated payments with regard to earlier tax years, and despite having been told "numerous times" by his lawyers that he should make such payments. 56.1 Stat. ¶¶ 7-8; Harrison Decl. ¶ 4, Ex. 2; Winick Dep. 19:12-18, 24:16-25. Mr. Winick testified that he stopped making quarterly estimated tax payments so he could spend more money gambling at casinos. 56.1 Stat. ¶ 9; Winick Dep. 25:7-12.

### C. IRS Procedures for Collecting Tax Liabilities

When a taxpayer refuses or neglects to pay taxes after a demand from IRS, a lien arises in favor of the United States on all of the taxpayer's "property and rights to property." 26 U.S.C. § 6321. The IRS may collect the tax by levy after giving the taxpayer 30 days' notice of its intent to do so. *See id.* §§ 6331(a), (d)(1), (d)(2).

Taxpayers have several options to satisfy their tax liabilities short of a levy. Under 26 U.S.C. § 6159(a), the IRS can enter into an installment agreement ("IA") with a taxpayer reflective of the taxpayer's "ability to pay on a monthly basis throughout the duration of agreements." Internal Revenue Manual ("I.R.M.") § 5.14.1.4(4). "No levy may be made on taxpayer accounts" while a request for an IA is pending, while an agreement is in effect, or for thirty days after an agreement is rejected or terminated. *Id.* § 5.14.1.5(1); 26 U.S.C. § 6331(k)(2).

Taxpayers may also attempt to resolve their tax deficiencies by submitting offers-in-compromise ("OICs"), in which their liability may be resolved for less than the full amount when, among other reasons, it is unclear whether the IRS will be able to collect it in full. *See* 26 U.S.C. § 7122; 26 C.F.R. § 301.7122-1(b)(2). As with IAs, the IRS may not levy a taxpayer's property while a proposed OIC is pending or for 30 days after the offer is rejected. I.R.M. § 8.23.1.3(1); 26 U.S.C. § 6331(k)(1).

*D. Mr. Winick's Payment History*

As discussed above, Mr. Winick incurred $9,578,044 in tax liabilities in tax years 201 to 2016. As detailed below, all told, he paid $4,551,376 toward those liabilities before filing for bankruptcy in August 2020—$2,639,376 in withholdings and $1,871,000 pursuant to IAs and OICs that were either pending or in effect.

Mr. Winick made a $25,000 payment (apart from the withholdings noted in the table above) toward his 2012 to 2016 tax liabilities in January 2014 while requesting an IA. 56.1 Stat. ¶ 10; Harrison Decl. ¶ 4, Ex. 2 at USA01702; Id. ¶ 5, Ex. 3 at USA03256. The IRS approved Mr. Winick's IA in July 2014, requiring him to pay $50,000 per month through November 2014, then $100,000 per month thereafter until his liabilities were fully paid. 56.1 Stat. ¶ 11; Harrison Decl. ¶ 5, Ex. 3 at USA03280. Mr. Winick made a total of four additional $50,000 payments—in May, June, August, and September 2014—pursuant to that IA or while it was being considered. 56.1 Stat. ¶ 12; Harrison Decl. ¶ 4, Ex. 2 at USA01702. Mr. Winick made no further payments after September 2014 and the IRS terminated the IA in March 2015, after he had paid only $225,000. 56.1 Stat. ¶ 13; Harrison Decl. ¶ 4, Ex. 2 at USA01702.

After the IRS terminated Mr. Winick's IA, he made a $25,000 payment in April 2015 in support of a request for a new IA. 56.1 Stat. ¶ 14; Harrison Decl. ¶ 4, Ex. 2 at USA01702. The IRS approved this IA in October 2015, requiring Mr. Winick to pay $50,000 per month from November 2015 through November 2017, and $75,000 a month thereafter until his liabilities were fully paid. 56.1 Stat. ¶ 15; Harrison Decl. ¶ 5, Ex. 3 at USA03295. In total, Mr. Winick paid $25,000 in April 2015, $30,000 each in May and June 2015, $50,000 a month between July 2015 and July 2016, and $25,000 a month between August 2016 and December 2016, for a total of $860,000. 56.1 Stat. ¶ 16; Harrison Decl. ¶ 4, Ex. 2 at USA01702-01703. Mr. Winick ceased

making payments thereafter and the IRS terminated his IA in March 2017. 56.1 Stat. ¶¶ 16-17; Harrison Decl. ¶ 4, Ex. 2 at USA01703.

After his second IA was terminated, Mr. Winick submitted an OIC on May 15, 2017, which included an $86,000 prepayment and offered to compromise the remaining outstanding over $7 million liability for only $430,000. 56.1 Stat. ¶ 18; Harrison Decl. ¶ 6, Ex. 4. Following several months of discussion, the IRS rejected the OIC in September 2018. 56.1 Stat. ¶ 19; Harrison Decl. ¶ 5, Ex. 3 at USA03357. Mr. Winick withdrew the offer shortly thereafter. 56.1 Stat. ¶ 20; Harrison Decl. ¶ 4, Ex. 2 at USA01704.

After withdrawing the OIC, Mr. Winick proposed yet another IA in November 2018, accompanied by an initial payment of $50,000. 56.1 Stat. ¶ 21; Harrison Decl. ¶ 4, Ex. 2 at USA01704. The new IA proposed that he would pay $50,000 per month from November 2018 through December 2019, and $114,000 a month thereafter until his liabilities were fully paid. 56.1 Stat. ¶ 22; Harrison Decl. ¶ 5, Ex. 3 at USA03370. Mr. Winick fourteen payments of $50,000 under this IA (monthly from November 2018 through January 2020, except for January 2019), totaling $700,000. 56.1 Stat. ¶ 23; Harrison Decl. ¶ 4, Ex. 2 at USA01704-01705.

