DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:  ZACHARY BANNON
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728
Fax: (212) 637-2717
E-mail: Zachary.Bannon@usdoj.gov

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JEFFREY WINICK<br><br>                           Debtor. | Chapter 7<br>No. 20-11976 (PB) |
| UNITED STATES OF AMERICA,<br><br>                        Plaintiff,<br><br>    - against –<br><br>JEFFREY WINICK<br><br>                      Defendant. | Adv. Proc. No. 20-1138 (PB) |

**THE UNITED STATES' STATEMENT PURSUANT TO LOCAL RULE 7056-1(b)**

Pursuant to Local Rule 7056-1(b) of the Local Rules of the United States Bankruptcy Court for the Southern District of New York, plaintiff the United States of America (the "Government"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this statement of undisputed material facts in support of its motion for partial summary judgment. The United States reserves the right to submit additional material undisputed facts in support of its reply to the opposition of defendant Jeffrey Winick.

1.      Through at least 2016, Mr. Winick derived the substantial majority of his income through commissions earned from brokering real-estate transactions, from which his employer did not withhold taxes. Declaration of Zachary Bannon dated April 14, 2023 ("Bannon Decl.") ¶ 3, Ex. 1 ("Winick Dep.") 26:8-13.

2.      Between 2000 and 2005, Mr. Winick repeatedly failed to make quarterly estimated tax payments required pursuant to 26 U.S.C. § 6654. Declaration of John T. Harrison dated April 14, 2023 ("Harrison Decl.") ¶ 3, Ex. 1; *id.* ¶ 5, Ex. 3 at USA03071, 03102 (noting no estimated taxes paid for tax years 2003 and 2005).

3.      Around 2003, Mr. Winick purchased a home located at 24 Parrish Pond Lane, Southampton, New York 11968 that, as of 2016, was appraised at a value of $3,210,000. Winick Dep. 81:18-82:3; Bannon Decl. ¶ 4, Ex. 2.

4.      Shortly after purchasing the Southampton home, Mr. Winick transferred its title for no consideration to the Jeffrey Winick 1999 Life Insurance Trust, which named his daughter Danielle Winick as beneficiary. Winick Dep. 82:4-9; Bannon Decl. ¶ 5, Ex. 3.

5.      On October 1, 2003, Mr. Winick entered into a lease agreement with the Jeffrey Winick 1999 Life Insurance Trust whereby he agreed to pay $150,000 per year to lease the Southampton property from the trust. Bannon Decl. ¶ 6, Ex. 4.

6.      From 2012 to 2016, Mr. Winick incurred liabilities to the Internal resulting from the underpayment of income taxes in the amounts summarized in the following table:

| Tax Year | Taxable Income | Taxes Owed | Tax Withholdings | Tax Liability |
|----------|----------------|------------|------------------|---------------|
| 2012 | $7,922,503 | $2,958,768 | $676,747 | $2,282,021 |
| 2013 | $4,675,510 | $1,944,528 | $558,099 | $1,386,429 |
| 2014 | $4,911,103 | $2,100,533 | $276,518 | $1,824,015 |

| 2015 | $3,891,521 | $1,578,350 | $876,635 | $701,715 |
| 2016 | $2,412,311 | $995,865 | $251,377 | $744,488 |
| Totals | $23,812,948 | $9,578,044 | $2,639,376 | $6,938,668 |

Harrison Decl. ¶ 4, Ex. 2.

7. Mr. Winick made some quarterly estimated tax payments pursuant to 26 U.S.C. § 6654 between 2005 and 2012. Winick Dep. 19:12-18.

8. Mr. Winick did not make any quarterly estimated tax payments between 2012 and 2016, though his lawyers told him "numerous times" that he should do so. Harrison Decl. ¶ 4, Ex. 2; Winick Dep. 24:16-25.

9. Mr. Winick stopped making quarterly estimated tax payments so that he could spend more money gambling at casinos. Winick Dep. 25:7-12.

10. Mr. Winick paid $25,000 toward his 2012 to 2016 tax liabilities in January 2014, in connection with a request to enter into an IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702; *Id.* ¶ 5, Ex. 3 at USA03256.

11. The IRS entered into an IA with Mr. Winick in July 2014, whereby Mr. Winick would pay $50,000 per month through November 2014, then $100,000 per month until his liabilities were fully paid. Harrison Decl. ¶ 5, Ex. 3 at USA03280.

