UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
In re:                                                     :
                                                           :    Chapter 7
    JEFFREY WINICK,                     :
                                                           :    Case No. 20-11976 (PB)
        Debtor.     :
-----------------------------------------------------------x
UNITED STATES OF AMERICA,                                  :
                                                           :    Adv. Proc. No. 21-01138 (PB)
        Plaintiff,  :
                                                           :
    v.                                  :
                                                           :
JEFFREY WINICK,                                            :
                                                           :
        Defendant.  :
-----------------------------------------------------------x

## DEFENDANT'S STATEMENT OF FACTS

Pursuant to Local Rule 7056-1, debtor and defendant Jeffery Winick ("Debtor") submits this statement of undisputed material facts in support of his motion for summary judgment.

Debtor reserves the right to submit additional undisputed material facts in response to any opposition submitted by plaintiff United States of America ("Plaintiff").

**Undisputed Material Facts Relevant to Count I**

1.    In Count I of its Complaint, Plaintiff contends that Debtor should be denied a discharge under section 727(a)(2)(A) of the Bankruptcy Code because he allegedly transferred his membership interests in an entity called SDSDR111 LLC ("SDSDR111") within one year before filing for bankruptcy in order to hinder, delay, or defraud the Internal Revenue Service ("IRS"). Adv. Dkt. No. 1 at 14-16, 18-19.

2. SDSDR111 is a Delaware LLC formed for the purpose of owning and operating an interest in the condominium located at 545 West 111th Street in New York City. Adv. Dkt. No. 1 at ¶ 52; Declaration of Jin Yan, Ex. 1 at WINICK 2104.[1]

3. Debtor executed a Secured Promissory Note dated January 29, 2015 in the principal amount of $500,000 in favor of David Berley ("Berley"). Declaration of Zachary Bannon, Ex. 38 at WINICK 2392-2400.

4. Defendant testified that the purpose of this $500,000 loan was to help him catch up on delinquent taxes. Bannon Ex. 1 at 125:15-22.

5. Under the Secured Promissory Note, Debtor granted a first priority lien and continuing security interest in and to his interests in SDSDR111. Bannon Ex. 38 at WINICK 2392-2400.

6. On January 30, 2015, a UCC financing statement was filed with the State of New York, Department of State, for Debtor's interests in SDSDR111, with Berley listed as the secured party. Bannon Ex. 40 at WINICK 2429-2430.

7. The IRS had previously filed a tax lien against Debtor with the New York County Register Office on May 19, 2014. Bannon Ex. 39.

8. It is not uncommon for the IRS to file tax liens against individuals with both the county as well as the state. Yan Ex. 2 at 154:14-24.

9. When filing its lien against Debtor, however, the IRS filed with the county only and not the state. Bannon Ex. 39.

---

[1] Shorthand references to exhibits attached to declarations are cited as "[declarant's last name] Ex. [#]."

10. Searches performed in 2016 for additional liens filed against Debtor with the state yielded no results beyond Berley's 2015 UCC financing statement. Bannon Ex. 40 at WINICK 2431-2432.

11. Debtor testified that when he borrowed the $500,000 from Berley, he was not aware that the IRS had a lien on his property and did not realize that the IRS had a lien on all of his property due to his delinquent taxes. Bannon Ex. 1 at 125:23-126:6.

12. Debtor has no recollection of receiving a notice of the IRS's 2014 tax lien or being informed of such a lien. Declaration of Jeffrey Winick ("Winick Decl.") ¶ 21.

13. Debtor testified that he did not understand how Berley was able to obtain a UCC filing from the state if the IRS had a lien on his interests in SDSDR111. Bannon Ex. 1 at 126:10-22.

14. The earliest notice of federal tax lien that Debtor produced in discovery was from August 2015, which was after he pledged his interests in SDSDR111 to Berley. Yan Ex. 4 at WINICK 2662-2665.

15. Plaintiff did not produce in discovery any notice of federal tax lien addressed to Debtor. Yan Decl. ¶ 23.

16. In response to Debtor's document request asking for "[a]ll documents concerning any notice(s) given to [Debtor] of the IRS's alleged lien on and/or interest in SDSDR111 LLC," Plaintiff directed Debtor to the proof of claim it filed in Debtor's bankruptcy case. Yan Ex. 5 at 4.

