**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
In re:                                        :
                                              :          Chapter 7
     JEFFREY WINICK,                    :
                                              :          Case No. 20-11976 (PB)
           Debtor.              :
--------------------------------------------------------x
UNITED STATES OF AMERICA,                     :
                                              :          Adv. Proc. No. 21-01138 (PB)
           Plaintiff,            :
                                              :
     v.                               :
                                              :
JEFFREY WINICK,                               :
                                              :
           Defendant.            :
--------------------------------------------------------x


## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## HIS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


**ARENTFOX SCHIFF LLP**

Steven Wilamowsky
1185 Avenue of the Americas
Suite 3000
New York, NY 10036
T: (212) 753-5000
E: steven.wilamowsky@afslaw.com

- and -

Jin Yan
1717 K St. NW
Washington, DC 20006
T: (202) 778-6442
E: jin.yan@afslaw.com

*Counsel for Defendant Jeffrey Winick*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ............................................................................................................. 12

I.     LEGAL STANDARD........................................................................................... 12

II.    THE COURT SHOULD GRANT DEBTOR SUMMARY JUDGMENT ON
COUNT I .................................................................................................... 13

III.   THE COURT SHOULD GRANT DEBTOR SUMMARY JUDGMENT ON
COUNT II ................................................................................................... 17

     A.    Debtor Did Not Make Any False or Fraudulent Statement Regarding the
Value of His Interests in WTN and WRG ........................................................ 17

           1.    There Is No Admissible Evidence Debtor Could Have Estimated
the Value of His Interests........................................................ 19

           2.    Debtor's Postpetition Conduct Does Not Show Any Fraudulent
Intent ......................................................................... 22

     B.    Debtor Did Not Make Any False or Fraudulent Statement Regarding the
Value of His Rolex Watches...................................................... 23

IV.   THE COURT SHOULD DENY SUMMARY JUDGMENT ON COUNT IV.............. 29

     A.    Debtor Made No Attempt to Evade or Defeat His Tax Liabilities ..................... 29

     B.    Debtor Did Not Willfully Evade His Tax Obligations ........................................ 32

CONCLUSION............................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Pataki*,
   278 F.3d 93 (2d Cir. 2002)................................................................................12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................................22

*In re Anderson*,
   884 F.3d 382 (2d Cir. 2018)................................................................................1

*In re Ayers*,
   25 B.R. 762 (Bankr. M.D. Tenn. 1982) ...........................................................13

*In re Blum*,
   41 B.R. 816 (Bankr. S.D. Fla. 1984)................................................................28

*In re Boyer*,
   328 Fed. App'x 711 (2d Cir. 2009)...................................................................17

*In re Brenes*,
   261 B.R. 322 (Bankr. D. Conn. 2001) ..............................................................25

*In re Carmel*,
   134 B.R. 890 (Bankr. N.D. Ill. 1991) ...............................................................39

*In re Chip's Southington, LLC*,
   No. 20-21458 (JJT), 2021 WL 5313546 (Bankr. D. Conn. Nov. 13, 2021) ...........................20

*In re Colish*,
   289 B.R. 523 (Bankr. E.D.N.Y. 2002) .............................................................32

*In re Deedon*,
   419 B.R. 1 (Bankr. D. Conn. 2009) ..................................................................25

*In re DeRise*,
   394 B.R. 677 (Bankr. E.D.N.Y. 2008)..............................................................25

*In re Dubrowsky*,
   244 B.R. 560 (E.D.N.Y. 2000) ........................................................................25

*In re Epstein*,
   303 B.R. 280 (Bankr. E.D.N.Y. 2004)..............................................................33

*In re Finjan Holdings, Inc.*,
    58 F.4th 1048 (9th Cir. 2023) ...........................................................................20

*Gilles v. Pleasant Hill Elementary School Dist. No. 69*,
    No. 09-1335, 2011 WL 5005995 (C.D. Ill. Oct. 20, 2011).....................................27

*In re Glaser*,
    49 B.R. 1015 (Bankr. S.D.N.Y. 1985) .................................................................13

*In re Gollomp*,
    198 B.R. 433 (S.D.N.Y. 1996).................................................................13, 15, 16

*In re Green*, Adv. No. 06-9086 (CGM), 2007 WL 1428547
    (Bankr. S.D.N.Y. May 11, 2007)...........................................................................13

*In re Griffith*,
    206 F.3d 1389 (11th Cir. 2000) ............................................................................31

*Grogan v. Garner*,
    498 U.S. 279 (1991)...............................................................................................29

*Hawkins v. Franchise Tax Bd. of Cal.*,
    769 F.3d 662 (9th Cir. 2014) ........................................................................ *passim*

*Hollman v. Taser Int'l Inc.*,
    928 F. Supp. 2d 657 (E.D.N.Y. 2013) ..................................................................20

*In re Hyman*,
    502 F.3d 61 (2d Cir. 2007)........................................................................1, 34, 36

*Internal Revenue Service v. Conard*,
    No. 18-cv-916, 2019 WL 10886919 (E.D. Va. Feb. 1, 2019) ....................33, 36, 37

*In re Jajajel*,
    Adv. No. 09-01141, 2010 WL 3946420 (Bankr. ED. Va. Oct. 8, 2010) ................28

*Kawaauhau v. Geiger*,
    523 U.S. 57 (1998)...........................................................................................35, 36

*In re Lang Chin*,
    617 B.R. 761 (Bankr. E.D.N.Y. 2020) .................................................................17

*In re Ligon*,
    55 B.R. 250 (Bankr. M.D. Tenn. 1985) ................................................................19

*In re Looft*,
    533 B.R. 910 (Bankr. N.D. Ga. 2015) ..................................................................30

*Mantel v. Microsoft Corp.*,
No. 16-cv-5277, 2018 WL 1602863 (S.D.N.Y. Mar. 29, 2018)..............................................26

*In re Marra*,
308 B.R. 628 (D. Conn. 2004) .................................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................................12

*In re May*,
2010 WL 5014716 (S.D. Ala. Nov. 30, 2010) ........................................................31

*In re Miga*,
Adv. No. 09-80066, 2011 WL 204896 (Bankr. N.D.N.Y. Jan. 21 2011) ................................13

*In re Parker*,
531 B.R. 103 (Bankr. E.D.N.C. 2015) .................................................................24

*In re Parnes*,
200 B.R. 710 (Bankr. N.D. Ga. 1996) .................................................................18

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
551 U.S. 224 (2007).................................................................................35

*In re Quiroz*,
Adv. No. 16-1027-R, 2018 WL 1773095 (Bankr. N.D. Okla. Apr. 10, 2018) ............... *passim*

*In re Robichaud*,
396 B.R. 252 (Bankr. D.R.I. 2008) .................................................................18

*In re Silver*,
367 B.R. 795 (Bankr. D.N.M. 2007) ..............................................................18, 19

*In re Smith*,
351 B.R. 274 (Bankr. D. Conn. 2006) .................................................................13

*Taylor v. Freeland & Kronz*,
503 U.S. 638 (1992).................................................................................27

*Thunberg v. Wallick*,
No. 09-419 S, 2010 WL 18380032 (D.R.I. May 5, 2010) .............................................22

*In re Tudisco*,
183 F.3d 133 (2d Cir. 1999).......................................................................... *passim*

*U.S. v. 110-18 Riverside Tenants Corp.*,
886 F.2d 514 (2d Cir. 1989).................................................................................14

*U.S. v. Bess,*
    357 U.S. 51 (1958) ....................................................................................................14

*U.S. v. Coblentz,*
    453 F.2d 503 (2d Cir. 1972) .....................................................................................36

*U.S. v. Rem,*
    38 F.3d 634 (2d Cir. 1994) .......................................................................................38

*United States v. Gorokhobsky,*
    575 F. Supp. 3d 1050 (E.D. Wisc. 2021) .................................................................33

*United States v. Helton,*
    843 Fed. App'x 779 (6th Cir. 2021) ..........................................................................33

*United States v. Timon,*
    No. 20-cv-1101, 2022 WL 17249463 (N.D.N.Y. Sept. 6, 2022) ..............................33

*Weinstock v. Columbia Univ.,*
    224 F.3d 33 (2d Cir. 2000) .......................................................................................12

*In re Wines,*
    114 B.R. 794 (Bankr. S.D. Fla. 1990), *aff'd in part and rev'd in part by In re
    Wines,* 997 F.2d 852 (11th Cir. 1993) .....................................................................24

*In re Wright,*
    191 B.R. 291 (S.D.N.Y. 1995) .............................................................................33, 37

*Zaremba v. Gen. Motors Corp.,*
    360 F.3d 355 (2d Cir. 2004) .....................................................................................20

**Statutes**

11 U.S.C. § 523(a)(1) ........................................................................................................34, 37

11 U.S.C. § 523(a)(1)(C) .............................................................................................. *passim*

11 U.S.C. § 523(a)(6) ..............................................................................................................35

11 U.S.C. § 727(a)(2) ................................................................................................................1

11 U.S.C. § 727(a)(2)(A) .............................................................................................13, 16, 23

11 U.S.C. § 727(a)(4) ..............................................................................................................29

11 U.S.C. § 727(a)(4)(A) .............................................................................................1, 17, 18, 27

11 U.S.C. § 727(a)(4)(B) .........................................................................................................27

11 U.S.C. § 727(d)(2) ....................................................................................................23

11 U.S. C. § (a)(1)(3) ...................................................................................................35

26 U.S.C. § 6672(a) .....................................................................................................37

26 U.S.C. § 7201 ....................................................................................................36, 37

**Other Authorities**

Fed. R. Bankr. P. 7056 .................................................................................................12

Fed. R. Civ. P. 56(a) ....................................................................................................12

Fed. R. Evid. 702 ....................................................................................................20, 22

Debtor and defendant Jeffrey Winick ("Debtor") submits this memorandum in support of his motion for summary judgment and in opposition to plaintiff United States of America's ("Plaintiff") motion for summary judgment.[1]

## PRELIMINARY STATEMENT

"The successful discharge of debt is not merely important to the Bankruptcy Code, it is its principal goal." *In re Anderson*, 884 F.3d 382, 386 (2d Cir. 2018). "[F]ailure to achieve discharge can amount to a financial death sentence" and thus "exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *In re Hyman*, 502 F.3d 61, 66 (2d Cir. 2007).

At this juncture, the Court cannot deny Debtor a discharge because the undisputed material facts demonstrate that two of Plaintiff's claimed exceptions are meritless and the third, while also meritless, will require a trial to resolve.

First, Plaintiff claims in Count I of its Complaint that Debtor violated 11 U.S.C. § 727(a)(2) by fraudulently transferring his minority interests in a limited liability company before filing bankruptcy. But the undisputed material facts show Debtor had no fraudulent intent when he consented to a creditor's proposal to take Debtor's interests (on which that creditor had a perfected lien) in full satisfaction of a $1.6 million loan that was in default.

