**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------x
In re:                                     :
                                           :          Chapter 7
      JEFFREY WINICK,                      :
                                           :          Case No. 20-11976 (PB)
                        Debtor.            :
----------------------------------------------------------x
UNITED STATES OF AMERICA,                  :
                                           :          Adv. Proc. No. 21-01138 (PB)
                        Plaintiff,         :
                                           :
      v.                                   :
                                           :
JEFFREY WINICK,                            :
                                           :
                        Defendant.         :
----------------------------------------------------------x
```

### DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 7056-1, debtor and defendant Jeffery Winick ("Debtor") responds to plaintiff United States of America's ("Plaintiff") Statement of Facts and submits additional material facts precluding the Court from granting Plaintiff summary judgment on Counts II and IV of its Complaint.

To the extent Debtor does not dispute certain facts for purposes of summary judgment, Debtor does not concede that those facts are material or are supported by admissible evidence and does not admit or agree with any of Plaintiff's legal conclusions. Debtor reserves the right to challenge any and all of Plaintiff's stated facts and legal conclusions at trial.

### RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

1.     Through at least 2016, Mr. Winick derived the substantial majority of his income through commissions earned from brokering real-estate transactions, from which his employer did

not withhold taxes. Declaration of Zachary Bannon dated April 14, 2023 ("Bannon Decl.") ¶ 3, Ex. 1 ("Winick Dep.") 26:8-13.

**RESPONSE**: Disputed in part. The cited testimony does not discuss Debtor's employer's not withholding taxes on his commissions. Bannon Ex. 1 at 26:8-13.

2.      Between 2000 and 2005, Mr. Winick repeatedly failed to make quarterly estimated tax payments required pursuant to 26 U.S.C. § 6654. Declaration of John T. Harrison dated April 14, 2023 ("Harrison Decl.") ¶ 3, Ex. 1; *id.* ¶ 5, Ex. 3 at USA03071, 03102 (noting no estimated taxes paid for tax years 2003 and 2005).

**RESPONSE**: Undisputed.

3.      Around 2003, Mr. Winick purchased a home located at 24 Parrish Pond Lane, Southampton, New York 11968 that, as of 2016, was appraised at a value of $3,210,000. Winick Dep. 81:18-82:3; Bannon Decl. ¶ 4, Ex. 2.

**RESPONSE**: Disputed in part. Debtor testified that he did not recall the date he purchased the property but believed it was in 2002 or 2003. Bannon Ex. 1 at 81:25-82:3.

4.      Shortly after purchasing the Southampton home, Mr. Winick transferred its title for no consideration to the Jeffrey Winick 1999 Life Insurance Trust, which named his daughter Danielle Winick as beneficiary. Winick Dep. 82:4-9; Bannon Decl. ¶ 5, Ex. 3.

**RESPONSE**: Disputed in part. The cited evidence does not discuss whether the Southampton property was transferred to the Jeffrey Winick 1999 Life Insurance Trust for any consideration or no consideration. Bannon Ex. 1 at 82:4-9; Bannon Ex. 3. The IRS's internal records indicate that Debtor sold the property to the trust for $1,290,000, thus indicating the transfer was supported by consideration. Harrison Ex. 3 at USA 3108, 3111, 3139.

5.      On October 1, 2003, Mr. Winick entered into a lease agreement with the Jeffrey Winick 1999 Life Insurance Trust whereby he agreed to pay $150,000 per year to lease the Southampton property from the trust.  Bannon Decl. ¶ 6, Ex. 4.

**RESPONSE**:  Undisputed.

6.      From 2012 to 2016, Mr. Winick incurred liabilities to the Internal resulting from the underpayment of income taxes in the amounts summarized in the following table:

| Tax Year | Taxable Income | Taxes Owed | Tax Withholdings | Tax Liability |
|---|---|---|---|---|
| 2012 | $7,922,503 | $2,958,768 | $676,747 | $2,282,021 |
| 2013 | $4,675,510 | $1,944,528 | $558,099 | $1,386,429 |
| 2014 | $4,911,103 | $2,100,533 | $276,518 | $1,824,015 |
| 2015 | $3,891,521 | $1,578,350 | $876,635 | $701,715 |
| 2016 | $2,412,311 | $995,865 | $251,377 | $744,488 |
| Totals | $23,812,948 | $9,578,044 | $2,639,376 | $6,938,668 |

Harrison Decl. ¶ 4, Ex. 2.

**RESPONSE**:  Undisputed.

7.      Mr. Winick made some quarterly estimated tax payments pursuant to 26 U.S.C. § 6654 between 2005 and 2012. Winick Dep. 19:12-18.

**RESPONSE**:  Disputed in part.  Debtor testified that he believed he made some quarterly estimated taxes between the early 2000s and 2012 but did not specify that 2005 as the beginning year of that date range.  Debtor also did not testify as to statutory basis for his payments.  Bannon Ex. 1 at 19:12-18.

8.      Mr. Winick did not make any quarterly estimated tax payments between 2012 and 2016, though his lawyers told him "numerous times" that he should do so. Harrison Decl. ¶ 4, Ex. 2; Winick Dep. 24:16-25.

**RESPONSE**: Disputed in part. Debtor testified that he believed he was told he should make quarterly estimated tax payments but did not specify in what year(s) he was told that. Bannon Ex. 1 at 24:16-25.

9.    Mr. Winick stopped making quarterly estimated tax payments so that he could spend more money gambling at casinos. Winick Dep. 25:7-12.

 **RESPONSE**: Disputed in part. To the extent Debtor's testimony is interpreted as he purposefully did not pay estimated taxes so that he could gamble the money that would otherwise go towards paying those taxes, that interpretation is not correct. The purpose of Debtor's gambling was not to avoid paying taxes. Declaration of Jeffrey Winick ("Winick Decl.") ¶ 6. It is accurate, however, to say that Debtor gambled away monies that could and should have been used to pay his estimated taxes. *Id.* ¶ 6.

