UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

JEFFREY WINICK,

                Debtor.

-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,

v.

JEFFREY WINICK,

                Defendant.

-----------------------------------------------------------x

Chapter 7

Case No. 20-11976 (PB)

Adv. Proc. No. 21-01138 (PB)

## DECLARATION OF JEFFREY WINICK

Jeffrey Winick declares, under penalty of perjury, as follows:

1. I am the debtor in the above-captioned bankruptcy case and the defendant in the above-captioned adversary proceeding. I submit this declaration in support of my motion for summary judgment and in opposition to plaintiff United States of America's ("Plaintiff") motion for summary judgment.

2. I am a commercial real estate broker with Winick Realty Group, LLC ("WRG"). WRG specializes in commercial leasing and represents both landlords and tenants.

3. I started gambling when I was 18 or 19 years old, and except for a brief break in the 1990s, have continuously gambled until 2019. I finally stopped gambling in 2019 because I didn't have money to gamble and the people that I used to borrow money from to gamble would no longer lend me any money.

4. Although I knew I had a gambling problem, I never realized how serious the problem was because even as I gambled away more and more money, I was earning more money from my job so the financial consequences of gambling were not apparent to me. I was not fully aware of how much money I lost gambling until I asked for that information from the casinos in responding to Plaintiff's document requests.

5. Before speaking to Dr. Weinstock in connection with this case, I had never sought or received any professional diagnosis of my gambling addiction. I never attended Gamblers Anonymous or obtained any treatment.

6. While I gambled with money that could and should have been used to pay estimated taxes, the purpose of my gambling was never to avoid paying taxes. Rather, the stress of those taxes often drove me to gamble more with the hope that I would hit it big and be able to pay off, or at least pay down, my tax debts.

7. I did not feel I needed to stop gambling or to change my lifestyle to save money to pay taxes for 2012-2016 because I had the prior experience of falling behind on my taxes in the early 2000s and then catching up when I made more money. I believed I could do the same for my 2012-2016 taxes.

8. I still believe I could have eventually paid back my back taxes, including interest and penalties, if two things hadn't happened. First, my relationship with my biggest client, Duane Reade/Walgreens, which accounted for about 60% of my commissions, ended after 2016. Second, Covid-19 hit, and WRG's business and my commissions have not recovered from its ongoing negative impact on the commercial real estate market.

9. I had been thinking about bankruptcy in June 2020 but did not decide to go through with filing until August when I did not have money to pay my creditors and did not think my

financial situation would improve for the foreseeable future. To my recollection, before 2020, I had never spoken to a bankruptcy lawyer and I certainly never had any idea that there was any way for me to potentially avoid paying my taxes altogether.

10. Any notion that I ever tried to evade or defeat my tax liabilities is false. I paid all of my taxes for 2017-2018. When I fell behind on my taxes in the early 2000s, I eventually paid all of it back, plus penalties and interest, in 2012. Even for 2012-2016, each year I paid the portion of my taxes that were withheld by WRG. I have also always filed accurate tax returns and filed them on time.

11. I do not deny that I spent my income on expenses other than tax payments during 2012-2016. However, my spending was never meant to prevent the IRS from collecting its debts.

12. I spent a lot of money because I was successful and that was the lifestyle my family and I had become used to. A lot of my expenses were things I paid for that benefitted others. For example, I paid for a lot of shopping trips for my daughter and my girlfriends over the years.

13. Certain spending was also required by and helpful to my job. As a commercial real estate broker, I get business through building relationships and getting referrals. A lot of my clients over the years are wealthy individuals, most of whom are much wealthier than I am. To get their business, I have to be in the same social circles, which requires me to maintain an affluent lifestyle.

14. While I get some personal benefit from some of my spending, that spending also helps my business. For example, renting a house in the Hamptons, where many wealthy New Yorkers have weekend or summer homes, allowed me to socialize with clients and potential clients on weekends and holidays. For further example, I believe the charitable donations listed on my tax returns from 2012-2016 were actually donations made by WRG for things such as charity golf

tournaments, but because I was the majority owner of the company, I was required to report those donations on my personal returns.

15. Even my gambling was tied to my business. When Mohegan Sun would send me a helicopter to take me to their casino, clients often came along. Similarly, I attended the International Council of Shopping Centers convention in Las Vegas each May and stayed at the Wynn hotel, where WRG would host events, and where I would gamble afterwards.

