DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By: ZACHARY BANNON
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728
Fax: (212) 637-2717
E-mail: Zachary.Bannon@usdoj.gov

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: <br><br> JEFFREY WINICK <br><br> Debtor. | Chapter 7 <br> No. 20-11976 (PB) |
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> - against – <br><br> JEFFREY WINICK <br><br> Defendant. | Adversary Proceeding No. 20-1138 (PB) |

## THE UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 7056-1 of the Local Rule of the United States Bankruptcy Court for the Southern District of New York, plaintiff the United States of America (the "Government"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submit this response to defendant Jeffrey Winick's Statement of Facts and Statement of Additional Material Facts.

To the extent the Government does not dispute facts for purposes of summary judgment, it does not concede that those facts are material or that they are supported by admissible evidence, nor does it admit any legal conclusions proposed by Mr. Winick. The Government reserves the right to challenge any facts at trial.

### *Response to Defendant's Statement of Facts*

1.      In Count I of its Complaint, Plaintiff contends that Debtor should be denied a discharge under section 727(a)(2)(A) of the Bankruptcy Code because he allegedly transferred his membership interests in an entity called SDSDR111 LLC ("SDSDR111") within one year before filing for bankruptcy in order to hinder, delay, or defraud the Internal Revenue Service ("IRS"). Adv. Dkt. No. 1 at 14-16, 18-19.

**Response:** Undisputed, except to note that Paragraph 1 consists of a characterization of the Government's complaint rather than a statement of fact.

2.      SDSDR111 is a Delaware LLC formed for the purpose of owning and operating an interest in the condominium located at 545 West 111th Street in New York City. Adv. Dkt. No. 1 at ¶ 52; Declaration of Jin Yan, Ex. 1 at WINICK 2104.

**Response:** Undisputed.

3.      Debtor executed a Secured Promissory Note dated January 29, 2015 in the principal amount of $500,000 in favor of David Berley ("Berley"). Declaration of Zachary Bannon, Ex. 38 at WINICK 2392-2400.

**Response:** Undisputed.

4.      Defendant testified that the purpose of this $500,000 loan was to help him catch up on delinquent taxes. Bannon Ex. 1 at 125:15-22.

**Response:** Disputed in part. It is undisputed that Mr. Winick testified that the purpose of this $500,000 loan was to help him catch up on delinquent taxes, but his tax records do not reflect that he made any tax payments around this time. Harrison Decl. ¶ 4, Ex. 2 at USA01702.

5.      Under the Secured Promissory Note, Debtor granted a first priority lien and continuing security interest in and to his interests in SDSDR111. Bannon Ex. 38 at WINICK 2392-2400.

**Response:** Disputed in part. It is undisputed that the Secured Promissory Note purported to give a first-priority lien to Mr. Berley. However, it is disputed whether the note in fact granted such a first-priority lien in light of the IRS's pre-existing lien. Bannon Decl. ¶ 41, Ex. 39.

6.      On January 30, 2015, a UCC financing statement was filed with the State of New York, Department of State, for Debtor's interests in SDSDR111, with Berley listed as the secured party. Bannon Ex. 40 at WINICK 2429-2430.

**Response:** Undisputed.

7.      The IRS had previously filed a tax lien against Debtor with the New York County Register Office on May 19, 2014. Bannon Ex. 39.

**Response:** Undisputed.

8.      It is not uncommon for the IRS to file tax liens against individuals with both the county as well as the state. Yan Ex. 2 at 154:14-24.

**Response:** Disputed in part. The IRS's corporate witness testified that the agency may file tax liens in both state and county registers. However, IRS guidance requires filing only in the county clerk's office in the county in which an individual taxpayer resides. Internal Revenue Manual (I.R.M.) 5.17.2.3.2(2).

9.     When filing its lien against Debtor, however, the IRS filed with the county only and not the state.  Bannon Ex. 39.

**Response:** Undisputed.

10.     Searches performed in 2016 for additional liens filed against Debtor with the state yielded no results beyond Berley's 2015 UCC financing statement.  Bannon Ex. 40 at WINICK 2431-2432.

**Response:**  Disputed.  The document cited does not make clear the scope of the title search performed.

11.     Debtor testified that when he borrowed the $500,000 from Berley, he was not aware that the IRS had a lien on his property and did not realize that the IRS had a lien on all of his property due to his delinquent taxes.  Bannon Ex. 1 at 125:23-126:6.

**Response:** Disputed in part.  It is not disputed that Mr. Winick testified as stated.  However, IRS transcripts reflect that Mr. Winick's representative was informed in May 2014 that tax liens had been filed.  Harrison Decl. ¶ 5, Ex. 3 at USA03269.  Furthermore, Mr. Winick had been the subject of IRS tax liens in connection with his prior debts.  *See, e.g.*, *id.*, Ex. 3 at USA03078.  From these facts, a factfinder could discredit Mr. Winick's testimony.

12.     Debtor has no recollection of receiving a notice of the IRS's 2014 tax lien or being informed of such a lien.  Declaration of Jeffrey Winick ("Winick Decl.") ¶ 21.

**Response:**  Disputed.  It is not disputed that Winick testified as stated.  However, Notices of Federal Tax Liens ("NFTLs") are sent to taxpayers and their representatives after they are recorded as a matter of IRS policy.  I.R.M. 5.12.7.11(1), 5.12.7.11.2(5).

13.     Debtor testified that he did not understand how Berley was able to obtain a UCC filing from the state if the IRS had a lien on his interests in SDSDR111.  Bannon Ex. 1 at 126:10-22.

**Response:** Undisputed.

14.     The earliest notice of federal tax lien that Debtor produced in discovery was from August 2015, which was after he pledged his interests in SDSDR111 to Berley.  Yan Ex. 4 at WINICK 2662-2665.

