UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                          .    Case No. 20-11976-PB
                                .
JEFFREY WINICK,                 .
                                .
          Debtor.              .
. . . . . . . . . . . . . . ..
UNITED STATES OF AMERICA,.      Adv. No. 21-01138-PB
                                .
          Plaintiff,           .
                                .
          v.                    .    One Bowling Green
                                .    New York, NY 10004
JEFFREY WINICK,                 .
                                .
          Defendant.    .            October 16, 2023
. . . . . . . . . . . . . ..         9:06 a.m.


TRANSCRIPT OF:


ADVERSARY PROCEEDING: 21-01138-PB UNITED STATES OF AMERICA V.
     WINICK; TRIAL RE: COMPLAINT OBJECTING TO DISCHARGE

BEFORE HONORABLE PHILIP BENTLEY
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

APPEARANCES:

For the Debtor/          ArentFox Schiff, LLP
Defendant:               By:  RYAN FOLEY, ESQ.
                              JIN YAN, ESQ.
                         1185 Avenue of the Americas
                         Suite 3000
                         New York, NY 10036

For Department of        Office of the U.S. Attorney
Justice:                 By:  ZACHARY BANNON, ESQ.
                              JEAN-DAVID BARNEA, ESQ.
                         86 Chambers Street
                         New York, NY 10007


ECRO:                    KS _ _ _ _

# **INDEX**

**PAGE**

WITNESSES FOR THE PLAINTIFF:

JOHN HARRISON
  Direct Examination by Mr. Bannon                    11
  Cross-Examination by Mr. Yan                        81

JEFFREY WINICK
  Direct Examination by Mr. Bannon                    88
  Cross-Examination by Mr. Yan                       178
  Redirect Examination by Mr. Bannon                229

WITNESSES FOR THE DEFENDANT:

(None)


                                              ID   EVD
EXHIBITS FOR THE PLAINTIFF:

1                                             29    30
2                                              5     8
3                                              5     8
4                                            125   127
5 through 62                                   5     8

EXHIBITS FOR THE DEFENDANT:

2 through 7                                    5     8
9                                             5     8
10                                            5     8

JOINT EXHIBITS:

1 through 28                                   5     8

1        (Proceedings commenced at 9:06 a.m.)

2        THE CLERK:  All rise.

3        THE COURT:  Good morning; please be seated.

4        Okay.  Do we have any housekeeping matters to deal

5   with before we jump into the presentation of evidence?

6        You can hear me, right?

7        MR. YAN:  We can hear you.

8        THE COURT:  Okay.

9        MR. BANNON:  Just a few, Your Honor.  First, the

10  parties have resolved one another's objections to all but four

11  exhibits, and for --

12        THE COURT:  Do you have a microphone there?

13        MR. BANNON:  I do.  Can you hear me better now?

14        THE COURT:  Now you're good.  Yeah.

15        MR. BANNON:  The parties have resolved all but four

16  objections to one another's exhibits.  So we would like before

17  trial starts and for the sake of efficiency to jointly move for

18  admission of those exhibits if it's agreeable to Your Honor.

19        THE COURT:  That's fine.  And just so I guess you'll

20  give me a list of which ones we're talking about?

21        MR. BANNON:  Yes, I can do that now, Your Honor.

22        THE COURT:  Okay.  Is it essentially -- I mean I have

23  your witness lists.  Is it everything in those lists?

24        MR. BANNON:  Everything is in these lists apart from

25  one new exhibit that is another housekeeping matter we'll

1  address with you.

2          THE COURT:  Okay.

3          MR. BANNON:  So the exhibits that there are currently

4  no objections to or for which objections were overruled in

5  motion in limine practice, there's Joint Exhibits 1 through 28,

6  Plaintiff's Exhibits 2 and 3.

7          THE COURT:  Sorry, let me just ask you --

8          MR. BANNON:  Apologies.

9          THE COURT:  -- to slow down.

10         MR. BANNON:  Yeah.

11         THE COURT:  Okay.  Sorry for the interruption.

12         MR. BANNON:  Plaintiff's Exhibits 2 and 3.

13         THE COURT:  Okay.

14         MR. BANNON:  Plaintiff's Exhibits 5 through 62.

15  There will be a 62nd exhibit that we'll provide the Court now.

16         THE COURT:  Okay.

17         MR. BANNON:  And then Defendant's Exhibits 2 through

18  7.

19         THE COURT:  Sorry.  Just give me one second.

20         MR. BANNON:  Yep.

21         THE COURT:  Yes, 2 through 7.

22         MR. BANNON:  2 through 7, 9, and 10.

23         THE COURT:  Okay.  And as for the ones that are on

24  your list but not on the list you just mentioned, what is the

25  expectation for those?

1              MR. BANNON:  There are four exhibits where they will

2     likely be objected to during trial, and we'll move for

3     admission of them when the times come in the presentation of

4     the case.

5              THE COURT:  Okay.  Is that what it amounts to?  I

6     wasn't keeping track.  You just gave me a list of all but four?

7              MR. BANNON:  Yes.

8              THE COURT:  Okay.

9              MR. BANNON:  Yes.

10             THE COURT:  All right.

11             MR. BANNON:  One --

12             THE COURT:  So --

13             MR. BANNON:  Apologies.

14             THE COURT:  Go ahead.

15             MR. BANNON:  One additional exhibit which we can

16    provide the Court now is Plaintiff's Exhibit 62 which

17    defendants have consented to entry of, and we can provide you a

18    copy of that.

19             THE COURT:  Okay, please do.

20             Thank you.  You don't by any chance have a stapler

21    with you, do you?  Sort of --

22             MR. BANNON:  I do not, sorry.

23             THE COURT:  Okay.  Better to have them stapled so

24    they don't come apart.  But I can take care of that.

25             MR. BANNON:  And the --

1          THE COURT:  Yes?

2          MR. BANNON:  And then the electronic copy of

3 Defendant's Exhibit 9 that we provided was an incorrect draft,

4 so Mr. Yan will provide you with a correct draft of Defendant's

5 Exhibit 9, as well.

6          THE COURT:  Okay.  Mr. Yan?

7          MR. YAN:  Yes.  And then one housekeeping matter,

8 Your Honor.  I don't know if you have electronic copies of all

9 the exhibits, whether you want us to at the end of the case

10 before we adjourn to give you like on a thumb drive all of the

11 different electronic copies of the exhibits that are admitted

12 if that would be helpful to the Court?

13          THE COURT:  So I'm going to ask my -- do we have

14 that?

15          THE CLERK:  (Indiscernible).

16          MR. YAN:  We included your exhibits on that, as well.

17

18          MR. BANNON:  Okay.  But DX-9 is --

19          MR. YAN:  It has an error.

20          MR. BANNON:  -- is the wrong one, so that's --

21          MR. YAN:  Got it.  What I can do is we have a binder

22 now that has the correct one.  We'll provide that to the Court,

23 and then what I can do is email the clerk after hearing today

24 with the right copy.

25          THE COURT:  Okay.  That makes sense.

1          MR. YAN:  Thank you.

2          Your Honor, may I approach with your binder?

3          THE COURT:  Yes, please.  Just give me one second.

4          Okay.  So this is now the correct binder of

5     defendant's exhibits?

6          MR. YAN:  That is correct, Your Honor.

7          THE COURT:  Okay.

8          All right.  Anything else on exhibits?

9          MR. BANNON:  Nothing from the Government, Your Honor.

10          MR. YAN:  Nothing from the Defense, Your Honor.

11          THE COURT:  Okay.  So all of the exhibits that

12     Mr. Bannon listed and for which he requested admission are

13     admitted.

14          (Joint Exhibits 1 through 28 admitted into evidence)

15          (Plaintiff's Exhibits 2, 3, and 5 through 62 admitted into

16                         evidence)

17          (Defendant's Exhibits 2 through 7, 9 and 10 admitted into

18                         evidence)

19          MR. YAN:  Thank you, Your Honor.

20          MR. BANNON:  Thank you.

21          THE COURT:  Any other preliminaries?

22          MR. BANNON:  Nothing from the Government, Your Honor.

23          MR. YAN:  Your Honor, I think I've discussed this

24     with the Government before, because of we'll need to switch the

25     electronic hook-up to ours, after the Government calls its

1  first witness, I would just ask that we take a break so we can

2  test out the electronics after that.

3          THE COURT:  Sure.  And when are you going to want to

4  do that?  Is it when you -- right before you begin your cross

5  of each Government witness?

6          MR. YAN:  I understand there's only one Government

7  witness, so we'll only have to do that once and then I imagine

8  --

9          THE COURT:  Well, technically, I think there's two

10 because the Government is putting on your client as their

11 witness.

12         MR. YAN:  That's correct.  So before each

13 presentation, I suspect because we only have one link-up --

14         THE COURT:  Okay.

15         MR. YAN:  -- unless -- I was joking.  Unless the

16 Government wants to lend us their resource as a hot seat

17 person, I think we'll have to do the switch.

18         THE COURT:  I'll leave that to the two of you.  And

19 that's fine.  And, yeah, we'll get your tech -- will you need

20 one of our tech people to help with the switch?

21         MR. YAN:  I don't anticipate so.  Just because

22 everything is taped down, I do not want to ruin the electronics

23 in Your Honor's courtroom, so I just want time to test it and

24 make sure it works.

25         THE COURT:  Sure.  So that's fine.  Just remind me

1   when the time comes.

2           MR. YAN:  Sure, Your Honor.

3           THE COURT:  Okay.  Anything else?

4           MR. YAN:  Nothing from us, Your Honor.

5           MR. BANNON:  No.

6           THE COURT:  All right.  Then I think we're ready to

7   begin.  Per our prior discussions, there won't be any opening

8   statements.  We'll just go right into testimony.  So, Mr.

9   Bannon, please present your first witness.

10          MR. BANNON:  We'll call John Harrison as the first

11  witness.

12          THE CLERK:  If you can please raise your right hand.

13           JOHN HARRISON, PLAINTIFF'S WITNESS, SWORN

14          THE COURT:  And, Mr. Bannon, let me just ask you to

15  pause for one second while I get set up.

16          MR. BANNON:  And for Your Honor's benefit, we did

17  provide a paper copy set of the exhibits we'll be using with

18  this witness.  It's more limited than the three binders that

19  you otherwise have, but it seems like you're using electronic

20  exhibits anyway.

21          THE COURT:  No.  I'm actually -- so let me just

22  explain.  I'm going to be -- I may be typing from time to time.

23  That does not mean I'm ignoring you.  That means I'm focusing

24  on what is being said and taking notes on my iPad.

25          MR. BANNON:  I appreciate it.

1          THE COURT:  So the short set of exhibits I think is

2  helpful.  Have you given that to us already?

3          MR. BANNON:  I think it should be on your desk, Your

4  Honor.

5          THE COURT:  Let me find it.

6          MR. BANNON:  Yes.  It's --

7          THE COURT:  What does it look like?

8          MR. BANNON:  It's titled "Harrison Direct Exhibits."

9          THE COURT:  It's still pretty bulky.

10          MR. BANNON:  It's the best we could do, I promise.

11          THE COURT:  Okay.

12                          (Pause)

13          THE COURT:  Okay, proceed.

14                    DIRECT EXAMINATION

15  BY MR. BANNON:

16  Q    Good morning, Mr. Harrison.

17  A    Good morning.

18  Q    Who do you currently work for?

19  A    The Internal Revenue Service.

20  Q    And what's your position?

21  A    Revenue officer.

22  Q    In brief, what does the position of a revenue officer

23  entail?

24  A    Sure.  It's the collection of tax be it past due balances,

25  missing returns, if there's an adjustment that's needed, be it

1  an amended return or penalty abatements, granting installment

2  agreements, collection of offer and compromise and, if

3  necessary, levy, seizure, filing notice of federal tax liens,

4  more or less.

5  Q    How long have you been a revenue officer?

6  A    I have been with the Service since 2001.  I had a brief

7  pause in there.  I started in collection and always been in

8  collection, but I was a supervisor revenue officer for

9  approximately eight years in there.  So kind of interrupted,

10 but all 22 years in collections, sir.

11 Q    And for what eight-year period were you a supervisor

12 revenue officer?

13 A    From approximately May 2009 until May or June of 2017.

14 Q    And how did that position differ from your work as a

15 revenue officer?

16 A    The supervisor revenue officer or group manager, as you

17 may hear me refer to them, is usually assigned a group of

18 revenue officers.  It could be as small as 5 or as big as 15.

19 They maintain inventory levels for the revenue officers, they

20 approve or disapprove of case closures, whether it's granting

21 installment agreements or abatements, extensions of federal tax

22 liens.  They're responsible for time input and timekeeping and

23 establishing monthly controls and things of that nature.

24 Q    And why did you return to being an ordinary revenue

25 officer after serving as a supervisor revenue officer?

1  A    Management just wasn't for me.

2  Q    And how long have you worked at the IRS in total?

3  A    Twenty-two years and three or four months.

4  Q    Approximately how many cases have you worked as a revenue

5  officer?

6  A    Thousands.

7  Q    Among those cases, have you ever taken over a case from

8  another revenue officer while it was already in collections?

9  A    Yes.

10 Q    In that circumstance, how do you familiarize yourself with

11 a case?

12 A    You have to review the total history, all past notes from

13 past times that it was in the field as well as all codes on a

14 computer system that we use called IDRS and things of that

15 nature, to familiarize with everything so as to avoid

16 duplication of work and try to pick up, if possible, kind of

17 where it left off.

18 Q    And what is IDRS?

19 A    It's a computer system that we use that kind of records

20 every transaction that posts to a taxpayer's account.

21 Q    Do you have a college degree?

22 A    Yes.

23 Q    What college did you graduate from?

24 A    (Indiscernible) University.

25 Q    In what year?

1  A    2002.

2  Q    What did you study?

3  A    Criminal justice and a psychology minor.

4  Q    And when did you begin working with the IRS again?

5  A    June of 2001.

6  Q    And you've been continuously employed with the IRS ever

7  since?

8  A    Yes.

9  Q    Are revenue officers at the IRS assigned different grade

10 levels?

11 A    Yes.

12 Q    What are the different grade levels that a revenue officer

13 can be?

14 A    Grade 7 is the entry level.  If -- that's the training

15 year.  If they're successful after their first year, they are

16 then promoted to a GS-9 and so forth.  And then the next year

17 after that, it goes to a Grade 11 automatically as long as they

18 are performing at a successful level.  And then you would

19 compete for a Grade 12 and Grade 13 where it tops out at.

20 Q    What is the significance of each grade level?

21 A    Most of the complexity of the case from the dollar amount,

22 are there assets involved, multiple income streams, complex

23 adjustment actions, things of that nature.

24 Q    What grade are you?

25 A    A 13.

1  Q    And where does Grade 13 fit into the grade level

2  hierarchy?

3  A    It's the highest, sir.

4  Q    Were you ever personally assigned to work on collections

5  for Mr. Winick's case?

6  A    Yes, very briefly.

7  Q    When?

8  A    Briefly I believe in the summer of 2009.

9  Q    Were other revenue officers --

10 A    I'm sorry, 2019, excuse me.

11 Q    Thank you.

12 A    Yeah.

13 Q    Were other revenue officers assigned to work on Mr.

14 Winick's case before you took over?

15 A    Yes.

16 Q    And when you took over the case, how did you familiarize

17 yourself with his prior collection history?

18 A    I had reviewed it was something over like 200 pages of

19 history across our different systems to kind of understand how

20 the case came about and what methods were used previously to

21 dispose of the case or resolve the case.

22 Q    Based on your experience as a revenue officer, are you

23 familiar with basic IRS policies governing the collection

24 process?

25 A    Yes.

1  Q    And based on your experience, are you capable of

2  understanding and explaining basic IRS documents that are

3  generated during the collections process?

4  A    Yes.

5  Q    During your time working for the IRS, have you become

6  familiar with how the agency assesses income taxes?

7  A    Yes.

8  Q    How are income taxes assessed?

9  A    The taxpayer files what is -- an individual taxpayer files

10 what's called a U.S. Form 1040 that they report their wages and

11 income.  And if there's a tax liability, it is assessed through

12 that filing.

13 Q    The assessment is based on that filing or an independent

14 analysis of the IRS?

15 A    It's based on that filing.

16 Q    How do salaried employees usually pay their tax

17 liabilities?

18 A    They have their taxes withheld by their employers at the

19 time they are paid their wages, W-2.

20 Q    And can you explain how employer withholding of taxes

21 works?

22 A    Yes.  Employers withhold taxes from their employees and

23 report them on a Form 941.  And then they issue a W-2 to show

24 the total amount of wages that were actually issued to the

25 taxpayer versus what was withheld and turned over to the

1  Government.

2  Q    How do taxpayers that are not salaried usually pay their

3  tax liabilities?

4  A    They have to make what are called estimated tax payments

5  throughout the taxable year.

6  Q    And what kinds of taxpayers make estimated tax payments?

7  A    Self-employed.

8  Q    Does this include taxpayers who earn commissions for their

9  work?

10  A    Yes.

11  Q    Why is that?

12  A    Because there are no taxes withheld at the time that

13  they're paid.

14  Q    Do some taxpayers pay both estimated taxes and

15  withholdings?

16  A    Yes, those with multiple revenue streams.

17  Q    Are there taxpayers that are required to make estimated

18  tax payments?

19  A    Yes.  If the tax liability owed on the non-withheld

20  earnings portion exceeds $1,000, they are required to make

21  quarterly estimated tax payments.

22  Q    Based on your experience working for the IRS, are you

23  familiar with a document called an account transcript?

24  A    Yes.

25  Q    What is an account transcript?

1   A    That is a computer printout usually provided to the

2   taxpayer that is a breakdown of all those transactions that I

3   mentioned on that system, IDRS, but it's -- IDRS speaks in

4   code, internal code.  The account transcript breaks down those

5   codes into layman's term so that the taxpayer can understand.

6   Q    I want to show you what's been entered into evidence as

7   Joint Exhibit 5.  And you have like a --

8   A    Yeah.

9   Q    -- computer in front of you.

10  A    Yes.

11  Q    And paper copies.  Do you see the exhibit?

12  A    Yes.

13  Q    Is this an example of an account transcript?

14  A    Yes, sir.

15          THE COURT:  Mr. Bannon, sorry to interrupt your flow,

16  but can I ask both you and Mr. Yan if at any point you get to

17  one of the few exhibits that's not already been -- that's not

18  already been admitted, just let me know.

19          MR. BANNON:  Of course.

20          THE COURT:  Just so I'm aware that we're dealing with

21  a different kind of exhibit.

22          MR. BANNON:  It will come up once shortly in this

23  witness.

24          THE COURT:  Okay.

25  BY MR. BANNON:

1  Q    Is this an example of an account transcript?

2  A    Yes.  Yes, it is.

3  Q    What taxpayer is this account transcript for?

4  A    Jeffrey Winick.

5  Q    And how can you tell from the transcript?

6  A    There is a -- on the left-hand side about a quarter of the

7  way down the words Jeff W-I-N-I, and that is, W-I-N-I would be

8  what we call a name control.  It's the last four of your

9  social.  The taxpayer identification number is blacked out on

10 here.

11 Q    Does this transcript relate to Mr. Winick's personal

12 income taxes?

13 A    Yes.

14 Q    How can you tell?

15 A    Again, at the top, toward the top left-hand side, it

16 mentions that it's for the Form 1040 for the taxpayer December

17 31st, 2012.

18 Q    Does the IRS prepare a separate account transcript for

19 each taxpayer for each tax year?

20 A    Yes.

21 Q    Could you flip through this exhibit and tell us what tax

22 years are covered?

23 A    Sure, one second.

24      It starts with 2012, 2013 1040, the 1040 for 2014, the

25 1040 for 2015, the 1040 for 2016.

1  Q    Turning back to the first page, do you see on the middle

2  of the first page where it says taxable income?

3  A    Yes.

4  Q    What is taxable income?

5  A    That is the portion of the taxpayer's income that is

6  subject to tax.

7  Q    And does that number reflect any analysis by the IRS or is

8  it taken from a taxpayer's tax return?

9  A    It is reported on the tax return by the taxpayer.

10 Q    Now look at the first page under the heading

11 "Transactions."  Do you see that?

12 A    Yes.

13 Q    Do you see the three-digit codes followed by text?

14 A    Yes.

15 Q    What are those codes?

16 A    Each of those codes represents something, whether it's a

17 notice or it could be an assessment or an abatement or a tax

18 assessment that's posted to the taxpayer's account.

19 Q    So let's look at the first line which lists code 150.

20 A    Yes.

21 Q    What does that code mean?

22 A    That means that a return has been filed, and the tax is

23 assessed on that return.

24 Q    On the same page, what does the line beginning with code

25 806 mean?

1  A    Those are withholding credits that are posted with the

2  return.  Any -- any credits that have been withheld by the

3  taxpayer's employer throughout the course of that year can be

4  claimed as a credit on the 1040 filing.

5  Q    And apart from withholdings, do account transcripts

6  reflect any other payments that a taxpayer makes towards their

7  liabilities?

8  A    Yes, every payment.

9  Q    When a taxpayer makes estimated tax payments, are those

10 payments reflected on an account transcript?

11 A    Yes.

12 Q    How would they be reflected?

13 A    It's a code, I believe it's a 430 or a 660.

14 Q    Does this account transcript reflect that Mr. Winick made

15 any quarterly estimated tax payments for tax year 2012?

16 A    No, it does not.

17 Q    How do you know?

18 A    There are no 660s or 430s.

19 Q    And apart from the withholdings that we just discussed,

20 does this transcript reflect that Mr. Winick had made any

21 payments by the time his tax liabilities were assessed for

22 2012?

23 A    No.

24 Q    Based on this document, can you tell me what Mr. Winick's

25 approximate taxable income, tax assessment, and withholdings

1  were for tax year 2012?

2  A    Yes.  The tax assessed on the return was approximately 2.9

3  million, and the withholding credits were posted with the

4  return were $676,747.

5  Q    Did Mr. Winick have a liability at the time those taxes

6  were assessed?

7  A    Yes.

8  Q    In approximately what amount?

9  A    Approximately 2.3 million.

10 Q    Now I'd like for you to turn to Page 1706.

11     Can you tell me what -- what tax year does this account

12 transcript relate to?

13 A    This is the account transcript for the 1040 2013.

14 Q    And can you tell me what Mr. Winick's approximate taxable

15 income, tax assessment, and withholdings were for that year?

16 A    Yes.  The taxable income was approximately $4.6 million.

17 The tax assessed on the return was approximately $1.9 million.

18 And the withholding credits posted with the return were

19 $558,099.

20 Q    Did he make any estimated tax payments for 2013?

21 A    No.

22 Q    Did he make any other payments for that year by the time

23 his taxes were assessed?

24 A    No.

25 Q    Did Mr. Winick have a liability at the time his taxes were

1  assessed?

2  A    Yes.

3  Q    In approximately what amount?

4  A    Approximately $1.4 million.

5  Q    Now if you could turn to Page 1708.  Are you there?

6  A    Yes.

7  Q    What tax year does this account transcript relate to?

8  A    2014.

9  Q    And, again, can you tell me Mr. Winick's approximate

10 taxable income, tax assessment, and withholdings for 2014?

11 A    Yes.  The taxable income was approximately $4.9 million.

12 The tax assessed on the return was approximately $2.1 million.

13 And the withholding credits posted with the return were

14 $276,518.

15 Q    Were there any estimated tax payments posted for this

16 year?

17 A    No.

18 Q    Were there any payments made for that year at the time

19 taxes were assessed apart from the withholdings?

20 A    No.

21 Q    Did Mr. Winick have a liability at the time his taxes were

22 assessed in 2014?

23 A    Yes.

24 Q    In approximately what amount?

25 A    1.9 million.

1  Q    Now I'd like for you to turn to Page 1710.

2  A    Yeah.

3  Q    What year does this account transcript relate to?

4  A    2015.

5  Q    And, again, can you tell me the approximate taxable

6  income, assessment, and withholding for that year?

7  A    Yes.  The taxable income was approximately 3.8 million.

8  The tax assessed on the return was approximately 1.5 million.

9  And the withholding credits posted with the return were

10 $876,635.

11 Q    Were there any estimated tax payments made that year?

12 A    No.

13 Q    Were there any other payments apart from withholdings that

14 were made by the time Mr. Winick's taxes were assessed?

15 A    No.

16 Q    And did Mr. Winick have a liability at the time his taxes

17 were assessed?

18 A    Yes.

19 Q    In approximately what amount?

20 A    Approximately $700,000.

21 Q    Finally, I'd like for you to turn to Page 1712.  What tax

22 year does this account transcript relate to?

23 A    2016.

24 Q    Can you tell me Mr. Winick's approximate taxable income,

25 assessment, and withholdings for that year?

1  A    Yes.  The taxable income was approximately $2.4 million.

2  The tax return was assessed at $995,865.  And the withholding

3  credits posted were $251,377.

4  Q    Were any estimated tax payments made for that year?

5  A    No.

6  Q    Were any other payments apart from withholdings made by

7  the time the taxes were assessed?

8  A    No.

9  Q    Did Mr. Winick have a liability at the time his taxes were

10 assessed?

11 A    Yes.

12 Q    In approximately what amount?

13 A    740 thousand.

14 Q    Now I want to draw your attention to a different time

15 period from the account transcripts you just reviewed.  Please

16 open your binder to what has been entered into evidence as

17 Joint Exhibit 4.  What is this document?

18 A    It's an account transcript.

19 Q    And what taxpayer is this account transcript for?

20 A    Jeffrey Winick.

21 Q    Does it reflect Mr. Winick's personal income tax?

22 A    Yes, it does, sir.

23 Q    And for the sake of efficiency, I'd like for you to flip

24 through this exhibit and tell us what tax years are covered in

25 the exhibit, whether Mr. Winick had a tax liability for that

1  year at the time his taxes were assessed.

2  A    And what was the last part, I'm sorry?

3  Q    Whether there was a liability for that year at the time

4  taxes were assessed.

5  A    Okay.  So it starts with the year of 2000.  And there was

6  a liability at the time the tax was assessed, 14,000.  The next

7  transcript is for 2001.  And there -- there was a liability at

8  the time the tax return was filed and assessed.  The next year

9  is 2002.  And there was a tax liability when the tax was

10  assessed.  The next year was 2003.  And there was a liability

11  at the time the tax was assessed.

12      The next year was 2004.  And there was a liability at the

13  time the tax was assessed.  Next is 2005.  And there was a tax

14  liability at the time the tax was assessed.

15  Q    And is that all the transcripts in that exhibit?

16  A    Yes, sir.

17  Q    Now I want you to turn to the second page of the account

18  transcript for 2004.  And I apologize that the pages aren't

19  numbered.

20  A    It's okay.  Okay.

21  Q    Do you see a series of entries with code 430?

22  A    Yes.

23  Q    What does this code mean?

24  A    Those are estimated tax payments.

25  Q    Is this what an account transcript looks like when a

1  taxpayer is making quarterly estimated tax payments?

2  A    Yes.

3  Q    And did Mr. Winick make quarterly estimated tax payments

4  in 2004?

5  A    Yes.

6  Q    Now I'd like for you to turn to the second to last page of

7  the exhibit, which is the last page that has any text on it.

8  A    Okay.

9  Q    Can you tell when Mr. Winick finally paid off his 2005 tax

10  liability?

11  A    Sorry, I'm on the wrong page.  Yes.

12  Q    And when did he pay off that liability?

13  A    July 2nd, 2012.

14  Q    How can you tell?

15  A    There is a payment of $432.62 and shortly thereafter, the

16  module comes out of installment agreement status.

17  Q    From your work as a --

18       MR. BANNON:  Your Honor, this is a point at which

19  there is a contested exhibit.

20       THE COURT:  Okay, thank you.

21  BY MR. BANNON:

22  Q    From your work as a revenue officer, are you familiar with

23  a report called an ICS case history transcript?

24  A    Yes.

25  Q    Can it also be called an archive history transcript?

1   A    Yes.

2   Q    What is it?

3   A    It is a historical record that contains all of the history

4   entries that have been input on to ICS throughout the case's

5   assignment into field collection.

6   Q    What is it used for?

7   A    I'm sorry, ICS?

8   Q    No.  What does ICS mean, first of all?

9   A    It's Integrated Collection System, I believe.

10  Q    And what is an ICS case history transcript used for?

11  A    It's to record all the actions that have been taken as it

12  pertains to the case.  It can -- everything from taxpayer

13  contacts to exchanges of information to field visits, what have

14  you.

15  Q    Who records events in an ICS case history transcript?

16  A    Most often it's the revenue officer, there could be offer

17  specialists and I believe appeals is the other functions.

18  Q    Is the revenue officer or other employee who makes those

19  recordings an individual who is familiar with the topic that

20  they're recording?

21  A    Yes.

22  Q    Is it generally the revenue officer assigned to the case?

23  A    Yes.

24  Q    And do revenue officers make those entries at or near the

25  time of the events which they're recording?

1  A     Policy is to enter them on the day that you take the

2  action or as soon as possible thereafter.

3  Q     And do the entries reflect actions that are taken by IRS

4  employees as part of their job responsibilities?

5  A     Yes.

6  Q     Do revenue officers prepare entries in an ICS case history

7  transcript in the ordinary course of business?

8  A     Yes.

9  Q     And is the preparation of these entries part of their

10 regular responsibilities working at the IRS?

11 A     Yes.

12 Q     And does the IRS maintain these transcripts in the

13 ordinary course of business?

14 A     Yes, for a certain period of time.  I'm not sure how far

15 they go back.

16 Q     Now I'd like to show you what's been marked for

17 identification as Plaintiff's Exhibit 1.  Do you recognize this

18 document?

19 A     Yes, sir.

20 Q     What is it?

21 A     It is an ICS archive history transcript.

22 Q     What taxpayer does it relate to?

23 A     Jeffrey Winick.

24 Q     And if you could flip from the first page of the document

25 to the last, can you tell what time period that it covers?

