UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                        .    Case No. 20-11976-PB
                              .
JEFFREY WINICK,               .
                              .
        Debtor.               .
. . . . . . . . . . . . . . ..
UNITED STATES OF AMERICA,.    Adv. No. 21-01138-PB
                              .
        Plaintiff,            .
                              .
        v.                    .    One Bowling Green
                              .    New York, NY 10004
JEFFREY WINICK,               .
                              .
        Defendant.            .    October 20, 2023
. . . . . . . . . . . . . ..        9:04 a.m.


                    TRANSCRIPT OF:


  ADVERSARY PROCEEDING: 21-01138-PB UNITED STATES OF AMERICA V.
     WINICK; TRIAL RE: COMPLAINT OBJECTING TO DISCHARGE

            BEFORE HONORABLE PHILIP BENTLEY
         UNITED STATES BANKRUPTCY COURT JUDGE








Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

APPEARANCES:

```
For the Debtor/          ArentFox Schiff, LLP
Defendant:               By:  RYAN FOLEY, ESQ.
                              JIN YAN, ESQ.
                         1185 Avenue of the Americas
                         Suite 3000
                         New York, NY 10036

For Department of        Office of the U.S. Attorney
Justice:                 By:  ZACHARY BANNON, ESQ.
                              JEAN-DAVID BARNEA, ESQ.
                         86 Chambers Street
                         New York, NY 10007


ECRO:                    KS _ _ _ _
```

# INDEX

                                                                    **PAGE**

WITNESSES FOR THE PLAINTIFF:

(None)

WITNESSES FOR THE DEFENDANT:

JEREMIAH WEINSTOCK, MD
  Direct Examination by Mr. Yan                                        5
  Cross-Examination by Mr. Barnea                                     59
  Re-Direct Examination by Mr. Yan                                    97

                                                              ID      EVD
EXHIBITS FOR THE PLAINTIFF:

(None)

EXHIBITS FOR THE DEFENDANT:

1 and 8, Withdrawn                                            5


JOINT EXHIBITS:

1          (Proceedings commenced at 9:04 a.m.)

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.

4          All right.  Good morning.  We're here in the Jeffrey

5  Winick Bankruptcy Case Number 20-11976 in the adversary

6  proceeding brought by the United States, Adversary Proceeding

7  21-01138.

8          Mr. -- who is speaking for the Government, Mr. Bannon

9  or Mr. Barnea?

10          MR. BARNEA:  Good morning, Your Honor.  This is Mr.

11  Barnea this morning.

12          THE COURT:  Okay.  All right.  Are there any

13  preliminaries before we launch into your witness?

14          MR. YAN:  We have one housekeeping matter, Your

15  Honor.

16          THE COURT:  Okay.

17          MR. YAN:  If you will recall on Monday, we provided

18  the Court, after the Court was over, with revised copy of

19  Defense Exhibit 9.  This was an updated copy and I have an

20  updated binder for the Court.

21          THE COURT:  Okay.

22          MR. YAN:  If I may approach and give it to the Court?

23          THE COURT:  Please.  You can give it to --

24          MR. BARNEA:  And Mr. Yan, weren't you also going to

25  withdraw some of your --

1          MR. YAN:  Yes, that's correct.  I'll -- we are also

2    withdrawing defense exhibits 1 and 8.  And so, the updated

3    binder reflects that those exhibits are withdrawn.

4          THE COURT:  Okay.

5          MR. YAN:  So I don't know if Your Honor wants it, or

6    to --

7          THE COURT:  Why don't you give the binder to my Law

8    Clerk?

9          MR. YAN:  Will do.

10          THE COURT:  Okay.

11          MR. YAN:  And with that, we are ready to proceed with

12    testimony from Dr. Weinstock this morning.

13          THE COURT:  Okay.  Mr. Barnea, your witness.

14          MR. YAN:  Oh, it's our witness, Your Honor.

15          THE COURT:  Oh, I'm sorry.  My apologies.

16          Mr. Yan?

17          MR. YAN:  Calling Dr. Weinstock to the stand.

18          JEREMIAH WEINSTOCK, DEFENDANT'S WITNESS, SWORN

19                         DIRECT EXAMINATION

20    BY MR. YAN:

21    Q    Good morning, Dr. Weinstock.

22    A    Good morning.  I'm sorry.  I can't see the counselor over

23    there because of the screen.

24    Q    Yeah.

25    A    So --

Q    I wonder if we might --

A    -- is there --

Q    -- let me adjust that.

          THE COURT:  Let's just stick with logistics before we get going.  Are you going to need the screen --

          MR. YAN:  No, Your Honor.  We're going old school today.

          THE COURT:  -- for the witness?  Okay, okay.  That works from my perspective.

          MR. BARNEA:  We're going to need the screen, but we'll set it back up after we take a break between Direct and Cross.

          THE COURT:  Okay.

BY MR. YAN:

Q    Dr. Weinstock, can you please state your full name for the record?

A    Jeremiah Weinstock.

Q    And what is your business address?

A    3700 Lindell Boulevard, St. Louis, Missouri and I work at St. Louis University so that's part of the address.

Q    Do you understand that you're testifying under oath this morning?

A    Yes.

Q    Is there anything that would prevent you from testifying truthfully and accurately?

1   A    No.

2   Q    Were you retained by Jeffrey Winick to serve as an expert

3   in this case?

4   A    Yes.

5   Q    What were you retained to do?

6   A    I was retained to evaluate his gambling behavior from the

7   period of 2012 to 2019 and provide an expert opinion about

8   that.

9   Q    Let's talk about your qualifications.

10           MR. YAN:  Your Honor, permission to approach the

11  witness?

12           THE COURT:  Yes.

13  Q    Dr. Weinstock, I've handed you a copy of what was

14  previously marked as Defense Exhibit 10 and I would note that

15  it's already been admitted into evidence.  Is that your CV?

16  A    Yes, it is.

17  Q    I'll represent to you that that was the version of your CV

18  that we received when we sent your expert report to the

19  government.  If you wouldn't mind taking a look at it and

20  seeing if there's any significant updates or changes?

21  A    There's really no significant changes.  I mean, I've

22  continued to publish and have some posters, but they're not

23  anything I would say, significant change.

24  Q    Thank you.  Can you take us through your education,

25  starting from after high school, please?

1 A    Sure.  So 1992 to '96, I attended Brandeis University in

2 Boston, Massachusetts and I earned a Bachelor's of Arts in

3 psychology.

4     And then, I worked for two years at Harvard Business

5 School and then, I went to graduate school in clinical

6 psychology.  I earned a Ph.D. at the University of Memphis and

7 I graduate -- it was 1998 to 2004, and I specialized in, my

8 degree is in clinical psychology, but during that time, I

9 became very interested in gambling disorder.  At the time, it

10 was called pathological gambling.

11     I completed, as part of the requirements of your Ph.D.,

12 you have to do an internship here.  It's akin to residency for

13 med school.  And I did that at the Southwest Consortium in

14 Albuquerque, New Mexico.

15     And then, after I completed by Ph.D., I did a post-

16 doctoral fellowship, a research-oriented one as an NIH,

17 National Institute of Health; it's called a T-32, so it's a

18 funded post-doc by the federal government given to the

19 University of Connecticut where I worked in the alcohol

20 research study center.

21     And I worked under one of the preeminent gambling disorder

22 researchers in the world.

23 Q    Okay.

24 A    And that completes my educational experiences.

25 Q    Can you describe your professional history?

1 A     Sure.  So I did my post-doctoral fellowship at the U-Conn

2 Health Center which is their medical school.  I did that for

3 two years and then, I stayed for an additional four years

4 working with Dr. Nancy Petry, continuing to produce research,

5 to manage her research studies, and to launch my own

6 independent research career.

7      So I had received, over time, $2.5 million in research

8 funding from the National Institutes of Health and also some

9 private research foundations, including the International

10 Center for Responsible Gaming.  They provide research funding.

11      So I stayed at U-Conn for additional four years and then,

12 in 2010, I went on the academic job market and secured a

13 tenure-track position at St. Louis University in St. Louis,

14 Missouri.  It's a good Catholic Jesuit institution; just to put

15 that out there.

16      And then, I've been -- I got an Assistant Professor

17 position.  I went up early for promotion in tenure and I was

18 promoted to Associate Professor.  The exact years are on my CV.

19 And then, I proceeded to earn rank and be promoted to Full

20 Professor; I think that was in 2020, is when I was promoted.

21      And again, I went up early for that as well.  And compared

22 to what they -- there's a standard time line, but that's

23 because I was having a lot of success.

24 Q     Are you still the Chair of the Department of Psychology?

25 A     Yes.  I'm sorry.  So, yes, I am.  Starting I think in

1  2021, I became the Chair or Chairperson of my Department at St.

2  Louis University.

3  Q    You mentioned that you were mentored by Dr. Nancy Petry?

4  A    Yes.

5  Q    What is her research experience with?

6  A    So Dr. Petry, unfortunately, she's no longer with us.  She

7  passed away from cancer around 2017.  At the time, she was

8  probably, if not the leading preeminent gambling disorder

9  researcher in the world, I mean -- or one of three, depending

10 on how you want to argue about it.

11      But it was the reason I went to work with her.  I mean, I

12 had some choices about where I wanted to do my post-doctoral

13 fellowship and I wanted to continue in gambling work.  She was

14 a highly-productive researcher.  She was the one percent of one

15 percent, is the way -- I could give you stats, but I don't know

16 that that would be meaningful here.

17      But the thing that I would say that kind of captures who

18 she was, our Diagnostic and Statistical Manual which we use to

19 diagnose people and it's used here in the U.S.; it underwent a

20 revision in 2013.  She was selected to serve on the Committee

21 to revise the substance and addictive behavior-related

22 disorders category section.  So she was part of the work group

23 that revised all the addiction-related criteria.

24      And she was specifically in charge of the gambling

25 disorder criteria.  And we would frequently talk about that

1  work and I feel like I had a little bit of influence on her

2  along the way with that.

3  Q    Let's talk about your clinical experience.  Can you

4  describe your clinical experience with gambling disorder?

5  A    Sure.  So I began treating gambling disorder during my

6  graduate school days at the University of Memphis.  Just south

7  of Memphis, at the time, is Tunica, Mississippi and at the

8  time, it was the third largest gambling destination in America

9  behind Vegas, Atlantic City.

10      It had seven or eight casinos there.  And so, in our

11  training clinic, we had a person present with a gambling

12  problem and from there, my research mentor, they established a

13  gambling clinic that's still going today.

14      So in 1999 was my first gambling client.  I continued to

15  see them through graduate school, during internship.  And then,

16  during post-doctoral fellowship, I continued to see gambling

17  disorder clients.

18      This was in the context of research though.  I'm talking

19  in the context of large, clinical trials, testing psycho-social

20  interventions; so different psychological treatments, on how

21  best to treat gambling disorder.

22      And so, I would directly see clients myself and follow the

23  protocols.  And in addition, I'd be -- I was the research

24  supervisor, the clinical supervisor for other individuals who

25  were providing that same treatment in the clinical trials.

1    And so, I treated a lot of individuals with gambling
2  disorder through there.  And I'm a licensed clinical
3  psychologist, as of -- I'd have to look on the exact dates --
4  2007; first, in the State of Connecticut and now, in the State
5  of Missouri.

6    When I moved to Missouri, I established a small, clinical
7  practice where I continued to see individuals with gambling
8  disorder.  Individuals present from a range of backgrounds and
9  I continue to do that.  I also continue to conduct clinically-
10  relevant research with individuals with gambling disorder.

11    So I've seen a lot of people walk through my door who
12  struggle with gambling.

13 Q    How many gambling disorder diagnoses have you performed,
14  over the course of your career?

15 A    So through clinical interviewing and directly myself,
16  easily well over 100.  Through supervising other clinicians and
17  their clinical interviews, that's easily another two-to-three
18  hundred, I would say, estimate, based on clinical trial
19  numbers.

20    And then, through screening questionnaires, as part of
21  research; so we use, sometimes in research and standard
22  questionnaires, because interviews take much longer.  That's
23  thousands upon thousands.  You know, I have a -- yeah,
24  thousands upon thousands in research studies over the years.

25 Q    You also treat patients who are diagnosed with gambling

1  disorder; is that right?

2  A    Yes.  I have that small clinical practice right now.  I

3  have -- currently, I only see one to two individuals at a time

4  because of Department Chair and active researcher.  But I

5  currently have one client with gambling disorder that I'm

6  treating right now.

7  Q    How many patients have you treated over the years?

8  A    Hundreds -- I mean, well over north of 100.

9  Q    Have you ever been sued for malpractice in connection with

10 diagnosing or treating someone for gambling disorder?

11 A    I've never been sued for malpractice for any reason.

12 Q    From your CV, it looks like you've authored or co-authored

13 various scientific articles relating to gambling disorder; is

14 that right?

15 A    That's correct.

16 Q    And how many have you authored?

17 A    As of this CV, 65 papers.  Probably about -- I'd have to

18 go through and count, but I would say on about at least half

19 are specifically about gambling disorder.

20 Q    And what aspects of gambling disorder do your publications

21 address?

22 A    Sure.  I would say that my research, in general, what I

23 seek to do is to understand and how we characterize gambling

24 disorder.  Part of my view, and this is now the accepted view

25 of the scientific literature, is that gambling disorder is

1 consistent and should be thought of as an addiction.

2      In DSM-5, they made that change.  Previously the diagnosis

3 of gambling disorder was in a different section.  And then, so

4 I'm very interested in how we understand and characterize

5 gambling disorder.

6      I have a lot of publications about how we assess and

7 understand and clinically, and through questionnaires, how we

8 assess gambling disorder.

9      And finally, I have a lot of research around how do we

10 treat individuals with gambling disorder; what are the best

11 ways, why do these treatments work; questions like that.

12 Q    Do you belong to any academic or professional

13 organizations that deal with gambling disorder?

14 A    Yes.  Specifically, I'm a member of the National Council

15 on Problem Gambling; that's a nationwide organization.  I am

16 also a member of the Association for Behavioral and Cognitive

17 Therapies and cognitive behavioral therapy is commonly used to

18 treat gambling disorder.

19      I'm part of -- one of my seminal publications that I co-

20 authored is on CBT for gambling disorder.  So I'm a member

21 there.

22      Recently, I am a fellow within that organization and that

23 is something that you apply for and you can only earn through

24 your accomplishments, both as a clinician and a researcher.

