**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

JEFFREY WINICK

Debtor.

Chapter 7
No. 20-11976 (PB)

UNITED STATES OF AMERICA,

Plaintiff,

- against –

JEFFREY WINICK,

Defendant.

Adversary Proceeding No. 20-1138 (PB)

## THE UNITED STATES OF AMERICA'S
## POST-TRIAL MEMORANDUM OF LAW

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel:  (212) 637-2728
Fax:  (212) 637-2717
E-mail: zachary.bannon@usdoj.gov

ZACHARY BANNON
JEAN-DAVID BARNEA
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

LEGAL STANDARD................................................................................................................. 1

Count IV – Violation of 11 U.S.C. § 523(a)(1)(C)........................................................... 2

    A.   Winick Satisfies the Conduct Element of Section 523(a)(1)(C).............................. 2

        1.   Winick Failed To Make Required Estimated Tax Payments ........................... 3

        2.   Winick Manipulated IRS Collection Procedures ............................................ 4

        3.   Winick Spent Lavishly on Nonessentials........................................................ 7

        4.   Winick Improperly Disposed of Assets .......................................................... 9

        5.   Winick Used Corporate Assets for Personal Purposes................................... 12

    B.   Winick Satisfies the Mens Rea Element of Section 523(a)(1)(C) .................... 13

        1.   The Scienter Standard in the Second Circuit Is General Intent..................... 13

        2.   Winick Acted Willfully Under the General Intent Standard.......................... 17

        3.   Winick's Acted Willfully Under the Specific Intent Standard, If It Applied ............... 20

Count I – Violation of 11 U.S.C. § 727(a)(2) ................................................................. 23

    A.   The Chronology of the Transactions Is a Badge of Fraud ................................. 24

    B.   Winick's Close Relationship with Berley Is a Badge of Fraud ......................... 26

    C.   The Inadequacy of the Consideration Is a Badge of Fraud................................ 26

    D.   The Pattern of the Transactions Is a Badge of Fraud........................................ 27

    E.   Winick's Financial Condition After the Transfer Is a Badge of Fraud.............................. 27

Count II – Violation of 11 U.S.C. § 727(a)(4)(A) ......................................................... 28

    A.   Winick's Statement Was False ......................................................................... 28

    B.   Winick's False Statement Was Made with the Requisite Scienter .................... 29

    C.   Any Advice of Counsel Winick Received Does Not Justify His False Statements........... 30

CONCLUSION.................................................................................................................. 32

# TABLE OF AUTHORITIES

Page(s)

## Cases

*City of Arkansas v. Anderson*,
762 P.2d 183 (Kan. 1988) ........................................................................... 21

*Dalton v. IRS*,
77 F.3d 1297 (10th Cir. 1996) .................................................................... 14

*Diorio v. Kreisler-Borg Const. Co.*,
407 F.2d 1330 (2d Cir. 1969) ...................................................................... 29

*Don Gastineau Equity Trust v. United States*,
687 F. Supp. 1422 (C.D. Cal. 1987) ........................................................... 10

*Feschbach v. IRS*,
594 B.R. 495 (M.D. Fla. 2018) ................................................................... 17

*Godindram v. Bank of India*,
538 B.R. 629 (E.D.N.Y. 2015) .................................................................... 31

*Grogan v. Garner*,
498 U.S. 279 (1991) ...................................................................................... 1

*Haesloop v. United States*,
No. 197-1717-575, 2000 WL 1607316 (Bankr. E.D.N.Y. Aug. 30, 2000) ........................ 11, 12

*Haneke v. United States*,
548 F.2d 1138 (4th Cir. 1977) .................................................................... 10

*Hargrave v. Oki Nursery, Inc.*,
646 F.2d 716 (2d Cir. 1980) ....................................................................... 15

*Hawkins v. Franchise Tax Bd.*,
769 F.3d 662 (9th Cir. 2014) ........................................................... 14, 17, 20

*Hinson v. United States*,
944 F.2d  (8th Cir. 1993) ........................................................................... 10

*Hochstein v. United States*,
900 F.2d 543 (2d Cir. 1990) ....................................................................... 15

*In re Abramov,*
    329 B.R. 125 (Bankr. E.D.N.Y. 2005) ................................................................. 28

*In re Barkley,*
    No. 09-ap-6549 (CRM), 2010 WL 4642483 (Bankr. N.D. Ga. Sept. 24, 2010) ....................... 8

*In re Bennett,*
    No. 12-ap-6136 (TMR), 2014 WL 293462 (Bankr. D. Or. Jan. 27, 2014) ............................ 26

*In re Birkenstock,*
    87 F.3d  957 (7th Cir. 1996) .................................................................. 14

*In re Bruner,*
    55 F.3d 195 (5th Cir. 1995) ................................................................... 14

*In re Carmel,*
    134 B.R. 890 (Bankr. N.D. Ill. 1991) .......................................................... 19

*In re Colish,*
    289 B.R. 523 (Bankr. E.D.N.Y. 2002) ............................................................ 7

*In re Epstein,*
    303 B.R. 280 (Bankr. E.D.N.Y. 2004) .......................................................... 3, 9

*In re Fegeley,*
    118 F.3d 979 (3d Cir. 1997) ................................................................... 14

*In re Feshbach,*
    974 F.3d 1320 (11th Cir. 2020) .............................................................. 7, 16

*In re Fretz,*
    244 F.3d 1323 (11th Cir. 2001) ............................................................. 13, 14

*In re Gardner,*
    360 F.3d 551 (6th Cir. 2004) ................................................................... 8

*In re Geiger,*
    408 B.R. 788 (C.D. Ill. 2009) ................................................................. 22

*In re Griffith,*
    206 F.3d 1389 (6th Cir. 2000) .............................................................. 10, 11

*In re Harris,*
    328 B.R. 837 (Bankr. S.D. Ala. 2005) .......................................................... 8

iii

*In re Herron*,
634 B.R. 883 (Bankr. W.D. Okla. 2021) ................................................................ 11

*In re Jacobs*,
490 F.3d 913 (11th Cir. 2007) ..................................................................... 4, 8, 10

*In re Kablaoui*,
196 B.R. 705 (Bankr. S.D.N.Y. 1996) ................................................................. 23

*In re Kaiser*,
722 F.2d 1574 (2d Cir. 1983) .............................................................................. 23

*In re Lubin*,
61 B.R. 511 (Bankr. S.D.N.Y. 1986) .................................................................. 27

*In re Lynch*,
299 B.R. 62 (Bankr. S.D.N.Y. 2003) ............................................................... 9, 15

*In re May*,
No. 10-0431, 2010 WL 5014716 (S.D. Ala. Nov. 30, 2010) ................................. 12

*In re Meyer*,
No. 8-11-9158-478 (DTE), 2013 WL 865544 (Bankr. E.D.N.Y. Mar. 7, 2013) ..... 16

*In re Moland*,
609 B.R. 467 (Bankr. D.S.C. 2018) ...................................................................... 8

*In re Moreo*,
437 B.R. 40 (Bankr. E.D.N.Y. 2010) ............................................................. 28, 29

*In re Murray*,
249 B.R. 223 (E.D.N.Y. 2000) .............................................................................. 1

*In re Nadeau*,
No. 21-ap-3045, 2023 WL 6332837 (Bankr. N.D. Ohio Sept. 28, 2023) ............... 28

*In re Osborne*,
951 F.3d 691 (5th Cir. 2020) ................................................................................. 4

*In re Peterson*,
317 B.R. 556 (Bankr. N.D. Ga. 2004) .................................................................... 8

*In re Seltzer*,
No. 04-ap-2286 (MG), 2007 WL 98495 (Bankr. S.D.N.Y. Jan. 9, 2007) .......... 15, 16

*In re Toti*,
    24 F.3d 806 (6th Cir. 1994) ................................................................. 14

*In re Tudisco*,
    183 F.3d 133 (2d Cir. 1999) ........................................................ passim

*In re Wright*,
    191 B.R. 291 (S.D.N.Y. 1995) ..................................................... 15, 18

*In re Xiang Yong Gao*,
    560 B.R. 50 (Bankr. E.D.N.Y. 2016) ................................................ 27

*In re Zick*,
    931 F.2d 1124 (6th Cir. 1991) ............................................................ 9

*Kalb v. United States*,
    505 F.2d 506 (2d Cir. 1974) ............................................................. 15

*Kerger v. United States*,
    609 F. Supp. 3d 562 (N.D. Ohio 2022) ........................................... 8, 9

*Krist v. Kolombos Rest. Inc.*,
    688 F.3d 89 (2d Cir. 2012) ................................................................. 2

*McGraw-Hill, Inc. v. United States*,
    623 F.2d 700 (Ct. Cl. 1980) ............................................................... 4

*Metro. Stevedore Co. v. Rambo*,
    521 U.S. 121 (1997) ........................................................................... 2

*Morimura, Arai & Co. v. Taback*,
    279 U.S. 24 (1929) ........................................................................... 30

*Morris Plan Indus. Bank v. Lassman*,
    116 F.2d 473 (2d Cir. 1940) ............................................................. 30

*Ostashko v. Ostashko*,
    No. 00 Civ. 7162 (ARR), 2002 WL 32068357 (E.D.N.Y. Dec. 12, 2002) .............................. 27

*Price-Davis v. United States*,
    549 B.R. 537 (S.D. Fla. 2015) ............................................................ 8

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007) ........................................................................... 16

*United States v. Adams*,
955 F.3d 238 (2d Cir. 2020) ..................................................................... 7

*United States v. Bowden*,
542 F. App'x 299 (5th Cir. 2013) ............................................................ 31

*United States v. Cameron*,
907 F.2d 1051 (11th Cir. 1990) ............................................................... 22

*United States v. Carmel*,
801 F.2d 997 (7th Cir. 1986) ................................................................... 19

*United States v. Coney*,
689 F.3d 365 (5th Cir. 2012) ........................................................... passim

*United States v. Gorokhovsky*,
575 F. Supp. 3d 1050 (E.D. Wis. 2021) .................................................. 22

