**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:                          :

                             :         Chapter 7

     JEFFREY WINICK,         :

                             :         Case No. 20-11976 (PB)

              Debtor.      :
-----------------------------------------------------------x
UNITED STATES OF AMERICA,   :

                             :         Adv. Proc. No. 21-01138 (PB)

            Plaintiff,    :

                             :

     v.                     :

                             :
JEFFREY WINICK,            :

                             :

           Defendant.    :
-----------------------------------------------------------x

**DEFENDANT'S POST-TRIAL BRIEF**

**ARENTFOX SCHIFF LLP**

Jin Yan
1717 K St. NW
Washington, DC 20006
T: (202) 778-6442
E: jin.yan@afslaw.com

- and -

Ryan Foley
1301 Avenue of the Americas
42nd Floor
New York, NY 10019
T: (212) 484-3997
E: ryan.foley@afslaw.com

*Counsel for Defendant Jeffrey Winick*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

I.      LEGAL STANDARD ................................................................................................ 2

II.     DEBTOR DID NOT VIOLATE 11 U.S.C. § 727(a)(4) ........................................... 2

     A.     Debtor Did Not Make a False Statement ................................................... 3

     B.     Debtor Did Not Know His Estimate Was Inaccurate ................................ 3

     C.     Debtor Had No Fraudulent Intent ............................................................. 5

     D.     Debtor Relied on Advice of Counsel ....................................................... 7

     E.     Debtor's Estimate Had No Adverse Effect on the Bankruptcy ................ 9

III.    DEBTOR DID NOT VIOLATE 11 U.S.C § 727(a)(2) ............................................ 9

     A.     The Government Lacks Direct Evidence of Fraudulent Intent ................ 10

     B.     The Government Lacks Circumstantial Evidence of Fraudulent Intent ... 10

IV.    DEBTOR DID NOT VIOLATE 11 U.S.C. § 523(a)(1)(C) ...................................... 15

     A.     The Government Has Not Proven Evasive Conduct ................................ 15

          1.    Debtor Made Ongoing Efforts to Pay His Taxes ....................... 15

          2.    Debtor Did Not Manipulate Collection Procedures .................. 17

          3.    Debtor's Did Not Spend Money to Evade Taxes ...................... 20

          4.    Debtor Did Not Transfer Assets to Evade Taxes ...................... 21

          5.    Debtor Did Not Misuse Corporate Assets to Evade Taxes ....... 25

     B.     The Government Has Not Proven Willfulness ......................................... 26

          1.    Willfulness Requires Specific Intent to Evade Taxes ............... 26

          2.    Debtor Lacked Any Specific Intent to Evade Taxes ................. 31

          3.    Debtor Lacked Any General Intent to Evade Taxes ................. 33

CONCLUSION .................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Anderson*,
884 F.3d 382 (2d Cir. 2018).................................................................................1

*In re Barrios*,
2007 WL 2406881 (Bankr. S.D.N.Y. Aug. 20, 2007) ..........................................2

*In re Bennett*,
2014 WL 293462 (Bankr. D. Or. Jan. 27, 2014) ...........................................13, 14

*In re Blum*,
41 B.R. 816 (Bankr. S.D. Fla. 1984)....................................................................9

*In re Boyer*,
328 Fed. App'x 711 (2d Cir. 2009)..........................................................2, 10, 14

*In re Brenes*,
261 B.R. 322 (Bankr. D. Conn. 2001) ..................................................................5

*In re Brown*,
108 F.3d 1290 (10th Cir. 1997) ..........................................................................11

*In re Bruner*,
55 F.3d 195 (5th Cir. 1995) ................................................................................30

*In re Chavin*,
150 F.3d 726 (7th Cir. 1998) ................................................................................5

*Chhabra v. Holder*,
444 Fed. App'x 493 (2d Cir. 2011)......................................................................28

*City of Arkansas v. Anderson*,
762 P.2d 183 (Kan. 1988) ...................................................................................32

*In re Colish*,
289 B.R. 523 (Bankr. E.D.N.Y. 2002) ................................................................19

*Dalton v. IRS*,
77 F.3d 1297 (10th Cir. 1996) ............................................................................29

*In re DeRise*,
394 B.R. 677 (Bankr. E.D.N.Y. 2008)..................................................................5

*Don Gastineau Equity Trust v. U.S.*,
　687 F. Supp. 1422 (C.D. Cal. 1987) ....................................................22

*In re Fasolak*,
　381 B.R. 781 (Bankr. M.D. Fla. 2007) ..................................................6

*In re Feshbach*,
　974 F.3d 1320 (11th Cir. 2020) ..........................................................19

*Fiataruolo v. U.S.*,
　8 F.3d 930 (2d Cir. 1993).............................................................30, 31

*In re Fielder*,
　548 B.R. 543 (Bankr. N.D. Iowa 2016) ................................................6

*In re Geer*,
　522 B.R. 365 (Bankr. N.D. Ga. 2014) ..................................................6

*In re Glaser*,
　49 B.R. 1015 (Bankr. S.D.N.Y. 1985) ..................................................9

*Godrindram v. Bank of India*,
　548 B.R. 629 (E.D.N.Y. 2015) .............................................................8

*In re Golden Seahorse LLC*,
　652 B.R. 593 (Bankr. S.D.N.Y. 2023)............................................26, 28

*In re Gollomp*,
　198 B.R. 433 (S.D.N.Y. 1996)......................................................12, 13

*In re Gorchev*,
　275 B.R. 154 (Bankr. D. Mass. 2002) ..................................................3

*In re Green*,
　2007 WL 1428547 (Bankr. S.D.N.Y. May 11, 2007)...........................2, 9

*In re Griffith*,
　206 F.3d 1389 (6th Cir. 2000) ............................................................23

*Haesloop v. U.S.*,
　2000 WL 1607316 (Bankr. E.D.N.Y. Aug. 30, 2000)...........................23

*Hawkins v. Franchise Tax Bd. of Cal.*,
　769 F.3d 662 (9th Cir. 2014) .........................................................20, 29

*In re Herron*,
　634 B.R. 883 (Bankr. W.D. Okla. 2021) ............................................25

*Hinson v. U.S.*,
    994 F.2d 843 (8th Cir. 1993) ...............................................................................22

*In re Howard*,
    167 B.R. 684 (Bankr. M.D. Fla. 1994) .................................................................28

*In re Hyman*,
    502 F.3d 61 (2d Cir. 2007).............................................................................1, 29

*In Morris Plan Indus. Bank v. Lassman*,
    116 F.2d 473 (2d Cir. 1940)...................................................................................5

*IRS v. Conard*,
    2019 WL 10886919 (E.D. Va. Feb. 1, 2019) .......................................................30

*In re Jacobs*,
    490 F.3d 913 (11th Cir. 2007) .......................................................................16, 22

*Kalb v. U.S.*,
    505 F.2d 506 (2d Cir. 1974)..................................................................................30

*Kawaauhau v. Geiger*,
    523 U.S. 57 (1998)..........................................................................................27, 30

*In re Koehl*,
    166 B.R. 74 (Bankr. E.D. La. 1993) ...............................................................22, 32

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001)...................................................................................2

*In re Looft*,
    533 B.R. 910 (Bankr. N.D. Ga. 2015) ......................................................17, 20, 35

*In re May*,
    2010 WL 5014716 (S.D. Ala. Nov. 30, 2010) ......................................................25

*In re Miga*,
    2011 WL 204896 (Bankr. N.D.N.Y. Jan. 21 2011) ...............................................2

*Morimura, Arai & Co. v. Taback*,
    279 U.S. 24 (1929)..................................................................................................5

*In re Osborne*,
    951 F.3d 691 (5th Cir. 2020) .........................................................................18, 19

*Ostashko v. Ostashko*,
    2002 WL 32068357 (E.D.N.Y. Dec. 12, 2002) ....................................................14

*In re Parker*,
531 B.R. 103 (Bankr. E.D.N.C. 2015) ...................................................................4

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
551 U.S. 224 (2007) ...................................................................................................27

*In re Quiroz*,
2018 WL 1773095 (Bankr. N.D. Okla. Apr. 10, 2018) ....................27, 28, 29, 31

*Reynoso v. Aviles*,
87 F. Supp. 3d 549 (S.D.N.Y. 2015) ......................................................................29

*Rosen v. Bezner*,
996 F.2d 1527 (3d Cir. 1993) ............................................................................10, 14

*In re Shove*,
629 B.R. 98 (Bankr. D. Mass. 2021) .......................................................................5

*In re Singh*,
433 B.R. 139 (Bankr. E.D. Pa. 2010) ......................................................................3

*In re Skibicki*,
2021 WL 1396743 (Bankr. D. Neb. Apr. 12, 2021) ...............................................5

*In re Smith*,
351 B.R. 274 (Bankr. D. Conn. 2006) .....................................................................2

*Terra Sec. ASA Konkursbo v. Citigroup, Inc.*,
820 F. Supp. 2d 541 (S.D.N.Y. 2011) ...................................................................19

*In re Toti*,
24 F.3d 806 (6th Cir. 1994) ....................................................................................30

*In re Tudisco*,
183 F.3d 133 (2d Cir. 1999) ............................................................................ *passim*

*U.S. v. Bowden*,
542 Fed. App'x 299 (5th Cir. 2013) .........................................................................8

*U.S. v. Schmidt*,
2016 WL 7230503 (E.D. Wash. Dec. 14, 2016) ....................................................33

*U.S. v. Uria*,
180 B.R. 688 (S.D. Fla. 1995) ................................................................................17

*In re Varner*,
2015 WL 4039390 (Bankr. N.D. Ohio June 30, 2015) ...........................................7

*In re Wines*,
    114 B.R. 794 (Bankr. S.D. Fla. 1990).......................................................................3

*In re Xiang Yong Gao*,
    560 B.R. 50 (E.D.N.Y. 2016) .................................................................................14

**Statutes**

11 U.S.C. § 523(a)(1)(C) ..................................................................................... *passim*

11 U.S.C. § 523(a)(2)(B) ...............................................................................................18

11 U.S.C. § 523(a)(6)......................................................................................................27

11 U.S.C. § 727(a)(2)...........................................................................................1, 14, 15

11 U.S.C. § 727(a)(2)(A).............................................................................................9, 10

11 U.S.C. § 727(a)(4).............................................................................................1, 2, 9

26 U.S.C. § 6672...................................................................................................30, 31

26 U.S.C. § 6672(a) .......................................................................................................30

26 U.S.C. § 7201..................................................................................................28, 30

26 U.S.C. § 7501............................................................................................................30

**Other Authorities**

S. Rep. No. 95-989, 95th Cong., 2d Sess. (1978) ........................................................28

Defendant and debtor Jeffrey Winick ("Debtor") submits this post-trial brief in response to plaintiff United States of America's (the "Government") post-trial brief.[1]  Adv. Dkt. No. 75.

