**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| Jeffrey Winick, | Case No. 20-11976 (PB) |
| Debtor. | **FOR PUBLICATION** |

-------------------------------------------------------------x

| | |
|---|---|
| United States of America, | Adversary Proceeding No. |
| Plaintiff, | 21-01138 (PB) |
| -against- | |
| Jeffrey Winick, | |
| Defendant. | |

-------------------------------------------------------------x

### DECISION AFTER TRIAL

**APPEARANCES:**

UNITED STATES ATTORNEY FOR
THE SOUTHERN DISTRICT OF NEW YORK
*Counsel for the Plaintiff*
86 Chambers Street, 3rd Floor
New York, New York 10007
By: Zachary Bannon
    Jean-David Barnea

ARENTFOX SCHIFF LLP
*Counsel for the Defendant*
1717 K St. NW
Washington, DC 20006
By: Jin Yan
    Ryan Foley

**Hon. Philip Bentley**
**U.S. Bankruptcy Judge**

1

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................3

PROCEDURAL HISTORY .................................................................................................5

FINDINGS OF FACT ..........................................................................................................8

    A.    Winick Chose to Grossly Underpay His Federal Income Taxes For Each of the 2012 Through 2016 Tax Years……………………………………………………………………………………………………..8

    B.    Winick Blocked IRS Enforcement of its Tax Liens by Entering Into a Series of Installment Agreements and an Offer-in-Compromise ....................................................................... 10

    C.    Winick Took Steps to Make Himself Judgment-Proof.................................................17

    D.    Winick's Gambling Losses.........................................................................................19

    E.    Facts Relevant to the Government's Claims Under Bankruptcy Code § 727.........................21

DISCUSSION.......................................................................................................................27

    I.    WINICK WILLFULLY ATTEMPTED TO EVADE HIS TAX OBLIGATIONS, RENDERING THEM EXEMPT FROM DISCHARGE UNDER BANKRUPTCY CODE § 523(A)(1)(C) ...................................................27

    A.    The *Tudisco* Standard ................................................................................................27

    B.    Under Either a Narrow or a Broad Application of the *Tudisco* Standard, Winick Willfully Attempted to Evade His Tax Obligations .................................................................30

    II.    THE GOVERNMENT HAS SHOWN NO BASIS TO DENY WINICK A DISCHARGE UNDER SECTION 727(A)(2) OR SECTION 727(A)(4) ...........................................................................................34

    A.    The Government Has Not Shown That Winick's July 2020 Transfer of His LLC Interest to Berley Was an Intentional Fraudulent Transfer.................................................................35

    B.    The Government Has Not Shown That Winick Intended to Deceive the Chapter 7 Trustee When He Misrepresented the Value of His Rolex Watches................................................40

CONCLUSION .....................................................................................................................45

### INTRODUCTION

For decades prior to his August 2020 chapter 7 filing, Jeffrey Winick (the "Debtor") was one of New York City's top commercial real estate brokers. As the chief executive officer and majority owner of Winick Realty Group, LLC ("Winick Realty"), he earned millions of dollars of cash compensation each year—an average of $4.75 million a year during the 2012 through 2016 tax years at issue in this suit. During and after that time, he spent lavishly, funding a luxurious lifestyle and incurring almost $12 million in gambling losses, while grossly underpaying his tax obligations. Following a decline in his brokerage business, initially caused by the loss of a key client and then exacerbated by the onset of the COVID-19 pandemic, he filed for chapter 7 in August 2020. His bankruptcy schedules reported only $530,000 of assets and more than $10 million of debts, including almost $9 million in federal tax liabilities.

By this adversary proceeding, the United States of America, on behalf of the Internal Revenue Service (the "IRS" or the "Government"), seeks a judgment determining that Winick's federal income tax liabilities for the 2012 through 2016 tax years are exempt from discharge under Bankruptcy Code § 523.[1] In addition, the Government seeks a judgment denying Winick a discharge pursuant to Bankruptcy Code § 727 on two independent grounds: that (i) shortly before his bankruptcy filing, he made an intentionally fraudulent transfer of his interest in a valuable LLC to a friend and business colleague, David Berley (section 727(a)(2)); and (ii) on his bankruptcy schedules, he fraudulently misstated the value of his two Rolex watches (section 727(a)(4)). Based on the evidence presented at the four-day trial in this case, the Court rules in favor of the

---

[1] The Government also sought a determination that Winick's federal income tax liability for the 2019 tax year is exempt from discharge under 11 U.S.C. §§ 523(a)(1)(A) and 507(a)(8)(A)(i), because the return for those taxes was due less than three years before his bankruptcy filing. Winick did not oppose that relief, and the Court entered summary judgment granting that claim prior to trial. Winick's taxes for 2017 and 2018 are not at issue, because he paid those taxes.

Government on its claim to exempt from discharge Winick's federal income taxes for 2012 through 2016 and rules against the Government on its claim for a denial of Winick's discharge.

The Government's claim that Winick's taxes are exempt from discharge rests on Bankruptcy Code § 523(a)(1)(C), which provides that an individual may not be discharged from any tax that he has "willfully attempted in any manner to evade or defeat." The Court finds that Winick's conduct satisfies this standard. During the years at issue, Winick spent millions of dollars on non-essentials, while choosing not to pay most of the federal taxes he owed. Almost half of his spending consisted of losses he incurred at casinos, which he claims were the product of a gambling addiction and therefore "non-volitional." However, the evidence at trial showed that Winick had the ability to limit his gambling sufficiently to pay his taxes in full, as he had done in the years before 2012 and would again do in later years. He simply chose not to do so during the years from 2012 through 2016.

Winick's choice to spend lavishly on non-essentials, including gambling, while leaving millions of dollars of tax obligations unpaid may, by itself, satisfy the willful evasion standard. But the Court need not decide that legal issue, which the Second Circuit left unresolved in *In re Tudisco*, 183 F.3d 133 (2d Cir. 1999), because Winick took additional steps—fraudulent steps— to evade his taxes. After the IRS filed a notice of tax lien in 2014, Winick entered into repeated installment agreements with the IRS, which had the legal effect of precluding the IRS from taking any further collection actions. By law, such installment agreements are available only to taxpayers who are in compliance with all filing and payment requirements for the current year. Winick was not in compliance with his current payment obligations; he paid no estimated taxes on the millions of dollars he earned each year in commissions. Winick's accountant, and later his tax lawyer, nevertheless induced the IRS to enter into these agreements by representing that he had no commission income and therefore was not required to make estimated tax payments. Winick

4

testified that he neither authorized nor knew of these misrepresentations, but his claim of ignorance is not credible. Winick, not his accountants, bears the responsibility for his years-long deception of the IRS. This fraud—a willful attempt to evade his tax obligations—renders Winick's federal income taxes for 2012 through 2016 exempt from discharge.

And there is more. In late 2012, facing the prospect of owing substantial taxes due to having paid no estimated tax on his commissions, Winick transferred business interests worth at least $4 million to his daughter for no consideration. He also gave her and others jewelry valued at more than $500,000. As a result of these and other transfers—and because, unlike most individuals of comparable income and lifestyle, he rented, rather than owned, both of his residences and leased the luxury cars he drove—his remaining assets when he filed for bankruptcy were minimal. These actions further support the Court's conclusion that Winick willfully attempted to evade his taxes.

For these reasons, the Court rules in the Government's favor on its claim under Bankruptcy Code § 523(a)(1)(C) and will enter a judgment that Winick's federal income taxes for 2012 through 2016 are exempt from discharge. At the same time, for the reasons discussed in Point II below, the Court finds the Government has not met its burden of proving either of the two grounds it asserts for denying Winick a discharge under Code § 727.

## PROCEDURAL HISTORY

On August 27, 2020, Winick filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code, together with his schedules of assets and liabilities. His asset schedule listed assets with a total value of only $530,000, consisting of $475,000 in leasing brokerage commissions that he had earned but not yet collected, plus $25,000 in financial assets and $30,000 in personal and household items. The last category included two Rolex watches, to which he ascribed a combined value of $5,000. In addition, Winick listed interests of "unknown" value in two businesses: a 22.5% ownership interest in Winick Realty Group and a 60% ownership interest

in WTN Realty Corp. He listed no retirement accounts or pension assets. On his schedule of

liabilities, he listed liabilities totaling approximately $10 million, including almost $9 million

owed to the IRS. On his schedule of exempt property, he claimed exemptions for almost $20,000

worth of personal and household items, including his Rolex watches.

The IRS filed a proof of claim in November 2020, asserting that Winick owed a total of

$8,896,271 in unpaid income taxes, plus interest and penalties, for the 2012 to 2016 and 2019 tax

years. The Government then commenced this adversary proceeding against Winick. Its complaint

(the "Complaint") seeks a ruling denying Winick a discharge (Counts I and II), as well as a ruling

that Winick's federal income tax liabilities for 2012 through 2016 and 2019 are exempt from

discharge (Counts III and IV). Specifically:

- Count I of the Complaint seeks denial of discharge pursuant to Bankruptcy
  Code § 727(a)(2)(A) on the ground that, less than a year before he filed for
  bankruptcy, Winick made an intentionally fraudulent transfer of his interest in
  an LLC to his friend David Berley.

- Count II seeks denial of discharge pursuant to Code § 727(a)(4)(A) on the
  ground that Winick knowingly and fraudulently made false oaths in the
  schedules he filed with his chapter 7 petition, by (i) stating that the value of
  his interests in Winick Realty and its holding company  was "unknown," and
  (ii) stating that the combined value of his two Rolex watches was $5,000.

- Count III seeks a ruling exempting from discharge his federal tax liabilities
  for the 2019 tax year under Bankruptcy Code § 523(a)(1)(A) and
  507(a)(8)(A)(i), which exempt from discharge any income taxes for which a
  return is due within three years before the debtor's bankruptcy petition.

- Count IV seeks a ruling exempting from discharge his federal tax liabilities
  for tax years 2012 through 2016 under Code § 523(a)(1)(C), which provides
  that a tax debt is non-dischargeable if the debtor "willfully attempted in any
  manner to evade or defeat such tax."