Mr. Winick has made no further payments toward his tax liabilities since January 2020. 56.1 Stat. ¶ 24; Harrison Decl. ¶ 4, Ex. 2 at USA01705. When he filed his bankruptcy petition in August 2020, his outstanding liabilities were as follows:

| Tax Period | Remaining Tax Due ($) | Penalties Due as of Petition Date ($) | Interest Due as of Petition Date ($) | Total Due as of Petition Date ($) |
|---|---|---|---|---|
| 2012 | 356,509.00 | 627,999.45 | 436,044.75 | 1,420,553.02 |
| 2013 | 1,386,429.00 | 416,699.65 | 413,433.23 | 2,216,561.88 |
| 2014 | 1,824,015.00 | 548,181.72 | 473,941.12 | 2,846,137.84 |
| 2015 | 701,715.00 | 207,987.26 | 155,801.40 | 1,065,503.66 |
| 2016 | 744,488.00 | 132,922.09 | 129,695.05 | 1,007,105.14 |
| Total | 5,013,156.00 | 1,933,790.17 | 1,617,915.55 | 8,564,861.72 |

56.1 Stat. ¶ 25; Harrison Decl. ¶ 7.

### III.   Mr. Winick's Lifestyle and Expenses

As noted above, Mr. Winick received over $23 million in income between 2012 and 2016, deriving from his role as majority owner and Chief Executive Officer of WRG—a commercial real-estate brokerage described on its website as having "been driving New York City's retail transformation for over 35 years and ha[ving] since expanded its reach to encompass the entire United States." 56.1 Stat. ¶ 26; Bannon Decl. ¶ 8, Ex. 6 at USA0794; Bannon Decl. ¶ 52, Ex. 50. But Mr. Winick lived a life of lavish luxury based on this substantial income, even as his debts to the IRS mounted.

Take Mr. Winick's housing expenses, for example. In 2012, Mr. Winick paid $15,000 per month to rent a Manhattan apartment, which increased to $17,000 per month by 2014 and to $18,000 per month by 2016. 56.1 Stat. ¶ 27; Winick Dep. 65:4-17. Over the same period, he spent $11,000 per month to rent a vacation home in Southampton. 56.1 Stat. ¶ 28; Bannon Decl. ¶ 9, Ex. 7; Winick Dep. 65:4-17. From 2012 through 2014, he paid between $5,350 and $6,700 per month to rent an apartment for his ex-wife. 56.1 Stat. ¶ 29; Bannon Decl. ¶ 10, Ex. 8; *id.* ¶ 11, Ex. 9; Winick Dep. 32:25-33:22, 80:21-81:17. And from 2013 to 2014, he spent at least $3,500 per month to rent an apartment for his daughter while she attended New York University (in addition to paying her entire tuition of approximately $75,000 per year), 56.1 Stat. ¶¶ 30-31; Bannon Decl. ¶ 13, Ex. 11 at WINICK75; *id.* ¶ 14, Ex. 12 at WINICK100. *id.* ¶ 12, Ex. 10; Winick Dep. 33:23-35:3.

Mr. Winick's housing costs extended into some high dollar incidentals. To provide some non-exhaustive examples, Mr. Winick spent tens of thousands of dollars to maintain his second home in Southampton alone, including: (1) between 2012 and 2016, Mr. Winick paid over $1,000 per month in utilities for his Southampton home, 56.1 Stat. ¶ 32; Bannon Decl. ¶¶ 15-18, Exs. 13-

16; (2) from 2014 to 2016, he paid approximately $200 per month to Optimum for media services, 56.1 Stat. ¶ 33; Bannon Decl. ¶ 19, Ex. 17; (3) between 2012 and 2018, he spent over $300 month for cable from Direct TV, 56.1 Stat. ¶ 34; Bannon Decl. ¶ 20, Ex. 18;[3] (4) in 2012 and 2013, he spent about $6,000 per year on boat storage in Southampton, 56.1 Stat. ¶ 36; Bannon Decl. ¶ 22, Ex. 20; (5) between 2012 and 2016, he spent over $1,500 a year on homeowner's association fees, 56.1 Stat. ¶ 37; Bannon Decl. ¶ 23, Ex. 21; and (6) in the summer of 2016 alone, he spent over $6,000 to prevent ticks, deer, and mosquitos from imposing on his relaxation, 56.1 Stat. ¶ 38; Bannon Decl. ¶ 24, Ex. 22.

In addition to his housing expenses, Mr. Winick has spent exorbitantly on shopping for luxury goods both while incurring his debts to the IRS and afterwards. Mr. Winick admits that he spent over $1,000 shopping once or twice a month from 2012 until he declared for bankruptcy. 56.1 Stat. ¶ 39; Winick Dep. 77:24-78:7. During that time, Mr. Winick used at least four different credit cards. 56.1 Stat. ¶ 40; Winick Dep. 50:18-23 (acknowledging four credit cards and stating "[t]here might be others"). A few examples of his spending on his American Express ("AmEx") card in 2013 illustrate Mr. Winick's spending habits: he spent (1) over $2,000 at All Saints, a luxury clothing brand, on January 30, 2013; (2) over $4,000 at Frontgate, an elevated home décor store, on June 18, 2013 (and over $3,000 there again, the next month); (3) over $4,500 at Intermix, another luxury clothing brand, on October 19, 2013; and (4) over $2,000 at Blanc Bleu, a luxury maritime brand, on December 31, 2013. 56.1 Stat. ¶ 41; Bannon Decl. ¶ 25, Ex. 23 at WINICK4297, 4330, 4336, 4356, and 4362. All told, he incurred charges of over $120,000 on his AmEx card in 2013. 56.1 Stat. ¶ 42; *see generally* Bannon Decl. ¶ 25, Ex. 23. Many of these

---

[3] For an overlapping time period, he was also paying almost $500 per month to Spectrum for media services in his Manhattan home, including pricy premium TV packages. 56.1 Stat. ¶ 35; Bannon Decl. ¶ 21, Ex. 19.

shopping expenses were incurred because Mr. Winnick allowed his ex-girlfriend and daughter to use these credit cards. For example, Mr. Winick's daughter spent over $15,000 in one trip to Intermix in September 2013. 56.1 Stat. ¶ 43; Bannon Decl. ¶ 25, Ex. 23 at WINICK4350. In Mr. Winick's words: "That was my punishment for showing up late to dinner, I had to go shopping. That was the last time I showed up late." 56.1 Stat. ¶ 43; Winick Dep. 77:6-10.