12. Mr. Winick made the following payments pursuant to his 2014 IA or while it was pending: January 2014 -- $25,000; May 2014 -- $50,000; June 2014 -- $50,000; August 2014 -- $50,000; September 2014 -- $50,000. He made no further payments under this IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702.

13. The IRS terminated Mr. Winick's IA in March 2015. Harrison Decl. ¶ 4, Ex. 2 at USA01702.

14. After his 2014 IA was terminated, Mr. Winick made a payment of $25,000 toward his tax liabilities in April 2015, while requesting to enter into a new IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702.

15. The IRS entered a second IA with Mr. Winick in October 2015, whereby he would pay $50,000 per month through November 2017, then $75,000 per month until his liabilities were fully paid. Harrison Decl. ¶ 5, Ex. 3 at USA03295.

16. Mr. Winick made the following payments pursuant to his 2014 IA or while it was pending: April 2015 -- $25,000; May 2015 -- $30,000; June 2015 -- $30,000; July 2015 -- $50,000; August 2015 -- $50,000; September 2015 -- $50,000; October 2015 -- $50,000; November 2015 -- $50,000; December 2015 -- $50,000; January 2016 -- $50,000; February 2016 -- $50,000; March 2016 -- $50,000; April 2016 -- $50,000; May 2016 -- $50,000; June 2016 -- $50,000; July 2016 -- $50,000; August 2016 -- $25,000; September 2016 -- $25,000; October 2016 -- $25,000; November 2016 -- $25,000; December 2016 -- $25,000. He made no further payments under this IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702-01703.

17. The IRS terminated Mr. Winick's second IA in March 2017. Harrison Decl. ¶ 4, Ex. 2 at USA01703.

18. Mr. Winick submitted an offer-in-compromise to the IRS in May 2017, offering $430,000, with a prepayment of $86,000, to compromise the over $7 million in liabilities that remained outstanding at that time. Harrison Decl. ¶ 6, Ex. 4.

19. In September 2018, the IRS informed Mr. Winick that his offer-in-compromise would be rejected. Harrison Decl. ¶ 5, Ex. 3 at USA03357.

20. Mr. Winick withdrew his offer-in-compromise on September 26, 2018. Harrison Decl. ¶ 4, Ex. 2 at USA01704.

21. After his offer-in-compromise was withdrawn, Mr. Winick made a payment of $50,000 toward his tax liabilities in November 2018, while requesting to enter into a further IA. Harrison Decl. ¶ 4, Ex. 2 at USA01704.

22. Under the terms of the IRS's third IA with Mr. Winick, he would pay $50,000 per month through December 2019, then $114,000 per month thereafter until his liabilities were fully paid. Harrison Decl. ¶ 5, Ex. 3 at USA03370.

23. Mr. Winick made the following payments pursuant to his third IA or while it was pending: November 2018 -- $50,000; December 2018 -- $50,000; January 2019 -- $50,000; February 2019 -- $50,000; March 2019 -- $50,000; April 2019 -- $50,000; May 2019 -- $50,000; June 2019 -- $50,000; July 2019 -- $50,000; August 2019 -- $50,000; September 2019 -- $50,000; October 2019 -- $50,000; November 2019 -- $50,000; December 2019 -- $50,000; January 2020 -- $50,000. He made no further payments. Harrison Decl. ¶ 4, Ex. 2 at USA01704-01705.

24. Mr. Winick made no further payments towards his tax liabilities after his January 2020 IA payment. Harrison Decl. ¶ 4, Ex. 2 at USA01705.

25. At the time Mr. Winick filed for bankruptcy in August 2020, his liabilities to the IRS were as summarized in the following table:

| Tax Period | Remaining Tax Due ($) | Penalties Due as of Petition Date ($) | Interest Due as of Petition Date ($) | Total Due as of Petition Date ($) |
|---|---|---|---|---|
| 2012 | 356,509.00 | 627,999.45 | 436,044.75 | 1,420,553.02 |
| 2013 | 1,386,429.00 | 416,699.65 | 413,433.23 | 2,216,561.88 |
| 2014 | 1,824,015.00 | 548,181.72 | 473,941.12 | 2,846,137.84 |
| 2015 | 701,715.00 | 207,987.26 | 155,801.40 | 1,065,503.66 |
| 2016 | 744,488.00 | 132,922.09 | 129,695.05 | 1,007,105.14 |
| Total | 5,013,156.00 | 1,933,790.17 | 1,617,915.55 | 8,564,861.72 |

Harrison Decl. ¶ 7.