17. The IRS's proof of claim in Debtor's bankruptcy case attaches tax liens but no notices of those tax liens to the Debtor. Yan Ex. 6.

18. The IRS's internal records show that in August 2015, Debtor's power of attorney for dealing with the IRS provided the IRS with a copy of the Secured Promissory Note reflecting Berley's $500,000 loan to Debtor. Declaration of John Harrison, Ex. 3 at USA 3290-3291.

19. In 2016, Berley loaned an additional $1 million to Debtor and the Secured Promissory Note was replaced with an Amended and Restated Secured Promissory Note. Bannon Ex. 38 at WINICK 2403-2414.

20. Debtor testified that the additional $1 million he borrowed from Berley was probably for taxes and gambling. Bannon Ex. 1 at 128:4-11.

21. Under the Amended and Restated Secured Promissory Note, Debtor reaffirmed his pledge of his interests in SDSDR111. Bannon Ex. 38 at WINICK 2403-2414.

22. The IRS's internal records show that in March 2018, Debtor's power of attorney provided the IRS with additional documents relating to the Berley loan, including copies of the Amended and Restated Secured Promissory Note and Berley's 2015 UCC financing statement. Harrison Ex. 3 at USA 3335-3336.

23. In November 2019, Debtor executed a Second Amended and Restated Secured Promissory Note in the principal amount of $1,627,500 in favor of Berley. Bannon Ex. 38 at WINICK 2419-2428.

24. Under the Second Amended and Restated Secured Promissory Note, Debtor reaffirmed his pledge of his interests in SDSDR111. Bannon Ex. 38 at WINICK 2419-2428.

25. In January 2020, a continuing UCC financing statement was filed on Berley's behalf for Debtor's pledged interests in SDSR111. Bannon Ex. 40 at WINICK 2434.

26. To Debtor's knowledge, the IRS never took any pre-bankruptcy action to object to his pledging his interests in SDSDR111 to Berley or to challenge Berley's lien on those interests. Winick Decl. ¶ 22.

27. The IRS's internal records do not show the IRS having taken any action to object to Debtor's pledging his interests in SDSDR111 to Berley or to challenge Berley's lien on those interests. Harrison Ex. 3.

28. On July 9, 2020, Debtor received a letter from Berley's counsel at Kudman Trachten Aloe LLP indicating that Debtor was in default under the Second Amended and Restated Promissory Note for failing to pay quarterly interest in the amount of $24,412.50 due on May 1, 2020 and demanding that Debtor immediately pay the accelerated indebtedness of $1,651,912.50. Yan Ex. 7.

29. On July 24, 2020, Debtor received a letter from Berley indicating that Berley proposed to retain Debtor's interests in SDSDR111 in full satisfaction of his unpaid obligations of $1,658,693.70. Yan Ex. 8.

30. The file path listed on the bottom of Berley's letter suggests that it was drafted by Berley's counsel at Kudman Trachten Aloe LLP. Yan Ex. 8.

31. On July 24, 2020, Debtor received a separate letter from Berley's counsel at Kudman Trachten Aloe LLP attaching a consent to Berley's accepting Debtor's interests in SDSDR111 in full satisfaction of Debtor's indebtedness. Yan Ex. 9.

32. On or about July 24, 2020, Debtor signed the consent provided by Berley's counsel, which authorized Berley's taking Debtor's interests in SDSDR111 in full satisfaction of Debtor's debt to Berley. Bannon Ex. 42.

33. Debtor had no intention of defrauding anyone when he allowed Berley to take his interests in SDSDR111 to satisfy Debtor's debt to him. Winick Decl. ¶ 19.

34. Debtor testified that before July 2020, he did not have any conversation with Berley regarding Debtor's filing for bankruptcy. Bannon Ex. 1 at 136:23-137:5.

35. At the time he transferred his interests in SDSDR111 to Berley in July 2020, Debtor had not yet made up his mind as to whether to file for bankruptcy. Bannon Ex. 1 at 139:18-23; Winick Decl. ¶ 9.

36. Debtor testified that he did not think that the IRS might go after his interests in SDSDR111 if he didn't transfer them to Berley before filing for bankruptcy because Berley had a lien on that interest for several years. Bannon Ex. 1 at 139:24-140:7.