Second, Plaintiff claims in Count II that Debtor violated 11 U.S.C. § 727(a)(4)(A) by making false oaths on his bankruptcy schedules. Plaintiff cannot demonstrate, however, that Debtor's scheduling the value of his interests in two New York City-based commercial real estate businesses as "unknown" during the height of the Covid-19 pandemic was false in any respect, much less that it was knowingly false. Nor can Plaintiff prove Debtor acted fraudulently in

---

[1] Debtor does not contest entry of summary judgment in Plaintiff's favor on Count III of the Complaint, which seeks to exempt Debtor's 2019 tax liabilities from discharge.

guessing two Rolex watches that he acquired via casino points were worth $5,000 when he had no experience buying or selling Rolex watches and was advised that no Chapter 7 trustee would accept any estimate without obtaining an independent appraisal.

Third, Plaintiff claims in Count IV that Debtor's tax debts to the Internal Revenue Service ("IRS") for 2012-2016 cannot be discharged under 11 U.S.C. § 523(a)(1)(C) because Debtor willfully evaded his tax obligations. Debtor did not. Plaintiff's evidence, at most, shows that Debtor spent his disposable income on things other than tax payments, mainly gambling, which Debtor's expert opined was not voluntary. But excessive spending alone does not show Debtor intended to evade his taxes, especially when Debtor proactively attempted to resolve his obligations and paid $4.5 million towards those liabilities. At a minimum, there are genuine issues of material fact concerning Debtor's conduct and intent that preclude entry of summary judgment on this claim.

The Court should grant Debtor summary judgment on Counts I and II and set the case for trial on Count IV.

## STATEMENT OF FACTS[2]

### Debtor, His Tax Liabilities, and His Gambling Addiction

Debtor is a commercial real estate broker with Winick Realty Group, LLC ("WRG"). Adv. Dkt. No. 1 at ¶ 2; Winick Decl. ¶ 2. In the past decade, he earned millions of dollars and accrued over $8.5 million in corresponding tax liabilities for tax years 2012-2016. PSOF Resp. ¶¶ 6, 25; Harrison Decl. ¶ 7; Harrison Ex. 2.

---

[2] All facts are taken from the following documents and their exhibits: Defendant's Statement of Facts ("DSOF"), Defendant's Response to Plaintiff's Statement of Facts and Statement of Additional Material Facts ("PSOF Resp."), Declaration of Zachary Bannon ("Bannon Decl."), Declaration of John Harrison ("Harrison Decl."), Declaration of James Feltman ("Feltman Decl."), Declaration of Jeffrey Winick ("Winick Decl."), and Declaration of Jin Yan ("Yan Decl."). Exhibits to declarations are cited as "[declarant's last name] Ex. [#]."

Debtor's tax debts arose from his failure to pay estimated taxes. PSOF Resp. ¶ 8; Harrison Ex. 2. That, in turn, resulted from his gambling away monies that could and should have been used to pay estimated taxes, as summarized in the chart below:

| Tax Year | Net Tax Liability | Net Gambling Losses |
|----------|-------------------|---------------------|
| 2012 | $2,282,021 | $4,526,800 |
| 2013 | $1,386,429 | $2,417,450 |
| 2014 | $1,824,015 | $2,166,575 |
| 2015 | $701,715 | $971,115 |
| 2016 | $744,488 | $1,805,400 |
| Total | $6,938,668 | $11,887,340 |

PSOF Resp. ¶ 87; Harrison Ex. 2; Bannon Ex. 26.

Debtor had been gambling since he was 18 or 19. PSOF Resp. ¶ 86; Winick Decl. ¶ 3. From 2012-2016, he lost over $11.8 million from gambling, which is nearly *half* of his total taxable income for that period. PSOF Resp. ¶ 88; Harrison Ex. 2; Bannon Ex. 26. It was not until 2019, when Debtor no longer had enough money to gamble and could not borrow money from others, that he finally stopped. PSOF Resp. ¶ 90; Winick Decl. ¶ 3.

In connection with this litigation, Dr. Jeremiah Weinstock diagnosed Debtor with moderate and persistent gambling disorder. PSOF Resp. ¶ 93; Yan Ex. 16 at 6-9. Dr. Weinstock opined that for Debtor, gambling was not volitional because he had been doing so maladaptively for over 40 years and both internal and external factors compelled him to gamble. PSOF Resp. ¶ 94; Yan Ex. 16 at 8-9. Debtor did not realize the magnitude of his problem until he saw his gambling losses in connection with this litigation. PSOF Resp. ¶ 91; Winick Decl. ¶ 4.

Debtor did not believe he needed to stop gambling in 2012-2016 to pay off his tax debts because past experience taught Debtor he could do both due to his increasing earnings. DSOF ¶ 95; Winick Decl. ¶ 7; Yan Ex. 16 at 9. He previously incurred millions of dollars in tax liabilities

in the early 2000s but reached an installment agreement with the IRS and was able to pay off more than $3.9 million, including penalties and interest, by 2012. PSOF Resp. ¶ 82; Harrison Ex. 1; Harrison Ex. 3 at USA 3189, 3192, 3248. This time around, however, Debtor lacked the income to fund both his gambling and his tax payments because he lost his largest client, which accounted for 60% of his commissions, and then the Covid-19 pandemic hit. PSOF Resp. ¶ 96; Winick Decl. ¶ 8.

**Debtor's Spending and Efforts to Pay His Taxes**

Even as he gambled away much of his disposable income, Debtor did not try to avoid his tax obligations. PSOF Resp. ¶ 79; Winick Decl. ¶¶ 6, 10. Debtor filed timely and accurate tax returns. PSOF Resp. ¶ 80; Winick Decl. ¶ 10. He fully paid his taxes for 2017 and 2018. PSOF Resp. ¶ 81; Winick Decl. ¶ 10. Debtor also attempted to resolve his liabilities for 2012-2016 through installment agreements and an offer in compromise. PSOF Resp. ¶¶ 10-23; Harrison Ex. 2; Harrison Ex. 4. Between January 2014 and January 2020, Debtor made 43 payments to the IRS totaling over $1.94 million. PSOF Resp. ¶¶ 12, 16, 18, 23; Harrison Ex. 2 at USA 1702-1705.

While Debtor spent disposable income on non-tax-related expenses, that was not done to prevent the IRS from collecting its debts. PSOF Resp. ¶ 98; Winick Decl. ¶ 11. Rather, Debtor made numerous payments to the IRS during the same time periods he was spending money on other things. *Compare* PSOF Resp. ¶¶ 12, 16, 23 (listing Debtor's payments to the IRS) *with id.* ¶¶ 27-47 (listing Debtor's spending). Indeed, the IRS did not expect Debtor to pay anything additional towards back taxes beyond the monthly amounts it agreed to in the installment agreements. PSOF Resp. ¶ 85; Yan Ex. 2 at 140:5-9.

Additionally, Debtor's affluent lifestyle was necessary to build and maintain a network of wealthy clients that were the source of his own wealth and success. PSOF Resp. ¶ 102; Winick

Decl. ¶¶ 12-13.  For example, Debtor's renting a residence in the Hamptons, where many wealthy New Yorkers have second homes, enabled him to network with clients and potential clients on weekends and holidays.  PSOF Resp. ¶ 103; Winick Decl. ¶ 14.  Even Debtor's gambling had a business development component, as Debtor often took clients on his trips to casinos and gambled in connection with work events.  PSOF Resp. ¶ 104; Winick Decl. ¶ 15.

Further, a lot of Debtor's spending was not for his own personal benefit but rather for the benefit of his daughter, ex-wife, and girlfriend.  PSOF Resp. ¶¶ 29-31, 43, 100; Winick Decl. ¶ 12; Bannon Ex. 1 at 33:10-22, 34:3-13, 42:19-24, 48:8-21, 49:3-9, 77:2-23, 78:8-12; Bannon Ex. 8; Bannon Ex. 9; Bannon Ex. 10; Bannon Ex. 11 at WINICK 75; Bannon Ex. 12 at WINICK 100.

**Debtor's Lack of Assets**

While Plaintiff claims that Debtor divested assets even has he spent available monies, none of the so-called divestments it points to was made for the purpose of thwarting the IRS's ability to collect its debt.  PSOF Resp. ¶ 113; Winick Decl. ¶ 17.  First, Debtor sold his interests in 987 Eighth Avenue, LLC in 2012 to help pay off the back taxes he owed.  PSOF Resp. ¶ 106; Bannon Ex. 1 at 102:6-103:20.  Second, as Debtor's representative previously explained to the IRS, Debtor gifted stock to his daughter in December 2012 for estate planning purposes in anticipation of the IRS's lowering the lifetime estate gift tax exemption from $5 million to $1 million.[3]  PSOF Resp. ¶ 107; Harrison Ex. 3 at USA 3329.  Third, Debtor sold his boat in 2014 because he no longer enjoyed owning it and it was not worth the expense.  PSOF Resp. ¶ 108; Bannon Ex. 1 at 54:15-22, 92:2-18.  Fourth, Debtor's daughter was gifted interest in Winick Realty Group, NJ by the trustee of the Danielle Winick 2012 Trust, not by Debtor.  PSOF Resp. ¶ 56; Bannon Ex. 31.  Fifth,

---

[3] The value of this gift, as reflected in Debtor's gift tax returns, was $1,467,180, not $4 million as Plaintiff erroneously claims.  PSOF Resp. ¶ 54; Harrison Ex. 3 at USA 3329; Yan Ex. 17 at WINICK 356.

Debtor's life insurance premium payments were gifts made annually since 2008 (and for which he filed gift tax returns) for estate planning purposes to take ensure his daughter would be taken care of in the event he died. PSOF Resp. ¶¶ 109-110; Winick Decl. ¶ 16; Bannon Ex. 1 at 52:10-53:18; Bannon Ex. 32. Sixth, some of the jewelry that Plaintiff claims Debtor gave away actually belonged to Debtor's daughter, and Plaintiff lacks evidence of the particular pieces Debtor gifted as well as the ownership of those pieces. PSOF Resp. ¶ 58; Bannon Ex. 1 at 94:12-25; Yan Ex. 18 at 73:25-74:17. And finally, the charitable donations listed on Debtor's tax returns were actually donations that WRG made for events such as charity golf tournaments, but Debtor was required to report the donations on his personal returns. PSOF Resp. ¶ 111; Winick Decl. ¶ 14.

Similarly, contrary to Plaintiff's unsupported contention, Debtor's lack of assets was not by design to frustrate the IRS. PSOF Resp. ¶ 113; Winick Decl. ¶ 17. Rather, it was a direct result of Debtor's failure to prudently manage his earnings and to resolve his gambling addiction. PSOF Resp. ¶ 113; Winick Decl. ¶ 17. Debtor is now in his 70s but has no assets sufficient to enable him to retire and little to show for all his decades of work and millions in earnings. PSOF Resp. ¶ 114; Winick Decl. ¶ 18; Bankr. Dkt. No. 1. This is a product of poor decision-making, not some absurd, self-defeating scheme to defraud the IRS. PSOF Resp. ¶ 115; Winick Decl. ¶ 18.

**Debtor's Membership Interests in SDSDR111**

Prepetition, Debtor owned interests in SDSDR111, which owned and operated a condominium located at 545 West 111th Street in New York City. DSOF ¶ 2; Yan Ex. 1 at WINICK 2104. In January 2015, Debtor pledged those interests as collateral for a $500,000 loan from Berley, the purpose of which was to help Debtor catch up on delinquent taxes. DSOF ¶¶ 3-4; Bannon Ex. 1 at 125:15-22; Bannon Ex. 38 at WINICK 2392-2400.