10.    Mr. Winick paid $25,000 toward his 2012 to 2016 tax liabilities in January 2014, in connection with a request to enter into an IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702; *Id.* ¶ 5, Ex. 3 at USA03256.

**RESPONSE**: Undisputed.

11.    The IRS entered into an IA with Mr. Winick in July 2014, whereby Mr. Winick would pay $50,000 per month through November 2014, then $100,000 per month until his liabilities were fully paid. Harrison Decl. ¶ 5, Ex. 3 at USA03280.

**RESPONSE**: Undisputed.

12.    Mr. Winick made the following payments pursuant to his 2014 IA or while it was pending: January 2014 -- $25,000; May 2014 -- $50,000; June 2014 -- $50,000; August 2014 -- $50,000; September 2014 -- $50,000. He made no further payments under this IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702.

**RESPONSE**: Undisputed.

13.      The IRS terminated Mr. Winick's IA in March 2015. Harrison Decl. ¶ 4, Ex. 2 at USA01702.

**RESPONSE**: Undisputed.

14.      After his 2014 IA was terminated, Mr. Winick made a payment of $25,000 toward his tax liabilities in April 2015, while requesting to enter into a new IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702.

**RESPONSE**: Undisputed.

15.      The IRS entered a second IA with Mr. Winick in October 2015, whereby he would pay $50,000 per month through November 2017, then $75,000 per month until his liabilities were fully paid. Harrison Decl. ¶ 5, Ex. 3 at USA03295.

**RESPONSE**: Undisputed.

16.      Mr. Winick made the following payments pursuant to his 2014 IA or while it was pending: April 2015 -- $25,000; May 2015 -- $30,000; June 2015 -- $30,000; July 2015 -- $50,000; August 2015 -- $50,000; September 2015 -- $50,000; October 2015 -- $50,000; November 2015 -- $50,000; December 2015 -- $50,000; January 2016 -- $50,000; February 2016 -- $50,000; March 2016 -- $50,000; April 2016 -- $50,000; May 2016 -- $50,000; June 2016 -- $50,000; July 2016 -- $50,000; August 2016 -- $25,000; September 2016 -- $25,000; October 2016 -- $25,000; November 2016 -- $25,000; December 2016 -- $25,000. He made no further payments under this IA. Harrison Decl. ¶ 4, Ex. 2 at USA01702-01703.

**RESPONSE**: Disputed in part. Plaintiff omits Debtor's additional payment of $20,000 in June 2015. Harrison Ex. 2 at USA 1702.

17.     The IRS terminated Mr. Winick's second IA in March 2017. Harrison Decl. ¶ 4, Ex. 2 at USA01703.

**RESPONSE**:  Undisputed.

18.     Mr. Winick submitted an offer-in-compromise to the IRS in May 2017, offering $430,000, with a prepayment of $86,000, to compromise the over $7 million in liabilities that remained outstanding at that time. Harrison Decl. ¶ 6, Ex. 4.

**RESPONSE**:  Disputed in part.  The cited evidence shows that Debtor made an offer in compromise of $430,000 with a prepayment of $86,000 but does not show that he owed in excess of $7 million in liabilities at the time.  Harrison Ex. 4.

19.     In September 2018, the IRS informed Mr. Winick that his offer-in-compromise would be rejected. Harrison Decl. ¶ 5, Ex. 3 at USA03357.

**RESPONSE**:  Disputed in part.  The cited evidence shows that the IRS representative informed Debtor's power of attorney, not Debtor himself, that his offer in compromise would be rejected.  Harrison Ex. 3 at USA 3357.

20.     Mr. Winick withdrew his offer-in-compromise on September 26, 2018. Harrison Decl. ¶ 4, Ex. 2 at USA01704.

**RESPONSE**:  Undisputed.

21.     After his offer-in-compromise was withdrawn, Mr. Winick made a payment of $50,000 toward his tax liabilities in November 2018, while requesting to enter into a further IA. Harrison Decl. ¶ 4, Ex. 2 at USA01704.

**RESPONSE**:  Undisputed.

22.     Under the terms of the IRS's third IA with Mr. Winick, he would pay $50,000 per month through December 2019, then $114,000 per month thereafter until his liabilities were fully paid. Harrison Decl. ¶ 5, Ex. 3 at USA03370.

**RESPONSE**:  Undisputed.

23.     Mr. Winick made the following payments pursuant to his third IA or while it was pending: November 2018 -- $50,000; December 2018 -- $50,000; January 2019 -- $50,000; February 2019 -- $50,000; March 2019 -- $50,000; April 2019 -- $50,000; May 2019 -- $50,000; June 2019 -- $50,000; July 2019 -- $50,000; August 2019 -- $50,000; September 2019 -- $50,000; October 2019 -- $50,000; November 2019 -- $50,000; December 2019 -- $50,000; January 2020 -- $50,000. He made no further payments. Harrison Decl. ¶ 4, Ex. 2 at USA01704-01705.

**RESPONSE**:  Undisputed.

24.     Mr. Winick made no further payments towards his tax liabilities after his January 2020 IA payment. Harrison Decl. ¶ 4, Ex. 2 at USA01705.