16. Over the years, I have made several gifts to my daughter, including gifts of stock and life insurance premiums. These gifts were part of my estate planning to make sure she would be taken care of in the event I die.

17. The reason I don't have a lot of assets is because I did not manage my money well and gambled a lot of it away. I did not intentionally dissipate assets or avoid acquiring assets to frustrate the IRS's collection efforts.

18. I am in my 70s and have little to show in terms of assets for the decades I've worked and all the millions I have made over the years. I have no retirement accounts or other assets that would enable me to retire. This is the result of poor financial decision-making, not any kind of scheme to defraud the IRS.

19. I had no intention of defrauding anyone when I agreed to allow David Berley ("Berley") to take my interests in SDSDR111 LLC ("SDSDR111") to satisfy my debt to him.

20. When I pledged my interests in SDSDR111 to Berley in 2015, I did not know that the IRS had a lien on it. I thought Berley had a first lien on those interests because that is what I granted him in the loan documents and he was able to get a UCC filing from the state.

21. I do not recall ever receiving any kind of documentation from the IRS regarding any lien it filed in 2014 or being told by anyone that the IRS already had a lien on my interests in

SDSDR111. I did not become aware of the IRS's 2014 lien until after I filed my bankruptcy case. If I had known the IRS had a lien at the time I pledged my interests to Berley, I would not have done so.

22. As far as I am aware, before I filed for bankruptcy, the IRS never took any action to object to or challenge my pledging my interests in SDSDR111 to Berley or to challenge his lien on those interests.

23. I had no intention to defraud anyone when I listed the value of WTN and WRG as "unknown" in my bankruptcy schedules.

24. I put "unknown" because I had no idea what their value was in August 2020 during the Covid-19 pandemic. At that time, there were a lot of unknowns, particularly in the real estate industry in New York City. I did not know if WRG would survive the pandemic given the stay-at-home orders and that clients were not paying us commissions.

25. I am not an expert on valuing businesses or business interests. I have no education, training, or experience in valuing businesses or business interests.

26. It never occurred to me to list prior valuations of WTN and WRG on my bankruptcy schedules, and I was not advised to do so. Also, I do not think those pre-Covid valuations would accurately reflect the value of my interests in August 2020.

27. With respect to the December 15, 2020 letter that Louis Eisinger sent to me and the other owners of WRG, I had no involvement in drafting that letter or any of its attachments.

28. I also had no intention to defraud anyone when I listed my two Rolex watches in my bankruptcy schedules.

29. I did not know the value of those Rolex watches at the time I scheduled them, so I put $5,000 as my best guess.

30. I am not an expert on watches or their values. While I have owned several Rolex watches over the years, I have never purchased or sold any of them for money. All of my Rolex watches were acquired using casino points awarded from my gambling at Mohegan Sun in Connecticut. I do not recall ever obtaining an appraisal of any of my Rolex watches before filing for bankruptcy. I don't know if those watches hold their value over time or what factors go into determining their value.

31. In 2014, I did an interview with Real Deal, a trade publication, for a profile they wanted to write about me. In that profile, the reporter quoted me as saying I collected Rolexes and that I was wearing the cheapest model they made. I don't recall making those statements but if I did, they were exaggerations that I probably made to make myself look good. I have no clue how much different Rolex models cost.

32. My bankruptcy counsel told me to put my best estimate as to the value of my Rolex watches and advised that I should not be too concerned with the value that I listed because regardless of what I put, the bankruptcy trustee would not accept that value and would obtain an independent appraisal.

33. I understand that Plaintiff is arguing that I should have looked at websites to estimate the value of my watches, but I never thought to do that. I have never bought or even looked at jewelry online. Also, nobody ever told me I should search for my watches online to get a sense of their values.

34. I also did not recall the insurance policy that I cancelled in 2015 when I filled out my bankruptcy schedules. Even if I remembered, looking at the declarations page of that cancelled policy, I cannot tell which, if any, of the two watches is listed on that page.

35. I did not think to list the model numbers of my Rolex watches on my bankruptcy schedules because I not see any instructions telling me to do so and nobody told me that I should do that.

Dated: May 1, 2023

_____
Jeffrey Winick