**Response:** Undisputed.

15.     Plaintiff did not produce in discovery any notice of federal tax lien addressed to Debtor.  Yan Decl. ¶ 23.

**Response:**  Undisputed.  However, in response to Mr. Winick's discovery requests, the Government directed Mr. Winick's attention to the IRS's proof of claim in his bankruptcy, which attaches tax liens dated May 2014.

16.     In response to Debtor's document request asking for "[a]ll documents concerning any notice(s) given to [Debtor] of the IRS's alleged lien on and/or interest in SDSDR111 LLC," Plaintiff directed Debtor to the proof of claim it filed in Debtor's bankruptcy case. Yan Ex. 5 at 4.

**Response:**  Undisputed.  However, the Government directed Winick's attention to the IRS's proof of claim in his bankruptcy, which attaches tax liens dated May 2014.

17.     The IRS's proof of claim in Debtor's bankruptcy case attaches tax liens but no notices of those tax liens to the Debtor.  Yan Ex. 6.

**Response:**  Undisputed.  However, NFTLs are sent to taxpayers and their representatives after they are recorded as a matter of IRS policy.  I.R.M. 5.12.7.11(1), 5.12.7.11.2(5).

18.     The IRS's internal records show that in August 2015, Debtor's power of attorney for dealing with the IRS provided the IRS with a copy of the Secured Promissory Note reflecting Berley's $500,000 loan to Debtor.  Declaration of John Harrison, Ex. 3 at USA 3290-3291.

**Response:**  Undisputed.

19.     In 2016, Berley loaned an additional $1 million to Debtor and the Secured Promissory Note was replaced with an Amended and Restated Secured Promissory Note.  Bannon Ex. 38 at WINICK 2403-2414.

**Response:** Undisputed.

20.     Debtor testified that the additional $1 million he borrowed from Berley was probably for taxes and gambling.  Bannon Ex. 1 at 128:4-11.

**Response:** Undisputed.

21.     Under the Amended and Restated Secured Promissory Note, Debtor reaffirmed his pledge of his interests in SDSDR111.  Bannon Ex. 38 at WINICK 2403-2414.

**Response:** Undisputed, except as to the validity of the alleged pledge, as stated in response to Paragraph 5.

22.     The IRS's internal records show that in March 2018, Debtor's power of attorney provided the IRS with additional documents relating to the Berley loan, including copies of the Amended and Restated Secured Promissory Note and Berley's 2015 UCC financing statement. Harrison Ex. 3 at USA 3335-3336.

**Response:**  Undisputed.

23.     In November 2019, Debtor executed a Second Amended and Restated Secured Promissory Note in the principal amount of $1,627,500 in favor of Berley.  Bannon Ex. 38 at WINICK 2419-2428.

**Response:** Undisputed.

24.     Under the Second Amended and Restated Secured Promissory Note, Debtor reaffirmed his pledge of his interests in SDSDR111.  Bannon Ex. 38 at WINICK 2419-2428.

**Response:** Undisputed, except as to the validity of the alleged pledge, as stated in response to Paragraph 5.

25.     In January 2020, a continuing UCC financing statement was filed on Berley's behalf for Debtor's pledged interests in SDSR111.  Bannon Ex. 40 at WINICK 2434.

**Response:**  Undisputed.

26.     To Debtor's knowledge, the IRS never took any pre-bankruptcy action to object to his pledging his interests in SDSDR111 to Berley or to challenge Berley's lien on those interests. Winick Decl. ¶ 22.

**Response:**  Undisputed.  However, Mr. Winick has presented no evidence that he informed the IRS of his intent to transfer SDSDR111 to Mr. Berley before that transaction occurred.

27.     The IRS's internal records do not show the IRS having taken any action to object to Debtor's pledging his interests in SDSDR111 to Berley or to challenge Berley's lien on those interests.  Harrison Ex. 3.

**Response:**  Undisputed.  However, Mr. Winick has presented no evidence that he informed the IRS of his intent to transfer SDSDR111 to Mr. Berley before that transaction occurred.

28.     On July 9, 2020, Debtor received a letter from Berley's counsel at Kudman Trachten Aloe LLP indicating that Debtor was in default under the Second Amended and Restated Promissory Note for failing to pay quarterly interest in the amount of $24,412.50 due on May 1, 2020 and demanding that Debtor immediately pay the accelerated indebtedness of $1,651,912.50. Yan Ex. 7.

**Response:** Undisputed.

29. On July 24, 2020, Debtor received a letter from Berley indicating that Berley proposed to retain Debtor's interests in SDSDR111 in full satisfaction of his unpaid obligations of $1,658,693.70. Yan Ex. 8.

**Response:** Undisputed.

30. The file path listed on the bottom of Berley's letter suggests that it was drafted by Berley's counsel at Kudman Trachten Aloe LLP. Yan Ex. 8.

**Response:** Disputed. Mr. Winick has presented no evidence sufficient to interpret the file path information at the bottom of Mr. Berley's letter.

31. On July 24, 2020, Debtor received a separate letter from Berley's counsel at Kudman Trachten Aloe LLP attaching a consent to Berley's accepting Debtor's interests in SDSDR111 in full satisfaction of Debtor's indebtedness. Yan Ex. 9.

**Response:** Undisputed.

32. On or about July 24, 2020, Debtor signed the consent provided by Berley's counsel, which authorized Berley's taking Debtor's interests in SDSDR111 in full satisfaction of Debtor's debt to Berley. Bannon Ex. 42.

**Response:** Undisputed.

33. Debtor had no intention of defrauding anyone when he allowed Berley to take his interests in SDSDR111 to satisfy Debtor's debt to him. Winick Decl. ¶ 19.

**Response:** Disputed. Numerous "badges of fraud," *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983), support the inference that Mr. Winick transferred his interest in SDSDR111 with intent to defraud the IRS, including that he:

- Was aware of the IRS's interest in SDSDR111 when he pledged it as collateral to Berley, *see supra* Response to Paragraph 5.

- Transferred an interest most recently valued at $2,500,000 in satisfaction of a debt of $1,658,693.70. *See* Bannon Decl. ¶¶ 44-45, Exs. 42-43; Winick Dep. 140:25-141:5.