1  A    Sure.  It starts on January 10th, 2004.  And the last date
2  is November 18th, 2019.
3         MR. BANNON:  At this time, I'd like to move for
4  Plaintiff's Exhibit 1 to be entered into evidence.
5         MR. YAN:  No objections, Your Honor.
6         THE COURT:  It's admitted.
7         (Plaintiff's Exhibit 1 admitted into evidence)
8  BY MR. BANNON:
9  Q    I'd like to direct your attention to a few specific
10 entries in the ICS case history transcript.  First, turn to
11 Page 3078 of the exhibit.  Do you see an entry dated March 4th,
12 2004?
13 A    I do.
14 Q    Do you see where the entry says TP/POA contact?
15 A    Yes.
16 Q    What does TP stand for?
17 A    Taxpayer.
18 Q    What does POA stand for?
19 A    Power of attorney.
20 Q    And what does a TP/POA contact?
21 A    Any sort of interaction between the assigned revenue
22 officer and the taxpayer or power of attorney.
23 Q    What is a power of attorney?
24 A    That is an individual that has been declared by the
25 taxpayer to represent them for all contacts in front of the

1  IRS.

2  Q    Does it have to be an attorney?

3  A    No.

4  Q    Are powers of attorney considered to be a taxpayer's

5  representative?

6  A    They act as the taxpayer themselves.

7  Q    Do taxpayers have to authorize someone to act as their

8  power of attorney?

9  A    Yes.  They file what's called a Form 2848 to appoint

10 somebody as the power of attorney.

11 Q    And I want to show you what's been entered into evidence

12 as Plaintiff's Exhibit 58.  Is this an example of the power of

13 attorney form you just described?

14 A    Yes.

15 Q    In general, are powers of attorney authorized to represent

16 taxpayers in communications with the IRS?

17 A    Yes.

18 Q    Are there different kinds of powers of attorney with

19 different powers in interaction with the IRS?

20 A    Yes.  Generally, either an attorney, a CPA, or what's

21 called an enrolled agent, they act quite literally as a

22 taxpayer.  They negotiate on behalf of the taxpayer, they

23 return all taxpayer -- I'm sorry, all correspondence, calls to

24 and from the IRS, and things of that nature.

25 Q    Can lawyers, accountants, and enrolled agents formally

 1  bind the taxpayer before the IRS?

 2  A    I'm sorry, say it --

 3  Q    Can lawyers, accountants, and enrolled agents formally

 4  bind the taxpayer --

 5  A    Yes.

 6  Q    -- before the IRS?

 7  A    Yes.

 8  Q    Okay.  I want to turn back to Plaintiff's Exhibit 1 now on

 9  that March 4th, 2004 entry on Page 3078.

10  A    Uh-huh.

11  Q    Does this entry show a communication between the IRS and

12  Mr. Winick's power of attorney?

13  A    Yes.

14  Q    Why would the IRS speak with the taxpayer's power of

15  attorney rather than directly to the taxpayer?

16             MR. YAN:  Objection, calls for speculation.

17             THE COURT:  Why don't you rephrase.

18  BY MR. BANNON:

19  Q    In general, when the IRS has a power of attorney on file,

20  do they contact the power of attorney rather than the taxpayer?

21  A    Yes.

22  Q    And is there a purpose for following that protocol?

23  A    Generally, the taxpayer, that's their right to

24  representation throughout the collection process so they have

25  by filing the previous document, the Form 28, advised the IRS

1  that we should direct all contacts directly through the power

2  of attorney.

3  Q    Are there circumstances where the IRS would communicate

4  directly with the taxpayer even if he had appointed a power of

5  attorney?

6  A    Yes, if the taxpayer's power if attorney was unavailable

7  or not responsive to contacts or perhaps not negotiating in the

8  best faith of the taxpayer and the government, things of that

9  nature.

10 Q    Can a taxpayer participate in meetings between the IRS and

11 his power of attorney if he chooses to do so?

12 A    Yes.

13 Q    Do you see a sentence towards the middle of this entry

14 that begins, "He does not have sufficient withholding?"

15 A    Yes.

16 Q    Can you read it aloud?

17 A    "He does not have sufficient withholding and that no

18 correction of this as not estimated taxes made for 2003."

19 Q    What does it mean to not have sufficient withholding?

20 A    That means that there is a tax liability hold at the time

21 of filing because based on the wages, the total wages that were

22 made, the billing credits are not enough to satisfy the tax

23 hold.

24 Q    And what does it mean for there to be no correction of

25 this as no estimated tax is made for 2003?

1  A    That would indicate that the taxpayer had been previously

2  advised that there was a lack of estimated tax payments and

3  that he still had not made them as of this date.

4  Q    And am I correct that you testified before that if a

5  taxpayer has non-withholding income streams, they're required

6  to make quarterly estimated payments?

7  A    Yes.

8  Q    Now I'd like for you to turn to Page 3101.

9       Do you see an entry dated May 31st, 2006?

10  A    Yes.

11  Q    Does it describe another contact between a revenue officer

12  and Mr. Winick's power of attorney?

13  A    Yes, it does.

14  Q    At the top of the next page within the same entry, do you

15  see a sentence that begins, "I told him his client would have

16  to show?"

17  A    Yes.  Yes, I do.

18  Q    Can you read that sentence out loud?

19  A    "I told him his client would have to show an ability to

20  stay current."

21  Q    Can you read the next sentence, as well?

22  A    "I told him there was an extension indicated for 2005 and

23  his client has not made any estimated tax payments."

24  Q    What does it mean for someone to stay current?

25  A    That means to file all of the returns that are due through

1  the current date as well as make all estimated tax payments

2  that are due through the current date.

3  Q    As a general matter, why do revenue officers inform

4  taxpayers about the need to stay current when their case is in

5  collections?

6  A    If a taxpayer indicates that they cannot full pay and

7  they'd like a means of resolution such as an offer and

8  compromise or installment agreement, one of the first

9  requirements is that the taxpayer is current.

10 Q    So in 2004 and 2006, did revenue officers remind

11 Mr. Winick's representatives that he was required to make

12 estimated tax payments and stay current on his liabilities?

13 A    Yes.

14 Q    How many, if any, estimated tax payments did Mr. Winick

15 make from 2012 through 2016?

16 A    None, sir.

17 Q    And how do you know that?

18 A    We would read those transcripts earlier.

19 Q    Now I want you to turn to Page 3267 which is about 200

20 pages into the exhibit.

21            THE COURT:  Say the number again.

22            MR. BANNON:  3267.

23 BY MR. BANNON:

24 Q    Do you see the second entry dated April 29, 2014 at the

25 bottom of the page?

1  A    Yes.

2  Q    Does this entry reflect another conversation between the

3  IRS and Mr. Winick's power of attorney?

4  A    Yes.

5  Q    On the following page within the same entry, can you read

6  the sentence beginning "Stressed importance out loud?"

7  A    "Stressed importance of making required ESP quarterly for

8  2014."

9  Q    Based on your experience, why would a revenue officer

10  stress the importance of making quarterly estimated tax

11  payments to a taxpayer in collections?

12  A    If you don't make estimated tax payments, the taxpayer can

13  start what's called permitting liabilities where they kind of

14  pay a large chunk towards the past due tax at the expense of

15  staying current on the current liability and, therefore,

16  they're never -- it's kind of like chasing their tail, they're

17  never able to -- to achieve compliance.

18  Q    Do you see the following sentence that begins "POA will

19  advise TP?"

20  A    Yes.

21  Q    Can you read it out loud including the two numbered

22  points?

23  A    "POA will advise TP to, one, full pay 2013 taxes between

24  now and 10/15/2014; two, pay first quarter ES payment for 2014

25  by 5/21/14."

1  Q    This may be obvious, but what does "POA will advise TP"

2  mean?

3  A    It means that the power of attorney will advise the

4  taxpayer.

5  Q    What does it mean to full pay 2013 taxes?

6  A    It means that the liability that is owed and assessed for

7  2013 will be paid between the date of this entry and

8  10/15/2014.

9  Q    And what does "pay first quarter ES payment" mean?

10  A    ES stands for estimated -- it's supposed to be estimated

11  tax payment.  ES is estimated tax payment.

12  Q    According to this entry, what did Mr. Winick's power of

13  attorney tell the IRS that he would advise Mr. Winick?

14  A    The POA started he would advise the taxpayer to full pay

15  2013 by 10/15/2014 and to pay their first quarter estimated tax

16  payment for 2014 by 5/21/14.

17  Q    Did Mr. Winick make an estimated tax payment for the first

18  quarter of 2014?

19  A    No.

20  Q    Did he make any estimated tax payments for 2014?

21  A    No.

22  Q    Now if you could turn to Page 3272.  Do you see the second

23  entry dated May 30th, 2014?

24  A    Yes.

25  Q    Does this discuss contact between a revenue officer and

1    Mr. Winick's power of attorney?

2    A    Yes, it does.

3    Q    At the top of the following page, can you read the first

4    three sentences aloud beginning "TP is not in compliance?"

5    A    Yes.  "TP is not in compliance with required quarterly ES

6    payments.  Stressed importance of making required ES payment

7    for 2014.  Per IMFOLI, TP has not make any ES payments for 2013

8    and first quarter of 2014."

9    Q    What is IMFOLI?

10   A    That computer database IDRS that I referenced earlier has

11   a series of what we call command codes so that particular --

12   that's -- we refer to it as IMFOLI and that would be a command

13   code that we would review to see which returns are filed, are

14   posted to the taxpayer's accounts, if there's any liabilities,

15   as well as if there's any estimated tax payments for the

16   current period.

17   Q    And what does it mean for a taxpayer to be "not in

18   compliance with required quarterly ES payments?"

19   A    That means as of the date of this entry that there were

20   not any estimated tax payments received for the current tax

21   year.

22   Q    Now if you could turn to Page 3276.  Do you see the entry

23   dated June 13th, 2014?

24   A    Yes.

25   Q    Does this reflect another contact between the revenue

1  officer and Mr. Winick's power of attorney?

2  A    Yes.

3  Q    In the continuation of the same entry on the following

4  page, could you read aloud the last two sentences beginning

5  "stressed importance?"

6  A    "Stressed importance of making required quarterly ES

7  payment for 2014.  Reminded POA that the second quarter ES

8  payment for 2014 is due by 6/16/2014."

9  Q    Is it fair to say that at least three times in the first

10 half of 2014, the IRS stressed the importance of paying

11 quarterly estimated taxes to Mr. Winick?

12 A    Yes.

13 Q    Did Mr. Winick make any quarterly estimated tax payments

14 in 2014?

15 A    No.

16 Q    Did he make any quarterly estimated tax payments between

17 2014 and 2016?

18 A    No.

19 Q    I'm going to direct us to another topic now and ask you a

20 few questions about installment agreements.  What is an

21 installment agreement?

22 A    That is a formal repayment plan negotiated and agreed upon

23 between the IRS and the taxpayer.

24 Q    Have you dealt with installment agreements as part of your

25 work as a revenue officer?

1  A     Yes.

2  Q     Are there requirements for a taxpayer to be eligible for

3  an installment agreement from the IRS?

4  A     Yes.  The taxpayer has to be current.

5  Q     And can you explain what it means to be current again?

6  A     To have all returns that are due through the present date

7  to have been filed and be up to date on your estimated tax

8  payments for the current year.

9  Q     Do installment agreements restrict the IRS's ability to

10  take enforced collection on a taxpayer's liabilities?

11  A     Yes.

12  Q     What kind of collection activities are forbidden?

13  A     Levy, seizure.

14  Q     Can the IRS refer a matter to the Department of Justice to

15  bring a lawsuit while it's under a restriction of an

16  installment agreement?

17  A     No.

18  Q     Does a revenue officer have discretion to ignore those

19  restrictions?

20  A     No.

21  Q     When do the restrictions begin in connection with an

22  installment agreement?

23  A     When an account is identified as pending installment

24  agreement.

25  Q     What does it mean for an account to be pending installment

1  agreement?

2  A    Once the IRS makes demand for a payment, if the taxpayer

3  indicates that they'd like to pay a specific amount on a

4  specific date and they identify the taxes owed, technically

5  they qualify as what we refer to as a pending installment

6  agreement.

7  Q    When do the restrictions on enforced collection activity

8  that attach to an installment agreement end?

9  A    Either when the payment plan has been satisfied or if it's

10  defaulted upon.

11  Q    And when you say defaulted upon, what do you mean?

12  A    The taxpayer stopped making payments or perhaps had a new

13  liability.

14  Q    Does the IRS have to take any action to end the

15  installment agreement?

16  A    Yes, normally a notice is issued to the taxpayer to give

17  them a chance to fix whatever went wrong, whatever the cause

18  for the liability or the default was.

19  Q    And is there a formal event that ends an installment

20  agreement?

21  A    I'm sorry.

22  Q    Is there an event that the IRS takes when an installment

23  agreement is formally ended?

24  A    Well, after that notice is issued, there's usually --

25  there's a time frame that the taxpayer has to respond and then

1  there's -- it goes through we have certain cycles and it will

2  take anywhere from two -- it could take up to two months after

3  the notice is issued before it will go back into collection

4  status.

5  Q    And when it transitions back into collection status, is

6  there an event that's associated with that?

7  A    I'm sorry, I'm not understanding your question.

8  Q    Does the IRS have to register an event that shows the

9  formal end of the installment agreement?

10 A    There's a notice issued to the taxpayer.

11 Q    Is that notice called a termination?

12 A    Yes.

13 Q    I want to direct your attention back to Plaintiff's

14 Exhibit 1 at 3272.

15 A    Okay.

16 Q    Is the second entry dated May 30th, 2014 the same one we

17 were discussing moments ago?

18 A    Yes.

19         THE COURT:  Sorry, I need to catch up with you.

20 Which exhibit?

21         MR. BANNON:  Plaintiff's Exhibit 1 at 3272.  My

22 apologies.

23         THE COURT:  And, I'm sorry, if you could just repeat

24 the last question.

25         MR. BANNON:  Yes.

1          THE COURT:  I'd appreciate it.

2    BY MR. BANNON:

3    Q    Is the second entry dated May 30th, 2014 the same one we

4    were discussing a few moments ago?

5    A    Yes.

6    Q    Do you see where it says "resolution plan discussed?"

7    A    Yes.

8    Q    What is a resolution plan?

9    A    It's a method of resolution for the case.  You kind of

10   discuss it with the power of attorney or the taxpayer and

11   document what steps you're going to reach whatever the agreed

12   upon resolution may be.

13   Q    Is an installment agreement one possible resolution plan?

14   A    Yes.

15   Q    Please read out the sentence beginning "Advised POA that

16   RO will recommend."

17   A    "Advised POA that RO will recommend a rejection of

18   proposed IA today."

19   Q    And can you also read the next sentence beginning "reason"

20   on the following page?

21   A    "Reason TP is not in compliance with required quarterly ES

22   payments."

23   Q    What does it mean to recommend rejection of a proposed IA?

24   A    Once an agreement is identified as pending, the revenue

25   officer then has to send it to a place we call independent

1  review where they review the reason for us requesting it to be
2  rejected.
3  Q    In general, why would a taxpayer's noncompliance with
4  quarterly estimated tax payments be a reason to recommend
5  rejection?
6  A    Because they're not current and, therefore, wouldn't
7  qualify for an installment agreement.
8  Q    Do you see down the page a little bit a sentence that
9  begins "POA stated that TP?"
10 A    Yes.
11 Q    Can you read it out loud?
12 A    "POA stated that TP didn't make much income for 2014.
13 Therefore, TP is not liable to pay ES payment at this time."
14 Q    In general, why wouldn't a taxpayer be liable to make
15 estimated tax payments if they didn't make much income?
16 A    That would -- that would state that the tax owed on the
17 non-withheld income for that year was lower than $1,000.
18 Q    So Mr. Winick's power of attorney told the IRS that he
19 didn't have income sufficient to require him to pay quarterly
20 estimated tax payments?
21 A    Correct.
22 Q    Would this statement be significant to the IRS in
23 determining whether to enter an installment agreement with a
24 taxpayer?
25 A    Yes.

1  Q    Why?

2  A    It gives the impression that the taxpayer is current and,

3  therefore, meets the requirements to be granted an installment

4  agreement.

5  Q    Based on your knowledge of Mr. Winick's tax liabilities

6  for 2014, was his power of attorney statement true?

7  A    No.

8  Q    Why not?

9  A    We saw on the transcripts his income was well beyond that

10 threshold.

11 Q    Does IRS policy permit taxpayers who fail to make required

12 estimated tax payments to enter installment agreements?

13 A    Yes.

14 Q    Under what circumstances?

15 A    I'm sorry.  That don't make estimated tax payments?

16 Q    If a taxpayer that's required to make estimated tax

17 payments does not make those payments --

18 A    Yes.

19 Q    -- are they permitted to enter installment agreements?

20 A    No.  I'm sorry.

21 Q    Thank you.  Now I want to direct your attention to what

22 has been entered into evidence as Plaintiff's Exhibit 2 at Page

23 556.  What is this document?

24 A    A Form 433D.

25 Q    And what's a Form 433D?

1  A    This is an installment agreement that the taxpayer signs

2  to enter into their agreement.

3  Q    Whose installment agreement is it?

4  A    Jeffrey Winick.

5  Q    When was it approved?

6  A    July 16th, 2014.

7  Q    What tax liabilities did it seek to satisfy?

8  A    The 1040 for 2012.

9  Q    And when were payments set to commence?

10 A    On July 28th, 2014.

11 Q    What payments were required under the agreement?

12 A    He was to pay 50,000 a month on the -- starting on July

13 28th and on the 28th of each thereafter until November 28th of

14 2014 at which point he would increase his monthly payment plan

15 or payment amount by 50,000 for a new amount of 100,000 per

16 month.

17 Q    Now I want to go back to Joint Exhibit 5 at Page 1702.

18         THE COURT:  And, Mr. Bannon, let me ask you to pause

19 for one second.

20         MR. BANNON:  Yes.

21         THE COURT:  I appreciate the speed with which you're

22 going through this.  I commend you for that.  But I just want

23 to make a note, so give me a moment.

24         MR. BANNON:  Yes, of course.

25                        (Pause)

1    THE COURT:  Okay, sorry for the interruption.  Please

2  proceed.

3    MR. BANNON:  No problem at all.  This is for you.

4  BY MR. BANNON:

5  Q    Are you at Page Joint Exhibit 5 at 1702?

6  A    Yes, sir.

7  Q    Does this document reflect entry of the installment

8  agreement we just discussed?

9  A    Yes.

10  Q    Where do you see that?

11  A    There's a 971 code about a third of the way down the page

12  on a transaction dated 7/16/2014.  It states, "Installment

13  agreement established."

14  Q    And on what date did this installment agreement become

15  pending?

16  A    February 11th, 2014.

17  Q    Where do you see that?

18  A    Further up on the same side, sir.  It's the fourth

19  transaction down from the top.

20    THE COURT:  Tell me again what page you're on.

21    MR. BANNON:  1702.  It's the second page of the

22  exhibit.

23    THE COURT:  And the exhibit number again?

24    MR. BANNON:  5.

25    THE COURT:  Okay, all right.  Thank you.

1          MR. BANNON:  Joint Exhibit 5, that is.

2    BY MR. BANNON:

3    Q    Can you tell from this document what payments were made

4    under this installment agreement?

5    A    Yes.

6    Q    And what payments were made?

7    A    It looks like he made two in August 6th and September

8    10th.

9    Q    And where do you see that?

10   A    They are 670 codes and they say "payment with installment

11   agreement" underneath.

12   Q    And can you see on what date the installment agreement was

13   terminated?

14   A    Yes.  3/16/2015.

15   Q    Where do you see that?

16   A    There's a 971 about halfway down the page, and it says "no

17   longer in installment agreement status."

18   Q    In general, is it unusual that it would take the IRS

19   several months from the time a taxpayer stopped making payments

20   on an installment agreement to the time the agreement is

21   terminated?

22   A    No.

23   Q    Why not?

24   A    Well, first, it starts as I had indicated earlier a notice

25   goes out to the taxpayer kind of giving them I believe it's up

1  to 30 days to respond to try to fix whatever the cause for the

2  default was.  And then it goes through what we call cycle.  I

3  think it's approximately nine weeks where it's kind of doing

4  systemic uploads and it won't formally default before six

5  months but -- I'm sorry, before about three months from when

6  that original letter goes out.

7      But then after that, it depends on if there's -- there may

8  not be reason for it to be assigned, there's a multitude of

9  factors as to why it doesn't come right out after the three-

10 month time frame.

11 Q    It just takes some time for the process to play out?

12 A    Correct.

13 Q    We discussed earlier that installment agreements prevent

14 the IRS from taking collection actions against a taxpayer,

15 right?

16 A    Yes.

17 Q    For what time period was the IRS precluded from taking

18 collection action against Mr. Winick as a result of this

19 installment agreement?

20 A    From February 11th, 2014 to March 16th, 2015.

21 Q    When did Mr. Winick start making payments to the IRS again

22 after the IRS terminated his installment agreement?

23 A    April 10th, 2015.

24 Q    How can you tell?

25 A    There is a code 673 dated as such.

1    Q    When did Mr. Winick have a new installment agreement

2    pending?

3    A    June 4th, 2015.

4    Q    Are there sometimes multiple entries or --

5    A    Sorry.

6    Q    -- the same --

7    A    Sorry, yes, there are.

8         Before the June 4th, there were two pending input.  There

9    was one also on March 31st, 2015.

10   Q    And in general, if there are two inputs for the same

11   event, which input is the correct input?

12   A    The earliest.

13   Q    In this instance?

14   A    March 31st.

15   Q    Now let's go back to Plaintiff's Exhibit 1 at Page 3288.

16              THE COURT:  What page?

17              MR. BANNON:  3288.  It's about 220 pages into the

18   exhibit.

19              THE COURT:  It takes a while to navigate this binder.

20              MR. BANNON:  It's long, but it's got good stuff in

21   it.

22              THE COURT:  3288.

23              MR. BANNON:  Yes.

24              THE COURT:  Okay.

25   BY MR. BANNON:

1  Q    Do you see an entry dated August 3rd, 2015?

2  A    Yes.

3  Q    Does this reflect another discussion of a resolution plan

4  between the Revenue Officer and Mr. Winick's power of attorney?

5  A    Yes.

6  Q    In the middle of the paragraph, do you see the clause that

7  begins "Asked about current compliance," and ends with, "will

8  address w/TP"?

9  A    Yes.

10  Q    Can you read that clause out loud?

11  A    Asked about current compliance, estimated tax, ES or

12  withholding.  Not sure, will address with TP.

13  Q    In general, why would a Revenue Officer ask about

14  compliance with estimated taxes or withholdings when discussing

15  a resolution plan?

16  A    Again, in order to get the taxpayer -- you have to get the

17  taxpayer current to qualify for certain methods of case

18  resolution.

19  Q    Can you read the next clause beginning, "She does

20  understand," and ending, "cannot be granted," as well?

21  A    "She does understand that without current compliance IA

22  cannot be granted."

23  Q    Does this reflect that the power of attorney shared the

24  understanding you just explained about what it takes to be

25  eligible for an installment agreement?

1  A    Yes.

2  Q    Please turn to the next page, 3289.  Do you see an entry

3  dated eight days later on August 11th, 2015?

4  A    Yes.

5  Q    Is this another communication with Mr. Winick's power of

6  attorney?

7  A    Yes.

8  Q    Can you read out loud the clause beginning, "For 2015,"

9  and ending with, "completely on W/H"?

10  A    "For 2015, he is current, as he is completely on W/H."

11  Q    What does it mean to be completely on W/H?

12  A    That his only income stream is issued via W-2 and that the

13  taxes are already being withheld by the employer.

14  Q    If someone is completely on withholding, are they required

15  to make quarterly estimated tax payments?

16  A    No.

17  Q    And is it your understanding that this is something the

18  power of attorney is telling the Revenue Officer?

19  A    Yes.

20  Q    Based on your knowledge of Mr. Winick's tax liabilities,

21  was Mr. Winick's 2015 income fully subject to withholding?

22  A    No.

23  Q    How do you know?

24  A    The transcripts, sir.

25  Q    Based on your experience as a Revenue Officer, would Mr.

1  Winick's representation have affected the IRS's willingness to

2  enter an installment agreement with him?

3  A    Yes.

4  Q    And, again, under IRS policy, if a taxpayer is required to

5  make quarterly estimated tax payments, but isn't doing so,

6  would the IRS enter into an installment agreement with them?

7  A    No.

8  Q    Now turn to page 3295.  Do you see the second entry dated

9  October 19th, 2015, called "Approval Request"?

10 A    Yes.

11 Q    What does this entry reflect?

12 A    This is the employee submitting a request for installment

13 agreement approval from their manager.

14 Q    With respect to an installment agreement requested by Mr.

15 Winick?

16 A    Yes.

17 Q    What tax liabilities did it seek to satisfy?

18 A    The 1040 liabilities for the years 2012, 2013, and 2014.

19 Q    And what payments were required under the agreement?

20 A    He was going to start by making $50,000 payments on the

21 25th of November, 2015, and continue making $50,000 payments on

22 the 25th of each month thereafter for two years until November

23 25th, 2017, at which point his new monthly payment would

24 increase to $75,000.

25 Q    Now I want to go back to Joint Exhibit 5 at pages 1702 and

1703. Does this document reflect entry of the installment agreement we just discussed?

A    Yes.

Q    Where do you see that?

A    On 1703, 971, indicating that installment agreement established, towards the top of the page.

Q    We discussed this before, but on what date did the installment agreement become pending?

A    March 31st, 2015.

Q    What payments were made under the installment agreement?

A    The taxpayer made $50,000 payments up through July of 2016, and then he started making $25,000 payments thereafter.

Q    When did he stop making $25,000 payments?

A    December 27th, 2016.

Q    Was Mr. Winick only making partial payments at any point in time?

A    Yes.

Q    Which payments were partial payments?

A    Per the terms of the agreement, starting in September, those payments for September, and there was two in November and one in December, are all partial payments.

Q    And was that December payment the last payment made under the installment agreement?

A    Yes.

Q    On what date was the installment agreement terminated?

1  A     3/20/2017.

2  Q     Where do you see that?

3  A     At the bottom of page 1703.

4  Q     With respect to this second installment agreement, for

5  what period was the IRS precluded from taking enforced

6  collection action against Mr. Winick?

7  A     That would be February -- I'm sorry, March 31st, 2015

8  through March 20th, 2017.

9  Q     I want to address a slightly different topic with you now.

10  Are you familiar with offers in compromise?

11  A     Yes.

12  Q     What is an offer in compromise?

13  A     That is the taxpayer offering to pay, in layman's terms,

14  pennies on the dollar or less than the full amount of the tax

15  owed, and they have to stay current for five years thereafter

16  or the entire liability would come back out.

17  Q     Are there also restrictions on the IRS's enforced

18  collection activities while it's considering a taxpayer's offer

19  in compromise?

20  A     Yes.

21  Q     Are the restrictions the same as for installment

22  agreements?

23  A     Yes.

24  Q     And with respect to offers in compromise, when do the

25  restrictions begin?

1  A    Upon receipt of the document.

2  Q    And when do the restrictions end?

3  A    If it's rejected, it will return to the taxpayer.

4  Q    I want to show you what's been entered into evidence as

5  Joint Exhibit 18.  What is this document?

6  A    A Form 656 Offer in Compromise.

7  Q    And is it a proposed offer in compromise by Mr. Winick?

8  A    Yes.

9  Q    How can you tell?

10 A    His name is in Section 1.

11 Q    What liabilities does it propose to resolve?

12 A    The 1040 income tax years 2012, 2013, 2014, 2015, and

13 2016.

14 Q    And where do you see that?

15 A    Under the individual taxpayer, it's down on the lower

16 third of the front -- that first page there.

17 Q    Please turn to the third page of the document now, which

18 is page 2604.  How much did Mr. Winick offer to pay to resolve

19 his outstanding tax liabilities?

20 A    Four hundred and thirty thousand dollars.

21 Q    Where do you see that?

22 A    Under the payment terms, toward the top of the page.

23 Q    Now please turn to the sixth page of the document, which

24 is page 2607.  What is the date of the offer?

25 A    May 1st, 2017.

1  Q    And where do you see that?

2  A    Where it's signed under section 8.

3  Q    Let's go back to Plaintiff's Exhibit 1 now at page 3300.

4                    (Pause)

5  Q    Do you see a second entry dated November 27, 2017 towards

6  the bottom of the page?

7  A    Yes.

8  Q    Read the first sentence out loud beginning, "OS advises

9  FTA meeting."

10  A    "OS advises FTA meeting thus to complete 11661-A."

11  Q    What is an OS?

12  A    That is the offer specialist.

13  Q    What is an FTA meeting?

14  A    That is a fraud technical adviser.

15  Q    And what does it mean for an offer specialist to advise an

16  FTA meeting?

17  A    It sounds like they were trying to set up a meeting with

18  the FTA to perhaps discuss the case.

19  Q    Can Revenue Officers also make fraud recommendations?

20  A    Yes, they would do so with the assistance of the FTA.

21  Q    Have you done so in your career as a Revenue Officer?

22  A    Yes.

23  Q    Are you familiar with the process of making a fraud

24  referral?

25  A    Yes.

1  Q    Read the sentence beginning "Case total balance" out loud.

2  A    "Case total balance due reported on AOIC is $7,453,002.99

3  with an unreasonable offer amount of $430,000."

4  Q    What is a case total balance?

5  A    Seven million four hundred fifty three two dollars and 99

6  cents -- two thousand two dollars and 99 cents.

7  Q    What is a case total balance that --

8  A    The total amount owed.  I'm sorry.

9  Q    Based on your experience, why would a Revenue Officer

10 describe such an offer as unreasonable?

11 A    In this instance, the offer specialist seems to have found

12 that the taxpayer has evaded payment and perhaps moved assets

13 to avoid payment of the tax.

14 Q    Can you read the sentence beginning "This is the third

15 offer" out loud?

16 A    Yes.  This is the third offer submitted by this taxpayer;

17 one submitted 3/8/2006, returned due to failure to file the 30-

18 20 -- 2004-12; one submitted 8/14/2006, which was rejected with

19 appeal rights, and the taxpayer did not appeal; and this

20 current offer submitted 5/15/2017.

21 Q    Based on your experience why would an offer in compromise

22 being a taxpayer's third offer in compromise be relevant to a

23 fraud referral?

24 A    It shows that the taxpayer has gone through the process

25 before and is aware of how it works and the requirements, this

1  being the third time doing the process.