25 And you basically need to make a substantive contribution to

1 the field that significantly advances our understanding related

2 to the topic area.  So I'm a fellow there.

3      I'm also a member of the American Psychological

4 Association and more specifically, their Division 50 which is

5 the Society on Addiction Psychology.

6 Q    Do you consider yourself to be amongst the most foremost

7 gambling disorder experts in the United States?

8 A    Yes.

9 Q    Is there anyone else you would put into that category?

10 A    Yes.  I can give you several names, if you'd like them.

11 Q    Sure.  Who else is in that category?

12 A    So, Dr. Nancy Petry, she's no longer with us.  Marc

13 Potenza at Yale University; Lia Nower at Rutgers University;

14 Timothy Fong at UCLA; and if I had to give another name, my

15 graduate mentor, James Whelan at the University of Memphis.

16 Q    To your knowledge, is Dr. Ilene Zwirn one of the

17 preeminent experts on gambling disorder?

18 A    No.

19      MR. YAN:  Your Honor, we tender Dr. Weinstock as an

20 expert on gambling disorder.

21      MR. BARNEA:  No objection, Your Honor.

22      THE COURT:  Accepted.

23 Q    Dr. Weinstock, please explain what gambling disorder is?

24 A    Gambling disorder is a maladaptive pattern of gambling.

25 So an individual who -- and gambling, you know, if you want me

1  to describe -- define gambling, I can.  It's where you are

2  putting money or other objects of value at risk on an uncertain

3  outcome in hopes of gaining something additional to what you're

4  putting up.

5      So it's a maladaptive pattern of gambling disorder that

6  persists despite negative or adverse consequences for an

7  individual throughout their personal life; so professional

8  work, their home life, or relationship with others.  They

9  jeopardize educational opportunities or things like that.

10     And it's really the hallmarks of the disorder -- and this

11  is all addiction; this is not just gambling disorder -- but the

12  hallmarks of addiction are tolerance; so you need to, in the

13  case of gambling disorder, you need to spend more and more

14  money to achieve the desired effect.

15     And for most people with gambling -- well, there's two

16  things that people are pursuing when they gamble.  For some

17  individuals, they are chasing the rush.  They love the action;

18  it's amazing, it's such an amazing thrill when they win and

19  they want that win and they need that win.

20     That's what makes life worth living, from their

21  perspective.  There are also some people who gamble just to

22  disassociate and to check out and to take a deep breath and

23  just kind of relax, right, and forget their life's problems.

24     But -- so, but it's tolerance; the next one is withdrawal.

25  So their body has, you know, our brain is a learning machine,

1  right, we take in information from the environment.  We're

2  taking things internally from us.  And so, our brain, over

3  time, learns to expect certain things.  I can give you an

4  example of, I get in my car and I'm driving and I can just get

5  in, it's very automatic.

6      And then, I get a rental car and the gear shifter goes

7  from being here to up here, but because of learning, I keep

8  reaching over here, right.

9      And so, that's not a good thing, right.  That's -- but

10  that's learning.  Our brain has learned to expect certain

11  things and so, with individuals with gambling disorder, because

12  it's this persistent pattern, what has happened is their body

13  becomes, and their brain, becomes used to gambling in a certain

14  way.

15      And when it doesn't happen, the brain gets very upset and

16  says, we used to do this; like we're doing this; like, why

17  aren't you doing this.  And so, it creates withdrawal.

18      It's a much more, sort of -- it's not physiological, but

19  there's physiological sort of processes.  With alcohol, there's

20  a chemical substance in the body and when it doesn't receive

21  that chemical substance, it has withdrawal.

22      Gambling disorder has similar things like that, even

23  though there's not an actual chemical coming being introduced

24  into the body.  But the research really shows it's the same

25  underlying process where the only way to relieve these

1  irritable feelings and this uncomfortableness and this agita is

2  to gable, right.

3       So that's withdrawal.  And loss of control can be manifest

4  in multiple ways and it's reflected in our diagnostic criteria

5  that way.

6       One way we manifest is that individuals are -- they say,

7  you know what, I need to stop; I need to quit, or I need to cut

8  down.  And next thing you know, they're back at the casino or

9  they're back doing this.

10      I can give you an example of, in other addictions like

11 drinking, like you have a -- you go out and you just tear up,

12 right; you put your drink on and you get tore up, get really

13 drunk.  And the next morning, you wake up and you're really

14 hung over and you swear, I'm not drinking again for the next,

15 like, month, right.

16      And the next night or Friday night, you're back out there

17 doing that, right.  So there are these unsuccessful attempts to

18 cut down.  The other example in the diagnostic criteria for

19 gambling disorder is chasing losses.  That's a big marker, of

20 loss of control.

21      This criteria, the exact wording, is you lose money one

22 day; and then, you return the next day to try to win back that

23 money, because you're -- you need the money for certain

24 circumstances, or you just want to keep gambling.

25      But the idea there is, I've lost money and I need to get

1  it back.  It's sort of, to me as a clinical psychologist and

2  when I was first learning about it, I mean, it's the definition

3  of insanity in the sense that the behavior that you just did,

4  and lost a bunch of money because the solution to your money

5  problems, I'm going to go to try to get it back; I'm going to

6  go do the same thing.

7       And so, I'm doing the same thing over and over and over

8  again, hoping for a different result.  So that's another

9  example of loss of control within gambling disorder.

10 Q    How do you diagnosis gambling disorder?

11 A    You can use some questionnaires.  Questionnaires aren't

12 perfect, but there are standard psychologically accepted

13 questionnaires.

14      But the gold standard by which we -- which the field,

15 psychiatry, psychology uses is a clinical interview.  And so,

16 you sit down and you ask the -- an individual a series of

17 questions; they are very guided.

18      And you are looking to assess for the presence of certain

19 things.  And you're also looking to rule out other things.  For

20 example, with gambling disorder, with bipolar disorder, people

21 become manic and so, they have lots of energy and they're

22 always seeking thrills.

23      And so, a rule-out for gambling disorder is the presence

24 of a manic episode, because the manic episode could better

25 explain what's going on with the gambling disorder.  So you

1  have to rule out that.

2      You also have to rule out if a person has a diagnosis of

3  Parkinson's Disease and they're taking a certain medication.

4  The medication basically makes dopamine more available in the

5  brain.

6      And then, individuals can become very addicted to highly-

7  rewarding activities including gambling.  There's actually an

8  FDA black-box warning on these medications about gambling.

9  Q    What is the DSM?

10 A    The DSM is the Diagnostic and Statistical Manual.  We're

11 currently on the fifth edition and we use it to -- as our

12 classification scheme for psychiatric disorders in the United

13 States and generally, North America.

14 Q    And the DSM lists various factors to determine the

15 presence of gambling disorder; is that right?

16 A    Yes.  There are nine diagnostic criteria that are

17 specified in there.  And an individual must endorse four or

18 more of those criteria.

19 Q    What are those nine criteria?

20 A    Sure.  I've walked through a couple of them, but I'll walk

21 through all nine right now.  So the first diagnostic criteria

22 is the one of tolerance.  So an individual needs to gamble with

23 more and more money to achieve the desired effect of their

24 gambling behavior.

25      Number two is withdrawal.  So basically, when they don't

1  have the opportunity to gamble, they become restless,

2  irritable, grouchy, uncomfortable; some physical sensations

3  along those lines.

4        Next one, I use the word, loss of control, but it's really

5  -- it's that unsuccessful attempt to cut down or stop gambling

6  is the number three.

7        Number four is preoccupation with gambling.  You spend a

8  lot of time thinking about gambling, the next gambling episode,

9  or you're reliving past experiences where you won big and

10  you're like re-imagining how you're going to do that.

11        Many individuals with gambling disorder will describe

12  actually the journey to their gambling destination.  So I'm

13  going to use here the example of a casino.  The trip to the

14  casino is actually one of the best parts of the experience,

15  because there's all this anticipation about how awesome it's

16  going to be and what they're going to do with all their

17  winnings and things like that.

18        So but even outside that traveling, they spend a lot of

19  time thinking about it, or they're trying to figure out how to

20  put together some money to go gamble.  And so, there's just a

21  lot of time spent thinking about gambling.  So that's that

22  preoccupation.

23        Some individuals, number five, gamble to relieve

24  uncomfortable emotions such as anxiety and depression.

25        Number six is chasing losses.  I've explained that one

1  where they go back -- they lose money one day and they go back

2  the next day.  I will add that that criteria is going to be

3  adjusted, because of the nature of gambling is changing that

4  you can make, within -- like with sports betting, you can make

5  within game bets, right, nowadays.  This is -- I can go on, I

6  won't go on about it.

7       But like, you can place a bet at the very beginning of the

8  game and on the over-under and you bet the under and with by

9  the end of the first period, that's blown, you know it's over.

10 And so, people will begin to chase their losses by making bets

11 immediately right after to try to recoup losses.

12      So we're at chasing losses; you lie to other people to

13 conceal your gambling.  Sometimes there is shame; sometimes

14 there's guilt or you just don't want people to know and be in

15 your business and because they will judge you in some way.

16      And then, so we -- I'm sorry, I'm going fast and I want to

17 slow down here a little bit.  So chasing losses, lies; then,

18 you jeopardize significant educational career opportunities and

19 jeopardize personal relationships.  So someone may, a loved one

20 may find out about the extent of your gambling, even despite

21 all your efforts to conceal and hide it.  And then, they become

22 highly upset because you're in significant debt, you're not

23 able to make your bills and you go ask them for money and they

24 get very upset, or you've drained your 401K and the

25 expectations for retirement are gone.

1    And then, lastly, is that you need -- rely on others to

2 bail you out of a desperate financial situation due to your

3 gambling.  Some people will turn and use that money to gamble

4 -- to continue to gamble or they'll use it just to make their

5 monthly payments for rent and electricity.

6 Q    Are there different levels of severity of gambling

7 disorder?

8 A    Yes, there are different levels.  Our DSM specifies -- you

9 have to understand, it's a continuum and we like to put things

10 into categories.  And so, we -- so, you know, continuum

11 recognizes that, like, it goes from nothing to this and then,

12 we kind of have to drop it into some boxes or cut that

13 continuum up into pieces.

14    And so, what the DSM says four to five diagnostic criteria

15 is mild severity; six and seven criteria is moderate severity;

16 and then, eight and nine is severe severity.

17 Q    Can you describe in reality what it looks like when

18 someone is mild versus moderate versus severe?

19 A    It's really heterogeneous in that each individual has

20 their own story and own sort of things.  But it -- I would say,

21 there are certain criteria that more likely to be met at less

22 severe and then, versus more severe.

23    So for example, relying on others for financial bailout,

24 that is something that's traditionally endorsed pretty late in

25 the game and you're at either moderate or severe.  Concealment

1  is a very early one.  Back in the day, I don't know, a while

2  ago, I did a study comparing professional gamblers with

3  pathological gamblers and they actually also endorse this

4  criterion because they don't want people to know all extent of

5  their winnings.

6      But in the cases people with gambling disorder, they're

7  endorsing this because they don't want people to know about

8  their losses or they don't want them to know where they've

9  been, right, because you're supposed to pick up Johnny at a

10  soccer game, and you're half an hour late and why are you late;

11  oh, there's traffic, right, you conceal it that way.

12      So concealing that, but that loss of control is one of the

13  early signs.  You know, in the moderate range you'll see the --

14  and also the tolerance is pretty quick to be endorsed.  And so,

15  those are some of the more early ones.

16      One of my own, sort of, pet peeves that I have, and I did

17  a paper around this, is the diagnostic criteria for gambling

18  disorder, the threshold is four or more criterion.  Meanwhile,

19  the diagnostic criteria, which have significant overlap with

20  like substance-use disorders like cocaine use disorder, alcohol

21  use disorder.

22      Their diagnostic threshold is two, yet, you know, there's

23  four of nine diagnostic criteria for gambling disorder that

24  overlap with seven out of the eleven criteria for the

25  substance-use disorder criteria set.

1    So our threshold is much higher for gambling disorder and

2  there's historical context related to that.  So even when

3  you're talking about within gambling disorder, mild versus

4  moderate versus severe, and you're thinking about it in

5  relationship to other addictions, it's not an apples to apples

6  comparison.

7    It's a much higher threshold to meet that.  So I would

8  even say, mild severity is a very significant problem.  People

9  who don't meet the full diagnostic criteria but still endorse

10  two or three, they're still experiencing dysfunction and

11  impairment in their lives, a lot of it social related.

12  Q    Can the severity of someone's gambling disorder change

13  over time?

14  A    Yes.  Research, literature shows that it can wax and wane

15  over time.  Some people, it's just like they're steady and

16  things don't change for a long period of time.  Other people,

17  you know, they have some level of awareness of what's going on

18  or other forces are interacting to cause them to change not on

19  their own sort of volition.

20    And so, people can wax and wane.  We also know that when

21  people engage in treatment, that a significant proportion will

22  relapse.  And so -- and that suggests, again, this, you know,

23  loss of control, how -- it is just really -- it captures people

24  and it wraps around them and it's very insidious and it just --

25  it's hard to break.  It holds them very tight.

1  Q    In this case, did you diagnose Mr. Winick?

2  A    Yes.

3  Q    Tell us about how you went about diagnosing him?

4  A    So I did the standard clinical interview. So I sat down

5  with Mr. Winick via Zoom. And I interviewed him in August of

6  2022. I assess for the presence or absence of each of the

7  diagnostic criteria.

8       You have to understand also, I'm relying on someone's self

9  report. And so, you, as a -- you know, even in my clinical

10 work, whether it's for, you know, something as insignificant

11 as, you know, being asked to be an expert witness, or just in

12 my own every-day clinical practice, you have to mitigate bias.

13      And so, there are some steps you take about asking

14 questions in multiple ways. By asking a question once this

15 way, half an hour later, you ask it again from a different way.

16 And so, you do, you know, embedded in the criteria is lying,

17 right, it's in there.

18      And so, you always have to just be ready for that when

19 you're doing a clinical interview. And so -- but that's why

20 it's the gold standard and what we do. And so, I spent a

21 significant amount of time, you know, also ruling out the other

22 rule-outs, like bipolar disorder, manic episode and the

23 Parkinson's medication.

24      You also just have to collect context around their story

25 so that you can understand sort of the functionality of

1  gambling in their life.

2  Q    In diagnosing Mr. Winick, did you follow the same

3  procedures that you do in your clinical practice?

4  A    Yes, it's the same standard clinical interview that you

5  do, and that's the gold standard by which all people should be

6  -- that's what the DSM says for any psychiatric disorder is

7  that you engage in a clinical interview.