*United States v. Lamott*,
831 F.3d 1153 (9th Cir. 2016) ................................................................. 18

*United States v. Landau*,
956 F. Supp. 1160 (S.D.N.Y. 1997) ................................................. 14, 19

*United States v. Parker*,
No. 07 Civ. 1969 (MLH), 2015 WL 1745879 (S.D. Cal. Feb. 17, 2015) ............................... 21

*United States v. Schmidt*,
No. 14 Civ. 237 (TOR), 2016 WL 7230503 (E.D. Wash. Dec. 14, 2016) ............................. 21

*United States v. Timon*,
No. 20 Civ. 1101 (MAD), 2022 WL 17249463 (N.D.N.Y. Sept. 6, 2022) ........................... 16

*United States v. Torniero*,
735 F.2d 725 (2d Cir. 1984) ................................................................... 19

*Vaughn v. IRS*,
No. 12 Civ. 60 (MSK), 2013 WL 1324377 (D. Colo. Mar. 29, 2013) ................................... 11

*Veal v. Geraci*,
23 F.3d 722 (2d Cir. 1994) ....................................................................... 4

*Village of San Jose v. McWilliams*,
284 F.3d 785 (7th Cir. 2002) ................................................................... 24

**Statutes**

11 U.S.C. § 523.................................................................................................................. passim

11 U.S.C. § 727................................................................................................. 23, 28, 30

11 U.S.C. § 522................................................................................................................. 30

26 U.S.C. § 6654................................................................................................................. 3

26 U.S.C. § 6672........................................................................................................ 14, 15

The United States of America (the "United States" or the "Government"), by its attorney Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this post-trial brief in the above-captioned adversary proceeding.[1]  As established at trial, for years, debtor-defendant Jeffrey Winick accrued millions of dollars in tax liabilities to the Internal Revenue Service ("IRS") while taking actions—spending lavishly, gambling millions of dollars, transferring property to family and friends for little or no consideration, using corporate resources for personal purposes, substantially underpaying his tax debts, misleading the IRS to inhibit its collection efforts, and providing dishonest information in his bankruptcy schedules— that prevented the IRS from collecting what it was owed for tax years 2012 to 2016 (the "Tax Years").  These facts entitle the Government to judgment on Counts I, II, and IV[2] of its adversary complaint.

## LEGAL STANDARD

Having conducted a bench trial, "the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1); *see also* Fed. R. Bankr. P. 7052 (incorporating Rule 52 to bankruptcy adversary proceedings).  The Government prevails on its claims if it "establish[es] by a preponderance of the evidence that [its] claim is not dischargeable." *Grogan v. Garner*, 498 U.S. 279, 287 (1991); *see also In re Murray*, 249 B.R. 223, 228 (E.D.N.Y. 2000) (applying preponderance standard to claims under 11 U.S.C. § 727).  To meet this standard,

---

[1] This brief cites the trial transcripts from October 16 (Dkt. No. 72), October 20 (Dkt. No. 73), and November 1 (Dkt. No. 74), 2023, respectively, as "10/16 Tr.," "10/20 Tr.," and "11/1 Tr."  It cites plaintiff's trial exhibits, defendant's trial exhibits, and joint trial exhibits, as listed in the Joint Pretrial Order, Dkt. No. 71 ("JPTO"), at 21-29, and as supplemented during the trial, as "PX," "DX," and "JX."  And it cites deposition testimony entered into evidence, *see* JPTO at 6-9, as "[Witness] Dep."

[2] The Court has already granted summary judgment to the Government on the remaining count, Count III, holding that Mr. Winick's 2019 tax liability is non-dischargeable.  Dkt. No. 55 at 5.

the Government need only prove "that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997). "It is within the province of the [] court as the trier of fact to decide whose testimony should be credited." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012).

## Count IV – Violation of 11 U.S.C. § 523(a)(1)(C)

Count IV of the Government's adversary complaint alleges that Winick "willfully attempted . . . to evade or defeat" paying his income taxes for the Tax Years in violation of 11 U.S.C. § 523(a)(1)(C), rendering these tax liabilities non-dischargeable. Dkt. No. 1 ("Adv. Compl.") ¶¶ 81-84; *accord* JPTO § V ¶ 3. The overwhelming evidence presented at trial proves this claim. In 2012, Winick stopped making legally required quarterly estimated tax payments, resulting in almost $9 million in personal income-tax liabilities (as of the Petition Date) for the Tax Years, all while he earned tens of millions of dollars in income. Rather than using that income to pay his taxes, Winick manipulated IRS collection procedures; spent lavishly on residences, shopping, travel, and gambling; dissipated assets to family and friends; and used his companies to fund his personal expenses. These facts establish a clear pattern of willful tax evasion.

In the Second Circuit, a willful evasion claim under section 523(a)(1)(C) "consists of a conduct element (an attempt to evade or defeat taxes) and a *mens rea* requirement (willfulness)." *In re Tudisco*, 183 F.3d 133, 137 (2d Cir. 1999). Winick contested both elements at trial, *see* JPTO § V ¶ 3, but, as set forth below, the Government's evidence easily establishes them.

### A. Winick Satisfies the Conduct Element of Section 523(a)(1)(C)

It is an open question in the Second Circuit whether the Government must show any conduct beyond the nonpayment of taxes to establish the conduct element under 11 U.S.C. § 523(a)(1)(C). *See In re Tudisco*, 183 F.3d at 137. Some courts have held that the Government must demonstrate "a failure to pay *accompanied by* other conduct designed to evade or defeat

taxes." *In re Epstein*, 303 B.R. 280, 286 (Bankr. E.D.N.Y. 2004) (emphasis added).  It is not necessary for this Court to resolve this question because Winick engaged in a plethora of "other conduct" that would satisfy the stricter standard, even if it applies.  Winick's other conduct includes: (1) his failure to make mandatory quarterly estimated tax payments; (2) his manipulation of the IRS's collection procedures, including through outright lies; (3) his exorbitant non-essential spending; (4) his dissipation of assets; and (5) his use of company resources for personal expenses. Each of these categories of conduct is discussed in turn.

### 1. *Winick Failed to Make Required Estimated Tax Payments*

Taxpayers whose earnings are not subject to sufficient tax withholdings must make quarterly estimated tax payments to the IRS, as required by 26 U.S.C. § 6654.  *See* 10/16 Tr. 17:17-21 (IRS witness John Harrison, discussing this requirement).  This requirement applies to taxpayers whose income derives from commissions.  *Id.* at 17:8-13.  Most of Winick's income for the Tax Years stemmed from commissions, from which his employer did not make tax withholdings.  *Id.* at 94:9-17.  Winick knew about the requirement to make quarterly estimated payments.  *See id.* at 94:20-23 (Winick, acknowledging the requirement).  In fact, he made quarterly estimated payments through the end of 2011.  PX 28 at WINICK 3238 (check showing estimated tax payment for final quarter of 2011); 10/16 Tr. 96:15-17 (Winick, acknowledging the same).  But in 2012, Winick chose to stop making estimated tax payments.  10/16 Tr. at 98:16-21; Winick Dep. 25:7-12.  Indeed, he made no estimated payments between 2012 and 2016.  *See generally* JX 5 (documenting Winick's payment history); 10/16 Tr. 35:14-18 (Harrison, interpreting Winick's Account Transcripts).

Winick continuously ignored his obligation to make quarterly estimated tax payments during the Tax Years despite receiving clear guidance and instructions that he must do so.  On at

least three occasions in early 2014, the IRS informed Winick's authorized representative, accountant Scott Rutter, that he was required to make estimated tax payments. *See* PX 1 at USA 3267, 3270, 3276 (documenting these conversations); 10/16 Tr. 35:19-39:12 (Harrison, explaining those entries in PX 1).[3] And Winick's lawyers told him on numerous occasions between 2012 and 2016 that he should be making these payments. 10/16 Tr. 98:10-13. Despite this repeated guidance from both his lawyers and the IRS, Winick did not make quarterly estimated tax payments for the years at issue.

Winick's decisions to stop making quarterly estimated tax payments and to ignore the advice of those telling him he should do so are far more egregious than the "mere nonpayment" of taxes. Rather, as the Eleventh Circuit has recognized, "[c]haracterization of earnings as non-wage income, without paying quarterly estimated taxes, . . . constitute[s] [an] affirmative attempt[] to conceal assets under § 523(a)(1)(C)," which is "highly relevant to the conduct requirement." *In re Jacobs*, 490 F.3d 913, 926 (11th Cir. 2007).

### 2. Winick Manipulated IRS Collection Procedures

Winick also manipulated the IRS's collection procedures to avoid collection actions against him. After incurring the tax liabilities at issue, Winick entered into several IRS installment agreements and made an offer in compromise to the IRS to resolve his outstanding liability. 10/16

---

[3] Rutter's knowledge may be imputed to Winick, as Winick appointed him as his agent in dealings with the IRS. PX 58 at WINICK 2592; *see also generally Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("In general, when an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-à-vis a third person the agent's knowledge is imputed to the principal."); *see also McGraw-Hill, Inc. v. United States*, 623 F.2d 700, 704 (Ct. Cl. 1980) (finding that "the knowledge of the accountant, as an agent acting within the scope of his duty, should be imputed to plaintiff" during dealings with the IRS). For the same reason, Rutter's statements can be imputed to Winick. *See, e.g.*, *In re Osborne*, 951 F.3d 691, 704 (5th Cir. 2020) ("We therefore hold that a fraudulent statement by a debtor's partner or agent may be imputed to the debtor under § 523(a)(2)(B).").

Tr. 39:19-67:16 (Harrison, discussing Winick's installment agreements and offer in compromise). The very pendency of these agreements and this offer prevented the IRS from taking enforced collection activity against Winick, such as levying his earnings. *See id.* at 40:9-42:12 (Harrison, discussing these restrictions); *see also* 26 C.F.R. § 301.6331-4 (installment agreements); *id.* § 301.7122-1 (offers in compromise).