## PRELIMINARY STATEMENT

"The successful discharge of debt is not merely important to the Bankruptcy Code, it is its principal goal." *In re Anderson*, 884 F.3d 382, 386 (2d Cir. 2018).  "[F]ailure to achieve discharge can amount to a financial death sentence" and thus "exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor."  *In re Hyman*, 502 F.3d 61, 66 (2d Cir. 2007).

Here, a discharge is warranted because the Government has not proven that Debtor violated sections 727(a)(2), 727(a)(4), and 523(a)(1)(C) of the Bankruptcy Code such that he deserves a financial death sentence.  Rather, the evidence at trial proves the Government's theories are fundamentally implausible.  Why would Debtor, who freely gave away his jewelry over the years, jeopardize his ability to discharge millions of dollars of debt by lying on his bankruptcy schedules just to keep two Rolex watches that he got for free from the casinos?  Why would he risk a denial of discharge by fraudulently transferring LLC interests to David Berley, when, as the Government's argues, Berley was his dear friend and the one creditor who didn't care about being repaid?  Why would Debtor orchestrate a complex, long-running scheme to avoid his tax obligations only to sabotage that very scheme by making concerted efforts to pay those obligations, and go through all that trouble just to render himself penniless and unable to retire?  The Government cannot provide coherent answers to these questions because Debtor is not guilty of the misconduct charged.  Accordingly, the Court should enter judgment in Debtor's favor on Counts I, II, and IV of the Government's adversary complaint and grant Debtor a fresh start.

---

[1] For the Court's convenience, Debtor uses the same record citation format as the Government.

**ARGUMENT**

## I.    Legal Standard.

"When a creditor challenges a debtor's discharge, the standard of proof is the preponderance of the evidence and the burden of persuasion lies with the creditor." *In re Boyer*, 328 Fed. App'x 711, 714 (2d Cir. 2009); *see also Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001) ("[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced.").

"Exceptions to discharge are construed liberally in favor of the debtor and strictly construed against the objecting creditor." *In re Barrios*, 2007 WL 2406881, at *2 (Bankr. S.D.N.Y. Aug. 20, 2007); *see also In re Miga*, 2011 WL 204896, at *6 (Bankr. N.D.N.Y. Jan. 21, 2011) ("Where, as here, the Court has any doubts with respect to the evidence, they must be resolved in the debtor's favor."). Indeed, "the law carries a 'presumption' in favor of the debtor in discharge contests." *In re Smith*, 351 B.R. 274, 277 (Bankr. D. Conn. 2006); *accord In re Green*, 2007 WL 1428547, at *3 (Bankr. S.D.N.Y. May 11, 2007).

## II.    Debtor Did Not Violate 11 U.S.C. § 727(a)(4).

In Count II, the Government alleges Debtor violated section 727(a)(4) of the Bankruptcy Code by scheduling the value of his two Rolex watches as worth $5,000. To prevail, it must prove that (1) Debtor made a statement under oath, (2) the statement was false, (3) Debtor knew the statement was false, (4) he made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case. *Boyer*, 328 Fed. App'x at 715. The Government has not met its burden with respect to the second, third, and fourth elements.

- 2 -

### A. Debtor Did Not Make a False Statement.

The Government cannot prove that $5,000 was a "false" value for Debtor's watches because it presented no evidence that they were worth something else at the time he filed his petition. *See In re Wines*, 114 B.R. 794, 797 (Bankr. S.D. Fla. 1990) (debtor's alleged undervaluation of claim listed on schedules was not a false oath where "the creditor presented no concrete evidence as to the exact value of the claim at the time the debtor filed his individual petition"), *aff'd in part and rev'd in part by In re Wines*, 997 F.2d 852 (11th Cir. 1993). In fact, when asked what value Debtor should have listed in lieu of $5,000, the Government's corporate representative could not provide any number. Cheung Dep. at 49:4-19.

The Government cannot rely on a *post-petition* valuation to prove falsity because Schedule A/B and its instructions ask for the value of Debtor's watches *as of the date of the petition*, not afterward. JX 1, Schedule A/B at 4; JX 17 at 16. *See In re Singh*, 433 B.R. 139, 155 (Bankr. E.D. Pa. 2010) (evidence of debtor's estimated monthly expenses four months post-petition was insufficient to prove scheduled expenses were false); *In re Gorchev*, 275 B.R. 154, 163 (Bankr. D. Mass. 2002) (evidence of debtor's income in the three years following his bankruptcy was insufficient to prove his scheduled income was false).

### B. Debtor Did Not Know His Estimate Was Inaccurate.

Further, nothing in the record proves that Debtor knew the estimate he provided was wrong or off in any way. The Government's corporate representative admitted that the Government had no evidence Debtor appraised his watches before scheduling their values or that he thought the watches were worth more than he listed. Cheung Dep. at 54:18-55:2. Indeed, Debtor testified that he did not know his watches were worth something other than what he put down. 10/16 Tr. at 196:15-19.

The Government relies on two pieces of circumstantial evidence, neither of which proves Debtor knew his valuation was false.

Debtor's statement in 2014 promotional interview that he collected Rolex watches does not prove he is a Rolex expert. PX 52. As Debtor explained, he played along with that puff piece and exaggerated his answers to make himself look good. 10/16 Tr. at 160:17-20, 162:7-18. In contrast to his prior unsworn statement, Debtor testified under oath that he is not knowledgeable about Rolex watches or their values. *Id.* at 191:5-10. He has never owned any watches other than Rolexes, and those Rolexes were all obtained from casino points. *Id.* at 191:1-4, 191:14-22. Debtor has never purchased or sold a Rolex watch for U.S. dollars and before filing for bankruptcy, had never gotten any of his watches appraised. *Id.* at 191:23-192:4. Testimony from those close to him corroborate that Debtor's watch collection was merely a byproduct of his gambling. Lapidus Dep. at 80-5:12; Berley Dep. at 57:8-22.

The Government's reliance on a 2015 jewelry insurance cancellation notice, PX 36, to suggest Debtor knew the value of his watches is also misplaced because Debtor did not even remember he had that document when he completed his schedules five years later. 10/16 Tr. at 160:3-6, 164:10-19, 194:19-23. In fact, Debtor had only ever obtained one jewelry insurance policy, and he canceled it after only six months. PX 36 at Winick 44; 10/16 Tr. at 192:16-23. Even looking at the declarations page of the canceled policy, Debtor could not identify whether the two Rolexes watches listed in his schedules corresponded with the items listed in the canceled insurance policy. 10/16 Tr. at 192:7-15. Given these uncontested facts, the Government cannot prevail. *See In re Parker*, 531 B.R. 103, 112-113 (Bankr. E.D.N.C. 2015) (rejecting argument that debtor undervalued classic cars where the evidence showed he did not know specific values

because the cars were acquired roughly a decade ago, one in exchange for a debt and the other for a price that debtor did not recall).

### C. Debtor Had No Fraudulent Intent.

Nor did Debtor harbor any fraudulent intent when he estimated the value of his watches. *See In re DeRise*, 394 B.R. 677, 690 (Bankr. E.D.N.Y. 2008) (fraudulent intent must be proven by actual fraud, meaning a defendant must have acted intentionally or with reckless disregard for the truth); *In re Brenes*, 261 B.R. 322, 334 (Bankr. D. Conn. 2001) ("A statement is not deemed to be made with fraudulent intent simply because it is false"); *see also* 6 Collier on Bankruptcy ¶ 727.04 (16th ed.) ("[A] false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent.").

Here, there is no evidence that Debtor intentionally misrepresented the value of his watches, and Debtor disclaimed any effort to defraud anyone. 10/16 Tr. at 196:23-25. Rather, Debtor simply went along with the number that his bankruptcy counsel suggested as a placeholder value. *Id.* at 162:22-163:9, 163:19-22.

The Government's backup argument that Debtor acted with reckless disregard for the truth is equally unsubstantiated. Reckless indifference means "not caring whether some representation is true or false," and the Government has presented no evidence to meet that standard. *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998); *In re Skibicki*, 2021 WL 1396743, at *8 (Bankr. D. Neb. Apr. 12, 2021); *In re Shove*, 629 B.R. 98, 116 (Bankr. D. Mass. 2021).

That Debtor did not consult a five-year-old cancelled insurance notice that he had forgotten about and that his counsel never asked for does not mean he acted recklessly.[2] 10/16 Tr. at 194:19-

---

[2] The Government's cited cases predate the Bankruptcy Code and are factually inapposite. *See Morimura, Arai & Co. v. Taback*, 279 U.S. 24, 29-30 (1929) (debtor was reckless in submitting financial statement to bank that was "utterly irreconcilable" with company financial statements prepared just six days before that); *In Morris Plan Indus. Bank v. Lassman*, 116 F.2d 473, 473 (2d

25. *See In re Fielder*, 548 B.R. 543, 550 (Bankr. N.D. Iowa 2016) (no false oath where debtor omitted wedding rings from schedules because she forgot about them, as they had been in storage and she had not worn them for years); *In re Fasolak*, 381 B.R. 781, 791 (Bankr. M.D. Fla. 2007) (no false oath where seventy-two-year-old debtor testified he closed no bank accounts within two years before petition date but did in fact close one and had forgotten about it); *In re Geer*, 522 B.R. 365, 396 (Bankr. N.D. Ga. 2014) (no false oath where debtor omitted transfer to grantor trust that occurred two years prepetition because he had forgotten about it).