After the close of discovery, the Government moved for summary judgment on Counts II,

III, and IV. Winick cross-moved for summary judgment as to Counts I and II and did not oppose

entry of summary judgment for the Government on Count III, concerning Winick's 2019 tax

6

liabilities. The Court ruled on these two motions from the bench, finding that disputed issues of material fact precluded summary judgment on most claims. At the same time, the Court granted summary judgment for the Government on the one unopposed claim (Count III) and granted summary judgment for Winick dismissing a portion of Count II—namely, the claim that it was fraudulent for Winick to schedule the value of his business interests as "unknown."

A four-day trial was then held on the Government's remaining claims. Four witnesses testified: Winick; a senior IRS revenue officer, John Harrison; and two psychiatrists, Dr. Jeremiah Weinstock and Dr. Ilene Zwirn, whom Winick and the Government, respectively, presented as experts on gambling disorders. In addition, the deposition testimony of a number of witnesses—including Winick's daughter, Danielle Lapidus; his former bankruptcy counsel, Steven Wilamowsky; and David Berley—was admitted into evidence.

The Court finds Harrison's testimony to have been highly credible: careful, precise and measured. The testimony of the two expert witnesses was also credible, although its relevance to the central issues in dispute was somewhat marginal. In contrast, Winick's testimony was unreliable in key respects. Winick, who was 73 years old at the time of the trial, testified that he was on multiple medications for a variety of ailments but that those medications did not impair his ability to testify. Whatever the reason, much of his testimony was imprecise and prone to memory lapses, as well as a tendency to exaggerate. For example, he testified that "95%" of his spending was on gambling, when in fact his gambling losses during the years at issue in this suit amounted to a bit less than half of his spending. More important, as discussed below, his testimony on one of the central issues in the case—his responsibility for the falsehoods that his accountant and his tax lawyer told the IRS in 2014 and 2015, respectively—appears to have been an outright fabrication.

<h1 align="center">FINDINGS OF FACT[2]</h1>

### A. Winick Chose to Grossly Underpay His Federal Income Taxes For Each of the 2012 Through 2016 Tax Years

Jeffrey Winick founded Winick Realty, a real estate brokerage and advisory services firm, in the early 1980s. Over the ensuing decades, the firm prospered, becoming one of New York City's leading commercial real estate brokers, with a specialty in retail leasing. According to the firm's website, its 50 agents leased more than 15 million square feet over the prior 30 years, among the most of any retail firm in the city. Winick personally leased more than one million square feet of retail space, for clients including Duane Reade/Walgreens, AT&T and Starbucks, as well as major landlords such as the Durst Organization. At all relevant times, Winick was Winick Realty's majority owner, as well as its Chief Executive Officer and Sole Manager, with sole authority to manage the company, including to fix the terms of his compensation.

During the five tax years at issue in this suit, 2012 through 2016, Winick received compensation totaling almost $24 million in taxable income—an average of $4.75 million a year—from Winick Realty. He lived a lifestyle commensurate with this level of income. He resided in a succession of luxury apartments in Manhattan's Sutton Place neighborhood, for which he paid up to $18,000 per month in rent, as well as a country house in Southampton, for which he paid about $180,000 per year in rent. (He rented the Southhampton home from an irrevocable life insurance trust, to which he had transferred that property in the early 2000's, after he first fell behind on his federal income taxes.) He also paid the rent on two additional Manhattan apartments—one for his

---

[2] The findings and conclusions in this opinion constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, based on the testimony given and the exhibits admitted at the four-day trial in this adversary proceeding. The Court has not attempted to distinguish between findings of fact and conclusions of law. Instead, all determinations of factual issues shall be deemed findings of fact, and all determinations of legal issues shall be deemed conclusions of law. *See Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405, 413–14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

8

ex-wife, from whom he had been divorced for about 20 years, and the other for his daughter. He owned no cars, but instead drove several Mercedes Benzes that his firm leased for him.

In addition, during the five years at issue, Winick took more than 30 international trips for pleasure—mostly to the Bahamas to gamble, but also to St. Barts and a variety of locations in Mexico, Germany and the Czech Republic. He spent freely on luxury goods and other expenses for himself, his daughter, his ex-wife and his ex-girlfriend, including funding high-end shopping trips for each of them, which they charged to his credit cards. He was particularly generous to his daughter: In addition to giving her interests in his businesses worth at least $4 million, jewelry worth hundreds of thousands of dollars, and an $85,000 cash gift, he also paid enormous life insurance premiums for her benefit—$90,000 a year from 2012 to 2015, and $140,000 a year in 2016 and 2017. On top of all this, he spent almost half his income to support his gambling addiction, running up almost $12 million in gambling losses during these years.

Winick's spending was so lavish that he would not have been able to fund it had he paid the taxes he owed. He therefore took steps, beginning in 2012, to systematically underpay his federal taxes. For five years in a row, from 2012 through 2016, he instructed his firm, Winick Realty, to withhold taxes *only* from his salary, which amounted to less than one-third of his total compensation—that is, to withhold no taxes from the commissions that made up more than two-thirds of his compensation. At the same time, he paid no estimated taxes on his commissions, and when he filed his federal income tax returns each year, he paid no portion of the taxes he owed.[3] The result was that, as summarized in the table below, he paid only about $2.6 million in federal

---

[3] This was not the first time Winick had done this. Between 2000 and 2005, he had similarly chosen not to withhold taxes from his commission income or to pay estimated taxes on that income. As a result, he accumulated an arrearage of almost $4 million in back taxes for those years. In 2006, Winick resumed paying estimated taxes, and in 2008, he entered into an installment agreement with the IRS to pay off his 2000-2005 back taxes over time. By the fall of 2012—the same year he once again stopped making estimated tax payments—he had fully paid off these tax arrearages pursuant to the installment agreement.

income tax (the amount his firm withheld from his salary) on the $23.8 million in taxable income

he earned in these five years, leaving $6.9 million in taxes unpaid:

| Tax Year | Taxable Income | IRS Taxes Owed | Tax Withholdings | Remaining Tax Liability |
|----------|----------------|----------------|------------------|-------------------------|
| 2012 | $7,922,503 | $2,958,768 | $676,747 | $2,282,021 |
| 2013 | $4,675,510 | $1,944,528 | $558,099 | $1,386,429 |
| 2014 | $4,911,103 | $2,100,533 | $276,518 | $1,824,015 |
| 2015 | $3,891,521 | $1,578,350 | $876,635 | $701,715 |
| 2016 | $2,412,311 | $995,865 | $251,377 | $744,488 |
| Totals | $23,812,948 | $9,578,044 | $2,639,376 | $6,938,668 |

By the time of his August 2020 bankruptcy filing, more than $1.9 million in penalties and

$1.6 million in interest had accrued on these unpaid taxes, bringing his total federal tax liability—

net of the partial payments he made pursuant to several installment agreements, discussed below—

to slightly more than $8.9 million.

Winick's practice of paying no estimated taxes on his commissions violated federal tax

law, which required him to make quarterly estimated tax payments to the IRS on the portion of his

taxable income that was not subject to withholding—that is, his commission income. *See* 26 U.S.C.

§ 6654 (any taxpayer making more than $1,000 a year in income not subject to withholding must

make estimated tax payments). At trial, Winick admitted that he was aware of this requirement.

Among other things, the IRS repeatedly reminded his accountants of this obligation, and his

lawyers informed him of this requirement on multiple occasions. Indeed, in the six years prior to

2012, Winick had consistently complied with his obligation to pay quarterly estimated taxes on

his commission income.

### B.  Winick Blocked IRS Enforcement of its Tax Liens by Entering Into a Series of Installment Agreements and an Offer-in-Compromise

Winick's practice of paying no estimated taxes on the majority of his income, year after

year, and then not paying the taxes he owed as a result raises the question: How did he manage to

get away with this? Why didn't the IRS take steps to foreclose on his assets and garnish his income?

The answer is that, beginning in 2014, when the IRS first recorded a tax lien on all of his assets, and continuing until shortly before his 2020 bankruptcy filing, Winick kept the IRS at bay by employing devices available under federal tax law—installment agreements and an offer-in-compromise—that had the legal effect of preventing the IRS from taking any steps to enforce its liens. While the use of these devices is usually entirely lawful, installment agreements are available only to taxpayers who are in compliance with their current tax obligations, including payment of any required estimated taxes. As just noted, Winick was not in compliance with his current obligations; he paid no estimated taxes on the millions of dollars of commission income he earned each year from 2012 through 2016. When the IRS inquired, in 2014 and again in 2015, about his failure to pay estimated taxes, he directed first his accountant and then his tax lawyer to tell the IRS—falsely—that he owed no estimated taxes for either of those years. Through this fraud, Winick was able to obtain two successive installment agreements, which continued in effect until 2017. This blocked IRS enforcement of its tax liens during that three-year period. He then made an offer-in-compromise in 2017 and entered into a third installment agreement in 2018, thereby forestalling IRS collection efforts until shortly before his 2020 bankruptcy filing.

### 1. Winick fraudulently induced the IRS to enter into the 2014 installment agreement

In early 2014, IRS representatives spoke repeatedly with Winick's accountants about his unpaid taxes for the two prior years, including his failure to make any estimated tax payments. The IRS then made a formal demand that he pay those taxes and told his accountants they intended to file a notice of tax lien against him. A lien arises in favor of the United States on all of a taxpayer's "property and rights to property" when the taxpayer fails to pay taxes after the IRS demands payment. 26 U.S.C. § 6321. The IRS then may enforce its lien by seizing the taxpayer's assets and

11

levying on his income. 26 U.S.C. § 6331. In May 2014, the IRS filed a tax lien notice and recorded its tax lien on all of Winick's assets.

Winick's accountants responded to the IRS's payment demand by proposing that he and the IRS enter into an installment agreement, under which he would pay his back taxes through a series of monthly payments over a period of several years. An installment agreement is a method by which the IRS allows a delinquent taxpayer to repay his back taxes over time, based on the taxpayer's ability to pay. *See* 26 U.S.C. § 6159(a); Internal Revenue Manual § 5.14.1.4(4). To be eligible for an installment agreement, the taxpayer must be in compliance with his current tax obligations, including having made any required estimated tax payments. Internal Revenue Manual § 5.14.1.4.2(1). While an installment agreement is in effect, as well as while a request for such an agreement is pending and for 30 days after the agreement is rejected or terminated, the IRS is barred from enforcing its tax liens or taking any other collection actions. 26 U.S.C. § 6331(k)(2); Internal Revenue Manual § 5.14.1.5(1).