Mr. Winick also traveled extensively from 2012 to 2020—by his count going on over thirty international trips to the Bahamas, France, Mexico, Germany, the Czech Republic, and St. Barts. 56.1 Stat. ¶ 44; Winick Dep. 95:2-96:23. These trips included expensive incidentals, too. For example, in 2014, Mr. Winick spent over $5,000 at Hillside Bahamas, a luxury retailer. 56.1 Stat. ¶ 45; Bannon Decl. ¶ 26, Ex. 24. And when he was in France in 2019, he spent over $20,000 on one occasion at an expensive beachside restaurant. 56.1 Stat. ¶ 46; Bannon Decl. ¶ 27, Ex. 25.

Mr. Winick also spent extraordinary amounts of money gambling while he continued to accrue tax liabilities—losing $4,526,800 in 2012; $2,417,450 in 2013; $2,166,575 in 2014; $971,115 in 2015; and $1,805,400 in 2016, a total of more than $10 million over this five-year period alone. 56.1 Stat. ¶ 47; Bannon Decl. ¶ 28, Ex. 26 at WINICK43. Mr. Winick's expert witness, Dr. Jeremiah Weinstock, opined that Mr. Winick had a moderate gambling disorder, but that he was able to adopt harm-reduction strategies to limit his gambling, like declining credit from casinos and setting bankroll limits so he would not lose more than a set sum in any individual outing. 56.1 Stat. ¶¶ 48-49; Bannon Decl. ¶ 29, Ex. 27 ("Weinstock Dep.") 25:23-27:15, 93:4-20. Dr. Weinstock concluded, however, that Mr. Winick could not have adopted the harm-reduction strategy of gambling with only post-tax dollars because "[p]ast experience had taught him that he didn't need to change his gambling behavior because everything had worked out previously in the

early 2000s." 56.1 Stat. ¶ 50; Weinstock Dep. 95:16-96:18. In other words, "being behind on his back taxes [was] not punishing to him, so therefore he [didn't] need to take any action." *Id.*

Mr. Winick made almost no efforts to cut back on his spending while he was incurring more and more tax debt between 2012 and 2016. When asked if "[a]nything specific [came] to mind that [he] would have cut back on around" 2014, Mr. Winick responded that he "got rid of [his] boat." 56.1 Stat. ¶ 51; Winick Dep. 54:15-17. When asked about further cutbacks he imposed on himself between 2014 and 2016, Mr. Winick responded: "I don't think I had a girlfriend then." 56.1 Stat. ¶ 52; Winick Dep. 66:3-6.

## IV. Mr. Winick's Divestment of Assets and Consolidation of Liabilities

In addition to his opulent spending, Mr. Winick took efforts to ensure that he would not have valuable assets for the IRS to levy and that only his tax liabilities would be impacted by his bankruptcy. Specifically, from 2012 to 2020, Mr. Winick divested almost all his valuable assets; avoided acquiring new assets; and paid off friendly creditors before filing for bankruptcy, all while ignoring his tax debts.

Starting with his divestments: (1) on September 13, 2012, Mr. Winick sold his interest in 987 Eighth Avenue, LLC, a company owning a leasehold over real property, for $2 million, 56.1 Stat. ¶ 53; Bannon Decl. ¶ 30, Ex. 28; Winick Dep. 102:6-19 (2) on December 18, 2012, Mr. Winick gifted a $4 million interest in his real-estate company to his daughter, 56.1 Stat. ¶ 54; Bannon Decl. ¶ 31, Ex. 29; (3) on September 30, 2014, Mr. Winick sold his 30-foot boat for almost $20,000, 56.1 Stat. ¶ 55; Bannon Decl. ¶ 32, Ex. 30; (4) on January 1, 2016, Mr. Winick gifted the New Jersey branch of his real-estate company to his daughter, 56.1 Stat. ¶ 56; Bannon Decl. ¶ 33, Ex. 31; (5) between 2013 and 2018, Mr. Winick gave at least $655,000 worth of life insurance policies to his daughter as gifts, 56.1 Stat. ¶ 57; Bannon Decl. ¶ 34, Ex. 32; (6) at some point after

2015, Mr. Winick gave away half a million dollars' worth of jewelry to family and friends, 56.1 Stat. ¶ 58; Bannon Decl. ¶ 35, Ex. 33; Winick Dep. 94:8-21; and (7) between 2012 and 2016, Mr. Winick donated over $200,000 to charity, 56.1 Stat. ¶ 59; Bannon Decl. ¶ 36, Ex. 34.