26. Between 2012 and the time he filed for bankruptcy, Mr. Winick served as the majority owner and chief executive officer of Winick Realty Group, LLC—a New York City-based commercial real-estate brokerage. Winick Dep. 13:5-18; Bannon Decl. ¶ 7, Ex. 5 at USA0860 (describing Mr. Winick as the 22.5% owner of WRG and WTN Realty Corp. as the 67.5% owner of WRG); Bannon Decl. ¶ 8, Ex. 6 at USA0794 (describing Mr. Winick as the 60% owner of WTN Realty Corp.); Bannon Decl. ¶ 52, Ex. 50.

27. In 2012, Mr. Winick paid $15,000 per month to rent his Manhattan apartment. By 2014, the rent had increased to $17,000 per month, and by 2016, his rent further increased to $18,000 per month. Winick Dep. 65:4-17.

28. Between 2012 and 2016, Mr. Winick paid $11,000 per month in rent to the trust he established for the benefit of his daughter for his vacation home in Southampton. Bannon Decl. ¶ 9, Ex. 7; Winick Dep. 65:4-17.

29. From 2012 through 2014, Mr. Winick paid between $5,350 and $6,700 per month to rent an apartment for his ex-wife, Lizette Cubria. Bannon Decl. ¶ 10, Ex. 8; *id.* ¶ 11, Ex. 9; Winick Dep. 32:25-33:22, 80:21-81:17.

30. From 2013 through 2014, Mr. Winick paid at least $3,500 per month to rent an apartment for his daughter while she attended New York University as an undergraduate. Bannon Decl. ¶ 12, Ex. 10; Winick Dep. 33:23-35:3.

31. From 2012 through 2013, Mr. Winick paid approximately $75,000 per year in college tuition for his daughter. Bannon Decl. ¶ 13, Ex. 11 at WINICK75; Bannon Decl. ¶ 14, Ex. 12 at WINICK100.

32. Between 2012 and 2016, Mr. Winick paid over $1,000 per month in utilities at his Southampton home. Bannon Decl. ¶¶ 15-18, Exs. 13-16.

33. Between 2014 and 2016, Mr. Winick paid approximately $200 per month to Optimum for media services at his Southampton home. Bannon Decl. ¶ 19, Ex. 17.

34. Between 2012 and 2018, Mr. Winick paid approximately $300 per month to DirecTV for media services at his Southampton home. Bannon Decl. ¶ 20, Ex. 18.

35. In at least 2017, Mr. Winick paid almost $500 per month to Spectrum for media services. Bannon Decl. ¶ 21, Ex. 19.

36. In 2012 and 2013, Mr. Winick spent $6,000 per year on boat storage fees at Strong's Marine. Bannon Decl. ¶ 22, Ex. 20.

37. In 2012 through 2016, Mr. Winick spent over $1,500 per year on association fees to the Parrish Pond Homeowners Association. Bannon Decl. ¶ 23, Ex. 21.

38. In the summer of 2016, Mr. Winick spent over $6,000 on pest control services from Premier Pest Control. Bannon Decl. ¶ 24, Ex. 22.

39. Mr. Winick estimates that he spent over $1,000 on shopping trips once-or-twice per month between 2012 and the time he filed for bankruptcy. Winick Dep. 77:24-78:7.

40. Mr. Winick used at least four different credit cards between 2012 and the time he filed for bankruptcy. Winick Dep. 50:18-23 (acknowledging four credit cards and stating "[t]here might be others").

41. Mr. Winick's expenses on his American Express ("AmEx") in 2013 included: (1) over $2,000 at All Saints on January 30, 2013; (2) over $4,000 at Frontgate on June 18, 2013 (and over $3,000 there again, the next month); (3) over $4,500 at Intermix on October 19, 2013; and (4) over $2,000 at Blanc Bleu on December 31, 2013. Bannon Decl. ¶ 25, Ex. 23 at WINICK4297, 4330, 4336, 4356, and 4362.