37. Berley testified that he did not recall Debtor ever telling him that Debtor wanted him to take the interests in SDSDR111. Yan Ex. 10 at 46:10-13.

38. Berley testified that he took Debtor's interests in SDSDR111 because he thought that was as good a result as he was going to get at the time. Yan Ex. 10 at 63:24-64:12.

39. Berley testified that when he gave Debtor money, it was never as a gift, and that he expected to be repaid. Yan Ex. 10 at 14:9-12, 40:15-18.

40. Subsequent to the transfer, Debtor obtained a valuation of his interests in SDSDR111 for tax purposes, and that valuation opined the fair market value of Debtor's interests as of July 31, 2020 was $240,000. Yan Ex. 1 at WINICK 2086.

41. Debtor testified that the other partners of SDSDR111 had a 30-day right of first refusal and could have purchased his pledged interests from Berley for the $1.6 million that was owed to Berley, but they did not do so. Bannon Ex. 1 at 141:24-142:17.

42. Berley testified that after Debtor transferred his interests in SDSDR111, Berley became a member of SDSDR111 and Debtor's only involvement with the company was as a rental agent. Yan Ex. 10 at 50:3-9.

43. Debtor disclosed the transfer of his interests in SDSDR111 to Berley on his bankruptcy schedules. Bankr. Dkt. No. 1 at 51 of 58.

44. Debtor also disclosed the transfer of his interests in SDSDR111 at the section 341 meeting conducted on October 8, 2020. Yan Ex. 11 at 5:22-6:22.

45. Postpetition, the Chapter 7 trustee's counsel requested information concerning the transfer of Debtor's interests in SDSDR111, and Debtor supplied that information. Yan Ex. 12 at 3; Yan Ex. 13.

### Undisputed Material Facts Relevant to Count II

46. In Count II of its Complaint, Plaintiff contends that Debtor should be denied a discharge under section 727(a)(4) of the Bankruptcy Code because he made two false oaths or accounts in his bankruptcy schedules: (1) he listed the value of his interests in WTN Realty Corp. ("WTN") and Winick Realty Group LLC ("WRG") as "unknown" and (2) he listed the value of his two Rolex watches as $5,000. Adv. Dkt. No. 1 at 16-17, 19.

47. Plaintiff's corporate representative testified that beyond these two items, Plaintiff is not alleging that anything else in Debtor's schedules was false. Yan Ex. 3 at 47:24-48:5.

**Debtor's Interests in WTN and WRG**

48. WRG is a commercial real estate brokerage firm in New York City and WTN is a related holding company for interests in WRG. Bankr. Dkt. No. 36 at ¶ 7; Winick Decl. ¶ 2; Bannon Ex. 44 at USA 2537; Yan Ex. 15 at WINICK 2294.

49. Plaintiff's corporate representative testified that the sole basis for Plaintiff's contention that Debtor's scheduling the value of his interests in WTN and WRG as "unknown" is false is that in the past, Debtor had been able to value those interests. Yan Ex. 3 at 56:23-57:13.

50. In 2013, Anchin, Block & Anchin LLP performed a valuation of the fair market value of Class B non-voting common stock in WTN and estimated that value be to $12,540 per share as of December 31, 2012. Bannon Ex. 44 at USA 2532-2533.

51. At the time of that valuation, Debtor owned 286.65 shares of Class B stock in WTN, which meant that the value of his shares was $3,594,591. Bannon Ex. 44 at USA 2537.

52. In 2018, Anchin, Block & Anchin LLP performed a valuation of the fair market value of Class A and Class B units in WRG and estimated that value be to $737 per unit as of June 30, 2018. Yan Ex. 15 at WINICK 2289-2290.

53. At the time of that valuation, Debtor owned 2,250 Class A units, which meant that the value of his units was $1,658,250. Yan Ex. 15 at WINICK 2295.

54. The 2013 valuation of WTN is the only pre-petition valuation of WTN that either party has produced in this case. Yan Decl. ¶ 24.

55. The 2018 valuation of WRG is the only pre-petition valuation of WRG that either party has produced in this case. Yan Decl. ¶ 25.

56. Debtor is not an expert on valuing businesses or business interests. Winick Decl. ¶ 25.

57. Debtor has no education, training, or experience in valuing businesses or business interests. Winick Decl. ¶ 25.

58. Plaintiff's corporate representative could not point to any evidence that Debtor knew the exact dollar value of his interests in WTN and WRG when he scheduled them as having "unknown" value. Yan Ex. 3 at 60:12-17.