Under the secured note documenting the loan, Debtor granted Berley a first priority lien on Debtor's interests in SDSDR111.  DSOF ¶ 5; Bannon Ex. 38 at WINICK 2392-2400.  Berley perfected that lien by filing a UCC financing statement with the New York State Department of State on January 30, 2015 and a continuing UCC financing statement on January 2, 2020.  DSOF ¶¶ 6, 25; Bannon Ex. 40 at WINICK 2429-2430, 2434.  Berley subsequently lent additional monies to Debtor for taxes and gambling, and the loan was modified to reflect a growing principal balance that ultimately exceeded $1.6 million.  DSOF ¶¶ 19-20, 23; Bannon Ex. 1 at 128:4-11; Bannon Ex. 38 at WINICK 2403-2414, 2419-2428.  With each amendment and restatement to the secured note, Debtor reaffirmed his pledge of his interests in SDSDR111.  DSOF ¶¶ 21, 24; Bannon Ex. 38 at WINICK 2403-2414, 2419-2428.

As it turns out, the IRS previously recorded a tax lien against Debtor in New York County in May 2014.  DSOF ¶ 7; Bannon Ex. 39.  While it is not uncommon for the IRS to file tax liens against individuals with both the state and county, in this instance, it filed its lien against Debtor's property with the county only.  DSOF ¶¶ 8-9; Yan Ex. 2 at 154:14-24; Bannon Ex. 39.  As a result, the IRS's tax lien was not picked up in searches of liens against Debtor filed with the state.  DSOF ¶ 10; Bannon Ex. 40 at WINICK 2431-2432.

Debtor was not aware of the IRS's 2014 lien when he pledged his interests to Berley. DSOF ¶ 11; Bannon Ex. 1 at 125:23-126:6; Winick Decl. ¶ 20.  Indeed, Debtor testified that he could not understand how Berley was able to obtain a UCC filing if the IRS already had a lien on Debtor's interests.  DSOF ¶ 13; Bannon Ex. 1 at 126:10-22.  Debtor has no recollection of ever receiving a notice of tax lien from the IRS in 2014 or otherwise being informed of the existence

of the IRS's lien.[4]  DSOF ¶ 12; Winick Decl. ¶ 21.  While Debtor did receive notices of other tax liens from the IRS, the earliest such notice he could locate in his records was from August 2015, more than a half a year after he already pledged his interests to Berley.  DSOF ¶ 14; Yan Ex. 4 at WINICK 2662-2665.

The IRS was well aware that Debtor had pledged his interests to Berley because copies of the Berley loan documents were provided to the IRS in August 2015 and March 2018.  DSOF ¶¶ 18, 22; Harrison Ex. 3 at USA 3290-3291, 3333-3336.  Notwithstanding these disclosures, the IRS never took any action prepetition to object to Debtor's pledge of his interests or to challenge Berley's lien on those interests—another reason why Debtor had no knowledge of the IRS's 2014 tax lien.  DSOF ¶¶ 26-27; Winick Decl. ¶ 22; Harrison Ex. 3.

On July 9, 2020, Berley's counsel notified Debtor he was in default and demanded that Debtor pay the $1,651,912.50 he owed Berley.  DSOF ¶ 28; Yan Ex. 7.  About two weeks later, Debtor was notified that Berley intended to retain Debtor's pledged interests in SDSDR111 in full satisfaction of Debtor's indebtedness, and Berley's counsel sent Debtor a form of consent to that transfer, which Debtor signed.  DSOF ¶¶ 29, 31-32; Yan Ex. 8; Yan Ex. 9; Bannon Ex. 42.

Debtor had no intention of defrauding anyone when he consented to the transfer of his interests.  DSOF ¶ 22; Winick Decl. ¶ 19.  Debtor testified that at the time of the transfer, he had not yet decided whether to file for bankruptcy, did not discuss bankruptcy with Berley, and did not think that the IRS might go after those interests if he didn't transfer them before filing because Berley had a lien on those interests for years.  DSOF ¶¶ 34-36; Bannon Ex. 1 at 136:23-137:5, 139:18-23, 139:24-140:7; Winick Decl. ¶ 9.  Berley similarly testified that he did not recall Debtor

---

[4] Plaintiff has not produced any notice of tax lien directed to Debtor in this litigation and no notices are attached to the IRS's proof of claim.  DSOF ¶¶ 15-17; Yan Decl. ¶ 23; Yan Ex. 5; Yan Ex. 6.

ever approaching him to ask that he take Debtor's interests. DSOF ¶ 37; Yan. Ex. 10 at 46:10-13. Berley expected to be repaid the monies he loaned, and he took Debtor's interests because he thought that was as good a result as he was going to get. DSOF ¶¶ 38-39; Yan Ex. 10 at 14:9-12, 40:15-18, 63:24-64:12.

After the transfer, Debtor obtained a valuation of his interests in SDSDR111 for tax purposes, and that appraiser opined that the fair market value of those interests as of July 31, 2020 was $240,000. DSOF ¶ 40; Yan Ex. 1 at WINICK 2086. Further, the other owners of SDSDR111 had a 30-day right of first refusal and could have purchased Debtor's pledged interests for the price of his indebtedness to Berley, but chose not to do so. DSOF ¶ 41; Bannon Ex. 1 at 141:24-142:17. Post-transfer, Berley substituted for Debtor as a member of SDSDR111, and Debtor's only involvement with the company was as a rental agent. DSOF ¶ 42; Yan Ex. 10 at 50:3-9.

Debtor disclosed the transfer of his interests in SDSDR111 to Berley on his bankruptcy schedules and later at the Section 341 meeting. DSOF ¶¶ 43-44; Bankr. Dkt. No. 1 at 51 of 58; Yan Ex. 11 at 5:22-6:22. He also cooperated with the Chapter 7 trustee's ("Trustee") requests for information concerning the transfer. DSOF ¶ 45; Yan Exs. 12, 13.

**Debtor's Interests in WTN and WRG**

As disclosed in his bankruptcy schedules, Debtor also owned interests in WRG and WTN Realty Corp. ("WTN"), a holding company for interests in WRG. DSOF ¶¶ 46, 48; Bankr. Dkt. No. 1 at 15 of 58; Bannon Ex. 44 at USA 2537. On his schedules, Debtor listed the then-current values of his interests in WTN and WRG as "unknown." DSOF ¶ 46; Bankr. Dkt. No. 1 at 15 of 58. Contrary to Plaintiff's contention, this was not done to defraud anyone. DSOF ¶ 60; Winick Decl. ¶ 23.

Debtor has no expertise, training, or experience in valuing businesses or interests in businesses. DSOF ¶¶ 56-57; Winick Decl. ¶ 25. He scheduled the value of his interests in WTN and WRG as "unknown" because he did not know what their value was in the midst of the Covid-19 pandemic given that WRG was shut down for a few months and no one was paying commissions owed to the company. DSOF ¶ 61; Bannon Ex. 1 at 117:10-21. Debtor also testified that even if he had asked his accountants to provide him with a valuation at the time he filed his schedules, he did not believe they would have provided him with one because "the uncertainty of COVID-19 made everything question in valuation, especially in the real estate industry in New York." DSOF ¶ 64; Bannon Ex. 1 at 119:9-24.

Plaintiff's corporate representative testified that the sole basis for Plaintiff's contention that Debtor's scheduling the value of his interests in WTN and WRG as "unknown" was false was that in the past, he had been able to value those interests. DSOF ¶ 49; Yan Ex. 3 at 56:23-57:13. However, the prior valuations of WTN and WRG were not done by Debtor; rather, they were performed by third party professionals. DSOF ¶¶ 50, 52; Bannon Ex. 44; Yan Ex. 15. Further, Debtor did not even think to rely on those prior valuations because those were pre-pandemic valuations and he did not believe them to be accurate indications of the values of his interests in August 2020. DSOF ¶ 63; Bannon Ex. 1 at 118:5-11; Winick ¶ 26. Plaintiff's corporate representative could not point to any evidence that Debtor knew the exact dollar value of his interests when he scheduled them. DSOF ¶ 58; Yan Ex. 3 at 60:12-17. Nor could Plaintiff's representative provide a number that Debtor should have listed in lieu of "unknown." DSOF ¶ 59; Yan Ex. 3 at 56:11-13.

Post-petition, Debtor cooperated with the Trustee in providing information concerning WTN and WRG. DSOF ¶¶ 65-66; Yan Exs. 12, 13. The Trustee subsequently filed a motion to

abandon the estate's interests in WTN and WRG, which the IRS objected to. DSOF ¶¶ 67, 70; Bankr. Dkt. Nos. 36, 46. The IRS's opposition was supported by a declaration opining that WRG was worth anywhere from $3.4 million to $11.8 million, thus rendering Debtor's interest worth anywhere from $2.1 million to $7.4 million. DSOF ¶ 71; Bankr. Dkt. No. 46-1. As a result of the IRS's objection, the Trustee decided to auction Debtor's interests in WTN and WRG. DSOF ¶ 72; Bankr. Dkt. Nos. 62, 68. Despite a robust marketing process, those interests were sold to WRG insiders for only $310,000, with no other bids having been submitted. DSOF ¶ 73; Bankr. Dkt. Nos. 75, 80, 81, 86.

**Debtor's Rolex Watches**

In his schedules, Debtor also identified two Rolex watches with a combined value of $5,000. DSOF ¶ 46; Bankr. Dkt. No. 1 at 14 of 58. He obtained these watches using casino points earned from his gambling trips to Mohegan Sun. DSOF ¶ 75; Winick Decl. ¶ 30.

Debtor is not an expert on watches or their values. DSOF ¶ 74; Winick Decl. ¶ 30. While he previously owned other Rolex watches, all of them were acquired through casino points and Debtor had no experience buying or selling them for money. DSOF ¶ 75; Winick Decl. ¶ 30.

When asked to estimate the then-current value of his watches, Debtor put down $5,000 because that was his best guess as to their value. DSOF ¶ 82; Winick Decl. ¶ 29. This was not done to defraud anyone. DSOF ¶ 83; Winick Decl. ¶ 28. While Plaintiff claims Debtor could have used the Internet to value his watches, it never occurred to Debtor to do that because he did not shop or look at jewelry online and nobody advised him to do so. DSOF ¶ 84; Winick Decl. ¶ 33. Indeed, Debtor was advised by his counsel that he should not be overly concerned with the value he listed because the Trustee would not accept that value and would obtain an independent appraisal. DSOF ¶ 81; Winick Decl. ¶ 32.

As predicted, post-petition, the Trustee's counsel reached out to Debtor's counsel to request information concerning the value of the watches, and the only thing Debtor could produce were photographs of those watches. DSOF ¶¶ 88-89; Yan Ex. 12; Yan Ex. 13. At the Trustee's request, Debtor obtained an independent appraisal of the watches, which valued them at $47,500 as of November 18, 2020. DSOF ¶¶ 92-93; Bankr. Dkt. Nos. 34 at ¶ 9, 34-3. The Trustee eventually sold the watches to Debtor's son-in-law for $33,393.75 in cash, with Debtor receiving a $15,600 exemption. DSOF ¶ 94; Bankr. Dkt. Nos. 34-2, 45.