**RESPONSE**:  Undisputed.

25.     At the time Mr. Winick filed for bankruptcy in August 2020, his liabilities to the IRS were as summarized in the following table:

| Tax Period | Remaining Tax Due ($) | Penalties Due as of Petition Date ($) | Interest Due as of Petition Date ($) | Total Due as of Petition Date ($) |
|---|---|---|---|---|
| 2012 | 356,509.00 | 627,999.45 | 436,044.75 | 1,420,553.02 |
| 2013 | 1,386,429.00 | 416,699.65 | 413,433.23 | 2,216,561.88 |
| 2014 | 1,824,015.00 | 548,181.72 | 473,941.12 | 2,846,137.84 |
| 2015 | 701,715.00 | 207,987.26 | 155,801.40 | 1,065,503.66 |
| 2016 | 744,488.00 | 132,922.09 | 129,695.05 | 1,007,105.14 |
| Total | 5,013,156.00 | 1,933,790.17 | 1,617,915.55 | 8,564,861.72 |

Harrison Decl. ¶ 7.

**RESPONSE**: Undisputed.

26. Between 2012 and the time he filed for bankruptcy, Mr. Winick served as the majority owner and chief executive officer of Winick Realty Group, LLC—a New York City-based commercial real-estate brokerage. Winick Dep. 13:5-18; Bannon Decl. ¶ 7, Ex. 5 at USA0860 (describing Mr. Winick as the 22.5% owner of WRG and WTN Realty Corp. as the 67.5% owner of WRG); Bannon Decl. ¶ 8, Ex. 6 at USA0794 (describing Mr. Winick as the 60% owner of WTN Realty Corp.); Bannon Decl. ¶ 52, Ex. 50.

**RESPONSE**: Disputed in part. The cited deposition testimony does establish that Debtor was the Chief Executive Officer of WRG between 2012 and the time he filed for bankruptcy. Bannon Ex. 1 at 13:5-18.

27. In 2012, Mr. Winick paid $15,000 per month to rent his Manhattan apartment. By 2014, the rent had increased to $17,000 per month, and by 2016, his rent further increased to $18,000 per month. Winick Dep. 65:4-17.

**RESPONSE**: Disputed in part. Debtor testified that at some unspecified point after 2012, he paid $15,000 per month for his apartment. Bannon Ex. 1 at 65:4-6.

28. Between 2012 and 2016, Mr. Winick paid $11,000 per month in rent to the trust he established for the benefit of his daughter for his vacation home in Southampton. Bannon Decl. ¶ 9, Ex. 7; Winick Dep. 65:4-17.

**RESPONSE**: Disputed in part. The cited evidence shows Debtor paid $11,000 per month in rent for the Southampton Property for February 2012 through June 2014, $68,000 for March through December 2015, $45,000 for January through June 2016, and $22,500 for July through September 2016. Bannon Ex. 7.

29.    From 2012 through 2014, Mr. Winick paid between $5,350 and $6,700 per month to rent an apartment for his ex-wife, Lizette Cubria. Bannon Decl. ¶ 10, Ex. 8; *id.* ¶ 11, Ex. 9; Winick Dep. 32:25-33:22, 80:21-81:17.

**RESPONSE**:  Disputed in part.  Debtor testified he paid rent for an apartment where both his ex-wife and daughter lived.  Bannon Ex. 1 at 33:12-22, 80:15-17.

30.    From 2013 through 2014, Mr. Winick paid at least $3,500 per month to rent an apartment for his daughter while she attended New York University as an undergraduate. Bannon Decl. ¶ 12, Ex. 10; Winick Dep. 33:23-35:3.

**RESPONSE**:  Disputed in part.  Debtor testified that he paid $3,000 or $3,500 for his daughter's apartment.  Bannon Ex. 1 at 34:20-35:3.

31.    From 2012 through 2013, Mr. Winick paid approximately $75,000 per year in college tuition for his daughter. Bannon Decl. ¶ 13, Ex. 11 at WINICK75; Bannon Decl. ¶ 14, Ex. 12 at WINICK100.

**RESPONSE**:  Undisputed.

32.    Between 2012 and 2016, Mr. Winick paid over $1,000 per month in utilities at his Southampton home. Bannon Decl. ¶¶ 15-18, Exs. 13-16.

**RESPONSE**:  Disputed in part.  While Debtor's utilities exceeded $1,000 per month in some months, that was not the case every month.  Bannon Exs. 13-16.

33.    Between 2014 and 2016, Mr. Winick paid approximately $200 per month to Optimum for media services at his Southampton home. Bannon Decl. ¶ 19, Ex. 17.

**RESPONSE**:  Disputed in part.  While Debtor's payments to Optimum sometimes exceeded $200 per month, that was not the case for the majority of the months.  Bannon Ex. 17.

34. Between 2012 and 2018, Mr. Winick paid approximately $300 per month to DirecTV for media services at his Southampton home. Bannon Decl. ¶ 20, Ex. 18.

**RESPONSE**: Disputed in part. The cited evidence does not specify that Debtor paid DirecTV for media services or for what address DirecTV provided services. Further, while Debtor's payments to DirecTV sometimes exceeded $300 per month, that was not the case for the majority of the months. Bannon Ex. 18.

35. In at least 2017, Mr. Winick paid almost $500 per month to Spectrum for media services. Bannon Decl. ¶ 21, Ex. 19.

**RESPONSE**: Undisputed.

36. In 2012 and 2013, Mr. Winick spent $6,000 per year on boat storage fees at Strong's Marine. Bannon Decl. ¶ 22, Ex. 20.

**RESPONSE**: Disputed in part. The cited evidence shows Debtor paid $5,846.25 for boat storage fees in 2012 and $6,119.44 in 2013. Bannon Ex. 20.

37. In 2012 through 2016, Mr. Winick spent over $1,500 per year on association fees to the Parrish Pond Homeowners Association. Bannon Decl. ¶ 23, Ex. 21.

**RESPONSE**: Undisputed.

38. In the summer of 2016, Mr. Winick spent over $6,000 on pest control services from Premier Pest Control. Bannon Decl. ¶ 24, Ex. 22.