- Transferred his interest in SDSDR111 to a close personal friend. Winick Dep. 123:16-21.

- Transferred his interest in SDSDR111 one month before declaring bankruptcy and while contemplating filing for bankruptcy. Winick Dep. 136:19-21.

- Transferred his interest in SDSDR111 in satisfaction of a debt on which he had not paid any principal during the life of the underlying loan. Winick Dep. 139:12-17.

- Transferred his interest in SDSDR111 as part of a course of dealing with Mr. Berley that resulted in Mr. Winick satisfying all his debts to Mr. Berley before filing for bankruptcy, while making no payments to the IRS. Winick Dep. 139:8-17; Bannon Decl. ¶ 43, Ex. 41; Eisinger Dep. 64:19-24.

34.     Debtor testified that before July 2020, he did not have any conversation with Berley regarding Debtor's filing for bankruptcy. Bannon Ex. 1 at 136:23-137:5.

**Response:** Undisputed.

35.     At the time he transferred his interests in SDSDR111 to Berley in July 2020, Debtor had not yet made up his mind as to whether to file for bankruptcy. Bannon Ex. 1 at 139:18-23; Winick Decl. ¶ 9.

**Response:** Undisputed. However, Winick was contemplating bankruptcy at the time. Winick Dep. 136:19-21.

36.	Debtor testified that he did not think that the IRS might go after his interests in SDSDR111 if he didn't transfer them to Berley before filing for bankruptcy because Berley had a lien on that interest for several years.  Bannon Ex. 1 at 139:24-140:7.

**Response:** Disputed in part.  Undisputed that Mr. Winick testified as stated.  However, this testimony need not be credited in light of the facts highlighted in the response to Paragraph 33 *supra*.

37.	Berley testified that he did not recall Debtor ever telling him that Debtor wanted him to take the interests in SDSDR111.  Yan Ex. 10 at 46:10-13.

**Response:**  Undisputed.

38.	Berley testified that he took Debtor's interests in SDSDR111 because he thought that was as good a result as he was going to get at the time.  Yan Ex. 10 at 63:24-64:12.

**Response:**  Undisputed.

39.	Berley testified that when he gave Debtor money, it was never as a gift, and that he expected to be repaid.  Yan Ex. 10 at 14:9-12, 40:15-18.

**Response:** Undisputed.

40.	Subsequent to the transfer, Debtor obtained a valuation of his interests in SDSDR111 for tax purposes, and that valuation opined the fair market value of Debtor's interests as of July 31, 2020 was $240,000.  Yan Ex. 1 at WINICK 2086.

**Response:**  Undisputed.  However, before the transfer, the most recent valuation of Winick's interest was $2,500,000.  Bannon Decl. ¶ 45, Ex. 43; Winick Dep. 140:25-141:5.

41.	Debtor testified that the other partners of SDSDR111 had a 30-day right of first refusal and could have purchased his pledged interests from Berley for the $1.6 million that was owed to Berley, but they did not do so.  Bannon Ex. 1 at 141:24-142:17.

**Response:** Undisputed.

42.     Berley testified that after Debtor transferred his interests in SDSDR111, Berley became a member of SDSDR111 and Debtor's only involvement with the company was as a rental agent.  Yan Ex. 10 at 50:3-9.

**Response:** Undisputed.

43.     Debtor disclosed the transfer of his interests in SDSDR111 to Berley on his bankruptcy schedules.  Bankr. Dkt. No. 1 at 51 of 58.

**Response:** Undisputed.

44.     Debtor also disclosed the transfer of his interests in SDSDR111 at the section 341 meeting conducted on October 8, 2020.  Yan Ex. 11 at 5:22-6:22.

**Response:** Undisputed.

45.     Postpetition, the Chapter 7 trustee's counsel requested information concerning the transfer of Debtor's interests in SDSDR111, and Debtor supplied that information.  Yan Ex. 12 at 3; Yan Ex. 13.

**Response:** Undisputed.

46.     In Count II of its Complaint, Plaintiff contends that Debtor should be denied a discharge under section 727(a)(4) of the Bankruptcy Code because he made two false oaths or accounts in his bankruptcy schedules: (1) he listed the value of his interests in WTN Realty Corp. ("WTN") and Winick Realty Group LLC ("WRG") as "unknown" and (2) he listed the value of his two Rolex watches as $5,000.  Adv. Dkt. No. 1 at 16-17, 19.

**Response:** Undisputed.

47.     Plaintiff's corporate representative testified that beyond these two items, Plaintiff is not alleging that anything else in Debtor's schedules was false.  Yan Ex. 3 at 47:24-48:5.

**Response:** Undisputed.

48.     WRG is a commercial real estate brokerage firm in New York City and WTN is a related holding company for interests in WRG.  Bankr. Dkt. No. 36 at ¶ 7; Winick Decl. ¶ 2; Bannon Ex. 44 at USA 2537; Yan Ex. 15 at WINICK 2294.

**Response:** Undisputed.

49.     Plaintiff's corporate representative testified that the sole basis for Plaintiff's contention that Debtor's scheduling the value of his interests in WTN and WRG as "unknown" is false is that in the past, Debtor had been able to value those interests.  Yan Ex. 3 at 56:23-57:13.

**Response:**  Undisputed, except to note that this factual testimony does not limit the legal arguments available to the Government in this adversary proceeding.

50.     In 2013, Anchin, Block & Anchin LLP performed a valuation of the fair market value of Class B non-voting common stock in WTN and estimated that value be to $12,540 per share as of December 31, 2012.  Bannon Ex. 44 at USA 2532-2533.

**Response:**  Undisputed.

51.     At the time of that valuation, Debtor owned 286.65 shares of Class B stock in WTN, which meant that the value of his shares was $3,594,591.  Bannon Ex. 44 at USA 2537.