2  Q    Can you now read the sentence beginning "The taxpayer has

3  had two defaulted" out loud?

4  A    "The taxpayer has had two defaulted installment agreements

5  under 1040 liabilities on March 16th, 2015 and March 20th,

6  2017."

7  Q    Based on your experience, why would it be relevant to a

8  fraud referral that a taxpayer had defaulted on two installment

9  agreements?

10  A    It also shows that the Service used, in addition to the

11  offer in compromise, the installment agreement on a number of

12  occasions to try to resolve the past due liabilities and it

13  hasn't worked.

14  Q    And read the sentence beginning "The taxpayer has

15  transferred" out loud.

16  A    "The taxpayer has transferred partnerships to his daughter

17  for no value."

18  Q    Based on your experience, why would this information be

19  relevant to a fraud referral?

20  A    It indicates that the taxpayer may have transferred assets

21  that have substantial value in order to place them beyond reach

22  of the Government through enforcement.

23  Q    Now I want to turn your attention to page 3357, which is

24  towards the back of the exhibit.

25                          (Pause)

1   Q    Do you see an entry dated September 6th, 2018?

2   A    Yes.

3   Q    Does it reflect another contact with Mr. Winick's power of

4   attorney?

5   A    Yes.

6   Q    Can you read the sentence beginning "Prior OS" out loud?

7   A    "Prior OS had prepared IET and AET, and the determination

8   in this offer is a rejection recommendation as the RCP computed

9   is greater than the balance due."

10  Q    What's an IET and AET?

11          THE COURT:  Sorry to interrupt, but I'm trying to

12  find what the witness is reading from.  Where in this long

13  passage is it?

14          MR. BANNON:  Yeah, it's right under TP/POA contact,

15  the first paragraph.  I highlighted them on the screen.

16          THE COURT:  Oh, the very beginning.

17          MR. BANNON:  Yes.

18          THE COURT:  Okay.  Would you mind backing up?

19          MR. BANNON:

20  BY MR. BANNON:

21  Q    Could you read the sentences that you just read aloud

22  aloud again?

23  A    Sure.  "Prior OS had prepared IET and AET, and the

24  determination in this offer is a rejection recommendation as

25  the RCP computed is greater than the balance due."

1  Q    What is an IET and AET?

2  A    My understanding is that they are tools used by the offer

3  in compromise function or the offer specialist, that is the

4  income-expense tool and the asset-expense tool.

5  Q    And what do they reflect, what information do they

6  reflect?

7  A    They reflect that his income and his assets, there's a

8  greater potential for us to collect through them than an offer

9  in compromise.  The RCP is the realized collection potential.

10 Q    So what does it mean to recommend rejection of an offer in

11 compromise because reasonable collection potential is greater

12 than the balance due?

13 A    More or less, the taxpayer has the means to pay the

14 liability.

15 Q    In general, is it unusual for it to take over a year to

16 evaluate an offer in compromise?

17 A    No.

18 Q    Why not?

19 A    For an offer submitted through a Revenue Officer through

20 the field, the Revenue Officer gets the document and attaches

21 what's called a Revenue Officer report to it, just confirming

22 that all the payments that are needed and signatures are

23 secured.  That goes through the group manager to the offer

24 specialist.  It could then take the offer group anywhere from

25 one to two months to even really acknowledge receipt or code it

1  as a pending installment -- or, I'm sorry, offer in compromise,

2  and then they have to go through the documents, what's been

3  submitted.  It's not uncommon for them to go back to the

4  taxpayer or the power of attorney throughout the course of

5  their investigation to try to get supplemental information to

6  assist in their recommendation.  So it adds up.

7  Q    It's another process that has multiple steps and just

8  takes time?

9  A    Correct.

10 Q    Now I want to direct your attention back to Joint Exhibit

11 5 at page 1704.

12          THE COURT:  Joint Exhibit 5?

13          MR. BANNON:  Joint Exhibit 5.

14 BY MR. BANNON:

15 Q    Can you tell from this page what Mr. Winick did after his

16 power of attorney was informed that his offer in compromise

17 would be rejected on September 6th, 2018?

18 A    Yes, toward the top of the page, there is a Code 42 and an

19 indication that the offer in compromise was withdrawn on

20 September 26th, 2018.

21 Q    For what period during this proposed offer in compromise

22 was the IRS prohibited from taking collection activity against

23 Mr. Winick?

24 A    May 16th, 2017 through September 26th, 2018.

25 Q    Did Mr. Winick make any tax payments during that period?

1  A    No.

2  Q    How can you tell?

3  A    The transactions on these transcripts appear in

4  chronological order and between when we received the offer on

5  May 16th, 2017 and when it was withdrawn on September 28th --

6  I'm sorry, 26th, 2018, there were no payments posted.

7  Q    When did Mr. Winick again propose an installment agreement

8  after withdrawing his offer in compromise?

9  A    Two days later on September 28th, 20 -- I'm sorry,

10  September 28th, 2018.

11  Q    Now I'd like to show you what's been entered into evidence

12  as Plaintiff's Exhibit 3.

13                         (Pause)

14  Q    What is this document?

15  A    This is a Form 433-D installment agreement.

16  Q    And whose installment agreement is it?

17  A    Jeffrey Winick.

18  Q    When was it entered?

19  A    It is signed on September 20th, 2018 by the taxpayer.

20  Q    And what tax years does the agreement cover?

21  A    1040 taxes for 2012, 2013, 2014, 2015, and 2016.

22  Q    Where do you see that?

23  A    Under the kind of taxes, about maybe a third of the way

24  down the page.

25  Q    When were payments set to commence under this installment

1    agreement?

2    A    He was to start paying $50,000 a month on the 1st of

3    December for 2018, and continue at 50,000 a month each month

4    thereafter for a year, and then on December 1st, 2019 he would

5    raise his new monthly amount to 114,000 a month.

6    Q    Before I turn to Mr. Winick's payment history under this

7    third installment agreement, I'll represent to you that the

8    parties have stipulated that Mr. Winick fully paid his 2017 and

9    2018 tax year income taxes; do you understand that?

10   A    Yes.

11   Q    Would a taxpayer's recent full payment of his taxes be

12   important to the IRS when deciding whether to approve a third

13   installment agreement for the taxpayer?

14   A    Yes.

15   Q    Why?

16   A    It shows an honest effort on the taxpayer's part to start

17   doing the right things to, you know, resolve the issue.

18   Q    Now I want to turn back to Joint Exhibit 5 at 1704 and

19   1705.

20                          (Pause)

21   Q    Does this document reflect when the installment agreement

22   we just discussed became pending?

23   A    Yes.

24   Q    On what date?

25   A    September 28th, 2018.

Q    Does it show when the installment agreement was
established?

A    Yes.

Q    On what date?

A    November 7th, 2018.

Q    Can you tell from the pages what payments were made under
this installment agreement?

A    Yes.

Q    Can you summarize them?

A    Yes, the taxpayer made monthly payments through about
August -- up through January 7th, 2020.

Q    And were some of those payments only partial payments?

A    Yes, the -- it looks like the December 2019 and the
January 2020.

Q    That was after his installment agreement was set to
increase in its amount?

A    Yes, I believe it was on 12/1/2019 it was supposed to go
up.

Q    When did Mr. Winick file for bankruptcy?

A    August 27th, 2020.

Q    Was the third installment agreement ever rescinded before
Mr. Winick's bankruptcy filing?

A    No.

Q    For what period would the IRS have been precluded from
taking enforced collection action against Mr. Winick with

1  respect to his third installment agreement?

2  A    From September 28th, 2018 through now.

3  Q    To save us some time here, I want to summarize a little

4  bit of the testimony you've given here this morning.

5      Am I correct that after the IRS assessed Mr. Winick's

6  first tax liability on November 18th, 2013 the IRS would have

7  been precluded from taking enforced collection action against

8  Mr. Winick by pending installment agreements and offers in

9  compromise from February 11th, 2014 to March 16th, 2015; March

10 31st, 2015 to March 20th --

11          THE COURT:  Sorry.  Slow down and start again,

12 please?

13          MR. BANNON:  Yes.

14 BY MR. BANNON:

15 Q    Would the IRS have been prohibited from taking enforced

16 collection action against Mr. Winick from February 11th, 2014

17 through March 16th, 2015; March 31st, 2015 through March 20th,

18 2017; May 16th, 2017 to September 26th, 2018; and September

19 28th, 2018 until Mr. Winick filed for bankruptcy?

20 A    Correct.

21 Q    In your experience, does the IRS usually begin enforced

22 collection activities in the first few months after a taxpayer

23 is first assessed tax liabilities?

24 A    No.

25 Q    Why not?

1  A    After there's a liability and notice of that liability

2  goes out, and there's three or four of them before it comes to

3  collection, and then the Revenue Officer or collection employee

4  has to then establish contact, make demand for payments,

5  provide deadlines and a time frame to do so, and things of that

6  nature.  It takes time.

7  Q    In your experience, can the IRS effectively take enforced

8  collection action against a taxpayer in the amounts of times

9  that the IRS had here between Mr. Winick's installment

10 agreements and offers in compromise?

11 A    Not likely, no.

12 Q    For the same reason?

13 A    Yes.

14 Q    Did the IRS ever have a meaningful opportunity to take

15 enforced collection action against Mr. Winick here?

16 A    No.

17 Q    Let's switch gears to one final topic, tax liens.  In your

18 experience as a Revenue Officer, does the IRS acquire liens in

19 connection with outstanding income tax liabilities?

20 A    Yes.

21 Q    How do those liens arise?

22 A    When there's a tax assessed on that TC-150, if there is

23 any liability ten days after that, there's like an automatic

24 lien, a Federal tax lien that arises.

25 Q    To what property does the tax lien attach?

1  A    All property.

2  Q    Is the IRS required to specify exactly what property the

3  taxpayer has for the lien to attach?

4  A    No.

5  Q    If the taxpayer owns property that the IRS doesn't know

6  about, does the lien still attach?

7  A    Yes.

8  Q    If the taxpayer owns shares in a corporate entity, does

9  the lien attach to that property?

10 A    Yes.

11 Q    And when they're first attached, does the public have

12 notice of the IRS's liens?

13 A    No.

14 Q    Does the IRS do anything to make its liens known to the

15 public?

16 A    Yes, we file what's called a notice of Federal tax lien.

17 Q    Why does it do that?

18 A    In order to put the public on notice and to establish its

19 place in line amongst other potential creditors.

20 Q    Where does the IRS file notices of Federal tax lien?

21 A    For an individual, the county in which they reside or

22 where there's assets.

23 Q    Can a Revenue Officer file a lien regarding an individual

24 taxpayer with both the county and state registers?

25 A    Yes, there's nothing precluding them from doing so.

1  Q    Are they required to do so under IRS policy?

2  A    No.

3  Q    Does the IRS provide notice to a taxpayer before it files

4  a notice of Federal tax lien against him?

5  A    Yes.

6  Q    What does IRS policy require in terms of this notice?

7  A    There's an attempt to contact the taxpayer and a demand

8  for payment, and then advising them that the lien will be

9  filed.

10 Q    By what means is that notice made?

11 A    Via certified mail.

12 Q    They send out a certified mail before they even file a tax

13 lien?

14 A    Oh, no, no, no, no.  It could be just any demand for

15 payment made in the field, made via telephone or correspondence

16 to the taxpayer.

17 Q    Does the IRS also provide notice to a taxpayer after it's

18 filed the notice of Federal tax lien?

19 A    Yes.

20 Q    And by what means does it provide that notice?

21 A    That is the notice that is issued via certified mail.

22 Q    Who does the IRS send that notice to if the taxpayer has a

23 power of attorney on file?

24 A    Definitely the taxpayer and it would go to the power of

25 attorney if they indicated on the 2848 that they filed that

1  they wished to be included on all copies of correspondence.

2  Q    So, even if there's a power of attorney on file, the

3  notice is sent to the taxpayer directly?

4  A    Yes.

5  Q    I want to go back and look at Plaintiff's Exhibit 1 at

6  page 3266.

7           THE COURT:  Give me the number again.

8           MR. BANNON:  3266, it's about --

9           THE COURT:  Which Exhibit?

10          MR. BANNON:  Plaintiff's Exhibit 1.

11          THE COURT:  Okay.  Thank you.

12          MR. BANNON:  About 200 pages in.

13  BY MR. BANNON:

14  Q    Do you see the second entry dated April 28th, 2014?

15  A    Yes.

16  Q    Does it reflect a communication between the IRS and Mr.

17  Winick's power of attorney?

18  A    Yes.

19  Q    Flipping to the next page, do you see the sentence within

20  the same entry that begins, "Explained filing of an NFTL"?

21  A    Yes.

22  Q    That's the full sentence, actually, right?

23  A    Yes.

24  Q    What does NFTL stand for?

25  A    Notice of Federal tax lien.

1   Q    What do you understand it to mean for the IRS to explain

2   the filing of an NFTL to a taxpayer's power of attorney?

3   A    What the impacts are, where it's filed, what it attaches

4   to -- what -- like I said, the impacts that it attaches to all

5   the taxpayer's property.

6   Q    And is that providing notice of the potential that it will

7   be filed?

8   A    Yes.

9   Q    On the same page, do you see the second entry dated April

10  29th, 2014?

11  A    Yes.

12  Q    Is this another communication with Mr. Winick's power of

13  attorney?

14  A    Yes.

15  Q    Do you see the sentence, "Explained criteria for filing an

16  NFTL"?

17  A    Yes.

18  Q    What do you understand it to mean for the IRS to explain

19  the criteria for filing an NFTL to a taxpayer's power of

20  attorney?

21  A    They advised -- in this case, it sounds like they advised

22  the power of attorney that -- what facts and circumstances need

23  to exist for us to file a Federal tax lien, very likely that

24  they exist in this case.

25  Q    Now if I could have you turn to page 3269.

1                          (Pause)

2   Q    Do you see the second entry dated May 1st, 2014?

3   A    Yes.

4   Q    Can you read the sentence beginning "Spoke Mr. Rutter"?

5   A    "Spoke Mr. Rutter and advised him the lien must be filed.

6   He want" --

7   Q    What do you understand that sentence to mean?

8   A    That the employee spoke with the power of attorney and

9   advised him that the lien had to be filed.

10  Q    And could you now turn to page 3271?

11  A    Yes.

12  Q    Do you see an entry dated May 5th, 2014?

13  A    Yes.

14  Q    What does this entry reflect?

15  A    You said 3271, correct?

16  Q    3271.  I apologize, it might be the second entry.

17  A    That's okay, that's okay.  It's an ALS response indicating

18  that the lien was filed and there's a serial number for the

19  lien.

20  Q    What is an ALS response?

21  A    ALS is a computer system, it's the automated lien system,

22  where some employees file their liens.  Revenue Officers

23  specifically just review liens on there.

24  Q    And you said that this reflects that a lien had been

25  filed?

1    A    Yes.  All the liens that are filed are loaded onto ALS.

2    Q    Could I turn your attention back to page 3269 now?  Do you

3    see another entry dated May 2nd, 2014, towards the bottom of

4    the page?

5    A    Yes.

6    Q    Can you read the sentence beginning "Advised POA" out

7    loud?

8    A    "Advised POA that liens have filed in separate

9    (indiscernible) today."

10   Q    To be clear, how could the IRS have informed Mr. Winick's

11   power of attorney that liens were filed on May 2nd when the

12   automated lien system response was not posted until May 5th?

13   A    Well, if you were to flip over to the next page, on that

14   same date of May 2nd there's a history entry indicating that

15   the employee ordered the lien on May 2nd as well.  So they

16   likely called the taxpayer after they had already hit the

17   button to file the lien.

18   Q    So it was requested by the RO --

19   A    Yes.

20   Q    -- on May 2nd?

21   A    Yes.

22   Q    But it wasn't posted to ALS until May 5th?

23   A    Yeah.  The computer systems talk to each other, it could

24   take a couple of days, it could take a couple weeks, I've seen

25   both.

1  Q    Let's go back to Joint Exhibit 5 at page 1702 now.

2                       (Pause)

3            THE COURT:  Joint Exhibit 5 at 1702?

4            MR. BANNON:  Yes, the second page of the document.

5            THE COURT:  Okay.

6  BY MR. BANNON:

7  Q    Can you tell from this page whether the IRS mailed a copy

8  of the notice of Federal tax lien to Mr. Winick once it was

9  filed?

10 A    Yes.

11 Q    How?

12 A    About the seventh transaction down, there's a 971 code,

13 and it says issued notice of lien filing and right to

14 collection due process hearing on May 15th, 2014.

15 Q    And that copy would be sent to Mr. Winick directly?

16 A    Yes.

17 Q    Would it have been sent by certified mail?

18 A    Yes, it would.

19 Q    Do account transcripts reflect when certified mail that's

20 sent to a taxpayer is returned as undeliverable?

21 A    Yes.

22 Q    How do they reflect that?

23 A    There would be a code on here indicating as such.

24 Q    Looking at this transcript, was the notice of Federal tax

25 lien that was sent to Mr. Winick returned to the IRS as

1  undeliverable?

2  A     No.

3  Q     How do you know?

4  A     There is no such code.

5  Q     Now I'd like to show you the first page of what has been

6  entered into evidence as Plaintiff's Exhibit 62, which you

7  probably don't have a copy of.

8           MR. BANNON:  May I approach the witness?

9           THE COURT:  Yes.

10                       (Pause)

11          THE COURT:  Which exhibit?

12          MR. BANNON:  Sixty two.  It's not in the binder; it's

13  the one I handed you this morning.

14          THE COURT:  Give me a moment.

15          MR. BANNON:  I may have another one.

16          THE COURT:  No, no, I have it, I just have to find

17  it.

18                       (Pause)

19          THE COURT:  All set.

20  BY MR. BANNON:

21  Q     Do you recognize this document?

22  A     Yes.

23  Q     What is it?

24  A     It's a notice of Federal tax lien, a copy of the lien.

25  Q     Did you retrieve this document?

1  A    Yes.

2  Q    From where?

3  A    ALS.

4  Q    ALS is, again --

5  A    Automated lien system, yes.

6  Q    Is this a photocopy of the actual notice of Federal tax

7  lien that would have been mailed to Mr. Winick or is it

8  something else?

9  A    It's kind of like a copy, it contains all the information.

10 There's an assumed letter attached that would be more -- look

11 like exactly what was sent to him as a cover.

12 Q    It contains all the same information that would have been

13 sent to Mr. Winick?

14 A    Yes.

15 Q    And does this document confirm that the IRS recorded a

16 notice of Federal tax lien in May 2014?

17 A    Yes, it does.

18 Q    Where was the notice of Federal tax lien filed?

19 A    New York County.

20 Q    Where do you see that?

21 A    Toward the bottom of the page.

22 Q    And when was the notice of Federal tax lien prepared?

23 A    On the 5th of May, 2014.

24 Q    And where do you see that?

25 A    Also at the bottom, right underneath the filing location.

1  Q    And when did the register office record the lien?

2  A    May 19th, 2014.

3  Q    Where do you see that?

4  A    The top-right corner, sir.

5  Q    I'd like to turn to the next page of the exhibit now.

6  What does this page reflect?

7  A    This is the cover letter that would accompany the lien

8  that was sent to the taxpayer.

9  Q    Does it show what kind of mail was sent out?

10 A    Yes, the top left indicates a certified mail and has the

11 receipt number.

12 Q    Does it show to whom and to what address it was sent?

13 A    Yes, it indicates that it was mailed to Jeffrey Winick at

14 14 East 54th Street, Apartment 31B, New York, New York, 10022.

15 Q    And does it explain what property is subject to the lien?

16 A    Yes, it states that the lien attaches to all property that

17 he currently owns.

18 Q    So, to summarize, did the IRS inform Mr. Winick's power of

19 attorney at least three times before it filed a notice of

20 Federal tax lien?

21 A    Yes.

22 Q    And did the IRS inform Mr. Winick's power of attorney

23 shortly after it filed the notice of Federal tax lien?

24 A    Yes.

25 Q    And did it mail a copy of the notice of Federal tax lien

1  to Mr. Winick by certified mail on May 15th, 2014?

2  A    Yes.

3  Q    And was that mailing returned as undeliverable?

4  A    No.

5  Q    Now I want to take a look at what has been entered into

6  evidence as Joint Exhibit 2 at page 4.

7                         (Pause)

8  Q    Does this document reflect that the IRS filed notices of

9  Federal tax liens for any of Mr. Winick's other tax liabilities

10 for tax years 2012 through 2016?

11 A    Yes.

12 Q    Which years?

13 A    2013, 2014, 2015, and 2016.

14 Q    And on what dates were they filed, respectively?

15 A    Okay, the 2013 notice of Federal tax lien was filed on

16 August 13th, 2015; the notice of Federal tax lien on the 2014

17 1040 liability was filed on October 27th of 2015; and the 2015

18 and 2016 1040 liabilities, the notice of Federal tax lien, both

19 periods were filed on November 27th, 2018.

20 Q    Okay.  Finally, I'd like to direct your attention back to

21 Joint Exhibit 5 one last time.

22                         (Pause)

23 A    Okay.

24 Q    For the sake of efficiency, I'd ask that you flip through

25 pages 1707, 1709, 1711, and 1713, and tell us, first, what tax

1  year is reflected on the page; second, whether a notice of

2  Federal tax lien was sent out that year; third, what date it

3  was sent out; and, fourth, whether it was returned as

4  undeliverable.

5  A     Okay.  So 1707 reflects transactions for the 1040 for the

6  tax year 2013, it indicates that a notice of Federal tax lien

7  was sent out via certified mail to the taxpayer on August 13th,

8  2015 and, in a review of the remainder of this transcript,

9  there's no indication that it was returned as undeliverable.

10       Page 1708 starts the transcript for the 1040 for 2014.

11 It indicates that a notice of Federal tax lien was issued to

12 the taxpayer via certified mail on 10/29/2015 and there are

13 no indications that it was returned back as

14 undeliverable.

15       Page 1710 starts the transcript for the 1040 for 2015 and

16 indicates that a notice of Federal tax lien was issued for the

17 taxpayer via certified mail on November 23rd, 2018, and there's

18 no indication in the remainder of the document that it was

19 returned as undeliverable.

20       And page 1712 is the 1040 for the tax year 2016 and that

21 indicates that the taxpayer was issued a notice of Federal tax

22 lien via certified mail on November 23rd, 2018, and there's no

23 indication that it was returned as undeliverable.

24            MR. BANNON:  I have no further questions.

25            THE WITNESS:  Thank you.

1           MR. YAN:  Your Honor, if we could take a moment just

2    to reset the computer technology?

3           THE COURT:  Sure.

4           THE WITNESS:  Is it feasible to use the restroom?

5           THE COURT:  Sure.  Let's take a five-minute break.

6           MR. YAN:  Thank you.

7           THE COURT:  Do you think five minutes is sufficient

8    to --

9           MR. YAN:  If we could have ten minutes --

10          THE COURT:  Okay.

11          MR. YAN:  -- just to make sure.

12          THE COURT:  Let's take a ten-minute break.

13          MR. YAN:  Thank you.

14       (Recessed at 10:46 a.m./Reconvened at 11:02 a.m.)

15          THE COURT:  Okay, please be seated.  How are we doing

16   on tech?

17          MR. YAN:  I think we have what we need, Your Honor.

18          THE COURT:  Okay.  Okay, let's get the witness back

19   on the stand.

20                         (Pause)

21          THE COURT:  And, sir, you are still under oath.

22          THE WITNESS:  Yes.

23          MR. YAN:  I'll wait until Your Honor is ready.

24          THE COURT:  Proceed.

25          MR. YAN:  Thank you.

1                          CROSS-EXAMINATION

2    BY MR. YAN:

3    Q    Good morning, Mr. Harrison.

4    A    Good morning.

5    Q    You were assigned to Mr. Winick's case for a brief period

6    of time; right?

7    A    Yes, sir.

8    Q    You were assigned sometime in 2019; correct?

9    A    Yes.

10   Q    And the ICS history that we looked at, the last entry is

11   from 2019; correct?

12   A    Correct.

13   Q    So safe to say that you were assigned his case for less

14   than a year?

15   A    Yes.

16   Q    You were not personally involved in Mr. Winick's dealings

17   with the IRS prior to your assignment to the case; correct?

18   A    Correct.

19   Q    You are relying on prior entries to figure out what

20   happened?

21   A    Yes.

22   Q    With respect to the entries in the documents in the ICS

23   history that you just talked about, you don't know if those

24   notes are audited; right?

25   A    No.

1  Q    You don't know if there's an automatic process of audited

2  those notes?

3  A    No, sir.

4  Q    Let's talk about Mr. Winick's installment agreements.  He

5  had three installment agreements with respect to his 2012

6  through 2016 taxes; right?

7  A    Correct.

8  Q    And those were full-pay agreements; right?

9  A    I'm sorry, what is full-pay agreements -- you mean

10 agreements to full pay the taxes?

11 Q    Correct.

12 A    Yes, correct.

13 Q    And they included penalties and interest; correct?

14 A    Correct.

15 Q    All of those were approved by the IRS; correct?

16 A    Correct.

17 Q    The IRS is not required to approve an installment

18 agreement; correct?

19 A    If the taxpayer meets certain legal grounds and provides

20 the information, then, yes, more or less, we would be.

21 Q    You're telling me that the IRS in every case, if a

22 taxpayer submits an installment agreement, it's necessarily

23 required to approve it?

24 A    No, sir.

25 Q    Mr. Winick also had an installment agreement for his taxes

1  from the early 2000s; correct?

2  A    Correct.

3  Q    And he complied with that installment agreement; correct?

4  A    To the best of my knowledge.  I would have to review the

5  history again, sir.

6  Q    He paid off those liabilities; correct?

7  A    Again, I would have to review the documents.  I believe

8  so, sir, yes.

9  Q    With respect to tax liens, they can be filed in the county

10 where the taxpayer resides; right?

11 A    Correct.

12 Q    They can also be recorded with the state; right?

13 A    Correct.

14 Q    Nothing prevents the IRS from recording a tax lien with

15 both the state and the county?

16 A    Correct.

17 Q    In fact, sometimes they get recorded with both the state

18 and county; correct?

19 A    Yes.

20 Q    And you've seen that done; correct?

21 A    Yes, I have.

22 Q    And you've seen that done for tax liens filed against

23 individuals; right?

24 A    Yes.

25 Q    The idea is to make sure that everyone is aware of a tax

1  lien; right?

2  A    Yes.

3  Q    The IRS treats the taxpayer and his power of attorney as

4  one and the same; right?

5  A    Yes, that's correct.

6  Q    If the power of attorney does something that the IRS

7  doesn't like, then that means the IRS is treating it as if the

8  taxpayer did it himself; right?

9  A    The taxpayer and the power of attorney are treated as one

10  and the same.

11  Q    So if a power of attorney tells the IRS something

12  inaccurate, that's treated as the taxpayer himself saying

13  something inaccurate; right?

14  A    That's correct.

15  Q    And that's the case even if the Revenue Officer never

16  directly spoke with the taxpayer?

17  A    Yes, that's correct.

18  Q    The IRS does not follow up with the taxpayer to confirm

19  what a power of attorney said; correct?

20  A    That's correct.  We're not supposed to be contacting a

21  taxpayer directly if there's a power of attorney.

22  Q    So the answer is it doesn't separately call the taxpayer;

23  right?

24  A    That's correct.

25  Q    The IRS assumes that when a Revenue Officer says something

1 to the power of attorney that that power of attorney will relay

2 it to the taxpayer; correct?

3 A    That is the purpose of a power of attorney, yes, correct.

4 Q    So when the Revenue Officer tells something to the power

5 of attorney, the Revenue Officer does not separately follow up

6 with the taxpayer to ensure that that same message is conveyed;

7 correct?

8 A    No.  If the notice was issued, then that would go -- a

9 copy of that would go to the taxpayer, as well as the power of

10 attorney, if designated as such.

11 Q    But in terms of oral conversations with the power of

12 attorney, the Revenue Officer doesn't follow up with the

13 taxpayer to repeat the same thing he said to the power of

14 attorney; is that right?

15 A    That's correct.

16          MR. YAN:  No further questions, Your Honor.

17          MR. BANNON:  No redirect from the Government, Your

18 Honor.

19          THE COURT:  Okay.  Thank you, Mr. Harrison, you are

20 excused.  Thank you.

21          MR. BANNON:  I suppose we'll need a couple more

22 minutes to move the --

23          THE COURT:  Ah, okay.

24          MR. BANNON:  Apologies.

25          THE COURT:  Take whatever time you need.

1                          (Pause)

2          MR. YAN:  Your Honor, if I may just ask a logistical

3  question, what time do you anticipate our going to before

4  breaking for lunch and what time are you going to kick us out

5  of your courtroom this afternoon?

6          THE COURT:  Those are good questions and, frankly, on

7  the latter question, I need to check -- well, I want to ask

8  both of you, you and Mr. Bannon, your preferences as far as how

9  long we go.  It may partly depend on where we are with the

10 witness.

11         MR. YAN:  Sure.

12         THE COURT:  I suspect we might still be going with

13 Mr. Winick at that point.  So, you know, I'm happy to hear from

14 both of you as to what's an appropriate time to adjourn for the

15 evening.

16         MR. BANNON:  Okay.

17         THE COURT:  I also -- I need to check with staff to

18 see what my flexibility is in terms of going past -- whether I

19 have the ability to go past 5:00 p.m.

20             As far as lunch, give me your thoughts on that, each

21 of you.  It's now 11:10, we've been going since 9:00.  I'm

22 flexible, I'm really happy to do it however best suits the

23 parties.

24         MR. BANNON:  I'm happy to let the Court know at the

25 lunch hour, 12:30, 1 o'clock, when I've reached a breaking

1  point in my examination that it makes sense to stop at and we

2  can stop there.

3      MR. YAN:  I think that makes sense.

4      THE COURT:  Okay, let's do it that way.

5      MR. BANNON:  Okay.

6      THE COURT:  And what amount of time do you want to

7  take for lunch?  Again, I'm prepared to defer to the two of you

8  on that.

9      MR. YAN:  I am not familiar with how quickly lunch

10 can be obtained in our locale, so --

11     MR. BANNON:  I'd love to take an hour.

12     MR. YAN:  I would be perfectly fine with an hour,

13 Your Honor.

14     THE COURT:  Okay, let's take an hour.  And, yeah, Mr.

15 Yan, you need to familiarize yourself with places nearby that

16 are quick, but I can tell you there are quite a few.  If you

17 walk over to Broad Street, you'll find a lot.