8  Q    Did anyone, be it Mr. Winick or any of his attorneys, tell

9  you in advance how your diagnoses should come out?

10 A    No, that's -- no.

11 Q    Is your compensation dependent on how your diagnosis comes

12 out?

13 A    No.  As listed in the report, I have a standard hourly

14 fee.  I also note that there are speciality guidelines for

15 forensic work, forensic psychological practice, put out by the

16 American Psychological Association.  And those guidelines

17 explicitly sort of -- they're guidelines, but they explicitly

18 say you cannot do that.  And I follow -- you know, I adhere and

19 follow those guidelines.

20 Q    Is your compensation dependent in how you testify today?

21 A    No, and that's also in those guidelines.

22 Q    What opinions did you reach in diagnosing Mr. Winick?

23 A    I reached four opinions that I detailed in the report.

24 Would you like me to start on those opinions?

25 Q    If you could just recap those opinions for us; and then,

1 we'll go through one by one?

2 A    Sure.  All right.  So number one, I diagnosed Mr. Winick

3 with a maladaptive pattern of gambling behavior.  So this is

4 also 2012 to 2019 was the period that I was asked to assess.

5 So that was the focus of my interview and what I was looking at

6 to understand.

7        So from the period of 2012 to 2019, Mr. Winick evidenced a

8 maladaptive pattern of gambling disorder that was consistent

9 with a diagnosis of gambling disorder that was persistent and

10 met moderate severity in terms of the severity level that we

11 talked about.

12       And I will add -- and I added in a statement that his

13 gambling behavior, at that time, was not a volitional act.

14 Q    What about your second opinion?

15 A    My second opinion related to -- let me pause for a moment,

16 just to collect myself.  So opinion number two, opinion number

17 two is -- let me go back.  So opinion two --

18            THE COURT:  If it's helpful for --

19            MR. YAN:  I can refresh.

20            THE COURT:  -- yeah.  That's fine.

21            MR. YAN:  Okay.  May I approach, Your Honor?

22            THE COURT:  Sure.

23 A    I'm sorry.  I've been talking for a while and go and I

24 just want to make sure I'm doing that, okay.  Yes, all right.

25 I have this down.

1      So Mr. Winick, his past experience taught him that he

2  could continue to gamble.  In the way that he was gambling, he

3  didn't think about it as maladaptive, but it's clearly.  He

4  could -- his past experience taught him he can continue to

5  gamble in this way and even if he was falling behind on his

6  taxes, this was not a big deal because past experience taught

7  him, from his prior experience of being behind on his taxes,

8  that he could continue to gamble.

9      So from 2002 to 2005, he had fallen behind on his taxes.

10  He got back on a repayment plan with who he owed.  And in 2012,

11  he successfully paid off all those taxes.  So past experience

12  is the -- we learn from past experience, all of us do, and so,

13  he learned that he could continue to gamble and everything

14  would be okay.  So that was the second opinion.

15      The third opinion was that he was, you know, very slow --

16  and this is consistent with many people with gambling disorder,

17  they're slow to recognize the financial harm that this is

18  causing them until basically it all comes crashing down.

19      So he's very -- and his -- and with Mr. Winick, his

20  financial circumstances were also changing dramatically at that

21  time.  So not only, like, you know, many -- some individuals

22  who are not in his circumstances, you know, they just have a

23  steady paycheck and they just continue to make things worse and

24  worse and take credit card debt, additional credit cards and

25  they start tapping into 401Ks and that sort of thing.

1    His income goes up and down, because he gets commissions

2  and things like that.  And he was really slow to recognize how

3  his income was changing in relationship to his gambling

4  behavior and he was just continuing to do what he always had

5  done.  And he, you know, thought everything was going to be

6  okay; past behavior had shown that.

7    So he was -- and this is a thing that's not unique to Mr.

8  Winick.  Many individuals with gambling disorder are really

9  slow to recognize that problem.  We know from the literature

10 that when people call the gambling help lines, like whenever

11 you see gambling advertisement now, they have like 1-800-

12 Gambler or in New York here, it's HOPE, 1-800-HOPENY or

13 something like that is the number.

14    Anyway, when people call this, one of the most primary

15 reason that's endorsed by over 50 percent of people are calling

16 help lines is a financial crisis.  That's what's pushed them to

17 come into treatment.

18    No one wants to come into treatment.  Only about less than

19 20 percent of people with a gambling disorder ever present for

20 professional help, right, so the vast -- and this is true of

21 all addictions, and generally, mental health.

22    Some have slightly higher rates of non-addictions, but all

23 addictions, it's only about 20 percent of people ever seek

24 professional help.  So he was really slow to recognize the

25 changing landscape of his finances.

1    We also know that about 20 percent of people with a
2  gambling disorder, slightly less -- it's like 17 to 19 percent,
3  declare bankruptcy, right, and so, the effects of gambling
4  persist for many years.

5    And then, opinion number 4, I think this was just
6  significant about what led to the cessation of gambling for
7  him, is that he started to turn to friends and family to bail
8  him out of that desperate financial situation; criterion number
9  9.

10   This was new for him.  He started taking personal loans
11  from Dr. David Berley.  And then, he also took loans from his
12  daughter.  He had never done this before previously.

13   And so, that was new because his financial situation was
14  changing and this is the way that I'm going to manage it and
15  keep doing what I'm going to do.  And it was only after -- and
16  that's enabling behavior.

17   I'm going to just put it out there, that that's the first
18  thing when I talk to family members with gambling disorder is
19  you can't give them money.  You can't bail them out.  That's --
20  you're helping them in their -- here's this diagnostic
21  criterion and you're helping them meet that; stop this, right.

22   And eventually, they stop.  They said, no more money, this
23  is crazy, this is insanity; I'm throwing good money after bad
24  and I'm not going to do this.  And so, at that point, he was
25  compelled to stop, you know, and it wasn't a choice that he

1  would freely make, you know.  But there was no other choice.

2  Q    Okay.  I just want to go back through them one by one.

3  A    Yeah, please.

4  Q    With respect to the first opinion, what do you mean when

5  you say he's got a maladaptive pattern of gambling behavior?

6  A    So he had a very pattern set of behavior.  I'm going to

7  start in annually, it was kind of the same.  So he, starting --

8  I'm going to start with Memorial Day.  Starting around Memorial

9  Day, he would go from New York City, not far from here, he

10 would get a helicopter that was provided to him gratis by

11 Mohegan Sun Casino, most of the times.

12      And Thursday afternoon, he would take the helicopter.  His

13 friend, David Berley, would come along with him many times, but

14 it was really for Mr. Winick, because he'd be bringing a bank

15 check with him, or a personal check with $200,000 to $250,000.

16      And then, he'd proceed to cash that in for chips and he

17 would sit and play Black Jack for one to five hours that night

18 and invariably, almost all that money would be gone.  If not,

19 then he would play a little bit in the morning on Friday until

20 basically the money was gone.

21      And then, the helicopter would take him to a destination

22 of his choice, usually out to the Hamptons or somewhere else.

23 And this would happen three out of four weekends a month from

24 Memorial Day to Labor Day.

25      And so, this was how he spent his time, each week, each

1  time, bringing, you know, $200,000 with him.  And then, from
2  basically, Labor Day coming back around to May, he would to go
3  the Bahamas and at the Atlantis Resort and, you know, he would
4  go on long weekends and Christmas and New Year's, but pretty
5  regularly -- Thanksgiving.  So it'd be like, you know,
6  Thanksgiving, maybe Columbus Day, Christmas, New Year's,
7  President's Day, you know, MLK, Passover; you know, any kind of
8  long weekend he could get down there.

9      He would stay for five to seven days and then, he would
10  bring a check with him for about $500,000 in which he would
11  gamble at a table by himself.  So this is the thing, he's also
12  gambling by himself which is very consistent, we know, with
13  individuals with gambling disorder it's a very isolating
14  activity.

15      They don't do it with other people.  Sometimes it's about,
16  like, I don't want you messing up what I'm doing and -- but
17  that's in, like a very small percentage of what's going on.
18  What it really is about is they don't want other people to know
19  and to see what they're doing, because I would say, it's very
20  maladaptive that he's doing that.

21      In addition, from time to time, several casinos would be
22  having some Black Jack tournaments where the end prize for
23  whoever won the tournament would get anywhere -- would get
24  somewhere between, you know, a quarter of a million to half-
25  million dollars, right.

1    They would call him up and say, hey, come on down; we have

2  a seat at the semi-final table; you're one of seven, right.

3  And the casinos are not dumb.  I mean, they know their business

4  and they know what they -- they know that they don't want that

5  money walking out the door, so that's why they would call Mr.

6  Winick, right, because if he won, and he did win on several

7  occasions, he's going to take that money and he's not going to

8  walk out the door.  He's going to pump it right back in.

9    So they're mitigating their losses by inviting Mr. Winick

10 there.  And so, that's a maladaptive -- there's this huge loss

11 of control.  He was chasing wins and losses.  You know, if he

12 won, that was more gasoline for the fire to like, can I get an

13 even bigger thrill; can I hit it even bigger, is what he would

14 be going after, because for Mr. Winick, what he was pursuing

15 was the thrill, the adrenaline rush, the awesome feeling.

16   And also, I mean, the casinos also treat you right.  I

17 mean, so you get a helicopter gratis.  They give him a very

18 nice suite up there; Mr. Winick, would you like some bottles of

19 wine to take with you as you leave -- and they're very nice

20 bottles of wine.  Bottles of wine that I, frankly, would not be

21 purchasing, right.

22   Things like that.  He's getting all these points for the

23 money he's spending and then, you can go into their stores and

24 they have very nice stuff that you can go and buy, really

25 expensive jewelry, that he can get through his points.  But

1 those points are pennies on the dollar, right. And so, they --
2 it's creating both internally he had things going on and
3 externally that were these forces just pushing him in this way
4 and it's maladaptive, along those lines.

5 I mean, it's -- it was a solitary activity. It effected
6 his mental health in some ways, like when he lost in some
7 especially what he would potentially characterize, like, some
8 bad beats or where the cards just kind of got unlucky on him.

9 You know, not randomness, but unlucky on him. That would
10 stick with him and sometimes effect his -- he had bad Mondays,
11 he talked about it that way. And so, it was sometimes hard to
12 shake what had happened.

13 Q   How many diagnostic criteria did you find he met?

14 A   Mr. Winick, you know, from most of like 2022 to 2018-ish,
15 it was six criterion. And then, when he started taking the
16 personal loans, that was the seventh criterion.

17 Q   I'd like to go through each of the criterion and you let
18 me know whether you found it or not?

19 A   Yes.

20 Q   And the reason for that. With respect to the first
21 criteria, did you find that he needed to gamble increasing
22 amounts of money?

23 A   Yes. So his, historically and through, you know, up until
24 2018-19, when he had to stop his gambling would escalate to get
25 that thrill. Like, his standard was kind of 200,000 and his

1  standard bets were $10,000 per hand, right, and he sometimes

2  playing two or three hands at a time.

3      And so that's how he was going through so much money in

4  just a couple of hours.  And sometimes though, within there, he

5  would escalate up to $25,000 per hand.  And so, that's -- he's

6  chasing, you know, needs to bet more and more money to achieve

7  the desired effect.

8      And so, he needed to spend more money within episode and

9  across time to get that rush, because also that rush is

10 fleeting.  He'd win, and less than an hour, that feeling is

11 gone and he needs it again.

12 Q    What about the second criteria?  Did you find he was

13 restless or irritable when attempting to cut down or stop

14 gambling?

15 A    Yes.  So he reported there were certain weekends he

16 couldn't go; sometimes it was like social commitments, he

17 couldn't get out and he was very irritated by he couldn't go

18 gamble and feeling very restless and sort of agitated.

19     And then, there was also certain weekends where

20 financially, there was -- you know, he had one sort of a rule

21 and we'll talk about that.

22     But if there was no money in the bank account, he didn't

23 go.  And he felt very angry, agitated and upset that he -- and

24 part of it is this -- there's a cognitive piece that goes with

25 this; the thoughts that run through your had -- that he

1 couldn't live the lifestyle that he deserved and he achieved.

2      And that's part of withdrawal; like, that's being --

3 you're upset and you're angry and you're -- but you're also

4 this physical agitation like you need some action and you can't

5 get it.

6      Like, I'm shaking my legs under here.  You can't see it in

7 the jury box, but I'm trying to like, demonstrate like that's

8 what he was feeling.  And so, that's how he met the criteria

9 for that one.

10 Q    Can this second criteria change over time?

11 A    What do you mean?

12 Q    Well, if someone, for example, let's say they stop

13 gambling for a year --

14 A    Mm-hmm.

15 Q    -- would this criteria present more prominently than

16 someone --

17 A    No.

18 Q    -- for example, who just quit gambling ten days ago?

19 A    Yeah.  So also what fits in with this criteria is cravings

20 and urges.  And so, what we know from the research literature,

21 large -- like this applies to all addictions and we've also

22 verified that this is true for people who struggle with

23 gambling disorder -- is that those cravings and those urges and

24 the, sort of the experience of withdrawal is very acute and

25 happens very frequently when a person first stops gambling, and

1   it's pretty awful.  And for the people who are like, by choice

2   they're trying to make a gambling problem, they recognize they

3   have a problem, they recognize they have to change and they

4   have to do something.

5       It's a really hard thing to manage.  We spend a lot of

6   time in treatment trying to help people manage those cravings

7   and to respond in a different way.  And -- but what we know is

8   that over time, those cravings, those urges, that experience of

9   withdrawal decreases in frequency and decreases in magnitude as

10  a person gets further and further away from their addictive

11  object.  The body is essentially healing from this experience,

12  right; the brain is learning not to anticipate this rewards

13  anymore over time.  It's learned to move the hand up to here

14  from down here, and it's learned that's the new pattern.

15  Q    With respect to the third criteria, did you find he made

16  repeated, unsuccessful efforts to stop gambling?

17  A    No, that was a criteria he did not meet.

18  Q    What about the fourth criteria; did you find he was

19  preoccupied with gambling?

20  A    Oh, yes.  He spent a lot of time thinking about gambling,

21  both the prior wins, you know, he likes to share the story

22  about how he was in Las Vegas in the 1990s and he won a Black

23  Jack -- not Black -- a Backgammon tournament and it was like

24  half a million dollars and he proceeded to pump that in.