But these installment agreements and this offer in compromise were not a good-faith effort to pay off Winick's tax liabilities. Between 2014 and his bankruptcy filing in 2020, Winick entered into three separate IRS installment agreements and defaulted on each one. 10/16 Tr. at 45:21-48:8, 53:8-55:1 (Harrison, discussing Winick's payment history under each agreement). After he stopped paying under each installment agreement, Winick waited until after the IRS formally terminated the agreement (thus reviving the threat of collection activity) and shortly thereafter started making payments again in anticipation of a request for a new agreement or offer. *See, e.g.*, JX 05 at USA 1702 (showing final payment under first installment agreement made September 10, 2015; IRS termination of the agreement on March 16, 2015; and resumed payment on April 10, 2015); *id.* at USA 1703-04 (showing final payment under second installment agreement made December 27, 2016; IRS termination on March 20, 2017; and resumed payment on May 15, 2017); *id.* at USA 1705 (showing final payment under third installment agreement made January 7, 2020; no IRS termination; and no resumed payment before August 2020 bankruptcy filing).

As for the offer in compromise, in May 2017, Winick offered to pay the IRS $430,000 to compromise what was then over $7 million in liabilities. *See* JX 18; 10/16 Tr. 58:1-8. This offer was so patently inadequate that it led the IRS offer specialist to refer the matter for a fraud review. PX 1 at 3300; 10/16 Tr. 57:3-59:22 (discussing that fraud referral). Indeed, Winick made his $430,000 offer in a year when his income exceeded $2.4 million. *See* PX 13 at WINICK 220. But

despite that significant income, Winick made no tax payments, and saved no money for tax payments, for the fifteen months his offer in compromise was under consideration between May 2017 and September 2018. *See* JX 5 at USA 1704; 10/16 Tr. 104:24-105:12 (Winick, acknowledging the same). In short, Winick's payment history under his installment agreements and his failure to make any payments during the pendency of this offer in compromise demonstrate his efforts to stymie IRS collection and are not a good-faith effort to pay overdue taxes.

Worse yet, Winick lied to the IRS to secure at least two of the installment agreements. To be eligible for an installment agreement, taxpayers must be current on their taxes at the time of the application, including making required estimated tax payments. 10/16 Tr. 40:2-8; *see also* Internal Revenue Manual § 5.14.1.4.2(1). But Winick was not current on his estimated tax payments when he applied for an installment agreement in 2014; at trial, Winick acknowledged that most of the income he earned in 2014—approximately $4.9 million—was not subject to withholdings and therefore that he was required to make estimated tax payments, but that he failed to do so. PX 13 at WINICK 105; 10/16 Tr. 106:17-107:22. Nevertheless, Winick's designated representative, Scott Rutter, told the IRS in May 2014 that Winick was "not liable to pay estimated tax payments" because he "didn't make much income for 2014." PX 1 at 3272; 10/16 Tr. 42:21-45:20 (Harrison, discussing Rutter's misrepresentation). Without this lie, Winick would not have been offered an installment agreement. 10/16 Tr. 45:16-20.

Another of Winick's authorized representatives, attorney Laurie Kazenoff,[4] made a similar misrepresentation to the IRS while negotiating Winick's second installment agreement. On August 11, 2015, Kazenoff told the IRS that Winick was not required to make estimated tax

---

[4] Like Rutter, Kazenoff made these statements within the authorized scope of her agency. *See* PX 58 at WINICK 2590-91.

payments at that time because his earnings were "completely on [withholding]." PX 1 at 3289; 10/16 Tr. 52:2-53:7 (Harrison, discussing Kazenoff's misrepresentation). This, too, was a lie. As Winick acknowledged at trial, almost half of his income that year—$1.7 million of about $3.9 million in total—was not subject to withholding. PX 13 at WINICK 132; 10/16 Tr. 109:5-15. Again, without this lie, Winick would not have been offered a second installment agreement. 10/16 Tr. 52:25-53:7.

When, as here, a debtor serially requests offers-in-compromise or installment agreements in bad faith, courts have found the conduct element of 11 U.S.C. § 523(a)(1)(C) to be satisfied. *See, e.g.*, *In re Colish*, 289 B.R. 523, 533 (Bankr. E.D.N.Y. 2002) (debtor "attempted to thwart or at the very least delay the collection of his tax liabilities by filing serial offers-in-compromise" that were "clearly too low in relation to the tax obligations owed"); *In re Feshbach*, 974 F.3d 1320, 1329 (11th Cir. 2020) ("There is ample evidence that the [debtors] approached the IRS with inadequate and unrealistic offers given their income and spending, and that they used the offer-in-compromise process to delay the payment of their taxes."). Winick's conduct was made even worse by the fact that he procured at least two of his installment agreements through lies. *Cf. United States v. Adams*, 955 F.3d 238, 249 (2d Cir. 2020) (concluding that "conduct involved the willful evasion of taxes" in a criminal case because the defendant repeatedly lied).

### 3. *Winick Spent Lavishly on Nonessentials*

While incurring liabilities to the IRS, Winick spent exorbitantly on non-essentials—gambling, shopping, international travel, renting luxury residences, and private-school tuition, just to name a few. "[L]arge discretionary expenditures, when a taxpayer knows of his or her tax liabilities, is capable of meeting them, but does not, are relevant to § 523(a)(1)(C)'s conduct

element." *In re Jacobs*, 490 F.3d at 926. The Government summarizes the most egregious categories of his spending, as detailed at trial, below:

1. Gambling: Winick spent over $13 million gambling at casinos between 2012 and 2019. *See* JX 3 at WINICK 43. Courts have found even significantly smaller gambling expenditures to evince willful evasion. *See, e.g.*, *In re Harris*, 328 B.R. 837, 840, 845 (Bankr. S.D. Ala. 2005) (considering $1,000 per month gambling habit as evidence supporting 11 U.S.C. § 523(a)(1)(C)'s conduct requirement); *In re Barkley*, No. 09-ap-6549 (CRM), 2010 WL 4642483, at *5 (Bankr. N.D. Ga. Sept. 24, 2010) (considering gambling as part of "a lavish lifestyle" that the debtor chose "[r]ather than pay[ing] her obligations to the IRS").

2. Shopping: Between 2012 and 2020, Winick (and his ex-girlfriend or daughter as authorized users of his credit cards) spent $1,000 or more on shopping trips at least once or twice a month. 10/16 Tr. 116:14-18. Sometimes the spending was far greater. For example, in May 2014, Winick's ex-girlfriend charged almost $17,000 to his credit card. PX 33 at WINICK 4387. And on one occasion in 2013, Winick allowed his daughter to spend $15,000 at a luxury clothing store to "punish" him for showing up late to dinner. 10/16 Tr. 116:10-13. All told, Winick (and other authorized users) charged at least $710,000 to his credit cards between 2012 and 2020. *See* PX 31A, 32A, 33B, 34A, 35A. Indeed, he spent $55,000 on his credit cards in October 2013 alone, with tens of thousands going towards luxury shopping. *See* PX 33A, 34B. Courts consider "self-admitted shopping problem[s]" as evidence supporting § 523(a)(1)(C)'s conduct element. *Kerger v. United States*, 609 F. Supp. 3d 562, 573 (N.D. Ohio 2022); *see also In re Moland*, 609 B.R. 467, 473 (Bankr. D.S.C. 2018) (Government established conduct element as a matter of law based in part on evidence that the debtor "commonly spent several hundred dollars at a time, sometimes thousands, while shopping"); *In re Peterson*, 317 B.R. 556, 564 (Bankr. N.D. Ga. 2004) (considering "luxury shopping sprees").

3. International Travel: Between 2012 and 2020, Winick went on over thirty international trips for pleasure. 10/16 Tr. 117:9-119:17. On these trips, Winick often spent excessively—$5,000 at a glass store in Prague, $5,000 on luxury goods in the Bahamas, and $21,000 at a restaurant in France, for example. *See generally* PX 33A; 10/16 Tr. 119:25-120:18; *cf. In re Gardner*, 360 F.3d 551, 560 (6th Cir. 2004) (considering "twenty golfing and vacation trips" as relevant conduct).

4. Luxury Residences: Between 2012 and 2020, Winick rented as many as four residences at a time (a vacation home in Southampton and three luxury Manhattan apartments for himself, his ex-wife, and his daughter), at cumulative rents of as high as $40,000 per month. 10/16 Tr. 110:13-113:21. Over that period, Winick spent over $1.5 million on rent. PX 9-12, 28B; *cf. Price-Davis v. United States*, 549 B.R. 537, 545 (S.D. Fla. 2015) (considering rental of "a fancy house" as evidence supporting the conduct element).

5. Tuition: In 2012 and 2013, Winick spent over $150,000 on his daughter's college tuition at New York University. *See* PX 13 at WINICK 75, 100. Again, the conduct element is satisfied by "evidence that debtor paid for non-necessities such as vacations and private school tuition instead of the debtor's tax liabilities." *Kerger*, 609 F. Supp. 3d at 572.

At trial, Winick explained that the reason he spent so much money was because he was "successful and that was the lifestyle [he] and [his] family had become used to." 10/16 Tr. 110:9-11. This testimony is an admission that Winick willfully evaded his taxes. *Cf. In re Epstein*, 303 B.R. at 289 (rejecting the argument that the debtor "was faced with conflicting duties; *i.e.*, the duty to pay taxes and the duty to support his family, and should not be penalized for choosing the latter" and finding that the debtor's "decision not to use his income to satisfy his federal tax liabilities stems not from his inability to make the tax payments but rather from a conscious choice to use his income for other discretionary and nonessential expense"); *In re Lynch*, 299 B.R. 62, 86 (Bankr. S.D.N.Y. 2003) ("Because [debtor] elected to spend her money elsewhere and not to satisfy her tax obligations—especially when she had the ability to easily pay them in full—the Court necessarily must hold, and it does hold, that she willfully evaded her taxes."). "Bankruptcy protection was not intended to assist those who, despite their own misconduct, are attempting to preserve a comfortable standard of living at the expense of their creditors." *In re Zick*, 931 F.2d 1124, 1129-30 (6th Cir. 1991) (internal quotation marks omitted).