Nor was there anything reckless about Debtor's not thinking to run an internet search for his watches using their model numbers given that Debtor had no idea that Rolexes had model numbers, had never shopped for Rolex watches online, and was never advised to do any research. 10/16 Tr. at 194:16-18, 195:11-17; Wilamowsky Dep. at 47:19-21, 82:10-13. Further, Debtor has limited technological facility, and the Government has offered no evidence he would have been able to run its desired searches. 10/16 Tr. at 195:18-196:5, 213:20-23.

The Government's argument that Debtor was reckless because he guessed the combined value of his watches was $5,000 when the value of a single watch was listed as $5,000 on a prepetition worksheet is even more farfetched. That worksheet, which listed "Rolex Watch $5,000," was filled out by Debtor's colleague, not Debtor, who was not even on the email chain transmitting the worksheet to counsel. PX 55 at 20, 28; 10/16 Tr. at 197:1-10. Debtor told both his colleague and counsel that he had two Rolex watches, not one. 10/16 Tr. at 197:11-18.

Critically, Debtor had no motive to falsify the value of his watches. *See In re Varner*, 2015 WL 4039390, at *9 (Bankr. N.D. Ohio June 30, 2015) ("While the court notes that debtors have

---

Cir. 1940) (debtor was reckless in answering question about the amount of his debts without ascertaining amount of judgments he knew had been entered against him).

been known to act irrationally, a lack of motive weighs against a finding of fraudulent intent."). While the Government speculates that Debtor "lowballed" the value of his watches so that he could claim them as exempt, the evidence shows that he claimed an exemption on the advice of his counsel.[3]  10/16 Tr. at 166:12-18, 196:20-22.  For Debtor to jeopardize a potential discharge of millions of dollars of debt over two Rolex watches that Debtor scheduled at $5,000, particularly where he freely gave other jewelry away, defies common sense.  10/16 Tr. at 156:9-16.  *See Varner*, 2015 WL 4039390, at *9 (finding it was unlikely debtor would risk not being able to discharge $20 million of debts by intentionally failing to disclose gifts totaling around $6,500).

Consistent with the lack of any fraudulent intent, Debtor disclosed the existence of his Rolex watches on his bankruptcy schedules and fully cooperated with the Chapter 7 trustee in providing information about the watches and getting them appraised.  Second Amended Stipulated Facts ("Stip."), Adv. Dkt. No. 71, at ¶¶ 21, 25-26; JX 1; JX 26.  Obviously, it would have made no sense for Debtor to do this had he intended to defraud creditors.

**D.      Debtor Relied on Advice of Counsel.**

In scheduling his watches, Debtor relied on the advice of his bankruptcy counsel—which was that *disclosure* of the watches was paramount and that the *value* ascribed to them was less important (and thus Debtor did not need to take any steps to confirm their value) because the trustee would for sure obtain an independent appraisal.[4]  Stip. at ¶ 24; Wilamowsky Dep. at 31:3-17, 32:12-35:11, 39:14-40:15, 58:19-22; 10/26 Tr. at 157:20-158:2, 195:11-15, 196:6-14.

---

[3] Ultimately, Debtor was allowed an exemption in the amount of $15,600, more than three times the scheduled value of his watches.  JX 27.

[4] Debtor incorporates and repeats the arguments made in his pre-trial letter brief regarding his advice of counsel defense, as supplemented by the trial record.  Adv. Dkt. No. 70.

The Government's argument that it is "unclear" what legal advice Debtor received is unfounded—that advice is abundantly clear from the record cited above.[5]  Nor is there any discrepancy between Debtor's prior declaration, which stated that counsel advised him to put his best estimate, and Debtor's testimony at trial, which was that the *source* of Debtor's best estimate was a number that counsel supplied.  *Compare* Declaration of Jeffrey Winick, Adv. Dkt. No. 42, at ¶ 32 *with* 10/16 Tr. at 162:22-163:22.  Debtor's testimony also comports with counsel's testimony that the estimate was made on the spot at a meeting with counsel and was meant to be a placeholder value.  10/16 Tr. at 163:18-22; Wilamowsky Dep. at 46:10-16, 47:12-17, 66:5-19.

Debtor also reasonably relied on counsel's advice.  Although the Government notes that counsel is himself no expert on watches, nothing in the record suggests that counsel informed Debtor of this fact such that Debtor should have discounted counsel's advice.  And, as discussed above, the testimony at trial refutes the Government's delusion regarding Debtor's being a Rolex expert such that he should have known better than to go along with counsel's suggested number.[6]  Similarly, the Government does not cite to anything in the trial record to support its arguments that Debtor failed to disclose pertinent facts to his counsel or that he did not rely in good faith on counsel's advice, which arguments are wrong for the reasons discussed in Debtor's letter brief.

Even if the Court finds that advice of counsel does not provide a complete defense, the very fact that Debtor consulted with and relied upon his counsel's advice supports the conclusion that Debtor did not act in an intentionally fraudulent or reckless manner.

---

[5] The Government cites *U.S. v. Bowden*, 542 Fed. App'x 299, 301 (5th Cir. 2013), but in that criminal action involving securities and wire fraud, the court found no legal advice was given and that counsel's silence did not form an evidentiary basis for an advice of counsel defense.

[6] The Government cites *Godrindram v. Bank of India*, 548 B.R. 629, 643 (E.D.N.Y. 2015), but there, the advice of counsel defense was rejected as inapplicable because the debtor failed to review his bankruptcy petition before signing it, which caused him to miss obvious omissions.

### E. Debtor's Estimate Had No Adverse Effect on the Bankruptcy.

Finally, Debtor should not be denied a discharge given that his valuation of his watches had no negative impact on his bankruptcy or creditors.[7] There is no dispute that, just as Debtor's counsel advised would occur, the Chapter 7 trustee obtained an independent appraisal of the watches (with Debtor's assistance) and was able to liquidate them. Stip. at ¶¶ 26-28. *See In re Blum*, 41 B.R. 816, 819 (Bankr. S.D. Fla. 1984) (debtor's alleged failure to properly value two automobiles was not sufficient to deny him a discharge where the automobiles were scheduled and the trustee was afforded the opportunity to obtain an independent appraisal); *see also* 6 Collier on Bankruptcy ¶ 727.04 (16th ed.) ("[A] false statement that has no effect on the case is not grounds for denying a discharge.").

Because the Government has not proven by a preponderance of the evidence that Debtor violated section 727(a)(4), judgment should be entered in Debtor's favor on this claim.

### III. Debtor Did Not Violate 11 U.S.C. § 727(a)(2)(A).

In Count I, the Government alleges that Debtor's consent to Berley's taking his interests in SDSDR111 LLC ("SDS") in exchange for a complete forgiveness of Debtor's $1.5 million defaulted loan violates section 727(a)(2)(A) of the Bankruptcy Code. To prevail, the Government must prove that Debtor (1) transferred, removed, destroyed, mutilated, or concealed property, or permitted those actions to be taken, (2) with the intent to hinder, delay, or defraud a creditor, and (3) did so within one year prior to filing for bankruptcy. *Green*, 2007 WL 1428547, at *4. Here, it has not proven that Debtor acted with actual fraudulent intent. *In re Glaser*, 49 B.R. 1015, 1019 (Bankr. S.D.N.Y. 1985).

---

[7] Debtor incorporates and repeats the arguments made in his pre-trial letter brief on this issue. Adv. Dkt. No. 66.

### A.     The Government Lacks Direct Evidence of Fraudulent Intent.

Debtor disclaimed any intent to defraud anyone when he transferred his SDS interests to Berley.  10/16 Tr. at 204:14-16.  The Government has no direct evidence to prove otherwise.

### B.     The Government Lacks Circumstantial Evidence of Fraudulent Intent.

Nor has the Government shown through circumstance evidence, using badges of fraud, that Debtor acted with fraudulent intent.

**Chronology of Events:** No fraudulent intent can be found in chronology of events.

The Government places undue emphasis on the fact that it had a lien on Debtor's interests before he pledged them to Berley given that the relevant timeframe for purposes of section 727(a)(2)(A) is not 2015, when the interests were pledged, but rather 2020, when they were transferred.[8]  *Boyer*, 328 Fed. App'x at 714 (holding that a creditor must show improper conduct and intent "were present during the one year period before bankruptcy"); *see also Rosen v. Bezner*, 996 F.2d 1527, 1534 (3d Cir. 1993) ("From the statutory language, it is clear that Congress intended this penalty to apply only where there is proof that the debtor intentionally did something improper during the year before bankruptcy; improper conduct before the one year period is forgiven.").

Debtor's testimony that he did not recall the IRS had a lien on his interests at the time he consented to Berley's taking them is unrebutted.  10/16 Tr. at 177:5-8, 204:11-13.  Debtor's lack of recall is hardly surprising given that Debtor was seventy years old at the time and had other pressing issues on his mind, such as whether his business would survive the Covid-19 pandemic. *See id.* at 187:17-189:9.  Also, the fact that Berley obtained a UCC lien and recently renewed that

---

[8] Debtor did not recall the IRS's lien at the time he pledged his interests.  10/16 Tr. at 168:23-169:24, 199:22-200:5, 200:8-16.

lien in January 2020 suggested to Debtor that there were no other lienholders. *See id.* at 177:7-8; 200:17-19; JX 12. That mistaken belief was also aided by the fact that, pre-transfer, the IRS *never* disputed the priority of Berley's lien despite knowing that Debtor had granted Berley a first priority lien since August 2015 and getting a copy of Berley's 2015 UCC financing statement in March 2018.[9] Stip. at ¶¶ 6, 8; PX 1 at USA 3290-91, 3335-36.