Winick had reason to know of these legal requirements and consequences, because he had entered into an installment agreement with the IRS in 2008 and used it to pay off the taxes he owed for the 2000 to 2005 tax years. In addition, Winick employed a large and sophisticated accounting firm to help him with his taxes—Citrin Cooperman, which holds itself out as one of the nation's largest professional service firms, *see* https://www.citrincooperman.com/In-Focus-Resource-Center/Citrin-Cooperman-Acquires-Top-200-Firm-Gettry-Marcus.

In the spring and summer of 2014, the IRS revenue officer in charge of Winick's case had a series of conversations with Winick's lead accountant, Scott Rutter of Citrin Cooperman, about whether Winick was in compliance with his estimated tax obligations for the year. The IRS officer first raised the issue in late April 2014, in the course of discussions with Rutter about a potential installment agreement. When Rutter and the IRS officer spoke again a month later, Rutter reported

that Winick was not currently required to make estimated quarterly payments. PX 1 at 3272-73 (IRS officer's contemporaneous notes of this conversation, concluding that Winick "is not liable to pay ES [i.e., estimated tax] payment at this time"). On July 9, 2014, after the IRS officer had again stressed the importance of making the required quarterly estimated payments for 2014, Rutter wrote a letter to the IRS confirming that Winick had not received any "non-withholding" income that year. The letter also stated that the only monies other than salary that Winick had received from Winick Realty that year were loans the firm had made to him. As a result, the letter concluded, Winick had "sufficient withholding taxes for 2014." The following week, the IRS approved his installment agreement request.

The representations in Rutter's letter—that all of Winick's compensation during the first half of 2014 had taken the form of salary, and that the non-salary payments he had received from his firm during those months were loans, not commissions—were false. It is undisputed that Winick earned approximately $4.9 million in commissions in 2014; he reported these commissions on his 2014 tax return as income not subject to withholding. While the evidence does not show what portion of these commissions he earned in the first half of the year, Winick admitted at trial that he made at least "some commissions between January and May of 2014." Moreover, he made no attempt to show that the amount of commissions he received in those months was *de minimis*, or that the payments he received from his firm during the first half of 2014 were loans, as Rutter's letter represented.

Instead, Winick testified that he neither authorized nor knew of Rutter's false representations to the IRS. However, this claim is not credible. Winick offered no conceivable reason why a senior accountant such as Rutter at a large and reputable firm such as Citrin Cooperman would make misrepresentations of this sort to the IRS of his own volition. Winick testified that Rutter might have received false information from one of Winick's assistants, but he

provided little explanation of how this could have happened, much less any evidence that it did happen. The fact that different Winick representatives made similar false representations to the IRS two years in a row—Rutter in 2014, and then Winick's tax lawyer in 2015—makes Winick's story even more far-fetched.

The only plausible inference one can draw is that, when Rutter told Winick the IRS needed confirmation that he had made all required estimated tax payments for the first half of 2014, Winick concocted the falsehoods that Rutter then relayed to the IRS: that Winick was not required to make any estimated tax payments that year because he had not earned any commissions, and that the only non-salary payments he had received from his firm were loans.

Based on these misrepresentations, the IRS agreed to enter into its 2014 installment agreement with Winick, thereby blocking any IRS enforcement or collection actions until the following year.

## 2. Winick fraudulently induced the IRS to enter into a second installment agreement in 2015

Winick stopped making payments under his first installment agreement in September 2014, and as a result, the IRS terminated that agreement in March 2015. Winick's accountants then proposed that the IRS enter into another installment agreement. The IRS eventually agreed, and the parties executed a second installment agreement, which continued until March 2017, when the IRS terminated it after Winick once again stopped making payments.[4]

Before entering into this second agreement, the IRS spoke with Winick's tax lawyer, Laurie Kazenoff of the Meltzer Lippe firm, in August 2015 to confirm that Winick was in compliance with any estimated tax obligations for the year. Ms. Kazenoff represented that the reason Winick

---

[4] Winick's 2014 and 2015 installment agreements each provided for relatively low initial payment amounts, which increased to higher amounts a year or so into the agreement. Under each agreement, Winick made most or all of the payments at the initial low amount and then stopped paying shortly before the first stepped-up payment.

had made no estimated tax payments in 2015 was that he was "completely on withholding"—that is, he had received no compensation from his firm other than salary that was subject to withholding. This representation is reflected in the IRS officer's contemporaneous notes of the conversation, PX 1 at 3289, and is not denied by Winick.

As in 2014, this representation appears to have been false. According to Winick's 2015 tax return, his compensation for that year totaled almost $3.9 million, of which about $2.2 million was salary and $1.7 million was commissions. Winick's post-trial brief argues that he might have earned all of that $1.7 million in commission income during the last five months of the year, after Ms. Kazenoff spoke with the IRS. But Winick has presented no evidence to support that possibility, nor any explanation of how that might have happened. Moreover, the plausibility of that scenario is undercut by Winick's acknowledgement that he earned about $1.9 million between January and July 2015. If Winick earned no commissions during those seven months, this would mean the entire $1.9 million he earned in those months was salary. This in turn would mean that he earned 86% of his 2015 salary ($1.9 million out of $2.2 million, the salary he reported on his tax return) during the first seven months of the year—a highly implausible scenario, which Winick made no attempt to explain.

Once again, in 2015 as in 2014, the only plausible inference one can draw is that the representation Winick's representative made to the IRS was an outright falsehood—and once again, this falsehood can only plausibly have come from Winick himself.

### 3. Winick continued to keep the IRS at bay by making an offer-in-compromise in 2017 and then entering into a third installment agreement in 2018

Following the termination of his second installment agreement in March 2017, Winick embarked on a new strategy to forestall IRS collection efforts. In May of that year, his accountants approached the IRS with a so-called offer-in-compromise: They offered to pay $430,000 in full satisfaction of his unpaid taxes for the 2012 through 2016 tax years, on the ground that this was

all he could afford to pay. *See* 26 U.S.C. § 7122; 26 C.F.R. § 301.7122-1(b)(2) (requiring IRS to consider taxpayer offers to compromise their unpaid tax obligations when the taxpayer claims his assets and earnings are insufficient to pay the taxes in full). After referring Winick's offer to a fraud specialist for review, the IRS ultimately rejected the offer as unreasonably low, concluding that they could recover a far larger sum through collection actions. Among other things, IRS personnel noted that Winick had already defaulted on two installment agreements, and in addition, that he had transferred assets worth millions of dollars to his daughter for no consideration five years earlier.

However, as is common, and as Winick's accountants surely would have expected, it took the IRS many months—in fact, a year and a half, until September 2018—to complete its internal review of Winick's offer-in-compromise and to formally reject it. In the meantime, the legal effect of the pendency of the offer was the same as that of an installment agreement: The IRS was barred from taking any enforcement or collection actions while the offer-in-compromise was pending and for 30 days thereafter. *See* Internal Revenue Manual § 8.23.1.3(1); 26 U.S.C. § 6331(k)(1).

Shortly after the IRS's rejection of Winick's offer-in-compromise, his accountants approached the IRS once again and proposed that the parties enter into yet another installment agreement. The IRS agreed, and the parties negotiated and executed a third installment agreement. This time, Winick made payments under the agreement for 15 months, before he stopped making payments in January 2020.

The combined effect of Winick's three installment agreements and his offer-in-compromise was to forestall any enforcement or collection efforts by the IRS for a six-year period, from February 2014 until January 2020. During the great majority of this time, the IRS was legally barred from undertaking any such efforts. Only once during this period, from March to May 2017, was there a gap of more than a few weeks between the end of one legal bar and the commencement

16

of another. That two-month gap was of no consequence, because, as Harrison testified, it generally takes the IRS several months to re-start the collection process once it has been paused.

### C. Winick Took Steps to Make Himself Judgment-Proof

In addition to grossly underpaying his federal taxes and then employing fraud to block the IRS from enforcing its tax liens, Winick repeatedly took steps to make himself largely judgment-proof, including by transferring assets worth millions of dollars for no consideration when he was in arrears on his tax obligations.

Unlike most individuals of comparable income and lifestyle, Winick has consistently rented, rather than owned, his residences. Between 2012 and 2020, Winick spent over $1.5 million on rent. This sum includes the rent he paid (up to $18,000 per month) for the succession of Sutton Place apartments in which he has lived, plus the rent he paid for his ex-wife's apartment and for his daughter's apartment when she lived in New York. It also includes the $180,000 in rent that he paid each year for his vacation home in Southampton. He had purchased that home in the early 2000's, at a time when he owed millions of dollars of back taxes to the IRS, and then promptly sold it to an irrevocable life insurance trust, which ultimately transferred it to his daughter for no consideration in 2016.

In addition to not owning these apartments or his vacation home, Winick did not own a car. Instead, he caused Winick Realty to lease three Mercedes Benz cars for him, which he used frequently. At trial, Winick testified that 95% of his use of the cars was for business. However, the record shows that the principal location where these cars were garaged was Winick's Southampton address, which casts some doubt on the truth of his testimony.

During the last four months of 2012, the year in which Winick stopped paying estimated taxes on his commission income, he took a series of steps to divest himself of his principal

remaining assets, including by transferring assets worth at least $4 million, and perhaps substantially more, to his daughter for no consideration:

987 Eighth Ave LLC: In September 2012, Winick sold his interest in 987 Eighth Ave LLC for $2 million. While he used about half of the proceeds to finish paying off his back taxes (mostly the arrears for 2002-05 that he repaid via his 2008 installment agreement), he used the other $1 million in proceeds to fund his gambling losses.

Winick Realty Group NJ LLC: Also in September 2012, Winick created an irrevocable trust for his daughter's benefit to hold his 74% ownership interest in a newly formed business entity, Winick Realty Group NJ LLC, which he created to expand his real estate business into New Jersey. In 2016, the trust transferred this 74% ownership stake to his daughter for no consideration. The record sheds no light on the value of this LLC interest.

WTN Realty: In December 2012, Winick transferred his shares in WTN Realty, which he valued at about $4 million, to his daughter for no consideration. Winick testified that he made this transfer on the advice of his financial advisors, who informed him of an impending change to the gift tax laws, namely, a reduction from $5 million to $1 million in the allowed lifetime gift tax exclusion. While the Court does not doubt that Winick received this advice, it does not alter the reality that this transfer fits the classic pattern of an intentional fraudulent conveyance: a transfer to a relative for no consideration at a time when creditor claims are looming.