At the same time, Mr. Winick avoided accruing assets. He always rented his residences—going as far as to purchase a home in Southampton, gift it to a trust for the benefit of his daughter, then pay rent to the trust to continue living there. 56.1 Stat. ¶¶ 3-5, 31; Winick Dep. 65:4-17, 81:18-82:9; Bannon Decl. ¶¶ 4-6, 9 Exs. 2-4, 7. Further, he used his company to conduct personal business. He drove luxury Mercedes-Benz cars for which his company paid tens of thousands of dollars in lease payments. 56.1 Stat. ¶ 60; Bannon Decl. ¶ 37, Ex. 35; Winick Dep. 100:12-22.[4] And he had company employees, like Louis Eisinger, assist in paying his personal debts directly from company funds, despite those transactions having no business purpose. 56.1 Stat. ¶ 61; Bannon Decl. ¶ 38, Ex. 36 ("Eisinger Dep.") 50:18-54:13; Bannon Decl. ¶ 39, Ex. 37.

In the lead-up to his bankruptcy, Mr. Winick worked to ensure that only his tax creditors would be negatively impacted by his filing. In late 2019, Mr. Winick owed his close friend, David Berley, just over $1.75 million, of which $250,000 was based on an unsecured loan via a 2018 note and the remaining $1.5 million was based on a 2015 note secured by Mr. Winick's interest in a real-estate holding company named SDSDR111 LLC, that owned a lease to property in Manhattan.[5] 56.1 Stat. ¶ 62; Bannon Decl. ¶ 40, Ex. 38. Mr. Winick had paid almost none of the principal on either loan for years, but he quickly paid off the unsecured note in full by making a

---

[4] Mr. Winick claimed at his deposition that these cars were used "90 percent [for] business." Winick Dep. 101:10-13. However, their principal garage location was Mr. Winick's Southampton address. *See* Bannon Decl. ¶ 37, Ex. 35. In an interview he gave to *The Real Deal* in May 2014, he stated "I have three cars. I love my Mercedes Convertible." Bannon Decl. ¶ 49, Ex. 47.

[5] Mr. Winick granted Mr. Berley a security interest in SDSDR111 LLC *after* the IRS recorded a lien on it. 56.1 Stat. ¶¶ 63-64; Bannon Decl. ¶¶ 41-42, Exs. 39-40.

$218,814 payment in February 2020 (shortly after he defaulted on his third IA with the IRS, 56.1 Stat. ¶ 24). 56.1 Stat. ¶ 65; Bannon Decl. ¶ 43, Ex. 41; Eisinger Dep. 64:19-24. And—ignoring the IRS's superior security interest—Mr. Winick transferred his interest in SDSDR111 LLC (one of his only valuable assets at the time) to Mr. Berley in satisfaction of his secured loan in July 2020, a mere month before he filed for bankruptcy, even though that asset had been most recently valued at $2.5 million. 56.1 Stat. ¶¶ 66-67; Bannon Decl. ¶¶ 44-45, Exs. 42-43; Winick Dep. 140:20-141:6.

## V.     Mr. Winick's Remaining Assets

By the time Mr. Winick filed for bankruptcy, he had narrowed his creditors to three with claims of known value—two taxing authorities and his daughter (who, as discussed above, had benefitted greatly from his generosity over the years). *See* Petition, Schedules D/E/F. And by that time, he had few remaining assets that could be used to satisfy his creditors, including two Rolex watches and two interests in his real estate company. *See id.* Schedules A/B/C.

In his bankruptcy petition, Mr. Winick scheduled his "two Rolex watches" as worth $5,000 collectively and claimed that they were exempt from the estate pursuant to 11 U.S.C. §§ 522(d)(4) & (5). *Id.* Schedule C at 1. These watches were actually worth $47,500, as evidenced by the appraisals ultimately conducted during the bankruptcy at the request of the Chapter 7 Trustee. 56.1 Stat. ¶ 68; Bankr. Dkt. No. 34-1. Information about the value of Mr. Winick's watches was readily available. Simple online searches for their models and reference numbers—"18kt Yellow Gold Rolex Yacht-Master 2, 2017 Ref. #116688M" and "18kt/Stainless Steel Rolex Submariner 2009, Ref. # 116613"—results in numerous recent sales at values in line with the appraisal and bearing no relationship to Mr. Winick's listed values. *See* 56.1 Stat. ¶ 69; Bannon Decl. ¶¶ 50-51, Exs. 48-49. Indeed, Mr. Winick had previously insured one of the two watches for over $10,000 in

2015.  56.1 Stat. ¶ 70; Bannon Decl. ¶ 35, Ex. 33 at WINICK47.  Mr. Winick was knowledgeable about the value of his Rolexes.  When asked "Do you live extravagantly" in 2014 by a real-estate magazine, he responded: "I collect Rolexes.  My favorite is the one I'm wearing, which is the cheapest one they make."  56.1 Stat. ¶ 71; Bannon Decl. ¶ 49, Ex. 47.

For his two business interests—one in WRG and one in WTN Realty Corp., a company that holds an interest in WRG—Mr. Winick scheduled their values as "UNKNOWN."  Petition, Schedule A/B.  Mr. Winick had previously been able to value these business interests precisely— concluding that each share of WTN Realty Corp. was worth $12,540 in 2012 and each share of WRG was worth $737 in 2018.  56.1 Stat. ¶¶ 72-75; Bannon Decl. ¶¶ 46-47, Exs. 44-45.  Further, as the Government's expert concluded, a sophisticated professional like Mr. Winick has the knowledge and ability to estimate the value of his business interests.  56.1 Stat. ¶ 74; Declaration of James Feltman dated April 14, 2023 ("Feltman Decl.") ¶¶ 4-5.  Nevertheless, Mr. Winick scheduled his interests in these companies as having "UNKNOWN" value, and asked the Chapter 7 Trustee to abandon them, claiming that they were valueless because the company needed a significant capital infusion to stay afloat, which the principals of WRG would not provide while the interests remained part of the estate.  56.1 Stat. ¶ 75; Bankr. Dkt. No. 36; Bannon Decl. ¶ 48, Ex. 46.  That alleged need for a capital infusion, however, was based on the assumption that WRG would close *no new transactions* in 2021 or 2022.  56.1 Stat. ¶ 76; Bannon Decl. ¶ 48, Ex. 46. Ultimately, WRG received no such capital infusion, yet it remains afloat.  56.1 Stat. ¶ 77; Eisinger Dep. 23:22-25:8. Mr. Winick's interests in his company were sold by the estate for $310,000.  56.1 Stat. ¶ 78; Bankr. Dkt. No. 86.