42. In total, Mr. Winick spent over $120,000.00 on his AmEx in 2013. *See generally* Bannon Decl. ¶ 25, Ex. 23.

43. On one instance in September 2013, Mr. Winick's daughter spent $15,000 on one trip to Intermix on his Amex. In his words: "That was my punishment for showing up late to dinner, I had to go shopping. That was the last time I showed up late." Bannon Decl. ¶ 25, Ex. 23 at WINICK4350; Winick Dep. 77:6-10.

44. Mr. Winick went on over thirty international trips between 2012 and the time he filed for bankruptcy, including trips to the Bahamas, France, Mexico, Germany, Prague, and Saint Barts. Winick Dep. 95:2-96:23.

45. Mr. Winick spent over $5,000 in one day at Hillside Bahamas while traveling in the Bahamas in April 2014. Bannon Decl. ¶ 26, Ex. 24 at WINICK 4388.

46. Mr. Winick spent over $20,000 in one instance at a beachside resort restaurant, Anao Plage Beaulieu, when traveling in France in October 2019. Bannon Decl. ¶ 27, Ex. 25 at WINICK 4781.

47. Between 2012 and 2016, Mr. Winick lost the following sums of money gambling at casinos: $4,526,800 in 2012; $2,417,450 in 2013; $2,166,575 in 2014; $971,115 in 2015; and $1,805,400 in 2016, for a total of over $10 million over this five-year period. Bannon Decl. ¶ 28, Ex. 26 at WINICK43.

48. Mr. Winick's expert witness, Dr. Jeremiah Weinstock, has diagnosed Mr. Winick with a gambling disorder of moderate severity. Bannon Decl. ¶ 29, Ex. 27 ("Weinstock Dep.") 25:23-27:15.

49. Dr. Weinstock opined Mr. Winick's disorder did not prevent him from being able to adopt harm-reduction strategies to limit his gambling, like declining to take credit from casinos

and setting bankroll limits so he would not lose more than a preset sum in any individual visit to a casino. Weinstock Dep. 93:4-20.

50. Dr. Weinstock opined further that Mr. Winick was incapable of adopting the harm-reduction strategy of gambling with only post-tax dollars because "[p]ast experience had taught him that he didn't need to change his gambling behavior because everything had worked out previously in the early 2000s" and because "being behind on his back taxes [was] not punishing to him, so therefore he [didn't] need to take any action." Weinstock Dep. 95:16-96:18.

51. The only cost-cutting measure Mr. Winick can recall that he undertook in 2014 was that he "got rid of [his] boat." Winick Dep. 54:17.

52. Mr. Winick could not identify any cost-cutting measures he instituted between 2014 and 2016, but noted in this regard that he did not "think [he] had a girlfriend then." Winick Dep. 66:3-6.

53. On September 13, 2012, Mr. Winick sold his interest in the company named 987 Eighth Avenue, LLC, a company owning a leasehold over real property, for $2 million. Bannon Decl. ¶ 30, Ex. 28; Winick Dep. 102:6-19.

54. On December 18, 2012, Mr. Winick gifted a $4 million interest in one of his real-estate companies, WTN Realty Corp., to his daughter. Bannon Decl. ¶ 31, Ex. 29.

55. On September 30, 2014, Mr. Winick sold his thirty-foot boat for almost $20,000. Bannon Decl. ¶ 32, Ex. 30.

56. On January 1, 2016, Mr. Winick gifted ownership of the New Jersey branch of his real-estate company to his daughter. Bannon Decl. ¶ 33, Ex. 31.

57. Between 2013 and 2018, Mr. Winick gifted at least $655,000 in life insurance policies to his daughter. Bannon Decl. ¶ 34, Ex. 32.

58. At some point after 2015, Mr. Winick gave away approximately half a million dollars in jewelry.  Bannon Decl. ¶ 35, Ex. 33; Winick Dep. 94:8-21.

59. Between 2012 and 2016, Mr. Winick donated over $200,000 to charity.  Bannon Decl. ¶ 36, Ex. 34.

60. Between 2012 and 2016, Mr. Winick drove luxury Mercedes Benz automobiles for which his company paid tens of thousands of dollars in leases.  Bannon Decl. ¶ 37, Ex. 35; Winick Dep. 100:12-22.

61. In late 2019 and early 2020, Louis Eisinger, WRG's Chief Operation Officer, assisted Mr. Winick in using WRG commissions to pay off Mr. Winick's personal debts, despite those debts having no connection to the business.  Bannon Decl. ¶ 38, Ex. 36 ("Eisinger Dep.") 50:18-54:13; Bannon Decl. ¶ 39, Ex. 37.