59. When asked what value Debtor should have listed on his schedules for his interests in WTN and WRG, Plaintiff's corporate representative could not provide a number. Yan Ex. 3 at 56:11-13.

60. Debtor had no intention to defraud anyone when he listed the value of WTN and WRG as "unknown" on his schedules. Winick Decl. ¶ 23.

61. When asked why he listed the value of his interests in WTN and WRG as "unknown," Debtor testified he did so because he "really did not know what the value was" given that "w[e] were shut down for six months," "[n]obody was paying the bills or commissions owed to us," and "[w]e didn't know what the world was out there" and "[s]o the value really was unknown." Bannon Ex. 1 at 117:10-21.

62. It did not occur to Debtor to list prior valuations of WTN and WRG on his schedules, and he was not advised to do so. Winick Decl. ¶ 26.

63. When asked why he didn't rely on the last-known value of WRG, Debtor testified it was due to the "whole COVID-19 effect" whereby "we were shut down and not collecting any money" and "[w]e weren't being paid receivables by landlords because landlords weren't getting paid by their tenants." Bannon Ex. 1 at 118:5-11.

64. Debtor testified that even if he had asked, he did not believe that his accountants would have provided him with a valuation for his interests because "the uncertainty of COVID-19 made everything questionable in valuation, especially in the real estate industry in New York." Bannon Ex. 1 at 119:9-24.

65. Post-petition, the Chapter 7 trustee's counsel requested various information concerning Debtor's interests in WTN and WRG, including governing agreements for those entities, annual tax returns, and financial statements. Yan Ex. 12 at 2-3.

66. Debtor responded to those requests and provided information concerning WTN and WRG. Yan Ex. 13.

67. On February 1, 2021, the Chapter 7 trustee filed a motion seeking the Court's approval to abandon the estate's interests in WTN and WRG. Bankr. Dkt. No. 36.

68. In his motion, the Chapter 7 trustee asserted that "[a]s a result of the COVID-19 pandemic, the Winick Firms, like most of the commercial real estate industry, have faced significant operational and financial difficulties. As a result, the Debtor's interests in the Winick Firms are currently virtually valueless, and his partners are unable to make investments necessary to salvage the firms without first formally disconnecting from the Debtor's bankruptcy estate." Bankr. Dkt. No. 36 at 2.

69. The Chapter 7 trustee's motion does not reference any representation made by Debtor regarding the value of WTN or WRG. Bankr. Dkt. No. 36.

70. On March 24, 2021, Plaintiff filed an opposition to the Chapter 7 trustee's motion that was supported by a declaration from James Feltman ("Feltman"). Bankr. Dkt. Nos. 46, 46-1.

71. In his declaration, Feltman opined that WRG was worth anywhere from $3.4 million to $11.8 and that Debtor's interest in WRG had a value proportionate to his 63% economic interest in WRG, meaning Debtor's interests were worth anywhere from $2,142,000 to $7,434,000. Bankr. Dkt. 46-1 at ¶¶ 8, 10.

72. Following Plaintiff's opposition to his motion, the Chapter 7 trustee pivoted from abandoning the estate's interests in WTN and WRG to retaining Maltz Auctions, Inc. to market and sell those interests. Bankr. Dkt. Nos. 62, 68.

73. After a robust marketing process, the estate's interests in WTN and WRG were ultimately sold for $310,000 to insiders of WRG, with no competing bids having been submitted. Bankr. Dkt. Nos. 75, 80, 81, 86.

**Debtor's Rolex Watches**

74. Debtor is not an expert on watches or their values. Winick Decl. ¶ 30.

75. All of the Rolex watches that Debtor has ever owned were acquired using casino points from Mohegan Sun, and he has never purchased or sold any Rolex watch for money or ever had a Rolex watch appraised pre-bankruptcy. Winick Decl. ¶ 30.

76. Plaintiff's corporate representative testified that Plaintiff had no evidence Debtor appraised his watches before scheduling their values or that Debtor thought the watches were worth more than the $5,000 that he listed. Yan Ex. 3 at 54:18-55:2.