Plaintiff's corporate representative testified that the sole basis for Plaintiff's contention that Debtor's Rolexes were worth more than the $5,000 listed in his schedules was the fact that they later sold for that amount. DSOF ¶ 86; Yan Ex. 3 at 55:3-12. However, that same representative conceded that Plaintiff had no evidence Debtor appraised his watches before scheduling their values or that Debtor thought the watches were worth more than the $5,000 he listed. DSOF ¶ 76; Yan Ex. 3 at 54:18-55:2. When asked what alternative value Debtor should have listed, Plaintiff's representative could not provide a number. DSOF ¶ 85; Yan Ex. 3 at 49:4-19.

## ARGUMENT

### I. Legal Standard.

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also* Fed. R. Bankr. P. 7056 (Rule 56 applies in adversary proceedings). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (the non-moving party cannot rely on allegations in the pleadings

but must instead "put up or shut up").  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citation omitted).

## II.    The Court Should Grant Debtor Summary Judgment on Count I.

To prevail on Count I, which seeks to deny Debtor a discharge based on 11 U.S.C. § 727(a)(2)(A), Plaintiff must prove by a preponderance of the evidence that Debtor (1) transferred, removed, destroyed, mutilated, or concealed property, or permitted those actions to be taken; (2) with the intent to hinder, delay, or defraud a creditor; and (3) did so within one year prior to filing for bankruptcy.  *In re Green*, Adv. No. 06-9086 (CGM), 2007 WL 1428547, at *4 (Bankr. S.D.N.Y. May 11, 2007).

Plaintiff must prove Debtor acted with actual fraudulent intent; a showing of constructive fraudulent intent is insufficient.  *In re Glaser*, 49 B.R. 1015, 1019 (Bankr. S.D.N.Y. 1985).  While intent may be inferred from badges of fraud, *In re Gollomp*, 198 B.R. 433, 440 (S.D.N.Y. 1996), if the Court "has any doubts with respect to the evidence, they must be resolved in the debtor's favor." *In re Miga*, Adv. No. 09-80066, 2011 WL 204896, at *6 (Bankr. N.D.N.Y. Jan. 21 2011); *see also In re Smith*, 351 B.R. 274, 277 (Bankr. D. Conn. 2006) ("[T]he law carries a 'presumption' in favor of the debtor in discharge contests.").

Here, Plaintiff alleges Debtor violated section 727(a)(2)(A) by consenting to a transfer of his interests in SDSDR111 in full satisfaction of his $1.6 million debt to Berley.  Debtor does not dispute that he consented to the transfer and did so within a year before he filed for bankruptcy. However, Plaintiff cannot prove the transfer was made with actual fraudulent intent.

Debtor did not act with any intent to defraud creditors when he gave up his interests in SDSDR111.  DSOF ¶ 33; Winick Decl. ¶ 19.  Debtor's transfer to Berley was a preferential one, but "the mere preferential payment of a valid debt is not a statutory ground for the denial of

discharge." *In re Ayers*, 25 B.R. 762, 770 (Bankr. M.D. Tenn. 1982); *see also In re Marra*, 308 B.R. 628, 630 (D. Conn. 2004) ("Preference of one creditor over another does not automatically establish the required intent"). When asked by Plaintiff's counsel whether he thought the IRS might go after his interests if he didn't transfer them to Berley before filing bankruptcy, Debtor said he had no such thought. DSOF ¶ 36; Bannon Ex. 1 at 139:24-140:7. He did not have any conversations with Berley about bankruptcy prior to filing and indeed, at the time of the transfer, Debtor had not even made up his mind about whether to file for bankruptcy. DSOF ¶¶ 34-35; Bannon Ex. 1 at 136:23-137:5, 139:18-23; Winick Decl. ¶ 9. Berley similarly testified that he did not recall Debtor ever approaching him about taking the interests in SDSDR111. DSOF ¶ 37; Yan Ex. 10 at 46:10-13. Simply put, there is no evidence Debtor made the transfer for the specific purpose of putting his interests out of the IRS's reach.[5]

While Plaintiff contends that Debtor pledged and then transferred his interests in SDSDR111 despite the IRS's having a superior lien on that interest, there is no evidence Debtor was aware of that lien, much less its priority.[6] DSOF ¶¶ 11-12; Bannon Ex. 1 at 125:23-126:6; Winick Decl. ¶¶ 20-21. There is no evidence that the IRS gave Debtor notice of its 2014 tax lien or that Debtor received any such notice; indeed, the earliest notice of tax lien that Debtor produced in this case came more than half a year after Berley's UCC lien was recorded. DSOF ¶¶ 14-17; Yan Ex. 4 at WINICK 2662-2665; Yan Decl. ¶ 23. Consistent with that lack of knowledge, Debtor testified that he didn't understand how the IRS could have had a lien on his interests when Berley

---

[5] Indeed, assuming the IRS had a valid lien, that lien is unaffected by the transfer. *See U.S. v. Bess*, 357 U.S. 51, 57 (1958) ("The transfer of property subsequent to the attachment of the lien does not affect the lien, for 'it is the very nature and essence of a lien, that no matter into whose hands the property goes, it passes cum onere [with burden]'") (internal citations omitted).

[6] It would appear that because the IRS recorded its lien before Berley recorded his lien, the IRS's lien has priority. *U.S. v. 110-18 Riverside Tenants Corp.*, 886 F.2d 514, 518 (2d Cir. 1989).

was able to obtain a UCC filing for those interests and maintain that filing for years. DSOF ¶ 13; Bannon Ex. 1 at 126:10-22. Debtor's lack of knowledge is also consistent with the IRS's having taken no prepetition action to object to Debtor's pledge of his interests or to challenge Berley's lien. DSOF ¶¶ 26-27; Winick Decl. ¶ 22; Harrison Ex. 3.

Nor are there any badges of fraud implicating any fraudulent intent. *See Gollomp*, 198 B.R. at 440 (listing badges). The transfer of Debtor's interests did not lack consideration given that Debtor obtained full satisfaction of his $1.6 million debt to Berley. DSOF ¶ 32; Bannon Ex. 42. Plaintiff has no evidence that the transferred interest in SDSDR111 was worth more than the debt that was forgiven. Rather, the evidence indicates the opposite is true. First, the other owners of SDSDR111 had a 30-day right for first refusal for Debtor's interests, and had they believed that those interests were worth more than Debtor's debt, they could have paid off that debt and acquired the interests for themselves. That didn't happen. DSOF ¶ 41; Bannon Ex. 1 at 141:24-142:17. Second, Debtor subsequently obtained a valuation of his interests for tax purposes and they appraised for only $240,000. DSOF ¶ 40; Yan Ex. 1 at WINICK 2086.

To the extent Plaintiff relies on the fact that Debtor and Berley were personal friends to suggest there is something untoward about the transfer, the evidence shows that the transfer occurred in the context of their relationship as creditor and debtor. Berley testified that he did not give Debtor over $1.6 million a gift; rather, he loaned Debtor the money and expected to be repaid. DSOF ¶ 39; Yan Ex. 14:9-12, 40:15-18. As such, the loan was documented like any other arms' length transaction. DSOF ¶¶ 3, 19, 23; Bannon Ex. 38. And when Debtor defaulted on the loan, Berley retained outside counsel to communicate the default to Debtor and to draft the paperwork to effectuate the transfer of Debtor's interests. DSOF ¶¶ 28-31; Yan Exs. 7-9.

Another badge of fraud not present here is Debtor's retention of any position, benefit, or use of the transferred property. As Berley testified, post-transfer, Berley replaced Debtor as a member of SDSDR111 and Debtor ceased to have any involvement with the company beyond serving as its rental agent. DSOF ¶ 42; Yan Ex. 10 at 50:3-9.

There is also no evidence that Debtor's financial condition materially worsened after he transferred his interests in SDSDR111 to Berley. To the contrary, given that the evidence indicates his interests were worth less than Debtor's indebtedness to Berley, it stands to reason that the transfer had no appreciable effect on Debtor's finances.

Finally, the general chronology of events shows Debtor did not act with any fraudulent intent because there was never any effort to hide the fact that he pledged his interests in SDSDR111 or the fact that those interests were transferred. As discussed above, Berley had a publicly filed UCC lien on Debtor's interests since 2015, and he renewed that lien in 2020. DSOF ¶¶ 6, 25; Bannon Ex. 40 at WINICK 2429-2430, 2434. Debtor's representatives also provided the IRS with copies of the Berley loan documents and his UCC filing. DSOF ¶¶ 18, 22; Harrison Ex. 3 at USA 3290-3291, 3335-3336. Debtor also truthfully disclosed the transfer on his bankruptcy schedules as well as at the section 341 meeting. DSOF ¶¶ 43-44; Bankr. Dkt. No. 1 at 51 of 58; Yan Ex. 11 at 5:22-6:22. *See Gollomp*, 198 B.R. at 441 ("Debtor's disclosure on the bankruptcy schedules mitigates against a finding of intent to defraud, as the information was sufficient to put creditors on notice of the transfer."). Debtor further cooperated with the Trustee's requests for information concerning the transfer and SDSDR111. DSOF ¶ 45; Yan Exs. 12, 13.

Given that section 727(a)(2)(A) must be construed strictly against Plaintiff and in Debtor's favor and given that Plaintiff cannot prove by a preponderance of the evidence that Debtor

possessed actual fraudulent intent in transferring his interests in SDSDR111, the Court should enter summary judgment in Debtor's favor on Count I.

## III. The Court Should Grant Debtor Summary Judgment on Count II.

To prevail on Count II, which seeks to deny Debtor a discharge under 11 U.S.C. § 727(a)(4)(A), Plaintiff must prove by a preponderance of the evidence that (1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew the statement was false; (4) he made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Boyer*, 328 Fed. App'x 711, 715 (2d Cir. 2009); *In re Lang Chin*, 617 B.R. 761, 767-768 (Bankr. E.D.N.Y. 2020). Again, the statute must be construed strictly against Plaintiff and liberally in favor of Debtor. *Boyer*, 328 Fed. App'x at 714.

Here, Plaintiff alleges that Debtor made two false statements on his schedules: (1) he listed the value of his interests in WTN and WRG as "unknown" and (2) he listed the value of two Rolex watches as $5,000. While Debtor does not dispute that these statements were made under oath and relate materially to his bankruptcy case, Plaintiff cannot prove the remaining elements.

### A. Debtor Did Not Make Any False or Fraudulent Statement Regarding the Value of His Interests in WTN and WRG.

Debtor's scheduling the value of his interests in WTN and WRG as "unknown" was not false in any respect and does not constitute grounds for denying him a discharge.

First and foremost, Plaintiff offers no argument, much less evidence, that there was a "true" quantitative value Debtor should have used in lieu of "unknown." When asked what value Debtor should have listed, Plaintiff's corporate representative could not come up with a number. DSOF ¶ 59; Yan Ex. 3 at 56:11-13. Absence evidence there was an accurate numerical value Plaintiff could and should have used, Plaintiff cannot prove Debtor made a false statement.