**RESPONSE**: Undisputed.

39. Mr. Winick estimates that he spent over $1,000 on shopping trips once-or-twice per month between 2012 and the time he filed for bankruptcy. Winick Dep. 77:24-78:7.

**RESPONSE**: Disputed in part. Debtor testified that the shopping trips included instances where others were spending his money and did not specify how many trips were for him personally as opposed to someone else. Bannon Ex. 1 at 77:24-78:7.

40. Mr. Winick used at least four different credit cards between 2012 and the time he filed for bankruptcy. Winick Dep. 50:18-23 (acknowledging four credit cards and stating "[t]here might be others").

**RESPONSE**: Undisputed.

41. Mr. Winick's expenses on his American Express ("AmEx") in 2013 included: (1) over $2,000 at All Saints on January 30, 2013; (2) over $4,000 at Frontgate on June 18, 2013 (and over $3,000 there again, the next month); (3) over $4,500 at Intermix on October 19, 2013; and (4) over $2,000 at Blanc Bleu on December 31, 2013. Bannon Decl. ¶ 25, Ex. 23 at WINICK4297, 4330, 4336, 4356, and 4362.

**RESPONSE**: Disputed in part. The cited evidence does not establish that all of the expenses incurred using Debtor's American Express card were charged by him personally or benefitted him personally. Bannon Ex. 23.

42. In total, Mr. Winick spent over $120,000.00 on his AmEx in 2013. *See generally* Bannon Decl. ¶ 25, Ex. 23.

**RESPONSE**: Disputed in part. The cited evidence does not establish that all of the entries on Debtor's American Express card statements from 2013 were for purchases that he personally made. Bannon Ex. 23.

43. On one instance in September 2013, Mr. Winick's daughter spent $15,000 on one trip to Intermix on his Amex. In his words: "That was my punishment for showing up late to dinner,

I had to go shopping. That was the last time I showed up late." Bannon Decl. ¶ 25, Ex. 23 at WINICK4350; Winick Dep. 77:6-10.

**RESPONSE**: Undisputed.

44. Mr. Winick went on over thirty international trips between 2012 and the time he filed for bankruptcy, including trips to the Bahamas, France, Mexico, Germany, Prague, and Saint Barts. Winick Dep. 95:2-96:23.

**RESPONSE**: Disputed in part. Debtor testified that the vast majority of his trips abroad were to the Bahamas. Bannon Ex. 1 at 95:2-96:23.

45. Mr. Winick spent over $5,000 in one day at Hillside Bahamas while traveling in the Bahamas in April 2014. Bannon Decl. ¶ 26, Ex. 24 at WINICK 4388.

**RESPONSE**: Disputed in part. The cited evidence does not establish whether the purchases at Hillside Bahamas were made by Debtor personally. Bannon Ex. 24 at WINICK 4388.

46. Mr. Winick spent over $20,000 in one instance at a beachside resort restaurant, Anao Plage Beaulieu, when traveling in France in October 2019. Bannon Decl. ¶ 27, Ex. 25 at WINICK 4781.

**RESPONSE**: Disputed in part. The cited evidence does not show that the vendor was a beachside resort restaurant or that the purchase was made by Debtor personally. Bannon Ex. 25 at WINICK 4781.

47. Between 2012 and 2016, Mr. Winick lost the following sums of money gambling at casinos: $4,526,800 in 2012; $2,417,450 in 2013; $2,166,575 in 2014; $971,115 in 2015; and $1,805,400 in 2016, for a total of over $10 million over this five-year period. Bannon Decl. ¶ 28, Ex. 26 at WINICK43.

**RESPONSE**: Disputed in part. The cited evidence is of Debtor's net, not gross, gambling losses. Also, Debtor's total net losses is closer to $12 million than it is to $10 million. Bannon Decl. Ex. 26 at WINICK 43.

48. Mr. Winick's expert witness, Dr. Jeremiah Weinstock, has diagnosed Mr. Winick with a gambling disorder of moderate severity. Bannon Decl. ¶ 29, Ex. 27 ("Weinstock Dep.") 25:23-27:15.

**RESPONSE**: Undisputed.

49. Dr. Weinstock opined Mr. Winick's disorder did not prevent him from being able to adopt harm-reduction strategies to limit his gambling, like declining to take credit from casinos and setting bankroll limits so he would not lose more than a preset sum in any individual visit to a casino. Weinstock Dep. 93:4-20.

**RESPONSE**: Disputed in part. Dr. Weinstock testified that these harm reduction strategies were undertaken in the 1980s or even 1970s, and thus were different from the harm reduction strategies available to Debtor based on his circumstances in the 2010s. Bannon Ex. 27 at 94:23-96:18.

50. Dr. Weinstock opined further that Mr. Winick was incapable of adopting the harm-reduction strategy of gambling with only post-tax dollars because "[p]ast experience had taught him that he didn't need to change his gambling behavior because everything had worked out previously in the early 2000s" and because "being behind on his back taxes [was] not punishing to him, so therefore he [didn't] need to take any action." Weinstock Dep. 95:16-96:18.

**RESPONSE**: Disputed in part. The cited excerpts of Dr. Weinstock's testimony do not include his complete answer as to why Debtor was incapable of adopting the harm reduction strategy of gambling only with post-tax dollars. Bannon Ex. 27 at 95:16-96:18.

51.     The only cost-cutting measure Mr. Winick can recall that he undertook in 2014 was that he "got rid of [his] boat." Winick Dep. 54:17.

**RESPONSE**:  Disputed in part.  Debtor testified that he cut back spending on a lot of things, and the one specific thing that came to his mind was that he got rid of his boat.  Bannon Ex. 1 at 54:3-17.

52.     Mr. Winick could not identify any cost-cutting measures he instituted between 2014 and 2016, but noted in this regard that he did not "think [he] had a girlfriend then." Winick Dep. 66:3-6.