**Response:**  Undisputed.  However, because WTN is company that solely holds interests in WRG and because, at that time, Winick owned a 22.5% interest in WRG, this valuation indicates a total value of Winick's shares in WRG and WTN of $4,793,788.  Bannon Decl. ¶ 46, Ex. 44.

52.     In 2018, Anchin, Block & Anchin LLP performed a valuation of the fair market value of Class A and Class B units in WRG and estimated that value be to $737 per unit as of June 30, 2018.  Yan Ex. 15 at WINICK 2289-2290.

**Response:**  Undisputed.

53.     At the time of that valuation, Debtor owned 2,250 Class A units, which meant that the value of his units was $1,658,250.  Yan Ex. 15 at WINICK 2295.

**Response:**  Undisputed.  However, because WTN is company that solely holds interests in WRG and because, at this time, Winick owned 60% of the stock in WTN which owned 67.5% of the stock in WRG, this valuation indicates a total value of Winick's shares in WRG and WTN of $4,463,100.  Bannon Decl. ¶ 46, Ex. 44.

54.     The 2013 valuation of WTN is the only pre-petition valuation of WTN that either party has produced in this case.  Yan Decl. ¶ 24.

**Response:**  Undisputed.

55.     The 2018 valuation of WRG is the only pre-petition valuation of WRG that either party has produced in this case.  Yan Decl. ¶ 25.

**Response:**  Undisputed.

56.     Debtor is not an expert on valuing businesses or business interests.  Winick Decl. ¶ 25.

**Response:**  Disputed.  A business professional in Winick's position has the knowledge and ability to estimate the value of his business interests.  Feltman Decl. ¶¶ 4-5.

57.     Debtor has no education, training, or experience in valuing businesses or business interests.  Winick Decl. ¶ 25.

**Response:**  Disputed.  A business professional in Winick's position has the knowledge and ability to estimate the value of his business interests.  Feltman Decl. ¶¶ 4-5.

58.     Plaintiff's corporate representative could not point to any evidence that Debtor knew the exact dollar value of his interests in WTN and WRG when he scheduled them as having "unknown" value.  Yan Ex. 3 at 60:12-17.

**Response:** Undisputed.

59.     When asked what value Debtor should have listed on his schedules for his interests in WTN and WRG, Plaintiff's corporate representative could not provide a number. Yan Ex. 3 at 56:11-13.

**Response:** Undisputed.

60.     Debtor had no intention to defraud anyone when he listed the value of WTN and WRG as "unknown" on his schedules. Winick Decl. ¶ 23.

**Response:** Disputed. The evidence highlighted in paragraphs 72-78 of the Government's 56.1 Statement ("Gov't 56.1 Stat."), Dkt. No. 31, supports the inference that Mr. Winick's scheduling of his interests in WTN and WRG was done with intent to defraud the IRS.

61.     When asked why he listed the value of his interests in WTN and WRG as "unknown," Debtor testified he did so because he "really did not know what the value was" given that "w[e] were shut down for six months," "[n]obody was paying the bills or commissions owed to us," and "[w]e didn't know what the world was out there" and "[s]o the value really was unknown." Bannon Ex. 1 at 117:10-21.

**Response:** Undisputed.

62.     It did not occur to Debtor to list prior valuations of WTN and WRG on his schedules, and he was not advised to do so. Winick Decl. ¶ 26.

**Response:** Disputed in part. Undisputed that Mr. Winick testified as stated, but this testimony need not be credited in light of the evidence of his intent to defraud. *See* Gov't 56.1 Stat. ¶¶ 72-78.

63.     When asked why he didn't rely on the last-known value of WRG, Debtor testified it was due to the "whole COVID-19 effect" whereby "we were shut down and not collecting any

money" and "[w]e weren't being paid receivables by landlords because landlords weren't getting paid by their tenants." Bannon Ex. 1 at 118:5-11.

**Response:** Undisputed.

64. Debtor testified that even if he had asked, he did not believe that his accountants would have provided him with a valuation for his interests because "the uncertainty of COVID-19 made everything questionable in valuation, especially in the real estate industry in New York." Bannon Ex. 1 at 119:9-24.

**Response:** Undisputed, except to note that Mr. Winick does not know whether he asked his accountants to provide him with any valuation of his interests in WTN or WRG. Winick Dep. 119:3-8.

65. Post-petition, the Chapter 7 trustee's counsel requested various information concerning Debtor's interests in WTN and WRG, including governing agreements for those entities, annual tax returns, and financial statements. Yan Ex. 12 at 2-3.

**Response:** Undisputed.

66. Debtor responded to those requests and provided information concerning WTN and WRG. Yan Ex. 13.

**Response:** Undisputed.

67. On February 1, 2021, the Chapter 7 trustee filed a motion seeking the Court's approval to abandon the estate's interests in WTN and WRG. Bankr. Dkt. No. 36.

**Response:** Undisputed.

68. In his motion, the Chapter 7 trustee asserted that "[a]s a result of the COVID-19 pandemic, the Winick Firms, like most of the commercial real estate industry, have faced significant operational and financial difficulties. As a result, the Debtor's interests in the Winick

Firms are currently virtually valueless, and his partners are unable to make investments necessary to salvage the firms without first formally disconnecting from the Debtor's bankruptcy estate." Bankr. Dkt. No. 36 at 2.

**Response:** Undisputed.

69.     The Chapter 7 trustee's motion does not reference any representation made by Debtor regarding the value of WTN or WRG. Bankr. Dkt. No. 36.

**Response:** Disputed. The Chapter 7 trustee's reply to the Government's opposition cites an alleged need for a capital contribution in WRG as a basis for the trustee's determination of the value of Mr. Winick's interests. Bankr. Dkt. No. 53 at 1; *see also* Bannon Decl. ¶ 48, Ex. 46.

70.     On March 24, 2021, Plaintiff filed an opposition to the Chapter 7 trustee's motion that was supported by a declaration from James Feltman ("Feltman"). Bankr. Dkt. Nos. 46, 46-1.