18     MR. YAN:  Yeah, we did some reconnaissance when we

19 were here last week, so I understand there are fast food

20 restaurants near us.

21     THE COURT:  Okay.  Yeah, the key is what's quick.

22     MR. YAN:  Yeah.

23     THE COURT:  Okay.

24     MR. BANNON:  If we're otherwise ready, I'd called Mr.

25 Winick as a witness.

1              JEFFREY WINICK, PLAINTIFF'S WITNESS, AFFIRMED

2                          DIRECT EXAMINATION

3    BY MR. BANNON:

4    Q    Good morning, Mr. Winick.

5    A    Good morning.

6    Q    We're here today as part of a lawsuit arising out of your

7    bankruptcy filing in 2020; right?

8    A    Yes.

9    Q    And, as part of your bankruptcy, you're seeking to have

10   more than $8 million of tax liabilities for 2012 to 2016

11   discharged; right?

12   A    Yes.

13   Q    You don't deny that you incurred those tax liabilities, do

14   you?

15   A    No.

16   Q    And you don't deny that you earned many millions of

17   dollars in income in those years, do you?

18   A    No.

19   Q    And you don't deny that you lived a luxurious lifestyle in

20   those years; right?

21   A    I would imagine so.

22   Q    And you don't deny that you spent millions of dollars on

23   luxury homes, international vacations, and gambling trips

24   during those years; right?

25   A    I would say 95 percent gambling.

1  Q    But you would like this Court to discharge your tax

2  liabilities so you don't have to pay them; right?

3  A    Yes.

4  Q    All right, let's get started with some questions about

5  your professional background.  You're a commercial real estate

6  broker; right?

7  A    Yes.

8  Q    And you've run your own real estate company ever since you

9  got your brokerage license in the late '80s or early '90s;

10 right?

11 A    Until three years ago.

12 Q    You formed Winick Realty Group in the mid-'90s; right?

13 A    I think in '82.

14 Q    '82?

15 A    I think so.

16 Q    You were the founding principal of Winick Realty Group?

17 A    Yes.

18 Q    And you held that position until the company was sold

19 during this bankruptcy case; right?

20 A    Yes.

21 Q    And when you founded Winick Realty Group, it employed

22 around 50 people; right?

23 A    Could you repeat the question?

24 Q    When you founded the company, it employed around 50

25 people; right?

1  A     No.  When I informed the company, it was like ten to

2  fifteen.

3  Q     Ten to fifteen, you said?

4  A     Yes.

5  Q     You gave a deposition in this matter; right?

6  A     Yes, but I think the question you asked me was, when I

7  formed the company, how many employees, and I had 50 employees

8  (indiscernible) in 2018, not in 1982.

9  Q     Are you saying 15 or 50?

10 A     Fifteen when -- ten to fifteen when I started, 40 to 50 in

11 the, you know, 20 to 2018, 2019, I guess.

12 Q     Okay, understood.

13       I'd like to show you what's been entered into evidence as

14 Plaintiff's Exhibit 7.

15       MR. BANNON:  And I apologize, Your Honor, we're going

16 to go through so many exhibits that I didn't make a specific

17 binder for this one.

18       THE COURT:  Okay, give me a moment.

19                       (Pause)

20       THE COURT:  So Harrison I can put aside, right?

21       MR. BANNON:  Yes.

22       THE COURT:  Okay.  And, okay, which exhibit did you

23 say?

24       MR. BANNON:  Plaintiff's Exhibit 7.

25       THE COURT:  Okay, I have it.

1  BY MR. BANNON:

2  Q    This is the operating agreement for Winick Realty Group;

3  right?

4  A    Yes.

5  Q    I want you to turn to page 845 and look at paragraph B.

6  Can you see that on the screen?

7  A    Yes.

8  Q    Is that better?

9       Looking at paragraph B, you're designated the sole manager

10 of Winick Realty Group; right?

11 A    Yes.

12 Q    Now I want you to take a look at paragraph 7.2 on the same

13 page.

14 A    Okay, I see it here.  Can you make it a little smaller?

15 Q    You want it to be smaller?

16 A    It's running off the page.

17                           (Pause)

18 Q    I think I know how to adjust it so that it will fit in the

19 page.

20 A    You can make it a little smaller, though.

21           UNIDENTIFIED SPEAKER:  The resolution?

22           MR. BANNON:  No, it's not a resolution issue, it's --

23           THE WITNESS:  Make it a little smaller.

24           MR. BANNON:  Permission to ask around --

25           THE COURT:  Sure, absolutely.

1                    (Laughter)

2                    (Pause)

3          THE COURT:  Take your time.  I'm very sympathetic to

4    tech difficulties.

5                    (Pause)

6          THE COURT:  Do you want to -- look, I don't want

7    people to race forward if the tech hasn't been fixed, do you

8    want to take a few moments?

9          MR. BANNON:  My understanding is that the fix is like

10   flipping two buttons, I just don't remember what the two

11   buttons are.  But we had this problem and we were able to work

12   through it -- the folks here are able to --

13         THE COURT:  Okay, so let's just pause until -- we're

14   waiting for them to get here and --

15         MR. BANNON:  Yes.

16         THE COURT:  -- fix it?  Okay, that's fine.

17                    (Off the record)

18         THE COURT:  Okay, let's continue.  Mr. Winick, are

19   you all set?

20         THE WITNESS:  All set.

21         THE COURT:  Okay.

22   BY MR. BANNON:

23   Q    You testified a moment ago that pursuant to this --

24   A    Yes.

25   Q    -- operating agreement you were designated the sole

1  manager of Winick Realty Group; right?

2  A    Yes.

3  Q    Now, if you take a look at paragraph 7.2 on the same page

4  --

5  A    Yes.

6  Q    -- you had the authority to manage the company; right?

7  A    Yes.

8  Q    In fact, the operating agreement gave you authority over,

9  quote, "all decisions, determinations, actions, approvals, or

10 consents relating to the management and control of the conduct

11 of the business of the company and its affairs," end quote.

12 Right?

13 A    Yes.

14 Q    And that included hiring and firing; right?

15 A    Yes.

16 Q    And it included the payment of distributions; right?

17 A    Yes.

18 Q    And it included making loans; right?

19 A    Yes.

20 Q    Between 2012 and 2016, you earned millions of dollars per

21 year from your work with Winick Realty Group; right?

22 A    Yes.

23 Q    In fact, you earned more than $25 million over that time

24 period; right?

25 A    Yes.

1  Q    In 2012, you earned about $8.5 million; right?

2  A    Around that.

3  Q    And the lowest you earned during a single year in this

4  period was in 2016 when you earned around three million; right?

5  A    Yeah.  I won't argue it, yes.

6  Q    And your work at Winick Realty Group was about 80 percent

7  brokering and 20 percent managing the business; right?

8  A    I would say probably 90-10.

9  Q    And most of your income from Winick Realty Group was in

10 the form of commissions; right?

11 A    Yes.

12 Q    You knew you had to pay taxes on your commissions; right?

13 A    Yes.

14 Q    And between 2012 and 2016, Winick Realty Group did not

15 withhold enough taxes from your earnings to cover your taxes;

16 right?

17 A    They only withheld taxes from my salary.

18 Q    Which was a small portion of your income; right?

19 A    Yes.

20 Q    And you knew that when you earned taxable income that

21 isn't subject to withholding you were supposed to make

22 quarterly estimated tax payments; right?

23 A    Yes.

24 Q    In 2017, your income went down to around $2.4 million;

25 right?

 1   A    Yes.

 2   Q    And that was in part because you lost your biggest client

 3   at Winick Realty Group around that time; right?

 4   A    Yes.

 5   Q    And in 2018 you earned about $1.9 million; right?

 6   A    Yes.

 7   Q    And in both of those years you paid your income taxes in

 8   full; right?

 9   A    Yes.

10   Q    And you paid in full because Winick Realty Group started

11   withholding taxes from most of your income in 2017; right?

12   A    Yes.

13   Q    And, as the sole manager of Winick Realty Group, you had

14   the power to decide how you would be compensated; right?

15   A    I imagine so.

16   Q    But you didn't start having taxes withheld from most of

17   your income until 2017; right?

18   A    It's something that my accountants said and I followed

19   what they said.

20   Q    But you had authority to make the decision sooner; right?

21   A    Yes.

22   Q    And you in fact made that transition in 2017; right?

23   A    Yes.

24   Q    The tax liabilities that gave rise to this bankruptcy

25   aren't your first past due tax liabilities; right?

1  A    No.

2  Q    You also got behind on your taxes in the early 2000s;

3  right?

4  A    Yes.

5  Q    And you entered into an installment plan with the IRS to

6  pay them off; right?

7  A    Yes, which I paid them off in full.

8  Q    You paid them off in full in 2012; right?

9  A    Yes.

10  Q    And while you were making those installment payments on

11  those older liabilities, you were also making quarterly

12  estimated tax payments to keep up with your tax liabilities for

13  the current periods; right?

14  A    I imagine.

15  Q    In fact, you made quarterly estimated tax payments until

16  the end of 2011; right?

17  A    Yes.

18  Q    But after you paid off your tax liabilities in the early

19  2000s, in 2012, you fell behind on your taxes again; right?

20  A    Yes.

21  Q    I'd like to show you a chart that your counsel and I

22  agreed upon summarizing your tax liabilities for each of 2012

23  through 2016.

24          MR. YAN:  Counsel, could you identify the exhibit

25  number?

1          MR. BANNON:  This is the JPTO at paragraph 33.

2          MR. YAN:  Thank you.

3          MR. BANNON:  Page 14 of the PDF.

4          THE COURT:  Paragraph 33?

5          MR. BANNON:  Yes.  And, Your Honor, if you don't have

6    a copy of the JPTO in front of you, I have a few here.

7          THE COURT:  I have it.

8          MR. BANNON:  Great.

9                         (Pause)

10   BY MR. BANNON:

11   Q    If you look at the column on the right, do these numbers

12   accurately reflect the amount of money you owed at the time you

13   filed your taxes for each of 2012 to 2016, to the best of your

14   knowledge?

15   A    To the best of my knowledge.

16   Q    And during those tax years when you were falling behind,

17   you knew that you were falling behind; right?

18   A    Yes.

19   Q    Indeed, on the tax returns you signed, you acknowledged to

20   the IRS that you owed those amounts; right?

21   A    Yes.

22   Q    But you didn't make any quarterly estimated tax payments

23   from 2012 to 2016; right?

24   A    Yes.

25   Q    And you didn't make any estimated tax payments for those

1  years even though you had made such payments for prior years;

2  right?

3  A    I made -- what I was getting income on, not commissions,

4  the quarterly was taken out.

5  Q    You had withholdings taken out from your income?

6  A    Right.

7  Q    But in prior years, before 2012, you were also paying

8  quarterly estimated taxes on your commission income too; right?

9  A    I believe so.

10 Q    And between 2012 and 2016 your lawyers told you numerous

11 times that you should be making quarterly estimated tax

12 payments; right?

13 A    Yes.

14 Q    But you didn't do so?

15 A    No.

16 Q    And the reason you didn't make those payments during that

17 period was so that you could spend more money gambling in

18 casinos; right?

19 A    I had a major gambling problem.

20 Q    And so the answer is yes, that --

21 A    Yes.

22 Q    -- was the reason?

23      After you incurred your tax liabilities in 2012 to 2016,

24 you entered into some IRS installment agreements and made some

25 payments under them; right?

1  A    Yes.

2  Q    But you didn't stay current on any of your installment

3  agreements; did you?

4  A    No.

5  Q    And you didn't change your lifestyle to set aside more

6  money to pay your taxes; right?

7  A    I did change my lifestyle.  I moved to lower-rent

8  apartments, I tried to cut back my gambling as best as I could,

9  but I was kind of out of control.

10 Q    Do you recall being deposed in this matter?

11 A    Excuse me?

12 Q    Do you recall having a deposition taken in this matter?

13 A    Yes.

14 Q    And you were under oath in that deposition; right?

15 A    Yes.

16 Q    And you swore to tell the truth?

17 A    Yes.

18 Q    And after your deposition you were given a copy of the

19 transcript and you signed off on your answers; right?

20 A    Yes.

21 Q    In your deposition, on page 31, line 9 to 14, do you

22 recall being asked the following question and giving the

23 following answer.  Question:  "Do you remember whether your

24 spending habits contributed to your inability to make payments

25 at that time?"

1    Answer:  "I don't think my spending habits changed at all.

2  My gambling problem was my problem, my spending habits were the

3  same."

4  A    I remember that.

5  Q    In addition to making the payments you made on your

6  installment agreements, you were hoping you would make a big

7  score at gambling to pay off your liabilities; right?

8  A    Yes.

9  Q    But you knew that you were required to pay taxes when they

10  were due; right?

11  A    Yes.

12  Q    And you knew that you weren't doing that at the time;

13  right?

14  A    Yes.

15  Q    In fact, you stated earlier in this case that you were

16  hoping you might win a large amount of money gambling so that

17  you could, quote, "pay off or at least pay down," end quote,

18  your tax liabilities; right?

19  A    Yes.

20  Q    Did you ever win a big chunk of money on a gambling trip

21  between 2012 and 2020?

22  A    I don't think so.

23  Q    You never had any significant winnings for one specific

24  trip?

25  A    I don't remember.  I know with each year I (indiscernible)

1  of them.

2  Q    Do you remember, was there ever any instances in which you

3  took your winnings from gambling and immediately went and paid

4  off your taxes with it?

5  A    No.

6  Q    Okay.  Now I want to talk to you about your installment

7  agreements with the IRS in a little more detail.

8        This morning you heard Mr. Harrison give testimony about

9  three installment agreements you entered with the IRS, the

10 payments you made under those installment agreements, and the

11 dates on which you stopped making those payments.  Do you

12 remember that?

13 A    Yes.

14 Q    Do you personally recall, sitting here today, your payment

15 history under those three installment agreements?

16 A    Not unless I see it in writing.

17 Q    Do you have any reason to doubt the accuracy of Mr.

18 Harrison's testimony or the account transcripts he relied on?

19 A    I don't believe so.

20 Q    I'd like to direct your attention to what's been entered

21 into evidence as Joint Exhibit 5 at page 1702.

22                          (Pause)

23 A    I see it.

24 Q    Do you see in the middle of the page that you made a

25 $50,000 payment to the IRS in September of 2014 under your

1   first installment agreement?

2   A    I see it started earlier than that.

3   Q    But do you see the payment that I'm making reference to --

4   A    Yes.

5   Q    -- the September payment?

6   A    Yes.

7   Q    And if you look a few lines down, do you see that your

8   next payment after that September payment wasn't made until

9   April of 2015?

10  A    Yes.

11  Q    And you didn't make that payment until after your

12  installment agreement was terminated, even though you'd missed

13  the last six months of payments; right?

14  A    Yes.

15  Q    Why did you wait to start making payments again until

16  after the IRS had terminated your installment agreement?

17  A    I don't remember.

18  Q    Now I want to direct your attention to the bottom of page

19  1703 in this exhibit and the top of page 1704.

20  A    Where am I looking?

21  Q    If you could just give us a minute.

22                          (Pause)

23  Q    Do you see at the bottom of page 1703 that your second

24  installment agreement got terminated on March 20th, 2017?

25  A    Yes.

1  Q    Directly above that, do you see that the last payment you

2  made before your installment agreement was terminated was from

3  December 27th, 2016?

4  A    Four months earlier, yeah.

5  Q    And on the top of the next page, do you see that your next

6  payment was May 15th, 2017?

7  A    Right.

8  Q    That was after your installment agreement was terminated;

9  right?

10 A    Yes.

11 Q    Why did you wait until after your installment agreement

12 was terminated to make another payment in this instance?

13 A    I think my lawyer recommended I do the offer in

14 compromise.

15 Q    So you stopped making payments and then started when your

16 lawyer recommended the different approach?

17 A    Yes.

18 Q    Now I'd like to show you what's been entered into evidence

19 as Joint Exhibit 18.

20 A    I see it.

21 Q    Looking at the first page, this is an offer in compromise

22 you submitted to the IRS; right?

23 A    Yes.

24 Q    Now I want to turn down to page 2607.  That's your

25 signature; right?

1  A    Yes.

2  Q    And you submitted this offer in compromise on May 1st,

3  2017; right?

4  A    Yes.

5  Q    Now let's turn back up to page 2604.  Do you see in this

6  offer where it says you offered to pay the IRS $430,000 to

7  satisfy your liabilities?

8  A    Yes.

9  Q    Do you recall Mr. Harrison's testimony from this morning

10  that at the time you submitted this offer you owed the IRS

11  about seven million dollars?

12  A    Yes.

13  Q    You don't have any reason to dispute that testimony;

14  right?

15  A    No.

16  Q    Let's go back now to Joint Exhibit 5 at page 1704.

17                        (Pause)

18  Q    If you look at the fourth line -- I'll wait for it to be

19  blown up.

20      If you look at the fourth line of this transcript, do you

21  see that you withdrew your offer in compromise on September

22  26th, 2018?

23  A    Yes.

24  Q    And can you also see that you didn't make any payments to

25  the IRS during the time period between when you submitted your

1  offer in compromise and withdrew it?

2  A    Yes.

3  Q    You continued to earn income during that period; right?

4  A    Yes.

5  Q    In fact, you earned about $2.4 million in 2017 and $1.9

6  million in 2018; right?

7  A    Yes.

8  Q    But any money you had while your offer in compromise was

9  pending you spent gambling; right?

10 A    Yes.

11 Q    You didn't try to save to make any big payment to the IRS?

12 A    No.

13 Q    I'm going to turn your attention now back to Joint Exhibit

14 5 at page 1705 one last time, then no more tax transcripts.

15      Do you see on the second line from the bottom that the

16 last payment you made to the IRS was in January of 2020?

17 A    Yes.

18 Q    You didn't make any payment to the IRS after that before

19 you filed for bankruptcy; right?

20 A    I thought I made one or two.

21 Q    But from this transcript --

22 A    No.

23 Q    -- do you have any reason to question this transcript?

24 A    Not up to this date.

25 Q    So you have no reason to question that the last payment

1    you made to the IRS before you filed for bankruptcy was January

2    2020?

3    A    I guess so.

4    Q    After you stopped paying the IRS in January of 2020, you

5    made a $200,000 loan repayment to your friend David Berley in

6    February of 2020; right?

7    A    Yes.

8    Q    And, after you stopped paying the IRS, you also

9    transferred property to Mr. Berley in July 2020 to pay back a

10   $1.6 million loan you had taken out from him; right?

11   A    Yes.

12   Q    Now I want to ask you some questions about the income that

13   you earned during the relevant period, starting with 2014.

14        In the first half of 2014, you earned income that was not

15   subject to tax withholdings by Winick Realty Group; right?

16   A    I guess so.

17   Q    In fact, let's take a look at Plaintiff's Exhibit 13 at

18   page 105.

19        If you look at lines -- oh, just one moment.

20        This is your 2014 tax return; right?

21   A    Yes.

22   Q    And if you look at line 7, for 2014, you only earned

23   $700,000 in wages; right?

24   A    Yes.

25   Q    And then, if you compare that to line 17, you earned $4.9

1  million in commissions; right?

2  A    Yes.

3  Q    And your wages were subject to withholding and your

4  commissions were not; right?

5  A    Yes.

6  Q    Looking at the next page, page 106, do you see on line 63

7  that you owed $2.1 million in total taxes for that year?

8  A    Yes.

9  Q    But, looking at line 64, you only withheld $275,000;

10 right?

11 A    Yes.

12 Q    So the large majority of the money you earned in 2014 was

13 not subject to tax withholdings; right?

14 A    Can you repeat the question?

15 Q    Out of all the money that you earned in 2014 --

16 A    Right.

17 Q    -- most of that money wasn't subject to withholdings from

18 Winick Realty Group; right?

19 A    Yes.

20 Q    You were supposed to be paying estimated taxes on the 4.9

21 million in commissions you earned during that period; right?

22 A    Yes.

23 Q    But in May 2014, your accountant, Scott Rutter at Citrin

24 Cooperman told the IRS that you were, quote, "not liable to pay

25 estimated tax payments," end quote, because you, quote, "didn't

1  make much income for 2014," end quote; right?

2  A    I don't remember.  Can you repeat the question?

3  Q    In 2014, in May of 2014, your accountant, Scott Rutter,

4  told the IRS that you weren't liable to pay estimated tax

5  payments because you hadn't made much money in 2014; right?

6  A    I have no idea what he said to the IRS.

7  Q    Do you recall Mr. Harrison's testimony about what he said

8  this morning?

9  A    I don't know where that was mentioned this morning.

10 Q    I'd like to show you Plaintiff's Exhibit 1 at page 3273.

11                         (Pause)

12 Q    Do you see where it says, "POA stated that TP didn't make

13 much income for 2014.  Therefore, TP is not liable to pay ES

14 payments at this time"?

15 A    The only thing I can think of was, in my business, you

16 don't make the same amount of commissions every month, it could

17 have been back-loaded at the end of the year, but I have no

18 idea what he told the agents.

19 Q    So is it your testimony that, of the $4.9 million in

20 commissions you earned in 2014, you might not have earned any

21 commissions by May of 2014?

22 A    I didn't say that.  I don't know if it was more back-ended

23 or what, but I don't remember what he said to the IRS.

24 Q    My question is a little different.  Is it possible that

25 you didn't make any commissions out of the 4.9 million --

1  A    No, I had to make some commissions.

2  Q    Okay.  So you made some commissions between January and

3  May of 2014?

4  A    Yes.

5  Q    Now I want to direct your attention to Plaintiff's Exhibit

6  13 at 132.

7       This is your 2015 tax return; right?

8  A    Yes.

9  Q    And in that year you earned about $2.2 million in salary

10 that was subject to tax withholdings and $1.7 million in other

11 income that was not subject to withholding; right?

12 A    Yes.

13 Q    So a little less than half of your income from 2015 was

14 not subject to withholdings?

15 A    I guess so.

16 Q    But on August 11th, 2015, your attorney, Laurie Kazenoff

17 at Meltzer, Lippe, told the IRS that your income from that year

18 was, quote, "completely on withholding," such that you were,

19 quote, "current" for your 2015 tax payments; right?

20 A    I don't remember what she said.

21 Q    Do you have any reason to dispute Mr. Harrison's testimony

22 to that effect from this morning?

23 A    Not really.

24 Q    Okay.  Let's switch gears a bit and talk about your

25 spending during the relevant time period.  You spent a lot of

 1  money between 2012 and 2016 on real estate, travel, shopping,

 2  gambling, and other luxuries; right?

 3  A    Mostly gambling.

 4  Q    You spent millions of dollars in total; right?

 5  A    Excuse me?

 6  Q    You spent millions of dollars on those things; right?

 7  A    I spent millions of dollars on gambling, I don't know

 8  about millions of dollars on other things.

 9  Q    And the reason you spent all this money was because you

10  were successful and that was the lifestyle you and your family

11  had become used to; right?

12  A    Yes.

13  Q    Since at least 2012, you've lived in a luxury apartment

14  building on 54th and 1st; right?

15  A    Yes.

16  Q    In 2012, your rent was $15,000 a month; right?

17  A    Yes.

18  Q    And, by 2014, it had gone up to $17,000 per month?

19  A    Yes.

20  Q    And, by 2016, it was $18,000 a month; right?

21  A    I don't remember, but probably, yes.

22  Q    And on top of that, between 2012 and 2016, you were also

23  paying $11,000 a month to rent a vacation home in Southampton;

24  right?

25  A    Yes.

1  Q    And you were renting that Southampton house from a trust

2  whose beneficiary was your daughter; right?

3  A    Yes.

4  Q    And you also paid thousands of dollars in incidental

5  expenses to maintain your Southampton house; right?

6  A    Yes.

7  Q    And, in addition to your city apartment and your Hamptons

8  house, from 2012 to 2014, you were also paying over $5,000 a

9  month for your ex-wife's apartment; right?

10 A    Yes.

11 Q    I'd like to show you what's in evidence as Plaintiff's

12 Exhibit 10.

13     This exhibit shows that you paid over $6,000 per month for

14 your ex-wife's apartment in 2012 and 2013; right?

15 A    Yes.

16 Q    And now I'd like to show you what's in evidence as

17 Plaintiff's Exhibit 11.

18     This shows that you paid over $5,000 a month for your ex-

19 wife's apartment in 2013 and 2014; right?

20 A    Yes.

21 Q    And at the same time as those apartments, you were also

22 paying about $3500 a month for your daughter's rent while she

23 was in college; right?

24 A    Yes.

25 Q    I'd like to show you what's in evidence as Plaintiff's

1  Exhibit 12.

2       This shows that you paid $7,000 per month for your

3  daughter's apartment in 2013 and 2014; right?

4  A    She shared the apartment with two other girls that

5  reimbursed her for 3500 a month.

6  Q    So you were only paying 3500?

7  A    Right, yes.

8  Q    It also shows that you paid $350 per month for garage

9  space; right?

10  A    Yes.

11  Q    What were you using the garage for?

12  A    Company car.

13  Q    Was it a company car that your daughter used?

14                        (Pause)

15  A    Maybe.  I'm not sure.

16  Q    To be clear, your daughter didn't own or lease her own car

17  at this time; right?

18  A    I'm not sure.

19  Q    On top of the rent you were paying and the garage space

20  you were paying for for your daughter, you were also paying

21  your daughter's college tuition at NYU; right?

22  A    No, she -- I don't know if she got a full scholarship or

23  half a scholarship, but she got some kind of scholarship.  I

24  don't remember how much it was.

25  Q    I'd like to show you Plaintiff's Exhibit 13 at page 75.

 1        If you look towards the bottom of the page, does this

 2   reflect your payment of your daughter's tuition in 2012?

 3   A    I believe so.

 4   Q    And tuition was around $80,000; right?

 5   A    Yes.  I'm not sure what I was paying.

 6   Q    This is from your tax return I'll represent to you.

 7   A    So you're saying I was paying $80,000?

 8   Q    I'm asking you, --

 9   A    I don't --

10   Q    -- does this document reflect that you were paying $80,000

11   for your daughter's tuition?

12   A    I'm not sure what this document is.

13   Q    Okay.  So in 2013 and 2014 you were paying for four

14   separate residences for the total of about $40,000 a month,

15   right?

16   A    Yes.

17   Q    I'll represent to you that I went through all of these

18   documents and added up the rent payments you made between 2012

19   and 2016 and I found that you spent $1.5 million on rent during

20   this period.  Does that sound right to you?

21   A    If you say so.

22   Q    In addition to rent, from 2012 until you filed for

23   bankruptcy, you paid for a lot of shopping trips for yourself,

24   your daughter, and your ex-girlfriend, right?

25   A    Yes.

1  Q    For example, in 2014 one of your girlfriends had a credit

2  card linked to one your accounts that you paid for, right?

3  A    Yes.

4  Q    And she spent thousands of dollars, and sometimes even

5  tens of thousands of dollars per month on that card, right?

6  A    I don't think that was my girlfriend.

7  Q    I'd like to show you what has been marked plaintiff's

8  exhibit 33 at 4359.

9          MR. BANNON:  And, Your Honor, if I may approach the

10  bench, I don't have the full exhibit, so --

11          THE COURT:  Okay.

12          THE WITNESS:  Thank you.

13          THE COURT:  Is what you handed me a portion of the

14  exhibit or the entire exhibit?

15          MR. BANNON:  It's a portion of the exhibit, Your

16  Honor.

17          THE COURT:  Okay.

18          MR. BANNON:  This is -- this is one of the exhibits

19  that we didn't provide in paper because the full exhibit was

20  hundreds of pages long.

21          THE COURT:  Okay.

22  BY MR. BANNON:

23  Q    This is your Amex statement from January of 2014, right?

24  A    Yes.

25  Q    Now, if you could turn to page 4361?  Do you see Anna

1  Bonette (phonetic) listed on this page towards the middle?

2  A    Yes.

3  Q    Who is Anna Bonette?

4  A    Old girlfriend.

5  Q    She was an old girlfriend?

6  A    Yes.

7  Q    And this shows that in January of 2014 she charged $2,000

8  to your credit card, right?

9  A    Yes.

10  Q    Now, if we could turn several pages to page 4387?  And if

11  you look at the middle of the page, for this month she spent

12  over $16,000 on your credit card, right?

13  A    Yes.

14  Q    So does this refresh your recollection that your girl --

15  ex-girlfriend spent thousands and sometimes tens of thousands

16  of dollars a month on your credit card?

17  A    I don't think she spent tens of thousands of dollars every

18  month.

19  Q    But she on occasion would spend over $10,000 in a month,

20  right?

21  A    I'm only looking at one.

22  Q    On at least one occasion she spent over $10,000 in a

23  month?

24  A    Yes.

25  Q    She didn't pay you that money back, right?

1  A    No.

2  Q    Your daughter also charged money to credit cards linked to

3  one of your accounts, right?

4  A    Yes.

5  Q    And she also spent over $10,000 on your credit cards

6  between 2012 and 2020, right?

7  A    No, that would be (indiscernible), yes.

8  Q    She didn't pay you back for that, right?

9  A    No.

10 Q    In fact, on one occasion in 2013 your daughter spent

11 $15,000 at a luxury clothing store to "punish you" for showing

12 up late to dinner with her, right?

13 A    Yes.

14 Q    You have estimated that you, your daughter, or one of your

15 ex-girlfriends have spent over $1,000 on single shopping trips

16 at least once or twice a month between 2012 and the time you

17 filed for bankruptcy, right?

18 A    Yes.

19 Q    In fact, Ms. Figueroa here reviewed the monthly credit

20 card statements you produced to the government in this

21 litigation and summarized them on spreadsheets that we shared

22 to your attorney and which have been entered into evidence as

23 summary exhibits in this case.  Those statements are for your

24 Citi, Amex, Bank of America, and FIA cards, and the summaries

25 are plaintiff's exhibits 32A, 33A, 33B, 34A, 34B, and 35A.  I

1  want to take a look at 33B for example.  Do you see that you

2  spent a total of about $500,000 on your Amex card between 2012

3  and 2020?