25      He also, one time was in Vegas -- oh, I forgot to say,

1  (indiscernible) spent a week in Vegas at a trade show and that

2  time, he had also gambled large sums of money.  He was in Vegas

3  in the 90s and he was up $1.7 million and he had people with

4  him who were saying, hey, pocket that, give me a couple of the

5  checks; you know, like, don't gamble this.  And he proceeded to

6  pump it all back into the casino and lose it all overnight,

7  right.

8       And so, that's preoccupation.  He's thinking about that

9  pretty regularly.  Those big wins stick out for people, that

10 they have that.  He also would, you know, he would anticipate

11 the call from the casino host who was calling up and saying,

12 Mr. Winick, would you like the helicopter this week, right, or

13 he'd be thinking about, you know, just the action of the game.

14      And sometimes, thinking about, also afterwards, how

15 certain hands went his way, or didn't go his way.  So he's, you

16 know, he had these bad Mondays and it's because he's ruminating

17 about his gambling.

18 Q    What about the fifth factor; did you find he gambled when

19 feeling distressed?

20 A    No.  That wasn't present for Mr. Winick.  He is looking

21 for the thrill and the rush.  That's the functionality.  That

22 criterion reflects the people sort of who are looking to

23 dissociate and want to relax and forget their problems.

24 Q    What about the sixth criteria; did you find he was chasing

25 losses?

1  A    Yes.  He would -- well, he'd chase losses and wins.  So,

2  but he would chase losses and that's more like, you know, so if

3  he had any little money left over from Thursday night, Friday

4  morning he would go down to the tables, trying recouping some

5  of that.

6      He would -- this wasn't a primary driver of his gambling

7  behavior, but it was -- it did pass through his head and he did

8  think about it from time to time.  He thought about, also, how

9  he's lost money gambling; he's behind on his taxes and maybe if

10 I hit it big, I can pay this month's quarterly, you know, this

11 month's taxes.

12     And so, that was sometimes running through his head.  It

13 wasn't the primary driver, but it was -- it's part of the

14 tapestry and so, he was chasing prior losses there, you know,

15 trying to get -- he said, talk about it, I'm trying to get my

16 day in the sun, right, and so, he's trying to get back that.

17 So he did evidence chasing losses.

18 Q    What about the seventh criteria; did you find he lied

19 about his gambling?

20 A    Yes.  So he gambled by himself predominantly and so, he

21 did not like for other people to know about what he was doing.

22 But with Mr. David Berley who had come with him; they would go

23 their separate ways while they were gambling.

24     And then, on top of that, you know, when he would go down

25 to the Bahamas, at the Atlantis, he would, you know, he would

1  gamble by himself in the evening and he didn't like people

2  being with him and watching.

3      So they would kind of, they would see him from afar, but

4  they really wouldn't.  And so, his daughter did not know the

5  extent of his financial dire straits that he was in until he

6  asked her for a loan.  And it was only because she's like, Dad,

7  I know something's going on; what's going on, what's going on.

8      And, you know, there's -- individuals with gambling

9  disorder experience a lot of shame and guilt.  I don't know

10 that Mr. Winick especially experienced guilt necessarily.  The

11 guilt is when you do things to, bad things, to other people

12 because of your gambling behavior.  You drain the 401K, and you

13 wrecked your retirement for you and your spouse.

14     You know, Mr. Winick is divorced.  And so, it's just him,

15 but there's a fair bit of shame, you know, that here's a man

16 who made a lot, a lot of money and yet, has nothing to show for

17 it, right.

18 Q    What about the eighth criteria; did you find he

19 jeopardized relationships or educational or job opportunities?

20 A    So he certainly jeopardized the relationship with his

21 daughter once she found out the extent of what it is and I

22 think, you know, if he did a more fine-grained analysis with

23 his relationship with his daughter, there may be some periods

24 of strain, just because of the fact that he's not available

25 Thursday nights, right, like, he's at the tables and, you know,

1  and growing up, she might have wanted to see him, or be around

2  him and he wasn't there.

3       So that, you know, that characterized -- that changes a

4  relationship over time.  You know, occupationally; so, with his

5  job, over a period of time, they recognized at work that, like,

6  something was not going right and they changed how they paid

7  him, right.

8       So they moved him off of these commission.  Like, he still

9  got commissions, but they took the taxes out on the front end

10 because they recognized that he wasn't the adult in the room.

11 And so, that they had to make some changes there.

12      And so, there were big changes that happened that, in some

13 ways, he was losing power and control in how he ran his life

14 because the people around him were starting to impose things to

15 try to, frankly, protect him, right, but that's jeopardizing

16 along those lines.

17 Q    Finally, the ninth factor; did you find he relied on

18 others to provide money?

19 A    Yes.  So he secured, he took loans from Dr. David -- not

20 doctor -- Mr. David Berley.  And people take loans both to

21 finance their gambling, and that's primarily what he was doing

22 with Mr. Berley.

23      Mr. Berley, at one point, said, hey, come to the Bahamas,

24 I'll give you a quarter of a million dollars; just come, right.

25 And so, I wanted to gamble; okay, sure; right, I'll do that.

1    And then, he also -- once that, you know, and then, he also

2    took other loans.  I think the total amount of loans that he

3    took from Mr. Berley was $1.6 million.

4         He also turned to his daughter to take personal loans.  I

5    think -- I don't remember the exact dollar amount, but I think

6    it's 300 to $500,000.  I think it was $300,000 that he took

7    from her.  So, yes.

8    Q    Are you aware that Dr. (indiscernible) diagnosed Mr.

9    Winick with a gambling disorder?

10   A    Yes.

11   Q    Although she diagnosed him with a moderate gambling

12   disorder, right?

13   A    I believe that's what her report said.

14   Q    How often do clinical psychologists agree in their

15   diagnoses of someone?

16   A    So psychologists and psychiatrists; she's a psychiatrist,

17   I'm a psychologist.

18   Q    Oh, sorry.

19   A    But so, you know, DSM-5, when they were getting ready to

20   roll it out, they did these things called field trials, when

21   they tested out the diagnostic criteria and, you know, how

22   well, how reliable and valid are these criterion.

23        And reliability is, part of it is, I interview somebody

24   and then, you interview somebody, if you're a psychiatrist.

25   And do we come up with the same set of diagnoses?  And we have

1  some statistical ways of then analyzing, you know, sort of that

2  reliability.  It's called inter-rater reliability.  And the

3  words that we describe it as is, you know, good -- like,

4  acceptable, good and excellent is the labels we put on it.

5      And I don't have information specifically about gambling

6  disorder, but the broad category of the substance and additive-

7  related disorders, those disorders, it's called CAPA and it's

8  good, so -- meaning more often than not, people, psychiatrists

9  and psychologists who diagnose, we generally agree on just --

10 and this is just presence and absence of a diagnosis.

11     And it's pretty good.  So people miss stuff, but she and I

12 both agree in that case that he has moderate-severity gambling

13 disorder.

14 Q    You also opined that from Mr. Winick gambling was not

15 volitional, correct?

16 A    Correct.  And so, I think this is something the public

17 really struggles with, because we've come from a place of

18 shame, guilty, this is a moral weakness, to where we're

19 starting to -- the public is starting to shift and understand,

20 there's now a gambling-specific court.

21     It's in the State of New York, actually, up in Buffalo;

22 Nevada is organizing one, where they have these gambling-

23 specific courts where they recognize there's a mental-health

24 problem that's driving some of these behaviors.  And some,

25 frankly then, illegal behavior in criminal proceedings, or

1  bankruptcy; things like that.

2      And so, the public has this view that like, it's a moral

3  weakness.  Like, with all addictions, it's why don't you just

4  stop, right; like, why can't you just stop.  And the thing is,

5  they can't stop, right, that's where this volitionality comes

6  in.

7      And when I, I teach a graduate course in our clinical

8  psychology Ph.D. program on additions.  It's called Addictions

9  Assessment and Intervention.  And one of the number one things

10 I want to get in my trainee's heads is that when, individuals

11 with addiction, it's not a volitional act.

12      By the time they get to meeting diagnostic criteria from

13 one of these disorders, that ship has long sailed.  Both

14 internal events, so how they feel on the inside, what their

15 brain has learned through cues that come from the environment

16 or internal cues, like, for the people who gamble out of

17 distress.

18      These things happen and the only response is to gamble,

19 right.  You know, the external cues of getting a helicopter,

20 getting all these comps, getting special treatment, right,

21 these things become ingrained, right, and seeking that thrill

22 and that rush becomes really the sole focus of what this person

23 is trying -- what they need, what they want.

24      And it's not even -- it's no longer even a want, it's what

25 they need to function.  And so, for Mr. Winick, both internal

1  events of that need for that rush and that excitement, because
2  there was no other excitement going on.

3     There's also significant changes in brain chemistry,
4  either, for some individuals, it's on the front end before the
5  disorder kind of comes up, they have like a genetic liability
6  for impulsivity and risk taking.  And then, they come and they
7  gamble, and like, whoa, this is truly amazing; this is awesome,
8  and it lights up all this dopamine which is the reward chemical
9  in our brain.

10     All this dopamine just gets flooded in their brain and it
11 rewires the brain, these high-magnitude rewards rewire the
12 brain that the brain only feels good when it gets that
13 magnitude of playing $10,000 a hand, three hands at a time and
14 they hit.  That's the only reward that makes them feel good.

15     The hot chocolate chip cookies out of the oven make me
16 feel good and are rewarding and it's like, hmm, I love that; or
17 even sex, it does not even match the dopamine release that
18 comes from hitting while you're playing Black Jack like that.

19     And so, the brain is reprogrammed to need that level of
20 reward to feel good.  Otherwise, it is a day like this, every
21 day for that individual.  It's so sad; it's dark' it's gray and
22 hot chocolate chip cookies aren't even moving the needle.

23     And so, the only thing that's going to make them feel good
24 is to gamble.  And when they can't gamble, the only thing
25 that's going to make them feel good is to gamble.

1  Q    Is there scientific literature that supports your

2  conclusion that --

3  A    Oh, yeah.

4  Q    -- for him, gambling wasn't volitional?

5  A    Yeah, so the Director of the National Institute on

6  Alcoholism and Alcohol Abuse, George Koob, writes a lot about

7  this in his research and done a lot of research.  It's called

8  the Opponent Process Theory of Addiction.

9       And basically, people start gambling and other addictions

10 because there's positive reinforcement that initially -- when

11 you're initially supposed to be like, oh, that's feels good,

12 let's do this, right.

13      But then, over time, that starts to decrease so it's an

14 opponent process and there's two processes and they're working

15 in opposition.  And the other process, so positive

16 reinforcement starts and that's what kind of -- and they keep

17 doing it for that, but slowly, every time it goes down and what

18 builds up and ramps and maintains the behavior is negative

19 reinforcement.

20      This aversive experience of not having rewards, going into

21 withdrawal and that compels compulses or requires that you do

22 that behavior.

23 Q    Is there a genetic component to gambling disorder?

24 A    For some individuals, there's an underlying genetic

25 liability related to impulsivity and risk taking.

1  Q    Did you assess that in Mr. Winick?

2  A    I believe he kind of fits some of that underlying.  I

3  mean, he seeks that thrill and that rush, so that's that risk

4  taking sort of thing.  I don't know about his family history,

5  whether there's addiction back in there.  That would be another

6  indicator that would suggest that.

7       I mean, there's not genetic tests that we have for this,

8  right, so I can't say with a degree of certainty, one way or

9  another, but my clinical intuition suggests that's a

10 possibility.

11 Q    Is there a physiological or chemical component to gambling

12 disorder?

13 A    Yeah.  I mean, it's the same thing as doing cocaine in

14 terms of the reward pathway in the brain.  We have the fMRI

15 studies so that's a functional magnetic resonance imaging in

16 the brain.

17      And we're looking where there's activation in the brain

18 and when people do cocaine, it lights up the reward pathway,

19 the dopamine pathway; it's the nucleus commons to the ventral

20 tegmental area, the VTA.

21      And basically, that's how dopamine's released from one

22 area down into the other and then, we feel really rewarded.  So

23 when you do cocaine, that happens; that gets released.

24      When you have individuals with gambling disorder, that's

25 it -- and everybody, right, frankly -- but there's significant

1  changes when you have gambling disorder, but that same pathway

2  is lighting up.

3       And so, those studies have been out for well over a

4  decade; it was early 2000s.

5  Q    Your time frame, in terms of focusing on Mr. Winick's

6  gambling disorder, you diagnosed for the 2012 through 2019 time

7  frame; is that right?

8  A    Yes, that was what I was asked to assess.

9  Q    Would you analysis be different if we asked to focus on a

10 different time frame?

11 A    Potentially.  I mean, I would have to ask and assess that

12 time period.

13 Q    Would it be fair to say that when you're gaging the

14 severity of someone's gambling disorder, the time frame that

15 you're focused on has an impact?

16 A    Yes, because we know that individuals with gambling

17 disorder, they're problem severity can wax and wane over time.

18 And some people completely stop it at some point, if they feel,

19 you know, that there are no other choices or some people move

20 into deciding to stop by themselves.

21 Q    Do you disagree with Dr. Zwirn's opinion that for Mr.

22 Winick, gambling was a volitional act?

23 A    I can only speak about his gambling behavior.  I can't

24 speak about -- she talked about some other aspects of volition

25 in her report.  You know, I'm an expert about gambling

1  disorder.  I fundamentally disagree.  I mean, I -- all

2  addiction, by the time you meet the diagnostic criteria, it is

3  no longer a volitional act.

4      I can't tell you how many people I've treated with other

5  addictions who also say this, like, I just want to stop using,

6  but I don't know how and it's the only way that I know how to

7  do to feel normal, right.  And it's not normal.  Like, it's not

8  normal, but that for them, it's the only way I have -- like,

9  you have to understand that people with addiction and people

10  with gambling disorder, they're categorically different from

11  individuals who don't have a gambling disorder.

12      Their brain has undergone some significant rewiring or

13  changes, or it was wired slightly that way in the beginning,

14  but it's been -- it's like carpet.  Like, so think about the

15  carpet in your grandmother's house, right, and it hasn't been

16  changed out in 20 years, right.

17      There's this pathway that's just been worn and worn, over

18  and over, from the couch going back to the bathroom, right.

19  That's the brain of a person with pathological gambling.  The

20  rest of us don't have -- or gambling disorder, I used

21  pathological, I'm going to use the DSM-4 name for it.