### 4. Winick Improperly Disposed of Assets

Winick also transferred and disposed of several significant assets in a manner that demonstrates willful tax evasion, as summarized below:

1. Mortgage Payments on Southampton Home: Despite having transferred title to his vacation home in Southampton to a trust for the benefit of his daughter in the early 2000s, Winick retained beneficial use of that home and continued to pay hundreds of thousands of dollars between 2012 and 2016 in rent to the trust, which used his payments to pay the mortgage on the home. *See* 10/16 Tr. 110:22-111:3 (Winick, acknowledging payments to trust); *id.* at 123:19-7 (Winick, acknowledging transfer

to trust, beneficial use, and the trust's use of his payments to pay the mortgage); PX 9 (cataloging rent payments); *cf. In re Jacobs*, 490 F.3d at 925 ("Placing title to significant assets in the names of family members, while remaining on the mortgage, qualifies as an affirmative act to evade or defeat tax payments under § 523(a)(1)(C).").

2. Transfer of Southampton Home: In 2016, the trust that Winick established for his daughter's benefit transferred ownership of the Southampton home to his daughter outright—at a time when the home was valued at over $3 million. *See* PX 4 (appraisal of Southampton home); 10/16 Tr. 125:2-4 (Winick, acknowledging transfer of home to his daughter). But at the relevant time, the trust was simply Winick's alter ego,[5] and its transfer of the home to his daughter can be imputed to him. *See Haneke v. United States*, 548 F.2d 1138, 1140 (4th Cir. 1977) (affirming determination that wife's transfer could be imputed to her husband, as she was acting as his alter ego).

3. Transfer of WTN Realty Corp.: On December 18, 2012, Winick gifted to his daughter shares in WTN Realty Corp. (an entity that held shares in his principal real-estate company, Winick Realty Group), which he asserted at the time were worth $4 million. PX 22; 10/16 Tr. 128:8-129:23. His daughter paid nothing for the shares. 10/16 Tr. 129:24-25. "[T]ransfers of property for little to no consideration" is "conduct covered by § 523(a)(1)(C)." *In re Griffith*, 206 F.3d 1389, 1396 (6th Cir. 2000) (collecting cases).

4. Formation of WRG NJ LLC: Winick expanded his real estate business into New Jersey in 2012 by creating a new corporate entity. JX 28; 10/16 Tr. 135:19-136:7. Although Winick was the administrative manager of this new company, called WRG NJ LLC, and was responsible for all decisions concerning its business affairs, *see* JX 28 at WINICK 449, he never held an ownership interest in the company. 10/16 Tr. 136:8-10. Instead, he formed another trust for the benefit of his daughter, which served as a founding member and 74% owner of WRG NJ LLC. *See* JX 24-7; JX 28 at WINICK 463. That trust ultimately transferred (for no consideration)

---

[5] Courts consider whether a trust is a person's alter ego by assessing "the totality of the circumstances," including the "use of the entity's assets for personal purposes, transfer of valuable assets from the taxpayer to the entity for little or no consideration, and use of the entity for fraudulent purposes." *Hinson v. United States*, 944 F.2d 842 (8th Cir. 1993). These factors are present here. Winick transferred the Southampton home to the trust at a time when he owed substantial taxes to the IRS in the early 2000s. 10/16 Tr. 123:19-25. There is no evidence that the trust paid him for the home when it was transferred. And after the transfer, Winick retained beneficial use of and primary financial responsibility for the home—he paid the mortgage and other housing expenses and used it as his vacation home. *Id.* at 111:4-6, 124:1-7. Where, after a transfer, a transferee continues to "reside at the real property at issue; . . . pay the property tax bills, the mortgage and the home insurance; . . . [and] use and enjoy their home precisely in the same manner as before the purported transfer, . . . [e]quity treats [the] trust[] as void." *Don Gastineau Equity Trust v. United States*, 687 F. Supp. 1422, 1427 (C.D. Cal. 1987).

its ownership interest in WRG NJ LLC to Winick's daughter in 2016, with Winick's consent. JX 24 at WINICK 1148; 10/16 Tr. 139:2-24. Courts find the conduct element of 11 U.S.C. § 523(a)(1)(C) met where a debtor "has taken deliberate steps to avoid accumulating assets that could be seized to satisfy his liabilities." *Haesloop v. United States*, No. 197-1717-575, 2000 WL 1607316, at *6 (Bankr. E.D.N.Y. Aug. 30, 2000) (Swain, J.).

5. <u>Transfers of Jewelry</u>: In 2015, Winick owned forty pieces of jewelry collectively valued at over $500,000. PX 36 at 45; 10/16 Tr. 155:20-156:8. But by 2020, he only had two jewelry pieces remaining. JX 1 at 13; 10/16 Tr. 9-13. Winick testified that he gave away the rest to his daughter and others. 10/16 Tr. 156:14-18. Again, "transfers of property for little to no consideration" is "conduct covered by § 523(a)(1)(C)." *In re Griffith*, 206 F.3d at 1396.

6. <u>Transfer of Life Insurance and Cash</u>: In addition to these other transfers, Winick gave his daughter annual gifts. From 2012 to 2015, Winick paid $90,000 per year in life insurance premiums for his daughter's benefit, an amount that increased to $140,000 per year in 2016 and 2017; and in 2018, Winick gifted his daughter $85,000 in cash. *See* JX 20-23; PX 60-61; 10/16 Tr. 131:2-134:23. These transfers were gratuitous. And again, "transfers of property for little to no consideration" is "conduct covered by § 523(a)(1)(C)." *In re Griffith*, 206 F.3d at 1396.

7. <u>Transfer of SDSDR111 LLC</u>: As explained *infra* at 23-28, in July 2020, Winick transferred his interest in SDSDR111 LLC to his friend David Berley with intent to hinder, delay, or defraud the IRS.

8. <u>Payment of 987 Eighth Ave. LLC Proceeds</u>: In September 2012, Winick sold shares he owned in a company called 987 Eighth Avenue LLC for $2 million, which he received *in addition* to his earnings as a real estate broker that year. PX 23; 10/16 Tr. 142:7-25. He used about half of those proceeds to pay off his then-outstanding 2011 tax liabilities. PX 28 at WINICK 3272; 10/16 Tr. 143:13-16. But he did not use any of the remainder toward his 2012 tax liability, though he had already fallen behind on his estimated tax payments for the year; instead, he chose to gamble and lose those remaining profits. 10/16 Tr. 143:17-144:1. "[D]iversion of . . . proceeds" for personal use "without using or setting aside any of those proceeds as a fund devoted to address [a] tax liability [is] sufficient to meet the conduct component of Section 523(a)(1)." *In re Herron*, 634 B.R. 883, 898 (Bankr. W.D. Okla. 2021).

Together, the property transfers discussed above helped "ensure[] that there would be inadequate funds to satisfy [Winick's] tax obligations." *Vaughn v. IRS*, No. 12 Civ. 60 (MSK), 2013 WL 1324377, at *2 (D. Colo. Mar. 29, 2013). They each accordingly contribute to the conclusion that Winick willfully evaded his tax obligations.

### *5. Winick Used Corporate Assets for Personal Purposes*

Finally, Winick used his company's assets for his personal use, thereby avoiding the accumulation of assets that could be subject to seizure by the IRS. For example, although Winick never owned or leased a car, Winick Realty Group leased three Mercedes vehicles at a time (for which it spent hundreds of thousands of dollars), which Winick treated as his own. *See* PX 38 (Mercedes leases); PX 52 at 18 (Winick, stating to a reporter in 2014: "I have three cars. I love my Mercedes convertible."); 10/16 Tr. 150:22-151:6 (Winick, acknowledging that his statement was about the company cars). Furthermore, the company's Chief Operating Officer, Louis Eisinger, handled Winick's personal business, such as paying his bills and organizing his personal budget and financial records. 10/16 Tr. 213:15-214:24. Although Winick testified that he "g[a]ve [Eisinger] bonuses out of [his] own commissions now and then," *id.* at 215:10-11, Eisinger testified unequivocally that he "only received compensation from Winick Realty Group," Eisinger Dep. 54:9-13. Courts "regard the use of business accounts for personal assets as another symptom of willful evasion." *In re May*, No. 10-0431, 2010 WL 5014716, at *13 (S.D. Ala. Nov. 30, 2010).

\* \* \*

The conduct element of § 523(a)(1)(C) is flexible, requiring an assessment of the totality of the circumstances. *See Haesloop*, 2000 WL 1607316, at *6 ("The Court, having considered the totality of the Plaintiff's conduct, finds that Plaintiff willfully attempted to evade or defeat his tax obligations within the meaning of section 523(a)(1)(C) of the Bankruptcy Code."). In this case, the Government has proven that Winick failed to make quarterly estimated tax payments despite receiving clear guidance from his advisors and the IRS; lied to the IRS to avoid collection activities; spent lavishly on everything but taxes; dissipated his assets; and used corporate resources to avoid accumulating assets. It is hardly an exaggeration to say that Winick engaged in

most of the categories of conduct that courts have found sufficient to satisfy the conduct requirement of 11 U.S.C. § 523(a)(1)(C). That element is easily met under the facts of this case.

## B. Winick Satisfies the Mens Rea Element of Section 523(a)(1)(C)

In addition to the conduct element, claims under 11 U.S.C. § 523(a)(1)(C) require a showing of willfulness. In assessing a debtor's scienter for this purpose, the Second Circuit follows the rule of most circuit courts, requiring only that a debtor's tax evasion be undertaken "voluntarily, consciously or knowingly, and intentionally," *In re Tudisco*, 183 F.3d at 137 (internal quotation marks omitted)—in other words, with general intent—as opposed to with specific, fraudulent intent. *See also In re Fretz*, 244 F.3d 1323, 1330 (11th Cir. 2001) ("As for the mental state requirement, a debtor's attempt to avoid his tax liability is considered willful under § 523(a)(1)(C) if it is done voluntarily, consciously or knowingly, and intentionally. Fraudulent intent is not required."). However, even if this Court considered there to be an open question about the applicable standard in this Circuit, it need not resolve that question, as Winick's conduct was willful under either of these standards.