Nor do the circumstances surrounding Debtor's consent to Berley's taking his interests suggest any fraudulent intent. *See In re Brown*, 108 F.3d 1290, 1293 (10th Cir. 1997) ("The mere fact that a transaction occurred soon before the filing of bankruptcy does not necessarily support the inference of fraud."). It was Berley who declared a default because he "wanted [his] money," and Berley who suggested taking Debtor's interests to satisfy Debtor's debt to him. Berley Dep. at 45:22-24; JX 13-15. Berley did not recall any conversations where Debtor told him to take Debtor's interests. Berley Dep. at 41:10-13. As for Debtor, before agreeing to give Berley his interests, Debtor did not talk to Berley about potentially filing for bankruptcy, had not decided whether he would file, and never told Berley to take his interests.[10] 10/16 Tr. at 203:7-8; 204:8-10. Debtor had no input on the timing or content of the consent he signed. *Id.* at 203:12-22. As for not informing the IRS prior to the transfer and not attempting to sell the interests for cash, that is entirely consistent with Debtor's lack of recall regarding anyone else having a lien on his interests. 10/16 Tr. at 177:5-8.

---

[9] In fact, the IRS recognized Berley's debt as "competing debt." PX 1 at USA 3353. In that situation, the IRS can take steps to clarify who has priority. Harrison Dep. at 156:22-157:6. But there is no evidence the IRS provided so much as notice to Debtor or Berley that it claimed priority over Berley's lien. *See* PX 1. Nor did the IRS file its lien with both the state and the county, which it could have easily done, and has done in other cases. 10/16 Tr. at 83:9-24.

[10] The mere fact that Debtor's bankruptcy counsel was copied on a transmittal email three days *after* the consent was executed does not show that counsel was involved in any way in the transaction. Stip. at ¶ 14; PX 55 at 21.

Contrary to the Government's argument, Debtor's payment history does not demonstrate any fraudulent intent. The Government notes that Debtor never made any principal payment, but that is hardly surprising given that the loan, by its terms, called for monthly interest only with principal due at a later date.[11] JX 6 at §§ 1-2; JX 8 at §§ 2-3; JX 11 at §§ 1-2. Nor did Debtor's payments to Berley "dramatically" change after January 2020, as reflected in Debtor's loan payment history. PX 45. The Government attempts to contrast Debtor's payment history under the secured loan with the payment history on a separate, unsecured loan, but the histories are not comparable. Berley's unsecured loan to Debtor was paid off in February 2020 by virtue of a deduction from Debtor's commissions that Berley took, as was his right under a letter of direction. PX 46-47. The letter of direction was Berley's idea, and under that letter, Berley, not Debtor, had discretion to apply any deductions to either the secured or unsecured loan. 10/26 Tr. at 174:18-175:1, 201:7-8, 201:24-202:1; PX 47. As Debtor explained, Berley wanted the smaller, unsecured loan paid first, and that's what he did when he took Debtor's commissions; Debtor had nothing to do with that decision.[12] 10/26 Tr. at 201:14-23. The Government cannot use *Berley's* actions—whether it is his decision to grant Debtor extensions and credit or his decisions to forebear or exercise his contractual remedies—to prove *Debtor's* intent.

Consistent with his lack of fraudulent intent, Debtor was forthright regarding the SDS transfer in connection with his bankruptcy. Debtor disclosed the transfer on his schedules. Stip. ¶ 17; JX 1, Statement of Financial Affairs at Part 4. *See In re Gollomp*, 198 B.R. 433, 441 (S.D.N.Y. 1996) ("Debtor's disclosure on the bankruptcy schedules mitigates against a finding of

---

[11] Berley's lawyers are the ones who came up with those terms. Berley Dep. at 55:18-24.

[12] Similarly, it was Berley's decision and within his discretion to waive application of the letter of direction in May 2020 when Debtor cash flow dried up during the Covid-19 pandemic. 10/16 Tr. at 202:5-13.

intent to defraud, as the information was sufficient to put creditors on notice of the transfer."). He also disclosed the transfer at the section 341 meeting. Stip. ¶ 19; DX 2 at 5:22-6:22. *See Gollomp*, 198 B.R. at 441 ("Disclosure at the first creditor's meeting tends to indicate that there was no fraudulent intent."). Debtor also cooperated with the Chapter 7 trustee's requests for information concerning the transfer and SDS generally.[13] Stip. at ¶ 20; DX 5-6.

**Relationship with Transferee:** While Debtor and Berley were friends, the evidence shows that Berley acted as a creditor rather than a friend when he took Debtor's interests.[14] Berley testified that when he lent Debtor money, "[i]t was never a gift," and that he "[d]efinitely" expected to be repaid. Berley Dep. at 14:9-12, 40:15-18. To that end, Berley's lawyers carefully documented Debtor's loan as well as all extensions and amendments. JX 6-10. They helped him file a UCC financing statement in January 2015 and obtain a continuing UCC financing statement in January 2020. JX 12. Berley also hired outside counsel to provide notice of Debtor's default and to draft the consent for Debtor to sign. JX 13; JX 15. Any notion that this was merely a sweetheart deal between friends is belied by the actions and corresponding costs Berley took to ensure he was secured and repaid.

**Adequacy of Consideration:** The transfer of Debtor's interests in SDS was fully supported by consideration. In exchange for giving up his interests, Debtor obtained complete satisfaction of his $1.6+ million secured debt to Berley. JX 16. In fact, Debtor obtained a *greater* amount of debt forgiveness than the interests were worth because a post-transfer appraisal

---

[13] The Court should also be aware that the Chapter 7 trustee and Government have asked for Debtor's assistance in selling the SDS interests, and Debtor agreed to provide such assistance.

[14] The facts here bear no resemblance to those of *In re Bennett*, 2014 WL 293462, at *6 (Bankr. D. Or. Jan. 27, 2014), where the debtor fraudulently transferred his LLC interests to friend for less than reasonably equivalent value, the friend had no contractual or other legal rights to the debtor's interests, and the debtor continued to control the LLC notwithstanding the transfer.

indicated the interests were worth only $240,000.[15]  Stip. at ¶ 16; DX 4 at Winick 2086.  While the Government notes that the interests had previously been valued at $2.5 million, that estimate was from 2017.  JX 25-3.  SDS owns a retail space leased by Duane Reade/Walgreens, 10/16 Tr. at 166:19-167:3, and as the Court well knows, commercial real estate values in 2017 are not remotely comparable to values in July 2020, during the Covid-19 pandemic.  Indeed, there was a market check on the value of Debtor's interests in the sense that the other SDS partners could have redeemed his shares and paid off Berley, but no one did.  10/16 Tr. at 176:23-177:3.

**Pattern of Transactions**: The SDS transfer does not fit into any discernible pattern.[16] While the Government argues that this was the latest "divestiture" that Debtor made, as explained below, none of the challenged transfers was fraudulent.  *Infra* at 21-25.  Nor can the Government bootstrap those transfers, all of which occurred years before the SDS transfer, to its section 727(a)(2) claim given that the relevant timeframe for gauging intent is the one-year period before Debtor's bankruptcy.  *Boyer*, 328 Fed. App'x at 714; *Rosen*, 996 F.2d at 1534.  Further, none of those transfers is remotely comparable to the SDS transfer, which is the only transfer prompted by a creditor seizing collateral to pay off a legitimate debt.

**Financial Condition**: Debtor's financial condition remained the same both before and after the transfer—he was still broke.[17]  In fact, Debtor was in a *worse* financial condition post-

---

[15] The Government's argument that there was an incentive to undervalue Debtor's interests is unsubstantiated as the appraisal was performed not by Debtor but rather Management Planning, Inc., an independent, third-party appraiser.  DX 4.  Further, the Government's lay opinion that the appraisal is "inconsistent" with Debtor's distributions over the years is insufficient, as the appraisal took those distributions (as reflected in SDS's tax returns), into account.  *See id.* at Winick 2090.

[16] This case is not analogous to *Ostashko v. Ostashko*, 2002 WL 32068357, at *6 (E.D.N.Y. Dec. 12, 2002), where a husband made a series of divestments in a three-month period after telling his wife he wanted a divorce and that she would never see a penny of his assets.

[17] This case is not comparable to *In re Xiang Yong Gao*, 560 B.R. 50, 64-65 (E.D.N.Y. 2016), where the debtor sold LLC interests and transferred a portion of the proceeds to his children's

transfer because he incurred $600,000 in transfer tax liabilities. 10/16 Tr. at 204:17-18. To state the obvious, had Debtor's intent been to *avoid* paying the IRS by making the transfer, it would have made no sense for him to voluntarily incur *additional* tax liabilities.

**Retention of Benefit or Use of Transferred Assets:** The Government conveniently omits a badge of fraud that is missing here—Debtor's lack of retention of any position, benefit, or use of the transferred SDS interests. Post-transfer, Berley replaced Debtor as a member of the company and Debtor ceased to have any involvement. Berley Dep. at 50:3-9.

Because the facts do not support the Government's claim that Debtor violated section 727(a)(2), judgment should be entered in Debtor's favor on this claim as well.

## IV. Debtor Did Not Violate 11 U.S.C. § 523(a)(1)(C).

Finally, in Count IV, the Government claims Debtor's federal tax liabilities for 2012-2016 cannot be discharged because he violated section 523(a)(1)(C) of the Bankruptcy Code. To prevail, the Government must prove that Debtor "willfully attempted in any matter to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). Under Second Circuit precedent, the "willfulness exception consists of a conduct element (an attempt to evade or defeat taxes)" and a mens rea requirement (willfulness)." *In re Tudisco*, 183 F.3d 133, 136-37 (2d Cir. 1999). The Government has not proven either element.

### A. The Government Has Not Proven Evasive Conduct.

The Government has not shown that Debtor evaded his tax obligations.

#### 1. Debtor Made Ongoing Efforts to Pay His Taxes.

For most of his life, Debtor paid his taxes. Debtor began working around age 18 and presumably has been paying taxes since that time. 10/16 Tr. at 179:10-11. In the more than fifty

---

mother and also transferred his joint interest in a house to her after he was named as a defendant in a multimillion dollar lawsuit and neither transfer was supported by any consideration.

years that have passed between then and when he filed for bankruptcy, there are only six years for which he has not fully satisfied his tax obligations. JX 2. Further, the Government concedes that Debtor always filed accurate and timely tax returns. Stip. at ¶ 29.