Finally, on a variety of occasions during or after 2015, Winick gave away a total of more than 40 pieces of jewelry, mostly to his daughter. In connection with an insurance policy that he took out on this jewelry in 2015 (which he cancelled shortly thereafter), he estimated these pieces to have a collective value of over $500,000.

### D.  Winick's Gambling Losses

At trial, Winick sought to excuse his non-payment of taxes on the ground that it was largely the product of his gambling addiction. He testified that his gambling losses amounted to "95%" of his spending during the five years at issue—a gross exaggeration, as his gambling losses during those years totaled only about half his overall spending. Nevertheless, there is no question that Winick had a serious gambling problem. He testified that he had been an active gambler since age 18 or 19, and it appears that the amounts he spent and lost at casinos snowballed over the decades. From 2012 through 2016, he incurred total gambling losses of about $11.8 million—an average of more than $2 million of losses per year.[5]

How did Winick manage to lose such a staggering sum? Each week, from Memorial Day to Labor Day, he spent a three-day weekend at the Mohegan Sun casino and resort in Connecticut. During the colder months, he took periodic week-long trips to casinos in the Bahamas. On each of these trips, he brought a check in a pre-determined amount—generally $200,000 to $250,000 for his weekend trips and $500,000 for his Bahamas trips. His game of choice was Blackjack, and his standard bet was $10,000 per hand. Remarkably, it appears that, on most—perhaps the great majority—of his gambling trips, he lost the entire sum he had brought with him. Only on rare occasions did he come away from a gambling trip having made a profit. While the testimony at trial sheds little light on why this was so, the likeliest answer appears to be that his consistent

---

[5] Winick's gambling losses appear to have peaked during this five-year period. He testified that, in 2017, he concluded he could no longer afford gambling losses of the magnitude he had been incurring, and he therefore resolved to cut back on his gambling. He accomplished this by instructing his firm, in 2017 and again in 2018, to withhold the taxes he owed on his commissions, thereby limiting the amount of cash he had available to bring to casinos. And in 2019, he testified, he concluded that he could no longer afford to gamble at all, and he therefore quit gambling altogether. Other than this cursory explanation—that he could no longer afford to gamble—neither Winick nor any other witness provided any explanation of how he managed to kick the gambling habit that, until then, had played such an outsized role in his life.

practice was to continue gambling, through both ups and downs, until he had lost the entire gambling stake he had brought for the trip.

At trial, Winick presented the expert testimony of Dr. Jeremiah Weinstock, a professor of psychology at St. Louis University and an expert on gambling disorders. Based on his interview of Winick and his review of the factual record of this case, Dr. Weinstock testified that Winick's gambling was the product of a gambling disorder and therefore should be considered "non-volitional." At the same time, Dr. Weinstock acknowledged that Winick was able to set and follow a few rules to limit the amount of his gambling losses (albeit not very successfully during the years at issue in this suit). Specifically, Dr. Weinstock testified, Winick had two principal "harm reduction strategies." First, he refused to gamble on credit, even when the casino offered to extend credit to him. Second, he limited the amount of money he could lose on each gambling trip by only bringing a pre-determined sum with him. Once he had lost the fixed sum he had brought for the trip, he would stop.

The Government, in response, presented the expert testimony of Dr. Ilene Zwirn, a forensic psychiatrist in New York City. Like Dr. Weinstock, she interviewed Winick and reviewed the factual record in this case. Dr. Zwirn testified that, while she agreed with Dr. Weinstock that Winick suffered from a gambling disorder, she disagreed with Dr. Weinstock in two principal respects. First, she characterized Winick's gambling disorder as mild, in contrast to Dr. Weinstock's testimony that it was moderate. Second, Dr. Zwirn concluded that, because Winick's gambling disorder did not deprive him of the ability to place limits on his gambling, his gambling should be considered volitional.

At bottom, the two experts' disagreements as to what labels to apply to Winick's behavior—whether his gambling disorder was moderate or only mild, and whether this rendered his behavior "non-volitional"—are of little moment. More important than these disagreements is

an undisputed fact, which both experts acknowledged: Winick's behavior in the years before 2012, as well as the years after 2016, confirms that he had the ability to arrange his affairs in a way that enabled him to pay his taxes in full, notwithstanding his gambling disorder. All it took was for him to instruct his firm to withhold not just a portion of his salary, but also the portion of his commissions on which he was required to make estimated tax payments. By this simple device, which he employed from 2006 through 2011 and then again in 2017 and 2018, he was able to rein in his compulsion to gamble to the extent necessary to comply with his tax obligations.

Neither Dr. Weinstock nor Winick suggested there was any medical or other reason why Winick could not have employed this same device during the years at issue in this suit. (For example, Winick did not get professional help for his gambling addiction at any time.) Had he simply chosen to withhold or pay estimated taxes on his commission income in the years at issue, as he had done from 2006 through 2011 and again did in 2017 and 2018, there is every reason to believe he could have paid his federal taxes as they came due. Stated differently, he could have paid his federal taxes in full every year had he simply chosen to comply with the law, which required him—like any taxpayer—to pay estimated taxes on his non-salary income.

**E.  Facts Relevant to the Government's Claims Under Bankruptcy Code § 727**

In addition to seeking a determination that Winick's taxes for 2012 through 2016 are exempt from discharge, the Government claims that Winick's discharge should be denied altogether on two independent grounds. First, shortly before his bankruptcy filing, he allegedly made an intentionally fraudulent transfer of his interest in a valuable LLC to a friend and former business colleague, David Berley, thereby warranting denial of discharge under Bankruptcy Code § 727(a)(2). Second, the Government alleges that Winick fraudulently misstated the value of his two Rolex watches on his bankruptcy schedules, thereby warranting denial of discharge under Code § 727(a)(4). The Court's findings of fact as to these two claims are set forth in turn below.

### 1.  Winick's July 2020 transfer of the LLC Interest to David Berley

The Government's claim under Code § 727(a)(2) relates to Winick's ownership of an equity interest (the "LLC Interest") in an LLC by the name of SDSDR111 LLC. That LLC was formed under Delaware law for the purpose of owning and operating an interest in a retail condominium located at 545 West 111th Street in Manhattan. For a number of years, the basement part of that retail space was occupied by Duane Reade, one of Winick's principal clients.

In January 2015, Winick approached his friend David Berley for a loan. Winick has described Berley as a "good friend," and Berley testified at his deposition that the two had been friends for over 20 years. Winick and Berley also had a longstanding business relationship, under which Berley's company, Walter & Samuels, paid Winick Realty commissions for commercial real estate services. In response to Winick's request, Berley agreed to loan him $500,000, and Winick pledged a "first-priority lien" on the LLC Interest as collateral for this loan. Berley filed UCC financing statements reflecting this security interest with the New York Department of State in January 2015 and again in August 2015. Over the next several years, Berley continued to extend additional credit to Winick, increasing the balance of his secured loan to more than $1.6 million. Winick made some interest payments, but no principal payments, on the loan. In January 2020, Berley renewed his UCC financing statement.

At the time Winick purported to pledge a first-priority lien on the LLC Interest to Berley, the IRS had already recorded a lien on all of Winick's assets, including the LLC Interest, in May 2014. The Government contends that Winick was aware of the IRS's lien, because it sent him a notice of the lien by certified mail in May 2014. Winick testified that he did not recall receiving the notice, but there is no indication that it was returned as undeliverable. The IRS also notified Winick's accountants of its lien in 2014, both before and after the IRS recorded the lien. In later years, the IRS recorded additional liens on Winick's assets on account of his underpayment of

taxes for the years 2013 through 2016. On a number of occasions during the years 2015 through 2018, the IRS sent him notices of these later liens.

The IRS was aware of Berley's competing lien. For example, it received a copy of Berley's 2015 UCC financing statement in March 2018. The IRS never contested Berley's lien or attempted to clarify the priority of its 2014 lien over Berley's lien at any time before Winick's bankruptcy filing. The Government contends that it was barred from doing so by the pendency of Winick's installment agreements and offer-in-compromise, and Winick has not contested that assertion.

In 2018, with Winick once again in need of cash, Berley made a second loan to him—this time an unsecured loan in the amount of $250,000. Berley's lawyers drafted, and Winick and Berley executed, a loan agreement, which authorized Berley's firm,  Walter & Samuels, to withhold commission payments that it owed to Winick Realty if needed to satisfy Winick's obligations under this loan. In February 2020, Berley employed this provision of the agreement, directing Walter & Samuels to withhold $250,000 of the commission payments it owed Winick Realty, thereby repaying this loan.

In June 2020, with his real estate brokerage business effectively shuttered due to the onset of the COVID pandemic, Winick began to contemplate a potential bankruptcy filing. At around the same time, Berley grew increasingly concerned about his ability to obtain repayment of his 2015 loan to Winick, the balance of which had grown to more than $1.65 million. In July 2020, Berley, through counsel, declared a default and demanded full payment of the loan. In light of Winick's limited cash resources, Berley proposed that Winick transfer the LLC Interest to him in full satisfaction of the loan. Berley's lawyers drafted a letter of consent to this transfer, which Winick counter-signed. In late July 2020, about a month before he filed for bankruptcy, Winick transferred the LLC Interest to Berley in full satisfaction of the loan.

At the time of this transfer, a valuation of the LLC Interest had not been done for several years. The most recent valuation, performed in 2017, had found the LLC Interest to be worth $2.5 million. Subsequently, in 2021, Winick obtained a valuation of the LLC Interest as of July 31, 2020 for tax purposes. That valuation estimated that the fair market value of the LLC Interest at that time—at the height of the COVID pandemic in New York City—was only $240,000, less than 10% of its 2017 value.

Winick testified at trial that, when he transferred the LLC Interest to Berley in July 2020, he did not recall that the IRS had obtained a lien on that interest prior to his 2015 pledge of the interest to Berley. He testified that, at the time of the July 2020 transfer, he was 70 old and had other pressing issues on his mind, such as whether his business would survive the COVID-19 pandemic and whether he might have to file for bankruptcy. Winick also testified that he and Berley never discussed the bankruptcy filing, and that he never told Berley to call a default on the loan. Berley testified, similarly, that he did not know of Winick's plans to file for bankruptcy, and that taking the interest in satisfaction of the loan was his idea, not Winick's.