## STANDARD OF REVIEW

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law."

13

*D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted). Where, as here, the undisputed facts establish willfulness as a matter of law, judgment should be entered for the Government. *See In re Fegeley*, 118 F.3d 979, 982 (3d Cir. 1997) (affirming district court's reversal of bankruptcy court on the ground that the record established willfulness as a matter of law). The Government bears the burden of proving that the debtor should be denied a discharge for taxes. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991).

## ARGUMENT

Mr. Winick is not entitled to discharge of his debts to the IRS. As set forth in Section I, Mr. Winick willfully evaded his tax liabilities from 2012 to 2016, rendering them non-dischargeable pursuant to 11 U.S.C. § 523(a)(1)(C). And as set forth in Section II, Mr. Winick made "false oath[s] or account[s]" in his bankruptcy schedules, requiring a total denial of discharge under 11 U.S.C. § 727(a)(4)(A). Summary judgment should thus be granted to the Government on Counts II, III, and IV of its complaint.

### I. Mr. Winick Willfully Evaded His Taxes for Tax Years 2012 to 2016

An income tax debt is non-dischargeable where a debtor "willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). "The willfulness exception consists of a conduct element (an attempt to evade or defeat taxes) and a *mens rea* requirement (willfulness)." *In re Tudisco*, 183 F.3d 133, 136 (2d Cir. 1999). Uncontested facts demonstrate that Mr. Winick's actions satisfy both of these elements for tax years 2012 to 2016.

A. *Mr. Winick Satisfies the Conduct Element for Willful Evasion*

The conduct element for willful evasion is satisfied by a taxpayer's "failure to pay accompanied by other conduct designed to evade or defeat taxes." *In re Epstein*, 303 B.R. 280, 286 (Bankr. E.D.N.Y. 2004). Mr. Winick's failure to pay his 2012 to 2016 liabilities is uncontested, and he clearly engaged in a variety of "other conduct" to evade or defeat his obligations.

First, Mr. Winick stopped making quarterly estimated tax payments, which are required by 26 U.S.C. § 6654, between 2012 and 2016 so he could gamble more, despite being told "numerous times" that he should make those payments. 56.1 Stat. ¶¶ 8-9; Harrison Decl. ¶ 4, Ex. 2; Winick Dep. 24:16-25, 25:7-12. "[F]ail[ure] to pay estimated taxes" is "highly relevant to the conduct requirement." *In re Jacobs*, 490 F.3d 913, 926 (11th Cir. 2007); *accord In re Hamer*, 328 B.R. 825, 834-35 (Bankr. D. Ala. 2005); *Haesloop v. United States*, No. 197-17172-575, 2000 WL 1607316, at *5 (Bankr. E.D.N.Y. Aug. 30, 2000).

Second, Mr. Winick consistently "ma[de] discretionary purchases rather than paying liabilities." *United States v. Gorokhovsky*, 575 F. Supp. 3d 1050, 1058 (E.D. Wis. 2021). Among other things, while Mr. Winick continued to accrue tax debts, he: (1) spent tens of thousands of dollars on multiple luxury residences, 56.1 Stat. ¶¶ 27-30; Bannon Decl. ¶¶ 9-12, Exs. 7-10; Winick Dep 32:23-35:3, 65:4-17, 80:21-81:17; (2) paid private-school college tuition for his daughter, 56.1 Stat. ¶ 31; Bannon Decl. ¶ 13, Ex. 11 at WINICK75; Bannon Decl. ¶ 14, Ex. 12 at WINICK100; (3) made substantial charitable donations, 56.1 Stat. ¶ 59; Bannon Decl. ¶ 36, Ex. 34; (4) spent lavishly on luxury goods, 56.1 Stat. ¶¶ 39-43; Winick Dep. 50:18-23, 77:24-78:7; *see generally* Bannon Decl. ¶ 25, Ex. 23; (5) traveled internationally dozens of times, 56.1 Stat. ¶ 44; Winick Dep. 95:2-96:23; and (6) gambled away millions of dollars at casinos, 56.1 Stat. ¶ 47;

Bannon Decl. ¶ 28, Ex. 26 at WINICK43. This conduct more than satisfies the relevant requirement. *See, e.g.*, *Kerger v. United States*, 609 F. Supp. 3d 562, 572 (N.D. Ohio 2022) (conduct element satisfied by "evidence that debtor paid for non-necessities such as vacations and private school tuition instead of the debtor's tax liabilities"); *Price-Davis v. United States*, 549 B.R. 537, 543 (S.D. Fla. 2015) (evidence that debtor "bought a new car, moved into a fancy house, paid for expensive dance and music lessons, traveled, sent her children to expensive private schools, and spent large amounts on retail and entertainment" satisfied conduct element). Also relevant to this analysis is that, after Mr. Winick accruing his liabilities, he did little to cut back on his spending. *In re Lynch*, 299 B.R. 62, 84 (Bankr. S.D.N.Y. 2003) (failure to make efforts at "belt-tightening" satisfied conduct element). Indeed, when asked what he had done to cut back on his spending between 2014 and 2016, Mr. Winick only joked that he didn't "ha[ve] a girlfriend then." 56.1 Stat. ¶ 52; Winick Dep. 66:3-6.