62. Mr. Winick received a loan, ultimately in the amount of $1.5 million, secured by his interest in SDSDR111 LLC, another company owning a leasehold, from David Berley in 2015.  He received a second, unsecured loan of $250,000 from Mr. Berley in 2018.  Bannon Decl. ¶ 40, Ex. 38.

63. The IRS filed a notice of tax lien, establishing a security interest in Mr. Winick's interest in SDSDR111 LLC, on May 19, 2014.  Bannon Decl. ¶ 41, Ex. 39.

64. Mr. Berley filed a UCC statement, establishing a security interest in Mr. Winick's interest in SDSDR111 LLC, on January 30, 2015.  Bannon Decl. ¶ 42, Ex. 40.

65. Mr. Winick paid $218,814 toward the principal of his unsecured loan from Mr. Berley on February 26, 2020.  Bannon Decl. ¶ 43, Ex. 41; Eisinger Dep. 64:19-24.

66. Mr. Winick transferred his entire remaining interest in SDSDR111 LLC to Mr. Berley in satisfaction of the secured loan on July 24, 2020.  Bannon Decl. ¶ 44, Ex. 42.

67. Before the transfer, the value of Mr. Winick's interest in SDSDR111 LLC had been most recently estimated to be $2.5 million. Bannon Decl. ¶ 45, Ex. 43; Winick Dep. 140:20-141:6.

68. A valuation of Mr. Winick's watches conducted in November 2020 showed that his "18kt Yellow Gold Rolex Yacht-Master 2, 2017 Ref. #116688M" was worth $38,000 and his "18kt/Stainless Steel Rolex Submariner 2009, Ref. # 116613" was worth $9,500. *See In re Winick*, No. 20-11976, Dkt. No. 34-1 (Bankr. S.D.N.Y. filed Feb. 1, 2021).

69. Simple internet searches for those model numbers reveals numerous resale watches of the same models for similar prices. Bannon Decl. ¶¶ 50-51, Exs. 48-49.

70. Until 2015, Mr. Winick had insured one of the two watches at issue for over $10,000. *See* Bannon Decl. ¶ 35, Ex. 33 at WINICK47.

71. When asked "Do you live extravagantly" in 2014 by a real-estate magazine, Mr. Winick responded: "I collect Rolexes. My favorite is the one I'm wearing, which is the cheapest one they make." Bannon Decl. ¶ 49, Ex. 47.

72. As of December 31, 2012, a share of stock in WTN Realty Corp. was valued at $12,540. Bannon Decl. ¶ 46, Ex. 44.

73. As of June 30, 2018, a share of WRG was valued at $737. Bannon Decl. ¶ 47, Ex. 45.

74. As a commercial real-estate broker and the principal of WRG, Mr. Winick had the knowledge and information available to him to estimate the value of his business interests at the time he filed for bankruptcy. Declaration of James Feltman dated April 14, 2023 ("Feltman Decl.") ¶¶ 4-5.

75. Mr. Winick requested that the Chapter 7 Trustee administering the estate abandon the estate's interests in WRG and WTN Realty Corp., arguing that these interests were valueless

because the companies needed significant capital infusions to remain solvent, which the principals of WRG would not provide if the interests remained part of the estate. *See In re Winick*, No. 20-11976, Dkt. No. 36 (Bankr. S.D.N.Y. filed Feb. 1, 2021); Bannon Decl. ¶ 48, Ex. 46.

76. WRG's alleged need for a capital infusion was premised on the notion that the company would sign no new deals in 2021 or 2022. Bannon Decl. ¶ 48, Ex. 46.

77. To date, WRG has not received a capital infusion from its principals but has remained in business. Eisinger Dep. 23:22-25:8.

78. The trustee sold these corporate interests in the bankruptcy for $310,000. *See In re Winick*, No. 20-11976, Dkt. No. 86 (Bankr. S.D.N.Y. filed Dec. 9, 2021).

Dated: April 14, 2023
       New York, New York

                                      DAMIAN WILLIAMS
                                      United States Attorney for the
                                      Southern District of New York

                   By:    */s/ Zachary Bannon*
                                      ZACHARY G. BANNON
                                      Assistant United States Attorney
                                      86 Chambers Street, Third Floor
                                      New York, New York 10007
                                      Tel.: (212) 637-2728