77. Schedule A/B does not provide instructions to list the specific make or model number of any listed watch. Bankr. Dkt. No. 1 at 14 of 58; Yan Ex. 14.

78. Debtor did not think to provide the specific model names and numbers of his Rolex watches on Schedule A/B and was not instructed to do. Winick Decl. ¶ 35.

79. While Debtor indicated in a 2014 interview with Real Deal, a real estate trade publication, that he collected Rolex watches and that he one he was wearing was the cheapest one that Rolex made, those statements were exaggerations intended to make him look good, and he had no idea how much different Rolexes models cost. Bannon Ex. 47; Winick Decl. ¶ 31.

80. The instructions for Schedule A/B state that debtors should "report the *current value* of the property that you own in each category" and explain that "*[c]urrent value* is sometimes called *fair market value* and, for this form, is the fair market value as of the date of the filing of the petition." Yan Ex. 14 (emphases in original).

81. Debtor was advised by his bankruptcy counsel that he should put his best estimate as to the value of his Rolex watches and not be too concerned with that value because the Chapter 7 trustee would not accept any value Debtor listed without obtaining an independent appraisal. Winick Decl. ¶ 32.

82. Debtor's best guess as to the current value of his two Rolex watches at the time he filed his petition was $5,000. Winick Decl. ¶ 29.

83. Debtor had no intention to defraud anyone when he scheduled the value of his two Rolex watches. Winick Decl. ¶ 28.

84. It did not occur to Debtor to try to estimate the value of his Rolex watches by using Internet websites because he has never bought or even looked at jewelry online and nobody advised him to do Internet research. Winick Decl. ¶ 33.

85. When asked what value Debtor should have listed for his two Rolex watches instead of $5,000, Plaintiff's corporate representative could not provide a value. Yan Ex. 3 at 49:4-19.

86. Plaintiff's corporate representative testified that the sole basis for Plaintiff's contention that Debtor's Rolex watches were worth more than the $5,000 that he listed in his schedules is the fact that they later sold for more than that amount. Yan Ex. 3 at 55:3-12.

87. Plaintiff's corporate representative testified that at the time Debtor filled out his schedules, Debtor could not know what his Rolex watches would sell for at a later date. Yan Ex. 3 at 52:2-7.

88. After the petition was filed, the Chapter 7 trustee's counsel requested information concerning the Rolex watches, including "the date of manufacture, the model, the date of acquisition and the cost of acquisition" along with "[a]ny documents related to those items including insurance policies, receipts, bills of sale, or appraisals." Yan Ex. 12 at 2.

89. In response, Debtor provided photographs of the watches but informed the Chapter 7 trustee's counsel that the Debtor had no receipts, bills of sale, or other information regarding his watches. Yan Ex. 13.

90. At the time he filled out his schedules, Debtor did not recall the 2015 notice of cancellation of an insurance policy he previously purchased for various pieces of jewelry. Bannon Ex. 33; Winick Decl. ¶ 34.

91. Looking at the declarations page of the cancelled policy, Debtor is unable to determine if any of the two Rolex watches listed on his schedules is reflected on that page. Bannon Ex. 33 at WINICK 47; Winick Decl. ¶ 34.

92. At the Trustee's request, Debtor obtained an independent appraisal of the watches. Bankr. Dkt. No. 34 at ¶ 9.

93. Christi Sothers Fine Jewelry appraised Debtor's two Rolex watches as being worth $47,500 as of November 18, 2020. Bankr. Dkt. No. 34-3.

94. Debtor and the Chapter 7 trustee subsequently entered into a stipulation to sell Debtor's Rolex watches to Debtor's son-in-law for $33,393.75 in cash, with Debtor receiving a $15,600 exemption for those watches, and the Court approved the sale. Bankr. Dkt. Nos. 34-2, 45.

Dated: May 5, 2023                                **ARENTFOX SCHIFF LLP**

                                                  */s/ Steven Wilamowsky*
                                                  Steven Wilamowsky

1185 Avenue of the Americas
Suite 3000
New York, NY 10036
Tel: (212) 753-5000
Email: steven.wilamowsky@afslaw.com

- and -

Jin Yan
1717 K Street NW
Washington, DC 20006
Tel: (202) 778-6442
Email: jin.yan@afslaw.com

*Counsel for Defendant Jeffrey Winick*