There is also no evidence that Debtor knew the value of his interests at the time he filed his schedules. Plaintiff cannot point to any contemporaneous appraisal or other evidence of the value of those interests that Debtor could or should have relied upon. DSOF ¶¶ 54-55; Yan Decl. ¶¶ 24-25. *Cf. In re Robichaud*, 396 B.R. 252, 255 (Bankr. D.R.I. 2008) (debtor violated section 727(a)(4)(A) by scheduling value of stock as unknown despite having valued the same stock at $11,350 just three months earlier in a family court filing).

Nor is there any evidence that Debtor knew that he was lying by listing the value of his interests as "unknown." Instead, as Debtor explained in his deposition, he truly believed the value was unknown given that in August 2020, the world was in the midst of the Covid-19 pandemic, the real estate business that supplied any value to his interests was dormant, and that business was not collecting commissions and other receivables. DSOF ¶ 61; Bannon Ex. 1 at 117:10-21. *See In re Parnes*, 200 B.R. 710, 716-717 (Bankr. N.D. Ga. 1996) (debtor's scheduling value of his 50% interests in dental partnerships as "unknown" was not sufficient to deny discharge where defendant did not know how to value his interests at the time he filed for bankruptcy).

Plaintiff's reliance on *In re Silver*, 367 B.R. 795 (Bankr. D.N.M. 2007) for the proposition that there is something inherently problematic about listing the value of an asset as "unknown" is misplaced. In *Silver*, which involved a post-discharge action to revoke the discharge, the debtor was found to have violated section 727(a)(4)(A) when she listed the market value of an LLC of which she was a member as "unknown" while concealing transfers to that same LLC. *Id.* at 814-815. Those actions, along with the debtor's false statements at the section 341 meeting and delay tactics when creditors and the trustee sought information, resulted in diverting the trustee's and creditors' attention from pursuing those assets. *Id.* at 815-816. Importantly, the bankruptcy court in *Silver* noted that using "unknown" is not per se insufficient. *Id.* at 815. Rather, it was only in

the unique context of that case that the debtor's valuing her interests in the LLC as "unknown" had "the effect of a lie." *Id.* Here, by contrast, Debtor is not accused of concealing any information about WRG and WTN on his schedules and instead openly cooperated with the Trustee in providing information about those companies. DSOF ¶¶ 65-66; Yan Exs. 12, 13.

Plaintiff advances two arguments as to why it nonetheless believes Debtor acted wrongfully in scheduling his interests as having "unknown" value: (1) Debtor had prior valuations for WTN and WRG and Debtor should have been able to perform his own valuation; and (2) Debtor's postpetition conduct demonstrates he acted with fraudulent intent. Neither argument is factually or legally supportable.

### 1. There Is No Admissible Evidence Debtor Could Have Estimated the Value of His Interests.

Plaintiff's assertion that Debtor should have been able to value WRG and WTN because he did so in the past is wrong and misrepresents the facts. While Debtor had prior valuations in his possession, those valuations were performed by a third party, not Debtor himself. DSOF ¶¶ 50, 52; Bannon Ex. 44; Yan Ex. 15. That critical fact distinguishes this case from *In re Ligon*, 55 B.R. 250 (Bankr. M.D. Tenn. 1985), where the debtor, who was "savvy in financial affairs" and had a "lifetime of experience as a banker" lied in listing the value of certain business interests as "unknown" despite having been able to value them on prior occasions on his financial statements. *Id.* at 251-252. Plaintiff cannot point to any prior valuation of his interests that Debtor performed himself because Debtor has no education, training, or experience in performing valuations of businesses or business interests. DSOF ¶¶ 56-57; Winick Decl. ¶ 25.

Further, the prior appraisals of Debtor's interests (from 2013 and 2018) did not occur in the unique context of the pandemic and the uncertainty it generated, particularly for the real estate industry in New York City, and thus were not reliable indicators of value as of August 2020.

DSOF ¶ 63; Winick Decl. ¶ 26. *See, e.g., In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1063 (9th Cir. 2023) (company's pre-pandemic revenue projections cannot be used to infer that its post-pandemic revenue would be similar); *In re Chip's Southington, LLC*, No. 20-21458 (JJT), 2021 WL 5313546, at *8 (Bankr. D. Conn. Nov. 13, 2021) (leasehold interest appraised at a certain value pre-pandemic would not necessarily retain that value throughout the pandemic). Indeed, Debtor testified that he did not believe any professional could put a value on his interests in August 2020 because "the uncertainty of COVID-19 made everything questionable in valuation, especially in the real estate industry in New York." DSOF ¶ 64; Bannon Ex. 1 at 119:9-24.

Plaintiff's counterfactual argument that Debtor could and should have performed his own valuation relies solely on inadmissible conjecture from its expert, James Feltman, whose testimony should be disregarded. Feltman Decl. *See, e.g., Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (affirming entry of summary judgment and exclusion of unreliable expert testimony); *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013) ("Thus, if expert testimony is excluded as inadmissible under the Rule 702 framework articulated in *Daubert* and its progeny, the summary judgment determination is made by the district court on a record that does not contain that evidence.").

In his declaration, which is a cut-and-paste job from his expert report, Feltman asserts that Debtor should have been able to estimate the value of his interests because (1) the current commercial real estate license exam has a section covering valuation and valuation methodology and (2) it is reasonable for Feltman to assume Debtor has sufficient knowledge about valuation and valuation methodology such that Debtor could have used the methodologies tested in the

license exam to value his interests, as Feltman did.[7] PSOF Resp. ¶ 116. *Compare* Feltman Decl. *with* Yan Ex. 19. As revealed in Feltman's deposition, however, these assertions are divorced from reality.

Feltman admitted in his deposition that he has never taken the commercial real estate license exam himself. PSOF Resp. ¶ 118; Yan Ex. 20 at 160:5-7. His entire understanding of what the exam covers with respect to valuation comes from the descriptions on a third-party website that provides a set of video study guides for the exam, of which one chapter covers valuation of *real property*. PSOF Resp. ¶ 118-119; Yan Ex. 19 at 2, Ex. C1; Yan Ex. 20 at 162:15-163:12; Yan Ex. 21. Incredibly, Feltman admitted he did not even view the videos on the third-party website he relied on and that the descriptions of those videos did not cover valuations of business interests. PSOF Resp. ¶ 118; Yan Ex. 20 at 163:22-164:18.

Feltman's deposition also revealed there is no factual foundation for his speculation that Debtor could have performed his own valuation. Feltman admitted he did not know whether Debtor had ever previously performed a own valuation of his business interests and lacked any information concerning Debtor's training or academic background. PSOF Resp. ¶ 120; Yan Ex. 20 at 157:3-8, 166:11-18, 168:22-169:1. While Feltman claims Debtor could have used the methodologies taught in the current commercial real estate license exam, he had no idea whether Debtor took the current version of this exam, whether at the time Debtor passed the exam, there was any section covering valuation, or whether Debtor ever viewed the videos on the third party website that Feltman himself relied upon. PSOF Resp. ¶ 120; Yan Ex. 20 at 160:8-19, 166:11-18.

---

[7] Feltman's preliminary valuation of Debtor's interests as being worth anywhere from $2.1 million to $7.4 million was way off the mark, as those interests sold for merely $310,000. DSOF ¶¶ 71, 73. *Compare* Bankr. Dkt. No. 46-1 at ¶¶ 8-10 *with* Dkt. No. 86.

Federal Rule of Evidence 702 requires expert testimony to be "based on sufficient facts or data" and the expert's conclusions to be the "product of reliable principles and methods." Feltman's testimony fails to meet these basic standards. As discussed above, there is no factual foundation for his opinions. Further, he does not apply of any methodology, much less sound methodology, to reach his conclusions. Nowhere in his declaration (or in his expert report) does Feltman describe how exactly Debtor could have used the unexplained real property valuation methodologies tested in the commercial real estate broker exam to estimate the value of his interests in WTN and WRG under normal circumstances, much less to account for the extraordinary conditions created by the pandemic. PSOF Resp. ¶ 117; Feltman Decl.; Yan Ex. 19. Feltman's mere say-so is not enough, and his declaration should be disregarded.

### 2. Debtor's Postpetition Conduct Does Not Show Any Fraudulent Intent.

Plaintiff's argument that Debtor's postpetition "course of dealing" with the Trustee also shows his fraudulent intent is similarly unsupported by the scant circumstantial evidence cited. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Plaintiff cannot rely on the *Trustee's* motion to abandon the estate's interests in WTN and WRG to infer *Debtor's* wrongdoing. In that motion, the Trustee took the position, based on his own investigation and independent business judgment, that Debtor's interests were of inconsequential value and benefit to the estate. DSOF ¶ 68; Bankr. Dkt. No. 36 at 2. The motion does not reference any representation made by Debtor regarding the value of WTN or WRG. DSOF ¶ 69; Bankr. Dkt. No. 36. There is nothing in the Trustee's motion to show Debtor's dealings with the Trustee were fraudulent or inappropriate in any respect. The circumstances here bear no resemblance to those in *Thunberg v. Wallick*, No. 09-419 S, 2010 WL 1838003, at *2

(D.R.I. May 5, 2010), where the debtor lied to both the trustee and his own attorney about depositing divorce settlement proceeds with his secured creditors and instead deposited those proceeds into a business account under his control. Nor is that case legally relevant because it involved a violation of section 727(d)(2), which concerns concealment of assets, not section 727(a)(2)(A), which concerns false oaths.

Plaintiff's attempt to attribute wrongdoing to Debtor based on a December 2020 letter from WRG's Chief Operating Officer to its members regarding the precarious financial condition of the company is similarly ridiculous. *See* Bannon Ex. 46. Debtor had no role in creating this letter or any of the projections attached to it. PSOF Resp. ¶ 75; Winick Decl. ¶ 27. Further, nowhere in the letter or attached projections is it represented that WRG would sign no new deals in 2012 or 2022, as the projections attached to the letter show the opposite. PSOF Resp. ¶ 76; Bannon Ex. 46. Thus, Plaintiff's evidence does not create any genuine issue of material fact sufficient to defeat summary judgment.

### B. Debtor Did Not Make Any False or Fraudulent Statement Regarding the Value of His Rolex Watches.

Similarly, Debtor's scheduling his Rolex watches as being worth $5,000 does not warrant the extreme remedy of denying him a discharge.

The premise of Plaintiff's claim—that Debtor's valuation was knowingly false because his watches *later* appraised and sold for $47,500—is fundamentally flawed. Debtor could not have known what the watches would eventually appraise for at the time he filed his bankruptcy schedules. Notably, Plaintiff cites no case for the proposition that post-petition values can be used to prove that values scheduled at an earlier time are false. Indeed, the bankruptcy schedules instruct debtors to list *current* rather than *future* values. DSOF ¶ 80; Yan Ex. 14.