**RESPONSE**:  Disputed in part.  Debtor testified he could not remember in what ways he cut back on spending.  Bannon Ex. 1 at 65:23-66:2.

53.     On September 13, 2012, Mr. Winick sold his interest in the company named 987 Eighth Avenue, LLC, a company owning a leasehold over real property, for $2 million. Bannon Decl. ¶ 30, Ex. 28; Winick Dep. 102:6-19.

**RESPONSE**:  Undisputed.

54.     On December 18, 2012, Mr. Winick gifted a $4 million interest in one of his real-estate companies, WTN Realty Corp., to his daughter. Bannon Decl. ¶ 31, Ex. 29.

**RESPONSE**:  Disputed in part.  Debtor's gift of 117 shares of WTN Realty Corp. was valued at $1,467,180, not $4 million.  Harrison Ex. 3 at USA 3329; Yan Ex. 17 at WINICK 356.

55.     On September 30, 2014, Mr. Winick sold his thirty-foot boat for almost $20,000. Bannon Decl. ¶ 32, Ex. 30.

**RESPONSE**:  Undisputed.

56.     On January 1, 2016, Mr. Winick gifted ownership of the New Jersey branch of his real-estate company to his daughter. Bannon Decl. ¶ 33, Ex. 31.

**RESPONSE**: Disputed. The assignment of membership interests in WRG NJ LLC was made by Ivan Moskowitz, as trustee of the Danielle Winick 2012 Trust, not Debtor. Bannon Ex. 31; Harrison Ex. 3 at USA 3321.

57. Between 2013 and 2018, Mr. Winick gifted at least $655,000 in life insurance policies to his daughter. Bannon Decl. ¶ 34, Ex. 32.

**RESPONSE**: Disputed in part. Debtor gifted life insurance premiums, not policies. Bannon Ex. 32.

58. At some point after 2015, Mr. Winick gave away approximately half a million dollars in jewelry. Bannon Decl. ¶ 35, Ex. 33; Winick Dep. 94:8-21.

**RESPONSE**: Disputed. Debtor testified that most or a lot of the items listed in the insurance policy that was cancelled in 2015 belonged to his daughter and couldn't specify which watches were given away. Bannon Ex. 1 at 94:12-25. Similarly, Debtor's daughter testified that some of the jewelry listed in the cancelled insurance policy were hers and that Debtor helped to insure those items because she did not have her own insurance. Yan Ex. 18 at 73:25-74:17.

59. Between 2012 and 2016, Mr. Winick donated over $200,000 to charity. Bannon Decl. ¶ 36, Ex. 34.

**RESPONSE**: Disputed. Debtor believes the donations were made by WRG but he was required to report him on his personal tax returns. Winick Decl. ¶ 14.

60. Between 2012 and 2016, Mr. Winick drove luxury Mercedes Benz automobiles for which his company paid tens of thousands of dollars in leases. Bannon Decl. ¶ 37, Ex. 35; Winick Dep. 100:12-22.

**RESPONSE**: Disputed in part. Debtor testified that of the two cars that WRG leased, one was driven by a company driver and he drove the other car. Bannon Ex. 1 at 100:18-19. Even for

the car he drove, others would also use the car to conduct business. *Id.* at 101:2-9. Similarly, WRG's Chief Operating Officer testified that other people used the cars the company leased and that they were not exclusively for Debtor's use. Bannon Ex. 36 at 33:24-35:13.

61.     In late 2019 and early 2020, Louis Eisinger, WRG's Chief Operation [sic] Officer, assisted Mr. Winick in using WRG commissions to pay off Mr. Winick's personal debts, despite those debts having no connection to the business. Bannon Decl. ¶ 38, Ex. 36 ("Eisinger Dep.") 50:18-54:13; Bannon Decl. ¶ 39, Ex. 37.

**RESPONSE**:  Disputed in part.  Debtor did not take commissions belonging to WRG to pay his debts; rather, as WRG's Chief Operating Officer testified, the company simply forewent the portion of commissions that would have otherwise have been due to Debtor.  Bannon Ex. 36 at 61:19-23, 63:2-13.

62.     Mr. Winick received a loan, ultimately in the amount of $1.5 million, secured by his interest in SDSDR111 LLC, another company owning a leasehold, from David Berley in 2015. He received a second, unsecured loan of $250,000 from Mr. Berley in 2018. Bannon Decl. ¶ 40, Ex. 38.

**RESPONSE**:  Disputed in part.  The secured loan that David Berley made to Debtor ultimately increased to $1,627,500.  Bannon Ex. 38 at WINICK 2419.  Also, SDSDR111 LLC owned a fee simple interest in real property, not a leasehold interest.  *Id.* at WINICK 2393; Bannon Ex. 1 at 123:25-124:12.

63.     The IRS filed a notice of tax lien, establishing a security interest in Mr. Winick's interest in SDSDR111 LLC, on May 19, 2014. Bannon Decl. ¶ 41, Ex. 39.

**RESPONSE**: Disputed in part. The cited evidence shows that the IRS filed a tax lien but the document is not a notice of tax lien and those words do not appear anywhere in the document. Bannon Ex. 39.

64.     Mr. Berley filed a UCC statement, establishing a security interest in Mr. Winick's interest in SDSDR111 LLC, on January 30, 2015. Bannon Decl. ¶ 42, Ex. 40.

**RESPONSE**: Disputed in part. Berley's security interest in Debtor's interests in SDSDR111 LLC was established earlier by the secured promissory note. Bannon Ex. 38 at WINICK 2392-2393. The UCC filing perfected that security interest. Bannon Ex. 40.

65.     Mr. Winick paid $218,814 toward the principal of his unsecured loan from Mr. Berley on February 26, 2020. Bannon Decl. ¶ 43, Ex. 41; Eisinger Dep. 64:19-24.