**Response:** Undisputed.

71.     In his declaration, Feltman opined that WRG was worth anywhere from $3.4 million to $11.8 and that Debtor's interest in WRG had a value proportionate to his 63% economic interest in WRG, meaning Debtor's interests were worth anywhere from $2,142,000 to $7,434,000. Bankr. Dkt. 46-1 at ¶¶ 8, 10.

**Response:** Undisputed.

72.     Following Plaintiff's opposition to his motion, the Chapter 7 trustee pivoted from abandoning the estate's interests in WTN and WRG to retaining Maltz Auctions, Inc. to market and sell those interests. Bankr. Dkt. Nos. 62, 68.

**Response:** Undisputed.

73. After a robust marketing process, the estate's interests in WTN and WRG were ultimately sold for $310,000 to insiders of WRG, with no competing bids having been submitted. Bankr. Dkt. Nos. 75, 80, 81, 86.

**Response:** Disputed. As identified by the Chapter 7 trustee, the sale came after "competing bidders' submissions of their 'best and final' offer to serve as the opening bidder." Bankr. Dkt. No. 75 at 2.

74. Debtor is not an expert on watches or their values. Winick Decl. ¶ 30.

**Response:** Disputed. Winick has held himself out publicly as an expert on watches and their values. Bannon Decl. ¶ 49, Ex. 47.

75. All of the Rolex watches that Debtor has ever owned were acquired using casino points from Mohegan Sun, and he has never purchased or sold any Rolex watch for money or ever had a Rolex watch appraised pre-bankruptcy. Winick Decl. ¶ 30.

**Response:** Disputed in part. Mr. Winick's declaration does not establish that he never had a watch appraised pre-bankruptcy. Winick Decl. ¶ 30.

76. Plaintiff's corporate representative testified that Plaintiff had no evidence Debtor appraised his watches before scheduling their values or that Debtor thought the watches were worth more than the $5,000 that he listed. Yan Ex. 3 at 54:18-55:2.

**Response:** Undisputed.

77. Schedule A/B does not provide instructions to list the specific make or model number of any listed watch. Bankr. Dkt. No. 1 at 14 of 58; Yan Ex. 14.

**Response:** Undisputed.

78. Debtor did not think to provide the specific model names and numbers of his Rolex watches on Schedule A/B and was not instructed to do. Winick Decl. ¶ 35.

**Response:** Disputed. Undisputed that Mr. Winick testified as stated, but that testimony need not be credited in light of certain evidence highlighted in the Government's 56.1 Statement. *See* Gov't 56.1 Stat. ¶¶ 68-71.

79.     While Debtor indicated in a 2014 interview with Real Deal, a real estate trade publication, that he collected Rolex watches and that he one he was wearing was the cheapest one that Rolex made, those statements were exaggerations intended to make him look good, and he had no idea how much different Rolexes models cost. Bannon Ex. 47; Winick Decl. ¶ 31.

**Response:** Disputed. Undisputed that Mr. Winick testified as stated, but that testimony need not be credited in light of certain evidence highlighted in the Government's 56.1 Statement. *See* Gov't 56.1 Stat. ¶¶ 68-71.

80.     The instructions for Schedule A/B state that debtors should "report the *current value* of the property that you own in each category" and explain that "*[c]urrent value* is sometimes called *fair market value* and, for this form, is the fair market value as of the date of the filing of the petition." Yan Ex. 14 (emphases in original).

**Response:** Undisputed.

81.     Debtor was advised by his bankruptcy counsel that he should put his best estimate as to the value of his Rolex watches and not be too concerned with that value because the Chapter 7 trustee would not accept any value Debtor listed without obtaining an independent appraisal. Winick Decl. ¶ 32.

**Response:** Undisputed.

82.     Debtor's best guess as to the current value of his two Rolex watches at the time he filed his petition was $5,000. Winick Decl. ¶ 29.

**Response:** Disputed in part. Undisputed that Winick guessed that the combined value of his watches was $5,000, but disputed that this was his "best guess" in light of the information available to him. *See* Gov't 56.1 Stat. ¶¶ 68-71.

83.     Debtor had no intention to defraud anyone when he scheduled the value of his two Rolex watches. Winick Decl. ¶ 28.

**Response:** Disputed. Undisputed that Mr. Winick testified as stated, but that testimony need not be credited in light of certain evidence highlighted in the Government's 56.1 Statement. *See* Gov't 56.1 Stat. ¶¶ 68-71.

84.     It did not occur to Debtor to try to estimate the value of his Rolex watches by using Internet websites because he has never bought or even looked at jewelry online and nobody advised him to do Internet research. Winick Decl. ¶ 33.

**Response:** Disputed. Undisputed that Mr. Winick testified as stated, but that testimony need not be credited in light of certain evidence highlighted in the Government's 56.1 Statement. *See* Gov't 56.1 Stat. ¶¶ 68-71.

85.     When asked what value Debtor should have listed for his two Rolex watches instead of $5,000, Plaintiff's corporate representative could not provide a value. Yan Ex. 3 at 49:4-19.

**Response:** Undisputed.

86.     Plaintiff's corporate representative testified that the sole basis for Plaintiff's contention that Debtor's Rolex watches were worth more than the $5,000 that he listed in his schedules is the fact that they later sold for more than that amount. Yan Ex. 3 at 55:3-12.

**Response:** Undisputed.

87.     Plaintiff's corporate representative testified that at the time Debtor filled out his schedules, Debtor could not know what his Rolex watches would sell for at a later date. Yan Ex. 3 at 52:2-7.

**Response:** Undisputed.

88.     After the petition was filed, the Chapter 7 trustee's counsel requested information concerning the Rolex watches, including "the date of manufacture, the model, the date of acquisition and the cost of acquisition" along with "[a]ny documents related to those items including insurance policies, receipts, bills of sale, or appraisals." Yan Ex. 12 at 2.