4  A    Yes.

5  Q    In totals -- in total, these summaries reflect that you

6  spent about $750,000 on your credit cards between 2012 and

7  2020; does that sound right to you?

8  A    Yes.

9  Q    In addition to your shopping and your rent, you also

10  traveled internationally many times between 2012 and 2020,

11  right?

12  A    A few times.

13  Q    During those years you visited Prague, right?

14  A    My daughter was in college in Prague and I believe I've

15  only been to Prague once.

16  Q    And you went to France?

17  A    I went to France for my daughter's wedding and I --

18  Q    Yeah, but --

19  A    -- also I went for a convention, a shopping center

20  convention.

21  Q    And you went to St. Barts?

22  A    I went, I think, twice.

23  Q    And Germany?

24  A    Germany I went to under very special circumstances.  I

25  went for 24 hours or 36 hours.  I got a call on a Friday that

1  my daughter was at the German Beer Festival and one of her
2  girlfriends was getting arrested and my daughter got involved
3  with a confrontation, that a beer bottle hit a German kid
4  because they were in the German tents.  And from what I
5  understood, I got a call from one of her friends on a Friday at
6  2:00 o'clock, that my daughter was arrested.

7          That was the last I heard of it.  My girlfriend at
8  the time, Anna, spoke five languages and lived in Germany.  My
9  ex-wife found out.  We ended up getting on a plane to go to
10 Germany.

11         The law firm I used in New York found a lawyer that
12 was associated with the law firm in New York.  They went to NYU
13 Stern.  I hired him.  By the time I landed and I was concerned
14 that nobody knew where my daughter was, the lawyer found my
15 daughter, got her out of the jail.  We got up the next day, we
16 left Germany and we came home.

17         The (indiscernible) three months later they wanted
18 $4,500 for a new leotard because it had blood on it and three
19 stitches, not 50 stitches.
20 Q    What was that about $4,500?  You said something about
21 $4,500.
22 A    The person that was injured, the German, you know, boy was
23 -- they settled for a couple of hundred dollars for a new
24 uniform and $4,000 in expenses.  So for $4,500 the case was
25 dismissed.

1  Q    You settled the case for $4,500?

2  A    Yes.

3  Q    You also traveled to Mexico in the period between 2012 and

4  2020, right?

5  A    I believe once or twice.  I'm not sure.

6  Q    And you also traveled to the Bahamas many times during

7  that period, right?

8  A    Yes.

9  Q    In total, you went on over 30 international trips between

10 2012 and 2020, right?

11 A    I would say 80 percent of it probably would be Bahamas.

12 Q    And with the exception of that trip you described to

13 Germany, those were vacations, right?

14 A    One in France was business, the shopping center convention

15 -- International Shopping Center convention.

16 Q    But the remainder were vacations?

17 A    Yes.

18 Q    And you sometimes spent tens, thousands, or even tens of

19 thousands of dollars during those trips, right?

20 A    Usually the trips to the Bahamas I did not pay for.

21 Q    But on some of the other trips you spent a lot of money

22 while you were on the trips, right?

23 A    I'm not sure what I spent, but if you showed me, I would

24 agree with you.

25 Q    I'll show you what we've entered into evidence as

1 plaintiff's exhibit 33A.  As we just discussed, this exhibit

2 shows a summary of your Amex statements and it includes on it

3 any individual charges that you made for over $2,000.  Looking

4 at the first page, can you see that you spent over $5,000 at a

5 luxury glass store called Moser, A.S. in Prague in April of

6 2014?

7 A    Yes.

8 Q    And in May of 2014 you spent $5,000 at a luxury goods

9 store called Hillside Bahamas, right?

10 A    It's probably my daughter or my girlfriend.

11 Q    It would have been with your money, right?

12 A    Yes.

13 Q    And if you turn to the fourth page of this exhibit, this

14 shows that in October of 2019 you spent $21,000 at a restaurant

15 in France, right?

16 A    That was my daughter's wedding.

17 Q    You did spend $21,000 at a restaurant?

18 A    I did.  Yes, I did.

19 Q    Now, as we all know, one of your biggest spending

20 categories from 2012 to 2019 was gambling, right?

21 A    Yes.

22 Q    I'd like to show you joint exhibit 3 at page 43.  This

23 page reflects that between 2012 and 2019 you lost about $13

24 million gambling, right?

25 A    Yes.

1  Q    But you were able to adopt some strategies to limit your

2  gambling, right?

3  A    I'm not sure of the question.

4  Q    For example, you made a personal rule that you'd only

5  gamble with money that you deposited at the casino, right?

6  A    I always would only play with bank (indiscernible), not

7  credit.

8  Q    And you would have a preset amount of money that you would

9  deposit at the casino before you would go?

10  A    Yes.

11  Q    And between 2012 and 2019 you never took any credit from

12  casinos, right?

13  A    No.

14  Q    And starting in 2017, you stopped gambling with pre-tax

15  dollars by withholding taxes from your income, right?

16  A    Yes.

17  Q    And your gambling decreased around the same time, right?

18  A    Yes.

19  Q    And you were able to quit gambling completely in 2019?

20  A    Yes.

21  Q    You said that the reason you quit gambling in 2019 was

22  that you no longer had money to do so, right?

23  A    Yes.

24  Q    But you earned $2.8 million in 2019, didn't you?

25  A    Yes.

1  Q    And that was significantly more than what you earned in

2  2017 or 2018, right?

3  A    I guess so.

4  Q    You didn't receive any professional help to help you quit

5  gambling, right?

6  A    No.

7  Q    And you never went to Gamblers Anonymous?

8  A    No.

9  Q    Before this lawsuit, you never sought or received any

10  professional diagnosis for your gambling condition, right?

11  A    I always knew I had a gambling problem, but I didn't seek

12  any help.

13  Q    You said you always knew you had a gambling problem?

14  A    Yes.

15  Q    When do you think you first recognized that?

16  A    When I was 19 years old.

17  Q    And before this lawsuit you never sought or received any

18  treatment for your gambling condition, right?

19  A    No.

20  Q    But you were successful when you quit gambling in 2019,

21  right?

22  A    Yes.

23  Q    You haven't gambled since?

24  A    No.

25  Q    I want to shift to another topic and talk about various

1  properties that you've owned over the years, okay?

2  A    (No verbal response.)

3  Q    In 1999, you formed a trust called the Jeffrey Winick 1999

4  Life Insurance Trust, right?

5  A    Yes.

6  Q    I want to show you what's been entered into evidence as

7  plaintiff's exhibit 5.  This is the agreement that creates that

8  trust, right?

9  A    Yes.

10 Q    Now if we could turn to the last page of the exhibit,

11 1299, you signed this agreement, right?

12 A    Yes.

13 Q    And if we can now turn back to page 1253, do you see under

14 this paragraph labeled "Second," that you named your daughter

15 as a beneficiary of the trust?

16 A    Am I too far, I think?  Yes.

17 Q    Right there.  Do you see that?

18 A    Yeah.

19 Q    In 2002 or 2003 you purchased a vacation home that we've

20 discussed before located at 24 Parish Pond Lane in Southampton,

21 right?

22 A    Yes.

23 Q    And you transferred ownership of that home to the trust at

24 closing, right?

25 A    Yes.

1 Q    And after you transferred that house to the trust, you

2 paid the rent to the trust so that you could continue to use

3 the property, right?

4 A    Yes.

5 Q    And the trust used your rent payments to pay the mortgage,

6 right?

7 A    Yes.

8 Q    I want to show you now it's been entered into evidence as

9 plaintiff's exhibit 6.  This is a copy of the lease agreement

10 between you and the trust, right?

11 A    Yes.

12 Q    Now, I am going to turn to page 1120.  You signed this

13 lease agreement, right?

14 A    Yes.

15 Q    And if we can go back to the first page, under this

16 agreement, you are required to pay $180,000 per year to rent

17 this house from the trust from 2013 to 2018 right?

18 A    Yes.

19 Q    As we discussed earlier, you did, in fact, pay $11,000 a

20 month to rent that house between 2012 and 2016, right?

21 A    Yes.

22 Q    In addition to paying the rent to the trust you also paid

23 for the maintenance, utilities, and other expenses, right?

24 A    Yes.

25 Q    You used that house as your weekend summer home, right?

1  A    Yes, along with my daughter and friends.

2  Q    And in 2016 the trust transferred ownership of the house

3  to your daughter outright, right?

4  A    Yes.

5  Q    But even after that transfer you continued to use the

6  house as your summer home, right?

7  A    Just in the -- just from May until September.

8  Q    The same way you had been using it before?

9  A    Right.

10 Q    I'd like to show you a document that's been marked for

11 identification as plaintiff's exhibit 4.

12         MR. BANNON:  Which, Your Honor, is one of the

13 exhibits that has not yet been entered.

14 BY MR. BANNON:

15 Q    Can you tell me what this document is?

16 A    It's an appraisal on the house from CNET.

17         MR. BANNON:  I'd move for admission of plaintiff's

18 exhibit 4.

19         THE WITNESS:  Excuse me?

20         MR. YAN:  Objection to that on the basis of

21 relevance.

22         THE COURT:  Give me one moment (indiscernible).  Mr.

23 Bannon?

24         MR. BANNON:  Your Honor, the document is relevant

25 because it shows the value of the house at the time the trust

1  transferred the property to his daughter.  Mr. Winick had

2  always treated the trust as if it were himself.  It was nothing

3  more than a nominee.  So this transfer can be imputed on to Mr.

4  Winick for purposes of determining what assets he's

5  transferred.  And the value of the property is relevant to the

6  amount of money that he transferred during the period where he

7  owed taxes.

8         THE COURT:  Is there -- is there evidence that Mr.

9  Winick controlled the trust's decisions?  You said it's

10  relevant because the trust transferred that property to Mr.

11  Winick's daughter.

12         MR. BANNON:  And in the first instance, Your Honor,

13  Mr. Winick continued to use the property after he had

14  transferred it to the trust in all the ways that showed the

15  incidences of ownership that you would expect of the owner of a

16  property, which rendered the trust nothing more than a nominee

17  for Mr. Winick during the time period.

18         THE COURT:  So it sounds like you're not arguing that

19  Mr. Winick legally had the power to control the -- the trust's

20  actions?

21         MR. BANNON:  Your Honor, I would reserve the right to

22  argue that based on what's in the trust agreement, but I don't

23  standing here right now.  I'm not positive whether there was

24  something in the trust agreement that would provide for that.

25         THE COURT:  But you're asking me to infer that that

1  may have been the case as a practical matter?

2          MR. BANNON:  The inference would be drawn based on

3  the fact that he maintained beneficial use of the property, he

4  paid the mortgage on it, he paid the expenses on it, so on and

5  so forth.

6          THE COURT:  Mr. Yan?

7          MR. YAN:  We object to that.  As Your Honor pointed

8  out, there's no evidence that he facilitated the transfer at

9  all.  It was the trust's property, not Mr. Winick's property,

10 and the trust transferred it to Mr. Winick's daughter.  As to

11 his beneficial use of the property, that was pursuant to a

12 lease.

13         THE COURT:  I'm going to admit the document into

14 evidence, but for what it's worth, I'm going to reserve on

15 whether it's entitled to any weight.  And I'll leave it to the

16 two of you to argue and maybe to put in your post-trial briefs,

17 argument about whether I should infer -- on what -- whether I

18 should infer or not that Mr. Winick directed the transfer of

19 the property to his daughter, or whether there's any other

20 relevance of the value of the property.

21              (Plaintiff's Exhibit 4 entered into Evidence)

22         MR. YAN:  Sure, Your Honor.  And I don't

23 think there's a need for an inference.  We'll talk about it in

24 his -- when I examine him.

25 BY MR. BANNON:

1  Q    I'd like to turn to page 1125 of plaintiff's exhibit 4.

2  The Hamptons house was worth over $3 million when the trust

3  transferred it to your daughter, right?

4  A    I guess so.

5  Q    And at the time of this transfer, you owed the IRS

6  millions of dollars, right?

7  A    Yes.

8  Q    Now let's talk about another asset that you transferred to

9  your daughter.  Can you look at plaintiff's exhibit 22?  This

10 document reflects that you gave your daughter shares in WTN

11 Realty Corp. on December 18th, 2012, right?

12 A    Yes.

13 Q    And WTN was a company that owned shares of Winick Realty

14 Group, right?

15 A    Yes.

16 Q    So in effect you transferred partial ownership of Winick

17 Realty Group to your daughter, right?

18 A    Yes, it was the year that they were reducing the gift tax

19 everybody thought from 5 million to 1 million, so my financial

20 advisors told me that I should do this.

21 Q    And when you made this transfer, the shares that you

22 transferred were worth $4 million, right?

23           MR. YAN:  Objection.  Facts not in evidence.

24           THE WITNESS:  I don't know what it was worth, but

25 that's what they estimate it was worth.

1  BY MR. BANNON:

2  Q    If you look at this document, it reflects that you

3  believed that the shares were worth $4 million, right?

4            MR. YAN:  Objection.  Mischaracterizes the document.

5            THE COURT:  Okay, let's pause.  Which exhibit?

6            MR. BANNON:  This is plaintiff's exhibit 22.

7            THE COURT:  Can you repeat the question, please?

8            MR. BANNON:  Yes.

9  BY MR. BANNON:

10 Q    This document --

11           THE COURT:  And, Mr. Winick, don't answer it because

12 I want to resolve your lawyer's objection to the question.

13 BY MR. BANNON:

14 Q    Mr. Winick, you signed this document, right?

15 A    Yes.

16 Q    And in this document you signed to the phrase, "In making

17 this transfer it is my intention to give stock having the value

18 of $4 million and believe this stock has such a value," right?

19 A    That's what I signed.

20 Q    And so when you transferred your shares of WTN to your

21 daughter, you believed that the shares had a value of $4

22 million, right?

23 A    I believe that's what I was told.

24 Q    Your daughter didn't pay anything for these shares, right?

25 A    No.

1  Q    This was a gift?

2  A    Yes.

3  Q    But at the time you transferred the shares you hadn't been

4  making estimated tax payments for 2012, right?

5  A    I guess not.

6  Q    And you were on track to owe a large amount of tax

7  liabilities for 2012, right?

8  A    Yes.

9  Q    And you've stated that the reason you gave these shares to

10 your daughter was for estate planning purposes in the event

11 that you died, right?

12 A    Yes.

13 Q    But you could have just left those shares to your daughter

14 in your will, right?

15 A    It's what I was told by my financial advisors.

16 Q    You didn't just leave it in your will, right?

17 A    No.

18 Q    In addition to the Southampton house and the WTN stock,

19 you gifted to your daughter life insurance premiums, right?

20 A    Yes.

21 Q    And you gave her $90,000 per year in life insurance

22 premiums in 2012, 2013, 2014, and 2015, right?

23 A    Yes.

24         MR. YAN:  Objection.  I don't think the numbers are

25 right.  I would ask that you show the numbers to put into

1  evidence.

2         MR. BANNON:  Yeah.  We can we can take a look at

3  joint exhibit 19.

4  BY MR. BANNON:

5  Q    This is your gift tax return for 2012, right?

6  A    Okay.  Yes.

7  Q    And if we turn to page 356 of this document, --

8         MR. BANNON:  Can we turn it sideways?

9         MS. FIGUEROA:  Yeah.

10        THE WITNESS:  I see it.  It's upside down, but I can

11 see it.

12 BY MR. BANNON:

13 Q    You can see it?  This reflects a $90,000 payment to your

14 daughter for the life insurance premiums in 2012, right?

15 A    Yes, but I think --

16 Q    And if we did turn to joint exhibit 20, --

17 A    I don't know what this has to do with anything.  The trust

18 was formed in 1999.

19 Q    I'm here to ask the questions today, Mr. Winick.

20        THE COURT:  Just answer the question, sir.

21        THE WITNESS:  Okay.

22 BY MR. BANNON:

23 Q    Looking at the first page of joint exhibit 20, this is

24 your gift tax return for 2013, right?

25 A    That's what it says.

1          MR. BANNON:  And if we turn to page 363?

2     BY MR. BANNON:

3     Q    This shows that you paid $90,000 in life insurance

4     premiums for your daughter's benefit in 2013, right?

5     A    Yes.

6          MR. BANNON:  And if we could turn to joint exhibit

7     21?

8     BY MR. BANNON:

9     Q    This is your gift tax return for 2014, right?

10    A    Yes.

11         MR. BANNON:  And if we can turn to page 370?

12    BY MR. BANNON:

13    Q    This shows that you paid $90,000 in life insurance

14    premiums for your daughter's benefit in 2014, right?

15    A    Yes.

16         MR. BANNON:  And if we get turned to joint exhibit

17    22?

18    BY MR. BANNON:

19    Q    This is your gift tax return for 2015, right?

20    A    Yes.

21    Q    And if we look at page 377, this shows that you paid her

22    $90,000 in life insurance premiums in 2015, right?

23    A    Oh, yes.

24    Q    In 2016 and 2017 you gifted her even more, $150,000 per

25    year in premiums, right?

1  A     I don't remember.

2            MR. BANNON:  Let's look at joint exhibit 23.

3  BY MR. BANNON:

4  Q     This is your gift tax return for 2016, right?

5  A     Yes.

6            MR. BANNON:  And if we could turn to page 384?

7  BY MR. BANNON:

8  Q     This shows that you paid $140,000 towards life insurance

9  premiums for the benefit of your daughter in 2016, right?

10 A     If that's what it shows, yes.

11           MR. BANNON:  And if we look at plaintiff's exhibit

12 61?

13           THE WITNESS:  Yeah.

14 BY MR. BANNON:

15 Q     This is your gift tax return for 2017.  And on page 398,

16 this shows that you paid $140,000 in premiums for the benefit

17 of your daughter in 2017, right?

18 A     Can you turn it the way I could read it?  I keep on

19 looking at it upside down?

20           MR. BANNON:  Yeah.  Give us a moment.

21                      (Pause)

22 BY MR. BANNON:

23 Q     Can you see now that this reflects that you paid $140,000

24 in premiums for your daughter in 2017?

25 A     Yes.

1  Q    And in -- so, in 2016 and 2017 your payments for these

2  insurance premiums for your daughter went up significantly even

3  though your salary had gone down, right?

4  A    I don't remember when.

5  Q    In 2018 you -- rather than giving insurance premiums, you

6  just gave your daughter $85,000 in cash, right?

7  A    I'm not sure of your question.

8  Q    Did -- in 2018 did you give your daughter $85,000 in cash?

9  A    I'm not sure what you're relating to.

10 Q    Did -- are you saying you don't understand my question or

11 you're not sure if --

12 A    I'm not sure I -- did I give her a check?  Did I give her

13 cash?  I'm not --

14 Q    I'll direct your attention to plaintiff's exhibit 60.

15 This is your gift tax return for 2018, right?

16 A    (No verbal response.)

17 Q    And if we turn -- if we turn -- well, do -- if we turn to

18 page 391 of this exhibit, -- and I can give you a

19 (indiscernible) it's sideways here.

20 A    I could see it.  Okay.

21 Q    This document reflects that you gifted your daughter

22 $85,000 in cash in 2018, right?

23 A    Yes.

24 Q    So in total between 2012 and 2018 you gave your daughter

25 over $500,000 in life insurance premiums in cash, right?

1  A    I paid the life insurance.  I didn't give it to her in

2  cash.

3  Q    But you contributed to the life insurance?

4  A    Yes.

5  Q    And again you say this was for estate planning purposes,

6  right?

7  A    In case I died.

8  Q    And every year you were giving your daughter these gifts,

9  you were continuing to accrue large tax liabilities, right?

10 A    Yes.

11 Q    Now I want to take a look at another asset and I'll start

12 by showing you what's been entered into evidence as joint

13 exhibit 24-7.  In this document you formed the Danielle Winick

14 2012 Trust in September 2012, right?

15 A    Yes.

16 Q    And the primary beneficiary of that trust was your

17 daughter, right?

18 A    Yes.

19 Q    And now I want to show you what's been entered into

20 evidence as joint exhibit 28.  This is the operating agreement

21 for Winick Realty Group New Jersey, right?

22 A    Yes.

23 Q    And according to the first couple paragraphs there, Winick

24 Realty Group New Jersey was formed around August of 2012,

25 right?

1  A     Yes.

2  Q     Winick Realty Group New Jersey was an affiliate of your

3  company that managed brokering operations in New Jersey, right?

4  A     It's a second company, yes.

5  Q     But it conducted Winick Realty Group's business in New

6  Jersey?

7  A     Yes.

8  Q     You've never been an owner or a part owner in Winick

9  Realty Group New Jersey, right?

10 A     No.

11 Q     But I want to direct your attention to page 463 of this

12 exhibit.  This page reflects that the trust you formed for the

13 benefit of your daughter owned 74 percent of Winick Realty

14 Group New Jersey when it was formed, right?

15 A     Yes.

16 Q     Now let's take a look back at page 449 of this exhibit.

17 If you look at Section 5.1, even though you weren't an owner of

18 the company, you were the company's Administrative Manager,

19 right?

20 A     Yes.

21 Q     And you were vested with authority over "all decisions

22 concerning the business affairs of the company," right?

23 A     Yes.

24 Q     So you created the Danielle Winick 2012 Trust to own an

25 interest in Winick Realty Group New Jersey, but took no

1  personal ownership interest in that company, right?

2  A    Repeat the question.

3  Q    You created the Danielle Winick 2012 Trust so that it

4  would own interest in Winick Realty Group New Jersey and you

5  wouldn't own an interest, right?

6           MR. YAN:  Objection.

7           THE WITNESS:  I didn't -- I didn't need the --

8           MR. YAN:  I don't -- Jeff.

9           THE WITNESS:  There was no reason for me to --

10          MR. YAN:  Jeff.  Jeff.

11          THE WITNESS:  No.

12          MR. YAN:  I object.  I don't think he's established

13 that Mr. Winick created the trust in order to own the interest

14 in the company.

15          THE COURT:  Why don't you rephrase it?

16 BY MR. BANNON:

17 Q    You formed the Danielle Winick 2012 Trust in the fall of

18 2012, right?

19 A    The trust -- my trust -- the trustee for Danielle Winick

20 formed it.

21 Q    When you say the trustee formed it, you had to enter the

22 trust agreement in the first instance to form of the trust,

23 right?

24 A    I guess so.

25 Q    And that trust immediately took an ownership interest in

1  Winick Realty Group New Jersey, right?

2  A     Yes.

3  Q     And I'm asking did you create the Danielle Winick 2012

4  Trust so that it could own a share Winick Realty Group New

5  Jersey, and that you wouldn't have to take a personal ownership

6  interest in the company?

7  A     There was no reason for me to own the company.

8  Q     So a trust owned it instead?

9  A     So my daughter or the trust owned it.

10 Q     Your daughter was in college at the time, right?

11 A     She worked part-time.

12 Q     At the time you formed the Danielle Winick 2012 Trust you

13 are substantially behind on your estimated tax payments for

14 2012, right?

15 A     I wasn't behind on my 2012 taxes until the end of 2012.

16 Q     But you hadn't been making throughout that year the

17 quarterly estimated payments that would be required for you to

18 stay current, right?

19 A     I guess so.

20 Q     Now, I want to show you plaintiff's exhibit 40.

21         MR. YAN:  Zach, I think it says exhibit 40 is

22 withdrawn.

23                         (Pause)

24         MR. BANNON:  Let's see if we could ask this question

25 without the exhibit.

1 BY MR. BANNON:

2 Q    In 2016 the Danielle Winick 2012 Trust assigned its

3 interest in the company to your daughter directly, right?

4 A    I guess so.

5 Q    And your daughter didn't pay for the -- the company, did

6 it -- did she?

7 A    Pay for what company?

8 Q    When the trust assigned its interest in the company,

9 Winick Realty Group New Jersey, to your daughter, did she pay

10 for it?

11 A    I don't know.

12 Q    Did you consent to the transfer of --

13 A    I guess so.

14 Q    -- the property?  And when the trust made the transfer

15 with your consent, you owed the IRS significant liabilities,

16 right?

17 A    Yes, but I'm not sure what your question is -- I'm

18 answering the right question.  I didn't control the trust.

19 Q    But as the Administrative Manager of Winick Realty Group

20 New Jersey, you have to consent to the transfer.

21 A    Yes, I consented.

22 Q    Yes.  And when you did that you owed the IRS a significant

23 liability, right?

24 A    Yes.

25 Q    So I wanted to summarize some of the transfers that were

1  made to your daughter over the years.  Okay?

2  A    Okay.

3  Q    You've stated that they were all motivated by estate

4  planning, right?

5  A    Yeah.

6  Q    Around 2002 you transferred your Southampton house into a

7  trust for your daughter while you continued to use the house,

8  right?

9  A    Yes.

10  Q    And in 2012 you established a trust for your daughter that

11  owned most of the New Jersey affiliate of your company, right?

12  A    Yes.

13  Q    And in 2012 you gifted your daughter shares in WTN, which

14  owns Winick Realty Group, right?

15  A    Yes.

16  Q    And between 2012 and 2018 you gifted your daughter over

17  $500,000 in cash and life insurance premiums, right?

18  A    Yes.

19  Q    And in 2016, one of the trust's you created gave its

20  interest in Winick Realty Group New Jersey to your daughter,

21  right?

22  A    I signed off on it.

23  Q    And in 2016, the other trust you created gave your

24  daughter the house in the Hamptons, right?

25  A    That was given by the trustee.

1  Q    But the trust did give the interest in the property to

2  your daughter at that time?

3  A    Yeah, but not me.

4  Q    When each one of those transfers was made you either owed

5  the IRS back taxes or had fallen behind on your estimated tax

6  payments for the year in question, right?

7  A    I guess so.

8  Q    But is it your position here today that you weren't

9  thinking about your tax liabilities when you made any of those

10 transfers?

11 A    No.

12 Q    No, it's not your testimony or no, you weren't thinking

13 about your liabilities?

14 A    I wasn't thinking about my liabilities?

15 Q    Do you claim that it wasn't your goal to pay less taxes

16 when you transferred the property to your daughter?

17 A    No.

18 Q    You do claim that?

19 A    Can you repeat your question?

20 Q    Was it your goal to pay less taxes when you transferred

21 that property to your daughter?

22 A    What property?

23 Q    The home to the trust, Winick Realty Group into -- Winick

24 Realty Group New Jersey into the trust that you formed for her,

25 WTN, the life insurance premiums, all of these transfers?

1    A    I'm not sure of your question.

2    Q    Were any of the transfers we just discussed, of Winick

3    Realty Group New Jersey, of WTN, of the life insurance

4    premiums, and of the Southampton home motivated by a desire to

5    pay less taxes?

6    A    No.

7    Q    Okay.  Now, let's talk about a few other valuable assets

8    that you owned during the relevant time frame.  Before 2012 you

9    owned an interest in a company called 987 8th Avenue, LLC,

10   right?

11   A    Yes.

12   Q    And that company owned an interest in a commercial

13   building, right?

14   A    A retail condo.

15   Q    And let's take a look at what's been entered into evidence

16   as plaintiff's exhibit 23.  Okay.  If you look at the top, this

17   document is dated September 2012, right?

18   A    Yes.

19   Q    And if you look at the next page on the screen, page 2284,

20   it reflects that you sold your interest in 987 8th Avenue, LLC

21   for $2 million, right?

22   A    Yes.

23   Q    And this is money that you earned in addition to being a

24   real estate broker that year, right?

25   A    Yes.

1  Q    Now I want to show you plaintiff's exhibit 28 at page

2  3272.

3          MR. BANNON:  And, Your Honor, I can provide a copy.

4  It's one of -- it's an excerpt from one of those very long

5  exhibits.

6          THE WITNESS:  Okay.

7  BY MR. BANNON:

8  Q    So I want you to take a look at this sixth check on this

9  page.  Do you see it?

10 A    Hm-hm.

11 Q    It's the one that's highlighted on the right.

12 A    Yes.

13 Q    After you sold your interest in 987 8th Avenue, LLC you

14 used about half of the money to pay your 2011 tax liabilities,

15 right?

16 A    Yes.

17 Q    But you didn't use any of it to pay your 2012 taxes,

18 right?

19 A    I don't believe so.

20 Q    In fact, if you look at each of the subsequent checks on

21 this page, in the week after you sold your interest in the

22 company, you wrote yourself seven checks for a total of $1

23 million, right?

24 A    Yes.

25 Q    And what were those checks for?

1  A    Gambling.

2  Q    Now I want to show you what's been entered into evidence

3  as plaintiff's exhibit 21.  You previously owned 30-foot boat,

4  right?

5  A    Yes.

6  Q    And you sold the boat for almost $20,000 on September

7  30th, 2014, right?

8  A    Yes.

9  Q    You didn't use that money to pay the IRS either, did you?

10 A    I don't remember.

11     MR. BANNON:  Can we take a look at joint exhibit 5 at

12 page 1702?

13 BY MR. BANNON:

14 Q    Does this page reflect that you made any payments to the

15 IRS after you sold your boat on September 30th, 2014?

16 A    I don't know what the miscellaneous payments are.  We

17 still had an agreement for payments.

18 Q    I'm directing your attention to the time period beginning

19 September 30th, 2014.

20 A    I'm not seeing the names of (indiscernible).

21 Q    Just one second.

22 A    September what?

23 Q    We'll highlight the relevant portion for you.

24     MS. FIGUEROA:  (Indiscernible)

25     MR. BANNON:  Ah.  This is -- yeah, there.

1          MS. FIGUEROA:  (Indiscernible)

2          THE WITNESS:  What's your question again?

3          MS. FIGUEROA:  (Indiscernible)

4          MR. BANNON:  And then scroll back.

5          MS. FIGUEROA:  There?

6          MR. BANNON:  Okay.

7    BY MR. BANNON:

8    Q    Does this document reflect that you made any payments to

9    the IRS immediately after you sold your boat on September 30th

10   of 2014?

11   A    What year did I sell my boat again?

12   Q    What's that?

13   A    When did I sell my boat again?

14   Q    September 30th, 2014.

15   A    I guess -- I guess not.

16   Q    Between 2012 and 2020 did you ever own a car?

17   A    No.

18   Q    In the same time period did you ever have a personal lease

19   for a car?

20   A    I had -- the company leased the cars.

21   Q    You didn't have any leases that were taken out under your

22   own name?