22      But um, that's that, it's just been worn and worn and they

23  can't get out of that little valley, right.  Meanwhile, you and

24  I have carpet that's kind of like this in this room; there

25  might be some spots here and there, and -- but it's generally

1  fine, right, where our brain is not worn that way.

2       He's been doing this since, frankly, he was 20, you know.

3  And so, that pathway is just kind of warn and it's not

4  volitional.  Like, how do you say no to a helicopter ride, you

5  know, when -- and they sweet talk you and do all these other

6  things and, we'll give you the suite, we'll have a table ready

7  for you, it's your favorite restaurant, think about the lobster

8  ravioli or whatever they're going to throw your way, right.

9       And this is, and you learn that.  And then, if you don't

10 go, your brain is screaming at you.

11 Q    How does your diagnoses that gambling was not volitional

12 for him square with the fact that a long time ago, he told the

13 casinos not to extend him credit?  Isn't that a volitional act?

14 A    Yes, yes.  So there are small degrees of volitionality.

15 And so, what -- I'm going to borrow from Alcoholics Anonymous,

16 they -- it's a -- you know, Alcoholics been with us since the

17 1930s.  There's some real wisdom there.

18      And they talk about hitting rock bottom, is one of the

19 things that they talk about.  Like, you're never going to

20 change until you hit rock bottom, right.  And so, for Mr.

21 Winick, what happened was, in the -- somewhere in his early

22 20s, in the 1980s, he got in the hole by borrowing from the

23 casinos.

24      And pretty bad, I mean, like a $1 million plus, right.

25 And he had no means to pay this back and like, that was a

1  pretty aversive experience where he wasn't in control anymore,
2  right.

3      And so, at that point, he figured out how to settle up
4  those debts, right.  So he's learning that, I can get out of a
5  hole and settle up my debts, right.  And then, he drew the one
6  and only rule that he had about his gambling behavior:  I will
7  only bring my own money to the casino, which he violated
8  actually in 2018 and 19 when he started borrowing from Mr.
9  Berley.

10     But I will only bring my own money; I'll only bring a bank
11 check or check made out to myself and then, and cash it; I'll
12 only do that.  And so, that's what we call a harm-reduction
13 strategy and that's for people who are not ready to change or
14 cannot change.

15     You know, the big, to give you an example of what I mean
16 by harm-reduction is where you -- and this -- it's been around
17 with us since the 1990s and it takes a little while for people
18 wrap their head around this, because we had this idea that
19 addiction is this volitional thing, right, and it's a moral
20 weakness, and the person's not really out of control.  They can
21 control the situation, no.  Hallmark is loss of control.

22     But so, harm reduction says for people who are -- who
23 can't change, you know, are unable to change; we've got to do
24 something so that we don't, these -- to limit the bad things
25 that are happening in our lives.  So the example is, needle

1  exchange programs for people who do IV drugs, right.  What

2  we're trying to do there is we will give you, you come, bring

3  your used needle, you give it to us, we'll give you a brand new

4  clean, you know, sterilized needles that you can use to shoot

5  up your drugs, right.

6       And what we're doing there is we're trying to prevent the

7  spread of blood-born pathogens, right, because I use a needle,

8  I shoot up and then, I turn to you and say, all right, your

9  turn to use drugs because I use it with somebody else; and you

10 -- and it has a little bit of blood on me from my blood and

11 then, I give it to you, and I have HIV.  And then, you use,

12 then you get HIV, right.  So we're trying to prevent the spread

13 of HIV.

14      What we do also in, you know, there's -- it's been in the

15 news.  New York is trying to do this, Philadelphia's trying to

16 do this, Vancouver's the first place to do this was, they're

17 safe places where you go and you can use your drugs, and mostly

18 IV drug use, in a supervised setting.

19      So there's a nurse practitioner.  You walk in with your

20 drugs that you bought off the street and usually opiates of

21 some sort, opioids, and heroin, and then, you go and it's

22 called supervised injection.

23      America clearly has a problem with this.  This is like a

24 line too far, but where the person is allowed to come in,

25 they're actively using drugs, they give them a clean needle,

1  they give them all the stuff to go use; the paraphernalia.

2       And then, they have a spot where they can sit and the
3  whole point of these is trying to watch people to prevent
4  overdose and give them clean syringes, because we don't --
5  people, when they buy drugs off the street, they don't know
6  what's in there.  There could be fentanyl in there and then,
7  that could kill them, right, through overdose.

8       So we do harm reduction strategies in all other addiction
9  treatments in our addiction efforts.  And so, he -- and
10 individuals can do this themselves, they don't need to have
11 programs that -- that was his one and only one.

12      So that was his golden rule, because he hit rock bottom
13 there, right, because he was no longer the one in -- he owed
14 somebody a huge pile of money.  He didn't know how to get out
15 of it.  So then, he's like, I'm never going to have that
16 happen.

17      But then, he did it again, 2018 and 19, right, he started
18 borrowing from David Berley.  He didn't go to the casinos.  He
19 knew not to do that; he wouldn't borrow out, but he started to
20 other people and getting money.

21 Q    Turning to your second opinion, can you explain the basis
22 for the opinion that he didn't perceive the need to change his
23 gambling behavior?

24 A    Yeah.  I mean, past behavior.  I can just say, past
25 behavior.  You know, so the two -- the early experience of

1  getting in the hole with the casinos in the 80s showed, oh,

2  hire a bunch of lawyers, work it out, be done, move along, keep

3  gambling like that, right.

4      And then, 2002 to 2005, again, more specifically around

5  back taxes; you know, he owes, you know, state, local and

6  federal governments some tax money.  He gets on a payment plan;

7  2012, he settles up all his debts.

8      All right, let's go.  And he's -- and during that 2012,

9  2002 to 2005 and continuing through that time period, he's

10 continuing to gamble in the same pattern he's always done; it

11 all worked out in the end.

12     So past behavior has shown him just to keep doing what

13 you're doing; it'll work out.

14 Q   Is there scientific literature supporting this idea that

15 past behavior influences how they perceive their current

16 behavior?

17 A   Yeah, I mean, we have a saying; past behavior -- the best

18 predictor of future behavior is past behavior and there's huge

19 amounts of literature showing that.  You know, where our brain

20 likes patterns and desires and craves patterns.

21     And so, it learns these patterns and it just does it.

22 That was a pattern he learned.

23 Q   Moving on to opinion three, can you explain the basis for

24 your opinion that he was slow to realize the harm that he was

25 doing?

1  A    It's such a common pattern with individuals with gambling

2  disorder, that they don't -- because it's -- gambling in

3  individuals with gambling disorder, it's about the money, but

4  it's not about the money, because it's about the money is a

5  means to get that thrill, that action, that rush.

6       And so, and then, when they hit it big, it's -- you know,

7  it is.  But -- and so, I mean, I've treated an airline pilot,

8  one of the most rational set of people you will ever meet,

9  right.  But he goes into the casino and he, like, there's no

10 reality.  Like, I worked with a physical therapist who said,

11 you know, all oxygen to my brain is shut off when I walk into

12 that casino, because I am not a rational human being.

13      I've treated anesthesiologists; these highly-educated

14 people who you hold respectable positions in society and they

15 have gambling problems, right.  And so, you know, frankly, the

16 anesthesiologist, he was only there because his wife and his

17 kids were pissed off because the college fund was gone and he

18 started to dip into the retirement fund and the wife's like,

19 nuh-uh, this is not happening on my watch.

20      But they're just not attending to the money.  It's a means

21 to the end and so, many individuals, as I said before, you

22 know, the top reason why people call help lines is basically

23 there's a financial crisis and that's what pushes people.

24 Q    Is there a typical time frame by which someone with

25 gambling disorder realizes the magnitude of their losses?

1  A    No, we -- no.  There is not a -- no, because the vast
2  majority of people never seek professional help for a gambling
3  disorder so it's at least 80 percent.  And we're constantly,
4  through our research, trying to figure out ways to reach people
5  and to encourage them to come in.

6        And when you talk to them about why they don't come in,
7  it's shame and stigma, but it's also, I don't think I have a
8  problem, right.  There's a scientific word for it, where
9  basically they don't recognize this is a problem.  And Mr.
10 Winick did not recognize this as a problem.
11 Q    How typical is his case in terms of not realizing he had a
12 problem?
13 A    It's very much in the range.  He's not special in that
14 way.
15 Q    Is there any research or literature on the amount of time
16 it takes for someone with gambling disorder to get back on
17 their feet?
18 A    It depends on the carnage, right, so it depends on how big
19 the debts are.  We know that, you know, 17 to 1 in 5, little
20 bit less than 1 in 5 of individuals with a gambling disorder
21 declares bankruptcy and then, that takes several years to work
22 through and recover from.

23       Some people never frankly recover.  I mean, there are
24 individuals who commit suicide from gambling, due to the
25 financial hole that they see that problem is unsolvable.  The

1  rate of suicide ideation, suicide attempt and completing

2  suicide due to gambling disorder, is one of the highest among

3  all psychiatric disorders.

4       There's a recent publication that showed gambling your --

5  had a higher prevalence of suicidal ideation and attempt higher

6  than depression, so major depressive disorder, MDD.  And so,

7  gambling disorder, so people -- some people never recover is

8  the bottom line.

9  Q    That's all I have.  Thank you, Dr. Weinstock.

10 A    You're welcome.

11          THE COURT:  Mr. Barnea, do you want to go right into

12 the cross, or would you like to take a short break?

13          MR. BARNEA:  Why don't we take a short break and --

14          THE COURT:  Ah.

15          MR. BARNEA:  -- also, do a little fixing the monitors

16 and such.

17          THE COURT:  Okay.  How much time do you want?

18          MR. BARNEA:  Ten minutes.

19          THE COURT:  Okay.  Let's take a ten-minute break.

20          Dr. Weinstock, you can step down.  During the break,

21 throughout your testimony, please do not speak with your

22 counsel about the case, or anyone about the case.

23          THE WITNESS:  Right.  I'm just going to go get a

24 drink of water and come back.

25          THE COURT:  Okay.  You're welcome to stretch your

1  legs, whatever you'd like.

2          THE WITNESS:  Does anybody have a water glass I can

3  have?

4          MR. YAN:  There's water outside.  I'll --

5                      (Recess)

6          THE COURT:  Okay, be seated.

7          Somebody has put a very large binder on my desk.

8          MR. BARNEA:  Yes, Your Honor.  Those are the

9  documents that we may need to look at with Dr. Weinstock during

10 his examination.  So we've given a copy to Dr. Weinstock, to

11 Your Honor, to your Law Clerk and to Mr. Winick's counsel.

12         THE COURT:  And are you planning to put them up on

13 the screen as well?

14         MR. BARNEA:  Yes, we are.  And again, some of these

15 exhibits may be things -- or there may -- some of them are not

16 even exhibits.  They're deposition transcripts and the like

17 that we may need to show Dr. Weinstock to refresh his

18 recollection.

19         THE COURT:  Okay.  Please proceed.

20                   CROSS-EXAMINATION

21 BY MR. BARNEA:

22 Q    Good morning, Dr. Weinstock.

23 A    Good morning.

24 Q    So you were retained in this case to assess whether Mr.

25 Winick has a gambling disorder and if so, to opine on the

1 ramifications of that disorder; is that right?

2 A    Yes, during the period of 2012 to 2019.

3 Q    Okay.  Actually, in your report, you wrote that you were

4 going to evaluate him from 2012 to 2020.  Is that accurate?

5 A    Yes, if that's what's in the report.  Yes.

6 Q    Okay.  So to render that opinion, you interviewed and

7 evaluated Mr. Winick on, I believe, it was August 31, 2022?

8 A    Correct.

9 Q    And that interview lasted about two hours, right?

10 A    Correct.

11 Q    And that's the only time you spoke with Mr. Winick before

12 rendering your opinion, right?

13 A    Correct.

14 Q    And in addition to speaking with Mr. Winick, you were

15 given certain information about him, right?

16 A    Yes.

17 Q    You were given a report about his gambling losses, right?

18 A    Yes.

19 Q    And you were given his tax returns from 2012 to 2019,

20 right?

21 A    Yes, to review his income.

22 Q    And you received a document related to a personal loan

23 from Mr. Berley that Mr. Winick had defaulted on, right?

24 A    Yes, I believe so.

25 Q    And you were retained by Mr. Winick's lawyer to provide

1  this assessment, right?

2  A     Yes.

3  Q     And you've been paid for your analysis and your testimony,

4  right?

5  A     As listed in the document.

6  Q     And you understood that your assessment and report were

7  going to be used for a legal case, for this case, right?

8  A     Yes.

9  Q     But you don't know the legal implications of Mr. Winick's

10 gambling disorder, right?

11 A     I'm not a lawyer.

12 Q     And it's not clear to you whether Mr. Winick had an

13 incentive to exaggerate his disorder to help in this lawsuit,

14 right?

15 A     Yes.  It's not clear to me.  I don't know the

16 implications.

17 Q     So you didn't consider any potential such incentive, as

18 part of your analysis, right?

19 A     I think it's more nuance than that.

20 Q     Okay.  You -- okay.  Well, let's move on.  As you

21 testified on direct, you reached several conclusions about Mr.

22 Winick's gambling, right?

23 A     Yes, four opinions.

24 Q     And your first conclusion was that Mr. Winick had a

25 moderate gambling disorder until August of 2019, right?

1  A     Correct.  Moderate-severity, yes.

2  Q     In August 2019, is when he stopped gambling altogether,

3  right?

4  A     Per my knowledge from the interview, yes.

5  Q     Now, as you explained earlier, for a gambling disorder to

6  be moderate, the person has to endorse six or seven of the nine

7  specified criteria in the DSM, right?

8  A     Six or seven.

9  Q     And you concluded that before 2018, Mr. Winick's met six

10 of those criteria, right?

11 A     Yes.

12 Q     And as of 2018, he went up to seven criteria, right?

13 A     Yes.

14 Q     And when you make this kind of assessment, you look at how

15 many of the criteria a person meets, right?

16 A     Yes, we all use the criteria to figure out -- yes, the DSM

17 requires us to do so.

18 Q     But you don't look at the quantity or extent to which the

19 person exhibits each criterion, right?

20 A     That's -- it's an ongoing scientific discussion and debate

21 and area of research about sort of how do you understand the

22 severity of this because it is such a continuum in a gray zone,

23 that there is nuance there to understand that we don't -- the

24 DSM, I'll just say, the DSM is an x-ray, right.  So think about

25 it like an x-ray of my arm and I have a broken bone, right.

1  What it tells me is, by observable behavior, that there's

2  something wrong, something broken there.