### 1. The Scienter Standard in the Second Circuit Is General Intent

There is a circuit split regarding whether the scienter requirement under 11 U.S.C. § 523(a)(1)(C) requires the Government to prove a debtor's specific intent to defraud the IRS or only general intent. General intent requires the Government to prove that "the debtor (1) had a duty to pay taxes under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated that duty." *United States v. Coney*, 689 F.3d 365, 374 (5th Cir. 2012). All but one circuit to have addressed the issue, including the Second Circuit in *Tudisco*, has found that general intent is the correct standard.[6] Specific intent, in contrast, has only been adopted by the Ninth Circuit,

---

[6] *Cf. In re Fegeley*, 118 F.3d 979, 984 (3d Cir. 1997) (noting that "[t]he majority of courts to address this issue have not required [a showing of specific intent]. Instead, they have adopted the

and requires the Government to "establish that the debtor took the actions with the specific intent of evading taxes." *Hawkins v. Franchise Tax Bd.*, 769 F.3d 662, 669 (9th Cir. 2014).

Second Circuit precedent, principles of civil willfulness, and sound policy all favor the general intent standard. To start, the intent standard is *not* an open question in the Second Circuit. The Second Circuit ruled in *Tudisco* that a "debtor's conduct" need only "be undertaken voluntarily, consciously or knowingly, and intentionally," to satisfy the relevant *mens rea* requirement. 183 F.3d at 137 (internal quotation marks omitted). In formulating this standard, the Second Circuit relied on three cases from circuits that have also adopted a general intent standard. *See id.* at 137 (citing *Dalton*, 77 F.3d at 1302; *In re Bruner*, 55 F.3d 195, 197 (5th Cir. 1995); and *In re Toti*, 24 F.3d at 809). Indeed, the Second Circuit's use of "knowing" in its standard is inconsistent with specific intent. *See United States v. Landau*, 956 F. Supp. 1160, 1162 (S.D.N.Y. 1997) ("Knowingly . . . normally signifies a requirement of general, not specific intent." (internal quotation marks omitted)). Moreover, interpreting a near-identical willfulness requirement in 26 U.S.C. § 6672,[7] the Second Circuit has held that the requirement of "willful action under § 6672"

---

test for 'civil willfulness.'"); *United States v. Coney*, 689 F.3d 365, 374 (5th Cir. 2012) ("[T]he debtor need not have made their attempt with the specific intent to defraud the IRS."); *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994) ("He had the wherewithal to file his return and pay his taxes, but he did not fulfill his obligation. It is undisputed that he did so voluntarily, consciously, and intentionally."); *In re Birkenstock*, 87 F.3d 957, 951 (7th Cir. 1996) ("[t]he debtor must both (1) know that he has a tax duty under the law, and (2) voluntarily and intentionally attempt to violate that duty. This willfulness requirement prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate."); *Dalton v. IRS*, 77 F.3d 1297, 1302 (10th Cir. 1996) ("A debtor's actions are willful under § 523(a)(1)(C) if they are done voluntarily, consciously or knowingly, and intentionally."); *In re Fretz*, 244 F.3d 1323, 1330 (11th Cir. 2001) ("Fraudulent intent is not required").

[7] *Compare* 11 U.S.C. § 523(a)(1)(C) ("willfully attempted in any manner to evade or defeat such tax"), *with* 26 U.S.C. § 6672(a) ("willfully attempts in any manner to evade or defeat any such tax").

was satisfied by conduct that was "voluntary, conscious, and intentional." *Kalb v. United States*, 505 F.2d 506, 511 (2d Cir. 1974) (internal quotation marks omitted). As the *Kalb* court explained, under that standard, "[i]t is . . . not necessary that evil motive or intent to defraud be proven in order to establish willfulness." *Id.*; *see also Hochstein v. United States*, 900 F.2d 543, 549 (2d Cir. 1990) ("[A]n individual's good or bad motive in failing to collect and pay taxes is irrelevant to the willfulness determination."). The Second Circuit's reasoning in *Kalb* applies with equal force to 11 U.S.C. § 523(a)(1)(C), and demonstrates that there is no open question as to the applicable *mens rea* standard in the Second Circuit: it is general intent. *See Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 720 (2d Cir. 1980) ("Use of the same language in various enactments dealing with the same general subject matter . . . is a strong indication that the statutes should be interpreted to mean the same thing.").

Lower courts in this circuit have consistently applied the general-intent standard. Even before *Tudisco*, district courts had ruled that "it is not necessary to prove that the debtor was inspired by bad purpose or evil motive in failing to pay his taxes." *In re Wright*, 191 B.R. 291, 293 (S.D.N.Y. 1995) (internal quotation marks omitted). Lower court cases after *Tudisco* have been in accordance. *See, e.g.*, *In re Lynch*, 299 B.R. 62, 80-81 (Bankr. S.D.N.Y. 2003) (noting that *Wright* "b[ore] heavily on th[e] [c]ourt's decision" and characterizing its holding as being "that the debtor's knowing allocation of resources to obligations other than taxes *would* constitute the requisite willful attempt to evade or defeat a tax"); *In re Seltzer*, No. 04-ap-2286 (MG), 2007 WL 98495, at *3 (Bankr. S.D.N.Y. Jan. 9, 2007) (following *Wright*);[8] *In re Meyer*, No. 8-11-9158-

---

[8] In a footnote, the *Seltzer* court suggested that "assuming that [the Government] needs to demonstrate an affirmative act of tax evasion to satisfy § 523(a)(1)(C)," there had to be "some nexus between the affirmative acts of evasion and the tax obligations at issue." *In re Seltzer*, 2007 WL 98495, at *3 n.6. The *Seltzer* court *did not* rule that such affirmative acts *were* a requirement of § 523(a)(1)(C) and explicitly noted that such a showing was "not required by *In re Wright*." *Id.*

478 (DTE), 2013 WL 865544, at *7 (Bankr. E.D.N.Y. Mar. 7, 2013) (concluding that conduct was willful because "the [d]ebtor had earned income but applied his income to discretionary expenses for himself and his children rather than making any payment on his tax obligations"); *United States v. Timon*, No. 20 Civ. 1101 (MAD), 2022 WL 17249463, at *5 (N.D.N.Y. Sept. 6, 2022) ("Following *Tudisco*, courts in the Second Circuit have required that the government show that the debtor (1) had a duty to pay the tax, (2) knew of that duty, and (3) voluntarily and intentionally violated the duty." (internal quotation marks omitted)).

The Second Circuit's holding in *Tudisco* is also consistent with Supreme Court precedent establishing that willful violations of civil statutes encompass reckless conduct. Section 523(a)(1)(C) is a civil statute. While "willfully is a word of many meanings whose construction is often dependent on the context in which it appears, . . . where willfulness is a statutory condition of civil liability, [the Supreme Court] ha[s] generally taken it to cover not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (internal quotation marks and citations omitted). In other words, even *reckless* conduct meets the civil willfulness standard, and specific intent is not required.[9]

A general intent standard is further correct as a matter of sound policy. A district court in Florida has explained this point:

> Drawing a line between spending for the purpose of evading taxes and spending for any other reason would inevitably obscure the factual inquiry into a debtor's mental state. Worse still, such a ruling runs the risk of encouraging spendthrift behavior

_____

*In re Seltzer* is otherwise entirely consistent with other Second Circuit precedent applying a general intent standard.

[9] *See, e.g.*, *In re Feshbach*, 974 F.3d at 1331 (declining to require proof of "specific intent to evade taxes" because the Eleventh Circuit had "adopted the civil willlfulness standard"); *Coney*, 689 F.3d at 374 (noting that the Fifth Circuit "implicitly adopted th[e] position" that "specific intent to defraud the IRS" is not required under 11 U.S.C. § 523(a)(1)(C) "by applying the three-part test for civil willfulness").

in spite of—or even because of—financial obligations to creditors. As feared by the bankruptcy court, a debtor could spend with impunity before an eventual discharge.

*Feschbach v. IRS*, 594 B.R. 495, 501 n.4 (M.D. Fla. 2018), *aff'd*, *In re Feshbach*, 974 F.3d 1320 (11th Cir. 2020). The dissenting judge in the Ninth Circuit's *Hawkins* case shared this concern. *See Hawkins*, 769 F.3d at 670 (Rawlinson, J., dissenting) (noting that the Ninth Circuit's test would grant "the rich . . . an unfettered ability to dodge taxes with impunity"). And it has been echoed in the academic literature.[10]

Accordingly, there is no open question in the Second Circuit that general intent is the correct standard to evaluate willfulness. Even if it were an open question, the substantial weight of authority, including Second Circuit decisions, Supreme Court precedent, lower court decisions in this circuit, and policy concerns demonstrate that general intent is the correct standard. This Court should thus apply the general intent standard here.

### 2. Winick Acted Willfully Under the General Intent Standard

The evidence at trial easily establishes that Winick acted willfully under the general intent standard, which requires the Government to prove that a "debtor (1) had a duty to pay taxes under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated that duty." *Coney*, 689 F.3d at 374; *see also In re Tudisco*, 183 F.3d at 137 (11 U.S.C. § 523(a)(1)(c) requires proof that "that the debtor's conduct [was] undertaken voluntarily, consciously or knowingly, and intentionally" (internal quotation marks omitted)). There is no dispute that Winick was required to pay his income taxes for tax years 2012 through 2016 and that he knew of this obligation. *See* 10/16 Tr. 94:12-23 (acknowledging his duty to pay taxes on non-withholding income). Thus, the

---

[10] *See, e.g.*, Matthew Williams, *Lavish Spending as Evidence of "Willful Tax Evasion": How the Ninth Circuit's Requirement of "Specific Intent" in* Hawkins *Creates a Circuit Split and Facilitates Abuse of the Bankruptcy System*, 68 Rutgers U.L. Rev. 517, 540-50 (2015).