The genesis of Debtor's tax problems was his failure to pay estimated taxes, and that was because he gambled away money he should have used to pay those taxes.[18] 10/16 Tr. at 98:16-21; JX 24-1. Both Debtor's and the Government's expert witnesses diagnosed Debtor with gambling disorder. 10/20 Tr. at 27:22-28:13; 11/1 Tr. at 52:4-9. Further, as Dr. Weinstock, one of the nation's foremost experts on the disorder, explained at length, gambling was not volitional for Debtor. 10/20 Tr. at 15:6-15, 44:14-46:25.

History shows, however, that when Debtor fell behind on his taxes, he always made efforts to catch up. Between 2000 and 2005, Debtor failed to pay quarterly estimated taxes. Stip. at ¶ 30; JX 4. However, he reached an installment agreement with the IRS to pay over $3.9 million by October 2012 to satisfy those liabilities, which he did. Stip. at ¶ 31; JX 4l; PX 1 at USA 3194. Meanwhile, he paid his taxes for 2006-2011. *See* JX 2; PX 1. When Debtor again fell behind on his taxes for 2012-2016, he again attempted to resolve his tax liabilities with the IRS.[19] Debtor entered into three installment agreements with the IRS, which called for Debtor to fully pay his back taxes, including penalties and interest. 10/16 Tr. at 82:4-14. From January 2014 through January 2020, Debtor made forty-three payments to the IRS totaling over $1.94 million. Stip. ¶ 46; JX 5. He also fully paid his 2017 and 2018 taxes. Stip. ¶ 48; JX 2. Along with paying the

---

[18] Debtor's situation is not comparable to *In re Jacobs*, 490 F.3d 913, 926 (11th Cir. 2007), where a lawyer caused his firm to characterize his salary as officer compensation to avoid withholding taxes. Here, Debtor's company did withhold taxes from his salary, but not from his commissions. 10/16 Tr. at 94:9-17, 181:18-21.

[19] While Debtor did not pay estimated taxes for those years, he did pay $2.6 million from tax withholdings. JX 5.

IRS, Debtor also paid New York State about $2 million in taxes from January 2012 through April 2020. DX 9. Indeed, had it not been for the Covid-19 pandemic and Debtor's loss of his largest client, he may well have been able to pay back everything he owed. 10/16 Tr. at 221:18-24.

The Government has not cited a single case where a taxpayer voluntarily made as many payments as Debtor did and a court nonetheless concluded that the taxpayer engaged in tax evasion. Indeed, courts presiding over the rare cases involving debtors who made multiple voluntary payments have found the opposite to be true. *See In re Looft*, 533 B.R. 910, 920-921 (Bankr. N.D. Ga. 2015) (finding no evasive conduct or willful intent to evade taxes where debtor made voluntary payments towards back taxes); *In re Fleck*, 242 B.R. 188, 191 (M.D. Fla. 1999) (same); *U.S. v. Uria*, 180 B.R. 688, 692 (S.D. Fla. 1995) (same).

### 2. Debtor Did Not Manipulate Collection Procedures.

The Government's assertion that Debtor's ongoing efforts to pay off his taxes are instead efforts to manipulate the IRS's collections procedures is not only unsupported but also nonsensical.

As the Government's corporate representative admitted, the mere fact that Debtor defaulted on his installment agreements does not mean he evaded his taxes. Cheung Dep. at 82:15-20. Debtor never entered into an installment agreement with the intent to dishonor the terms of that agreement, 10/16 Tr. at 222:19-23, and Debtor's tax transcripts show that he made some payments under each agreement, JX 5. Further, Debtor had no obligation to ask for further installment agreements after defaulting, yet he continued to do so, and the IRS continued to grant them. Cheung Dep. at 82:12-15.

Under the Internal Revenue Manual, had the IRS believed that Debtor requested installment agreements to delay collection, it could have rejected those requests. I.R.M. § 5.14.3.3. In fact, requests by a taxpayer who has defaulted on prior installment agreements is a factor that the IRS evaluates in determining whether a request is made to delay collection. *Id.* Additionally,

"[e]nforcement action, including seizure and sale, may be taken without regard for the requests for IAs made to delay collection." *Id.* The IRS, however, did not apply these procedures to Debtor. *See* PX 1. Further, the IRS's internal records show no collection activity being planned, much less thwarted, by Debtor's defaults and subsequent requests for installment agreements. *See id.* at USA 3284, 3297, 3373.

Nor can the Government pin the blame for any misrepresentations made by Debtor's tax representatives on Debtor. The Government cites no case imputing behavior to a taxpayer for purposes of section 523(a)(1)(C). It cannot rely on *In re Osborne*, 951 F.3d 691, 695, 704 (5th Cir. 2020) because that case dealt with section 523(a)(2)(B), and there, a wife's fraudulent statement could be imputed to the debtor because she submitted, with the debtor's knowledge, a false financial statement regarding their joint financial condition. Here, by contrast, there is no evidence that Debtor was aware of the statements his representatives were making to the IRS, and Debtor disclaimed knowledge of what they said. 10/16 Tr. at 108:3-18, 109:16-20. In fact, Debtor fired one of those representatives because he didn't care about Debtor. 10/16 Tr. at 169:2-20. Also, given the evidence of Debtor's reliance on others to help manage his financial affairs, it is more likely that any information Debtor's representatives obtained about him was supplied not by Debtor but instead by others. *See* 10/16 Tr. at 213:12-19; PX 44; PX 54.

The IRS's own records also refute any argument that it was duped. The IRS did not simply accept Debtor's representative's May 30, 2014 statements that Debtor "didn't make much income for 2014" and thus was "not liable to pay ES payment at this time" at face value. PX 1 at USA 3273. Rather, the IRS asked for and received, on June 30, 2014, a copy of Debtor's paystub showing he received $510,040 in gross pay through May 2014. *Id.* at USA 3275. That paystub

precludes any reasonable reliance on Debtor's representative's assertions to the contrary.[20]  Indeed, the revenue officer assigned to Debtor's file noted this pay in an analysis performed on July 15, 2014 and ultimately concluded that "[Debtor] has sufficient withholding taxes for 2014."  *Id.* at USA 3279-3280.  The fact that Debtor *eventually* made millions in 2014 does not mean the IRS was misled *at the time* it evaluated and approved Debtor's installment agreement.

Similarly, the Government has not proven that the IRS was duped into approving an installment agreement with the Debtor in 2015.  While Debtor's representative's assertion on August 11, 2015 that Debtor was "current" because he was "completely on [withholding]" *ultimately* proved to be wrong, the Government presented no evidence to show that statement was false *at the time it was made*.  PX 1 at USA 3289.  Nor could the IRS have reasonably relied on this representation given that, on August 28, 2015, the IRS received paystubs showing that Debtor had two sources of compensation—biweekly salary and commissions, which totaled over $1.9 million as of July 28, 2015, PX 1 at USA 3291, and had access to Debtor's prior tax returns showing he was *never* completely on withholding, *see* PX 13 at Winick 49, 79.

As for Debtor's May 2017 offer-in-compromise, he submitted it on his representative's recommendation because he lost his largest client in 2016 and believed he would not generate sufficient future income to pay the IRS.[21]  10/16 Tr. at 103:11-17, 223:14-19; JX 18 at Winick

---

[20] To the extent the Court relies on *Osborne* to find that Debtor's representatives' statements can be imputed to him, it should also follow the holding in that case that a creditor must prove reasonable reliance before it can claim to have been defrauded by those statements.  *Osborne*, 951 F.3d at 697; *see also Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 545 (S.D.N.Y. 2011) (common law fraud requires reasonable reliance on a material misrepresentation).

[21] Unlike in the Government's cited cases, there was a legitimate basis animating Debtor's submitting an offer-in-compromise.  *Cf. In re Colish*, 289 B.R. 523, 533-534 (Bankr. E.D.N.Y. 2002) (debtor was tax attorney who filed serial offers in compromise from 1990 to 1995 and knew that while the offers were pending, he could forestall collection and delay filing bankruptcy); *In re Feshbach*, 974 F.3d 1320, 1329 (11th Cir. 2020) (debtor did his homework and was familiar with

2603.  While the Government complains that the amount offered was inadequate relative to Debtor's liabilities, that is the very purpose of an offer-in-compromise—to pay "pennies on the dollar," as the Government's own witness put it.  *Id.* at 55:12-16.  And while Debtor eventually made over $2 million in income for 2017, the Government has presented no evidence that Debtor knew that would be the outcome when he submitted his offer in May 2017.  In fact, Debtor testified that the bulk of that income came in the latter half of that year.  10/16 Tr. at 223:23-224:1.

In short, the Government has not established that Debtor acted wrongfully in seeking to pay off his back taxes through the very mechanisms the IRS established for that very purpose.

### 3. Debtor's Did Not Spend Money to Evade Taxes.

Likewise, there is no evidence that any of Debtor's spending was motivated by any desire to evade or defeat his tax liabilities.  His spending was a natural byproduct of his success and the lifestyle to which he and his family had become accustomed.[22] 10/16 Tr. at 109:24-110:12. Indeed, not paying taxes and spending money on non-tax-related expenses are two sides of the same coin. As the Ninth Circuit reasoned, "if simply living beyond one's means, or paying bills to other creditors before bankruptcy, were sufficient to establish a willful attempt to evade taxes, there would be few bankruptcies in which taxes would be dischargeable." *Hawkins v. Franchise Tax Bd. of Cal.*, 769 F.3d 662, 669 (9th Cir. 2014); *see also Looft*, 533 B.R. at 919 ("Although lavish spending is relevant to the conduct analysis, it is generally accompanied by additional culpable

---

tax code and IRS regulations and would have understood that an offer-in-compromise would halt IRS collection efforts).