Winick did not take any steps to conceal his transfer of the LLC Interest from his creditors. In the schedules he filed with his chapter 7 petition, and also in his testimony at the section 341 meeting of creditors, he disclosed the transfer. He also cooperated with the chapter 7 trustee's requests for information regarding the LLC Interest.

As discussed further in Point II.A below, the Court finds that the Government has failed to show that Winick transferred the LLC Interest to Berley with the intent to hinder, delay or defraud his creditors.

### 2. Winick's misstatement of the value of his two Rolex watches

When Winick filed for bankruptcy in August 2020, he filed a number of schedules along with his chapter 7 petition. On his schedule of assets (Schedule A/B), he listed assets with a total

24

value of only $530,000, including $30,000 in personal and household items. The personal items listed included two Rolex watches, to which he ascribed a combined value of $5,000.[6] In November 2020, just three months later, the chapter 7 trustee obtained an appraisal of these two watches which valued them at $47,500—almost ten times the value Winick had supplied.

The Government contends that Winick knew these watches were worth much more than $5,000 but valued them at that amount in an attempt to dupe the chapter 7 trustee into letting him keep the watches as exempt property. At minimum, the Government claims, Winick was reckless in valuing the watches at $5,000. It points to the fact that, in 2015, Winick took out an insurance policy that covered more than 20 luxury watches, most of which were Rolexes and almost all of which were worth more than $10,000 each. In addition, Winick had once publicly described himself as a Rolex collector, in a promotional interview for an article in an online real estate publication, *The Real Deal*. Finally, the Government submitted evidence of sample online searches, which indicated that an online search for the prices of similar Rolex watches would have shown that the combined value of the two watches greatly exceeded $5,000.

Winick testified that he had no idea what his two Rolexes were worth. While he had once owned a dozen or more Rolex watches, he had never purchased or sold any of them. Instead, he had acquired all of his watches with casino points—a by-product of the massive sums he spent gambling at casinos[7]—and he had subsequently given away all but the two he still owned, primarily to his daughter. Moreover, he only taken out a jewelry insurance policy once, in 2015,

---

[6] Winick's asset schedule also listed interests of "unknown" value in two businesses: a 22.5% ownership interest in Winick Realty Group and a 60% ownership interest in WTN Realty Corp. As previously noted, Count II of the Government's complaint alleged that his listing of the value of these business interests as "unknown" was an additional "false oath," and the Court granted summary judgment dismissing that portion of Count II. The Court found that, at time Winick filed his petition and schedules—in August 2020, at the height of the COVID pandemic in New York City—it was neither false nor fraudulent for him to have listed the value of his two local real estate businesses as unknown.

[7] Winick's daughter and his friend David Berley corroborated his testimony on this point. They each testified at deposition that Winick's watch collection was entirely a byproduct of his gambling.

and he cancelled that policy after six months. He testified that, when he filed his petition five years later, he did not remember that insurance policy or the amounts for which the watches were insured. Moreoever, he had never received an appraisal of any of his watches. Finally, when the chapter 7 trustee told Winick he wanted to obtain an appraisal of the two watches he had listed, he cooperated fully with the trustee.

Most important, Winick testified that the value he ascribed to the two Rolexes on his asset schedule was based on the advice of his bankruptcy counsel, Steven Wilamowsky. Specifically, Winick testified that he told Wilamowsky he didn't know what the Rolexes were worth, and in response, his counsel advised him to put down $5,000 as a placeholder value. Wilamowsky's deposition testimony, submitted into evidence at trial, was similar, although not identical: He testified that he told Winick it wasn't necessary to get an appraisal or otherwise attempt to value the watches, because whatever value he put down, the chapter 7 trustee would obtain an appraisal of his own. In Wilamowsky's words, after "kind of pushing [him] to give a value for the watches," he told Winick to put down his "best estimate" or "best guess" at the watches' value, because "there's no way in hell [the trustee is] going to take your word for it."[8]

As discussed further in Point II.B below, the Court finds that, although Winick acted recklessly in listing his two watches as having a combined value of $5,000, the Government has failed to show that, in so doing, Winick acted with an intent to deceive the chapter 7 trustee.

---

[8] Previously, in the declaration he submitted in support of his pre-trial summary judgment motion, Winick had given a version of events that largely matched Wilamowsky's deposition testimony. His declaration stated that he, not Wilamowsky, came up with the $5,000 figure after Wilamowsky "told [him] to put [his] best estimate as to the value of [his] Rolex watches." Dkt. No. 42, ¶ 32.

**D**ISCUSSION

**I.   Winick Willfully Attempted to Evade His Tax Obligations, Rendering Them Exempt From Discharge Under Bankruptcy Code § 523(a)(1)(C)**

An individual debtor does not receive a discharge for an income tax debt "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). The creditor to which the tax is owed bears the burden of proving by a preponderance of evidence that this standard is met. *In re Boyer*, 328 F. App'x 711, 714 (2d Cir. 2009). Moreover, "[e]xceptions to discharge are construed liberally in favor of the debtor and strictly construed against the objecting creditor." *Gomez-Cuevas v. Barrios (In re Barrios)*, 2007 WL 2406881, at *2 (Bankr. S.D.N.Y. 2007); *see also Kawaauhau v. Geiger,* 523 U.S. 57, 62 (1998) ("exceptions to discharge 'should be confined to those plainly expressed.'" (internal citation omitted)).

**A.  The *Tudisco* Standard**

The Second Circuit addressed the specific standards governing a section 523(a)(1)(C) claim in *In re Tudisco*, 183 F.3d 133 (2d Cir. 1999). The court there held that a plaintiff asserting such a claim must prove two elements: "a conduct element (an attempt to evade or defeat taxes) and a *mens rea* requirement (willfulness)." 183 F.3d at 136.

With respect to the first of these two elements, the court of appeals declined to decide whether "simple nonpayment" of taxes was sufficient by itself to satisfy the conduct requirement. *Id.* The court observed that, while "[m]ost circuits have held that a simple nonpayment of taxes does not satisfy § 523(a)(1)(C)'s conduct requirement," *id.* (citing *Haas v. IRS (In re Haas)*, 48 F.3d 1153, 1156 (11th Cir. 1995)), at least one circuit had disagreed, finding "culpable omissions" sufficient by themselves satisfy this requirement, *id.* at 137 (citing *In re Bruner*, 55 F.3d 195, 200 (5th Cir. 1995)). Because the debtor in *Tudisco* had committed affirmative acts to evade his tax obligations, *see id.* (debtor had failed to file tax returns and had submitted a "patently false"

27

affidavit to his employer to avoid income tax withholding), the court saw no need to rule on whether mere non-payment of taxes would have satisfied the conduct requirement.

For the second element of the legal standard, the *mens rea* element, the Second Circuit required nothing more than a showing that "the debtor's conduct be undertaken voluntarily, consciously or knowingly, and intentionally." *Id*. This standard was met*,* the court held, by the bankruptcy court's finding that the debtor "knew he had to pay taxes." *Id.*

In the quarter century since *Tudisco*, few courts in this District have had occasion to address the issue *Tudisco* left unresolved, namely, what affirmative acts, if any, beyond mere non-payment of taxes are required to satisfy the conduct element of Code § 523(a)(1)(C). The leading post-*Tudisco* decision in this District, *In re Lynch*, 299 B.R. 62 (Bankr. S.D.N.Y. 2003), set a relatively low bar, holding that the conduct requirement was satisfied by the debtor's decision to prioritize spending on "non-essentials" ahead of her payment of taxes. *Id.* at 64-65.

In *Lynch*, Judge Gerber conducted a detailed review of the debtor's discretionary spending to determine whether the debtor, after incurring unpaid taxes, continued to make "luxury" expenditures "without any discernible effort at belt-tightening," and concluded that the debtor had violated section 523(a)(1)(C) by making substantial non-essential expenditures. 299 B.R. at 84 (internal citations omitted). The debtor's "knowing conduct" included "spending money on a Central Park West Apartment at a cost of more than $6,000 per month; eating dinner in restaurants four days a week; traveling considerably, to California, China and Paris; running up credit card bills; and making huge gratuitous transfers to her church, all ahead of payment of the back taxes due." *Id.* at 85-86. Because the debtor "elected to spend her money elsewhere and not to satisfy

her tax obligations—especially when she had the ability to easily pay them in full," the court held that she willfully evaded her taxes. *Id*. at 86.[9]

More recent cases in this Circuit have not needed to decide the issue left open by *Tudisco*, as the debtor in each case engaged in affirmative acts of evasion, in addition to spending on non-essentials. *See, e.g.*, *Narine v. U.S. (In re Narine)*, 2024 WL 2947604, at *7 (Bankr. E.D.N.Y. 2024) (Mazer-Marino, J.) (deliberate non-disclosure of income, coupled with failure to timely file six years of returns); *Haesloop v. U.S.*, 2000 WL 1607316, at *6 (Bankr. E.D.N.Y. 2000) (Swain, J.) (debtor failed to timely file tax returns for three years, failed to make required estimated tax payments, and took "deliberate steps to avoid accumulating assets that could be seized to satisfy his liabilities.").

A 2014 decision by the Ninth Circuit, *Hawkins v. Franchise Tax Bd. of Cal.*, 769 F.3d 662 (9th Cir. 2014), casts some doubt on the continuing validity of *Lynch*'s holding that mere spending on non-essentials is sufficient to render taxes exempt from discharge under Bankruptcy Code § 523(a)(1)(C). The Ninth Circuit conducted a rigorous analysis of the text, statutory context and legislative history of section 523(a)(1)(C)—the sort of statutory construction exercise the Supreme Court has repeatedly demanded in the 25+ years since *Tudisco* was decided. *See Hawkins,* 769 F.3d at 666-69. Based on its review of "the structure of the statute as a whole, including its object and policy, legislative history, case precedent, and analogous statutes," *id.* at 668-69, the court

---

[9] The court also found that the debtor had committed at least one affirmative act to evade her taxes: cancelling her direct deposit shortly before the IRS was to begin garnishing her salary. *See id.* at 76. However, Judge Gerber did not rely on this finding to conclude that the debtor willfully attempted to evade or defeat her taxes. *See id.*at 64, 77, 86.