Third, Mr. Winick transferred significant assets to friends and family rather than paying back the IRS. While accruing debts, Mr. Winick gave away for no or inadequate compensation: (1) in 2012, a $4 million interest in his company to his daughter, 56.1 Stat. ¶ 54; Bannon Decl. ¶ 31, Ex. 29; (2) in 2016, the New Jersey branch of his company to his daughter, 56.1 Stat. ¶ 56; Bannon Decl. ¶ 33, Ex. 31; (3) between 2013 and 2018, over $600,000 in life insurance policies to his daughter, 56.1 Stat. ¶ 57; Bannon Decl. ¶ 34, Ex. 32; (4) after 2015, approximately $500,000 in jewelry to friends and family, 56.1 Stat. ¶ 58; Bannon Decl. ¶ 35, Ex. 33; Winick Dep. 94:8-21; and (5) in 2020, a business interest most recently valued at $2.5 million to a friend, 56.1 Stat. ¶¶ 66-67; Bannon Decl. ¶¶ 44-45, Exs. 42-43; Winick Dep. 140:20-141:6. "[T]ransfers of property for little to no consideration" is "conduct covered by § 523(a)(1)(C)." *In re Griffith*, 206 F.3d 1389, 1396 (11th Cir. 2000) (collecting cases).

Fourth, Mr. Winick improperly paid his personal expenses and conducted personal business using his company's accounts. Mr. Winick drove luxury vehicles leased by his company for tens of thousands of dollars. 56.1 Stat. ¶ 60; Bannon Decl. ¶ 37, Ex. 35; Winick Dep. 100:12-22. When he needed to pay off personal debts in late 2019 and early 2020, Mr. Winick paid them directly out of his company's commissions and used his employees to assist him in doing so. 56.1 Stat. ¶ 64; Eisinger Dep. 50:18-53:12; Bannon Decl. ¶ 39, Ex. 37.[6] Courts "regard the use of business accounts for personal assets as another symptom of willful evasion." *In re May*, No. 10-0431, 2010 WL 5014716, at *13 (S.D. Ala. Nov. 30, 2010).

Finally, Mr. Winick manipulated the IRS's collection procedures to avoid the IRS ramping up its collection activities. From 2014 until he filed for bankruptcy, Mr. Winick was almost always operating under a proposed or approved IA or OIC, *see* 56.1 Stat. ¶ 10-24, Harrison Decl. ¶¶ 4-6, Exs. 2-4, which prevented the IRS from levying his assets. *See* 26 U.S.C. § 6331(k). But Mr. Winick routinely defaulted on the IAs just before his monthly payments were scheduled to increase by their terms, *see* 56.1 Stat. ¶¶ 12, 16, 23, Harrison Decl. ¶¶ 4-5, Exs. 2-3, and his OIC offered only $430,000 of the more than $7 million he owed at the time, *see* 56.1 Stat. ¶ 18; Harrison Decl. ¶ 6, Ex. 4. He thus ended up paying less than $2 million through his IAs and OIC on his 2012 to 2016 tax liabilities, leaving over $8 million due (including interest and penalties accrued) when he filed for bankruptcy. 56.1 Stat. ¶ 25; Harrison Decl. ¶ 7. Mr. Winick's IAs and OIC evince a scheme to avoid payment to the IRS. *See, e.g.*, *In re Colish*, 289 B.R. 523, 533 (Bankr. E.D.N.Y.

---

[6] Mr. Winick's company made large payments on his behalf to his friend and creditor David Berley a mere month after he stopped making IA payments to the IRS in 2020. 56.1 Stat. ¶ 68; Bannon Decl. ¶ 43, Ex. 41; Eisinger Dep. 64:19-24. A debtor violates § 523(a)(1)(C) "if the debtor had the wherewithal to file his return and pay his obligation, but voluntarily, consciously, and intentionally decided to pay other creditors instead." *In re Wright*, 191 B.R. 291, 292 (S.D.N.Y. 1995) (quotation marks omitted).

2002) (noting that the debtor "attempted to thwart or at the very least delay the collection of his tax liabilities by filing serial offers-in-compromise" that were "clearly too low in relation to the tax obligations owed"); *In re Mitchell*, 633 F.3d 1319, 1329 (11th Cir. 2011) (same).

"Courts stress the wide variety of circumstances in which a willful evasion of tax obligations can be found, and resist attempts to pigeonhole that statute to apply only in particular narrow, discrete circumstances." *In re May*, 2010 WL 5014716, at *13. It is no exaggeration to say that Mr. Winick engaged in most of the categories of conduct that courts have found to satisfy the conduct requirement of 11 U.S.C. § 523(a)(1)(C). That Government thus has satisfied this element of its willful evasion claim.

B. *Mr. Winick Satisfies the Mens Rea Element for Willful Evasion*

Ample, undisputed evidence also establishes that Mr. Winick satisfies the scienter element of willful evasion, which requires that the debtor's conduct be undertaken "voluntarily, consciously or knowingly, and intentionally." *In re Tudisco*, 183 F.3d at 137 (quotation marks omitted). There is no dispute that Mr. Winick knew that he had to pay his taxes, that his withholdings were not sufficient to cover them, and that he needed to make quarterly estimated tax payments to meet his obligations, but chose instead not to make those payments and instead spend this money on gambling and luxuries. 56.1 Stat. ¶¶ 7-9; Winick Dep. 19:12-18, 24:26-25; 25:7-12; Harrison Decl. ¶ 4, Ex. 2. As the Second Circuit has held, it is enough that a debtor concedes "that he knew that he had to pay taxes" to meet the *mens rea* requirement. *In re Tudisco*, 183 F.3d at 137.