Plaintiff cannot point to any contemporaneous evidence produced by either party in discovery to show that Debtor's watches were worth more than $5,000 at the time he completed his schedules. Indeed, when asked what value Debtor should have listed for the watches, Plaintiff's corporate representative could not provide any number. DSOF ¶ 85; Yan Ex. 3 at 49:4-19. *See In re Wines*, 114 B.R. 794, 797 (Bankr. S.D. Fla. 1990) (debtor's alleged undervaluation of claim listed on schedules was not a false oath or account where "the creditor presented no concrete evidence as to the exact value of the claim at the time the debtor filed his individual petition"), *aff'd in part and rev'd in part by In re Wines*, 997 F.2d 852 (11th Cir. 1993).

There is also no evidence that Debtor knew the value of his watches was anything other than $5,000 at the time he scheduled them. Plaintiff's corporate representative testified that Plaintiff had no evidence Debtor appraised his watches before scheduling their values or that he thought the watches were worth more than $5,000. DSOF ¶ 76; Yan Ex. 3 at 54:18-55:2. That is not surprising given that Debtor is not an expert on watches or their values. DSOF ¶ 74; Winick Decl. ¶ 30. All of the Rolex watches he has ever owned were acquired using casino points from gambling; he has never purchased or sold a Rolex watch using real money. DSOF ¶ 75; Winick Decl. ¶ 30. Thus, as Debtor's counsel disclosed to the Trustee in inviting the Trustee to examine the watches for himself, Defendant had no receipts, bills of sale, appraisals, or other information regarding the watches. DSOF ¶¶ 88-89; Yan Exs. 12, 13. *See In re Parker*, 531 B.R. 103, 112-113 (Bankr. E.D.N.C. 2015) (rejecting argument that debtor undervalued classic cars where the evidence showed he did not know specific values because the cars were acquired roughly a decade ago, one in exchange for a debt and the other for a price that debtor did not recall).

Debtor provided an honest, if flawed, estimate, which he was entitled to do.[8]  *See In re Brenes*, 261 B.R. 322, 334 (Bankr. D. Conn. 2001) ("The Bankruptcy Code and Rules do[] not require a debtor to have independent appraisals performed on each property to determine its value."); *see also* 6 Collier on Bankruptcy ¶ 727.04 (16th ed.) ("[A] false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent.").

Debtor did not harbor any fraudulent intent when he estimated the value of his watches. DSOF ¶ 83; Winick Decl. ¶ 28.  *See In re DeRise*, 394 B.R. 677, 690 (Bankr. E.D.N.Y. 2008) (fraudulent intent must be proven by actual fraud, meaning a defendant must have acted intentionally or with reckless disregard for the truth); *Brenes*, 261 B.R. at 334 ("A statement is not deemed to be made with fraudulent intent simply because it is false").  Debtor was advised by his bankruptcy counsel that there was no chance the Trustee would blindly accept whatever value Debtor scheduled, so Debtor put in $5,000 as his best guess with the expectation that the Trustee would get an independent appraisal (which he did, with Debtor's help).  DSOF ¶¶ 81-82, 92; Winick Decl. ¶¶ 29, 32; Bankr. Dkt. No. 34 at ¶ 9.  *See In re Dubrowsky*, 244 B.R. 560, 573 (E.D.N.Y. 2000) ("An explanation by the debtor that he acted on advice of counsel, who in turn was fully aware of all the relevant facts, generally rebuts an inference of fraud."); *In re Deedon*, 419 B.R. 1, 9-10 (Bankr. D. Conn. 2009) (debtor's answers to questions at section 341 exam based on advice of counsel were not made with reckless disregard for the truth).

---

[8] It is ironic that Plaintiff argues Debtor's lay valuation of his watches was false merely because the watches later sold for more than 9x that amount given that Plaintiff's expert's valuation of Debtor's interests in WTN and WRG were off by a magnitude of 7x to 23x based on the ultimate sale price of those interests.  DSOF ¶¶ 71, 73.  *Compare* Bankr. Dkt. No. 46-1 at ¶¶ 8-10 *with* Dkt. No. 86.  Apparently, Debtor is supposed to have greater expertise valuing watches than Duff & Phelps has valuing business interests.

The meager circumstantial evidence of fraud that Plaintiff raises in its motion are insufficient to make out a prima facie case, much less defeat Debtor's summary judgment motion.

The fact that Plaintiff has to resort to documents from 2014 or 2015 to try to prove Debtor's alleged fraudulent intent in 2020 speaks volumes regarding the weakness of its case. Debtor's 2014 interview with the Real Deal, which is clearly a marketing piece where he boasted about collecting Rolexes, is insufficient to prove he is an actual watch expert, as Debtor had no idea how much different Rolexes cost. DSOF ¶ 79; Bannon Ex. 47; Winick Decl. ¶ 31. Indeed, as noted above, Debtor has never purchased or sold a Rolex watch for money. Similarly, while Plaintiff claims that Debtor had previously insured one of the watches for over $10,000, that claim is based on a prior insurance policy that Debtor *cancelled* back in 2015. Bannon Ex. 33. Plaintiff's argument that Debtor was reckless to not consult a cancelled insurance policy from 5 years before he completed his schedules, and which document he did not even recall he had, is unsupported by any legal precedent and ridiculous on its face. DSOF ¶ 90; Winick Decl. ¶ 34. Even if Debtor had thought to consult the cancelled policy, he is unable to determine if any of the two watches is reflected in that policy because the descriptions there do not reference model numbers. PSOF Resp. ¶ 70; DSOF ¶ 91; Winick Decl. ¶ 34; Bannon Ex. 33 at WINICK 47.

The only "contemporaneous" evidence Plaintiff offers in support of its argument that Debtor was reckless in August 2020 when he scheduled the value of his watches are Google search results that Plaintiff's counsel recently found in April 2023. Bannon Exs. 48-49. This evidence should be disregarded because it was never produced in discovery. *See*, *e.g.*, *Mantel v. Microsoft Corp.*, No. 16-cv-5277, 2018 WL 1602863, at *4 (S.D.N.Y. Mar. 29, 2018) ("[T]he Court concludes it is appropriate in this case to prevent the Plaintiff from supplementing the factual record on this motion for summary judgment with information and material that was withheld

during the course of discovery."); *Gilles v. Pleasant Hill Elementary School Dist. No. 69*, No. 09-1335, 2011 WL 5005995, at *3 (C.D. Ill. Oct. 20, 2011) ("The law is very clear: evidence that was not properly produced during discovery cannot be used to support or oppose summary judgment."). Debtor requested "[a]ll documents concerning the value of Defendant's Rolex watches at the time he filed his bankruptcy schedules" and Plaintiff identified only the postpetition valuation that Debtor obtained. Yan Ex. 5 at 5. But even if Plaintiff is allowed to belatedly supplement the record with evidence not indicative of Rolex prices at the time Debtor submitted his schedules,[9] that evidence proves nothing because Debtor never thought to run Internet searches using the model numbers of his watches given that he has never purchased or even looked at jewelry online, and nobody advised him to do Internet research. DSOF ¶ 84; Winick Decl. ¶ 33.

Plaintiff's argument that Debtor intentionally lowballed the value of his watches to that he could claim them as exempt is just that—argument. There are no facts to substantiate this theory. By contrast, when the watches were sold, the sales price reflected a waiver of Debtor's exemptions totaling $15,600, which is significantly more than the claimed $5,000 exemption. DSOF ¶ 94; Bankr. Dkt. No. 34-2. Further, Plaintiff cites no law holding that an exemption claim can form the basis of a false oath under section 727(a)(4)(A). Plaintiff purports to rely on *Taylor v. Freeland & Kronz*, 503 U.S. 638, 644 (1992), but there, the Supreme Court noted that bad faith exemption claims fall under the false claims prong of section 727(a)(4)(B), which is *not* a violation that Plaintiff has alleged in this case.

---

[9] Plaintiff's search results reflect a wide range of values—$15,000 to over $79,000 for one watch and $9,100 to nearly $28,000 for the other. PSOF Resp. ¶ 60; Bannon Exs. 48-49. Under Plaintiff's theory, however, using any value that didn't match up to the eventual sale prices of the watches would amount to a false oath.

Plaintiff goes even further out on a limb in arguing that Debtor "generically" listed his watches as "[t]wo Rolex watches" in order to make it difficult for the Trustee to conduct diligence on his watches. In truth, Debtor didn't list model numbers because the schedules didn't ask for that information (the schedules use the generic term "watch"), he didn't think to provide them, and nobody instructed him otherwise. DSOF ¶¶ 77-78; Bankr. Dkt. No. 1 at 14 of 58; Winick Decl. ¶ 35. Plaintiff cites to *In re Jajajel*, Adv. No. 09-01141, 2010 WL 3946420 (Bankr. ED. Va. Oct. 8, 2010), but that case does not hold that debtors must specify the particular make or model of a watch. Rather, in *Jajajel*, the court found that the debtor acted fraudulently when he listed his Rolex watch generically as "Watch," assigned it a value of $100, and then unilaterally sold it post-petition for $3,000 even though it was estate property. *Id.* at *1-*2. The debtor also intentionally undervalued other jewelry, including by failing to list the actual sales prices he obtained for certain items even though those sales occurred before the debtor completed and signed his schedules. *Id.* at *3. Debtor's actions are not remotely analogous to that misconduct.

Plaintiff's notion that Debtor's descriptions of his watches as "two Rolex watches" and scheduling them as exempt would hoodwink the Trustee into not conducting diligence is not only absurd but also belied by the facts. Upon truthfully disclosing his ownership of the watches, Debtor was contacted by the Trustee for additional information regarding those watches, which he provided. DSOF ¶¶ 88-89; Yan Exs. 12, 13. Debtor also commissioned an independent appraisal of his watches at the Trustee's request and facilitated a sale of those watches for the appraised value, thereby sparing the estate auction expenses. DSOF ¶¶ 92, 94; Bankr. Dkt. Nos. 34 at ¶ 9, 34-2. *In re Blum*, 41 B.R. 816, 819 (Bankr. S.D. Fla. 1984) (allegation that debtor failed to properly value two automobiles in his bankruptcy schedules was not sufficient to deny him a discharge where the automobiles were properly scheduled and the trustee was afforded the

opportunity to obtain an independent appraisal); *see also* 6 Collier on Bankruptcy ¶ 727.04 (16th ed.) ("[A] false statement that has no effect on the case is not grounds for denying a discharge.").

Finally, while Plaintiff notes that the Court can consider Debtor's scheduling of his watches and business interests together, where neither amounts to a violation of section 727(a)(4)(A), Plaintiff's combining them fares no better. Plaintiff's argument that Debtor lied when he tried to provide a numerical estimate and also lied when he could not provide such an estimate is a "heads I win, tails you lose" proposition that should be rejected. Because Plaintiff falls well short of meeting its burden of proof, and section 727(a)(4) must be liberally construed in favor of a discharge, the Court should grant Debtor summary judgment on Count II.

## IV. The Court Should Deny Summary Judgment on Count IV.

To prevail on Count IV, which seeks to exempt Debtor's tax debts for 2012-2016 from discharge, Plaintiff must prove by a preponderance of the evidence that Debtor "willfully attempted in any matter to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C); *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Under Second Circuit precedent, the "willfulness exception consists of a conduct element (an attempt to evade or defeat taxes)" and a mens rea requirement (willfulness)." *In re Tudisco*, 183 F.3d 133, 136-137 (2d Cir. 1999). Genuine issues of material fact abound as to both elements such that summary judgment cannot be granted.