**RESPONSE**: Disputed in part. The cited evidence does not specify whether the payment was for Debtor's secured loan or unsecured loan. Bannon Ex. 41; Bannon Ex. 36 at 64:19-24. Further, the payment was not made directly by Debtor; rather, pursuant to a prior letter agreement, Walter & Samuels, Inc. was authorized to hold back commissions and offset those commissions against Debtor's debts. Bannon Ex. 37; Bannon Ex. 41.

66.     Mr. Winick transferred his entire remaining interest in SDSDR111 LLC to Mr. Berley in satisfaction of the secured loan on July 24, 2020. Bannon Decl. ¶ 44, Ex. 42.

**RESPONSE**: Disputed in part. It is more accurate to say that Debtor consented to a transfer of his interests given that Berley proposed the transfer and Berley's counsel drafted the transfer document for Debtor to execute. Yan Ex. 8; Yan Ex. 9.

67.     Before the transfer, the value of Mr. Winick's interest in SDSDR111 LLC had been most recently estimated to be $2.5 million. Bannon Decl. ¶ 45, Ex. 43; Winick Dep. 140:20-141:6.

**RESPONSE**: Disputed in part. Debtor disputes any characterization of the 2017 appraisal of his interests as being "recent" relative to the 2020 transfer. Bannon Ex. 43.

68.    A valuation of Mr. Winick's watches conducted in November 2020 showed that his "18kt Yellow Gold Rolex Yacht-Master 2, 2017 Ref. #116688M" was worth $38,000 and his "18kt/Stainless Steel Rolex Submariner 2009, Ref. # 116613" was worth $9,500. *See In re Winick*, No. 20-11976, Dkt. No. 34-1 (Bankr. S.D.N.Y. filed Feb. 1, 2021).

**RESPONSE**: Disputed in part. The cited evidence shows that the appraiser estimated Debtor's watches to be worth those amounts but does not necessarily establish that they were, in fact, worth those amounts, as the appraiser did not agree to purchase the watches for those amounts in making its appraisal. Bankr. Dkt. No. 34-1.

69.    Simple internet searches for those model numbers reveals numerous resale watches of the same models for similar prices. Bannon Decl. ¶¶ 50-51, Exs. 48-49.

**RESPONSE**: Disputed. Debtor objects to Plaintiff's attempt to use Internet search results from April 2023 to try to show Debtor acted wrongfully in August 2020. Debtor disputes Plaintiff's characterization of its counsel's Internet searches as "simple" and disputes that the results reveal "similar" prices for Debtor's watches. The prices for the Yacht-Master model in Plaintiff's search results range from less than $15,000 to over $79,000. Bannon Ex. 48. The prices for the Submariner model in Plaintiff's search results range from around $9,100 to nearly $28,000. Bannon Ex. 49.

70.    Until 2015, Mr. Winick had insured one of the two watches at issue for over $10,000. *See* Bannon Decl. ¶ 35, Ex. 33 at WINICK47.

**RESPONSE**: Disputed. It is unclear from looking at the declarations page of the cancelled insurance policy which of the two Rolex watches Plaintiff references is listed on that page, and Debtor cannot make that determination. Bannon Ex. 33 at WINICK 47; Winick Decl. ¶ 34.

71.     When asked "Do you live extravagantly" in 2014 by a real-estate magazine, Mr. Winick responded: "I collect Rolexes. My favorite is the one I'm wearing, which is the cheapest one they make." Bannon Decl. ¶ 49, Ex. 47.

**RESPONSE**: Disputed in part. Debtor does not deny making these statements, but to the extent Plaintiff attempts to use these statements to argue Debtor knew the values of his Rolex watches, that is not correct. Winick Decl. ¶ 31. As Debtor's daughter testified, he was not a watch collector; instead, his collection of watches were a product of his gambling. Yan Ex. 18 at 80:5-12.

72.     As of December 31, 2012, a share of stock in WTN Realty Corp. was valued at $12,540. Bannon Decl. ¶ 46, Ex. 44.

**RESPONSE**: Disputed in part. The cited valuation opines that based on the information contained in that valuation, "the estimate of the fair market value of a class of Class B Non-Voting Common Stock on a non-controlling, non-marketable basis" in WTN Realty Corp. as of December 31, 2012 is $12,540. Bannon Ex. 44.

73.     As of June 30, 2018, a share of WRG was valued at $737. Bannon Decl. ¶ 47, Ex. 45.

**RESPONSE**: Disputed. The cited exhibit is a 2013 valuation of WTN. Bannon Ex. 45.

74.     As a commercial real-estate broker and the principal of WRG, Mr. Winick had the knowledge and information available to him to estimate the value of his business interests at the

time he filed for bankruptcy. Declaration of James Feltman dated April 14, 2023 ("Feltman Decl.") ¶¶ 4-5.

**RESPONSE**:  Disputed.  This is not a fact but rather an inadmissible expert conclusion. *See infra.* ¶¶ 111-115.

75.     Mr. Winick requested that the Chapter 7 Trustee administering the estate abandon the estate's interests in WRG and WTN Realty Corp., arguing that these interests were valueless because the companies needed significant capital infusions to remain solvent, which the principals of WRG would not provide if the interests remained part of the estate. *See In re Winick*, No. 20-11976, Dkt. No. 36 (Bankr. S.D.N.Y. filed Feb. 1, 2021); Bannon Decl. ¶ 48, Ex. 46.