**Response:** Undisputed.

89.     In response, Debtor provided photographs of the watches but informed the Chapter 7 trustee's counsel that the Debtor had no receipts, bills of sale, or other information regarding his watches. Yan Ex. 13.

**Response:** Undisputed.

90.     At the time he filled out his schedules, Debtor did not recall the 2015 notice of cancellation of an insurance policy he previously purchased for various pieces of jewelry. Bannon Ex. 33; Winick Decl. ¶ 34.

**Response:** Disputed. Undisputed that Mr. Winick testified as stated, but that testimony need not be credited in light of certain evidence highlighted in the Government's 56.1 Statement. *See* Gov't 56.1 Stat. ¶¶ 68-71.

91.     Looking at the declarations page of the cancelled policy, Debtor is unable to determine if any of the two Rolex watches listed on his schedules is reflected on that page. Bannon Ex. 33 at WINICK 47; Winick Decl. ¶ 34.

**Response:** Disputed. The makes of Mr. Winick's watches are listed on his insurance policies. Bannon Decl. ¶ 35, Ex. 33. Furthermore, *each* of Mr. Winick's watches were valued over $5,000, the combined value he listed for the two watches at issue. *See id.*

92. At the Trustee's request, Debtor obtained an independent appraisal of the watches. Bankr. Dkt. No. 34 at ¶ 9.

**Response:** Undisputed.

93. Christi Sothers Fine Jewelry appraised Debtor's two Rolex watches as being worth $47,500 as of November 18, 2020. Bankr. Dkt. No. 34-3.

**Response:** Undisputed.

94. Debtor and the Chapter 7 trustee subsequently entered into a stipulation to sell Debtor's Rolex watches to Debtor's son-in-law for $33,393.75 in cash, with Debtor receiving a $15,600 exemption for those watches, and the Court approved the sale. Bankr. Dkt. Nos. 34-2, 45.

**Response:** Undisputed.

### *Response to Winick's Statement of Additional Material Facts*

79. Debtor did not try to evade or defeat his tax liabilities. Winick Decl. ¶ 10.

**Response:** Disputed. Certain facts cited in the Government's 56.1 Statement contradict Mr. Winick's uncorroborated statement in his declaration. Gov't 56.1 Stat. ¶¶ 1-67.

80. Debtor has always filed accurate and timely tax returns. Winick Decl. ¶ 10.

**Response:** Undisputed.

81. Debtor paid all of his taxes for 2017-2018. Winick Decl. ¶ 10.

**Response:** Undisputed.

82.     In the early 2000s, Debtor accrued outstanding tax debts but reached an installment agreement with the IRS to pay over $3.9 million by October 2012, which he complied with. Harrison Ex. 1; Harrison Ex. 3 at USA 3189, 3192, 3248.

**Response:**  Undisputed.

83.     For tax years 2012-2016, Debtor paid over $2.6 million in taxes from tax withholdings. Harrison Ex. 2.

**Response:**  Undisputed.

84.     From January 2014 through January 2020, Debtor made 43 voluntary payments to the IRS totaling over $1.94 million, most of which were in connection with installment agreements. Harrison Ex. 2 at USA 1702-1705.

**Response:**  Undisputed.

85.     Where the IRS agrees to an installment agreement with a taxpayer, it does not expect the taxpayer to pay more towards that taxpayer's back taxes than the agreed upon monthly amount. Yan Ex. 2 at 140:5-9.

**Response:**  Undisputed, except to note that taxpayers are not prohibited from making additional payments and that Mr. Winick was often in default of his installment agreements.  Gov't 56.1 Stat. ¶¶ 12-13, 16-17, 23-24.

86.     Prior to 2019, with the exception of a brief break in the 1990s, Debtor had been gambling since he was 18 or 19. Winick Decl. ¶ 3.

**Response:**  Undisputed.

87.     Debtor's net gambling losses for 2012 through 2016 exceeded his tax liabilities for each year, as summarized below:

| Tax Year | Net Tax Liability | Net Gambling Losses |
|----------|-------------------|---------------------|
| 2012     | $2,282,021        | $4,526,800          |

| | | |
|---|---|---|
| 2013 | $1,386,429 | $2,417,450 |
| 2014 | $1,824,015 | $2,166,575 |
| 2015 | $701,715 | $971,115 |
| 2016 | $744,488 | $1,805,400 |
| Total | $6,938,668 | $11,887,340 |

Harrison Ex. 2; Bannon Ex. 26.

**Response:** Undisputed.

88.     Debtor's net gambling losses for 2012 through 2016 totaled just under 50% of his total taxable income for that period. Harrison Ex. 2; Bannon Ex. 26.

**Response:** Undisputed.

89.     Debtor did not realize how serious his gambling addiction was because even as he was losing money from gambling, he was making more from his job. Winick Decl. ¶ 4.

**Response:** Disputed in part.  Mr. Winick's statement characterizes him as having a "serious . . . gambling addiction."  The record supports the conclusion that he had only a moderate gambling disorder.  Weinstock Dep. 25:23-27:15.

90.     It was not until 2019, when he no longer had money to gamble with and others would not loan him the money, that Debtor stopped. Winick Decl. ¶ 3.

**Response:** Disputed.  During the year Mr. Winick stopped gambling in 2019, he earned $2,725,000.  Yan Ex. 11 at 5:13-16.

91.     Debtor did not realize how much money he lost gambling until he asked for that information from the casinos in responding to Plaintiff's document requests. Winick Decl. ¶ 4.

**Response:** Undisputed.

92.     The purpose of Debtor's gambling was not to avoid paying his taxes. Winick Decl. ¶ 6.

**Response:** Undisputed insofar as Mr. Winick attests that this was not the purpose of his gambling.

93.     Debtor's expert, Dr. Jeremiah Weinstock, diagnosed Debtor with moderate and persistent gambling disorder. Yan Ex. 16 at 6-9.