23   A    No.

24   Q    Okay, but during that time Winick -- Winick Realty Group

25   leased numerous Mercedes Benzes, right?

1  A    Yes.

2  Q    Now, I want to show you plaintiff's exhibit 38 and I want

3  you to take a look at the first page of it.  If you look at the

4  vehicle information in the upper right-hand corner, this is a

5  lease for a 2017 Mercedes E300, right?

6  A    Right.

7  Q    And in the upper left-hand corner can you see that it's a

8  three-year lease --

9  A    Yes.

10 Q    -- starting in 2018?

11 A    Yes.

12 Q    And the total cost on the right side of the document

13 towards the middle was about $23,000, right?

14 A    Yes.

15       MR. BANNON:  Now, if we could turn to page 1302?

16 BY MR. BANNON:

17 Q    You signed this lease on behalf of Winick Realty Group,

18 right?

19 A    Yes.

20       MR. BANNON:  Now if we could turn to the next page,

21 1303?

22 BY MR. BANNON:

23 Q    This is a three-year lease on a 2014 Mercedes GL550 that

24 the company took out in 2014 for almost $60,000, right?

25 A    Yes.

1          MR. BANNON:  And if we could turn to page 1306?

2    BY MR. BANNON:

3    Q    This is a three-year lease on a 2011 Mercedes GL550 that

4    the company took out in 2011 for about $40,000, right?

5    A    Yes.

6          MR. BANNON:  And on page 1399?

7          THE WITNESS:  Excuse me?

8    BY MR. BANNON:

9    Q    I'm pulling up another page.  This is a three-year lease

10   on a 2015 Mercedes S550 V4 that the company took out in 2015

11   for about $70,000, right?

12   A    I guess so.

13         MR. BANNON:  And now let's turn to page 1313.

14   BY MR. BANNON:

15   Q    This is a three-year lease on a 2016 Mercedes SL550 that

16   the company took out in 2015 for about $65,000, right?

17   A    Yes, but we didn't have all these cars at the same time.

18   Q    Understood.  They all are covering different time periods.

19   I agree.

20   A    Okay.

21         MR. BANNON:  Finally, let's look at page 1317.

22   BY MR. BANNON:

23   Q    This is a three-year lease on a 2013 Mercedes SL550 that

24   the company took out in 2013 for about $65,000, right?

25   A    Yes.

1  Q    Now, you testified that you haven't owned or leased any
2  personal vehicles since 2012, right?
3  A    Yes.
4  Q    But you treated the company cars as if they were your
5  personal vehicles, right?
6  A    I used them 95 percent of the time for company businesses.
7  Q    But they were the only vehicles that you drove for your
8  personal -- as a personal matter too, right?
9  A    Yes.
10  Q    And you treated them like they were your own, right?
11  A    No.  One was for a driver for -- that worked for the
12  company.  Another one was -- one was a sports car, okay, and
13  one was, I think, a sedan, okay.  And I drove one and when we
14  -- I would work seven to six days a week in the wintertime and
15  I would drive to Long Island and the Boroughs because we did
16  deals all over.  So I was always using the car.  The only time
17  I used to car personally was when I went to Long Island.  My
18  driver had -- there was a driver that everybody used in the
19  company and the company would also -- if they needed my car,
20  they -- the car that was leased just to me, they would use that
21  one also.
22  Q    But you treated all three cars like they were your
23  personal vehicles, right?
24            MR. YAN:  Objection.  Misstates his testimony.
25            MR. BANNON:  I'm not stating his testimony.

1          THE COURT:  I will allow the question.

2          THE WITNESS:  Did I treat what -- repeat the

3 question.

4 BY MR. BANNON:

5 Q    Did you treat all three vehicles that Winick Realty Group

6 owned at any -- or leased at any point in time as your personal

7 vehicles?

8 A    Not relevant.

9          MR. BANNON:  Let's take a look back at page 1302.

10 BY MR. BANNON:

11 Q    If you look in the bottom right-hand corner, you

12 personally guaranteed Winick Realty Group's leases, right?

13 A    Yes.

14 Q    That's your signature?

15 A    Yes.

16          MR. BANNON:  And if we can turn to the next page?

17 BY MR. BANNON:

18 Q    In the -- towards the upper left-hand corner, the company

19 listed the cars' principle garage locations as your house in

20 Southampton, right?

21 A    Yes.

22 Q    And now I want to take a look at joint exhibit 24-4.

23 A    Okay.

24 Q    This is an automobile insurance policy, right?

25 A    Yes.

1  Q    And it lists the 2015 Mercedes S550 and 2016 Mercedes

2  SL550 we just discussed as the insured vehicles, right?

3  A    Yes.

4  Q    If you turn to the next page of this document it lists you

5  and your daughter as the only authorized drivers, right?

6  A    They have it as additional insured, yes.

7  Q    I'm sorry.  I didn't catch that.

8  A    They have us as insured, yes.  It doesn't stop somebody

9  else from driving it.

10        MR. BANNON:  Now let's take a look at plaintiff's

11 exhibit 52.

12 BY MR. BANNON:

13 Q    This is an online article based on an interview you gave a

14 reporter in 2014, right?

15 A    Yes.

16        MR. BANNON:  And if we can turn to the bottom of page

17 6?

18 BY MR. BANNON:

19 Q    The reporter asks you, "Do you have a collection of cars?"

20 Right?

21 A    Yes.

22 Q    And on the top of the next page, you responded, "I have

23 three cars.  I love my Mercedes convertible."  Right?

24 A    Yes, I was puffing myself up.

25 Q    You didn't own any cars at the time, right?

1  A    No.

2  Q    And you didn't personally lease any cars, right?

3  A    No.

4  Q    So you were referring to your company cars when you made

5  this statement, right?

6  A    Yes.

7  Q    And the Mercedes convertible that you loved would have

8  been the 2013 SL550 that the company has leased for --

9  A    I guess so.

10 Q    -- $22,000 a year, right?

11 A    I guess so.

12         MR. BANNON:  Your Honor, I probably have an hour to

13 go through, maybe 45 minutes.  I would be happy to break for

14 lunch or we can just go straight through.

15         THE COURT:  Mr. Yan?

16         MR. YAN:  I defer to the group.  I think it might

17 help to take a lunch break at this point.

18         THE COURT:  I think we've been going almost four

19 hours, so I think this is a good time for a lunch break.  Why

20 don't we break for an hour and I'll see you back in an hour.

21         MR. BANNON:  Thank you.

22         MR. YAN:  Thank you, Your Honor.

23                    (Recess)

24         COURT CLERK:  All rise.

25         THE COURT:  Please be seated.  Let's talk one second,

before we resume Mr. Winick's testimony, about scheduling. So,
I'm told we could go past five. We could go as late as six if
we absolutely had to. But, there's a downside in doing that.
We lose an hour -- my colleague here, who's overseeing the
transcript at five and as a result we'd probably have a
perfectly good transcript between five and six, but it might
not be quite as perfect as it would be with -- with, you know,
active oversight.

So, I'd prefer not to go back -- go past five if we
could avoid it. We can not go past six. If we are going to
stop at five, whatever the stop time is going to be, I'd like
to stop the testimony a few minutes before the end and spend a
few minutes at that point talking about scheduling. I think
I've -- actually, I can fill you in now about my schedule for
the week. I have a few conflicts on a few afternoons this
week.

I think I've told you all about them, but it's
possible some are new. So, let me just mention those, so
everyone is on the same page. So, tomorrow I have a conflict
at one, and so we have to end tomorrow at noon. On Wednesday I
have a hearing at three. So, if people want to work through
lunch on Wednesday, we can go as late as two, or -- or we could
take a lunch break and go until -- come back and go until 2:30.
Thursday we're not on, right. And Friday, I don't have any
conflicts but it -- it sounds like it's day that probably isn't

1  going to go super long, because it's just -- it's -- it's

2  Doctor -- is it Weinstock, or --

3           MR. YAN:  Yes, it's Doctor Weinstock, Your Honor.

4           THE COURT:  Doctor -- Doctor Weinstock, Yeah.

5           MR. YAN:  And -- and, Your Honor, Mr. Bannon and I

6  spoke before we took a break.  It seems to me that we're

7  probably be done with Mr. Winick by tomorrow.  I mean, I would

8  be surprised if it went past tomorrow.  So, we may not have any

9  issues with Wednesday and Thursday.

10          THE COURT:  And, then after Mr. Winick -- I don't

11  think you have anymore witnesses.

12          MR. YAN:  That's right.

13          THE COURT:  And, I don't think any witnesses are on

14  your list, but I guess there's only the question as to whether

15  you want to call a rebuttal witness.

16          MR. YAN:  No, we don't plan on any further witness

17  after Mr. Winick.

18          THE COURT:  Okay.  So, after Mr. Winick is done then

19  -- then we're done with all the factual part of the record and

20  we're leaving just the two expert witnesses?

21          MR. YAN:  That's right.

22          MR. BANNON:  That's correct.

23          THE COURT:  Okay.  All right, so it sounds like the

24  odds are quite good that we don't need Wednesday?  Is that

25  right?

1          MR. YAN: I think that's right.  Yes.

2          THE COURT:  If we just -- we come back on Friday and

3   then we come back again on Wednesday, November 1st?

4          MR. YAN:  Correct.

5          THE COURT:  Okay.  Any issues -- housekeeping type

6   issues, scheduling issues that either of you would like to

7   raise?

8          MR. YAN: No, Your Honor.

9          MR. BANNON:  No.

10         THE COURT:  All right, let's continue with Mr.

11  Winick's testimony.  Proceed.

12                      DIRECT EXAMINATION

13  BY MR. BANNON:

14  Q    Good afternoon, Mr. Winick.  Do you recall before the

15  break we were having a discussion about Winick Realty Group,

16  New Jersey --

17  A    Right.

18  Q    -- and the transfer of that from the trust to your

19  daughter in 2016?

20  A    Yes.

21  Q    I'd like to direct your attention to joint Exhibit 24 at

22  Page 1148.

23         THE COURT:  Can you please say that again?

24         MR. BANNON:  It's joint Exhibit 24 at 1148.  And,

25  that is one of the exhibits that is not reproduced in full in

1  your binder, Your Honor.

2            THE COURT:  Oh, okay.

3            MR. BANNON: You have an electronic copy of is, but

4  not a paper copy.

5            THE COURT:  Okay.

6            MR. YAN:  But, it should be on your screen, Your

7  Honor.

8            MR. BANNON:  Yes.

9            THE COURT:  Ah -- ah, very good, thank you.

10  BY MR. BANNON:

11  Q    Do you recognize this document to be the document by which

12  the trust transferred it's interest in W -- in Winick Realty

13  Group, New Jersey, to your daughter?

14  A    Yes.

15  Q    And, at the bottom, is that your signature?

16  A    Yes.

17  Q    And, you consented to that transfer as the administrative

18  manager of Winick Realty Group, New Jersey, right?

19  A    Yes.

20  Q    Okay.  Next, I'd like to show you what's been admitted

21  into evidence as plaintiff's Exhibit 36.  This document

22  reflects that cancellation of an insurance policy for

23  collectibles in 2015, right?

24  A    Yes.

25  Q    And, if you look at the second page, Page 45, before you

1  cancelled this policy, you had insured jewelry worth over

2  $500,000 in total, right?

3  A    Yes.

4  Q    And, if you turn to the fourth and fifth pages --

5  A    I have it.

6  Q    There's a fifth page as well.  Just a moment.

7  A     You had 40 different pieces of jewelry insured at the

8  time, right?

9  Q    But, by the time you filed for bankruptcy five years

10 later, you only had two pieces of jewelry left, right?

11 A    Yes.

12 Q    That was your two Rolex watches?

13 A    Yes.

14 Q    And, that's because you had given all the other jewelry

15 away to your daughter and others, right?

16 A    Yes, I don't know what happened to the lighters.

17 Q    But principally, you gave the other --

18 A    Yes.

19 Q    --  pieces away to your daughter and others?

20                          (No audible response)

21 Q    You didn't sell any of the jewelry to sell your taxes,

22 right?

23 A    No.

24 Q    Let's talk a little bit more about the two Rolex watches I

25 just mentioned.  I want to show you what's been introduced into

1  evidence as Joint Exhibit 1.  This is your bankruptcy petition,

2  right?

3  A    Yes.

4  Q    And, if you turn to the 46th page of the exhibit, which is

5  titled Declaration About An Individual Debtor Schedule.

6  A    Yes.

7  Q    Do you see that you signed under penalty of perjury, that

8  you had read the summary and schedules filed with the

9  declaration?

10  A    Yes.

11  Q    And, that they are true and correct?

12  A    Yes.

13  Q    Did you in fact review the schedules to your bankruptcy

14  petition before you signed it?

15  A    I believe so.

16  Q    And, if you turn to Schedule A/B which is Page 4 of the

17  exhibit.  One of the things that you swore to, was that you had

18  two Rolex watches worth $5,000, right?

19  A    Yes.

20  Q    When you listed the value of your two Rolex watches as

21  $5,000, you were just guessing, right?

22  A    My lawyer told me to describe you the number because they

23  would -- the -- receiver would either do an appraisal or they

24  would tell me to do an appraisal.

25  Q    I'm guessing -- I'm asking you a different question, which

1  is, when you listed that number, you were just guessing, right?

2  A    That's what my lawyer -- just told me to write it.

3  Q    But, you were guessing?

4  A    Yes.

5  Q    And, before you guessed as to the watches value, you

6  didn't run any internet searches --

7  A    No.

8  Q    -- to see if they would help you determine the value,

9  right?

10 A    No.

11 Q    And, you didn't look at any of your old insurance policies

12 or other paperwork that you had about your watch collection,

13 right?

14 A    No.

15 Q    In fact, you didn't take any steps to try to figure out

16 the watches' value, right?

17 A    No, I just went with what my lawyer told me to put into

18 the form.

19 Q    You just guessed on the spot when your lawyer asked how

20 much they were worth, right?

21 A    No, my lawyer told me to put in $5,000 because either I

22 would have to get an appraisal or the receiver would do an

23 appraisal or tell me to get the appraisal, which eventually I

24 did get the appraisal.

25 Q    Your lawyer told you to put in the $5,000 number?

1  A    Yes.

2  Q    So, that wasn't a number that you came up with?

3  A    No.

4  Q    That was a number that your lawyer came up with?

5  A    Yes.

6  Q    So, is it your testimony here today that your lawyer came

7  up with the $5,000 figure, not you?

8  A    Yes.

9  Q    Let's turn back to, Plaintiff's Exhibit 5 and look at the

10 -- is that what I'm -- no, Plaintiff's Exhibit 36.  At Page 47.

11 In 2015 as we just discussed, you had an insurance policy that

12 covered numerous watches, right?

13 A    Yes.

14 Q    And, many of those watches were Rolexes, right?

15 A    Yes.

16 Q    And, everyone of the watches in your insurance policy was

17 worth more than $5,000, right?

18 A    Now that I see it, yes.

19 Q    In fact, almost every watch was worth more than $10,000,

20 right?

21 A    Yes, but I don't know which ones are mine and which ones

22 were gifts.

23 Q    You didn't take these insurance values into account when

24 you scheduled the value of your watches in your petition,

25 right?

1  A    I don't even know how I made a -- where this paper came

2  from or the insurance.

3  Q    Is it your position that you didn't remember any of these

4  watches or what they were worth when you filed your bankruptcy

5  petition?

6  A    Yes.

7  Q    You've claimed in this case, that you're not an expert on

8  watches or their value, right?

9  A    Yes.

10 Q    I want to direct your attention back to the interview that

11 we discussed earlier, which is Plaintiff's Exhibit 52 at 21.

12 In this interview, the reporter asked you, quote, do you live

13 extravagantly, end quote.  And, you responded, quote, I collect

14 Rolexes, my favorite is the one I'm wearing which is the

15 cheapest one they make, right?

16 A    Yes.

17 Q    So, you told the reporter that you considered yourself a

18 collector of Rolexes, right?

19 A    I was puffing up my, how would you say it, I was building

20 up my prestige.

21 Q    At the time you did own numerous Rolexes though, right?

22 A    No, I had the same two Rolexes, as long as I can remember.

23 The rest I gave away and the rest were gifts, so, womens

24 watches.

25 Q    Back in 2014 you owned more than the two Rolexes though?

1  A    Probably.

2  Q    And, you suggested to the reporter that you knew which

3  Rolex models where cheaper or more expensive than others,

4  right?

5  A    Not as -- I don't believe so.

6  Q    I'd like to direct your attention back to the sentence,

7  "My favorite one is the one I'm wearing, which is the cheapest

8  one they make."  Do you see that?

9  A    Right.

10 Q    That sentence suggests that you know the difference of the

11 values between different Rolex models, right.

12 A    No, I know the difference between a gold and a silver,

13 that gold is worth more than silver.

14 Q    So, you're saying that, that's in relation to the watch

15 you were wearing being silver rather than gold?

16 A    Yes.

17 Q    As part of this case, you submitted a declaration to the

18 Court that discussed this interview, right?

19 A    Excuse me?

20 Q    As part of this -- this case that we're here --

21 A    Right.

22 Q    -- for, you submitted a declaration to the Court that

23 discussed this interview, right?

24 A    I believe so.

25 Q    I'll show you the declaration now.  Looking at the first

1  page of the declaration, you submitted this under penalty of

2  perjury, right?

3  A    Yes.

4  Q    And, if you turn to the last page, Page 7, that's your

5  signature, right?

6  A    Yes.

7  Q    And, if you turn to Page 6, Paragraph 31, you told the

8  Court that you didn't remember making the statements to the

9  reporter, but if you did, they were exaggerations that you

10 probably made to make yourself look good, right?

11 A    Say the same thing now.

12 Q    So, you essentially told the Court that your statement to

13 the reporter wasn't true, right?

14 A    Yes.  They also wrote articles about me that weren't true

15 either.

16 Q    And, the reason that you lied to the reporter was to make

17 yourself look good?

18 A    Yes.

19 Q    But, you want the Court to believe that you're telling the

20 truth here today, right?

21 A    Yes.

22 Q    You claimed that the reason you put $5,000 as the value of

23 your Rolexes was that your bankruptcy lawyer told you to put

24 the best estimate of their value, right?

25 A    He told me to write down $5,000 and that I would get

appraisals after I submitted the papers.  That the Court would

order me to get to get the appraisals.  I'll say it -- either

they'll tell me to get, which I did, or they would do the

appraisals.  Which I sent them copies of my Rolexes and

anything else they requested.

Q    Okay.  So, I just want to be clear on this, your testimony

here today, is that your bankruptcy counsel came up with the

$5,000 number, right?

A    Yes.

Q    I want to direct your attention back to your declaration

at Paragraph 32.  Do you see that when you submitted this

declaration under penalty of perjury, you said, "My bankruptcy

counsel told me put the -- my best estimate as to the value of

my Rolex watches and advised that I should not be too concerned

with the value that I listed, because regardless of what I put,

the Bankruptcy Trustee would not accept that value and would

obtain and independent appraisal?"

A    I just repeated that.  I just said that earlier.

Q    And, you said that your bankruptcy counsel said put your

best estimate, right.

A    He was the one that gave me the number to fill in.  It was

just a place to hold.

Q    So, when you signed the declaration that said that your

bankruptcy counsel told you to put your best estimate, that

wasn't true, right?

1  A    I -- from what I remember he was the one that told me to

2  put in the number.

3  Q    Okay.  It was his estimate then, right?

4  A    I don't know if it was an estimate or just putting in the

5  number for the number because I would have to get an appraisal

6  anyway.

7  Q    Before your bankruptcy lawyer came up with that $5,000,

8  did you tell him that you were a Rolex collector?

9  A    No.  I don't believe so.

10  Q    Did you tell him that you had previously insured over a

11  dozen luxury watches, including Rolexes for over $5,000 each?

12  A    I don't remember the insurance policy until I saw the

13  insurance policy.  And, when I saw the insurance policy -- back

14  when I saw it -- I cancelled it immediately.

15  Q    So, you didn't tell your lawyer that you had that

16  insurance policy?

17  A    I didn't remember having it.  Unless I saw it.  I

18  cancelled it back then.  I didn't know it existed.  I never

19  bought a watch.

20  Q    So, given that your lawyer came up the $5,000 figure, it's

21  fair to say that you didn't take any steps to figure out what

22  your watches were worth?

23  A    No, I listened to my lawyer.

24  Q    Okay.  I want to take a look at Plaintiff's Exhibit 55

25  now.  And, if we can turn to the 20th page.  This is an e-mail

1  from the chief operating officer of Winick Realty Group, Louis

2  Eisinger, to your bankruptcy lawyer dated July 28th, 2020,

3  right?

4  A    Yes.

5  Q    That's about a month before you filed for bankruptcy?

6  A    Yes.

7  Q    Now, lets turn to an attachment on the e-mail, which is

8  Page 28 of the exhibit.  In this document, you had listed

9  $5,000 as your guess for the value of one Rolex watch, right?

10          MR. YAN:  Objection.  Hasn't established that he's

11  the one who listed it?

12          THE COURT:  Can you repeat the question please?

13          MR. YAN:  I can rephrase the question, Your Honor.

14          THE COURT:  Okay.

15  BY MR. BANNON:

16  Q    When Louis Eisinger conveying information to your

17  bankruptcy lawyer, was he doing so on your behalf?

18  A    He was helping me fill out the forms.

19  Q    So, when -- these forms here for instance would've been

20  something that Louis Eisinger helping you with so that you

21  could convey information to your bankruptcy lawyer?

22  A    Yes.

23  Q    And, in this document you listed $5,000 as your guess for

24  the value of one Rolex watch, right?

25          MR. YAN:  Objection.  Hasn't established that he's

1  the one who listed it.

2        THE COURT:  Why don't you rephrase.

3  Q    This document reflects that Louis Eisinger was conveying

4  on your behalf that one Rolex watch was worth $5,000, right?

5  A    That's what it says.

6  Q    But, in your final bankruptcy petition you listed two

7  Rolex watches, right?

8  A    Yes.

9  Q    And, you listed their combined total value as $5,000,

10  right?

11  A    Yes.

12  Q    Now, I want to look at Joint Exhibit 1 again, at Page 1 of

13  Schedule C.  In your bankruptcy schedules you claimed that your

14  Rolexes were fully exempt from the bankruptcy estate, right?

15  A    Yes.

16  Q    And, if you had listed a higher value for them, they might

17  not have been exempt, right?

18  A    I have no idea.  This is what my lawyer told me to do.

19  Q    Okay.  I want to discuss a different piece of property an

20  LLC called SDSDR111.  You had a minority interest in the LLC,

21  right?

22  A    Yes.

23  Q    And, that entity held an interest in a retail space in an

24  apartment building?

25  A    A retail condo.

1  Q    And, there was a pharmacy that was a long term tenant of

2  that retail space, right?

3  A    Duane Reade/Walgreens.

4  Q    Sitting here today, you know that since May 2014, the

5  I.R.S. has had an perfective lien against all of your property,

6  right?

7  A    I don't remember that.

8  Q    But, sitting here today, do you know that, that's true?

9  A    Yes.

10 Q    That includes your interest in the LLC, right?

11 A    Now I understand that, but I don't remember having the

12 lien.

13 Q    I want to direct your attention to Joint Exhibit 6 now.

14 This document reflects that a man name David Burley loaned you

15 $500,000 in January 2015, right?

16 A    Yes.

17 Q    Mr. Burley was a good friend of your's right?

18 A    And, business associate.

19 Q    But, he was a good friend?

20 A    Yes.

21 Q    And, if you look at the bottom of the first page, Mr.

22 Burley's loan was secured by a first priority lien in

23 collateral, right?

24 A    Yes.

25 Q    That collateral was your interest in SDSDR111.

1  A    Yes.

2  Q    Now, I want to show you Page 125, Lines 15-22 of your

3  deposition, which has been entered into evidence in the

4  governments case in chief as a deposition designation.  You

5  testified at your deposition that you borrowed money from Mr.

6  Burley to help you pay your taxes, right?

7  A    I believe that's what I told him.  I -- I believe that's

8  what I told him.

9  Q    You believe that's what you told Mr. Burley?

10 A    Yeah.

11 Q    But, you don't believe that, that was actually the reason

12 that you borrowed the money from him?

13 A    I don't remember, but from when I go back on the records

14 now, it was for gambling.

15 Q    But if you read your deposition testimony, under oath, you

16 swore that the loan was to help you catch up with your taxes,

17 right?

18 A    That's what I thought.

19 Q    But you don't think that anymore?

20 A    No.

21 Q    You didn't use the loan to pay back the I.R.S. did you?

22 A    Let the record show was I lost it gambling.

23 Q    You've claimed in this matter that you did not know that

24 the I.R.S. had a lien in your interest in the LLC when you

25 granted a security interest in Mr. Burley, right?

1  A    Yes.

2  Q    But, as Mr. Harrison testified the morning, I.R.S. records

3  reflect that a revenue officer told your accountant Scott

4  Broder, in April and May of 2014, that a lien would be filed

5  against you, right?

6  A    I'm not sure he told me anything, because he wasn't my

7  accountant that long.  He really didn't want my bankruptcy --

8  not my bankruptcy -- my -- the tax thing -- he wanted the

9  company business.  And, we wouldn't give him the company

10 business so basically we let him go.  I let him go.

11 Q    But, you don't personally have a basis to dispute that the

12 I.R.S. informed him of it's intent to file a lien, right?

13 A    I don't have anything that -- they didn't inform him.  I'm

14 not sure I was informed.  I -- I just don't remember.

15 Q    And you don't -- you don't have any basis to dispute that

16 the I.R.S. informed Mr. Broder once the lien had been filed,

17 right?

18 A    I believe what the I.R.S. is saying and what they conveyed

19 to Mr. Broder -- to me -- once I didn't give him the business,

20 he didn't really care about me, so.

21 Q    The I.R.S. mailed the lien directly to you by certified

22 mail, right?

23 A    That's what he said, I don't remember seeing it one way or

24 the other.

25 Q    Do you have any basis to dispute that it was sent to you

by certified mail?

A     No.

Q     And, the letter was not returned to the I.R.S. as undeliverable, right?

A     I don't know, but -- I just don't remember.

Q     Is it possible that you just forgot about receiving the I.R.S. lien notice, given the passage of time?

A     Definitely forgot about it.

Q     That you could've known at the time, but have forgotten between 2014 and the present, right?

A     Yes.

Q     Now, I want to review the basic terms and payments of your loan from Mr. Burley.  Lets turn back to Joint Exhibit 6 and look at Page 2392.  If you look at the first paragraph, the -- the -- the paragraph numbered one.  The loan required only interest payments until a maturity date of November 2015, right?

A     Yes.

Q     And, under Paragraph 2, the note allowed Mr. Burley to demand full payment if you ever missed an interest payment, right?

A     Yes.

Q     And, between 2015 and 2020, you missed several payments, right?

A     Yes.

1  Q    And, you never made any principal payments on the loan,

2  right?

3  A    Not on this loan.

4  Q    Not on this secured loan?

5  A    Right.

6  Q    You had another loan from Mr. Burley that you did make

7  principal payments, right?

8  A    I had an additional two loans.

9  Q    But, even though you had missed several interest payment

10 and never made principal payments on this loan, Mr. Burley,

11 extended the maturity date of the loan several times, right?

12 A    Yes.

13 Q    And, over the years Mr. Burley increased the size of the

14 loan twice, first to $1.5 million and then to about $1.6

15 million, right?

16 A    No.  $1.5 and then when he didn't even know the interest

17 that I accrued was in that million 6.

18 Q    Right, so --

19 A    But, he only gave me a million five.  And, then what we

20 didn't know was the additional interest that he hadn't paid

21 before.

22 Q    Yeah, he -- he increased the size of the loan to $1.5

23 million and then when you had missed some interest payments, he

24 --

25 A    Right.

1  Q    -- he has wrapped those interest payments

2  A    Yes.

3  Q    -- back into the principal of the loan.  And, before 2020,

4  even when you missed interest payments, Mr. Burley never called

5  an event of default, right?

6  A    No, he used to ask me kidding around, like when are you

7  going to pay it, and I said just when -- hopefully I'll make a

8  hit one day and I'll pay you back.

9  Q    And you understood that the reason that he wasn't calling

10 an event of default and he was increasing the size of your loan

11 and extending the maturity date was because he was your good

12 friend, right?

13 A    Yes.

14 Q    But, by June 2020, you were contemplating filing for

15 bankruptcy, right?

16 A    I -- I don't know if it was June, July, August -- sometime

17 in I think July.

18 Q    If I could direct your attention to your declaration at

19 Paragraph 9.

20 A    It said June, July, August, so it's saying the same thing.

21 Q    In -- in your declaration before the Court, you swore that

22 you had started thinking about bankruptcy in June 2020, right?

23 A    I have been thinking about bankruptcy in June '20, but did

24 not decided to go through with the filing until August.  Like I

25 said, June, July, August.

1  Q    So, you started thinking about it in June 2020 and then by

2  August you decided to actually do it?

3  A    Yes.

4  Q    On July 19, 2020, after he had extended you additional

5  credit, extended the loan maturity date numerous times and

6  overlooked missed interest payments for five years, Mr. Burley

7  called an event of default on your loan, right?

8  A    Yes.

9  Q    And, to repay the loan, on July 24, 2020, you signed a

10 consent to foreclosure surrendering your interest in SDSDR111

11 LLC to him, right?

12 A    Yes.

13 Q    And, that was just a month before you filed for

14 bankruptcy, right?

15 A    Yes.

16 Q    You've claimed in this case, that you did not discuss your

17 potential bankruptcy filing with Mr. Burley before you

18 surrendered your interest with him, right?

19 A    Yes.

20 Q    I want to turn back to Plaintiff's Exhibit 55 and look at

21 the 21st page of that document.  Towards the top of the page,

22 do you see an e-mail from Louis Eisinger to a William Hammond

23 dated July 27th, 2020?

24 A    Yes.

25 Q    Mr. Hammond was Mr. Burley's lawyer, right?

1 A    Yes.

2 Q    And, both you and Mr. Burley are copied on this e-mail to,

3 right?

4 A    Yes.

5 Q    In this email, Mr. Eisinger is conveying on your behalf

6 the foreclosure notice for the SDSDR interest, right?