3       The DSM doesn't tell you causality or things like that,

4  right; and so, or what the implications are for treatment

5  necessarily in terms of -- I mean, we know people who are more

6  severe, treatment is much harder, difficult; we know that it's

7  much more difficult for them.  They're more likely to have

8  comorbid disorders and all these other things going on.

9       But, you know, that broken bone could be due to a tumor,

10 it could be due to a car accident, it could be due to calcium

11 deficiency, right.  And so, the DSM is because of -- and this

12 is true for every diagnosis, we rely on observable behavior and

13 report of the individual.

14 Q    Okay.  In diagnosing Mr. Winick, you counted the number of

15 criteria he met.  You did not determine how serious each

16 criteria or how severe each criteria was; is that right?

17 A    The DSM does not require that.

18 Q    Okay.  Let's take a look at some of those DSM criteria.

19 Why don't we take a look at Plaintiff's Exhibit 57; it's in

20 your binder and we're going to put it up on your screen.

21 A    Mm-hmm.

22 Q    And if we go to the bottom of page 4, and the top of page

23 5, we have listed the nine criteria that you talked us through

24 --

25 A    Yup.

1  Q    -- a little bit earlier.  You see that, okay.  So -- and

2  again, you explained some of these to us earlier.  So let's

3  just talk about a few of them.  The first criterion is needs to

4  gamble with increasing amounts of money in order to achieve the

5  desired excitement; is that right?

6  A    Mm-hmm.

7  Q    Okay.  And just to -- you have to say, yes or no --

8  A    Oh, sorry.  Yes.

9  Q    -- because mm-hmm -- court reporters don't know how to

10  type mm-hmm.

11  A    Yeah, no, no.  Okay.

12  Q    This is the biggest lawyer trick that we learn when we

13  take depositions and --

14  A    I didn't mean to do that.

15  Q    -- trials and stuff.  Okay.  So this criteria about

16  needing to gamble increasing amounts of money, in order to

17  achieve the desired excitement.  This is sort of analogous to a

18  drug or alcohol addiction where the amount that the person

19  needs to get high increases over time, right?

20  A    Yes, it's consistent with that.

21  Q    To paraphrase an analogy that you gave during your

22  deposition, if three beers used to be enough for the person to

23  get buzzed, over time, that wouldn't be enough and he would

24  need six beers to get the same effect, right?

25  A    Yes.

1  Q    Okay.  So in the gambling context, this would mean that

2  earlier in the person's gambling career, betting, say $1,000

3  would be enough to be exciting, but over time, the person would

4  need to bet $5,000 to get the same thrill, right?

5  A    Yes, that is correct.

6  Q    Now, as you explained during your testimony, during the

7  period in question from 2012 to 2019, Mr. Winick had a pretty

8  patterned-gambling behavior, right?

9  A    Mm-hmm.  Yes.

10 Q    See -- from Memorial Day to Labor Day, he went to the

11 Mohegan Sun on three out of every four weekends, right?

12 A    Yes.

13 Q    He would gamble on Thursday evening for a few hours,

14 right?

15 A    Correct.

16 Q    And then, he would sometimes gamble for another hour on

17 Friday morning, right?

18 A    Correct.

19 Q    And he would bring a bank check with him for $200,000 to

20 $250,000 for each such trip, right?

21 A    Or a personal check, yes.

22 Q    Right.  And that's the amount he would gamble with on each

23 such trip, right?

24 A    Correct.

25 Q    Okay.  And he didn't go gambling when he had social

1  obligations that prevented him from going, right?

2  A    Occasionally.  I mean, he would sometimes try to get out

3  of those.

4  Q    Right.  But that was the three out four weekends,

5  scenario?

6  A    Mm-hmm.

7  Q    And his standard Black Jack bet during this time was

8  $10,000 a hand, right?

9  A    It ranged.

10 Q    He sometimes, on rare occasions, bet up to $25,000 per

11 hand, right?

12 A    Correct.

13 Q    Okay.  And he actually decreased his standard bet size in

14 2017, after he lost a big client account, right?

15 A    I'm not aware of the exact facts there, but he continued

16 to persist to gamble regularly.

17 Q    Right.  But his standard bet size decreased after he lost

18 the client account, right?

19 A    I'm not aware of that.

20 Q    Did you, when you interviewed Mr. Winick in this case,

21 take notes of your interview?

22 A    Yes, I have my own personal notes.

23 Q    And did you produce those notes to Mr. Winick's lawyer in

24 this case?

25 A    No.

1  Q    Okay.  We received a set of your notes.

2  A    Oh, I guess I did then, yes.  Sorry.  Sorry.

3  Q    If you didn't, then I'm not sure what notes I have.

4  A    Yeah, that -- I'm sorry.  Yes, I mean, you don't share

5  unless I guess you asked, because I don't really recall that.

6  But --

7  Q    Why don't we just take a look at --

8  A    -- mm-hmm.

9  Q    -- your notes, just to see if this refreshes your

10  recollection.  This is the first page of your notes.  Are these

11  the notes you took during Mr. Winick's interview?

12  A    They appear to be.

13  Q    Okay.  And if we look at the bottom paragraph, I'm looking

14  at the end of bullet point one, "Bet size decreased in 2017,

15  Duane Reade account lost, biggest account." So --

16  A    Okay.  Yeah, so I -- that's what he did share then.  I'm

17  sorry, I don't recall that.

18  Q    -- no problem.  All right.  You can put that down.  Thank

19  you.  And you also explained that in addition going to Mohegan

20  Sun during summer weekends, Mr. Winick also participated in

21  Black Jack tournaments in, I believe, it was in Connecticut and

22  in Atlantic City.  Is that right?

23  A    Throughout the year.

24  Q    Right.  And he -- at those tournaments, the prize money or

25  the gambling money was between $250,000 and $500,000, right?

1  A    That -- those were the jackpots; a few won.

2  Q    Okay.  And then, you also explained that Mr. Winick

3  regularly went to the Atlantis Hotel in the Bahamas several

4  times a year, right?

5  A    Correct.

6  Q    And he took those trips around major holidays, right?

7  A    Yes.

8  Q    And he gambled during those trips and he'd usually bring

9  about $500,000 for each such trip, right?

10 A    Correct.

11 Q    And he limited himself to that amount during each such

12 trip, right?

13 A    Mm-hmm.  Sorry, yes.

14 Q    And then, finally --

15 A    That was his harm-reduction strategy.

16 Q    -- right.  And finally, you said that Mr. Winick would

17 gamble in Las Vegas during the week before Memorial Day when he

18 would attend an annual convention there, right?

19 A    Correct.

20 Q    So this patterned-gambling behavior was in place between

21 the years that you looked at, 2012 to 2019, right?

22 A    Yes, but there were changes based on what his income would

23 allow.

24 Q    Right.  And --

25 A    Right, and so, he would exceed and he would go up if his

1  income supported that, you know. And so, that's a part of that
2  tolerance. There's also the historical tolerance from $1,400 a
3  hand when he was 19 or 20 in Puerto Rico to, you know, $10,000
4  to $25,000 a hand.
5  Q    -- oh, and let's take a look at that. Let's talk about
6  that very point. Let's take a look at Mr. Winick's gambling
7  losses. I believe that's in a Joint Exhibit 3. This is one of
8  the sets of documents that you received in order to prepare
9  your report, right?
10 A    That's one of the documents, yes. There's many.
11 Q    Right. And this document, and it has many pages, reflect
12 Mr. Winick's overall annual gains or losses from gambling at
13 each casino, for each year, right?
14 A    It reflects losses?
15 Q    Right. Well, overall annual gains or losses?
16 A    It -- there's not gains.
17 Q    Well, actually, there are a few, but mostly there are
18 losses.
19 A    Yes.
20 Q    I agree with you. Let's turn to the last page, page 43 of
21 this Exhibit. So this is a chart, maybe this is the one that
22 you were -- that you've seen most closely. This is a chart
23 summarizing the information provided by each of the casinos,
24 right?
25 A    Yes, but wasn't there also another casino that didn't have

1  records for him?

2  Q    I'm not aware of that.  But this is the chart that --

3  A    That was provided as an Exhibit, yes.

4  Q    -- we received, yes.  As you can see, there's a column for

5  each casino, right?

6  A    Yes, correct.

7  Q    And there's a row for each year from 2012 to 2019, right?

8  A    Correct.

9  Q    And the annual total from all the casinos is in the far

10 right column; do you see that?

11 A    Correct.

12 Q    So in 2012, Mr. Winick lost more than $4.5 million

13 gambling in various casinos, right?

14 A    Yes, and that was the year his salary was the highest.

15 Q    Right.  And then, in 2013, his gambling losses were cut

16 almost in half to about $2.4 million, right?

17 A    Yes.  And the thing also about gambling is it's an

18 unpredictable event.

19 Q    I'm just -- sure.  I'm just asking some questions about

20 this chart.

21 A    Yes.

22 Q    So and in 2014, his gambling losses decreased again to

23 about $2.1 million, right?

24 A    I think that the point that I was trying to make is very

25 important, is that while these are losses, there's ups and

1  downs within there.  And so, you know, there's more money on

2  the table that he wagered than necessarily are being reflected

3  here.

4  Q    Right.  But we don't have the information about his

5  specific --

6  A    No.  No casino at that time had that --

7  Q    -- gains or losses, wins.

8  A    -- level of data.

9  Q    So all we have are these overall loss numbers that were

10  provided, right?

11  A    Yes.  And I'm saying that they don't fully reflect the

12  scope of his gambling.

13  Q    Right.  I mean, if you see some -- in some years in

14  certain casinos, he did win certain amount of money.  So for

15  example, in the Wynn Casino in 2012, he had overall win of

16  $306,000 for that year, although that was overtaken by the

17  losses from other casinos, right?

18  A    Yes.  But again, you're try -- I think what you're asking

19  is the overall picture of his gambling and there are -- there's

20  variability that this document doesn't capture.

21  Q    Right.  But we don't have any information about that

22  variability?

23  A    Yeah, there's no information.  But we know it's there.

24  Q    Right, okay.  So from 2014 to 2015, his gambling losses,

25  overall gambling losses, went down from about $2.1 million to

1  about $970,000, right?

2  A    Yes, that's what it reflects.

3  Q    And then, there was an increase in 2016, up to $1.8

4  million, right?

5  A    Yes.

6  Q    And followed by a dramatic decrease in 2017 to about

7  $560,000, right?

8  A    Yes, because that was the changing financial

9  circumstances.

10 Q    Right.  And then, even -- another large decrease in 2018

11 to about $115,000?

12 A    Followed by a large increase in 2019.

13 Q    Right, to $426,000, right?

14 A    Yeah.

15 Q    Okay.  How long --

16 A    Tolerance there.

17 Q    -- right.  And Mr. Winick stopped gambling altogether

18 again in August of 2019, right?

19 A    Correct.

20 Q    And that wasn't the first time Mr. Winick had quit

21 gambling, right?

22 A    Correct.  He reported a period of absence in the 90s.

23 Q    Okay.  And he had, during in the 90s, he had quit gambling

24 for about one or two years, right?

25 A    Yeah, due to financial circumstances, again.

1  Q    Right.  So as we can see in this chart, putting aside the

2  potential variability that we cannot see about what was

3  happening within each year, overall, Mr. Winick's gambling's

4  were decreasing during the time period at issue, right?

5  A    There's increases as his income allows.

6  Q    Right.  But in 2012, he lost about $4.5 million and by

7  2017 or 2018, he was losing several hundred thousand dollars a

8  year, right?

9  A    Correct.  And I think -- what I would say that that

10  reflects his harm-reduction strategy of the limiting it to what

11  he can bring to the casino.  But as his income fluctuates up,

12  it goes up.  As it fluctuates down, it goes down.

13  Q    Got it, okay.  Now, as we discussed earlier, you concluded

14  that Mr. Winick needed to gamble increasing amounts of money to

15  achieve the desired effect, right?

16  A    Correct.

17  Q    And that's your conclusion even though Mr. Winick's

18  gambling losses decreased substantially between 2012 and 2019?

19  A    Because they increased back up when he had the

20  availability of funds, whether it was his own income or loans,

21  right; he's taking loans from -- personal loans so he can get

22  that rush.

23  Q    Right.  So that --

24  A    To get that action that he needs.

25  Q    -- so, for example, before 2012, Mr. Winick's income had

1  risen steadily for some time, right?

2  A    I didn't review those tax years, so I don't know his

3  income before 2012.

4  Q    Okay.  But, in general, when his income went up, he

5  gambled more and when his income went down, he gambled less,

6  right?

7  A    Yes.  And so, ask yourself why does it go up, when he has

8  the means to do so, versus -- and then, when it goes down.  And

9  he also explicitly say, that was the next -- the related

10 criteria of, you know, being restless or irritable when he

11 can't go, right.

12     That's -- the two are kind of related a little bit in the

13 sense, you know, I'm not living the lifestyle that I deserve,

14 that I achieve, right, and there's that restless and

15 irritability that goes with that and he also really wanted to

16 go.

17 Q    Right.

18 A    So yeah, so I would say there's tolerances as evidenced by

19 the fluctuation in relationship to his harm-reduction strategy.

20 Q    Okay.  But in general, as his income went up, he gambled

21 more and as his income went down, he gambled less, right?

22 A    Yes, because he had his one harm reduction strategy.

23 Q    Okay.  And then, when his income dropped further, he chose

24 to stop gambling altogether, right?

25 A    After no one else would give him money.

1  Q    And as his income decreased, right?

2  A    Yes, but he -- but his income was decreasing, he was

3  seeking other means to get money to continue to gamble.  So he

4  didn't stop, like, even though his income was going down, he

5  didn't stop.  He just started to find other ways to get money

6  so he could keep going.

7       And when they didn't want to keep him going, that's when

8  it had to stop.  That wasn't his choice.

9  Q    Now, the fact that a person regularly gambles a lot of

10 money in and of itself doesn't necessarily mean they have a

11 gambling problem, right?

12 A    Oh, no.

13 Q    Let's take a look at something in the DSM.  Let's take a

14 look at page 8 of Exhibit 57.

15 A    Can I back up to that question for one second?

16 Q    Sure.

17 A    I will say, we do have financial moderation -- I'm going

18 to use moderation, we call it low-risk limits, guidelines based

19 on income that we know that individuals who consistently exceed

20 1.7 percent of their annual income will experience harms

21 related to their gambling.