Government was only required to prove that Winick "voluntarily and intentionally violated that duty." *Coney*, 689 F.3d at 374. This is not a high bar. "'Intentionally' . . . serves merely to distinguish nonvolitional or accidental conduct." *United States v. Lamott*, 831 F.3d 1153, 1158 n.1 (9th Cir. 2016).

As detailed above, Winick engaged in a wide variety of voluntary and intentional conduct—failing to make estimated tax payments, stymying the IRS's ability to collect, spending lavishly on non-necessities, dissipating assets, and using corporate resources for personal purposes—that satisfied 11 U.S.C. § 523(a)(1)(C)'s conduct requirement. *See supra* at 2-13. Winick does not even contest that he undertook most of this conduct voluntarily and intentionally. For example, in a pre-trial brief, Winick confirmed that he "does not argue that his non-gambling expenditures were non-volitional." Dkt. No. 57, at 9; *see also In re Wright*, 191 B.R. at 293 (evidence that debtor "spent thousands of dollars on tuition payments," "paid substantial credit card charges incurred by his wife and daughter," and "took expensive personal trips," supported a finding of willfulness). He likewise does not contest that he transferred assets and paid money to other creditors (and non-creditors) rather than paying the IRS. 10/16 Tr. 139:25-141:3; *cf. In re Wright*, 191 B.R. at 293 (willfulness is met when "the debtor had the wherewithal to file his return and pay his obligation, but voluntarily, consciously, and intentionally decided to pay other creditors instead"). These actions thus indisputably satisfy the voluntary and intentional requirement under a general intent standard.

The sole spending category that Winick claims was non-volitional is his gambling, due to his gambling disorder. 10/20 Tr. 44:14-16. But even this does not help him for at least three reasons.

<u>First</u>, it does not explain away the voluntariness and intentionality of his other (non-gambling) conduct, which is independently sufficient to establish Winick's willfulness.

<u>Second</u>, a gambling compulsion is not a cognizable legal basis to avoid paying taxes. "[A] compulsion to gamble, even if a mental disease or defect, is not, *ipso facto*, relevant to the issue whether the defendant was unable to restrain himself from non-gambling offenses." *United States v. Torniero*, 735 F.2d 725, 732 (2d Cir. 1984); *see also United States v. Carmel*, 801 F.2d 997, 999 (7th Cir. 1986) (collecting cases holding "that there is an insufficient nexus between the alleged disease of compulsive gambling and [] non-gambling crimes[s]" for compulsive gambling to constitute a *mens rea* defense). This attempted defense should be rejected as a matter of law, as had been held in the analogous contexts of drug or alcohol addiction. *See Landau*, 956 F. Supp. at 1162 ("Moreover, intoxication due to an addiction to alcohol or cocaine—no matter how severe—is considered voluntary as a matter of law.").[11] Relying on these principles, at least one court has held that, "as a matter of law, . . . [a] [d]ebtor's compulsive gambling disorder does not operate to prevent [a] [d]ebtor from forming the requisite fraudulent intent to evade payment of taxes." *In re Carmel*, 134 B.R. 890, 908 (Bankr. N.D. Ill. 1991).

<u>Third</u>, *Winick*'s gambling disorder did not, as a factual matter, render his gambling involuntary in the relevant sense. Winick's expert psychologist, Dr. Jeremiah Weinstock, conceded that Winick could and did adopt harm-reduction strategies to limit his gambling. 10/20

---

[11] There is no basis to distinguish cases involving substance addition from Winick's gambling disorder. As the Government's expert psychiatrist Dr. Ilene Zwirn testified, gambling disorder is an addiction disorder categorized under the same topic as substance abuse disorders within the *Diagnostic and Statistical Manual*. 11/1 Tr. 6:1-5. Both testifying experts relied on analogies to substance abuse to explain their opinions on Winick's gambling disorder. *See* 10/20 Tr. 49:21-54:20; 11/1 Tr. 7:9-14. The Second Circuit has considered it "instructive to compare compulsive gambling with the classic impulse disorder, substance abuse." *Torniero*, 735 F.2d at 733.

Tr. 82:8-11. For example, Winick refused loans from casinos and only gambled with a pre-determined amount at each visit to ensure he could afford his other expenses. *Id.* at 85:16-86:3. Dr. Weinstock also acknowledged that Winick was able to control his gambling enough to: make estimated tax payments before 2012; make numerous tax payments between 2012 and 2016; decide to increase the tax withholdings from his earnings, which enabled him to pay his taxes in full in 2017 and 2018; and quit gambling without professional assistance in 2019. *Id.* at 72:17-19, 93:2-97:8. These tax-related decisions that Winick *actually* made are inconsistent with the notion that Winick was incapable of paying his taxes rather than gambling away that money. As the Government's expert psychiatrist, Dr. Ilene Zwirn, explained:

> Mr. Winick continuously made decisions about paying his taxes. He told me that he always paid taxes, just sometimes not enough. He had the ability to make financial decisions, payment of taxes being one of them. And so, I think that he was never unable to make those decisions.

11/1 Tr. 46:1-6.

In short, Winick's gambling disorder did not render even his gambling, let alone his non-gambling financial decisions, involuntary under a general intent standard. Applying such a standard, Winick plainly engaged in conduct inconsistent with his duty to pay taxes that was "undertaken voluntarily, consciously or knowingly, and intentionally." *In re Tudisco*, 183 F.3d at 137 (internal quotation marks omitted).

### 3. Winick's Acted Willfully Under the Specific Intent Standard, If It Applied

Even if this Court were to apply the Ninth Circuit's specific-intent standard articulated in *Hawkins*, 769 F.3d at 669, the Government has presented overwhelming evidence that Winick acted willfully in evading his taxes. The few courts that have applied *Hawkins* since it was decided agree that "[a] fact-finder can infer specific intent where certain 'badges of fraud' are present." *United States v. Schmidt*, No. 14 Civ. 237 (TOR), 2016 WL 7230503, at *2 (E.D. Wash. Dec. 14,

2016).  Those badges of fraud include "implausible or inconsistent explanations of behavior, concealing assets, failure to cooperate with tax authorities, [and] lack of credibility of taxpayer's testimony," as well as "failing to make estimated tax payments, . . . filing false documents with the IRS, and other conduct, the likely effect of which would be to mislead or conceal."  *Id.*; *accord United States v. Parker*, No. 07 Civ. 1969 (MLH), 2015 WL 1745879, at *2 (S.D. Cal. Feb. 17, 2015).  Winick's conduct clearly demonstrates these badges, as summarized below:

1. <u>Implausible Explanations</u>: Winick's explanation for his tax evasion was consistently implausible.  For example, he testified that the numerous property transfers to his daughter discussed above, *see supra* at 9-11, were motivated by "estate planning." 10/16 Tr. 139:25-141:3.  Even assuming that estate planning is a legitimate activity for someone who owes millions of dollars to the IRS,[12] Winick's acknowledgement that he knew he was behind on his taxes when each of these transfers was made, but nevertheless did not even *think* about his tax liabilities when he made them, *see id.* at 141:4-17, is simply implausible.

2. <u>Concealing Assets</u>:  Winick's asset transfers had the obvious effect of concealing those assets or making them harder for creditors such as the IRS to reach.  For example, Winick transferred ownership of his Southampton home to a trust for the benefit of his daughter while retaining beneficial use of the property. *See supra* at 10.  Further, rather than taking an ownership stake in the New Jersey branch of his company, he ran the company while putting the ownership interest in his daughter's name.  *See id.* at 10-11.  These transactions kept assets that Winick benefitted from out of the reach of his creditors.

3. <u>Failure to Cooperate</u>: On three occasions, Winick entered, then defaulted on, several installment agreements with the IRS.  *See supra* at 4-5.  And in one circumstance, he proposed a patently unreasonable offer in compromise of his tax liabilities.  *See supra* at 5-6.  These actions demonstrate Winick's unwillingness to cooperate with taxing authorities.

4. <u>Lack of Credibility</u>: Winick did not testify credibly at trial in several instances.  When explaining his decision to list the combined value of his two Rolex watches on his bankruptcy schedules as $5,000, Winick's trial testimony differed materially from a sworn declaration he had previously provided the Court, as discussed in more detail *infra* at 31.  When discussing his use of his

---

[12] As one court has noted, estate planning is improper where "the obvious effect of the transfers" is to "place[] . . . [property] beyond the reach of . . . personal creditors."  *City of Arkansas v. Anderson*, 762 P.2d 183, 191 (Kan. 1988).  "An estate plan cannot be used to hinder, thwart, delay, or defraud creditors." *Id.*

company cars, Winick claimed at trial that he did not treat those vehicles as his personal vehicles despite overwhelming evidence that he did. 10/16 Tr. 148:22-151:11. And Winick further admitted at trial that he had previously lied to a reporter to cast himself in a favorable light. *Id.* at 162:16-18. His lack of credibility is another indicium of his fraudulent intent.

5. <u>Failure to Make Estimated Tax Payments</u>: There is no dispute that Winick failed to make required quarterly estimated tax payments, despite being told on numerous occasions that he should do so. *See supra* at 3-4. His failure to make these payments further evinces his intent to evade his taxes.

6. <u>False Information to the IRS</u>: Winick was not honest with the IRS. As discussed above, on at least two occasions, his appointed representatives provided false information to the IRS to persuade it to enter installment agreements with him, which forestalled the agency's collection activities. *See supra* at 6-7. There could be no clearer evidence of Winick's intent to defraud the IRS than such overt lies.