[22] As the Government acknowledges, much of Debtor's spending was not for his own, but rather others' benefit.  For example, Debtor's daughter and ex-girlfriend made substantial purchases using Debtor's credit cards, and he did not tell them to spend his money so that creditors could not collect.  10/16 Tr. at 218:17-219:7, 219:23-25.  Similarly, Debtor's paying for his daughter's college apartment was not meant to waste his money to avoid creditors but rather to help her out during a time when she was not financially independent.  *Id.* at 220:6-10, 220:22-25.

behavior intended to prevent the IRS from reaching the debtor's assets."). Here, the Government cannot point to any pattern of spending that shows Debtor was attempting to evade taxes by dissipating his income. In fact, after reviewing copies of Debtor's credit card statements, one IRS revenue officer concluded that there was "nothing out of the ordinary based on [Debtor's] income and job." PX 1 at USA 3291.

Debtor's biggest category of spending was on gambling, and he gambled because he had an addiction, not because he sought to evade taxes. 10/16 Tr. at 88:22-25; 10/20 Tr. at 27:22-28:13; 11/1 Tr. at 52:4-6. Indeed, Debtor was hoping he would hit it big at the casinos so that he could use the winnings to pay off his tax debts. 10/16 Tr. at 100:5-8, 100:15-19.

Any notion that Debtor was spending lavishly to avoid his taxes is refuted by the fact that Debtor made numerous voluntary tax payments to both the IRS and New York State from 2012 through 2020. DX 9. In the Government's cited cases where the debtors' spending was found to have constituted evasive conduct, such spending was *in lieu* of satisfying their tax liabilities. Here, however, Debtor's spending was *in addition* to making tax payments and attempting to resolve his tax liabilities. Further, during the periods for which Debtor was making payments under installment agreements, he was not obligated to pay more than the agreed-upon amounts and was free to spend excess income elsewhere. Cheung Dep. at 77:6-15; Harrison Dep. at 140:5-13.

### 4. Debtor Did Not Transfer Assets to Evade Taxes.

None of the asset transfers that the Government points to demonstrates evasive conduct. In fact, most of the transfers were done as part of Debtor's estate planning to make sure his daughter—his only child, closest confidant, and best friend—would be taken care of when he passed away. 10/16 Tr. at 135:3-7, 136:11-15, 186:5-8, 186:25-187:1.

**Southampton House:** Debtor purchased a beach house in Southampton in 2002 or 2003, and he sold that house to his life insurance trust in September 2003. Stip. at ¶ 53. The sale was

done on the advice of Debtor's accountants, and the purpose was not to evade taxes or creditors. 10/16 Tr. at 142:2-6, 205:15-206:3. In fact, the trust paid fair market value of $1.29 million for the property.[23] PX 1 at USA 3108, 3111. *See In re Koehl*, 166 B.R. 74, 80 (Bankr. E.D. La. 1993) (transfers for fair market value to trusts that debtors did not control and for which debtors' children were beneficiaries were not made to evade or defeat payment of taxes). Though Debtor continued to use the property, he did so pursuant to a lease with the trust, as landlord, and Debtor paid for his use and enjoyment of the property. Stip. at ¶¶ 66-67; PX 6; PX 9.

Nor is the decision of the trustee of Debtor's life insurance trust to transfer the house to Debtor's daughter in 2016 indicative of wrongful conduct on Debtor's part. Stip. at ¶ 57; 10/16 Tr. at 125:2-4. After all, the trust was an *irrevocable* trust whose assets Debtor had no control over and the trustee was authorized to sell trust-owned real estate. PX 5 at Arts. 6, 13.A. Debtor's daughter testified that the trustee transferred title to her because she had graduated from college and was able to take financial responsibility for paying the mortgage. Lapidus Dep. at 68:21-69:9. The Government's argument that the trust was Debtor's alter ego is meritless.[24]

**WTN Stock:** On December 18, 2012, Debtor gifted 117 shares of stock in WTN Realty Corp. ("WTN") to his daughter. PX 22. He did so on the advice of his financial advisors for estate

---

[23] To the extent *Jacobs*, 490 F.3d at 935, stands for the proposition that it is problematic for a debtor to transfer title to property while remaining on the mortgage, here, the facts show that it was the trust, not Debtor, who was the borrower and mortgagor. PX 1 at USA 3108.

[24] The Government cites *Hinson v. U.S.*, 994 F.2d 843 (8th Cir. 1993), but none of the enumerated factors pointing to alter ego status is present here: (1) Debtor and the trustee are not related; (2) there is no evidence Debtor's and the trust's monies were commingled; (3) Debtor paid for his use of the trust's property; (4) the trust paid to acquire the Southampton home from Debtor; and (5) Debtor had no control over the trust and did not use it for any fraudulent purpose. *Cf. id.* at *2 (corporation was alter ego where taxpayer controlled it and used corporate checking account for personal expenses); *Don Gastineau Equity Trust v. U.S.*, 687 F. Supp. 1422, 1423-1425 (C.D. Cal. 1987) (trust was alter ego where taxpayer served as trustee and controlled trust and never paid to use the trust's real estate).

planning purposes—in particular, in anticipation of the reduction in the lifetime gift tax exclusion from $5 million to $1 million.[25]  10/16 Tr. at 128:17-20, 130:9-12, 208:2-8.  The purpose of the transfer was to ensure his daughter would be taken care of if he died, not to evade his tax obligations.[26]  *Id.* at 130:9-12, 142:2-6, 208:8-11.  The gift was worth $1,467,180, generated gift taxes, and was properly reported in Debtor's 2012 gift tax returns.  JX 19 at Winick 356.

**WRG NJ Interests:** Debtor never owned any interest in WRG NJ, LLC ("WRG NJ").  10/16 Tr. at 136:8-10, 208:22-23.  Rather, his daughter's trust owned an interest in that company, *id.* at 208:24-209:1, which interest was acquired through a capital contribution, JX 28 at Winick 463.[27]  The trust, in turn, was an irrevocable trust administered by a trustee that was not Debtor.  JX 24-7.  The trustee, not Debtor, transferred the trust's ownership interests in WRG NJ to Debtor's daughter in 2016.[28]  JX 24 at Winick 1148.  That transfer occurred after Debtor's daughter graduated from college, was becoming financially independent, and was fully involved in the

---

[25] Numerous law firms published articles in 2012 regarding the expiration of the lifetime estate tax.  *See*, *e.g.*, https://www.loeb.com/en/insights/publications/2012/04/5120000-lifetime-gift-tax-exemption-expiring-soon (last visited Dec. 4, 2023); https://www.pillsburylaw.com/en/news-and-insights/estate-and-gift-tax-planning-opportunities-scheduled-to-sunset.html (last visited Dec. 4, 2023).

[26] The Government points out that Debtor's daughter paid nothing for this stock, but that is the very definition of a gift.  It cites *In re Griffith*, 206 F.3d 1389, 1396 (6th Cir. 2000) to argue inadequate consideration is problematic conduct, but that case does not involve gift transfers and does not hold gifting is *per se* violative of section 523(a)(1)(C).

[27] The Government places undue emphasis on the fact that, on paper, Debtor was the administrative manager of WRG NJ given that it cannot point to any actions that he took.  Indeed, under the LLC agreement, Debtor was authorized to delegate powers to Steve Baker, the company's President, and Baker served as the distributions manager, who had the sole authority to determine the amount and timing of distributions to members.  JX 28 at § 5.1.

[28] This case is not comparable to *Haesloop v. U.S.*, 2000 WL 1607316, at *6 (Bankr. E.D.N.Y. Aug. 30, 2000), where the debtor's actions to avoid accumulating assets, including voluntarily paying off his wife's substantial back taxes while ignoring his own, resulted in his Chapter 7 case being administrated as a "no asset" case.

company. Lapidus Dep. at 64:24-65:10. As part of that transaction, Debtor's daughter signed a release acknowledging that the trustee determined, in the exercise of his discretion as independent trustee, to distribute the interests to her. JX 24-6.

**Jewelry Gifts:** The Government's assertion that Debtor owned and gave away close to 40 pieces of jewelry worth nearly half a million dollars is unsupported. While Debtor previously insured 40 pieces of jewelry, not all of that jewelry (*e.g.*, diamond stud earrings, necklaces, tennis bracelets, diamond rings) belonged to him. 10/16 Tr. at 194:1-6; PX 36 at Winick 47-48. Rather, Debtor got the policy to help insure jewelry that belonged to his daughter. 10/16 Tr. at 192:10-17; Lapidus Dep. at 73:24-74:17. Further, there is no evidence that Debtor's giving away jewelry was part of any plan to divest himself of assets; all Debtor's jewelry was obtained from casino points, which explains why he freely gave them away over the years. 10/16 Tr. at 193:11-19; Wilamowsky Dep. at 42:4-13.

**Life Insurance Premiums:** Debtor made annual gifts of life insurance premium payments to his daughter, and he paid taxes and filed returns for all those gifts. JX 19-23; PX 60-61. He had been doing that since the trust was set up in 1999. 10/16 Tr. at 207:5-14. Those gifts were made for estate planning purposes, not to pay less taxes or put monies out of creditors' reach, *id.* at 135:5-7, 142:2-6, 207:15-17, as corroborated by the fact that Debtor consistently made such gifts, both in years for which he had no outstanding liabilities (2008-2011, 2017-2018) and years for which he did have liabilities (2012-2016). JX 19-23; PX 60-61.

**987 Eighth Avenue Sale:** In September 2012, Debtor sold his 20% interest in 987 Eighth Avenue, LLC ("987 Eighth Ave.") for $2 million. Stip. at ¶ 54; PX 23; 10/16 Tr. at 211:12-13, 22-23. He sold the interest because he needed the money to pay taxes and for gambling. 10/16 Tr. at 211:24-212:3. That testimony is corroborated by his bank account records, which show that

on the very same day he received a $2 million wire for the sale, he had his assistant write a check to the Government in the amount of $909,527 for his 2011 taxes, a check to New York State for $78,842 for his 2011 taxes, and various checks payable to himself for gambling.  PX 28 at Winick 3271-3273; 10/16 Tr. at 212:15-213:16.  Clearly, Debtor could not have made this sale to evade his taxes given that almost half the proceeds of the sale went to pay taxes.[29]

**SDS Transfer:** As discussed, the SDS transfer was not wrongful.  *Supra* at 9-15.

Upon reviewing much of the same evidence submitted in this case, IRS revenue officers concluded in 2018 that "[Debtor] is not the beneficiary of a trust, estate [o]r life insurance policy," that "[i]n the past 10 years the taxpayer has not transferred any assets for less than their full value," "[t]here are no funds being held in trust by a third party," and "[d]issipated asset issues – None." PX 1 at USA 3323, 3353.  In short, no "pattern" of divestment emerges from these transfers, which were made at different times, by different people, and for different, non-fraudulent reasons.