Judge Gerber's *Lynch* decision relied heavily on a pre-*Tudisco* decision by Judge Mukasey, *In re Wright*, 191 B.R. 291, 293 (S.D.N.Y. 1995). There, Judge Mukasey had set a similarly low bar for violations of Code §523(a)(1)(C), holding that "it is not necessary to prove that the debtor was inspired by 'bad purpose or evil motive' in failing to pay his taxes"; instead, "[i]t is enough if the debtor 'had the wherewithal to file his return and pay his obligation,' but 'voluntarily, consciously, and intentionally' decided to pay other creditors instead." *Id.* (quoting *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994), *cert. denied*, 513 U.S. 987 (1994)). It bears note that, in *Wright*, as in *Lynch*, the court found the debtor had committed affirmative acts of evasion that would have satisfied a more stringent standard. *See id.* at 295 (debtor "adroitly manipulated his personal finances so as to thwart IRS attempts to collect the taxes he owed").

concluded that these considerations mandated a narrow construction of the statute's "willful evasion" standard:

> [A] mere showing of spending in excess of income is not sufficient to establish the required intent to evade tax; the government must establish that the debtor took the actions with the specific intent of evading taxes.

*Id.* at 669; *see also id.* ("[I]f simply living beyond one's means, or paying bills to other creditors prior to bankruptcy, were sufficient to establish a willful attempt to evade taxes, there would be few personal bankruptcies in which taxes would be dischargeable.").

*Hawkins* raises the bar on the rigor of the analysis that will be needed to resolve the legal issue left open by *Tudisco*. Any court that wishes to wade into this debate will need to grapple with the Ninth Circuit's specific arguments concerning the text, statutory context and legislative history of Bankruptcy Code § 523(a)(1)(C). The ultimate outcome of this issue in our Circuit remains to be seen.[10]

## B.  Under Either a Narrow or a Broad Application of the *Tudisco* Standard, Winick Willfully Attempted to Evade His Tax Obligations

The facts of this case do not require the Court to decide the legal issue left open by *Tudisco*—namely, whether a debtor's decision to prioritize spending on non-essentials over

---

[10] The specific holding of *Hawkins*—that the debtor must have acted "with the specific intent of evading taxes," *id.* at 669—is contrary to the Second Circuit's holding that the statute's *mens rea* element is satisfied by a mere showing that the debtor "knew that he had to pay taxes," *Tudisco*, 183 F.3d at 137. Nevertheless, the Ninth Circuit's broader point—that the statutory term "willful evasion" must mean more than mere willful non-payment of taxes—could readily be applied, in this Circuit, to the conduct element of the statute. Specifically, a court that found the *Hawkins* point persuasive could rule that the debtor's conduct must include some affirmative act of evasion, thereby resolving the issue left open by *Tudisco.*

The Court suspects that, in the great majority of cases—as in *Tudisco* itself and the other cases just discussed—the court will not need to decide the unresolved *Tudisco* issue. For starters, any tax for which a return is due within three years before the debtor files for bankruptcy is automatically exempt from discharge. *See* 11 U.S.C. §§ 523(a)(1)(A) & 507(a)(8)(A)(i). Thus, for "willful evasion" under Code § 523(a)(1)(C) to be at issue, the debtor will need to have failed to pay his taxes for at least three years before bankruptcy. As the present case illustrates, it is often difficult for a taxpayer, particularly one with a high level of income, to fall and remain behind on his federal taxes for a protracted period of time without violating Internal Revenue Code rules designed to ensure current payment of income taxes, such as the withholding and estimated tax requirements—thereby committing affirmative acts of evasion that go beyond mere spending on non-essentials.

payment of his taxes is sufficient by itself to satisfy the conduct element, or whether affirmative acts to evade taxes are also required. Whatever the standard, Winick's conduct clearly renders his tax debts exempt from discharge.

### 1. Winick spent lavishly on non-essentials

Winick's spending readily satisfies the standard applied in *Lynch:* that the debtor prioritized spending on non-essential items over payment of his taxes. To be sure, almost half of Winick's expenditures during the five tax years at issue consisted of the $11.8 million he incurred in gambling losses, which he claims were "non-volitional." But even apart from his gambling losses, he spent lavishly on non-essential expenditures.

Winick's total taxable income during the five years from 2012 through 2016 was $23.8 million—an average of $4.75 million per year. He paid only $2.6 million in taxes during those years (the amount his firm withheld from his salary), leaving him a total of $21.2 million after taxes. Even if his gambling losses were disregarded on the ground that they were non-volitional, this would still mean that he chose to spend $9.4 million during these years ($21.2 million less $11.8 million)—an average of almost $1.9 million per year—on expenditures other than taxes. As detailed above, his personal expenditures included a host of items that few people would label "essential": up to $18,000 a month in rent for a succession of Sutton Place apartments for himself, plus additional rent for separate apartments for his ex-wife and his daughter; about $180,000 a year in rent for his Southhampton vacation home; more than 30 international trips for pleasure; high-end shopping trips for his ex-wife, his ex-girlfriend and his daughter; and lavish gifts to his daughter, including hundreds of thousands of dollars of jewelry, $85,000 in cash, and the payment of more than $600,000 in life insurance premiums for her benefit.

It may be true, as his lawyers argued, that there was "nothing out of the ordinary" about Winick's expenditures when compared to those of his high-income peers. But people of all incomes

31

and stations in life are required to pay the taxes they owe each year, even when that puts a crimp in the spending to which they are accustomed.

In any event, there is no good reason to exclude Winick's gambling losses from the tally of his discretionary expenditures. As noted above, it is undisputed that he was able to limit his gambling sufficiently to pay his taxes in full when he felt it was necessary to do so. During the years 2006 through 2011, and again in 2017 and 2018, he accomplished this feat by the simple device of instructing his firm to withhold taxes not just from his salary, but also from his commission income. By simply paying a proper amount of estimated tax each quarter—as the law required—he ensured that, when his gambling compulsions took over, he would only have access to his post-tax earnings. In other words, this practice ensured that he would only be able to gamble with his own money, not with the government's money. There is no apparent reason, medical or otherwise, why Winick could not done the same thing during the years from 2012 through 2016.

## 2.  Winick took multiple affirmative steps to evade his taxes

The Court need not decide whether Winick's excessive spending on non-essentials would be sufficient, by itself, to find a violation of Bankruptcy Code § 523(a)(1)(C), because his culpable conduct went far beyond mere non-payment of taxes. Beginning in 2012, Winick stopped paying estimated taxes on the millions of dollars a year he earned in commissions, even though he knew he was required to pay estimated taxes on this income. This behavior—choosing not to pay estimated taxes on millions of dollars of income—was a knowing violation of the federal tax laws, an affirmative act that constituted a willful evasion of his tax obligations.

Moreover, when the IRS informed him, in early 2014, that it intended to record a tax lien against all of his assets, he directed his accountant to deceive the IRS—to falsely tell them that he had no income subject to estimated tax and therefore was in compliance with his estimated tax obligations for the year. In 2015, he directed his tax lawyer to tell the IRS the same thing. Each

time, the statement was an outright fabrication, and each time, the source of the lie can only have

been Winick himself. Through these lies, he induced the IRS to enter into two successive

installment agreements, which together precluded the IRS from taking any action to seize his assets

or garnish his income for a total of three years. At trial, Winick denied any responsibility for these

falsehoods, but it is clear that this denial was yet another falsehood.

And this is not all. At the same time that Winick was choosing to pay no tax on millions of

dollars of income each year and lying to the IRS to prevent it from taking enforcement actions, he

was taking steps to make himself largely judgment-proof. Some of this was behavior that went

back a decade or more: his choice to rent, rather than own, his Southampton vacation home and

the three apartments for himself, his ex-wife and his adult daughter, as well as to lease the multiple

Mercedes he drove. But Winick also took new steps to divest himself of his remaining assets.

During the last four months of 2012, after he stopped paying his estimated taxes, he transferred

assets worth at least $4 million, and perhaps substantially more, to his daughter for no

consideration, through a series of transactions that bore the hallmarks of intentional fraudulent

transfers. He also gave away more than 40 pieces of jewelry, collectively valued at more than

$500,000, to his daughter and others, in addition to giving his daughter an $85,000 cash gift and

paying more than $600,000 in life insurance premiums for her benefit. Courts have held that

"transfer[ing] property for little to no consideration" is "conduct covered by § 523(a)(1)(C)." *In re

Griffith*, 206 F.3d 1389, 1396 (11th Cir. 2000), *cert. denied*, 531 U.S. 826 (2000); *see also

Haesloop*, 2000 WL 1607316, at *6 (finding willful evasion of taxes by debtor who, among other

things, "deliberately structured his lifestyle and assets so as to preclude any meaningful attempt

by the IRS to collect on the tax debt other than through pursuit of his future income.").

To be sure, the record is not devoid of facts that weigh in Winick's favor. Unlike the debtor

in *Tudisco*, Winick always filed accurate and timely tax returns with the IRS. See *Tudisco*, 183

F.3d at 137, 139 (debtor repeatedly failed to file tax returns). In addition, Winick may well have had some legitimate reasons, as well as illegitimate ones, for entering into his three installment agreements with the Government. He did make a total of 43 payments, totaling $1.94 million, to the IRS from 2014 through 2020—a significant achievement, which distinguishes his case from some other cases involving willful evasion of taxes. He may well have believed that, as he testified, his financial fortunes would one day take a turn for the better—his brokerage business would rebound or he would make a "big score" at the casinos—and he would then be able to repay his back taxes, as he had done once before. But a hope of this sort is little different from that of many Ponzi artists and other fraudsters who rationalize their wrongs by telling themselves they will one day repay their victims. Such hopes are no excuse for fraud—and in this case, any hopes and good intentions Winick may have had are no excuse for his repeated and willful choice to gamble with the government's money and then flout the tax laws and lie to the IRS to prevent it from taking steps to collect his back taxes.

## II.    The Government Has Shown No Basis to Deny Winick a Discharge Under Section 727(a)(2) or Section 727(a)(4)

In addition to seeking an exemption from discharge for the taxes it is owed for the 2012 through 2016 and 2019 tax years, the Government asks the Court to deny Winick's discharge altogether on two independent grounds: that (i) shortly before his bankruptcy filing, he made an intentionally fraudulent transfer of a valuable LLC interest to David Berley, his friend and business colleague (Code § 727(a)(2)); and (ii) on his bankruptcy schedules, he fraudulently misstated the value of his two Rolex watches (Code § 727(a)(4)).