Courts have also looked to a second factor in assessing scienter—whether the taxpayer "voluntarily and intentionally attempted to violate" his duty to pay taxes. *Gorokhovsky*, 575 F. Supp. 3d at 1060. To assess this factor, courts look to "badges of fraud" that overlap substantially

with the conduct required to satisfy the conduct element for willful evasion discussed above, such as "recurrent understating income," "concealing assets," "failing to make estimated tax payments," "transferring assets to family members," "transferring assets for insufficient consideration," "transfers that greatly reduced assets subject to IRS execution," and "transfers in the face of serious financial difficulties." *Id.* As discussed above, Mr. Winick engaged in this sort of behavior.

Still other courts have concluded that the *mens rea* element for willful evasion is satisfied "'when the taxpayer has the financial means to meet his outstanding tax liabilities but makes a conscious decision not to apply those monies toward his tax debt.'" *United States v. Timon*, No. 20 Civ. 1101 (MAD), 2022 WL 17249463, at *8 (N.D.N.Y. Sept. 6, 2022) (quoting *United States v. Helton*, 843 F. App'x 779, 781 (6th Cir. 2021)). Mr. Winick's behavior unquestionably satisfies this test as well, as he applied his substantial income towards almost everything but his tax debts— from gambling to travel to gifts to high-end residences to luxury shopping.

The Government understands that Mr. Winick intends to argue that his tax evasion was not willful because he suffered from a moderate gambling disorder. Dkt. No. 21 at 2; 56.1 Stat. ¶ 48; Weinstock Dep. 25:23-27:15. But Mr. Winick's scienter is established by far more than his gambling, including the other ways in which he frustrated the IRS's collection activities— transferring assets to family and friends and spending lots of money on luxury goods and real estate. But even considering his gambling in isolation and assuming the sincerity of his disorder, it would not negate the *mens rea* element. Mr. Winick's expert witness, Dr. Weinstock, has opined that Mr. Winick's gambling disorder was not severe enough to prevent him from adopting harm-reduction strategies to stop him from losing too much money at casinos, such as by imposing spending limits on himself and declining to take credit from casinos. 56.1 Stat. ¶ 49; Weinstock Dep. 93:4-20. But with regard to his tax debts, Dr. Weinstock opined that Mr. Winick had learned

from his past experience with the IRS "that he didn't need to change his gambling behavior because everything had worked out previously in the early 2000s"—in other words "being behind on his back taxes [was] not punishing to him, so therefore he [didn't] need to take any action." 56.1 Stat. ¶ 50; Weinstock Dep. 95:16-96:18. Indeed, Dr. Weinstock recognized that Mr. Winick's disorder was not severe enough to require him to cut back on other aspects of his lavish lifestyle to fund his gambling. Weinstock Dep. 105:20-106:6.

The law does not recognize such a carefully circumscribed disorder as a defense under 11 U.S.C. § 523(a)(1)(C). Numerous courts of appeals have "concluded that there is an insufficient nexus between the alleged disease of compulsive gambling and [] non-gambling crimes[s]" for compulsive gambling to constitute a *mens rea* defense. *See United States v. Carmel*, 801 F.2d 997, 999 (7th Cir. 1986) (collecting cases). Based on those precedents, at least one bankruptcy court has found "as a matter of law, that [a] [d]ebtor's compulsive gambling disorder does not operate to prevent [a] [d]ebtor from forming the requisite fraudulent intent to evade payment of taxes." *In re Carmel*, 134 B.R. 890, 908 (Bankr. N.D. Ill. 1991). Even accepting that a gambling disorder could be a defense to scienter in some circumstances, those circumstances are not present here. For example, in the related context of alcohol addiction, the Eleventh Circuit has held that "someone who can control his drinking enough" to perform his profession "can control his drinking enough to file tax returns and pay taxes." *In re Fretz*, 244 F.3d 1323, 1331 (11th Cir. 2001). Here, there is no dispute that Mr. Winick was able to continue working, maintain his opulent lifestyle, and adopt harm-reduction strategies while afflicted by his alleged gambling disorder. Weinstock Dep. 105:20-106:6. This disorder thus cannot offer him a defense to liability as a matter of law.

* * *

In short, the undisputed facts establish that Mr. Winick willfully evaded his tax liabilities from tax years 2012 to 2016. The Court should accordingly grant summary judgment to the Government on Count IV of its complaint.

## II.     Mr. Winick Concealed the Value of His Assets on His Bankruptcy Schedules

Separately, Mr. Winick should be denied a bankruptcy discharge altogether in this case because he made "false oath[s] or account[s]" when valuing his watches and business interests in his bankruptcy schedules, in violation of 11 U.S.C. § 727(a)(4)(A), which provides that a debtor is ineligible for a discharge if he "knowingly and fraudulently, in or in connection with the case made a false oath or account." Courts in this Circuit apply a five-part test to determine whether a debtor satisfies this standard, which asks whether: "(1) the debtors made a statement under oath; (2) the statement was false; (3) the debtors knew that the statement was false; (4) the debtors made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case." *In re Moreo*, 437 B.R. 40, 61 (Bankr. E.D.N.Y. 2010).

The first and fifth elements are easily satisfied for both the watches and the business interests because: for the first element, "[s]tatements under oath include statements in documents filed with the Bankruptcy Court, such as the bankruptcy schedules," *id.*; and for the fifth element, both statements were "material" because they "bear[] a relationship to the debtor's . . . estate," insofar as "[l]ying about assets that are part of the estate—even if possibly exempt—certainly bears a relationship to the estate," *In re Murray*, 249 B.R. 223, 230 (E.D.N.Y. 2000) (quotation marks omitted). The third and fourth elements are often considered in tandem, *see In re Moreo*, 437 B.R. at 62-65, and courts consider "reckless indifference to the truth . . . [to be] the equivalent of fraud," *Diorio v. Kreisler-Borg Const. Co.*, 407 F.2d 1330, 1331 (2d Cir. 1969).