### A. Debtor Made No Attempt to Evade or Defeat His Tax Liabilities.

Debtor expressly denies Plaintiff's assertion that he tried to evade or defeat his tax liabilities. PSOF Resp. ¶ 79; Winick Decl. ¶ 10. Plaintiff's evidence does not prove otherwise.

Debtor's nonpayment of quarterly estimated taxes is insufficient to establish tax evasion as a matter of law because "simple nonpayment of taxes does not satisfy § 523(a)(1)(C)'s conduct requirement." *Tudisco*, 183 F.3d at 136.

Similarly, the fact that Debtor used available income to pay for things other than tax payments, standing alone, does not show he was evading, much less defeating, his tax liabilities. Indeed, not paying taxes and spending money on non-tax-related expenses are two sides of the same coin. As the Ninth Circuit reasoned in *Hawkins v. Franchise Tax Bd. of Cal.*, "if simply living beyond one's means, or paying bills to other creditors before bankruptcy, were sufficient to establish a willful attempt to evade taxes, there would be few bankruptcies in which taxes would be dischargeable." *Id.*, 769 F.3d 662, 669 (9th Cir. 2014). Thus, "[a]lthough lavish spending is relevant to the conduct analysis, it is generally accompanied by additional culpable behavior intended to prevent the IRS from reaching the debtor's assets." *In re Looft*, 533 B.R. 910, 919 (Bankr. N.D. Ga. 2015); *accord Tudisco*, 183 F.3d at 137, 139 (finding the conduct requirement was satisfied where debtor failed to file tax returns for 7 years and submitted false tax withholding statements to his employer). Debtor's spending habits do not establish tax evasion as a matter of law, and as a matter of fact, he denies that the purpose of his spending was to prevent the IRS from collecting its debt. PSOF ¶ 98; Winick Decl. ¶ 11.

Plaintiff's contention that Debtor transferred assets to his friends and family are simply another variant of the same argument that he didn't use his assets to pay the IRS. But here too, Plaintiff's evidence does not prove evasive conduct. Of the five transfers Plaintiff references, two did not even involve transfers made by Plaintiff or of Plaintiff's property. The assignment of interests in WRG NJ LLC to Debtor's daughter in 2016 was made by Ivan Moskowitz, as trustee of the Danielle Winick 2012 Trust, not Debtor. PSOF ¶ 56; Bannon Ex. 31; Harrison Ex. 3 at USA 3321. As for the approximately $500,000 in jewelry listed in a 2015 insurance policy cancellation notice that Plaintiff claims Debtor gave away, there is no evidence that Debtor owned all of that jewelry, or which particular pieces were gifted and the ownership of those pieces. PSOF ¶ 58;

Bannon Ex. 1 at 94:12-25; Yan Ex. 18 at 73:25-74:17. Another of the listed transfers involves Debtor's interests in SDSDR111, which, as discussed above, was made without fraud and fully satisfied Debtor's debt to Berley. Indeed, the loan that resulted in the transfer was made for the purpose of helping Defendant pay his taxes. DSOF ¶¶ 4, 20; Bannon Ex. 1 at 125:15-22, 128:4-11. The remaining two transfers are gifts of stock and life insurance premiums to Debtor's daughter, for which he filed gift returns. Bannon Ex. 17; Yan Ex. 17. The stock gift was prompted by estate planning concerns in light of the IRS's announcing a reduction to the lifetime estate gift tax exemption, and the life insurance premiums were annual gifts that Debtor made starting years before the tax years at issue. PSOF Resp. ¶¶ 107, 109; Harrison Ex. 3 at USA 3329; Bannon Ex. 1 at 52:17-25; Bannon Ex. 32. These actions cannot be analogized to the facts of *In re Griffith*, 206 F.3d 1389, 1391 (11th Cir. 2000), where the debtor transferred assets previously belonging to him alone to himself and his wife to be held as tenants by the entirety and also created a new entity to hold transferred assets less than a month after he received an adverse tax court ruling.

Plaintiff's argument that Debtor improperly used company assets as his personal assets is based on gross misrepresentations of the evidence. With respect to Debtor's use of WRG's company cars, Debtor testified was that he only drove one of the two, and that he used that car mainly for business purposes to look at real estate, while WRG's Chief Operating Officer testified that others also used the cars. PSOF Resp. ¶¶ 60, 112; Bannon Ex. 1 at 100:18-19, 101:10-102:5; Bannon Ex. 36 at 33:24-35:13. With respect to the letter directing commissions owed to WRG to be paid to Berley directly, WRG's Chief Operating Officer testified that the company was not using company receivables to pay Debtor's debts but rather forgoing commissions that would otherwise have been due to Debtor. PSOF ¶ 61; Bannon Ex. 36 at 61:19-23, 63:2-13. Plaintiff's lone case on this point is not remotely analogous to the facts at hand. *See In re May*, 2010 WL

5014716, at *11 (S.D. Ala. Nov. 30, 2010) (debtor avoided having a personal checking account and instead diverted earnings into business accounts from which he wife paid personal obligations).

Finally, Debtor did not "manipulate" the IRS's collection procedures to thwart its collection activities. Plaintiff cannot complain about the impropriety of installment agreements that IRS agreed to and pursuant to which it collected close to $2 million. PSOF Resp. ¶¶ 10-12, 14-16, 21, 23; Harrison Ex. 2. Also, unlike the debtors in Plaintiff's cited case law, Debtor made only one offer in compromise during this period and the offer was not prompted by any scheme to stall collection but rather Debtor's loss of a major client that had accounted for 60% of his commissions. PSOF ¶ 97; Harrison Ex. 4 at USA 2104; Winick Decl. ¶ 8. *Cf. In re Colish*, 289 B.R. 523, 533-534 (Bankr. E.D.N.Y. 2002) (debtor was tax attorney who filed serial offers in compromise from 1990 to 1995 and knew that while the offers were pending, he could forestall collection and delay filing bankruptcy). Plaintiff's contention that Debtor's ongoing and proactive efforts to *resolve* his tax liabilities is instead evidence of tax evasion is beyond absurd.

### B.   Debtor Did Not Willfully Evade His Tax Obligations.

Plaintiff fails to establish not only Debtor's wrongful conduct but also Debtor's wrongful intent. The Second Circuit has provided limited guidance on what suffices to meet the mens rea requirement beyond defining "willful" as "voluntarily, consciously or knowingly, and intentionally."[10] *Tudisco*, 183 F.3d at 137 (2d Cir. 1999).

---

[10] The Second Circuit did *not* hold that "it is enough that a debtor concedes 'that he knew that he had to pay taxes' to meet the *mens rea* requirement," as Plaintiff falsely asserts. Plaintiff cannot supplant the statutory requirement of "willful" conduct with "knowingly" conduct and its misreading cannot be squared with the Second Circuit's definition of willful as "voluntarily," "consciously or knowingly," *and* "intentionally."

There is a split in authority as to the mental state required to prove willful tax evasion. Some courts have employed a lax definition of willfulness that encompass any circumstance where a taxpayer has the financial means to pay outstanding tax liabilities but makes a conscious choice to spend money elsewhere. *E.g.*, *United States v. Helton*, 843 Fed. App'x 779, 781 (6th Cir. 2021); *see also Hawkins*, 769 F.3d at 669 (listing similar precedent from other circuits). Some lower courts in the Second Circuit have followed that precedent. *E.g.*, *In re Wright*, 191 B.R. 291, 293 (S.D.N.Y. 1995); *United States v. Timon*, No. 20-cv-1101 (MAD/CFH), 2022 WL 17249463, at *8 (N.D.N.Y. Sept. 6, 2022).

Other courts have defined willfulness strictly to require a plaintiff to prove a debtor acted with specific intent to evade tax liabilities. *E.g.*, *Hawkins*, 769 F.3d at 669; *In re Quiroz*, Adv. No. 16-1027-R, 2018 WL 1773095, at *12 (Bankr. N.D. Okla. Apr. 10, 2018); *Internal Revenue Service v. Conard*, No. 18-cv-916, 2019 WL 10886919, at *2 (E.D. Va. Feb. 1, 2019); *accord* 4 Collier on Bankruptcy ¶ 523.07 (16th ed.) ("This exception relates to a dishonest scheme and excepts from discharge taxes as to which a debtor made a fraudulent return, or taxes that the debtor willfully attempted in any manner to evade or defeat. The obvious purpose is to prevent the use of the Bankruptcy Code as part of the dishonest scheme to evade tax liability."). Some of Plaintiff's cited case law contains language consistent with this line of authority. *E.g.*, *In re Epstein*, 303 B.R. 280, 286 (Bankr. E.D.N.Y. 2004) (interpreting *Tudisco* as holding that "a failure to pay accompanied by other conduct *designed* to evade or defeat taxes, is sufficient to establish nondischargeability under § 523(a)(1)(C)") (emphasis added); *United States v. Gorokhobsky*, 575 F. Supp. 3d 1050, 1060 (E.D. Wisc. 2021) (evaluating badges of intentional fraud in determining intent).

In *Hawkins*, which also involved the dischargeability of tax debts of a wealthy debtor, the Ninth Circuit undertook an exhaustive examination of section 523(a)(1)(C), as well as precedent and analogous statutes, in adopting a narrow construction of willful evasion:

> Given the structure of the statute as a whole, including its object and policy, legislative history, case precedent, and analogous statutes, we conclude that declaring a tax debt nondischargeable under 11 U.S.C. § 523(a)(1)(C) on the basis that the debtor "willfully attempted in any manner to evade or defeat such tax" requires a showing of specific intent to evade the tax. Therefore, a mere showing of spending in excess of income is not sufficient to establish the required intent to evade tax; the government must establish that the debtor took the actions with the specific intent of evading taxes. Indeed, if simply living beyond one's means, or paying bills to other creditors before bankruptcy, were sufficient to establish a willful attempt to evade taxes, there would be few bankruptcies in which taxes would be dischargeable. Such a rule could create a large ripple effect throughout the bankruptcy system. As to discharge of debts, bankruptcy law must apply equally to the rich and poor alike, fulfilling the Constitution's requirement that Congress establish "uniform laws on the subject of bankruptcies throughout the United States." U.S. Const., art. I, § 8, cl. 4.

*Hawkins*, 769 F.3d 666-669; *accord Quiroz*, 2018 WL 1773095, at *10-*17 (following *Hawkins* and providing additional analysis as to why a narrower interpretation is appropriate). This Court should similarly adopt the narrower interpretation of willful evasion as requiring evidence of specific intent to evade taxes for the many reasons stated in *Hawkins* and its progeny and highlighted below.

For starters, the fresh start philosophy of the Bankruptcy Code advocates a narrower rather than more expansive definition of willfulness. *Hawkins*, 769 F.3d at 667. Second Circuit precedent is consistent with that rationale. *See Hyman*, 502 F.3d at 66 ("[E]xceptions to discharge are to be narrowly construed").