**RESPONSE**:  Disputed.  Nothing in the cited evidence references Debtor's requesting the Chapter 7 trustee abandon the estate's interests in WRG and WTN or the Debtor's arguing that those interests were valueless.  Bankr. Dkt. No. 36; Bannon Decl., Ex. 46.  Rather, it is the Chapter 7 trustee who argued that "the Debtor's interests in the Winick Firms are currently virtually valueless, and his partners are unable to make investments necessary to salvage the firms without first formally disconnecting form the Debtor's bankruptcy estate."  Bankr. Dkt. No. 36 at 2. Similarly, the letter indicating WRG requires additional capital is signed by WRG's Chief Operating Officer, not Debtor.  Bannon Decl., Ex. 46.  Debtor had no role in the preparation of the letter or is attached projections.  Winick Decl. ¶ 27.

76.     WRG's alleged need for a capital infusion was premised on the notion that the company would sign no new deals in 2021 or 2022. Bannon Decl. ¶ 48, Ex. 46.

**RESPONSE**:  Disputed.  It is unclear where in the cited letter there is any representation or notion that the company would sign no new deals in 2012 or 2022.  Rather, the projections attached to the letter show bookings in 2021 and 2022.  Bannon Ex. 46.

77. To date, WRG has not received a capital infusion from its principals but has remained in business. Eisinger Dep. 23:22-25:8.

**RESPONSE**: Disputed in part. WRG's Chief Operating Officer specifically testified that the company did not receive the capital infusions referenced in his December 2020 letter. Bannon Ex. 36 at 23:22-24:21. Debtor also objects to Plaintiff's attempt to use hindsight bias to call into question the assertions and projections stated in the December 2020 letter.

78. The trustee sold these corporate interests in the bankruptcy for $310,000. *See In re Winick*, No. 20-11976, Dkt. No. 86 (Bankr. S.D.N.Y. filed Dec. 9, 2021).

**RESPONSE**: Undisputed.

## DEFENDANT'S STATEMENT OF ADDITIONAL MATERIAL FACTS

79. Debtor did not try to evade or defeat his tax liabilities. Winick Decl. ¶ 10.

80. Debtor has always filed accurate and timely tax returns. Winick Decl. ¶ 10.

81. Debtor paid all of his taxes for 2017-2018. Winick Decl. ¶ 10.

82. In the early 2000s, Debtor accrued outstanding tax debts but reached an installment agreement with the IRS to pay over $3.9 million by October 2012, which he complied with. Harrison Ex. 1; Harrison Ex. 3 at USA 3189, 3192, 3248.

83. For tax years 2012-2016, Debtor paid over $2.6 million in taxes from tax withholdings. Harrison Ex. 2.

84. From January 2014 through January 2020, Debtor made 43 voluntary payments to the IRS totaling over $1.94 million, most of which were in connection with installment agreements. Harrison Ex. 2 at USA 1702-1705.

85.     Where the IRS agrees to an installment agreement with a taxpayer, it does not expect the taxpayer to pay more towards that taxpayer's back taxes than the agreed upon monthly amount.  Yan Ex. 2 at 140:5-9.

86.     Prior to 2019, with the exception of a brief break in the 1990s, Debtor had been gambling since he was 18 or 19.  Winick Decl. ¶ 3.

87.     Debtor's net gambling losses for 2012 through 2016 exceeded his tax liabilities for each year, as summarized below:

| Tax Year | Net Tax Liability | Net Gambling Losses |
|:---:|:---:|:---:|
| 2012 | $2,282,021 | $4,526,800 |
| 2013 | $1,386,429 | $2,417,450 |
| 2014 | $1,824,015 | $2,166,575 |
| 2015 | $701,715 | $971,115 |
| 2016 | $744,488 | $1,805,400 |
| Total | $6,938,668 | $11,887,340 |

Harrison Ex. 2; Bannon Ex. 26.

88.     Debtor's net gambling losses for 2012 through 2016 totaled just under 50% of his total taxable income for that period.  Harrison Ex. 2; Bannon Ex. 26.

89.     Debtor did not realize how serious his gambling addiction was because even as he was losing money from gambling, he was making more from his job.  Winick Decl. ¶ 4.

90.     It was not until 2019, when he no longer had money to gamble with and others would not loan him the money, that Debtor stopped.  Winick Decl. ¶ 3.

91.     Debtor did not realize how much money he lost gambling until he asked for that information from the casinos in responding to Plaintiff's document requests.  Winick Decl. ¶ 4.

92.     The purpose of Debtor's gambling was not to avoid paying his taxes.  Winick Decl. ¶ 6.

93.     Debtor's expert, Dr. Jeremiah Weinstock, diagnosed Debtor with moderate and persistent gambling disorder.  Yan Ex. 16 at 6-9.

94.     Dr. Weinstock opined that for Debtor, gambling was no longer a volitional act because he had been gambling maladaptively for over 40 years and both internal and external forces compelled him to gamble.  Yan Ex. 16 at 8-9.

95.     Because Debtor had paid off his back taxes from the early 2000s while continuing to gamble, that experience taught Debtor he could continue to gamble and still pay his taxes.  Yan Ex. 16 at 9; Winick Decl. ¶ 7.

96.     Debtor believes he could have paid his taxes for 2012-2016 if it weren't for the loss of his biggest client, Duane Reade/Walgreens, which accounted for about 60% of his commissions, and the Covid-19 pandemic.  Winick Decl. ¶¶ 7-8.

97.     Debtor's offer in compromise, *supra* ¶ 18, was prompted by his loss of Duane Reade/Walgreens as a client.  Harrison Ex. 4 at USA 2104; Winick Decl. ¶ 8.

98.     Debtor spent his disposable income on things other than tax payments but that spending was never meant to prevent the IRS from collecting its debts.  Winick Decl. ¶ 11.

99.     Debtor's spending habits were a product of his success and the lifestyle that he and his family had become accustomed to.  Winick Decl. ¶ 12.