**Response:** Undisputed. *See* Weinstock Dep. 25:23-27:15. However, Dr. Weinstock's expert report is inadmissible on a motion for summary judgment. *See Glowczensky v. Taser Int'l, Inc.*, No. 04 Civ. 4052, 2010 WL 1957289, at *2 (E.D.N.Y. May 13, 2010) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used [on] a motion for summary judgment without additional affidavit support.").

94.     Dr. Weinstock opined that for Debtor, gambling was no longer a volitional act because he had been gambling maladaptively for over 40 years and both internal and external forces compelled him to gamble. Yan Ex. 16 at 8-9.

**Response:** Disputed. This paragraph is not supported by admissible evidence. *See Glowczensky*, 2010 WL 1957289, at *2.

95.     Because Debtor had paid off his back taxes from the early 2000s while continuing to gamble, that experience taught Debtor he could continue to gamble and still pay his taxes. Yan Ex. 16 at 9; Winick Decl. ¶ 7.

**Response:** Disputed. The admissible, cited evidence does not support the conclusion that Mr. Winick "could continue to gamble and still pay his taxes." Rather, Mr. Winick stated that he believed that he could fail to pay his taxes and then pay his overdue taxes later. Winick Decl. ¶ 7.

96.     Debtor believes he could have paid his taxes for 2012-2016 if it weren't for the loss of his biggest client, Duane Reade/Walgreens, which accounted for about 60% of his commissions, and the Covid-19 pandemic. Winick Decl. ¶¶ 7-8.

**Response:** Disputed. The admissible, cited evidence does not support the conclusion that Mr. Winick "could have paid his taxes" but for the events cited. Rather, Mr. Winick testified that he thought he could fail to pay his taxes, then pay his overdue taxes later, but was prevented from doing so by external events. Winick Decl. ¶¶ 7-8.

97.     Debtor's offer in compromise, *supra* ¶ 18, was prompted by his loss of Duane Reade/Walgreens as a client. Harrison Ex. 4 at USA 2104; Winick Decl. ¶ 8.

**Response:** Undisputed that Mr. Winick made this claim in 2017. It is not, however, contained in his sworn declaration.

98.     Debtor spent his disposable income on things other than tax payments but that spending was never meant to prevent the IRS from collecting its debts. Winick Decl. ¶ 11.

**Response:** Disputed. Circumstantial evidence supports the conclusion that Mr. Winick knew his spending would have the effect of causing him not to pay his back taxes. Gov't 56.1 Stat. ¶¶ 26-66.

99.     Debtor's spending habits were a product of his success and the lifestyle that he and his family had become accustomed to. Winick Decl. ¶ 12.

**Response:** Disputed. Mr. Winick did not earn enough to maintain his spending habits and comply with his legal obligation to pay taxes.

100.     Some of Debtor's spending was not for his own benefit but rather for the benefit of his daughter, his ex-wife, and/or his girlfriend. Winick Decl. ¶ 12; Bannon Ex. 1 at 33:10-22, 34:3-

13, 42:19-24, 48:8-21, 49:3-9, 77:2-23, 78:8-12; Bannon Ex. 8; Bannon Ex. 9; Bannon Ex. 10; Bannon Ex. 11 at WINICK 75; Bannon Ex. 12 at WINICK 100.

**Response:** Undisputed that Mr. Winick spent money on his daughter, ex-wife, and girlfriend. Disputed that this "spending was not for his own benefit."

101. While Debtor derived some personal benefit from his spending, some of that spending was also related to and helped his business as a commercial real estate broker. Winick Decl. ¶¶ 13-15.

**Response:** Undisputed that Mr. Winick derived personal benefit from his spending. Disputed that Mr. Winick's self-serving declaration is sufficient to establish that his spending was for a legitimate business purpose.

102. In order to build client relationships and attract and retain business from wealthy clients, Debtor needed to run in the same social circles, which required him maintain an affluent lifestyle. Winick Decl. ¶ 13.

**Response:** Disputed. According to Mr. Winick's declaration, he was unable to maintain clients to support his business even while spending money on luxuries rather than paying his taxes. Winick Decl. ¶ 8.

103. By renting a house in the Hamptons, Debtor was able to socialize with clients and potential clients on weekends and holidays. Winick Decl. ¶ 14.

**Response:** Undisputed.

104. Even Debtor's gambling was connected to his business, as he often took clients on trips to casinos and gambled when he traveled for business. Winick Decl. ¶ 15.

**Response:** Undisputed.

105.    With respect to Debtor's paying for utilities, homeowners' association fees, and pest control for the house he leased in the Hamptons, *supra* ¶¶ 32, 33, 37-38, all of those expenses were required by his lease. Bannon Ex. 4; Harrison Ex. 3 at USA 3331.

**Response:**  Disputed.  The lease agreement cited by Winick only supports that he was responsible to pay charges "for water, electricity, telephone, and gas."  Bannon Decl. ¶ 6, Ex. 4.

106.    With respect to Debtor's 2012 sale of his interests in 987 Eighth Avenue, LLC, *supra* ¶ 53, Debtor testified that he used the profits from the sale to help pay his unpaid taxes from prior to 2012. Bannon Ex. 1 at 103:3-20.

**Response:**  Disputed in part.  Undisputed that Mr. Winick testified as stated.  However, Mr. Winick sold his interest in 987 Eighth Avenue, LLC on September 13, 2012, Bannon Decl. ¶ 30, Ex. 28, after he had already paid off his back taxes from before 2012, Harrison Decl. ¶ 5, Ex. 3 at USA03248.

107.    With respect to Debtor's 2012 gift of shares of WTN Realty Corp. to his daughter, *supra* ¶ 54, Debtor's accountant previously explained to the IRS that the gift was made for estate planning purposes because the IRS was proposing to lower the lifetime estate tax exclusion from $5 million to $1 million, so Debtor was trying to make a sizeable gift before the limit was reduced (which reduction ultimately did not happen). Harrison Ex. 3 at USA 3329.

**Response:**  Undisputed that Mr. Winick's accountant explained this to the IRS.  Disputed that this was the sole purpose of the transaction.