7 A    Yes.

8 Q    And, Steve Wilamowsky is also copied on this e-mail,

9 right?

10 A    Yes.

11 Q    That was your bankruptcy lawyer, right?

12 A    Yes.

13 Q    I have just a few more questions about your financial

14 relationship with Mr. Burley.  In addition to the secured loan

15 we just dicussed, Mr Burley gave you an unsecured loan for

16 $250,000 in 2018, right?

17 A    Yes.

18 Q    Let's take a look at Plaintiff's Exhibit 47.  This is a

19 letter agreement between Winick Realty Group's president, you

20 and David Burley dated November 1st, 2019, right?

21 A    Yes.

22 Q    In this letter you agreed that Mr. Burley's company could

23 forgo paying you real estate commissions in exchange for

24 commensurate forgiveness on either the secured or the unsecured

25 loans, right?

1  A    Yes.

2  Q    And, you used this arrangement to fully pay the unsecured

3  loan in February of 2020, right?

4  A    Yes.  And, I declared taxes on the money that was taken

5  out.

6  Q    But, you never made -- used this arrangement to make

7  payments on the secured loan, right?

8  A    No.

9  Q    In fact, in May of 2020, Mr. Burley waived his right to

10  receive about $50,000 pursuant to this agreement, right?

11  A    I'm not sure --

12  Q    I'll direct you --

13  A    -- which agreement you're talking about.

14  Q    The agreement to forgo commissions in exchange for loan

15  forgiveness.

16  A    Can you say that again?

17  Q    I'll show you an exhibit.  Let me direct your attention to

18  Plaintiff's Exhibit 42.  Plaintiff's Exhibit 43, my apologies.

19  This is an e-mail from Bill Hess, the C.F.O. of Mr. Burley's

20  company and you, dated May 18th, 2020?

21  A    Yes.

22  Q    And, it reflects that Mr. Burley is giving you a one time

23  waiver of the terms of the agreement we just discussed, with

24  respect to you have a $52,000 commission, right?

25  A    Yes.

1  Q    Before you gave up your interest in it, you received

2  periodic distributions from SDSDR111, right?

3  A    Yes.

4  Q    And, in the few years leading up to your bankruptcy you

5  received hundreds of thousands of dollars in distributions,

6  right?

7  A    I don't know how many hundreds of thousand, but yes.

8  Q    If I represented to you that your K-1s for the company

9  reflected over $400,000 in payments, would you --

10 A    Yes.

11 Q    Now, lets take a look at Joint Exhibit 25-3.  In the first

12 sentence of the fourth paragraph -- this document reflects that

13 your interest of the LLC had an estimated value of $2.5 million

14 dollars in April 2017, right?

15 A    Yes.

16 Q    That was the most recent valuation of that interest that

17 you had at the time you surrendered the interest to Mr. Burley,

18 right?

19 A    In -- he -- yes.

20 Q    And, you surrendered this interest to your friend in

21 satisfaction of a $1.6 million loan, right?

22 A    Yes.

23 Q    Did you try to sell the LLC interest for cash?

24 A    No, my partners didn't want it?

25 Q    Did you try to find other buyers to sell it for a higher

1  price so that you could use additional money to pay the I.R.S.?

2  A    Any buyer would have to be approved by the partnership.

3  Q    So, you didn't do that?

4  A    No.

5  Q    And, did you inform the I.R.S. before you surrendered the

6  interest to David Burley?

7  A    No, I didn't remember the I.R.S. had a lien and David

8  Burley had a lien so.

9           MR. BANNON:  I have no further questions.

10           MR. WINICK:  Excuse me?

11           MR. BANNON:  No further questions.

12           MR. YAN:  Your Honor, if we could take like a ten

13  minute break so we can get set up.

14           THE COURT:  Okay, yes, ten minute break.

15           MR. WINICK:  Do I go back to my seat?

16                (No audible response)

17                    (Recess)

18           THE COURT CLERK:  All rise.

19           THE COURT:  Be seated please.  All right.  We've got

20  tech issues?

21           MR. YAN:  I think we're good, Your Honor.

22           THE COURT:  Okay.  Mr. Winick --

23           MR. YAN:  I hope so.

24           THE COURT:  Okay.  You may resume the -- the

25  stand.

CROSS EXAMINATION

BY MR. YAN:

Q    Jeff would you mind adjusting your microphone so we can hear you.  Good afternoon, Jeff.

A    Good afternoon.

Q    Can you please state your full name for the record?

A    Jeffrey Winick.

Q    Where do you live?

A    420 East 54th Street, New York, New York 10022.

Q    How old are you?

A    73.

Q    Are you taking any medications?

A    A lot of medications.

Q    What are you taking?

A    Medicines for my kidney, diverticulitis, colitis, diabetes, pain medications for a nervous condition, my back and neck, blood thinners.  I have stents.  Lung inhalers.

Q    Does any of that medication effect your ability to testify truthfully or accurately?

A    No.

Q    Is there anything that would prevent you from testifying truthfully or accurately?

A    No.

Q    Let's start by talking about your background a little bit. Where were you born?

1  A    Brooklyn.  New York.

2  Q    Have you lived in the New York metropolitan area all your

3  life?

4  A    Yes.

5  Q    What is the highest level of education that you've

6  obtained?

7  A    High school.

8  Q    Did you graduate from high school?

9  A    Yes.

10  Q    What did you -- when did you start working?

11  A    Like around 18.

12  Q    What were you doing at the time?

13  A    My family was in the trimming business in the garment

14  center.  They had me work there with my father and grandmom.

15  Q    What did you do there?

16  A    I was a sales person for selling trimmings to special

17  companies who just -- manufacturing companies -- we would do

18  ruffled laces and belts that wouldn't come in the garments that

19  he would buy in the store with the belts already on it.

20  Q    How long did you do that for?

21  A    About six to eight months.

22  Q    What did you do afterwards?

23  A    I was on my own womens -- ladies belt line and started

24  selling it to the retailers.

25  Q    How long did you do that for?

1   A    Six years.

2   Q    What did you do after that job?

3   A    I don't remember but, I mean, the next big thing I did was

4   real estate.

5   Q    What did you do in real estate when you first started?

6   A    I met somebody that bought the tenants rights, which means

7   that, if a building was going -- or a condo -- and you couldn't

8   afford to buy the apartment, she would buy the apartment --

9   let's say you live in a two bedroom apartment, then she would

10  offer $50,000 to $100,000 and she would flip it before the --

11  building would co-oped to another party.  Of course, back then,

12  there were two plans.  There was a 35 percent eviction plan on

13  conversions and a 15 percent -- more than 15 percent, but under

14  35 percent -- you couldn't evict the tenants.  So, if tenants

15  couldn't afford -- we would take the money and would flip it to

16  the next buyer.  We were like buying the tenant's right and

17  then flipping them.

18  Q    How long did you do that for?

19  A    A couple years.

20  Q    What did you do after that?

21  A    I started renting apartments in New York.  Furnishing them

22  and renting them out and I had a residential brokerage company.

23  Q    How long did you have that company for?

24  A    Couple of -- couple of years, five years I guess.

25  Q    What did you do after that?

1  A    I went into the retail business and I opened up Winick

2  Realty Group.

3  Q    Why did you go into the retail business?

4  A    Didn't like residential.

5  Q    Any particular reason why?

6  A    No.

7  Q    What does Winick Realty do?

8  A    We specialize in retail leasing.  We also do warehouse

9  leasing and office leasing.  But, I would say 75 to 80 percent

10  of our business is retail.

11  Q    In 2012 to 2016 what was your position at Winick Realty?

12  A    I think it was CEO or CO.

13  Q    Were you a broker as well?

14  A    Yes.

15  Q    I think you testified this before, but how much time were

16  you spending managing the company as opposed to brokering?

17  A    Probably 90 percent brokering.

18  Q    What about your compensation?  How much of that came from

19  management versus brokering?

20  A    I was getting a salary of $325,000 a year and the rest was

21  all commissions.

22  Q    How much did you work?

23  A    Excuse me?

24  Q    How much did you work when you were at Winick Realty?  In

25  the 2012 to 2020 period?

1  A     Five to six days a week.

2  Q     Did you enjoy your job?

3  A     I love my job.

4  Q     What do you love about it.

5  A     I'm a deal junkie.

6  Q     Are there down sides to your job?

7  A     Are there down sides?

8  Q     Yes.

9  A     Up until I lost my biggest client in 2016 which was

10 Walgreens of Duane Reade it was on the upside.  I mean, I

11 represented some of the biggest companies in the United States.

12 Q     Who did you represent?

13 A     Duane Reade/Walgreens, Chase Manhattan Bank, joined the

14 mergers with Manny Hanny and Chemical Bank.  We represented

15 Mobil/Exxon, Block Buster.  We still represent, not me but the

16 company represents AT&T and Chipotle.

17 Q     Of those names, who was your biggest client?

18 A     Duane Reade/Walgreens.

19 Q     How much revenue was Duane Reade/Walgreens generating for

20 your company?

21 A     Not the net revenue, but over 35 years, $350 million

22 gross.

23 Q     Are they still a client?

24 A     No.

25 Q     What happened?

A     When Duane Reade got sold for the fifth time, probably --
they went public, non-public.  Walgreens bought them and -- I
think in 2011 -- and Walgreens gave me a five year contract to
continue what I was doing, which was basically doing all their
leasing, subleasing and help run their real estate department.

Q     What happened at the end of that five year contract?

A     They went with National Broker and didn't renew my
contract.

Q      What was the financial effect of losing Walgreens/Duane
Reade as a client?

A     Drastic.

Q     Can you quantify how drastic it was?

A     It was probably 60 percent of my income, 70 percent of my
income.

Q     Did you ever make up for that loss with other clients?

A     No.

Q     Let's talk about your commissions.  How does your
commissions work?

A     The company bills out whatever it is and depending where I
am, but I would say I would average about 70 percent of the
gross commissions and I would dispute -- distribute my 70
percent to -- there's two levels, one -- hypothetically we did
$10. million a year.  Some of it might be a co-broke, other
brokers that we get after commissions.  So hypothetically, we
netted two and a half million dollars, then -- seven and a half

1 million dollars.  I would get 70 percent and of 70 percent I

2 would disperse it to brokers who helped work on the accounts

3 with me.

4 Q    What happened to the other 30 percent of that?

5 A    House gets -- house would always get at least 30 percent.

6 Q    And, by house, you mean Winick Realty.

7 A    Yes.

8 Q    How did you land Duane Reade as a client?

9 A    First met them -- well, now it's not 35 years, probably 40

10 years ago, when they had 40 stores and I met the original three

11 owners.  One of the brothers on 125th Street in Harlem.

12 Q    And, how were you able to keep them as client for so long?

13 A    When they sold the company they recommended me to the

14 chairman of the board who was expanding the company.  And,

15 every time there was another chairman of the board they would

16 introduce me to the next predecessor.  I was social with them.

17 I became friendly with them.

18 Q    Can you describe the extent of your social interactions

19 with them?

20 A    We would have dinner every other week, once a month.  I

21 saw them probably at lease once a week.  We had real estate

22 committee meetings at their office at 40 Wall Street every

23 other week.  We would spend every other Saturday, except in the

24 summer times, looking -- going on the -- between -- the bus,

25 looking at 10 to 20 sites on a Saturday.  I dealt with

1   everybody in the real estate department.  I dealt with the

2   lawyers that were negotiating half of Duane Reade and I was

3   really -- they looked at me for my experience and negotiating

4   the leases.

5   Q    How do you get business generally?

6   A    Well, during the Duane Reade times, I happened to be

7   representing Chemical Bank, which brought Manny Hanny and they

8   wanted to get rid of a bunch of sites, so I guess that was my

9   inlay into Duane Reade, because I leased a bunch of those sites

10  to Duane Reade and Starbucks that Manny Hanny got -- Chase got

11  rid of when they bought Manny Hanny and the same thing when

12  Chase bought Chemical Bank.  The same thing that Duane Reade

13  and Starbuck took a lot of these sites.  And, then Chemical --

14  then Chase Bank started using me for their own new sites and

15  relocations.

16  Q    Do you have a network of real estate contacts?

17  A    Yes.

18  Q    Is it a large network?

19  A    It grew a large network between referrals -- I still get

20  referrals on tenants going to different companies and I still

21  get referrals from landlords I represent to other landlords.

22  Q    How much of your business is obtained through referrals?

23  A    75-80 percent today.

24  Q    And, what about the other business.  How do you get that?

25  A    People call on my signs on properties where my name is.

1 But, they call out on brokers.  Whoever brings in the property

2 usually puts their name on it, depending on the size of the

3 property and stuff.  A lot of times I won't put my name on it.

4 It's too small for me to take the calls.

5 Q    Switching gears for a second, do you have family?

6 A    Yes.

7 Q    Who?

8 A    I have daughter who is my best friend.

9 Q    Where you married at one point?

10 A    I was married for like two years.

11 Q    When did you divorce?

12 A    After two years.  28 years ago -- 27 years ago.

13 Q    And, is your daughter the only child from that marriage?

14 A    Yes.

15 Q    How old was your daughter when you divorced?

16 A    2 or 3.

17 Q    And, what is your relationship with your daughter like?

18 A    We -- I used to spend all the time with her as she was

19 growing up, more and more and more.  She lived with me for, I

20 think, two or three years when she had a big fight with her

21 mother when she was like 14 or 15.

22 Q    Can I ask you to just speak up a little bit so that the

23 audio is clear.

24 A    Okay.

25 Q    Is your daughter the person you are closest with?

1  A    Yes.

2          THE COURT:  Mr. Winick, if you move the mic you might

3  be able to sit --

4          MR. WINICK:  Can we move these books?

5          UNIDENTIFIED SPEAKER:  Exactly.

6          THE COURT:  Can we move those books?

7          UNIDENTIFIED SPEAKER:  It's taking up the whole --

8          MR. YAN:  I just want to make sure the audio is

9  clear.

10         THE COURT:  Yeah, no -- I --

11         MR. WINICK:  The books are in my way Your Honor.

12         THE COURT:  Right, so there -- there you go.  You can

13 sit -- whatever is most comfortable.

14         MR. WINICK:  Okay, that better?

15         MR. YAN:  Much better. Thank you.

16 BY MR. YAN:

17 Q    Did Covid-19 affect Winick Realty?

18 A    Basically shut us down.

19 Q    What do you mean by shut you down?

20 A    Landlords wouldn't be -- tenants were all leaving and not

21 paying their rents, so landlords weren't paying the

22 commissions.  Nobody was there out looking for properties and

23 most landlords wouldn't let you show the properties either.

24 But, we were basically shut down for six months.

25 Q    Was Winick Realty a leasing property at the time?

1  A    Not really.

2  Q    Did Winick Realty have a lease on its own property?

3  A    Yes.

4  Q    And, was it able to make it's rent payments?

5  A    No.

6  Q    What did it do then?

7  A    We were -- I think we were paying half the rent and we

8  ended up settling to half the size floor in the same building

9  and we have -- there's a certain amount of time that they got

10 to stay there before they could move.  But, they got to ask --

11 go to their landlord -- but basically, I think they're still on

12 the hook for half a million dollars in liabilities from Covid.

13 Q    Can I ask you to move the microphone a little bit closet

14 to you.  Thank you.  How did Covid effect new deals?

15 A    Can you repeat the question?

16 Q    Sure, how did Covid effect deal flows in your business?

17 A    It was terrible.  Landlords were not getting paid by the

18 tenant.  Tenants -- landlords were trying to pay their

19 mortgages and the last person that they ever were paid was the

20 brokers.  Also, a lot of the tenants went out of the business

21 during the time so we never got our final commissions.  Some

22 landlords we had to sue.

23 Q    Was the amount of revenue that Winick Realty was getting

24 at the time, did that go down?

25 A    Yes.

1  Q    Did your own compensation go down?

2  A    Drastically.

3  Q    What do you mean by drastically?

4  A    I think that was mentioned earlier that '17 I made $2.5

5  million.  I know '20, '21, and '22, I probably averaged like

6  625.

7  Q    625,000?

8  A    625,000.  I mean, it was 500, 000 in '20, 600,000 '21, and

9  around 700 in '22.  Probably be the same this year.

10 Q    Do you expect to make more money next year?

11       MR. BANNON:  Objection, relevance.

12 A    What year we talking about?

13       MR. YAN:  We're talking about his compensation and

14 how Covid affected his business.

15 A    No, what year --

16       THE COURT:  I'll allow the question.

17 Q    Sure.  The question was, do you expect to make more money

18 next year?

19 A    You mean '24?

20 Q    Well, I mean for this -- yes, 2024?

21 A    I'm -- do I expect to make more money in the rest of '23?

22 Q    Yes?

23 A    Possibly.

24 Q    How is the commercial real estate sector these days?

25 A    Not the same.  Commissions are down because the real

1  estate value went down and we get paid based on rents.  Like on

2  a ten-year lease, we get a percentage of it.  Rents are

3  probably half what the market was.

4  Q    How many brokers are working at Winick Realty now?

5            MR. BANNON:  Objection, relevance.

6            MR. YAN:  It just goes to the effect of Covid.

7            THE COURT:  Okay.  We're reaching the outer bounds of

8  relevance, so let me just ask you to move it along.

9            MR. YAN:  Sure.  Will do.

10 Q    Do you recall when you filed for bankruptcy?

11 A    In August --

12 Q    Why did you file?

13 A    I think August 2020.

14 Q    Why did you file at that time?

15 A    I basically had no income coming in from Covid and I

16 didn't know how to pay off my IRS debts in New York State.

17 Q    We just looked at your petition, right?

18 A    Yes.

19 Q    And on your schedules, you listed to Rolex watches,

20 correct?

21 A    Yes.

22 Q    Were those the only two Rolexes you had the time?

23 A    Yes.

24 Q    How many Rolex watches have you owned over the years?

25 A    Maybe a dozen.  I'm not sure.

1  Q     Have you owned luxury watches other than Rolexes?

2  A     No.

3  Q     What about other non-luxury watches?

4  A     No.

5  Q     Do you consider yourself knowledgeable about Rolex

6  watches?

7  A     Excuse me?  No.

8  Q     Do you consider yourself knowledgeable about Rolex watch

9  values?

10 A     No.

11 Q     Do you know what factors go into determining the value of

12 a Rolex watch?

13 A     I never bought a watch.

14 Q     How did you get your watches?

15 A     From -- most of them from Mohegan Sun in Connecticut,

16 which they gave me -- when I went gambling, they would give me

17 points and I would use the points to go shopping.

18 Q     Is Mohegan Sun a casino?

19 A     It's a gambling casino in Connecticut.

20 Q     Were all the Rolex you acquired over the years from

21 gambling?

22 A     I believe so.

23 Q     Did you ever purchase a Rolex watch with U.S. dollars?

24 A     Not that I recall.

25 Q     Did you ever sell a Rolex watch for U.S. dollars?

1  A     No.

2  Q     Before your bankruptcy, did you ever get any of your Rolex

3  watches appraised?

4  A     No.

5  Q     Before your bankruptcy, had you ever shopped for Rolex

6  watches online?

7  A     No.

8  Q     Do you consider yourself a Rolex collector?

9  A     No.

10  Q     Remember we looked at the jewelry insurance policy that

11  you had?

12  A     Yes.

13  Q     Why did you get that policy?

14  A     Probably more for my daughters jewelry, when she wasn't in

15  the house anymore.  She was I think going to college.  But, I

16  don't even remember why I got it or when I found out what it

17  was costing, I cancelled it.

18  Q     Prior to that cancellation, had you gotten previous

19  jewelry policies?

20  A     I don't believe so.

21  Q     And since cancelling that one, had you gotten further

22  jewelry policies?

23  A     No.

24  Q     Do you recall why you cancelled that policy?

25  A     I didn't even know I had it.

1  Q    Do you remember anything about the process of getting your

2  jewelry insured?

3  A    No.  The only think I can remember is it might have been a

4  list -- I don't know the list came about, but it might have

5  been everything that I got at Mohegan Sun.

6  Q    So you think the list was from the casino?

7  A    Yes.

8  Q    Did the insurers send someone to your house to look at all

9  the pieces?

10  A    No.

11  Q    Can we pull up PX-36 please?  Scrolling down to the

12  declarations page, do you see on the right side there is a

13  column for amount insured?  Do you know how --

14  A    Yes.

15  Q    Do you know --

16  A    I don't know if that's the amount insured.  Yeah, okay,

17  the amount insured.

18  Q    Do you know how those amounts were calculated?

19  A    Like again, I think this list came from Mohegan Sun.

20  Q    Right, but in terms of the amounts insured, do you know

21  how those amounts were calculated?

22  A    I think these were the retail prices of the points I used

23  to purchase them I guess.

24  Q    But you're speculating?

25  A    Yes.

1  Q    Did all the jewelry that's listed in PX-36 belong to you?

2  A    No.

3  Q    Can you put out some of the ones you think belong to other

4  people?

5  A    All the diamonds, all the earrings.  There's a bunch of

6  women's watches here.  I don't know what's what.

7  Q    Looking at this page, can you tell if the two Rolexes that

8  are listed on your bankruptcy schedules are listed on this

9  list?

10  A    I'm sure they are.

11  Q    But can you tell which one they are?

12  A    Not really.

13  Q    Can you point to the exact numbers of the two items that

14  were your watches that you listed?

15  A    Unless I went back to the appraisal, no.

16  Q    Before you filed for bankruptcy, did you know that Rolexes

17  had model numbers?

18  A    No.

19  Q    You testified that you didn't look at this document before

20  you filed your bankruptcy schedules, is that right?

21  A    Yes.

22  Q    Why didn't you look at it?

23  A    Didn't know I had it.

24  Q    Did your bankruptcy attorney ask for a jewelry policy?

25  A    No.

1  Q    Your bankruptcy attorney was Mr. Steven Wilamowsky?

2  A    Yes.

3  Q    What did you tell him about your watches?

4  A    I told him I had two watches.

5  Q    Did you tell him where you got them from?

6  A    Yes.

7  Q    What did you tell him?

8  A    I got it from Mohegan Sun.

9  Q    Did he ask for any other information about your watches?

10 A    No.

11 Q    Did Mr. Wilamowsky tell you to do any research on your

12 watches before scheduling them?

13 A    No.

14 Q    Did he tell you to check the internet for prices?

15 A    No.

16 Q    Did you ever think to do a Google search on your own?

17 A    No.

18 Q    How computer savvy are you?

19 A    I know how to read e-mails.  I know how to send e-mails.

20 I can redline documents and stuff like that.

21 Q    Do you know how --

22 A    I can't do Excel.  I have people do that for me.

23 Q    And who are the people that do that for you?

24 A    My secretary, Louis, the other brokers in the office.

25 Q    Do you know how to use Microsoft Word?

1  A    I don't type my own letters.  I would take documents and

2  mark them up and they would redline them.  I know how to read.

3  I don't know how to use Microsoft Voice or Google, or what do

4  you call it, the when you have Zoom.  That, I don't know how to

5  do.

6  Q    Did Mr. Wilamowsky ever tell you to look at other source

7  of information to confirm whether 5,000 was a good number or

8  not?

9  A    No.  What he told me was to put down two -- just put down

10 the numbers and then they're going to request me to get my own

11 appraisal or they'll get their appraisal.  I mean, eventually I

12 got the appraisals so I just don't understand why he didn't

13 tell me just to go get the appraisal.  I got it within three

14 days after the Court asked me to get it.

15 Q    At the time you scheduled your watches as being worth

16 5,000, did you know that they were worth something else?

17 A    No.

18 Q    Did you believe that they were worth something else?

19 A    I had no idea.

20 Q    Why did you claim an exemption on your schedules for your

21 watches?

22 A    Because my attorney told me I could.

23 Q    By scheduling your watches as being worth 5,000, did you

24 attempt to defraud anyone?

25 A    No.

1  Q    Do you recall that we looked at the e-mails that Mr.

2  Eisinger sent to Mr. Wilamowsky?

3  A    Yes.

4  Q    And those attached workbooks, correct?

5  A    Yes.

6  Q    Did you fill out those workbooks?

7  A    Did I fill them out?  I guess Louis helped me fill them

8  out.

9  Q    Did you personally fill them out, did you type it in?

10  A    No.

11  Q    Did you ever tell Mr. Eisinger that you only had one Rolex

12  watch?

13  A    No.

14  Q    Did you ever tell Mr. Wilamowsky that you only had one

15  Rolex watch?

16  A    No.

17  Q    How many watches did you tell them you had?

18  A    Two.

19  Q    Let's talk about SDSR111, okay?

20  A    Yes.

21  Q    Will you understand if I call it SDS for short?

22  A    Yes.

23  Q    At one time you had an ownership interest in SDS, right?

24  A    Yes.

25  Q    What was your ownership interest?

1  A    I think 20 percent.

2  Q    How did you acquire that interest?

3  A    I put together -- I found the property, which was a retail

4  master lease and I put Duane -- I had Duane Reade as a tenant

5  and Duane Reade wanted it.  They knew that I was getting a

6  finder's fee in a pretty position, so I got a carried interest

7  of my 20 percent.

8  Q    So the carried interest was kind of finder's fee, right?

9  A    Yes.

10 Q    You didn't actually contribute capital in terms of money

11 --

12 A    So, yes, it was 25 percent.  I'm sorry.

13 Q    Okay.  So, my question was, you didn't contribute any

14 capital, right?

15 A    No.

16 Q    At some point you pledged your interest to Mr. Berley,

17 right?

18 A    Yes.

19 Q    And what is your relationship to Mr. Berley?

20 A    I represent him in his billings and he's also became a

21 good friend in the last 10 years.

22 Q    How long have you known him?

23 A    10-12 years.

24 Q    How much business did he do with you?

25 A    Looks like he did like a couple hundred thousand a year.

1  Q    And did he do business personally or through a company?

2  A    Through Walters & Samuel.

3  Q    And it's his business?  Is he on the tenant side, landlord

4  side, something else?

5  A    He's the landlord.

6  Q    You borrowed 500,000 from Mr. Berley, right?

7  A    Yes.

8  Q    What was the purpose of the borrowing?

9  A    Well, I know what I told him that I actually used it for

10 taxes, but I have to use it for gambling.

11 Q    Did he know you were a gambler?

12 A    Yes.

13 Q    How did he know that?

14 A    He went on a bunch of gambling trips with me.

15 Q    Where did you go?

16 A    Bahamas, Las Vegas for the shopping center convention,

17 Foxwoods and Mohegan Sun in Connecticut.

18 Q    Did Mr. Berley have a gambling problem?

19 A    No.

20 Q    And you pledged SDS as collateral for that loan, correct?

21 A    Yes.

22 Q    Why did you pledge that interest?

23 A    He asked me if he could take a lien out on it and I said

24 yeah.  I didn't know I had a lien against it.

25 Q    But you granted him a first lien on your interest?

1   A    I gave him a lien.  I didn't know there was anything

2   existing.

3   Q    At the time you granted him a lien, did you think that

4   there was already a lien on that?

5   A    No.

6   Q    Did Mr. Berley file a lien against you?

7   A    Yes.

8   Q    Do you recall the IRS filing a tax lien against you in

9   2014?

10  A    I don't remember.

11  Q    Do you recall ever receiving a notice of a federal tax

12  lien in 2014?

13  A    If I got it, I just don't remember.

14  Q    Do you recall ever telling Mr. Berley that you had tax

15  liens against you?

16  A    I didn't even know I had tax liens against me.

17  Q    Did Mr. Berley ever ask if there were other liens filed

18  against you?

19  A    I don't think so.  He got a lien on it, so.

20  Q    In addition to the million five that you borrowed from Mr.

21  Berley, you also borrowed another 250,000, right?

22  A    Right.

23  Q    Was that loan secured by anything?

24  A    No.

25  Q    Why wasn't that loan secured?

1  A    He wanted me to go with him to the Bahamas and I said to

2  him I didn't have any money and he said, well, I'll lend you

3  250, just come along.  There is -- I forgot --

4  Q    Do you recall looking at the letter of direction that you

5  signed?

6  A    Yes.

7  Q    Whose idea was the letter of direction?

8  A    David Berley.

9  Q    You owed him for two loans, right?

10 A    The 250 was three loans, but consolidated to two.

11 Q    Right, so you owed him, there was a secured loan and there

12 was an unsecured loan?

13 A    Right.

14 Q    Which loan was supposed to be paid first on the letter of

15 direction?

16 A    He wanted the $250,000 back first.

17 Q    He wanted you to pay the smaller loan first?

18 A    Yes, because when we went gambling, if I didn't lose it, I

19 would have just given it back to him and that's what he wanted

20 back first.

21 Q    Did you ever tell him to apply the commissions to the

22 unsecured loan before the secured loan?

23 A    No, that was his idea of giving back the 250.

24 Q    Did you have any control over whether he applied the money

25 he was taking to one loan or the other?

1  A    No.

2  Q    Do you recall that we previously looked at a document

3  where Mr. Berley took your commissions?

4  A    Yes.

5  Q    Do you recall we looked at an e-mail where he was waiving

6  the right to take your commissions?

7  A    Yes.

8  Q    And that was for May 2020, correct?

9  A    Yes.

10 Q    Why was he waiving the right to take your commissions in

11 May 2020?

12 A    Because he understood the circumstances that I didn't have

13 any income in and it was Covid.  It was the height of Covid.

14        MR. BANNON:  Sorry, I didn't catch that?

15 A    I said that he knew that I wasn't getting paid by most of

16 the landlords that owed me money and it was the height of Covid

17 19.

18 Q    And that's the reason why he granted you the waiver?

19 A    Yes.

20        MR. BANNON:  Objection, speculation.

21        MR. YAN:  I don't think it's speculating.

22        THE COURT:  Why don't you try it a different way?

23        MR. YAN:  Sure.  Well, you know, I'll withdraw.

24 We'll move on to the next one.

25 Q    Did you ever pay back the secured loan?

1  A    No.

2  Q    At some point Mr. Berley declared default?

3  A    Yes.

4  Q    Why did he declare default in July of 2020?

5  A    Because he knew I was getting -- I was not going -- I

6  didn't have the money to pay him back.

7  Q    Did you tell him to declare default?

8  A    No.

9  Q    And as a result of your default, he took your interest in

10 SDS, correct?

11 A    Yes.

12 Q    And you signed a consent form giving him the interest,

13 correct?