22      So, I mean, because that's the thing about gambling, is

23 the -- you can't use exact dollar amounts.  You have to look at

24 it as an intensity is better reflected as a percent of income.

25 That's in my report, that he is betting 39 percent, over that

1  time period, he bet 39 percent of his income.  That, at well,

2  exceeds 1.7 percent.

3       So we know from the scientific literature, based on that

4  intensity, he's likely to be experiencing problems related to

5  his gambling.

6  Q    Let's take a look at page 8 of the --

7  A    Okay.

8  Q    -- DSM Exhibit.  And if we look at the -- where is it --

9  at the last -- no, no -- the last sentence of that first

10 paragraph that begins with, "Similarly."

11 A    Is it high-lighted?

12 Q    Right in the middle of the page; it's about in the middle

13 of the page.  "Similarly, amounts of money spent wagering" --

14 A    His frequency of gambling can be related --

15 Q    -- so does it say there that, "Amounts of money spent

16 wagering are not in themselves indicative of a gambling

17 disorder.  Some individuals can wager thousands of dollars per

18 month and not have a problem with gambling.  While others may

19 wager must smaller amounts but experience substantial gambling-

20 related difficulties."  Did I read that correctly?

21 A    You did read that correctly.  Can I add some additional

22 context?

23 Q    Well, I think that -- you can do that Mr. Winick's lawyer

24 on re-direct, if you need.  If we look also on the same page,

25 in the second sentence of that paragraph.  It begins with

1  "National Data."  Let's read that sentence.  It's towards the

2  top of the first paragraph.

3  A     Right after (indiscernible)?

4  Q     Yup, yup.  "National data from the United States and

5  Canada show that most individuals who develop a gambling

6  disorder evidence a pattern of gambling that gradually

7  increases in both frequency and amount of wagering."  Do you

8  see that?

9  A     Yes.

10 Q     But Mr. Winick's gambling did not gradually increase in

11 frequency during 2012 to 2019, right?

12 A     He had a long-established maladaptive pattern of gambling.

13 Q     And his gambling did not gradually increase in the amount

14 of wagering during that period either, right?

15 A     No.  His gambling problem was ongoing.

16 Q     Okay.

17 A     This is about the development.

18 Q     Got it.  I'd like to turn to one of the other DSM

19 criteria.  Let's go back to pages 4 and 5 and the list of the

20 factors.  And let's look at the sixth criteria on the bottom,

21 on the top of page 5.  This is what you were talking about

22 earlier as chasing losses, right?

23 A     Correct.

24 Q     And that is when a person loses money gambling, they often

25 return another day to try to get even, right?

1  A    Yes.

2  Q    And you concluded that Mr. Winick is outside this

3  criterion, right?

4  A    Yes.

5  Q    And your basis for concluding that Mr. Winick was chasing

6  his losses was that sometimes, if he lost money on a Thursday

7  night and still had money left over, he would go back and

8  gamble the remainder of his money on Friday morning, right?

9  A    Mm-hmm.  And it's not literally, so another day -- so it

10 doesn't have to be the next day.  Sometimes he would go back,

11 you know, when you think about it, he was thinking about how he

12 needed to pay his taxes and he would think about having his day

13 in the sun to earn -- to make up that money that he didn't

14 have.

15      So he was, it was primarily due to gambling losses.  So it

16 could be also an additionally an episode the following week

17 when he goes.  But he would also, Friday morning, if there was

18 money left over, he would go and try to recoup the losses from

19 the previous evening.

20 Q    But -- if we can -- oh, sorry.  No, no.  Go ahead, sorry.

21 A    I would also add this criterion is one -- is not present

22 in the other substance-use disorder criterions.  So if you're

23 not an expert, you may not be familiar with this criterion as

24 well, because it is novel and only applies in the context of

25 gambling disorders, not found in the criteria set for alcohol

1  use and other addictions.

2  Q    But -- okay.  I got that, but when Mr. Winick gambled on

3  Friday mornings, he would still be using the remainder of the

4  $200,000 pot that he had brought with him for that weekend,

5  right?

6  A    He was chasing the losses from the previous night.

7  Q    Well, he -- but my question is, he was using the remainder

8  of money that he had already brought with him to gamble that

9  weekend?

10 A    Consistent with his harm-reduction strategy of only

11 bringing a set amount.

12 Q    Right.  Now, let's go back at the -- to the DSM and read a

13 little bit more of an explanation about this criterion.  It's

14 on page 6 of Exhibit 57 and it's the last paragraph.  "The

15 pattern of chasing one's losses may develop with an urgent need

16 to continue gambling often with placing larger bets, or taking

17 greater risks to undue a loss or series of losses.  The

18 individual may abandon a gambling strategy and try to win back

19 losses all at once, although many gamblers may chase for short

20 periods of time, it is the frequent and often long-term chase

21 that is characteristic of gambling disorder."  Do you see that?

22 A    Yes.

23 Q    Mr. Winick didn't tell you that he increased his bet size

24 substantially on Friday mornings compared to Thursday evenings,

25 did he?

1  A    He did not share that.  He did say there was fluctuation

2  from $10,000 up to $25,000.

3  Q    Right.  And Mr. Winick didn't tell you that he abandoned

4  his gambling strategy on Friday mornings and tried to win back

5  all his losses from Thursday nights all at once, did he?

6  A    They may abandon; it doesn't mean that they are required

7  to abandon.

8         THE COURT:  Dr. Weinstock, I'm going to step in here

9  and ask that you please listen carefully to the question that's

10 asked and try to confine your answers to the question you've

11 been asked.

12        THE WITNESS:  Yes, Sir.

13 Q    Okay.  Let's switch gears a bit.  You testified earlier

14 that Mr. Winick's gambling during the time period in question

15 was not volitional; do you remember that?

16 A    Yes.

17 Q    Okay.  So essentially, if Mr. Winick went to gamble, he

18 couldn't choose to do otherwise, right?

19 A    Can you repeat the question?

20 Q    Once he was, you know, on his way to the casino or once he

21 was decided to go to the casino, he sort of had to gamble.  Is

22 that your opinion?

23 A    Yes.  In the addiction literature, we -- and, Judge,

24 please correct me if I'm going off, but I want to stick to the

25 answer, but we have, there's this construct called stimulus

1  control.  And basically, the closer an individual comes to

2  their addictive object, the harder it is to make an alternative

3  decision.

4       And so, you know, stepping on that helicopter, there is

5  no, you know, literally no getting off that train, but no

6  getting off the helicopter before he arrives there and then,

7  gambles.

8  Q    I wouldn't recommend getting off -- jumping off a

9  helicopter anyway.

10 A    Yeah.  So we, and this applies to all addictions, we know

11 that, you know, one of the first things we do, is we tell

12 people to get rid of all their paraphernalia.  Like, smokers,

13 we say, get rid of lighters, ashtrays; all these things because

14 those are cues and that's you're really close to that stimulus.

15      And so, we do what's called stimulus control where we try

16 to have the person rearrange the environment so they don't come

17 in contact with those cues.

18 Q    Right.  And it's your conclusion that Mr. Winick

19 experiences serious loss of control while he's gambling, right?

20 A    Yes.

21 Q    And as you said, the triggers for this loss of control

22 were things like receiving calls from a gambling host to

23 arrange a helicopter ride to a casino, right?

24 A    And internal cues as well, but, yes.

25 Q    But, and you discussed this earlier as well, Mr. Winick

1  was able to set some limits or controls on his gambling, right?

2  A    There was one, and only one, yes.

3  Q    Well, he didn't gamble every dollar he earned, right?

4  A    No, he did not.

5  Q    He didn't gamble so much that he lost his apartment or his

6  vacation home by gambling with his rent money, right?

7  A    No.

8  Q    He was able to impose limits on his gambling and you've

9  referred to these as harm-reduction strategies, right?

10  A    Yes.  And I believe this is what keeps him in the moderate

11  severity range, is that harm-reduction strategy.

12  Q    Now, you mentioned earlier during your direct testimony,

13  some harm-reduction strategies are external, like the State or

14  City providing a needle exchange --

15  A    Yeah.

16  Q    -- like for drug users.  But this was an internal harm-

17  reduction strategy that he set for himself, right?

18  A    And individuals can do both.  Like, both can happen, yes.

19  Q    And you mentioned this already, Mr. Winick refused to take

20  loans from casinos, right?

21  A    Correct.

22  Q    And that was the limit he put on himself, right?

23  A    Yes.

24  Q    And he chose to take that limit upon himself, right?

25  A    Yes.

1  Q    And relatedly, Mr. Winick went on each gambling trip with

2  a bank check or a personal check for the amount he had decided

3  in advance that he would gamble during that trip, right?

4  A    What we felt was in his bank account, yes.

5  Q    So for example, when he went to Mohegan Sun, he would

6  typically bring between $200,000 and $250,000 with him, right?

7  A    Correct.

8  Q    And he was able to set that constrain on himself, right?

9  A    That was the one constraint, yes.

10 Q    Now, as we also discussed earlier, Mr. Winick also gambled

11 on a relatively-set schedule, right?

12 A    Relatively.

13 Q    That was another decision he made to structure his

14 gambling, right?

15 A    I think that's an interesting question.  People, so -- and

16 this is with gambling disorder all -- I would say almost all of

17 them have a pattern to their gambling behavior that's pretty

18 consistent.

19      So one of the assessment tools, I mean, so Mr. Winick here

20 had his reports from the casinos.  Prior to being able to get

21 reports from casinos, we would ask clients to sit down and fill

22 out a calendar to retrospectively tell us what to do.

23      And, I mean, I've done hundreds of these calendars with

24 people.  And one of the things we do is feed them back this

25 information from their calendar because they're, like Mr.

1  Winick, they are not aware of how much they're spending.

2       But it's always, for many people with gambling disorder,

3  it is a really patterned thing that they're doing.  It is, you

4  know, they're going on pay day is another big example of how

5  things can be pattern.  It's the availability of money or

6  access.

7       Sometimes it's when they can get free from family -- like,

8  everybody has a different sort of story of way that their

9  gambling behavior is patterned.

10  Q    Okay.  Well, as a result of the various self-imposed

11  constraints that Mr. Winick had, he kept enough of his earnings

12  to pay for his expensive apartment and other luxuries, right?

13  A    Yes, he was paying for the things he had established for

14  himself.

15  Q    And his luxurious lifestyle was part of his identity,

16  right?

17  A    I don't know -- you're using the word, luxurious, and I

18  don't know anything about his apartment or other things that he

19  did besides, I know that he would go to the casinos and then,

20  he would go to the Hamptons.  I don't -- he doesn't own -- I

21  didn't -- I don't know if he owns property there, or if he was

22  staying with friends.

23       So I can't speak to the word, luxurious, I would say.

24  But, yes, he was maintaining whatever lifestyle he had set up

25  for himself.  However, he'd also become frustrated when he

1  couldn't gamble and he said like, and he used the word,

2  lifestyle.

3  Q    Okay.  Well, one of the things Mr. Winick liked about

4  gambling was how well the casinos treated him, right?

5  A    That's part of it, yes.  That's part of it for lots of

6  people.

7  Q    Yeah.  He liked how the casinos gave him perks like free

8  hotel rooms and helicopter rides, right?

9  A    Wine, box tickets.

10 Q    That made him feel special, right?

11 A    Yeah.  I mean, that's their goal.

12 Q    Right.  That was -- well, you may not know as much as we

13 have all heard about Mr. Winick's lifestyle, but that was

14 consistent with his love of a luxurious lifestyle, right?

15 A    Okay.

16 Q    So Mr. Winick was able to limit and control his gambling

17 by refusing loans from casinos, to summarize.  So -- to

18 summarize, Mr. Winick was able to limit and control his

19 gambling by refusing loans from casino, by gambling on a set

20 schedule, by gambling only up to a pre-determined amount at

21 each visit and to make sure that he set these limits low enough

22 to maintain his other experiences, right?

23 A    So I would say the pattern piece, that's consistent with

24 anybody with a gambling problem.  That's not a harm-reduction

25 strategy or limitation.  That's just, he needed to get his fix

1  and that's how, the schedule that he needed to fix on.

2  Q    Okay.

3  A    But the other things, I would agree to.

4  Q    Okay.  Mr. Winick also told you that for him business came

5  first and gambling came second, right?

6  A    Correct.

7  Q    And he told you that gambling never effected his work

8  performance, right?

9  A    He talked about bad Mondays, but generally speaking, he --

10 business came first for him.

11 Q    Okay.  So he was able to be successful at work during this

12 time period, right?

13 A    Generally speaking, yes, and I'd say his income verifies

14 that.

15 Q    And in addition, as we've mentioned a few times, he

16 stopped gambling altogether in August of 2019, right?

17 A    Correct.

18 Q    And in your opinion, that's because he no longer had money

19 available to gamble and was no longer taking loans from friends

20 and family, right?

21 A    They would no longer give him loans.  But, yes, he no

22 longer had access to cash.

23 Q    And one of the reasons his income decreased was he had

24 lost his biggest client, right?

25 A    Correct.

1  Q    But Mr. Winick lost that client two years before he

2  stopped gambling, in 2017, right?

3  A    Correct.

4  Q    And after that loss, he still made around $2 million or

5  more every year through 2019, right?

6  A    It fluctuated, but, yes, there was -- it went up and down,

7  but, yeah.

8  Q    In 2019, the year Mr. Winick stopped gambling, he earned

9  almost $2.8 million, right?

10  A    Correct.

11  Q    So it wasn't a literal lack of funds that prevented Mr.

12  Winick from gambling after August 2019, right?

13  A    Well, he was also making payments on his taxes at that

14  point, so I believe he was making regular payments then.  So

15  that was another additional financial outlay each month or

16  quarter, depending on his payment schedule.

17       And he, you know, he -- it's interesting when you talk to

18  gamblers, sometimes I talk with them about, they come into

19  treatment, they ask about moderation.  And I talk to them

20  about, well, 1.7 percent of your income and also, there's some

21  time limits.

22       And you talk to them and they're like, I don't want to do

23  that; that's like -- that's the taste, there's no fun in that,

24  right.  And if he couldn't gamble $200,000 a time, it wasn't

25  worth going.  There were weekends where he wouldn't go because

1  he didn't have that cash going, because it's -- he had to get

2  that dose.

3      If we think about it as dose, he had to get a dose.  So he

4  could no longer get that dose.  He had no longer had access to

5  cash to support that.

6  Q    Even at $2.9 million a year?

7  A    I guess so.  I mean, I don't know how he was spending his

8  money.