In short, numerous badges of fraud support a finding of Winick's specific intent to evade his taxes, if such a finding is required. Indeed, the behaviors discussed above with respect to the conduct element of 11 U.S.C. § 523(a)(1)(C) are further indicia of specific intent. *See, e.g.*, *In re Geiger*, 408 B.R. 788, 793 (C.D. Ill. 2009) (finding that "excessive expenditures on nonessential items[] and placing property in another person's name" were "badges of fraud"); *United States v. Gorokhovsky*, 575 F. Supp. 3d 1050, 1060 (E.D. Wis. 2021) (same, with respect to various asset transfers). So even if specific intent were required the Second Circuit, which it is not, the Government would nonetheless prevail on this element.[13]

\* \* \*

Ultimately, the Government presented substantial evidence at trial establishing that Winick willfully engaged in conduct that evaded or defeated his taxes. The Court should thus grant judgment in the Government's favor on Count IV.

---

[13] Nothing about Winick's non-severe gambling disorder negates any of the Government's proof that he acted with specific intent. Indeed, psychiatric defenses rarely negate specific intent. *See, e.g.*, *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) ("psychiatric evidence . . . will only rarely negate specific intent").

## Count I – Violation of 11 U.S.C. § 727(a)(2)

Count I of the Government's adversary complaint alleges that Winick violated 11 U.S.C. § 727(a)(2) by transferring his interest in an entity called SDSDR111 LLC (the "Interest")—which owned and operated an interest in a building's commercial space, *see* JPTO, Ex. A ("Stipulated Facts") ¶ 1—to his friend David Berley with intent to delay, hinder, or defraud the IRS. Adv. Compl. ¶¶ 68-71; JPTO § V ¶ 1. To prevail on this claim, the Government had to prove by a preponderance of the evidence that: "(1) the debtor transferred property; (2) said property belongs to the debtor; (3) the transfer occurred with actual intent to hinder, delay, or defraud; and (4) the transfer occurred within one year prior to filing for bankruptcy." *In re Kablaoui*, 196 B.R. 705, 708 (Bankr. S.D.N.Y. 1996). Winick contests only the third element, his intent. JPTO § V ¶ 1.

The Second Circuit has recognized that "[f]raudulent intent is rarely susceptible to direct proof" and that parties must instead rely on "'badges of fraud' to establish the requisite actual intent to defraud." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). As relevant to this statutory scheme, these "badges" can include: (1) a lack of adequacy of consideration underlying the transfer; (2) the friendship of the transferor to the transferee; (3) the financial condition of the transferor both before and after the transaction; (4) the pattern of transactions following the incurring of a debt; and (5) the general chronology surrounding the transaction under inquiry. *Id.* at 1582-83. If "one or some of these factors are met," it "creates a presumption of an intent to defraud establishing plaintiff's prima facie case and shift[ing] the burden" to the defendant to disprove his fraudulent intent. *Village of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002) (internal quotation marks omitted). Here, the Government proved several badges of fraud, establishing a presumption that Winick transferred the Interest with intent to hinder, delay, or defraud the IRS.

## A. The Chronology of the Transactions Is a Badge of Fraud

The strongest indication that Winick transferred the Interest with intent to hinder, delay, or defraud the IRS is the chronology of the transaction. Winick knew that the IRS had a first-priority lien on the Interest, but nevertheless pledged it to secure a sweetheart loan from his friend, Berley. When Winick's financial situation worsened years later, he stopped paying the IRS and selectively used his excess income to pay a separate, unsecured debt to Berley. And soon after Winick began contemplating bankruptcy in June 2020, he transferred the Interest to Berley to satisfy the secured debt—without notifying the IRS, despite its superior interest in the LLC. Winick took each of these steps in a way that made it more difficult for the IRS to collect on his liabilities.

Specifically, Winick knew the IRS had a first-priority lien on the Interest when he pledged it as collateral to Berley in exchange for a $500,000 loan in January 2015. *See* JX 6 (promissory note to Berley). At the time of this pledge, the IRS had already perfected a lien on all of Winick's assets (necessarily including the Interest) based on Winick's outstanding 2012 tax liability. *See* PX 62 at 1; *see also id.* at 2 (lien notice, stating: "The lien attaches to all property you currently own and to all property you may acquire in the future."). The IRS sent notice of the lien to Winick personally by certified mail, which was not returned as undeliverable. *See id.* at 2-3 (reflecting contents of letter to Winick); JX 5 at USA1702 (reflecting mailing of notice of lien filing); 10/16 Tr. 74:7-77:17 (John Harrison, explaining that notice was sent to Winick and not returned as undeliverable, and further explaining the contents of the notice sent to Winick). The IRS also informed Winick's authorized representative at the time, *see* PX 58 at WINICK 2592-93, both before and after the IRS recorded its lien in May 2014. *See* PX 1 at USA3265-69 (reflecting conversations with Rutter on this subject on April 25, April 28, April 29, May 1, and May 2, 2014); 10/16 Tr. 70:5-73:25 (Harrison, explaining these conversations).

Winick's payment history to Berley also evinces his intent to defraud the IRS. Indeed, Winick *never* made a principal payment on this debt. 10/16 Tr. 171:1-5. For five years after loaning money to Winick, Berley repeatedly extended additional credit, extended the loan maturity date, and declined to exercise his right to call a default on the loan when Winick missed interest payments. *See* JX 7-11; 10/16 Tr. 170:12-171:25 (Winick, acknowledging this history). Despite Winick making no principal payments, Berley gave Winick an additional, unsecured loan of $250,000 in 2018. PX 41; 10/16 Tr. 174:13-17.

Winick's payments to Berley changed dramatically after January 2020, when Winick stopped making payments to the IRS. JX 5 at USA1705; 10/16 Tr. 65:9-11 (Harrison, explaining payment history). In February 2020, Winick repaid Berley the full amount he owed on the *unsecured* loan. PX 46; 10/16 Tr. 106:4-7 (Winick, acknowledging the payment). But Winick never paid the principal on the secured loan, even after entering into an agreement with Berley that would have allowed him to redirect commission payments for that purpose. PX 47; 10/16 Tr. 175:2-8; Winick Dep. 134:2-20. Indeed, Berley waived his right to receive $52,000 from Winick under that agreement in May 2020. PX 42; 10/16 Tr. 175:17-25.

In July 2020, after five years of lenience, Berley held Winick in default on the secured loan, and Winick transferred the Interest to him to resolve the issue. *See* JX 13-16. At the time, Winick was already contemplating bankruptcy. 10/16 Tr. 172:14-25. This transaction appears to have been influenced by Winick's contemplated bankruptcy, as evidenced by the fact that Winick's bankruptcy lawyer was involved in it. *See* PX 55 at 21 (email conveying transfer of the Interest, copying bankruptcy attorney Steven Wilamowsky); 10/16 Tr. 174:5-12. Winick did not inform the IRS before transferring the Interest, despite its superior lien. *Id.* at 177:5-8. Nor did he try to sell the Interest for cash so he could pay the IRS with the proceeds. *Id.* at 176:23-177:4.

The result of this transfer was to impair the IRS's ability to act on its secured interest when Winick filed for bankruptcy a month later. To this day, the estate has not recovered the Interest, despite years of efforts by the Chapter 7 trustee. *See In re Winick*, No. 20-11976 (PB), Dkt. Nos. 102, 108, 110, 113, 115, 116, 118, 120, 121 (Bankr. S.D.N.Y.).

Winick's course of dealing with Berley on these loans strongly supports an inference that Winick intended to delay, hinder, or defraud the IRS.

### B. Winick's Close Relationship with Berley Is a Badge of Fraud

Fraudulent intent can also be inferred from the close personal relationship between a transferor and transferee. Winick and Berley were close friends. 10/16 Tr. 198:19-21 (Winick, describing Berley as "a good friend"); Berley Dep. 9:9-10 (stating, of Winick, "[w]e've been friends 20-plus years"). Their friendship was the impetus for the loans. 10/16 Tr. 199:8-10 (Winick, describing personal nature of the loan). And the preferential treatment that Winick received throughout his loan repayment was a direct result of the friendship. *Id.* at 172:9-13. In ultimately repaying the secured loan, Winick gave Berley the Interest as "his way of taking care of his friend at his other creditors' expense," thus evincing his intent to "hinder or delay collection of other creditors' claims against him." *In re Bennett*, No. 12-ap-6136 (TMR), 2014 WL 293462, at *6 (Bankr. D. Or. Jan. 27, 2014).

### C. The Inadequacy of the Consideration Is a Badge of Fraud

At the time Winick transferred the Interest to Berley, it was worth far more than the outstanding balance of the secured loan. This further evinces Winick's intent to delay, hinder, or defraud the IRS. At the time of the transfer, Winick owed Berley $1.6 million, Stipulated Facts ¶ 12, but the Interest had been most recently valued at $2.5 million, *id.* ¶ 13; JX 25-3; 10/16 Tr. 176:11-19 (Winick's acknowledgment of these facts). Even if Berley had the only secured claim on the Interest (which he did not), he received an asset that was worth more than he was owed, and

thus provided inadequate consideration to Winick for the Interest.[14] "[A] presumption of intent to defraud arises when valuable property has been . . . transferred for inadequate consideration." *In re Lubin*, 61 B.R. 511, 514 (Bankr. S.D.N.Y. 1986).

## D. The Pattern of the Transactions Is a Badge of Fraud

Winick's intent can further be inferred from the fact that his transfer of the Interest was but one of many transfers he made after incurring the tax debts at issue. *See generally, supra* at 9-11. When a debtor "divest[s] himself of valuable asset after valuable asset in a series of suspect transactions" after incurring a debt, his divestments provide "ample and compelling evidence" of intent to hinder, delay, or defraud. *Ostashko v. Ostashko*, No. 00 Civ. 7162 (ARR), 2002 WL 32068357, at *19 (E.D.N.Y. Dec. 12, 2002).

## E. Winick's Financial Condition After the Transfer Is a Badge of Fraud

Finally, Winick's financial condition after transferring the Interest supports an inference of fraudulent intent. After transferring the Interest, he was left, by his own account, with only $530,000 in assets when he filed for bankruptcy, *see* JX 1 at 20, far less than his more than $10 million of liabilities, *see id.* at 23-34. In other words, Winick "appears to have endeavored to render himself 'judgment proof' by divesting himself of any assets on which a judgment creditor could collect." *In re Xiang Yong Gao*, 560 B.R. 50, 64-65 (Bankr. E.D.N.Y. 2016).