### 5.    Debtor Did Not Misuse Corporate Assets to Evade Taxes.

The Government's claim that Debtor used corporate assets for personal purposes to avoid accumulating assets flies in the face of the factual record.[30]  With respect to the cars that Winick Realty Group, LLC ("WRG") leased, those cars were *not* exclusively for Debtor's use.  10/16 Tr. at 216:17-25; Eisinger Dep. at 32:21-33:7, 33:24-35:13.  Further, Debtor had *always* leased cars through his company because that is what his accountants advised him to do.  10/16 Tr. at 216:10-16; Lapidus Dep. at 81:17-19.  Similarly, the fact that Debtor's colleague and former executive

---

[29] The facts here are not comparable to *In re Herron*, 634 B.R. 883, 898 (Bankr. W.D. Okla. 2021), where the debtor used settlement proceeds to buy a house for cash rather than to pay taxes and fund the home purchase with a mortgage.

[30] *In re May*, 2010 WL 5014716, at *11 (S.D. Ala. Nov. 30, 2010), where the debtor avoided having a personal checking account and diverted earnings into business accounts from which his wife paid personal obligations, cannot be analogized to this case.

assistant Louis Eisinger helped Debtor with personal matters is not indicative of any wrongdoing. There was no tax avoidance purpose for seeking Eisinger's assistance.  10/16 Tr. at 214:25-215:8. Indeed, Debtor *always* had help with his personal finances both because he did not know how to do certain things and so that he could focus on making more money for WRG.  *Id.* at 213:12-214:24.  As the Government acknowledges, Debtor also compensated Eisinger for his assistance by giving him a piece of Debtor's own commission.[31]  *Id.* at 215:10-11.

> **B.      The Government Has Not Proven Willfulness.**

Nor does Debtor's conduct evidence any willful tax evasion.

> ### 1.      Willfulness Requires Specific Intent to Evade Taxes.

The plain language of section 523(a)(1)(C) requires proof of specific intent of attempted tax evasion.  As the Second Circuit held, "willful" means "voluntarily, consciously or knowingly, and intentionally," *Tudisco*, 183 F.3d at 137, and when that definition is plugged into the statutory text—"voluntarily, consciously or knowingly, and intentionally attempted in any manner to evade or defeat such tax"—a specific intent standard is evident.  *See In re Golden Seahorse LLC*, 652 B.R. 593, 606 (Bankr. S.D.N.Y. 2023) ("When the meaning of a statutory provision is plain … courts are required to apply that plain meaning").

By contrast, an interpretation of section 523(a)(1)(C) that requires no proof of specific intent ignores the statutory language.  *See In re Quiroz*, 2018 WL 1773095, at *14 (Bankr. N.D. Okla. Apr. 10, 2018) (reasoning "[t]he word 'evade' is not a neutral term, but connotes dodging, eluding, avoiding, hiding, making oneself unavailable, or being less than candid," and "the ordinary meaning of the word 'defeat' is to destroy, beat, conquer, overcome, vanquish, nullify, or

---

[31] This testimony is *not* inconsistent with Eisinger's testimony that he was paid by WRG.  As reflected in Debtor's bank statements, all compensation, regardless of form or source, was paid by WRG.  *See* PX 28.

frustrate" and "Congress chose these words—words that implicate an intent to undermine, harm, conceal, or deceive—to describe conduct that warrants excepting taxes from discharge"); 4 Collier on Bankruptcy ¶ 523.07 (16th ed.) ("This exception relates to a dishonest scheme and excepts from discharge taxes as to which a debtor made a fraudulent return, or taxes that the debtor willfully attempted in any manner to evade or defeat.").

Further, the term "willful" appears only twice in section 523—first in subsection (a)(1)(C) and then in subsection (a)(6)—and should be defined consistently. *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[T]he standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."); *Quiroz*, 2018 WL 1773095, at *17 ("[T]he Supreme Court's interpretation of the word [willful] for the purpose of § 523(a)(6) is presumed to apply for the purpose of § 523(a)(1)(C)."). "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate and intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original).[32] That logic extends to section 523(a)(1)(C):

> Under the reasoning of *Geiger*, in § 523(a)(1)(C), "willfully" modifies "attempted in any manner to evade or defeat such tax." The statute is unambiguous that the "attempt … to evade" is the conduct that must be intentional. Thus, voluntary, intentional acts (*i.e.*, using one's earnings to renovate a home, contributing to charity, gambling, signing documents that contain errors) do not constitute "willful[] attempt[s] … to evade" unless the evidence is also sufficient to infer that the debtor committed the conduct in order to prevent or frustrate the assessment or collection of taxes.

*Quiroz*, 2018 WL 1773095, at *17.

---

[32] Surprisingly, *Kawaauhau* is not even mentioned in any of the case law that the Government relies on. That glaring omission renders those decisions of questionable precedential value.

To the extent the Court finds the statutory language to be ambiguous, legislative history confirms that section 523(a)(1)(C) imposes a specific intent requirement. *See Golden Seahorse*, 652 B.R. at 612 ("When a statute is ambiguous … consideration of legislative history can aid in determining the statute's meaning."). The Senate report preceding the enactment of the Bankruptcy Code in 1978 noted that "[t]ax claims with respect to which the debtor filed a fraudulent return, entry on invoice, or fraudulently attempted to evade or defeat any tax (sec. 523(a)(1)(C)) are included." S. Rep. No. 95-989, 95th Cong., 2d Sess. (1978). As this historical evidence makes clear, Congress was targeting fraudulent conduct such that specific intent to evade or defeat taxes must be proven to satisfy the statute.

Requiring proof of specific intent is also justified by the fact that the "the language of § 523(a)(1)(C) tracks almost verbatim that of the criminal tax evasion statute," *Quiroz*, 2018 WL 1773095, at *15, which makes it a felony to "willfully attempt[] in any manner to evade or defeat any tax." 26 U.S.C. § 7201; *see also In re Howard*, 167 B.R. 684, 686 (Bankr. M.D. Fla. 1994) ("[I]t follows that willful evasion is tested as it would be best applied under I.R.C. § 7201, no other intent being found in the Bankruptcy Code."). Indeed, the Second Circuit's holding that section 523(a)(1)(C) has a mens rea requirement directly invokes application of a criminal law analogue of willfulness. *Tudisco*, 183 F.3d at 136; *see also Chhabra v. Holder*, 444 Fed. App'x 493, 495 (2d Cir. 2011) ("[W]illful evasion of income tax includes a specific intent to defraud"). The fact that section 523(a)(1)(C) is not a criminal statute is of no significance given that "the Bankruptcy Code does not hold the IRS to the standard of proof required in a criminal case." *Quiroz*, 2018 WL 1773095, at *16.

Last, but certainly not least, a specific intent standard better comports with the fresh start philosophy of the Bankruptcy Code. *Hawkins*, 769 F.3d at 667; *accord Hyman*, 502 F.3d at 66 ("[E]xceptions to discharge are to be narrowly construed").

The general intent standard that the Government advocates—which requires only that a debtor (1) have a duty to pay the tax, (2) know of the duty, and (3) voluntarily and intentionally violate that duty—is wrong as a matter of law. This cannot possibly be the correct standard because it eviscerates the statutory text—section 523(a)(1)(C) requires that a debtor "willfully attempt[] in any manner to evade or defeat such tax," *not* "willfully violate a duty to pay such tax." *See Reynoso v. Aviles*, 87 F. Supp. 3d 549, 556 (S.D.N.Y. 2015) ("The Court's role is to interpret a statute. It is not to rewrite it."). Indeed, the Government's preferred standard conflicts with the well-established rule that mere nonpayment of taxes is insufficient to bar discharge of a tax liability. *See Tudisco*, 183 F.3d at 136 ("Most circuits have held that a simple nonpayment of taxes does not satisfy § 523(a)(1)(C)'s conduct requirement"); *Hawkins*, 769 F.3d at 699 ("[N]o circuit has held that failure to pay taxes, by itself, constitutes willful tax evasion").

The Government's assertion that general intent is the governing standard in the Second Circuit is belied by the lack of a definitive holding in *Tudisco*. Further, merely because the Second Circuit cited cases from other circuits adopting a general intent standard does not mean it adopted the same standard. Indeed, the cases cited in *Tudisco* did not address the question of whether specific intent was required by section 523(a)(1)(C). *See Dalton v. IRS*, 77 F.3d 1297 (10th Cir. 1996); *In re Bruner*, 55 F.3d 195 (5th Cir. 1995); *In re Toti*, 24 F.3d 806 (6th Cir. 1994). Similarly, the Government's argument that reckless conduct is included within the definition of willfulness is not addressed in *Tudisco*, and at least one court has relied on *Tudisco* to expressly hold otherwise. *See IRS v. Conard*, 2019 WL 10886919, at *2 (E.D. Va. Feb. 1, 2019) ("As the Supreme

Court intimated in *Kawaauhau*, if Congress wished for reckless disregard to satisfy a debtor's tax evasion under § 523(a)(1)(C) it could have included that language in the statute. It did not.").

The Government's further attempt to justify a general intent standard by analogizing section 523(a)(1)(C) to section 6672 of the Internal Revenue Code is misplaced. By its terms, section 6672 applies only in the special circumstance where a company fails to turn over taxes held in trust for the United States and only to individuals entrusted with ensuring the company complies with that duty.[33] 26 U.S.C. § 6672(a) (imposing a civil penalty on "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who ... willfully attempts in any manner to evade or defeat such tax or the payment thereof"); *see also Kalb v. U.S.*, 505 F.2d 506, 510 (2d Cir. 1974) ("The statute essentially provides penalties for breach of that trust imposed by 26 U.S.C. § 7501 (1970) when an employer fails to pay the government taxes withheld from the wages of employees."); *Fiataruolo v. U.S.*, 8 F.3d 930, 938 (2d Cir. 1993) (explaining that section 6672 "cuts through an employer's organizational structure and allows the IRS to impose liability directly and individual on those persons responsible for the tax delinquency").