Claims under section 727 must surmount a high bar. As the Second Circuit has repeatedly held, Code § 727 "'impos[es] an extreme penalty for wrongdoing,' which 'must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt.'" *In re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006) (quoting *State Bank of India v. Chalasani (In re*

*Chalasani*), 92 F.3d 1300, 1310 (2d Cir. 1996)); *see also* CHARLES J. TABB, LAW OF BANKRUPTCY § 10.1 at 943 (5th ed. 2020) ("Denial of discharge . . . is a draconian 'lose-lose' situation for debtors," who "still must turn over all of [their] nonexempt property for distribution to creditors.").

Based on the facts adduced at trial, the Court finds that the Government has not proved sufficient facts to surmount the high bar faced by its section 727 claims.

### A. The Government Has Not Shown That Winick's July 2020 Transfer of His LLC Interest to Berley Was an Intentional Fraudulent Transfer

Bankruptcy Code § 727(a)(2) provides that the debtor shall not receive a discharge if "the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . (A) property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). Under this section, a debtor is denied a discharge if "(1) the debtor transferred property; (2) said property belongs to the debtor; (3) the transfer occurred with actual intent to hinder, delay, or defraud; and (4) the transfer occurred within one year prior to filing for bankruptcy." *In re Kablaoui*, 196 B.R. 705, 708 (Bankr. S.D.N.Y. 1996). The Government bears the burden of proving by each of these elements by a preponderance of evidence. *Id.*

There is no dispute that Winick's July 2020 transfer of the LLC Interest to Berley satisfies three of these four elements: It was a transfer of Winick's property made less than a year before he filed for bankruptcy. The only contested element is element (3), which requires a showing of actual intent to hinder, delay or defraud. While this element "may be satisfied from the facts and circumstances of the case," *id.* at 709, "[t]he intent must be actual, as distinguished from constructive, intent," *id*. Because "[f]raudulent intent is rarely susceptible to direct proof," parties may instead rely on "'badges of fraud' to establish the requisite actual intent to defraud." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (internal citations omitted). These badges of fraud include:

35

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*In re Kaiser*, 722 F.2d at 1582–83.

Having no direct evidence of fraudulent intent, the Government relies on a "badges of fraud" analysis. It contends that Winick received less than fair value for the transfer (badge # 1); that Berley was a longtime friend and business associate of his (badge # 2); that Winick made the transfer shortly before filing for bankruptcy, at a time when he was in dire financial condition and had stopped making installment payments to the IRS (badge # 4); and that the transfer was part of a broader pattern of transfers by Winick intended to shield his assets from the IRS (badges # 5 and # 6). The Government also argues that Winick knew the IRS had a senior lien on all of his assets, including the LLC Interest.

The principal shortcoming of this badges of fraud analysis is the Government's failure to show that Winick received less than fair value for the transfer of the LLC Interest. It is undisputed that the balance of Winick's debt to Berley exceeded $1.65 million at the time of the transfer. The Government contends that the LLC Interest was worth more than that amount, but the only evidence it has offered to support that conclusion is an appraisal performed three years earlier, in 2017, which valued the LLC interest at $2.5 million. In contrast, Winick has presented an appraisal that valued the LLC Interest as of July 31, 2020—*i.e.*, within days of the transfer—and found it to be worth only $240,000. A contemporaneous appraisal of a property's value is usually more probative than one performed three years earlier; in this case, that is especially so, given the sharp drop in New York City real estate values that followed the onset of the COVID pandemic in the

spring of 2020. Moreover, while the Government contends Winick had an incentive to get a low-ball appraisal, it has made no attempt to show that the appraiser he hired was not independent or that his appraisal was procedurally or substantively flawed in any way. Finally, to find that Winick received fair value for the transfer, the Court need not find that Winick's appraisal was accurate, but merely that the LLC Interest was worth no more than $1.65 million at the time of the transfer— that is, that its value at the height of the COVID pandemic was at least one-third lower than it had been in 2017. Winick's appraisal amply supports this conclusion.

It follows that, when Winick transferred the LLC Interest to Berley in satisfaction of his $1.65 million debt, he received at least fair value, and maybe significantly more. It is black letter law that satisfaction of a debt, no less than receipt of property, constitutes value for purposes of fraudulent transfer law. *See* TABB, LAW OF BANKRUPTCY, § 6.34 at 590. Moreover, while a transfer of property in satisfaction of a debt is sometimes voidable as a *preferential* transfer, it does not generally constitute a *fraudulent* transfer. As the Second Circuit recently reiterated:

> [T]he requisite actual intent for purposes of § 548(a)(1)(A) [the Bankruptcy Code's intentional fraudulent transfer section] must be something more than just an intent to prefer one creditor over another. Thus, mere intent to prefer one creditor over another, although incidentally hindering or delaying creditors, will not establish a fraudulent transfer under section 548(a)(1).

*In re Fairfield Sentry*, 147 F.4th 136, 163 (2d Cir. 2025) (internal quotation marks and citations omitted).

By the same token, courts addressing discharge challenges under Bankruptcy Code § 727(a)(2)(A) have consistently held that "a mere preferential transfer, without more, is not the equivalent of a fraudulent transfer for purposes of an objection to discharge and would not constitute . . . evidence of actual fraud." *Dubrowsky v. Estate of Perlbinder (In re Dubrowsky)*, 244 B.R. 560, 576 (E.D.N.Y. 2000); *accord Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301,

307 (11th Cir. 1994) (reversing denial of discharge under § 727(a)(2)(A): "A mere preferential transfer . . . is not tantamount to a fraudulent transfer for the purposes of denying discharge").

Once it is recognized that there was nothing inherently fraudulent about Winick's transfer of the LLC Interest in satisfaction of his $1.65 million debt, it is equally apparent that the remaining badges of fraud asserted by the Government do not establish that Winick acted with fraudulent intent. These remaining badges amount to little more than that Winick paid off a debt he owed to a friend, shortly before he filed for bankruptcy and at a time when he was not paying other creditors. In other words, Winick made a preferential transfer to a favored creditor—something debtors routinely do before filing for bankruptcy.[11] Such debt repayments can be recovered under Bankruptcy Code § 547 if they meet the elements of a preferential transfer, *see* 11 USC § 547,[12] but the mere making of a preferential transfer does not warrant the denial of a debtor's discharge. If it did, a very large number of individual debtors would be stripped of a discharge on this ground.

The Government argues, finally, that Winick should be denied a discharge because he knew his transfer of the LLC Interest to Berley violated the IRS's rights as the holder of a senior lien on all of his assets, including the LLC Interest. This argument fails as a matter of both law and fact.

As a legal matter, the Government cites no authority, nor is the Court aware of any, for the proposition that a debtor who has knowingly converted a secured creditor's collateral—that is,

---

[11] While unnecessary to the Court's ruling, the Court finds that the Government has not shown that this transfer was motivated by Winick's friendship with Berley. To be sure, Berley had been a friend for many years, and he presumably would not have loaned money to Winick in 2015 or thereafter but for that friendship. But by 2020, that friendship may have become strained. Certainly Berley by that time was acting more like an arms-length creditor than like a friend. He retained counsel to assist him in obtaining repayment from Winick, and he then took formal legal steps both to call the default under the 2015 loan and to obtain repayment of his other loan to Winick out of the commissions his firm owed Winick's firm. As for Winick, he responded to Berley's demands by agreeing to make a transfer for which, as just discussed, he received more than fair value.

[12] The chapter 7 trustee filed suit against Berley in April 2024 on behalf of Winick's bankruptcy estate, seeking to recover the transfer of the LLC Interest as a fraudulent transfer pursuant to Bankruptcy Code §§ 544, 548 and 550 or, alternatively, as a preferential transfer pursuant to Code § 547. *Messer v. Berley (In re Winick)*, Ch. 7 Case No. 20-bk-11976, Adv. No. 24-01352. The outcome of that suit is not apparent from the docket.

transferred property subject to a lien in violation of the secured creditor's rights—should be denied a discharge for that reason. To be sure, there is ample case law holding that a debtor's conversion of a secured creditor's collateral may, in some circumstances, constitute "willful and malicious injury" that exempts *that one creditor*'s claim from discharge under Code § 523(a)(6). *See* TABB, LAW OF BANKRUPTCY, § 10.21 at 989 ("Literally thousands of § 523(a)(6) cases involve the conversion by the debtor of a secured party's collateral"); *see also* Charles J. Tabb, *The Scope of the Fresh Start in Bankruptcy: Collateral Conversions and the Dischargeability Debate*, 59 GEO. WASH. L. REV. 56 (1990) (analyzing the conversion-of-collateral case law under Code § 523(a)(6)). But giving such a remedy to a secured creditor whose rights have been violated is one thing (and not a remedy sought by the Government in this case); depriving a debtor of a discharge of the debts he owes to *all* creditors is a different remedy altogether, governed by a different section of the Bankruptcy Code. To the Court's knowledge, none of the thousands of decisions that address conversion of collateral under Code § 523(a)(6) have held that such conduct warrants denial of discharge under Code § 727(a)(2). At least, the Government has cited no such cases.

Moreover, the Government's arguments concerning the IRS's rights as a secured creditor fail as a matter of fact, as well as law, because the Government has not proved that Winick knowingly deprived the IRS of any such rights. In the first place, as far as can be told from the record, Winick's transfer of the LLC Interest to Berley did not hinder the IRS's ability to foreclose on its collateral. Under the UCC, "a security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest . . . ." N.Y. U.C.C. Law § 9-315(a)(1). Thus, even after the transfer, the Government continued to have a lien on the LLC Interest and could have foreclosed on it at any time. The Government has not argued otherwise, nor has it identified any way in which the transfer limited its rights or caused it any harm.

In addition, the Government has not shown that Winick knew the IRS's lien was senior to Berley's or that his transfer of the LLC Interest to Berley was in any way improper. The Government contends that Winick was on notice of the Government's lien, and the Court agrees: The IRS sent copies of its initial tax lien notice to both Winick and his accountant in 2014, and in later years, the IRS recorded additional tax liens (junior to Berley's lien) and sent copies of those notices to both Winick and his accountant. The Court is skeptical of Winick's testimony that, by 2020, he had forgotten that the IRS had a tax lien on all of his property. However, the Government's evidence falls short in a crucial respect: Nothing in the record supports a finding that Winick knew the Government's tax lien was *senior* to Berley's lien. In the first place, there no direct evidence that Winick knew this. More generally, there is no evidence that Winick, who is not a lawyer and has had no legal training of any sort, was familiar with the rules governing lien priority or other aspects of secured transactions. Thus, even if Winick knew, at the time of the transfer, that the IRS had obtained a lien on the LLC Interest before Berley acquired his lien, the Government has not shown that he knew the legal consequences of that fact, namely, that the IRS's lien was senior to Berley's.