**Rolex Watches:** Mr. Winick made a knowing and fraudulent false oath or account when scheduling his watches on his bankruptcy petition. To begin, the value Mr. Winick listed for his watches was demonstrably false—he scheduled both watches as worth a total $5,000, but they were appraised at $47,500 (nearly an order of magnitude higher) only a few months later. 56.1 Stat. ¶ 68; Bankr. Dkt. No. 34-1. Furthermore, Mr. Winick valued his watches with reckless indifference to the truth. As early as May 2014, Mr. Winick held himself out to the public as a Rolex collector familiar with watch models and their values. 56.1 Stat. ¶ 71. Around the same time, he insured one of the two watches for over $10,000, comparable to its value in the Trustee's appraisal. *See* 56.1 Stat. ¶¶ 68, 70; Bannon Decl. ¶ 35, Ex. 33 at WINICK47.[7] And internet searches of the model numbers for his watches would have shown Mr. Winick that their value was much closer to $50,000 than $5,000. 56.1 Stat. ¶ 69; Bannon Decls. ¶¶ 50-51, Exs. 48-49.

Nevertheless, Mr. Winick scheduled his watches at a combined value of $5,000, low enough to claim them as exempt from the estate, *see* 11 U.S.C. § 522(d), evincing his fraudulent intent. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 644 (1992) (noting that 11 U.S.C. § 727(a)(4) "may limit bad-faith claims of exemptions by debtors"). And he scheduled them ambiguously as "two Rolex watches" rather than including their model numbers, which would have made it more difficult for the Chapter 7 Trustee to conduct the diligence that Mr. Winick apparently declined to do himself. *See, e.g.*, *In re Jalajel*, No. 09-11453, 2010 WL 3946420, at *3 (Bankr. E.D. Va. Oct. 8, 2010) (inferring fraudulent intent where debtor listed watches generically in his schedules). The undisputed evidence thus establishes Mr. Winick's fraudulent intent to conceal the value of his Rolexes.

---

[7] Notably, Mr. Winick insured twenty-two luxury watches around 2015, *none* of which were insured for less than $5,000 per watch. *See* Bannon Decl. ¶ 35, Ex. 33.

**Business Interests:** Mr. Winick also knowingly and fraudulently made a false oath or statement by scheduling his interests in WRG and WTN Realty Corp. as having "UNKNOWN" value. Courts have found that a debtor who schedules a business interest as having unknown value engages in "a poorly conceived effort to disguise and conceal [a] substantial asset," if he does so despite "never [having] had any trouble valuing [it] in the past." *In re Ligon*, 55 B.R. 250, 253 (Bankr. M.D. Tenn. 1985); *see also In re Silver*, 367 B.R. 795, 815 (Bankr. D.N.M. 2007) (finding that scheduling stocks as having "unknown" value "had the effect of a lie"). This is the case here. Mr. Winick had previously been able to estimate the value of his business interests—in 2012 and in 2018. *See* 56.1 Stat. ¶¶ 72-73; Bannon Decl. ¶¶ 46-47, Exs. 44-45. And as a principal of WRG and a licensed real estate broker, he had the information available to estimate the value of his interests when he filed for bankruptcy. 56.1 Stat. ¶ 74; Feltman Decl. ¶¶ 4-5. And yet, he did not.

Mr. Winick's course of dealing with the Chapter 7 Trustee after scheduling his business interests provides further evidence of his fraudulent intent. *See Thunberg v. Wallick*, No. 09-419, 2010 WL 1838003, at *2 (D.R.I. May 5, 2010) (considering post-petition conduct in determining fraudulent intent). Shortly after filing his schedules, Mr. Winick sought to have the estate abandon its claim to his business interests, arguing that they were valueless because his real-estate firm could only survive with a capital infusion that was unlikely to be made. 56.1 Stat. ¶ 75; Bankr. Dkt. No. 36; Bannon Decl. ¶ 48, Ex. 46. But this alleged need for capital was premised on the illogical premise that the firm would close no new deals in 2021 or 2022. 56.1 Stat. ¶ 76; Bannon Decl. ¶ 48, Ex. 46. Unsurprisingly, the firm survived with no capital infusion and the business interests were ultimately the most valuable asset sold by Mr. Winick's estate, after the Government objected to its abandonment. 56.1 Stat. ¶¶ 77-78; Eisinger Dep. 23:22-25:8; Bankr. Dkt. No. 86.

Mr. Winick may argue that the value of his property interests was uncertain in light of the COVID-19 pandemic. But that is no defense to his actions. As the official bankruptcy instructions provide, where the value of an asset is "difficult to figure out," a debtor should "estimate the value and be prepared to explain how [he] determined it." U.S. Bankruptcy Court, *Instructions: Bankruptcy Forms for Individuals* (Dec. 2015). Mr. Winick made no effort to do so.

\* \* \*

Importantly, "[t]he Second Circuit has recognized that fraudulent intent may be inferred from a series of incorrect statements and omissions contained in the schedules." *In re Moreo*, 437 B.R. at 62 (citing cases). Thus, this Court may consider Mr. Winick's scheduling of his watches and business interests together in determining whether he made a false oath or account in his bankruptcy petition, sufficient to deny him a discharge. The undisputed facts thus support summary judgment in the United States' favor on Count II of its complaint.

## CONCLUSION

For the reasons explained herein, the Court should grant summary judgment to the Government on Counts II, III, and IV of its complaint.

Dated: New York, New York
     April 14, 2023

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney for the
          Southern District of New York
          *Attorney for Respondents*

      By:  */s/ Zachary Bannon*
          ZACHARY BANNON
          Assistant United States Attorney
          86 Chambers Street, 3rd Floor
          New York, New York 10007
          Telephone: (212) 637-2728
          E-mail: zachary.bannon@usdoj.gov