The text of section 523(a)(1) also supports a narrow construction of willfulness. "The word 'evade' is not a neutral term, but connotes dodging, eluding, avoiding, hiding, making oneself unavailable, or being less than candid" and "the ordinary meaning of the word 'defeat' is to

destroy, beat, conquer, overcome, vanquish, nullify, or frustrate." *Quiroz*, 2018 WL 1773095, at *14. "Congress chose these words—words that implicate an intent to undermine, harm, conceal, or deceive—to describe conduct that warrants excepting taxes from discharge." *Id.*

Further, the term "willful" appears only twice in section 523—in subsection (a)(1)(3) and in subsection (a)(6), 11 U.S.C. § 523, such that they should be interpreted consistently. *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[T]he standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."). In *Kawaauhau v. Geiger*, the Supreme Court held that willful injury, as used in section 523(a)(6) (providing an exception to discharge for "willful and malicious injury by the debtor to another entity or the property of another entity") means "deliberate and intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.*, 523 U.S. 57, 61 (1998) (emphasis in original). That statutory formulation resembled an intentional tort, which generally requires that the actor intend "the consequences of an act," and not simply "the act itself." *Id.* at 61-62. Further, a contrary and broader interpretation would encompass "a wide range of situations in which an act is intentional, but injury is unintended," which would be "incompatible with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed.'" *Id.* at 62 (internal citations omitted).

"[T]he Supreme Court's interpretation of the word [willful] for the purpose of § 523(a)(6) is presumed to apply for the purpose of § 523(a)(1)(C)" such that for purposes of the latter statute, "voluntary, intentional acts (i.e., using one's earnings to renovate a home, contributing to charity, gambling, signing documents that contain errors) do not constitute 'willful[] attempt[s] … to evade' unless the evidence is also sufficient to infer that the debtor committed the conduct in order to prevent or frustrate the assessment or collection of taxes." *Quiroz*, 2018 WL 1773095, at *17.

Indeed, courts have expressly rejected the IRS's arguments that *Kawaauhau* allows for a different and broader definition of willful as applied to section 523(a)(1)(C).[11]  *Conard*, 2019 WL 10886919, at *2; *Quiroz*, 2018 WL 1773095, at *12, *16-*17.

Consistent with *Kawaahau's* mandate of construing exceptions to discharge narrowly, the Second Circuit has interpreted other provisions of section 523 narrowly. For example, in *Hyman*, when confronted with the appropriate standard to determine a violation of section 523(a)(4) (excepting from discharge debts accrued "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny"), the Second Circuit rejected other circuit precedent holding that an innocent mistake can constitute a defalcation.  *Id.*, 502 F.23d at 66-67.  But the Second Circuit went even further, and in examining precedent from the circuits that required some level of wrongful conduct to find a defalcation, adopted the *most* stringent test, which required a showing of conscious misbehavior or extreme reckless akin to showing scienter in the securities law context. *Id.* at 67-68.

Courts applying a narrower construction of willful evasion have also noted that the text of 523(a)(1)(c) of the Bankruptcy Code mirrors that of section 7201 of the Internal Revenue Code, 26 U.S.C. § 7201, which makes it a felony to "willfully attempt[] in any manner to evade or defeat any tax," and thus requires proof of specific intent.  *Hawkins*, 769 F.3d at 668; *Quiroz*, 2018 WL 1773095, at *15-*16.  Indeed, the Second Circuit's interpretation of section 523(a)(1)(C) has having a "mens rea requirement" directly invokes application of a criminal law analogue of willfulness.  *Tudisco*, 183 F.3d at 136; *see also U.S. v. Coblentz*; 453 F.2d 503, 505 (2d Cir. 1972)

---

[11] As far as Debtor's undersigned counsel are aware, *none* of the lower court decisions or even circuit-level court decisions adopting a broader interpretation of willful evasion grapple with, much less cite, *Kawaauhau*.  That alone makes those cases questionable in terms of precedential value.

(to establish liability under section 7201, "[i]t is essential that the government establish beyond a reasonable doubt that [defendant] acted willfully and knowingly with the specific intent to evade the tax").

By contrast, courts applying a broader construction of willful evasion have inaptly analogized section 523(a)(1)(C) to section 6672 of the Internal Revenue Code, 26 U.S.C. § 6672(a), which imposes a civil penalty on "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who . . . willfully attempts in any manner to evade or defeat such tax or the payment thereof," and does not require proof of bad purpose of evil motive. *See Wright*, 191 B.R. at 292-293. Reliance on section 6672 is wrong for at least two reasons. First, section 6672 applies in the context where a corporate officer or other responsible employee fails to turn over withholding taxes and is not analogous to a situation where a debtor owes taxes but spends his income elsewhere. *Quiroz*, 2018 WL 1773095, at *15. Second, as noted above, given that the Second Circuit requires proof of mens rea to establish a violation of section 523(a)(1)(C), the better analogue is to the criminal tax evasion statute, section 7201.

Debtor submits that if the issue of whether to read section 523(a)(1) broadly or narrowly were to reach the Second Circuit, it would agree with *Hawkins*, *Quiroz*, and *Conard* that to prove mens rea, a plaintiff must prove specific intent to evade or defeat tax liabilities. But even if the Court were to apply the broader standard of willfulness that Plaintiff advocates, summary judgment is still unwarranted based on the evidentiary record it has presented.

Plaintiff has no evidence in the form of testimony or written communications that show Debtor acted for the purpose of evading his tax obligations, and Debtor expressly disavows any

such intent.[12]  PSOF Resp. ¶ 79; Winick Decl. ¶ 10.  This alone raises a genuine issue of material fact that the Court cannot resolve on summary judgment.  It would also be anomalous for the Court to enter summary judgment against Debtor without having heard live testimony from him given that the majority of section 523(a)(1)(C) decisions are rendered after trial.

Plaintiff's evidence of Debtor's intent relies entirely on the conduct discussed above, which conduct, when viewed in the light most favorable to Debtor, is insufficient to establish willful evasion.  Additional evidence further undermines Plaintiff's arguments.

First, Debtor's tax history as a whole shows he did not try to dodge his tax burdens.  Debtor always filed accurate and timely tax returns.  PSOF Resp. ¶ 80; Winick Decl. ¶ 10.  Debtor also paid all of his taxes for tax years 2017 and 2018.  PSOF Resp. ¶ 81; Winick Decl. ¶ 10.  When Debtor previously incurred millions in liabilities in the early 2000s, he eventually paid off those liabilities.  PSOF Resp. ¶ 82; Harrison Ex. 1; Harrison Ex. 3 at USA 3189, 3192, 3248.  Even with respect to his liabilities for 2012-2016, it is not the case that Debtor didn't pay any taxes; rather, he paid $2.6 million from tax withholdings.  PSOF Resp. ¶ 83; Harrison Ex. 2.

Debtor's ongoing efforts to resolve his unpaid tax liabilities for 2012-2016 also corroborate his lack of intent to evade taxes.  While Plaintiff claims Debtor somehow acted wrongfully in obtaining several installment agreements with the IRS, the fact remains that Debtor had no obligation to seek additional installment agreements after defaulting on prior ones but did nonetheless.  PSOF Resp. ¶¶ 10, 14, 21; Harrison Ex. 2.  All told, Debtor voluntarily made 43 separate payments totaling over $1.94 million from January 2014 through January 2020.  PSOF

---

[12] To the extent Plaintiff challenges Debtor's credibility, that too weighs in favor of denying summary judgment.  *U.S. v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) ("On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried.").

Resp. ¶ 84; Harrison Ex. 2 at USA 1702-1705. He also paid $2.6 million from tax withholdings. PSOF Resp. ¶ 83; Harrison Ex. 2. Debtor even borrowed money from Berley to pay his taxes. DSOF ¶¶ 4, 20; Bannon Ex. 1 at 125:15-22, 128:4-11. These actions are simply irreconcilable with any willful *evasion* of taxes.

Debtor's gambling addiction also shows he lacked the requisite mens rea. As Dr. Weinstock's undisputed expert testimony establishes, gambling, which was by far Debtor's largest expense, was not voluntary.[13] PSOF Resp. ¶ 93; Yan Ex. 16 at 8-9. Had Debtor not gambled away over $11.5 million between 2012 and 2016, that would have been more than enough money to pay off the $6.9 million (or $8.5 million when interest and penalties are added) in tax debts he accrued for this same period; in fact, his net gambling losses for each year dwarfed his net tax liabilities for each year. PSOF Resp. ¶ 87; Harrison Ex. 2; Bannon Ex. 26. As Dr. Weinstock also opined and Debtor confirmed, that Debtor believed he could pay off his taxes without compromising his gambling habit because prior experience with paying off his tax debt from the early 2000s taught him this was possible. PSOF Resp. ¶ 94; Yan Ex. 16 at 9; Winick Decl. ¶ 7. Debtor's conduct in paying under installment agreements while continuing to gamble corroborates this belief. At a minimum, Dr. Weinstock's testimony demonstrates that Debtor's gambling away monies that could have paid his taxes was not undertaken to willfully evade his tax obligations.

Ultimately, Plaintiff's willful evasion claim depends on the far-fetched notion that Debtor would rather leave himself destitute than pay the IRS. After all, Debtor is well past the retirement

---

[13] While Plaintiff's nonpredecential case law indicates a gambling addiction "does not operate to prevent the Debtor from forming the requisite fraudulent intent to evade payment of taxes," *In re Carmel*, 134 B.R. 890, 908 (Bankr. N.D. Ill. 1991), it does not preclude Debtor from introducing such evidence. Given that under *Tudisco*, Plaintiff must prove Debtor acted voluntarily in evading taxes, Dr. Weinstock's opinion that Debtor's gambling was involuntary is at least relevant to that inquiry.

age and his bankruptcy schedules reveal he has no retirement accounts or other assets sufficient to sustain his retirement. PSOF Resp. ¶ 110; Winick Decl. ¶ 18; Bankr. Dkt. No. 1. With every dollar that he spent on non-tax items, Debtor jeopardized his own financial future. Plaintiff does not contend that Debtor's plan all along was to cut off his own nose to spite his face, but that is the implication of its illogical theory of the case, and one that Debtor disputes. PSOF Resp. ¶¶ 92, 98, 113; Winick Decl. ¶¶ 6, 12, 17.

Because there are disputed issues of material fact concerning whether Debtor willfully attempted to evade or defeat his tax obligations, the Court cannot grant summary judgment on Plaintiff's section 523(a)(1)(C) claim.

## CONCLUSION

For these reasons, Debtor requests that the Court grant him summary judgment on Counts I and II of the Complaint and deny Plaintiff summary judgment on Count IV.

Dated: May 5, 2023

**ARENTFOX SCHIFF LLP**

*/s/ Steven Wilamowsky*
Steven Wilamowsky
1185 Avenue of the Americas
Suite 3000
New York, NY 10036
T: (212) 753-5000
E: steven.wilamowsky@afslaw.com
- and -

Jin Yan
1717 K St. NW
Washington, DC 20006
T: (202) 778-6442
E: jin.yan@afslaw.com

*Counsel for Defendant Jeffrey Winick*