100.     Some of Debtor's spending was not for his own benefit but rather for the benefit of his daughter, his ex-wife, and/or his girlfriend.  Winick Decl. ¶ 12; Bannon Ex. 1 at 33:10-22, 34:3-13, 42:19-24, 48:8-21, 49:3-9, 77:2-23, 78:8-12; Bannon Ex. 8; Bannon Ex. 9; Bannon Ex. 10; Bannon Ex. 11 at WINICK 75; Bannon Ex. 12 at WINICK 100.

101.    While Debtor derived some personal benefit from his spending, some of that spending was also related to and helped his business as a commercial real estate broker.  Winick Decl. ¶¶ 13-15.

102.    In order to build client relationships and attract and retain business from wealthy clients, Debtor needed to run in the same social circles, which required him maintain an affluent lifestyle.  Winick Decl. ¶ 13.

103.    By renting a house in the Hamptons, Debtor was able to socialize with clients and potential clients on weekends and holidays.  Winick Decl. ¶ 14.

104.    Even Debtor's gambling was connected to his business, as he often took clients on trips to casinos and gambled when he traveled for business.  Winick Decl. ¶ 15.

105.    With respect to Debtor's paying for utilities, homeowners' association fees, and pest control for the house he leased in the Hamptons, *supra* ¶¶ 32, 33, 37-38, all of those expenses were required by his lease.  Bannon Ex. 4; Harrison Ex. 3 at USA 3331.

106.    With respect to Debtor's 2012 sale of his interests in 987 Eighth Avenue, LLC, *supra* ¶ 53, Debtor testified that he used the profits from the sale to help pay his unpaid taxes from prior to 2012.  Bannon Ex. 1 at 103:3-20.

107.    With respect to Debtor's 2012 gift of shares of WTN Realty Corp. to his daughter, *supra* ¶ 54, Debtor's accountant previously explained to the IRS that the gift was made for estate planning purposes because the IRS was proposing to lower the lifetime estate tax exclusion from $5 million to $1 million, so Debtor was trying to make a sizeable gift before the limit was reduced (which reduction ultimately did not happen).  Harrison Ex. 3 at USA 3329.

108.     With respect to Debtor's 2014 sale of his boat, *supra* ¶ 55, Debtor testified that he sold it because he no longer enjoyed it and it was not worth the expense.  Bannon Ex. 1 at 54:15-22; 92:2-18.

109.     With respect to the life insurance policy premiums that Debtor gifted to his daughter, *supra* ¶ 57, Debtor made those gifts annually starting from 2008 and continuing through 2018.  Bannon Ex. 1 at 52:17-25; Bannon Ex. 32.

110.     Debtor's gifts to his daughter, including his gifts of stock and life insurance premiums, *supra* ¶¶ 54, 57, were part of his estate planning to ensure that she would be taken care of in the event he died.  Bannon Ex. 1 at 53:15-18; Winick Decl. ¶ 16.

111.     With respect to Debtor's charitable donations, *supra* ¶ 59, Debtor believes the donations were actually made by WRG for things such as charity golf tournaments but that he was required to report those donations on his personal tax returns.  Winick Decl. ¶ 14.

112.     With respect to Debtor's use of WRG's leased cars, *supra* ¶ 60, Debtor testified that 90% of the time, the car he drove was used for business purposes, but it was hard to differentiate between personal and business use because he was always driving around to look at real estate.  Bannon Ex. 1 at 101:10-102:5.

113.     Debtor did not accumulate assets because he did not manage his money well and gambled a lot of it away.  He did not intentionally dissipate assets or avoid acquiring assets to frustrate the IRS's collection efforts.  Winick Decl. ¶ 17.

114.     Debtor is in his 70s but has little in assets to show for his decades of work and has no retirement accounts or other assets that would enable him to retire.  Winick Decl. ¶ 18; Bankr. Dkt. No. 1.

115.    Defendant's financial situation is the result of poor decision-making, not any kind of scheme to defraud the IRS.  Winick Decl. ¶ 18.

116.    The declaration submitted by James Feltman in support of Plaintiff's motion is excerpted from his expert report.  *Compare* Declaration of James Feltman *with* Yan Ex. 19.

117.    Neither Feltman's declaration nor his report discloses any methodology used to reach his conclusion that Debtor was capable of estimating the value of his interests in WTN and WRG or whether that methodology has been recognized as accurate or accepted by any judicial, scientific, financial, or other relevant authority.  Feltman Decl.; Yan Ex. 19.

118.    While Feltman asserts that "[t]he valuation methodologies tested for in the commercial real-estate broker exam could have been employed by Mr. Winick to estimate the value of his interests in his companies," Feltman testified in his deposition that he had never taken the exam, did not know whether it covered valuation of business interests, and that his understanding of what the exam covered with respect to valuations derived from a third party website that provided a series of videos covering exam topics, none of which he has viewed.  Feltman Decl. ¶ 5; Yan Ex. 20 at 160:5-7, 161:24-162:4, 163:8-164:18.

119.    The valuation section of that website that Feltman relied upon covers valuation of real property, not personal property.  Yan Ex. 19 at Ex. C1; Yan Ex. 21.

120.    Feltman testified that that he was not familiar with Debtor's training or academic background, did not know if Debtor viewed the website Feltman relied upon, did not know if Debtor had performed his own valuation of his interests in a business, and could not point to any other valuation that Debtor performed.  Yan Ex. 20 at 157:3-8, 166:11-18, 168:22-169:1.

Dated: May 5, 2023                           **ARENTFOX SCHIFF LLP**

                                             */s/ Steven Wilamowsky*
                                             Steven Wilamowsky

1185 Avenue of the Americas
Suite 3000
New York, NY 10036
Tel: (212) 753-5000
Email: steven.wilamowsky@afslaw.com

- and -

Jin Yan
1717 K Street NW
Washington, DC 20006
Tel: (202) 778-6442
Email: jin.yan@afslaw.com

*Counsel for Defendant Jeffrey Winick*