108.    With respect to Debtor's 2014 sale of his boat, *supra* ¶ 55, Debtor testified that he sold it because he no longer enjoyed it and it was not worth the expense. Bannon Ex. 1 at 54:15-22; 92:2-18.

**Response:**  Undisputed.

109.  With respect to the life insurance policy premiums that Debtor gifted to his daughter, *supra* ¶ 57, Debtor made those gifts annually starting from 2008 and continuing through 2018. Bannon Ex. 1 at 52:17-25; Bannon Ex. 32.

**Response:** Undisputed.

110.  Debtor's gifts to his daughter, including his gifts of stock and life insurance premiums, *supra* ¶¶ 54, 57, were part of his estate planning to ensure that she would be taken care of in the event he died. Bannon Ex. 1 at 53:15-18; Winick Decl. ¶ 16.

**Response:** Disputed.  Because Mr. Winick knew he owed taxes when he made these transfers, it can be inferred that he transferred his property so that it would pass to his daughter rather than the IRS.

111.  With respect to Debtor's charitable donations, *supra* ¶ 59, Debtor believes the donations were actually made by WRG for things such as charity golf tournaments but that he was required to report those donations on his personal tax returns. Winick Decl. ¶ 14.

**Response:** Disputed.  Mr. Winick's testimony that he "believe[d]" this to be the case is insufficient to support it as a factual contention.

112.  With respect to Debtor's use of WRG's leased cars, *supra* ¶ 60, Debtor testified that 90% of the time, the car he drove was used for business purposes, but it was hard to differentiate between personal and business use because he was always driving around to look at real estate. Bannon Ex. 1 at 101:10-102:5.

**Response:** Disputed in part.  Undisputed that Mr. Winick testified as stated, but other evidence supports the conclusion that the vehicles were leased for personal use. *See, e.g.*, Bannon Decl. ¶ 49, Ex. 47 (referring to him "hav[ing] three cars" and "lov[ing] [his] Mercedes convertible").

113. Debtor did not accumulate assets because he did not manage his money well and gambled a lot of it away. He did not intentionally dissipate assets or avoid acquiring assets to frustrate the IRS's collection efforts. Winick Decl. ¶ 17.

**Response:** Disputed. Substantial evidence contradicts this uncorroborated assertion. *See, e.g.*, Gov't 56.1 Stat. ¶¶ 53-67.

114. Debtor is in his 70s but has little in assets to show for his decades of work and has no retirement accounts or other assets that would enable him to retire. Winick Decl. ¶ 18; Bankr. Dkt. No. 1.

**Response:** Undisputed.

115. Defendant's financial situation is the result of poor decision-making, not any kind of scheme to defraud the IRS. Winick Decl. ¶ 18.

**Response:** Undisputed that Mr. Winick's financial situation is the result of poor decision-making. Disputed that his financial situation is not "any kind of scheme to defraud the IRS."

116. The declaration submitted by James Feltman in support of Plaintiff's motion is excerpted from his expert report. Compare Declaration of James Feltman with Yan Ex. 19.

**Response:** Undisputed that the opinions in James Feltman's declaration are consistent with those in his expert report.

117. Neither Feltman's declaration nor his report discloses any methodology used to reach his conclusion that Debtor was capable of estimating the value of his interests in WTN and WRG or whether that methodology has been recognized as accurate or accepted by any judicial, scientific, financial, or other relevant authority. Feltman Decl.; Yan Ex. 19.

**Response:** Disputed. Mr. Feltman's declaration explains that he is an expert in valuation and related services and that Mr. Winick (by the nature of his position at WRG) had both the

information and knowledge to estimate the value of his company in the same manner as Mr. Feltman had valued the company on an earlier date. Feltman Decl. ¶¶ 2-5.

118.    While Feltman asserts that "[t]he valuation methodologies tested for in the commercial real-estate broker exam could have been employed by Mr. Winick to estimate the value of his interests in his companies," Feltman testified in his deposition that he had never taken the exam, did not know whether it covered valuation of business interests, and that his understanding of what the exam covered with respect to valuations derived from a third party website that provided a series of videos covering exam topics, none of which he has viewed. Feltman Decl. ¶ 5; Yan Ex. 20 at 160:5-7, 161:24-162:4, 163:8-164:18.

**Response:**  Disputed.  At his deposition, Mr. Feltman indicated that it was reasonable to assume that, because Mr. Winick is a commercial real estate broker, he would have taken the relevant licensing exam; that Mr. Feltman found licensing exam preparation courses by looking to the state licensing agency's resources; that, while he did not watch every video in the preparation course, he read enough to understand the requirements for receiving a license; and that the valuation methodologies tested for in the commercial real estate broker license exam could have been employed to estimate the value of WRG and WTN.  Supplemental Declaration of Zachary Bannon dated May 18, 2023, ¶ 3, Ex. 1 ("Feltman Dep.") 159:20-167:14.

119.    The valuation section of that website that Feltman relied upon covers valuation of real property, not personal property. Yan Ex. 19 at Ex. C1; Yan Ex. 21.

**Response:**  Undisputed.  However, Mr. Feltman testified that the valuation methodologies covered on the website are the same as those that are employed to value business interests.  Feltman Dep. 165:13-166:10.

120.    Feltman testified that that he was not familiar with Debtor's training or academic background, did not know if Debtor viewed the website Feltman relied upon, did not know if Debtor had performed his own valuation of his interests in a business, and could not point to any other valuation that Debtor performed. Yan Ex. 20 at 157:3-8, 166:11-18, 168:22-169:1.

**Response:**  Undisputed.

Dated: May 18, 2023
        New York, New York

                                      DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York

By:     */s/ Zachary Bannon*
                                          ZACHARY G. BANNON
                                          Assistant United States Attorney
                                        86 Chambers Street, Third Floor
                                        New York, New York 10007
                                        Tel.:  (212) 637-2728
                                        Email:  Zachary.Bannon@usdoj.gov