14 A    Yes.

15 Q    Did you have any input into the consent form?

16 A    No.

17 Q    Did you have any input into when he sent you the consent

18 form?

19 A    No.

20 Q    Did you have any involvement of the drafting of the

21 language of the consent form?

22 A    No.

23 Q    Why did you consent to the foreclosure?

24 A    He had a right to foreclose on the property and he still

25 did this with me.  I didn't want to jeopardize that, so I

1 signed the form.

2 Q    Before you signed the consent, did you ever talk to him

3 about potentially filing for bankruptcy?

4 A    No.

5 Q    Before signing the consent, had you made up your mind as

6 to whether you would file?

7 A    No.

8 Q    Did you ever tell Mr. Berley he should take your interest

9 before you filed for bankruptcy?

10 A    No.

11 Q    At the time you consented, did you remember that the IRS

12 had a lien on your interest?

13 A    No.

14 Q    When you consented to Mr. Berley taking your interest in

15 SDS, did you intend to defraud anyone?

16 A    No.

17 Q    Did you owe taxes as a result of the transfer?

18 A    I wound up owing him $600,000 for 2020 by him taking back

19 the property.

20 Q    Let's talk about some of the other property transfers that

21 you've been asked about.  What is 24 Parrish Pond Lane?

22 A    The beach house that was in trust to my daughter.

23 Q    At some point, did you buy the house in your own name?

24 A    I believe it was (indiscernible) six months or nine

25 months.

1  Q    Other than that house, have you ever owned any other real

2  estate in your own name?

3  A    Residential?

4  Q    Residential or any other type of real estate?

5  A    I own a retail condo on 57th Street and 8th Avenue.

6  Q    Did you own the condo or did you own an interest that?

7  A    Master lease.  It was a master lease.  I had 20 percent.

8  I might have years ago, don't remember.

9  Q    Why did you buy 25 Parrish Pond.

10 A    Because my daughter, we used to rent houses every year,

11 and when my daughter was like 10 she says, why do we keep on

12 renting houses when we're leaving them better than when we got

13 them, let's go look for a house.  Went and looked for a house.

14 We found a house we liked and I bought it for her.

15 Q    The house was eventually transferred to the life insurance

16 trust, correct?

17 A    Yes.

18 Q    Why was that done?

19 A    I wanted my daughter to have a house.

20 Q    Was it your idea to transfer it to the trust?

21 A    It was my finance -- my accountants that advised me to put

22 it in a trust.

23 Q    Do you recall why they advised you to do that?

24 A    No.

25 Q    Was the purpose of the transfer to evade your taxes?

1  A    No.

2  Q    Was the purpose to get an asset out of your name so that

3  creditors couldn't touch it?

4  A    No.  I mean, it was brought almost simultaneously of me

5  signing the contract, closing it, and then transferring it.

6  Q    Was is the Jeffrey Winick 1999 life insurance trust?

7  A    It had life insurance policies on me.  It had the house

8  and the trust.

9  Q    What was the purpose of setting up the trust?

10 A    So one day that something happened to me, my daughter

11 would be okay.

12 Q    Whose idea was it to create the trust?

13 A    My finance advisors and my accountants, I guess.

14 Q    At the time you set up the trust, did you have outstanding

15 tax liabilities?

16 A    I don't believe I had in 2000 -- 1999 and I'm not sure

17 about the date the house was bought.

18 Q    At some point the house was transferred from the trust to

19 your daughter, right?

20 A    From the trust to my -- yes.

21 Q    Do you know why the trust did that?

22 A    I couldn't get a mortgage.  I was the guarantor on the

23 mortgage originally and I couldn't get a mortgage anymore.  The

24 mortgage was coming due, so the trustee transferred to her and

25 she got a new mortgage in her own name.

1  Q    Was she able to make payments in her own name?

2  A    Yes.

3  Q    Did you tell the trustee to transfer the asset to her?

4  A    No.

5  Q    Let's talk about the life insurance payments, premium

6  payments, that you were making.  Were you paying the life

7  insurance premiums from the time you set up the trust?

8  A    Yes.

9  Q    Did you pay every year?

10  A    Yes.

11  Q    And those were gifts to the trust?

12  A    Yes.

13  Q    Did you file tax returns for those gifts?

14  A    Yes.

15  Q    Was the purpose of gifting premiums to put monies out of

16  creditors' reach?

17  A    No.

18  Q    Are you a beneficiary of the trust?

19  A    No.

20  Q    Have you received anything from the trust?

21  A    No.

22  Q    At one point, you also owned an interest in WTN, right?

23  A    Yes.

24  Q    And you gave some of those interests to your daughter,

25  correct?

1  A    Yes.

2  Q    Why did you give your interest to your daughter?

3  A    To protect in the future.  My accounts says that year, you

4  could give up the $5 million because they figure that the gift

5  tax was going down to $1 million, so they advised me I should

6  do the transfer.

7  Q    Was it your idea to do the transfer?

8  A    It was my accountants.

9  Q    Was the purpose of the transfer to evade your tax

10 obligations?

11 A    No.

12 Q    Did you file a tax return for that gift?

13 A    Yes.

14 Q    After the interests were transferred to your daughter, did

15 you get any distributions?

16 A    I don't remember.

17 Q    Did Danielle ever give you a portion of her distributions

18 from those interests?

19 A    I don't remember what the breakdown was on what she owned

20 in WTN and what I owned in Winick, but if there were any

21 distributions, she got her portion and share.

22 Q    Did you ever own an interest in WRG New Jersey?

23 A    No.

24 Q    Your daughter's trust owned an interest in that company,

25 correct?

1  A    Yes.

2  Q    What was the purpose of establishing your daughter's

3  trust?

4  A    I didn't -- it was for the future.  It wasn't for the

5  present.

6  Q    Was your -- was it your idea to set up a trust?

7  A    Probably my accountants again.

8  Q    What type of trust was the -- was your daughter's trust?

9  A    In New Jersey, I'm not sure.

10 Q    But I mean was it a revocable trust or irrevocable trust?

11 A    I'm not sure.

12 Q    Okay.  Did you have powers to control the trust?

13 A    I'm not sure.

14 Q    Was the trust set up so that creditors couldn't attach any

15 interest that you might have had?

16 A    No.

17 Q    We've looked at a document where -- well, let me rephrase.

18 The trust ended up assigning the interest in WRG New Jersey to

19 your daughter directly, correct?

20 A    I believe so.

21 Q    And you signed that as the administrative agent for the

22 company, right?

23 A    Yes.

24 Q    Did you tell the trustee to transfer those interests to

25 your daughter?

1  A    I believe the trustee did everything when she hit a

2  certain age.

3  Q    Well, my question is, did you tell him to transfer it to

4  your daughter?

5  A    No.

6  Q    Did your daughter ever give you any of her distributions

7  from WRG New Jersey?

8  A    No.

9  Q    Can we pull up PX-21 please?  This is a letter confirming

10 sale of a boat, correct?

11 A    Right.

12 Q    Who was the owner of the boat?

13 A    DLW62.

14 Q    Why was the boat sold?

15 A    Didn't want it anymore.

16 Q    Why didn't you want it anymore?

17 A    Well, I didn't want to be on boats that much anymore.

18 Q    Was there a reason for that?

19 A    I got a metal plate in my 5, 6, and 7, from boating.

20 Q    That's your spine?

21 A    Yes, my neck.

22 Q    Your cervical spine?

23 A    Yup.

24 Q    To your knowledge, at the time of the sale, were there any

25 liens on the boat?

1  A    No.

2  Q    Were there any liens on DLW62, LLC?

3  A    No.

4  Q    Did you use the boat after it was sold?

5  A    No.

6  Q    Did you sell the boat to get an asset away from creditors?

7  A    No.

8  Q    What is 987 Eighth Avenue, LLC?

9  A    It was a master lease that I put together the buying of

10 the master lease.  I don't know, there was like maybe 35 years

11 left and Walgreen, Duane Reade, became the tenant.

12 Q    Did you own an interest in the LLC?

13 A    20 percent.

14 Q    How did you get that 20 percent?

15 A    By putting together the deal.

16 Q    That was your carried interest?

17 A    Yes.

18 Q    Who are the other members of the company?

19 A    Steve Baker, Ary Freilich, and Lou Bumber (phonetic).

20 Q    Did you end up selling your interest in the company?

21 A    Yes.

22 Q    And how much did you sell those for?

23 A    Two million.

24 Q    Why did you sell your interest?

25 A    I needed the money.

1  Q    What did you need the money for?

2  A    To pay off the Government and then I had extra money that

3  I blow on gambling.

4  Q    Did you sell your interests so that creditors couldn't

5  attach those interests?

6  A    The only creditors that I have were New York State and

7  IRS.

8  Q    But did you sell them so that you wouldn't have to pay the

9  IRS or New York State?

10  A    I took a million dollars and I paid IRS and New York

11  State.

12  Q    After you sold your interest, did you get further

13  distributions?

14  A    No.

15  Q    Let's pull up PX-28 please.  And, we'll go to Page Winick

16  3271, do you see that document?

17  A    Yes.  Yes.

18  Q    Scrolling down a little bit, there is a $2 million

19  transfer, wire transfer, do you see that?

20  A    Yes.

21  Q    What was that $2 million?

22  A    The sale of my interest.

23  Q    In 987 Eighth Avenue?

24  A    Yes.

25  Q    If we could scroll down to the next page please?  And what

1 did you do with the proceeds of that sale?

2 A    I wrote a check to New York State to --

3 Q    Jeff, could you please speak into the microphone?

4 A    I'm just looking for a minute.  I wrote a check for

5 $909,000 to Treasury Department and $78,000 New York State.  I

6 think that's what I owed them to pay them off for 2011.

7 Q    Do you see that there are other checks under that to you

8 personally?

9 A    Yes.

10 Q    What were those checks for?

11 A    I took those checks to go gamble.

12 Q    Now, the checks that are appearing on this page, did you

13 write them?

14 A    No.

15 Q    Who wrote those checks?

16 A    Louis Eisinger, works for me.

17 Q    Why was Louis writing your checks?

18 A    Louis would take care of all my bills, and checking, and

19 Quickbooks, and stuff like that.

20 Q    Do you know how to access your own Chase account?

21 A    Except for looking for balances on the phone, no.

22 Q    Do you know how to do a wire transfer using your account?

23 A    No.

24 Q    You never wrote your own checks?

25 A    Excuse me?

1  Q    You never wrote your own checks?

2  A    Maybe once in a blue moon.

3  Q    Who is Louis Eisinger?

4  A    He's -- I believe he's CEO of the company now.

5  Q    At one time was he your executive assistant?

6  A    He was -- he started out as a secretary of the company and

7  became my executive assistant, a little over the last 16 years.

8  Q    Did he help you on personal matters unrelated to the

9  company's business?

10 A    He would take care of my paperwork and paying my bills.

11 Q    How would he know what bills to pay?

12 A    I would give him the bills most of the time.

13 Q    Why did you rely on Mr. Eisinger to take care of your

14 personal matters?

15 A    I always had somebody to rely on and keep track of my

16 payments and stuff like that.

17 Q    Why did you have -- why didn't you do it yourself?

18 A    I never did.  I was too busy trying to make more and more

19 money.

20 Q    Before Mr. Eisinger were there other people who would take

21 care of your personal matters for you?

22 A    Other secretaries or assistants.

23 Q    Throughout your career, was that always the case?

24 A    I believe so.

25 Q    Was there ever any tax avoidance reason for asking Mr.

1  Eisinger to perform these tasks?

2  A    No.

3        MR. BANNON:  Objection, leading.

4        MR. YAN:  It's a yes or no question.

5        THE COURT:  I'll allow it.

6  Q    Was there any tax avoidance reason for asking Mr. Eisinger

7  to do these tasks for you?

8  A    No.

9  Q    Was he compensated for helping you with personal matters?

10 A    I would give him bonuses out of my own commissions now and

11 then.

12 Q    Aside from the Parrish Pond property, did you ever own any

13 other real estate, not through a company but through your own

14 personal name, Jeffrey Winick?

15 A    I don't believe so.

16 Q    Why not?

17 A    Whatever monies I had, I didn't do the right thing, but

18 gamble it away.

19 Q    Did you always rent?

20 A    Yes.

21 Q    Where did you rent?

22 A    The last 30 years at 420 54th Street.

23 Q    So you lived in the same building for the last 30 years?

24 A    Yes.

25 Q    Why that building in particular?

1  A     Convenience of my office.  I always got a good deal on the

2  rent there?

3  Q     What do you mean you always got a good deal?

4  A     I was chummy with the owners.  I did business with -- I

5  did business with the owners.

6  Q     Did you ever think that by not owning real estate in your

7  own name, you prevented creditors from attaching things that

8  you owned?

9  A     No.

10  Q    We've looked at the fact that you were also leasing cars

11  through Winick Realty, correct?

12  A    Yes.

13  Q    Why were you leasing cars to the company?

14  A    Because the accountants told me that's how I should do it.

15  Q    And how long had you been doing that?

16  A    Probably my whole life.

17  Q    How many cars did Winick Realty lease?

18  A    At the same time?

19  Q    At the same time at any particular point?

20  A    I think the most, three.

21  Q    Who was allowed to use those cars?

22  A    There was a driver, my daughter, me, and anybody in the

23  company.

24  Q    Were any of the cars exclusively for your use?

25  A    No.

1  Q    Why did you personally guarantee the leases?

2  A    Somebody had to.

3  Q    Are you still personally guarantee of the leases?

4  A    No.

5  Q    Is it because the dealer no longer requires a personal

6  guarantee?

7  A    No.

8  Q    So who's personally guaranteeing them now?

9  A    There's only one car now and my daughter guarantees it.

10 Q    When you used your cars, was it for business or personal

11 use?

12 A    Mostly business.

13 Q    When you used it for personal use, what were you doing?

14 A    Getting up to Long Island, but basically I used the car in

15 the city driving around looking at real estate in the Boroughs,

16 in New Jersey.

17 Q    And Winick Realty also paid for your insurance, right?

18 A    Yes.

19 Q    Why did it do that?

20 A    It was part of my compensation.

21 Q    Why didn't you pay for your insurance yourself?

22 A    It was a company car.

23 Q    Had Winick Realty been paying for your car insurance since

24 you started the company?

25 A    I believe so.

1  Q    How many credit cards did you have in the 2012-2016 time
2  frame?

3  A    Four or five.

4  Q    Were there other people who had accounts that you were
5  paying for?

6  A    My last girlfriend.  This girl Anna and my daughter.

7  Q    Why did you give them access to your cards?

8  A    One, she was my daughter, and everybody had a credit card
9  at the time, and Anna was living with me.

10 Q    Could you move the microphone closer to your face?

11 A    And Anna was living with me and most kids had credit cards
12 at that time.

13 Q    Did you monitor their spending?

14 A    Not really.

15 Q    Did you encourage them to spend your money?

16 A    No.

17 Q    Let's take a look at PX-38(a) please.

18 A    I see it.

19 Q    Sure.  I just wanted to go through some of the entries.
20 The February 2013 entry for about $2500 from AllSaints USA, can
21 you tell who charged that amount?

22 A    I believe my daughter and Anna.

23 Q    What about the next entry down to Claudio Milano?

24 A    It must -- I think -- it must be a women's clothing store.

25 Q    What about from July 2013, the two charges that intermix?

1  A    Probably my daughter.

2  Q    What about there's a few more intermix charges, who spend

3  that money?

4  A    Probably my daughter or Anna.  It's more likely my

5  daughter.

6  Q    Why was your daughter spending so much money?

7  A    She became a shopaholic.

8  Q    Did you do -- does she do anything else besides shopping?

9  A    She ran in highschool a charity called Operation Smile for

10 kids with cleft palates.  She basically was on -- ran the

11 committee for all the private schools in New York.  She did

12 events, raised money.  She went to Vietnam and gave a huge

13 check to the president of Vietnam with Jackie Chan spent two

14 weeks in Vietnam and a week in the operating room.  She did the

15 same thing and went to Bolivia.  She also worked in a couple of

16 charities in New York, Jewish charities, and she used to do

17 some kind of kitchen thing for people, kitchen lines.  So, I

18 mean, she gave back.  She actually got a scholarship because of

19 her humanitarian work.

20 Q    Going back to spending, what about your girlfriend, did

21 you encourage her to spend your money?

22 A    No.

23 Q    Did you ever tell either of them, spend the money now,

24 otherwise creditors are going to get it?

25 A    No.

1  Q    Do you recall that we talked about some of the residence

2  that you were paying for?

3  A    Yes.

4  Q    Other than your own?

5  A    Yes.

6  Q    Why were you paying for an apartment for your daughter?

7  A    I believe that was when she was going to college.

8  Q    Why didn't you ask her to pay her own rent?

9  A    I don't think she was making that kind of money when she

10 was going to college.

11 Q    You were also paying rent for your exwife, right?

12 A    My exwife would call up my daughter and say I'm going to

13 put her on the street, make my daughter miserable and cry, and

14 my daughter would call me up and say you're got to help mom

15 out, and I kept on doing it.

16 Q    Are you still doing it?

17 A    No.

18 Q    When did you stop paying for your exwife's apartment?

19 A    Whenever the records show.  I mean --

20 Q    Is she paying for her own apartment now?

21 A    I think my daughter is helping her out.

22 Q    Was the purpose of paying rent for others so that you

23 could spend your money so that creditors couldn't get your

24 money?

25 A    No.

1  Q    We talked a little bit about your vacations, right?

2  A    Yes.

3  Q    Where did you vacation the most?

4  A    Bahamas and Miami.

5  Q    Why did you go to the Bahamas so often?

6  A    They would usually give me money for airfare, room, board,

7  food, comp everything because I gambled, and a safe place for

8  my daughter growing up.

9  Q    You got into trouble with taxes in early 2000s, right?

10  A    Yes.

11  Q    What happened then?

12  A    Probably gambling.

13  Q    Did you eventually pay those taxes back?

14  A    Yes.

15  Q    How were you able to do that?

16  A    I keep on making more and more money, and I also thought I

17  would eventually catch up, even on the 12 to 16.

18  Q    So are you saying that because you did in the early 2000s,

19  you thought the same could happen with respect to your taxes in

20  the 2010s?

21  A    Yes.

22  Q    Did that plan work?

23  A    Might of worked if Covid didn't come and I didn't lose

24  Walgreens and Duane Reade.

25  Q    You entered into three installment agreements with the

1  IRS, correct?

2  A    Yes.

3  Q    Did you make some payments on those installment

4  agreements?

5  A    Couple of million of dollars.

6  Q    At the time that you were making the installment payments,

7  were you also gambling?

8  A    Yes.

9  Q    Was this the same with respect to your tax liabilities and

10  the -- from the early 2000s?

11  A    Can you clarify the question?

12  Q    Sure.  When you had tax liabilities from the early 2000s

13  --

14  A    Yeah.

15  Q    -- and you were making installment payments --

16  A    Yeah.

17  Q    -- were you still gambling at the time?

18  A    Yes.

19  Q    When you entered into an installment agreement with the

20  IRS, did you ever do so with the intention of not paying it?

21  A    No.

22  Q    Did you intend to fully pay the IRS back?

23  A    Yes.

24  Q    In addition to owing the IRS money, did you owe the State

25  money?

1  A    Yes.

2  Q    How much did you owe the State?

3  A    Couple million of dollars.

4  Q    Did you reach any sort of resolution with the State?

5  A    I think I paid most of the State back until Covid hit.

6  Q    Were you able -- did you have an installment plan with the

7  State?

8  A    Yes.

9  Q    Were you able to pay off the entire installment agreement?

10 A    I thought I did, but I'm not sure.  I think I still owe

11 them like 700,000.

12 Q    And why didn't you pay all of it back?

13 A    I was making my installment agreements until Covid came.

14 Q    Do you recall we looked at an offer and compromise that

15 you submitted in 2016?

16 A    Yes.

17 Q    Why did you submit an offer and compromise?

18 A    I started -- that's when I lost Duane Reade and I started

19 panicking that I needed my income -- would like this go away.

20 Q    And we saw that your income was eventually in the millions

21 of dollars for that year, correct?

22 A    Yes.

23 Q    Did you know that you would earn that income at the time

24 you made your installment -- your offer and compromise?

25 A    I think most of that income came in the second half of

1  that year.

2  Q    Did you know that that income would be coming in at the

3  time you made the offer and compromise?

4  A    Not sure.

5  Q    Let's talk about your gambling, when did you start?

6  A    '18 and '19.

7  Q    What did you start gambling on?

8  A    Blackjack.

9  Q    Do you gamble on anything else?

10 A    Used to go to the horses but that didn't do it for me,

11 when I was in my 20s, but I never really -- blackjack was what

12 I played and nothing else.

13 Q    Can you move the microphone a little bit closer to you?

14 A    I think I'm going to keep on hitting it.  Is that better?

15 Q    That's better.

16 A    After -- horses for a couple of years, but the main thing

17 was I always played blackjack.

18 Q    How much were you betting per hand?

19 A    Anywhere from 500 to 15,000.  I could go up --

20 Q    And how many hands were you betting?

21 A    I could go to three hands at a time.

22 Q    Can we pull up JX-3 please and we'll go to the last page

23 of that exhibit?  Do you see that document?

24 A    Yes.

25 Q    Is that the list of casinos that you were gambling at?

1  A    Most of them.

2  Q    Were there additional casinos that are not listed on this

3  page?

4  A    Probably.

5  Q    Before filing for bankruptcy, did you know how much you

6  were losing with the casinos?

7  A    No.  I never asked for tax letters at the end of each year

8  because I always knew I lost and you only have put if you win,

9  so I never realized this.  If I would have known what I was

10 actually losing, I probably would have stopped a long time ago.

11 Q    Did you previously ask them for a record of your wins or

12 losses?

13 A    Not until 2019.

14 Q    Why did you gamble so much?

15 A    It was my addiction.  The only time I was basically in my

16 own world.

17 Q    Did you gamble in order to evade your tax obligations?

18 A    No.

19 Q    Was there ever a thought that if I gambled enough,

20 creditors wouldn't be able to touch my earnings?

21 A    I thought about that a couple of time.  (indiscernible)

22 just to put this all behind me.

23 Q    When you went to the casinos to gamble, did you go by

24 yourself?

25 A    Sometimes myself.  Most of the time with friends or people

1  I do business with.

2  Q    Did you take clients on gambling trips?

3  A    Take them to Connecticut overnight.

4  Q    Were they gambling as much as you were?

5  A    No.

6  Q    Could they afford to gamble as much as you were gambling?

7  A    They could -- most of them could afford ten times more

8  than I gambled, but they didn't.

9  Q    Did you get perks from the casinos?

10  A    Yes.

11  Q    What kind of perks were you getting?

12  A    I get shopping points.  Like every time I would go to

13  Mohegan Sun they would give me like 10,000 points just for

14  coming in.

15  Q    Did they provide transportation?

16  A    They would supply me with a helicopter.

17  Q    And how often were you flying by helicopter to these

18  casinos?

19  A    25 times during the year maybe.  Going for overnight

20  usually, just for 24 hours.  I probably never stayed -- maybe

21  one or two weekend there.

22  Q    So we can see from JX-3 how much money you lost in just

23  the past decade.  Do you have a sense over the course of your

24  life how much money you lost gambling?

25  A    Probably three, four, five, times more than that.

1  Q   These days, what are your sources of income?

2  A   Excuse me?

3  Q   These days, what -- how are you making your money?

4  A   Just on commissions.

5  Q   Do you have any LLC interests that are paying you?

6  A   No.

7  Q   Do you have a 401(k)?

8  A   No.

9  Q   Have you ever had a 401(k)?

10  A   I don't think so.

11  Q   Have you ever had any type of retirement account?

12  A   No.

13  Q   Do you have any other form of savings?

14  A   No.

15  Q   Do you have any bank accounts in foreign countries?

16  A   No.

17  Q   Do you have any assets outside the United States?

18  A   No.

19  Q   Are you the beneficiary of any trust?

20  A   No.

21  Q   Do you have any kind of pension?

22  A   No.

23  Q   You're 73, right?

24  A   Yes.

25  Q   How's your house?

1  A    So-so.

2  Q    Do you have anything saved up for retirement?

3  A    No.

4  Q    Why not?

5  A    Because I always figured I would work til the day I die.

6  Q    If you don't get a discharge in this bankruptcy, do you

7  have the means to pay back the IRS?

8  A    No.

9        MR. BANNON:  Objection, relevance.

10        MR. YAN:  It's relevance to its intent.

11        THE COURT:  Excuse me?

12        MR. YAN:  It's relevant to its intent.

13        THE COURT:  Can you repeat the question?

14        MR. YAN:  Sure.  If you don't get a discharge in this

15  bankruptcy, do you have the means to pay back the IRS?

16  A    No.

17        THE COURT:  I'll allow the question.

18  Q    Are you going to be able to retire?

19  A    No.

20        MR. BANNON:  That's all I have.  Thank you.

21        THE COURT:  Mr. Bannon?

22        MR. BANNON:  If we could have a few minutes, Your

23  Honor?

24        THE COURT:  What do you want, five minutes, ten

25  minutes?

1        MR. BANNON:  Then minutes would be great.

2        THE COURT:  A ten minute break, and when --

3                    (Recess)

4        COURTROOM DEPUTY:  All rise.

5        THE COURT:  Please be seated.  Mr. Bannon, what do

6   you think about timing?

7        MR. BANNON:  I'm guessing somewhere between one and

8   two minutes.

9        THE COURT:  Oh, okay.  That's simple.

10                  REDIRECT EXAMINATION

11  BY MR. BANNON:

12  Q    You testified moments ago that you made a number of

13  financial decisions like the transfer of your Southampton home

14  to a trust and the transfer of your shares in WTN to our

15  daughter on the advice of your accounts, rights?

16  A    Accountants, yeah.

17  Q    But, these choices were ultimately yours to make, right?

18  A    Yes.

19  Q    You could have kept the property for yourself, right?

20  A    I didn't buy it with that purpose.

21  Q    But you could have --

22  A    Yes.

23  Q    -- if you wanted to and you could have sold the property

24  to pay your taxes, right?

25  A    How could I pay my -- before -- it's like -- you want to

1  repeat your --

2  Q    For instance, you could have instead of giving the shares

3  in WTN to your daughter, you could have sold them, realized

4  some profits, and paid back your taxes, right?

5  A    WTN shares would probably be worth -- I think you know

6  what they're worth, like $50,000.  You already sold them.

7  Q    You could have done it though, right?

8  A    You sold them.

9  Q    I know.  I'm saying in 2012 you could have sold that

10 property to pay your taxes, right?

11 A    Which property?

12 Q    Your shares in WTN, rather than giving them to your

13 daughter?

14 A    I don't think they were ever worth $4 million.

15 Q    It was ultimately your choice as to how you were going to

16 dispose of your property though, right?

17 A    I wasn't disposing of it.

18 Q    Whether you were to give them to your daughter or keep

19 them for yourself, that was your choice?

20 A    Yes, it was my choice.

21 Q    When you're accountants recommended that you made these

22 transfers did they explain to you why they recommended it?

23 A    I put away for my daughter's future and, look, I wasn't

24 concerned about my future.  I'm concerned now.

25 Q    They told you that the purpose of it was to save for your

1  --

2  A    Estate planning.

3  Q    -- daughter's future?

4  A    Yeah, estate planning.

5          MR. BANNON:  I have no further questions.

6          MR. YAN:  I also have no further questions, Your

7  Honor.

8          THE COURT:  Okay, thank you, Mr. Winick.  You are

9  excused.

10          MR. YAN:  I think the next witness that we have is

11  not going to be here until Friday and that's Dr. Weinstock, so

12  I think we can give Your Honor your time back for the remaining

13  week until Friday.

14          MR. BANNON:  I agree.

15          THE COURT:  Okay, so just to take stock, the fact

16  witnesses are completed?

17          MR. YAN:  Correct.

18          THE COURT:  And we have left two witness, both expert

19  witnesses?

20          MR. YAN:  Correct.

21          THE COURT:  Okay.

22          MR. BANNON:  The one housekeeping matter to address

23  again is, Mr. Yan, if you could provide the Court with the

24  corrected copy of Defense Exhibit 9.  I think he has the

25  incorrect one electronically right now.

1          MR. YAN:  Yes.  We'll provide the Court

2    electronically and I'll bring extra copies on Friday.

3          THE COURT:  All right, any other housekeeping matters

4    before we adjourn?

5          UNIDENTIFIED SPEAKER:  Just to confirm, what time are

6    we starting on Friday?

7          THE COURT:  I think it's nine.  Let me just look at

8    my calendar.  Did -- well, let's talk about that.  I think

9    we've agreed on nine.  We could start at ten if it's not going

10   to go -- depending on how long -- depending on preferences and

11   depending on how long people think it's going to go.

12         MR. YAN:  Your Honor, my preference would be to just

13   start at nine so that -- because I'm pretty sure we're going to

14   be done by noon if we start at nine.

15         MR. BANNON:  That's fine.  Okay.

16         THE COURT:  So nine it is.  What I have in my

17   calendar for the final day, November 1st, is ten o'clock.

18         MR. YAN:  That's correct.

19         MR. BANNON:  Correct.

20         THE COURT:  All right, so thank you to both sides for

21   moving along briskly today.  Nicer to be done more quickly than

22   expected.  I will see you all on or at least some of you on

23   Friday.

24         MR. YAN:  Thank you, Your Honor.

25         MR. BANNON:  Thank you, Your Honor.

1    THE COURT:  Okay.  Thank you.

2               * * * * *

# **C E R T I F I C A T I O N**

          We, DIPTI PATEL, TRACEY WILLIAMS, CYNTHIA POND, SUE

DIPIERRO and WENDY ANTOSIEWICZ, court approved transcribers,

certify that the foregoing is a correct transcript from the

official electronic sound recording of the proceedings in the

above-entitled matter, and to the best of our ability.


/s/ Dipti Patel
DIPTI PATEL


/s/ Tracey Williams
TRACEY WILLIAMS


/s/ Cynthia Pond
KAREN ENGLISH


/s/ Sue DiPierro
SUE DIPIERRO


/s/ Wendy Antosiewicz
WENDY ANTOSIEWICZ

J&J COURT TRANSCRIBERS, INC.      DATE:  October 19, 2023