9  Q    Now, you know that this case has to do with Mr. Winick's

10 unpaid taxes for tax years 2012 through 2016, right?

11 A    Correct.

12 Q    And part of the issue was that his company had mostly paid

13 him in commissions during those years and no taxes were being

14 withheld from his commissions, right?

15 A    I believe so, yes.

16 Q    And so, he wasn't -- and he wasn't making his quarterly

17 estimated tax payments to the IRS during those years, right?

18 A    That's what I've been informed.

19 Q    Okay.  So to stay current on his taxes during those years,

20 he would have had to set aside the money he was supposed to pay

21 in estimated taxes, right?

22 A    Yes, that's what people typically do.

23 Q    And he would have had to use that money to pay his taxes,

24 rather than for gambling or other expenses, right, in order to

25 stay current on his taxes?

1  A    Yes.  He would --

2  Q    He would have had to set aside his money --

3  A    -- that's what you would have to do, but he has a mental

4  health problem.  Yes.

5  Q    I'm just asking what he would --

6  A    Yeah.

7  Q    -- have had to do?

8  A    A typical person would set aside the money and then, they

9  would pay the -- I mean, I do that.  I pay some quarterly taxes

10  on things and so, yes, you set aside the money and then, you

11  pay it when it comes time.

12  Q    Right.  And in your view, his gambling condition precluded

13  him from making that choice, right, for setting aside the money

14  for his taxes?

15  A    That was the sole -- his gambling was his sole focus.

16  That was -- I mean, business, gambling and the rest was

17  background noise.

18  Q    Right.  So his gambling condition precluded him from being

19  able to set aside however many dollars he was supposed to set

20  aside --

21  A    Correct.

22  Q    -- for his quarterly estimated tax payments, right?

23  A    Yes, correct.

24  Q    And that's because, as you explained, he didn't view that

25  consequences of not paying his taxes as sufficiently -- I

1  believe you put it, you said, aversive, during your deposition;

2  is that right?

3  A    Yes.  That was -- because past behavior had taught him

4  that, you know, I'll just keep doing what I'm doing and, yes,

5  I'll pay that -- pay it off and everything will be fine.

6  Q    He didn't find being past due on his taxes to be aversive,

7  because he had previously been able to payoff past due taxes

8  without serious repercussions, right?

9  A    Yes.

10 Q    In contrast, he found his previous experience of owing

11 money to casinos to be aversive, right?

12 A    Yes.

13 Q    Because he had had a bad experience when he owed monies to

14 casinos several decades earlier, right?

15 A    Yeah, as a young adult.

16 Q    And that motivated him to set the boundary of no longer

17 taking credit from casinos, right?

18 A    Yes.

19 Q    So he -- and it's because Mr. Winick had been able to pay

20 off his prior debt to the IRS through a payment plan, he didn't

21 feel compelled to take any action when he started falling

22 behind on his taxes, right?

23 A    Yeah, he -- past behavior had taught him that he could do

24 this and everything would be fine.

25 Q    But this rendered him unable to set aside money to pay his

1    taxes, right?

2    A    Mm-hmm.  You know, everybody has a different rock bottom,

3    or what they find aversive.  The example that I can use,

4    there's a study where we give, so my -- one of my undergrads,

5    but she did this during her grad study.  They looked at,

6    there's a commonly used questionnaire to assess negative

7    consequences for college student drinkers.

8         And we all can kind of agree what those consequences are

9    and we all think, you know, you and I as adults would say,

10   like, those are negative consequences.  What she did is she

11   gave this list to the college students and said, are these bad

12   things that are happening; are these harmful?  And more than

13   half of the items on the list, they said, no.

14        So people have different perspectives on what's bad and

15   what's aversive.

16   Q    But in your view, the fact that Mr. Winick had been

17   previously able to payoff his past due debts to the IRS made

18   him unable to set aside money to pay his taxes during 2012 to

19   2016, right?

20   A    Yes, his gambling didn't need to stop or change, because

21   he was going -- in his view, I'm going to -- I'll payoff the

22   taxes, just like I did last time.

23   Q    So Mr. Winick was motivated by what he considered

24   sufficiently threatening to him, right?

25   A    He was -- I don't like the word motivated, but we can go

1  there.

2  Q    Okay.  And that included his desire not to be indebted to

3  casinos and his desire to maintain his lifestyle, whatever it

4  was, right?

5  A    I mean, I would say, the harm-reduction strategy was

6  imposed upon him, what in 2017, when they changed how his --

7  Q    Well, we're going to talk about that in a minute.

8  A    Okay.  Please, so what was your question?  I'll gladly

9  answer.

10  Q    He -- it was motivating to him to maintain limits on his

11  gambling to maintain his lifestyle and to not be in debt to

12  casinos, right?

13  A    That was aversive to him, so he did things so that

14  wouldn't happen again.  And not be -- like, he -- being behind

15  on his taxes was not a bad experience, because he paid it off

16  the last it happened.  So --

17  Q    Right.  And being behind in his taxes previously, the

18  consequences of that were not sufficiently threatening to

19  motivate to restrict himself to gambling with only post his tax

20  dollars, right?

21  A    I would say, it doesn't register as a consequence for him.

22  It doesn't appear on his radar, is how I would describe it.

23  Q    So he -- in your view, because of his past experience, he

24  lacked the ability to decide to gamble only with his post-tax

25  earnings, right?

1  A    Yes, he lacked the ability.

2  Q    But as you just mentioned, in 2017, Mr. Winick switched to

3  being paid on mostly on a salary from which his company

4  withheld taxes, right?

5  A    Yes, that was imposed upon him.

6  Q    Well, have you seen a transcript of Mr. Winick's testimony

7  at his trial on Monday?

8  A    No, I have not.

9  Q    Okay.  So you didn't see that Mr. Winick testified that

10 his accountants recommended that he made this change and start

11 withholding taxes, right?

12 A    If that's what's his testimony, then, sure.

13 Q    And you also didn't see that Mr. Winick testified he

14 decided to follow that recommendation, right?

15 A    I did not see that, yeah.

16 Q    And you also didn't see that that was because, as he

17 testified, he had the ultimate power to decide how his company

18 compensated him, right?

19 A    If that's what he testified, yes.

20 Q    Okay.  Now, Mr. Winick continued gambling in 2017 to 2019,

21 after he started having taxes withheld from his earnings,

22 right?

23 A    I'm sorry; repeat the question?

24 Q    Mr. Winick continued gambling in 2017, 2018 and 2019,

25 after taxes were being withheld from his compensation, right?

1  A     Yes.

2  Q     But after he made that switch, his gambling no longer

3  interfered with his ability to stay current on his taxes,

4  right?

5  A     Yeah.  Yes, so because he was -- the money was never put

6  in his hands.

7  Q     In fact, he paid his 2017 and 2018 taxes in full, right?

8  A     I believe so.

9  Q     Okay.  And even though -- he did that even though he was

10 still gambling at the time, right?

11 A     Yes.  He was, yes.

12 Q     So during those years, he was gambling only with his post-

13 tax earnings, right?

14 A     Yes.  And as we saw, they declined.

15 Q     Right.  In addition, Mr. Winick's gambling started well

16 before 2012, right?

17 A     Yes, this was a longstanding pattern.

18 Q     He had been gambling for decades before that, right?

19 A     Correct.

20 Q     And I don't know if you -- you may have not seen this, if

21 you didn't see the testimony or depending what information you

22 got, but in the years leading up to 2012, Mr. Winick was making

23 estimated tax payments to the IRS as well; did you know that?

24 A     Yes.  He was making -- I believe so, yes.

25 Q     And he was making those estimated payments before 2012

1  while also making installment payments to the IRS for his

2  earlier past-due liabilities, in those years leading up to

3  2012, right?

4  A    Yes.

5  Q    And he was making those estimated payments while also

6  gambling before 2012, right?

7  A    Yes.  His income was much different, but, yes.

8  Q    So during that pre-2012 period, Mr. Winick was also

9  gambling, only with his post-tax earnings, right?

10 A    Yes.

11 Q    And finally, throughout 2012 to 2020, Mr. Winick did make

12 payments to the IRS on top of his salary withholdings, right?

13 A    Repeat the question, please.  I'm sorry.

14 Q    During the period that we're concerned with here, 2012 to

15 2020 --

16 A    Yeah.

17 Q    -- Mr. Winick did make voluntary payments to the IRS on

18 top of what was withheld from his relatively small salary,

19 right?

20 A    Correct.

21 Q    Let's take a look at a summary prepared by Mr. Winick's

22 attorney of his tax payments during this time period.

23 A    Mm-hmm.

24 Q    It's Defendant's Exhibit 9 and you have a version of it in

25 your binder.  I don't know if you've seen anything like this

1  before, but it's several pages long and you're welcome to flip

2  through it or Ivy can scroll down a little bit.  I'll give you

3  a minute to take a look at it.

4  A    Mm-hmm.

5  Q    As you can see, between 2012 and 2020, Mr. Winick paid

6  millions of dollars to the IRS and New York State in taxes,

7  right?

8  A    Correct.

9  Q    And he made those payments voluntarily from his bank

10 account, as you can see from the top it says this is from his

11 Chase Bank account, right?

12 A    Yes, I see that on the summary.

13 Q    And he chose to make those payments, right?

14 A    Correct.

15 Q    And Mr. Winick made these additional payments during the

16 same years he was gambling a lot, right?

17 A    He was making these payments as he was gambling.

18 Q    So when he wanted to, he was able to make payments to the

19 IRS rather than gambling that money away, right, even in 2012

20 and until 2016, right?

21 A    He -- so this Exhibit's new to me so I just -- I'm

22 digesting as we're talking.  There's fluctuations, but it

23 appears -- there's fluctuation, so I -- like, what I -- I look

24 at this and I'm wondering, like, starting in 2014, you know,

25 aside from, you know, a couple of payments here and there, he's

1  on a very consistent pattern of paying.  It seems like that's

2  also when he was likely underpaying.

3        So I'm just curious -- I'd be curious about Mr. Winick of

4  what was going on then and just -- that pattern is just kind of

5  curious to me.

6  Q    Well, but in general, between 2012 and 2016, Mr. Winick

7  made many, many payments to the IRS voluntarily, right?

8  A    Correct.

9  Q    No further questions.

10                    REDIRECT EXAMINATION

11 BY MR. YAN:

12 Q    I just have one question.  I just wanted to give you an

13 opportunity to provide context when you were asked about the

14 DSM, where it said, "amounts of money wagering are not in

15 themselves indicative of gambling disorder."

16 A    Yes, can we bring that -- is that back up, defense

17 counsel, or whichever they are.

18 Q    Sure.  Do you have a copy of, it's Plaintiff's Exhibit 57?

19 A    Oh, 57, okay.  So this is, the context there -- I'm just

20 trying to find the statement where it says this.

21 Q    Yeah.  It's under the hearing, "Development and Course,"

22 and it's the second to last sentence of that first paragraph.

23 A    All right.  So we're going under Development --

24 Q    The bottom of the page is 273 out of 282.

25 A    -- yeah.  I found Development and Course.  So this has

1  been one of the -- the field really grappled with this issue

2  for a long time.  Because dollar amount is not -- it's

3  different for different people, right.

4      You know, so like, for example, and it's really based on

5  your income, right.  So $1,000 to somebody making $30,000 to

6  $1,000 versus someone making $100,000 versus someone making $1

7  million a year, it's very different dollar amounts, right, in

8  terms -- like, the actual dollar amount is the same, but the

9  impact of losing or wagering that is very different to the

10 person depending on their income.

11     It's sort of like, I think, it's one of the Norwegian

12 countries now does speeding tickets based on your income, not

13 based on how much -- a standard flat rate, right, because the

14 rich can -- you know, people who make high incomes, you know,

15 it's not penalizing to pay out $150 ticket, right.

16     So that's what we've been grappling here.  And so that's

17 why that we -- there's context there and why, as a field, we

18 are -- when we look at these moderation limits, we go to

19 percent of income.

20     And so, that is a better way of capturing it along those

21 lines and that's why they say, some wages -- some individuals

22 waste thousands of dollars per month and not have a problem

23 with gambling, while others wager much smaller amounts, but

24 experience social gambling harm.  It's because it's income, is

25 the big thing, or it's -- sometime it's not always income.

1  Also, sometimes it's spouses or relationships, like, the fact

2  that you're gambling it all can be problematic if your social

3  network doesn't support you gambling, right.

4      We know in moderation when people try to set moderation

5  goals, one of the things that we have to talk to people about

6  is does your support network, your family, your loved ones,

7  your significant others; if you pick up a drink and they see

8  you, are they going to lose their minds and be very upset with

9  you, because in that case, the moderation is not going to work.

10      So what are the sort of harms associated with it; if they

11  see you place one bet, by one lottery ticket, are they

12  automatically assuming and you're just going to go right back

13  to it.

14      So the actual dollar amount isn't the best set of

15  information.  It's really the context there related to that.

16  Q    Thank you, Dr. Weinstock.  I have nothing further.

17          MR. BARNEA:  Nothing further.  Thank you.

18          THE COURT:  Okay.  Dr. Weinstock, you are excused.

19  Thank you.

20          THE WITNESS:  Thank you.

21          MR. YAN:  I think that's all we have for today, Your

22  Honor.

23          THE COURT:  Okay.  Let's just take stock of where we

24  are.  So the government finished its case in chief the last

25  time we were here, correct?

1         MR. BARNEA:  That's right, Your Honor.

2         THE COURT:  Have you now finished Mr. Winick's case?

3         MR. YAN:  That's correct, Your Honor.  I think the

4    only thing left is the government wanted to call a rebuttal

5    expert.

6         THE COURT:  Okay.  Correct, from your standpoint?

7         MR. BARNEA:  That's correct, Your Honor.

8         THE COURT:  All right.  And so, that would be

9    November 1; I think 12 days from now.  And we're staring at 10

10   a.m., not 9 a.m.  All right.  Are there any other matters we

11   should address before we adjourn for the day?

12        MR. BARNEA:  Not from our perspective, Your Honor.

13        MR. YAN:  Nor from ours.

14        THE COURT:  Okay.  We are adjourned.  Thank you, all.

15        MR. BARNEA:  Thank you.

16                          * * * * *

## C E R T I F I C A T I O N

I, TRACY E. VERGOLLO, court approved transcribers, certify
that the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter, and to the best of our ability.

/s/ Tracy E. Vergollo
TRACY E. VERGOLLO

J&J COURT TRANSCRIBERS, INC.          DATE:   October 23, 2023