\* \* \*

The numerous "badges of fraud" discussed above establish a presumption that Winick intended to hinder, delay, or defraud the IRS. *See, e.g.*, *In re Abramov*, 329 B.R. 125, 131-32

---

[14] Winick has claimed that the Interest was worth only $250,000 based on a subsequent valuation. *See* DX 4. But that valuation was conducted one year after he transferred it to Berley, for the purpose of determining whether Winick owed taxes on the transfer, *see* Winick Dep. 122:19-23, which created a significant incentive to undervalue the Interest to avoid adverse tax consequences. That valuation is also inconsistent with the fact that Winick received over $400,000 in dividends from the Interest in the few years leading up to his bankruptcy. PX 43; 10/16 Tr. 176:1-10.

(Bankr. E.D.N.Y. 2005) (finding fraudulent intent where home was transferred for less than market value to family member, while debts were building).  Because Winick offered no credible explanation at trial "to overcome the strong evidence of the existence of circumstantial factors that courts have historically looked to in inferring an intent to hinder, delay or defraud creditors," *In re Nadeau*, No. 21-ap-3045, 2023 WL 6332837, at *14 (Bankr. N.D. Ohio Sept. 28, 2023), judgment should be entered in favor of the Government on Count I.

## Count II – Violation of 11 U.S.C. § 727(a)(4)(A)

Count II of the Government's adversary complaint alleges that Winick violated 11 U.S.C. § 727(a)(4)(A) by falsely listing the value of his "two Rolex watches" at $5,000 in Schedule A/B of his bankruptcy petition.  Adv. Compl. ¶¶ 72-77; JPTO § V ¶ 2.  To prevail on this claim, the Government had to prove by a preponderance of the evidence that: "(1) the debtor[] made a statement under oath; (2) the statement was false; (3) the debtor[] knew that the statement was false; (4) the debtor[] made the statement with intent to deceive; and (5) the statement related materially to the bankruptcy case." *In re Moreo*, 437 B.R. 40, 61 (Bankr. E.D.N.Y. 2010).  Winick contests only the second, third, and fourth elements.  JPTO § V ¶ 2.[15]

### A.  Winick's Statement Was False

The value that Winick listed for his two Rolex watches on his bankruptcy schedules was demonstrably false.  He stated that they were worth a total of $5,000 in August 2020, *see* JX 1 at 14, but they were appraised by the Chapter 7 trustee at $47,500 only a few months later, in November 2020, *see* Stipulated Facts ¶ 27; JX 26, Ex. C.  Winick presented no evidence that the value of his watches increased by nearly ten times in the intervening four months.

---

[15] In a pre-trial brief, the Government explained that there is no *de minimis* exception to claims brought pursuant to 11 U.S.C. § 727(a)(4)(A), and that, even if such exception existed, it would not apply given the significant value of Winick's watches compared to the size of the estate.  *See* Dkt. No. 68.  This Court should thus not conclude that Winick's false oaths were *de minimis*.

### B. Winick's False Statement Was Made with the Requisite Scienter

The third and fourth elements—knowledge of falsity and intent to deceive—are often considered in tandem. *See, e.g.*, *In re Moreo*, 437 B.R. at 62. They can be met not only by showing a debtor's actual knowledge and intent to deceive, but also by his "reckless indifference to the truth." *Diorio v. Kreisler-Borg Const. Co.*, 407 F.2d 1330, 1331 (2d Cir. 1969). As explained below, Winick was an avid Rolex collector who knew the value he listed for his watches on his bankruptcy schedules was false. But even if he did not know the watches' precise values, the process by which he claims to have come up with them was recklessly indifferent to the truth.

With respect to Winick's actual knowledge of the value of his watches, his claim that he knows little about Rolex watches is specious. In 2014, Winick held himself out as a collector of Rolex watches who understands the values of different Rolex models. *See* PX 52 at 10 (Winick, during an interview in 2014, stating: "I collect Rolexes. My favorite is the one I'm wearing, which is the cheapest one they make."). And Berley testified that Winick "always talks about [how] he did well because he had this huge collection [of Rolexes]." Berley Dep. 67:25-67:3. Winick acknowledged owning a dozen Rolexes in the past. 10/16 Tr. 190:24-25. In fact, at the time he cancelled a jewelry insurance policy in 2015, Winick owned over twenty luxury watches. PX 36. Many of those watches were Rolexes, every one of them was worth more than $5,000, and almost all of them were worth more than $10,000 apiece. *Id.*; 10/16 Tr. 159:9-21. In light of the overwhelming evidence that Winick knew the value of Rolexes, his trial testimony to the contrary cannot be credited. 10/16 Tr. 191:5-10 (testimony that Winick does not "consider [him]self knowledgeable about Rolex watches"). Of course, Winick had a strong incentive to undervalue his watches. By listing them as worth only $5,000, he was able to claim that the watches were exempt from the bankruptcy estate under 11 U.S.C. §§ 522(d)(3), (d)(4). *See* JX 1 at 21.

Even if the Court were to credit Winick's testimony that he did not know what his watches were worth, it should still conclude that he listed their value with reckless indifference to the truth. Although he has provided several different stories about the origin of the $5,000 figure, Winick has consistently indicated that he took no steps to determine the watches' value. 10/16 Tr. 164:20-23. He did not consult the insurance document in his possession which reflected the value of several of his Rolex watches, all of which were far more valuable than what he listed. *See* PX 36; 10/16 Tr. 158:11-14. And he did not perform even a simple Internet search, which would have given him at least a good idea of the watches' values. *See* PX 53; 10/16 Tr. 158:5-7. Where a debtor "is merely guessing at the right amount—which it is necessarily within his power to ascertain—his answer is untruthful unless he in some way conditions it." *Morris Plan Indus. Bank v. Lassman*, 116 F.2d 473,473 (2d Cir. 1940); *see also Morimura, Arai & Co. v. Taback*, 279 U.S. 24, 33 (1929) (noting that individuals act "with reckless indifference to the actual facts" when they make a statement "without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct"). Winick's failure to take any steps to ascertain the value of his watches was recklessly indifferent to the truth. Worse yet, Winick guessed the combined value of his two Rolex watches as $5,000 only weeks after he guessed that only one of the watches was worth the same amount. *Compare* PX 55 at 20 (listing one Rolex at $5,000), *with* JX 1 at 14 (listing two Rolexes at $5,000); 10/16 Tr. 166:3-11.

In short, Winick either actually knew that the value he listed for his watches was false, or was reckless as to the truth of that value, either of which satisfies the scienter requirements of 11 U.S.C. § 727(a)(4)(A).

### C. Any Advice of Counsel Winick Received Does Not Justify His False Statements

Winick has asserted that he relied on the advice of counsel in deciding what to list in his bankruptcy schedules for his watches' value, but has given several inconsistent accounts as to what

legal advice he received. In a sworn declaration submitted to the Court, Winick stated that he listed a value of $5,000 for his watches because his "bankruptcy counsel told [him] to put [his] best estimate as to the value of [his] Rolex watches." Dkt. No. 42, ¶ 32. Winick's counsel, Steve Wilamowsky, similarly testified at his deposition that he told Winick to put down his "best estimate" or "best guess," after "kind of pushing [Winick] to give [him] a value for the watches." Wilamowsky Dep. 32:12-18. At trial, however, Winick claimed that he did not come up with the $5,000 figure at all, but rather that it was Wilamowsky who arrived at the number and told him (Winick) to write it down. 10/16 Tr. 163:19-22. Winick cannot rely on an advice of counsel defense when it is unclear what advice he received. *See United States v. Bowden*, 542 F. App'x 299, 301 (5th Cir. 2013) (affirming failure to give advice-of-counsel instruction where there was no "evidentiary basis upon which [it] could be based").

Even putting aside this inconsistency, Winick's advice of counsel defense cannot succeed. It would not have been reasonable for Winick to simply rely on his bankruptcy counsel—who self-describes as "a guy with . . . not even a real Apple watch, like a $40 knockoff," Wilamowsky Dep. 44:3-4—to value his Rolexes (an issue that arguably falls outside the realm of legal advice altogether), when Winick held himself out to the public as a collector of Rolex watches who understands the values of different Rolex models, *see* PX 52 at 10, and had previously insured over twenty luxury watches that he owned. PX 36. "It is well-established that a debtor's purported reliance on the advice of counsel is unreasonable when the erroneous advice should be 'transparently plain' to the debtor." *Godindram v. Bank of India*, 538 B.R. 629, 642 (E.D.N.Y. 2015) (Bianco, J.). It would have been transparently plain to a Rolex collector like Winick that $5,000 could not be the combined value of two Rolex watches. If, however, it was *Winick* who arrived at the $5,000 figure, in reliance on his counsel's advice to provide his "best estimate" as to

the watches' value, Winick did not establish that he disclosed all pertinent facts to his lawyer before receiving that advice or that he relied in good faith on the advice to put forward his "best estimate," as explained in one of the Government's pre-trial briefs. *See* Dkt. No. 66.

* * *

Even though he is a longtime Rolex collector, Mr. Winick falsely listed the total value of his two Rolex watches at $5,000 in his bankruptcy schedules, claiming them to be fully exempt from the bankruptcy estate. Because he did so with either actual knowledge of his statement's falsity or with reckless indifference to the truth, the Court should enter judgment for the Government on Count II of its adversary complaint.

## CONCLUSION

For the reasons outlined above, the Court should grant judgment to the Government on Counts I, II, and IV of its complaint.

Dated: New York, New York
      November 17, 2023                   Respectfully submitted,

                                      DAMIAN WILLIAMS
                                      United States Attorney

                         By:  */s/ Zachary Bannon*
                                      ZACHARY BANNON
                                      JEAN-DAVID BARNEA
                                      Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007