Given the importance of section 6672 to the government's ability to collect taxes and raise revenue, it makes sense to impose a laxer enforcement standard that requires only willful nonpayment of taxes.[34] *See Quiroz*, 2018 WL 1773095, at *15 ("This less culpable standard of 'willfulness' seems appropriate in the § 6672 context because each dollar paid to other creditors

---

[33] By contrast, section 7201 of the Internal Revenue Code penalizes a taxpayer's attempt to evade or defeat his or her *own* taxes, which is the same situation that section 523(a)(1)(C) of the Bankruptcy Code addresses.

[34] Indeed, when a section 6672 claim is brought, it is the *defendant* who bears the burden of *disproving* he was a responsible person or that his failure to cause taxes to be turned over to the government was not willful. *Fiataruolo*, 8 F.3d at 938.

depletes the fund the responsible person is required to *hold in trust* for the government") (emphasis in original).  However, that same standard cannot be imported into section 523(a)(1)(C) given the differing policy goal of the Bankruptcy Code to provide debtors with a fresh start.

In short, section 523(a)(1)(C) requires proof of specific rather than general intent.  But the Government would lose under either standard.

### 2.    Debtor Lacked Any Specific Intent to Evade Taxes.

There is no evidence that Debtor had the specific intent to evade his tax obligations.  Debtor's ongoing efforts to resolve his tax liabilities with both the IRS and New York State and the millions he voluntarily paid towards that end conclusively rebut any such intent.  *Supra* at 16-17.  Debtor also testified that none of the spending, transfers, or use of company assets that the Government complains about was motivated by a desire to avoid his tax obligations.  *Id.* at 20-26.  The Government has no evidence to rebut that testimony.

The supposed badges of fraud that the Government points to either do not exist or have been rebutted:

**Implausible Explanations**:  The Government argues that Debtor's explanations were "consistently implausible" yet can only point to one example—his testimony that he wasn't thinking about his tax liabilities at the time he made transfers to or for the benefit of his daughter.  But the fact that Debtor made these transfers for legitimate, estate planning purposes is entirely consistent with his not thinking about his tax liabilities.[35]  Indeed, Debtor's actively thinking about his tax liabilities at the time of the transfers would tend to show intentional tax evasion!

---

[35] The Government cites no case law holding that estate planning is *per se* illegal when someone owes taxes.  *Cf. Koehl*, 166 B.R. at 80 (debtors' transfers to trusts for estate planning did not violate section 523(a)(1)(C)).  *City of Arkansas v. Anderson*, 762 P.2d 183, 191 (Kan. 1988) is inapposite because that case involved a fraudulent transfer action brought pursuant to a state statute where the "evidence of fraud was overwhelming."  Here, the Government's evidence is underwhelming.

**Concealing Assets:** The Government's assertion that the challenged transfers "concealed" assets is patently absurd given that they were disclosed in gift tax returns and in response to the IRS's information requests. *Supra* at 21-25.

**Failure to Cooperate:** Equally absurd is the Government's argument that Debtor's efforts to *resolve* his tax liabilities by seeking installment agreements and asking for an offer-in-compromise amount to a *failure* to cooperate with the IRS. In truth, Debtor would not have been granted installment agreements or even had his offer-in-compromise considered had he not cooperated with the IRS in answering its questions and supplying voluminous records. *See* PX 1 at USA 3274-79, 3290-91, 3312-22, 3328-44; JX 24; JX 25.

**Lack of Credibility:** Debtor's credibility is not undermined by the three pieces of testimony the Government points out. First, as discussed, his testimony that his counsel supplied the value for his watches is consistent with his prior sworn declaration. *Supra* at 8. Second, nothing in the cited transcript shows that Debtor treated the company cars that WRG leased as his own, 10/16 Tr. at 148:22-149:8, and testimony from others proves otherwise, *supra* at 25-26. Third, the fact that Debtor, under oath, was forthright about his prior exaggerations (made while not under oath) demonstrates he is a credible witness. 10/16 Tr. at 162:7-21.

**Failure to Pay Estimated Taxes:** This is the only badge of fraud present. But this badge is rebutted by the fact that Debtor's failure to pay was not motivated by a desire to avoid his taxes but rather by his non-volitional gambling addiction. *Supra* at 16; *infra* at 33-35.

**False Information:** Debtor did not provide any false information to the IRS, and to the extent his representatives did, the Government cannot point to any evidence that Debtor knew his representatives had provided such information or cite any case law holding that a third party's actions suffice to prove a debtor's specific intent. *Supra* at 18-19.

**Missing Badges:** The Government conveniently omits the multiple badges of fraud missing from this case, including understatement of income, inadequate or falsified records, failure to file tax returns, sophistication in tax matters, engaging in or attempting to conceal illegal activities, backdating documents, and filing false documents with the IRS. *See U.S. v. Schmidt*, 2016 WL 7230503, at *2 (E.D. Wash. Dec. 14, 2016) (listing badges).

The totality of the facts shows that the Government has not proven by a preponderance of the evidence that Debtor acted with the specific intent to evade his tax liabilities.

### 3. Debtor Lacked Any General Intent to Evade Taxes.

Even under a general intent standard, the Government loses because there is insufficient evidence showing Debtor intended to evade or defeat his tax obligations. Debtor's predicament stems from his failure to pay estimated taxes, which was in turn a result of his gambling addiction. *Supra* at 16. In fact, his net gambling losses for each year dwarfed his net tax liabilities for each year such that had Debtor not gambled away over $11.5 million between 2012 and 2016, that would have been more than enough money to pay off the $6.9 million (or $8.5 million when interest and penalties are added) in tax debts he accrued for this same period. *Compare* Stip. at ¶¶ 33, 48 *with* JX 3 at Winick 43. But as Debtor explained, he never realized the magnitude of his gambling losses until after it was too late. 10/16 Tr. at 225:5-10.

The Government's argument that a gambling addiction is not a legal basis to avoid paying taxes misses the point—Debtor's addiction explains *why* his nonpayment of taxes was not willful.[36] As Dr. Weinstock explained, for people like Debtor, gambling is "no longer a want, it's what they need to function." 10/20 Tr. at 45:24-25. Further, Debtor's experience with paying his

---

[36] None of the Government's cited case law where gambling disorder was held not to provide a legal defense concerned section 523(a)(1)(C). Given that conduct must be volitional to be willful, Debtor's gambling disorder diagnosis and Dr. Weinstock's explanation of the effects of that disorder on Debtor's volition are undeniably relevant.

back taxes from the early 2000s while continuing to gamble taught Debtor that he did not need to change his behavior to ensure he could successfully pay his taxes from 2012 to 2016.[37] *Id.* at 54:21-55:22, 89:18-90:9, 91:16-22, 92:17-93:1. Debtor's bank accounts prove that very point, as he had checks made out to himself for gambling at or around the same time he had checks made out to pay taxes. PX 28 at Winick 3242, 3258, 3272, 3295-96, 3329, 3333, 3342, 3359, 3373, 3433-34, 3449, 3481-83, 3541, 3590-91.

The Government's assertion that Debtor's adopting harm reduction strategies and making certain tax-related decisions shows his gambling was volitional ignores Dr. Weinstock's testimony to the contrary. As Dr. Weinstock explained, there are small degrees of volition that Debtor exercised to limit the fallout from his compulsive gambling behavior and that the consequences of not paying taxes were not sufficiently aversive for Debtor to make the conscious choice to gamble with post-tax dollars. *Id.* at 51:11-52:14, 89:18-90:9. Dr. Zwirn's contrary conclusion is based solely on her mere say-so as a hired gun for the Government who has zero academic credentials with respect to gambling disorder and whose relevant clinical experience is limited to treating a grand total of five patients with that disorder.[38] 11/1 Tr. at 50:16-24, 51:6-20, 54:10-24; PX 56. Her testimony is entitled to no weight.

As for Debtor's non-gambling expenditures, as already discussed, those occurred concurrently with Debtor's voluntary payments on his back taxes, demonstrating a lack of general intent to avoid his tax obligations. *Supra* at 21. *See Looft*, 533 B.R. at 920-921 (applying general

---

[37] The Government's expert, Dr. Zwirn, agreed that people commonly learn and draw conclusions based on their prior experiences. 11/1 Tr. at 46:7-47:3.

[38] By contrast, Dr. Weinstock is a leading academic researcher of gambling disorder, has conducted or supervised hundreds of gambling disorder diagnoses, treated well over 100 patients, and was mentored by one of the authors of the diagnostic criteria for determining the presence of gambling disorder. 10/20 Tr. at 10:3-25, 12:13-19, 13:7-19; DX 10; PX 57.

intent standard and finding no willful tax evasion where debtor maintained an affluent lifestyle but made voluntary payments towards his liabilities). Similarly, as explained above, Debtor did not transfer assets or use company assets with the general intent to evade his tax burdens. *Supra* at 21-26.

Because the Government has not proven by a preponderance of the evidence that Debtor willfully attempted to avoid or defeat his tax burdens, the Court should enter judgment in Debtor's favor on the Government's section 523(a)(1)(C) claim.

## CONCLUSION

For these reasons, the Court should enter judgment in Debtor's favor on Counts I, II, and IV of the Government's adversary complaint and grant Debtor a discharge.

Dated: December 4, 2023      **ARENTFOX SCHIFF LLP**

*/s/ Jin Yan*
Jin Yan
1717 K St. NW
Washington, DC 20006
T: (202) 778-6442
E: jin.yan@afslaw.com

- and -

Ryan Foley
1301 Avenue of the Americas
42nd Floor
New York, NY 10019
T: (212) 484-3997
E: ryan.foley@afslaw.com

*Counsel for Defendant Jeffrey Winick*