For these reasons, the Court finds that the Government has not shown that Winick transferred the LLC Interest to Berley with the intent to hinder, delay or defraud his creditors. No basis exists to deny Winick a discharge under Bankruptcy Code § 727(a)(2)(A).

**B.  The Government Has Not Shown That Winick Intended to Deceive the Chapter 7 Trustee When He Misrepresented the Value of His Rolex Watches**

Section 727(a)(4) precludes a discharge if "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account." 11 U.S.C. § 727(a)(4)(A). The parties agree that, to prevail on its 727(a)(4)(A) claim, the Government must prove five elements: "(1) the debtor[] made a statement under oath; (2) the statement was false; (3) the debtor[] knew that the statement was false; (4) the debtor[] made the statement with intent to deceive; and (5) the

statement related materially to the bankruptcy case." *In re Moreo*, 437 B.R. 40, 61 (E.D.N.Y. 2010).

Winick admits that elements one and five are satisfied: He signed his schedules under oath, and his statement that his two Rolex watches were worth $5,000 related materially to his bankruptcy case. He disputes elements two, three and four: that this statement was false, that he knew it was false, and that he made the statement with intent to deceive.

The Court finds that the Government has proved element two: The $5,000 value that Winick ascribed to his two Rolex watches was false. It is undisputed that the chapter 7 trustee obtained an appraisal of these watches in November 2020, which valued them at $47,500—almost ten times the value Winick had listed three months earlier. Winick has not challenged the accuracy of that appraisal, nor has he provided any evidence to suggest that the market value of these watches increased at all, let alone almost ten-fold, between August and November 2020.

The application of elements three and four—the debtor's knowledge of falsity and intent to deceive—is less clearcut. These two elements are often considered in tandem. *See Moreo*, 437 B.R. at 62. In appropriate circumstances, a reckless indifference to the truth can be sufficient to sustain an action for fraud. *In re Kaiser*, 722 F.2d 1574, 1583 n.4 (2d Cir. 1983). At the same time, "[f]raudulent intent must be shown by actual, not constructive fraud." *Dubrowsky*, 244 B.R. at 571; *accord, e.g.*, *In re Georges*, 138 F. App'x 471, 472 (3d Cir. 2005) ("The objecting party must prove an 'actual intent on the part of the bankrupt to hinder, delay, and defraud his creditors.'" (quoting *In re Topper*, 229 F.2d 691, 692 (3d Cir. 1956)); 6 COLLIER ON BANKRUPTCY ¶ 727.04 (16th ed. 2025) ("[A] false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent."). As Judge Spatt held in *In re Dubrowsky*, "[t]he party objecting to the discharge must show that the information was omitted [or misstated] for the specific purpose of

perpetrating a fraud and not simply because the debtor was careless or failed to fully understand his attorney's instructions." 244 B.R. at 571–72.

In the unusual facts of this case, the Court finds that the Government has proved element three but not element four: It has shown that Winick acted with reckless indifference to the truth in stating that his watches had a combined value of $5,000, but it has not proved that he did so with intent to deceive.

Winick's statement was reckless, because he could have easily determined that it was false. Winick testified that he made no attempt to determine the value of his two watches by conducting an online search of Rolex watch values, or by consulting a jeweler or a luxury watch retailer, or by any other means. The sample online searches presented by the Government at trial make clear that an online search would have revealed that the combined value of Winick's two watches was much higher than $5,000. The Court believes Winick's testimony that he is not an expert on the value of Rolex watches and is not adept at online searches. Nevertheless, he has given no reason he could not have enlisted the help of his daughter or his lawyer in conducting an online search. Alternatively, he could have side-stepped this issue by scheduling the value of his two watches as "unknown." By ascribing a value to the watches that a quick investigation would have shown to be too low, Winick acted with reckless indifference to the truth.

However, the Government has not shown that, in scheduling his watches as having a $5,000 combined value, Winick acted with an intent to deceive. Winick gave this value for the watches on the advice of his bankruptcy counsel, Steven Wilamowsky. Specifically, Winick testified that he told Wilamowsky he didn't know what his Rolexes were worth, and in response, his counsel advised him to put down $5,000 as a placeholder value. To be sure, there is a discrepancy in the testimony concerning who came up with the $5,000 figure: According to Wilamowsky's deposition testimony (admitted into evidence at trial), as well as Winick's own summary judgment

declaration, Winick himself—not Wilamowsky—came up with this figure. But this discrepancy is a detail when compared to the central point, on which all of the testimony agrees: Wilamowsky told Winick it wasn't necessary to get an appraisal or otherwise attempt to value the watches. Instead, he could put down his "best guess" as to the watches' value, because whatever value he scheduled, the chapter 7 trustee would obtain an appraisal of his own.

If Winick were the only witness who provided this testimony, the Court might question its veracity. But Winick's counsel gave substantively identical testimony on this central point, and the Court has no reason to doubt that testimony. Winick's counsel, Steven Wilamowsky, was a well-regarded bankruptcy lawyer, who had no apparent motive to testify falsely on this issue.[13] Indeed, the Government, which took Wilamowsky's deposition, has not questioned the truth of his account.

In light of Wilamowsky's testimony, the Court cannot find that Winick acted with fraudulent intent when he scheduled his two Rolex watches as having a combined value of $5,000. "An explanation by the debtor that he acted on advice of counsel, who in turn was fully aware of all the relevant facts, generally rebuts an inference of fraud." *Dubrowsky*, 244 B.R. at 573; *see also, e.g.*, *In re Georges*, 138 F. App'x at 472 ("'[T]he advice of counsel may provide an excuse for an inaccurate or false oath.'") (quoting *In re Topper*, 229 F.2d at 693).

The Government contends that Wilamowsky was not aware of all relevant facts, such as the jewelry insurance policy for Winick's watches that was briefly in place in 2015, which had valued most of his watches at more than $10,000 each. But this overlooks that the dispositive legal advice on which Winick relied was not that he should value the watches at $5,000. Rather, as just

---

[13] Wilamowsky was a partner at Schiff Hardin (later ArentFox Schiff) at the time Winick commenced his chapter 7 case. He left the firm in October 2023 to become a managing director at Cerberus Capital Management, and he took no part in the trial of this case.

noted, the key advice was that it was okay to put down his "best guess" as to the watches' value, because the trustee would obtain his own appraisal in any event. Wilamowsky did not base this advice on any facts that Winick disclosed or could have disclosed to him; rather, he based it on his own decades of experience as a bankruptcy lawyer.

Wilamowsky's advice on this point may well have been bad advice. With the benefit of hindsight, Wilamowsky himself presumably regrets not having advised Winick to schedule the watches' value as "unknown." But a client is entitled to rely on his counsel's advice unless it is "transparently plain" that the advice is erroneous. *Dubrowsky*, 244 B.R. at 573; *accord Gobindram v. Bank of India*, 538 B.R. 629, 643 (E.D.N.Y. 2015); *see also In re Kempff*, 847 F.3d 444, 449-50 (7th Cir. 2017) (affirming denial of § 727(a)(4) discharge objection for debtor whose misstatements "resulted from either a misunderstanding or the 'utter incompetence' of [her] attorney."). Particularly for a layman like Winick with no bankruptcy experience, it was not evident, much less transparently plain, that Wilamowsky was wrong in telling him it did not matter what value he ascribed to the watches on his asset schedule.

The Government contends that Winick had a motive to undervalue the watches, on the hope that the trustee might allow him to keep them as exempt assets, but the Court does not find this argument persuasive. Particularly in light of Wilamowsky's advice that the trustee was sure to obtain his own appraisal, it would have been deeply irrational for Winick to have jeopardized the discharge of $10 million of debt to preserve a remote chance that the trustee might allow him to keep the two watches. *Cf. In re Varner*, 2015 WL 4039390, at *12 (Bankr. N.D. Ohio 2015) (finding it was unlikely that debtor would risk the ability to discharge $20 million of debts by intentionally failing to disclose gifts totaling around $6,500).

A final consideration is that the undervaluation of his two watches was the only material misstatement or omission that Winick made on his schedules and other bankruptcy filings. In many

cases in which the debtor is found to have made a "false oath" in violation of section 727(a)(4)(A), the debtor's filings are replete with false statements and omissions, and the courts give weight to this overall pattern in determining the debtor's intent. *See Dubrowsky*, 244 B.R. at 576 ("As the Second Circuit has recognized, fraudulent intent may be inferred from a series of incorrect statements [or omissions] contained in the schedules.") (citing *In re Diorio*, 407 F.2d 1330, 1331 (2d Cir.1969)). Winick, in contrast, did not fail to disclose any of his assets; other than undervaluing his watches, he filed complete and accurate schedules. He also cooperated fully with the chapter 7 trustee. This weighs in his favor on the intent determination. More broadly, the isolated and relatively trivial nature of his one misstatement—undervaluing two watches whose combined value was a tiny fraction of his overall assets and debts—weighs against imposition of the "extreme penalty" of denial of discharge, *Cacioli*, 463 F.3d at 234. This one misstatement would be a thin reed on which to base so drastic a remedy.

For these reasons, the Court finds that the Government has not shown that Winick acted with intent to deceive the chapter 7 trustee when he falsely listed his two Rolexes as having a combined value of $5,000. A denial of Winick's discharge under Bankruptcy Code § 727(a)(4)(A) therefore is not warranted.

## CONCLUSION

The Court concludes that (i) Winick's federal income tax liabilities for the years 2012 through 2016 are exempt from discharge under Bankruptcy Code § 523(a)(1)(C), and (ii) no basis

exists to deny Winick a discharge under Code §§ 727(a)(2) or 727(a)(4).

The Government shall settle a judgment in accordance with this decision on no less than five business days' notice by email. The time to appeal will run from the date of entry of judgment.

Dated: January 20, 2026
        New York, New York


                                    /s/ *Philip Bentley*
                                    Hon. Philip Bentley
                                    United States Bankruptcy Judge